No. 24-5536

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Knife Rights, Inc.; Eliot Kagan; James Miller; Garrison Ham; North County Shooting Center, Inc.; and PWGG L.P.,

Appellants,

v.

Rob Bonta, in his Official Capacity as Attorney General of the State of California, *et al.*,

Respondents.

Appeal from the U.S. District Court
for the Southern District of California
(Case No.: 3:23-CV-00474-JES-DDL), Hon. James E. Simmons, Jr., U.S.
District Judge, Presiding

## APPELLANTS' OPENING BRIEF

John W. Dillon (State Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road, Suite 105, No. 255
Carlsbad, California 92009
jdillon@dillonlawgp.com
Telephone: (760) 642-7150
Fax: (760) 642-7151

*Attorneys for Plaintiffs-Appellants Knife Rights, Inc., Eliot Kaagan, James Miller, Garrison Ham, North County Shooting Center, Inc., and PWGG L.P.*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, individual persons do not have to file a Disclosure Statement. Further, Appellants Knife Rights, Inc., North County Shooting Center, Inc., and PWGG L.P. have no parent corporation or any publicly held corporation that owns 10% or more of its stock.

By:    */s/ John W. Dillon*
          John W. Dillon

# TABLE OF CONTENTS

**Page**

Disclosure Statement ................................................................i

TABLE OF CONTENTS ...................................... ii

TABLE OF AUTHORITIES ..................................iv

INTRODUCTION ..........................................................1

I.    CONSTITUTIONAL AUTHORITIES........................................4

II.    JURISDICTIONAL STATEMENT ...........................5

III.   ISSUES PRESENTED FOR REVIEW ......................................6

IV.   STATEMENT OF THE CASE AND PROCEDURAL HISTORY ..........6

V.    SUMMARY OF ARGUMENT ................................10

VI.   STANDARD OF REVIEW ...................................13

ARGUMENT ..................................................................15

I.    The Ban Unquestionably Regulates Arms-Bearing Conduct—
and the Government Bears the Burden to Justify Its Regulation ..............16

II.    Appellants are Part of "The People" Under the Plain Text of the
Second Amendment ...................................................17

III.   Appellants' Proposed Conduct is Protected Because it Falls
Under the Plain Text of the Second Amendment ....................20

IV.   The Knives in Question are "Arms" Under the Plain Text of the
Second Amendment ...................................................21

V.    There is No Historical Justification For the State of California's
Ban on Automatically Opening Knives ...................................29

    A. Automatically Opening Knives are in Common Use Today ..............30

        (i)   Total Number Establishes Common Use ....................................32

        (ii)  Categorical Commonality Is Also Satisfied.................................36

        (iii) Automatically Opening Knives Are Common
            Jurisdictionally ...................................................38

    B. Automatically Opening Knives Are Not Both Dangerous

and Unusual Arms................................................................39

C. Appellees' Historical Arms Regulations Fail to Justify
The State's Ban on Automatically Opening Knives............................46

VI.    CONCLUSION ................................................................54

CERTIFICATE OF COMPLIANCE ................................................................55

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allen v. A.H. Robins Co., Inc.*, 752 F2d 1365 (9th Cir. 1985) .............14

*Altman v. Cty. of Santa Clara,*
   464 F. Supp. 3d 1106 (N.D. Cal. 2020) ........................................19

*Arakaki v. Hawaii*, 314 F.3d 1091 (9th Cir. 2002)...............................14

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ..............................13, 14

*Blue Lake Rancheria v. United States,*
   653 F.3d 1112 (9th Cir. 2011) .......................................................14

*Caetano v. Massachusetts*, 577 U.S. 411 at 420 ...........29, 30, 31, 33, 39

*City of Akron v. Rasdan*, 105 Ohio App.3d 164,
   663 N.E.2d 947 (Ohio Ct. App., 1995) ........................................26

*City of Los Angeles, Calif. v. Patel*, 576 U.S. 409 (2015) ..............14, 15

*Commonwealth v. Canjura,*
   494 Mass. 508, 240 N.E.3d 213 (2024) ..................................22, 23

*District of Columbia v. Heller*, 554 U.S. 570 (2008)....................*Passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)...........................9

*Fouts v. Bonta*, 718 F.Supp.3d 1276 (S.D. Cal. 2024).......22, 31, 45. 52

*Furman v. Georgia*, 408 U.S. 238 (1972)..............................................47

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ....................2, 39, 40

*Gamble v. United States*, 139 S.Ct. 1960 (2019) .................................47

*Griffin v. State*, 47 A.3d 487 (Del. 2012) .............................................26

*Haynie v. Harris*, No. C 10-01255 SI,
   2014 U.S. Dist. LEXIS 28293 (N.D. Cal. Mar. 4, 2014) ............19

*Heiniger v. City of Phoenix*, 625 F.2d 842 (9th Cir. 1980) ..................14

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) .....................................32

*In re S.C. v. S.C.,* 179 Cal.App.4th 1436 (2009)....................................8

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) .............................5

*Liberty Lobby, Inc. v. Rees*, 852 F.2d 595 (9th Cir. 1988)....................14

*Marsh v. Chambers*, 463 U.S. 783 (1983)............................................47

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...............3, 4, 30, 45

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .................................46

*New York State Rifle & Pistol Ass'n v. Bruen*,
     597 U.S. 1 (2022) ........................................................................*Passim*

*Ornelas v. United States*, 517 U.S. 690 (1996).....................................14

*People v. Bass*, 225 Cal.App.2d 777 (1963)..........................................49

*People v. Yanna*, 297 Mich. App. 137, 824 N. W. 2d 241 (2012) .........30

*Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
     F. 4th __, 2025 WL 340799 (5th Cir. Jan. 30, 2025).....................9

*Rocky Mountain Gun Owners v. Town of Superior*, Case No.
     1:22-cv-01685-RM-NRN, Doc. 18 (D. Colo. July 22, 2022).........29

*San Diego Cty. Gun Rights Comm. v. Reno*,
     98 F.3d 1121 (9th Cir. 1996).......................................................19

*State v. DeCiccio*, 315 Conn. 79, 105 A.3d 165 (2014) ...................23, 25

*State v. Delgado*, 298 Or. 395, 692 P.2d 610 (1984)...........23, 24, 25, 36

*State v. Griffin*, 2011 Del Super LEXIS 193, *26,
     2011 WL 2083893 (Del Super Ct., May 16, 2011) ......................26

*State v. Herrmann*, 366 Wis. 2d 312,
     873 N.W.2d 257 (2015)........................................................ 25-26

*State v. Montalvo*, 229 N.J. 300, 162 A.3d 270 (2017).........................26

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) ..............................................48

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017).........9, 19

*United States v. Oliver*, 41 F.4th 1093 (9th Cir. 2022)........................14

*United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024).............45

*United States v. Rahimi*, 602 U.S. 680 (2024) ..........................16, 17, 21

*United States v. Ramos*, No. 21-cr-00395-RGK-1,
   2022 U.S. Dist. LEXIS 222784 (C.D. Cal. Aug. 5, 2022) ...........18

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ...................11

*Virginia v. Moore*, 553 U.S. 164 (2008) ................................................47

**U.S. Code**

Section 1291 ...............................................................................................5

Section 1331 ...............................................................................................5

**U.S. Constitution**

Second Amendment....................................................................*Passim*

Fourteenth Amendment.............................................................4, 46, 48

Fourth Amendment.............................................................................47

Bill of Rights ...................................................................................47, 48

**Federal Rules of Appellate Procedure**

Rule 26.1 .................................................................................................. i

Rule 32(a)(5) and (6)..............................................................................55

Rule 32(g)(1)............................................................................................55

Ninth Cir. R. 32-1 ..................................................................................55

**California Penal Code**

Section 653k.............................................................................................8

Section 17235.............................................................................1, 7, 10, 42

Section 21510.........................................................................1, 7, 8, 10, 24, 42

Section 21590.........................................................................1, 7, 8, 10, 42

Section 18000...........................................................................1, 7, 8, 42

Section 18005...........................................................................1, 7, 8, 42

**Other Authorities**

Erickson, *Antique American Switchblades,* pp. 25-143.................. 33-34

Escobar, *Deadly Ingenuity: A History of Unusual Weapons From Around the World and Across Time* ...........................31, 44

Escobar, *Saps, Blackjacks, and Slungshots: A History of Forgotten Weapons* ...................................................44

Fallon, *Fact and Fiction About Facial Challenges*, 99 Cal. L.Rev. 915, 918 (2011) ......................................14

G.C. Neumann, *Swords and Blades of the American Revolution* 227 (1973) ...............................................23, 24

H.L. Peterson, *American Knives: The First History and Collector's Guide* 129 (1958) ...............................24

H. Peterson, *Daggers and Fighting Knives of the Western World* 12 (2001) ............................................25

Senate Report 1980 ......................................................32

# INTRODUCTION

Eliot Kaagan, James Miller, and Garrison Ham, individuals who desire to keep and bear automatically opening knives ("switchblades"); North County Shooting Center, Inc. and PWGG, L.P., bladed weapon retailers, on their own behalf and on behalf of their customer base; and Knife Rights, Inc. ("Knife Rights"), an organization advocating for knife rights under the Second Amendment, on its own behalf and on behalf of its members (collectively, "Appellants") brought summary judgment on their Second Amendment challenge to the State of California's ban on "switchblades."[1] The challenged laws state that "[e]very person" who publicly possesses, carries, sells, offers for sale, exposes for sale, loans, transfers, or gives a switchblade knife, as defined, is "guilty of a misdemeanor" punishable by fines, jail time, and probation conditions, and commits a "nuisance" subject to surrender, confiscation, and destruction. See Cal. Penal Code §§ 17235, 21510, 21590, 18000 and 18005. The Complaint challenged the laws at issue as infringing on their right to "keep and bear Arms" in violation of the Second Amendment. 15-ER-4054-4059. Appellants sought declaratory and injunctive relief to permanently restrain enforcement of the challenged laws, among other relief, and appeal the district court's order denying

---

[1] California Penal Code § 17235 defines "switchblade knife" to mean "a knife *having the appearance of a pocketknife* and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the writ or other mechanical devise, or is release by the weight of the blade or by any tope of mechanism whatsoever."

1

Appellants' motion for summary judgment and granting Appellee's motion for summary judgment. 15-ER-4060.

Bladed weapons have been used for warfare, utility tools, and offensive and defensive weapons for centuries, long before this Nation's founding. They represent the *original* "arms" commonly used for offense and defensive purposes, even before the introduction of firearms, and continue to be used today for lawful purposes. In fact, during the time in which the Second Amendment was ratified, bladed weapons (*e.g.*, swords, daggers, and knives) were the most commonly carried and used weapons for both offensive and defense purposes. As such, there is no question that a switchblade knife falls within the plain text of "Arms" under the Second Amendment. Indeed, the Supreme Court has already made clear that the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). In this Circuit, this includes *all arms* "commonly possessed by law-abiding citizens *for lawful purposes*." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (emphasis added), abrogated on other grounds by *Bruen*, 597 U.S. 1. Further, in *Heller*, the Supreme Court stated the Second Amendment protects weapons that are "'in common use at the time' for lawful purposes like self-defense" and that weapons "typically possessed by law-abiding citizens for lawful purposes" are within the scope of the Second Amendment. *Heller*, 554 U.S. at 625. Accordingly, though self-defense is "the core lawful purpose" protected by the Second Amendment (*Heller*, 554 U.S. at 630),

2

it is not the only lawful purpose that receives Second Amendment protection. *See also McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) ("our central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense …" and not exclusively for self-defense).

In spite of *Heller*, reaffirmed in *Bruen*, 597 U.S. at 31, the district court granted Appellees' summary judgment motion and denied Appellants' summary judgment motion, ruling that Appellants "failed to prove" that banned switchblade knives are covered by the plain text of the Second Amendment because they are not "arms" "commonly used for self-defense," and thus, are both "dangerous and unusual." As a consequence, the district court ruled that they fall "outside" the scope of the Second Amendment under "*Bruen* step one." *See* 1-ER-7-16, 19. Appellants appeal the ruling on *de novo* grounds.

At the same time, however, the district court ruled that Appellees failed to meet their burden under "*Bruen* step two" to justify the switchblade knife ban by demonstrating that is consistent with the Nation's historical analogous arms regulations.  1-ER-16-19. Appellees could not carry their heavy burden. Nearly all the historic laws cited by Appellees involved concealed carry restrictions on Bowie knives and clubs, and were rejected by the district court (*id* at 15-17), concluding there was no tradition that could be analogized to support the switchblade knife ban. Nevertheless, because the district court held that automatically opening knives were not "arms" under the plain text of the Second Amendment, the court ruled in favor of Defendant-Appellee. 1-ER-19.  Appellees, having not cross-appealed that ruling,

and are now bound by this portion of the district court's final ruling.

By this appeal, Appellants respectfully request that this Court conduct: (a) a *de novo* review; (b) reverse the district court's ruling that the banned switchblades are not bearable "arms" under the plain text of the Second Amendment; (c) affirm or otherwise acknowledge the district court ruling that there is no historical justification for the switchblade knife ban; (d) reverse the district court's ruling that the arms in question are not in common use for lawful purposes and thus are both "dangerous and unusual" under the *Heller/Bruen "historical tradition"* analysis; (c) declare the switchblade knife ban laws unconstitutional; and (d) permanently enjoin enforcement of the challenged laws.

## I.    CONSTITUTIONAL AUTHORITIES

The Second Amendment of the U.S. Constitution provides:

> "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. Const. amend II.

The Second Amendment "guarantees the individual right to keep and bear arms (*Heller*, 554 U.S. at 592), and is incorporated against the State of California (and all other the states) through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution (*McDonald*, 561 U.S. at 791).

*Bruen* abrogated the two-step means-end scrutiny approach employed by this Circuit and other sister circuits, rejecting the "approach as having one step too many." *Bruen*, 597 U.S. at 19. The *Bruen* court also made "the constitutional standard endorsed" in *Heller*

more explicit," in analyzing Second Amendment challenges. *Bruen*, 597 U.S. at 31. The *Heller / Bruen* framework is summarized twice in *Bruen*. *Id.* 597 U.S. at 17, 24. The *Bruen* court held that:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command.""

*Id.* at 17, citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961).

Although *Bruen* discussed "firearm regulation[s]," that was because the arm at issue in that case was a firearm. No reason exists to vary the *Bruen/Heller* framework by type of "arm."

## II.   JURISDICTIONAL STATEMENT

The district court had jurisdiction over Appellants' Second Amendment claims because the claims present important federal constitutional questions under 28 U.S.C. § 1331. The district court's judgment was entered on August 23, 2024. 1-ER-2. Appellants timely appealed on September 9, 2024. 15-ER-4063-4065. This Court has jurisdiction under 28 U.S.C. § 1291 because Appellants have timely appealed the final decision and judgment of the district court. 1-ER-2.

## III.   ISSUES PRESENTED FOR REVIEW

1.      Whether the district court correctly ruled that Appellants
are part of "the people" within the meaning of the Second Amendment—
an issue not contested by Appellees.

2.      Whether the district court erred in concluding that
Appellants failed to meet their burden to prove that their proposed
conduct (*i.e.*, individuals/members wanting to possess, carry, sell, offer
to sell, loan, transfer, or give the banned switchblades for lawful
purposes, such as self-defense, and retailer members wanting to sell,
offer to sell, or expose for sale switchblades currently banned in
California to the public/their customers) was covered by the plain text of
the Second Amendment?

3.      Whether the district court erred in limiting the "in common
use" analysis to only self-defense and not for arms in common use for
*any* lawful purpose, including self-defense?

4.      Whether the district court erred in ruling that the banned
switchblades are dangerous and unusual weapons, as though this
analysis is separate from and additional to the "in common use"
"historical tradition" analysis under the Second Amendment, using the
*Heller / Bruen* framework?

5.      Whether the district court erred in applying the "in common
use/dangerous and unusual" analysis in *Heller*'s textual analysis, rather
than under *Heller's* "historical tradition" analysis.

## IV.  STATEMENT OF THE CASE AND PROCEDURAL HISTORY

California prohibits the possession, carry, sale, offers for sale,

exposure for sale, loan, transfer, or giving of a common automatically opening knife with a blade length of two inches or longer that it classifies as a "switchblade knife." *See* Cal. Penal Code §§ 17235, 21510, and 21590.

Simply put, Penal Code § 17235 defines a "switchblade knife" to mean *"a knife having the appearance of a pocketknife"* with a spring-blade knife, snap-blade knife, gravity knife, or any other similar mechanism with a blade, which is two or more inches in length, and which can be "released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever." *Id.* (emphasis added).

In California, "[*e*]*very person* who does any of the following with a switchblade knife, as defined, is guilty of a misdemeanor: (a) possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public, (b) carries the knife upon the person, (c) sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person." *See* Cal. Penal Code § 21510. Misdemeanors may entail fines and jail time, forfeiture and destruction of the switchblade knife, a criminal record, and other stigmas and consequences. *E.g.*, Cal. Penal Code §§ 21510, 18000, 18005. In short, the challenged laws make it a crime to publicly possess, carry, offer to sell, expose for sale, sell, loan, transfer, or give a switchblade knife to any other person. It is a complete switchblade knife ban, without any statutory exceptions.

Additionally, in at least one instance, a California court has held

that this ban extends to possession even within a private residence. *See In re S.C. v. S.C.,* 179 Cal.App.4th 1436 (2009) (police discovery of a switchblade in defendant juvenile's pocket during a search conducted at a private residence could result in defendant being found to have violated then-Penal Code § 653k,[2] even though defendant did not possess the knife in a public place or a place open to the public). As such, in California, there is a direct threat of criminal prosecution for the mere *possession* of a "switchblade knife."

Moreover, Defendants' unconstitutional enforcement scheme mandates that the unlawful possession or carry of any switchblade knife is a nuisance; and thus, such knives are subject to forced surrender, disposal, and destruction under Penal Code §§ 18000 and 18005. *See also* Cal. Penal Code § 21590.

This switchblade knife ban, enforced by Appellees, places an outright ban on the possession, carry, sale, offers of sale, exposure for sale, loan, transfer, or giving of a "switchblade knife," and as such, the ban unconstitutionally infringes on the fundamental right to keep and bear arms, despite that such knives are commonly used arms today and fully protected by the Second Amendment.

In this case, Appellants desire to keep and bear these bladed arms for any lawful purpose, including self-defense. See 15-ER-4052 and 5-ER-1093-96, 1098-1102, 1104-1109, 1111-1117; 13-ER-3247-3251, 3253-3257. Other Appellants want to offer to sell, and sell, switchblades currently banned in California to the public. 13-ER-3247-3251, 3253-

---

[2] California Penal Code § 21510 was formerly Penal Code § 653k.

3257; 3-ER-364. Appellants, including Knife Rights members, are ordinary, law-abiding, adult citizens and part of the people whom the Second Amendment protects. *See Heller*, 554 U.S. at 580 ("the people … unambiguously refers to all members of the political community, not an unspecified subset"). Therefore, as held in *Heller*, there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." S*ee also* 15-ER-4052 and 5-ER-1093-96, 1098-1102, 1104-1109, 1111-1117; 13-ER-3247-3251, 3253-3257.

The actions/conduct at issue—namely, the ability for Appellants and other similarly situated California residents and visitors to California to possess, carry, sell, offer to sell, expose for sale, loan, transfer, or give bladed arms unquestionably falls within the plain text of the Second Amendment protecting the right to "keep and bear arms." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Among these rights is "the ability to acquire arms." *Id*. at 677-78 (citing to *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *see also Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, F. 4th __, 2025 WL 340799 at *4-5 (5th Cir. Jan. 30, 2025) (holding that the "threshold textual question is not whether the laws … impose reasonable or historically grounded limitations, but whether the Second Amendment 'covers' the conduct (commercial purchase) to begin with" and that the right to "keep and bear arms"… implies the right to purchase them).

On March 15, 2023, Appellants filed their complaint against Appellees, in their official capacities as State and City officials, challenging the constitutionality of the banned switchblades under

Penal Code §§ 17235, 21510, and 21590.  15-ER-4045-4060.  The operative complaint sought declaratory and permanent injunctive relief and other remedies.  15-ER-4060.

On March 6, 2024, the parties cross-moved for summary judgment.  13-ER-3265-3289 and 5-ER-1046-1074.  Both sides then opposed the cross-motions on April 8, 2024.  5-ER-1013-1041, 3-ER-393-420.  The parties replied in support of their respective cross-motions on April 15, 2024. 3-ER-359-372, 378-392. The district court heard oral argument on the motions on May 8, 2024.  3-ER-272-322.

On August 23, 2024, the district court issued its Order granting Appellees' motion for summary judgment and denying Appellants' motion for summary judgment.  1-ER-3-19. The district court entered judgment in favor of Appellees the same day, August 23, 2024.  1-ER-2. Appellants appealed on September 9, 2024. 15-ER-4063-4065.

## V.    SUMMARY OF ARGUMENT

The district court's decision took the clear and straightforward test established in *Heller* and affirmed in *Bruen*, and misapplied the Supreme Court's plain text analysis by engrafting new evidentiary burdens, standards, and limitations not found in the Second Amendment's text. It also improperly applied *Heller's* "in common use/dangerous and unusual" "historical tradition" analysis as a textual matter, and wrongly separated this analysis into two separate and distinct "tests" and imposed evidentiary burdens that far exceed Supreme Court precedent.

First, the district court correctly ruled that Appellants are a part of "the people" under the plain text of the Second Amendment. 1-ER-8-10. The district court properly applied the plain and ordinary meaning of the word in its historical and contemporary context, finding that "the People" "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 570 U.S. at 580 (and adding that "the people" refers "to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered of that community," citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). The district court also correctly acknowledged that "neither party disputes that [Plaintiffs] are "the people" who the Second Amendment safeguards." 1-ER-9. However, the district court's wheels fell off with the balance of what the court called the "*Bruen* step one" analysis.

Specifically, the district court erred in going beyond the plain and ordinary meaning of "arms" under the Second Amendment and entirely ignored *Heller's* controlling authority that "arms" encompass "prima facie, … *all instruments that constitute bearable arms*, even those that were no [yet] in existence. *Heller*, 554 U.S. at 582 (emphasis added). The district court also took *Heller's* "dangerous and unusual" "historical tradition" analysis and separated it into two distinct tests applied under the *Heller/Bruen* textual analysis, adding additional conditions that require an arm to be considered an "arm" under the Second Amendment's plain text and that specific arms must be "commonly used for self-defense" *and* not "dangerous and unusual." 1-ER-10-14. It also erred in ruling that the banned switchblades are "dangerous and

unusual weapons," which is not a separate and additional analysis under the Second Amendment. 1-ER-14-15. Additionally, the district court erred in concluding that Appellants failed to meet their burden to prove that their proposed conduct was covered by the plain text of the Second Amendment. 1-ER-15-16. To the contrary, the record shows that the individual Appellants and Knife Rights' members want to possess and carry the banned switchblades for any lawful purpose, including self-defense, and that the retailer Appellants want to sell, and offer to sell, the banned switchblades to the public—their customer base. 15-ER-4052 and 5-ER-1093-96, 1098-1102, 1104-1109, 1111-1117; 13-ER-3247-3251, 3253-3257. In any event, the district court skirted the "course of conduct" analysis by repeating its refrain that "Plaintiffs' proposed conduct cannot be covered by the Second Amendment because the weapons at issue are not commonly used for self-defense *and* are dangerous and unusual." 1-ER-15-16 (emphasis added).

Though stating it was not required to so, the district court also conducted what it referred to as "*Bruen* step two" analysis, which the court explained "demands" that the government "justify its regulation [as] consistent with the nation's historical tradition" of regulating arms. 1-ER-16-19. The district court found that Appellees could not meet their burden to justify an American regulatory tradition that could be analogized to support the switchblade knife ban. *Id*. Undaunted, the district court concluded that while "Defendants [Appellees] fail to meet their *Bruen* step two burden, because Plaintiffs did not satisfy *Bruen* step one, the Court *must conclude that the weapons at issue are not*

12

*bearable arms protected by the Second Amendment.*" 1-ER-19 (emphasis added).

The district court's "historical tradition" analysis under *Bruen* demonstrates that there is no historical justification for California's switchblade knife ban—a ruling now final for purposes of this case.

However, this Court can and should correct the district court's faulty analysis that the banned switchblades *are not bearable arms protected by the Second Amendment.* The uncontradicted evidence in this case shows that automatically opening knives (switchblades) are in common use for lawful purposes—including self-defense. These knives are common numerically; they are common categorically as they are simply folding pocket knives; and they are common jurisdictionally as they are legal to purchase and possess in the vast majority of this country. Because these knives are indisputably in common use today, as a matter of fact and law, they cannot be considered both "dangerous *and* unusual" arms that may be subject to bans through the application of *Heller's* "historical tradition" analysis.

The district court's grant of Appellee's motion for summary judgment should be reversed, along with a reversal of the district court's denial of Appellants' motion.

## VI.  STANDARD OF REVIEW

This Court "reviews *de novo* a district court's grant or denial of summary judgment." *Arce v. Douglas*, 793 F.3d 968, 975-976 (9th Cir. 2015), citing *Blue Lake Rancheria v. United States*, 653 F.3d 1112. 1115 (9th Cir. 2011) (applying standard to cross-motions for summary

judgment); and *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002) (grant of summary judgment). More broadly, this Court should determine whether the challenged laws violate rights guaranteed by the Second Amendment, which is a question reviewed *de novo*. *United States v. Oliver*, 41 F.4th 1093, 1097 (9th Cir. 2022).

In reviewing a grant of summary judgment, the Court views "the evidence and inferences therefrom in the light most favorable to the party against whom the district court ruled." *Arce*, 793 F.3d at 976, citing *Allen v. A.H. Robins Co., Inc.*, 752 F2d 1365, 1368 (9th Cir. 1985). In conducting a *de novo* review, the lower court's findings and conclusions are not entitled to deference. *Ornelas v. United States*, 517 U.S. 690, 705 (1996) (Justice Scalia, dissenting) ("in *de novo* review, the 'weight due' to a trial court's finding is zero"); *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (9th Cir. 1988); *Heiniger v. City of Phoenix*, 625 F.2d 842, 843-844 (9th Cir. 1980).

In its decision, the district court states this case is a "facial challenge," inferring limitations that do not exist here. Indeed, in *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415 (2015), a case the district court relied on, the Supreme Court clarified that facial challenges are "not categorically barred or especially disfavored," and that the Supreme Court "has never held that these claims (facial challenges) cannot be brought under any otherwise enforceable provision of the Constitution." *Id. (and* citing Fallon, *Fact and Fiction About Facial Challenges*, 99 Cal. L.Rev. 915, 918 (2011) (pointing to several terms in which the Supreme "Court adjudicated more facial challenges on the merits than it did as-applied challenges"). *Id.*

14

Indeed, in *Patel*, the Supreme Court cited *Heller*, 554 U.S. 570 (2008) as a Second Amendment facial challenge, along with a "diverse array" of other constitutional provisions involving facial challenges without any bar or restriction.

## ARGUMENT

This case should have been straightforward. Appellants are part of "the people" who want to keep and bear commonly owned automatically opening folding knives (switchblades) for lawful purposes, such as self-defense; and want to offer to sell, and sell, such arms to the public. 15-ER-4052 and 5-ER-1093-96, 1098-1102, 1104-1109, 1111-1117; 13-ER-3247-3251, 3253-3257. *Bruen's* framework instructs that courts first analyze the text of the Second Amendment; and "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. Once this threshold question is answered, it is the government's burden to justify its regulation by demonstrating that the regulation "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 19, 24.

Here, the Second Amendment's plain text covers the people, the conduct, and the knives ("Arms") banned by the State of California; and therefore, it falls to Appellees to justify the regulation as consistent with historical tradition rooted in the founding of analogous arms regulations. *Id*. Per the district court, Appellees did not meet their burden; and Appellees failed to cross-appeal rendering this issue final and beyond challenge. This Court should reverse the district court's

challenged rulings to prevent the continued violation of Appellants'
Second Amendment rights.

## I.    The Ban Unquestionably Regulates Arms-Bearing Conduct—and the Government Bears the Burden to Justify Its Regulation.

The Supreme Court has repeatedly made clear, "[w]e also clarified
that when the Government regulates arms-bearing conduct, as when
the Government regulates other constitutional rights, it bears the
burden to 'justify its regulation.'" *United States v. Rahimi*, 602 U.S. 680,
691 (2024) (citing *Bruen*, 597 U.S. at 24). The simple question, which
requires little analysis, is whether the challenged laws regulate
bearable arms and the conduct protected by the Second Amendment? If
so, then courts must immediately place the burden on the government
to justify its regulation through traditional historically analogous laws
or regulations.

In the present case, under the Second Amendment's plain text
analysis, California's switchblade knife ban indisputably targets
protected conduct—the possession, carry, sale, offers for sale, exposure
for sale, loan, transfer, or giving of switchblade knives. As such, the
burden is on Appellees to justify its switchblade knife ban. However, the
district court erred by dissecting this straightforward analysis and
essentially creating at least a five-part test in which the knives in
question are not even considered "arms" under the plain text unless
Appellants separately prove they are "arms," "commonly used,"
"commonly used *for self-defense*" and they are not *both* "dangerous and

16

unusual."[3] This is in error and not the standard set forth in *Heller*, and affirmed in *Bruen* and *Rahimi*. Nevertheless, Appellants have definitively shown that the people, arms, and conduct in question are encompassed by the Second Amendment's plain text and that Appellees have failed to justify their ban through traditional historically analogous arms regulations, nor appeal the district court's ruling in that regard.

## II.  Appellants are Part of "The People" Under the Plain Text of the Second Amendment.

There is no dispute that Appellants are a part of "the People" under the plain text of the Second Amendment. 1-ER-8-10.  By its terms, the Second Amendment extends to "'the people'" and that "term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580-581. The Second Amendment thus recognizes a right that belongs to 'all Americans.'" *Id*. at 581 (recognizing that the analysis "start[s]" with "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans").  Appellees do not dispute this fact and the district court found that there was no genuine material dispute as to whether Plaintiffs are "the people" within the meaning of the Second Amendment. 1-ER-8-10. The district court's correctly analyzed and applied the plain and ordinary meaning of "the people" under the

---

[3]  The five-parts engrafted into the plain text analysis by the district court are, at a minimum: (1) the knives are "arms," (2) "commonly used," (3) commonly used "for self-defense," (4) they are not dangerous, and (5) they are not "unusual." Borrowing from *Bruen*, the district court's analysis should be rejected "as having … too many" steps. *Id*. 597 U.S. at 19.

Second Amendment. *Id*. Importantly, Appellees did "not contest" this Second Amendment plain text analysis. *1-ER-10*.

Just as the Supreme Court made clear that the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," the Supreme Court has also made clear that "the people" described in the Second Amendment are "ordinary, law-abiding, adult citizens." *United States v. Ramos*, No. 21-cr-00395-RGK-1, 2022 U.S. Dist. LEXIS 222784, at *7 (C.D. Cal. Aug. 5, 2022) (quoting *Bruen*, 597 U.S. at 31).

Importantly, this is not a complex legal test with burdens of proof or evidentiary showings. Rather, once shown that Appellants are part of "the people" protected by the Second Amendment, the simple question becomes: Does Second Amendment's plain text cover an individual's conduct? If yes, the Constitution *presumptively protects* that conduct.

Appellants' Complaint alleged that the Individual Appellants are adult natural persons who are U.S. citizens and law-abiding. 15-ER-4047-4048. Knife Rights is an advocacy organization suing on behalf of its members "to defend and advance the right to keep and bear bladed arms." 15-ER-4047. Retailer Appellants are weapon retailers who "bring[] this action on behalf of its customers and would-be customers" who wish to acquire the switchblade knives regulated in the challenged statutes. 15-ER-4048-4049. All Plaintiffs are members of Knife Rights. 15-ER-4047-4049.

According to the district court, the "Individual Plaintiffs fit comfortably within the ambit of 'the people' covered in the Second Amendment." 1-ER-9. The retailer Appellants, like individuals, "have standing to challenge regulations that burden their or their customers' 'right to acquire arms.'" *Altman v. Cty. of Santa Clara*, 464 F. Supp. 3d 1106, 1125 (N.D. Cal. 2020) (*quoting Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017); and 1-ER-9. Thus, it is undisputed that the all Plaintiffs have standing, including the retailer Appellants who instituted this action on behalf of their customers and prospective customers who are a part of "the people" protected by the Second Amendment. *Id*.

Further, organizations "have associational standing to sue on behalf of their members" if (a) their members would otherwise have standing to sue in their own right; (b) the interests that the organization seeks to protect are germane to their purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Haynie v. Harris*, No. C 10-01255 SI, 2014 U.S. Dist. LEXIS 28293, at *23 (N.D. Cal. Mar. 4, 2014), *quoting San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130-31 (9th Cir. 1996). 1-ER-9.

Appellants' complaint properly alleged that Knife Rights' "members include peaceable, law-abiding individuals in California that wish to exercise their right to bear arms . . . ." 15-ER-4047. Appellants' also properly alleged that "[t]he interests that Knife Rights seeks to protect in this lawsuit are germane to the organization's purposes." *Id*. Appellants' claim is that the challenged laws infringe on their

19

constitutional rights to keep and bear arms 15-ER-4054-4060. Neither
Appellants' claims nor requested relief require the participation of
individual members of Knife Rights. Because Knife Rights' members
consist of "the people" protected by the Second Amendment, their
interests in this litigation are germane to their organizational purposes,
and their claims and requested remedies do not require participation of
their members. 1-ER-9-10. Accordingly, Appellants are part of "the
people" within the meaning of the Second Amendment.

## III.  Appellants' Proposed Conduct is Protected Because it Falls Under the Plain Text of the Second Amendment.

Appellants claim that their proposed course of conduct—namely to
"keep and bear" the banned switchblades for lawful purposes, including
self-defense—is protected conduct under the plain text of the Second
Amendment. This has never been disputed in this case. See 1-ER-16.
Likewise, the retailer Appellants want to offer to sell, and sell, the
banned knives to the public—their customer base. *Id*.; *see also* 15-ER-
4052 and 5-ER-1093-96, 1098-1102, 1104-1109, 1111-1117; 13-ER-3247-
3251, 3253-3257. These are undisputed facts.

The conduct in question is not seriously disputed, namely, to keep
and bear the regulated switchblades for lawful purposes, including self-
defense, and to possess, carry, sell, offer to sell, expose for sale, loan,
transfer, or give such arms to the public. Such actions falls under the
protection of the Second Amendment as they unquestionably constitute
"arms-bearing conduct." *Rahimi*, 602 U.S. at 691 (2024). Nevertheless,
the district court improperly held that Appellants conduct was *not*
covered by the Second Amendment because the "arms" in question were

not "commonly used for self-defense and are dangerous and unusual." 1-ER-16. These conditions, engrafted onto the plain text of the Second Amendment, do not exist under the textual analysis implemented under the *Heller/Bruen framework*. As such, this Court should reverse the district court's flawed application.

## IV.    The Knives In Question are "Arms" Under the Plain Text of the Second Amendment.

In granting Appellees' motion for summary judgment and denying Appellants' cross-motion, the district court applied the wrong standard under the *Heller/Bruen* framework and concluded that automatically opening knives (switchblades) are not "arms" under the plain the text of the Second Amendment because Appellants supposedly failed to prove that the banned arms are "in common use today for self-defense or that the weapons are not dangerous and unusual" under "*Bruen* step one." 1-ER-15. But the Supreme Court has never required such a standard, nor ever implemented any such standard in which one must prove that each and every arm in use today must be shown to be in common use and only for self-defense in order to be considered an "arm" under the plain text of the Second Amendment:

> "As we explained in *Heller*, for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. Rather, it 'extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence'…. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers."

*Rahimi*, 602 U.S. at 691–692 (internal citations omitted).

21

The Massachusetts Supreme Judicial Court understood this fact in analyzing a "switchblade" prohibition. *See Commonwealth v. Canjura*, 494 Mass. 508, 512–513, 240 N.E.3d 213, 218–219 (2024), citing *Heller*, 554 U.S. at 581. In that case, the Massachusetts court held that "[i]n evaluating whether switchblades are 'arms' entitled to Second Amendment protection, we are guided by the Supreme Court's decision in *Heller*. There, the Supreme Court analyzed the plain meaning of the term 'arms,' observing its '[Eighteenth Century] meaning is no different from the meaning today.'" *See Canjura*, 494 Mass. at 512–513, citing *Heller*, 554 U.S. at 581. Indeed, the district court ignored the fact that another Southern District Court previously held that "in common use for self-defense" goes well outside of the Second Amendment's text. *Fouts v. Bonta*, 718 F.Supp.3d 1276, 1280 (S.D. Cal. 2024) ("the State contends that a billy is not commonly *used* for self-defense…. Even if such evidence did exist, it would only be an argument if the Second Amendment said, 'the right of the people to keep and bear only those Arms that are commonly used for self-defense, shall not be infringed.' Of course, that is not the case. Use is not required for Second Amendment protection.").

In considering the plain meaning of the term "arms," *Heller* provided two Eighteenth Century definitions of the term: "[w]eapons of offense, *or* armor of defense," as defined in the 1773 edition of Samuel Johnson's dictionary (emphasis added), and "anything that a man wears for his defense, *or* takes into his hands, *or* uses in wrath to cast at or strike another," as defined in Timothy Cunningham's 1771 legal dictionary. *Heller,* 554 U.S. at 581 (emphasis added; cleaned up). Like

the parties in *Canjura*, there is no dispute in this case that the banned switchblades fit these dictionary definitions of "arms." Like handguns, revolvers, shotguns, rifles, and pocket knives, a person can carry a switchblade for offensive or defensive purposes. *Id.* at 628-629. Indeed, unlike the district court in this case, the Massachusetts Supreme Court properly applied *Heller's* methodology:

> "To assess whether the drafters would have intended the term 'arms' to include switchblade knives for Second Amendment purposes, however, we must employ *Heller's* methodology, centered on constitutional text and history. See *Heller*, 554 U.S. at 581-582, 128 S.Ct. 2783. *A review of the history of the American colonies reveals that knives were ubiquitous among colonists, who used them to defend their lives, obtain or produce food, and fashion articles from raw materials*. See *State v. Delgado*, 298 Or. 395, 401, 692 P.2d 610 (1984). See also G.C. Neumann, *Swords and Blades of the American Revolution* 227 (1973) (knives and daggers were "personal necessities to the early American")."

*Canjura*, 494 Mass. at 512–513 (emphasis added).

The Massachusetts Supreme Court in *Canjura* further elaborated:

> "In fact, in the colonial and Revolutionary War era, colonists typically owned or were equipped with hatchets, swords, and knives to use in their defense. See *State v. DeCiccio*, 315 Conn. 79, 117 n.27, 105 A.3d 165 (2014). Although swords and daggers were the most common bladed weapons, Seventeenth and Eighteenth Century *Americans also carried smaller knives with three-to-four-inch blades that were used for self-defense, hunting, and trapping*. See *Delgado*, 298 Or. at 401-402, 692 P.2d 610. *Of the many varieties of knives, the folding pocketknife played an important role, both as a tool and a weapon*. See *Id*. at 403, 692 P.2d 610. *Indeed, as 'America developed and its frontiers moved inland,' the folding knife increased in popularity enough that it became*

23

*an 'almost universal' accessory.* Neumann, *supra* at 231. 'By the early 1700s, when the eastern seaboard had become a highly settled area with large towns and cities and relatively good roads, men normally carried a folding pocket knife.' *Delgado, supra* at 402, 692 P.2d 610.

Contemporaneous sources refer to Eighteenth Century folding pocketknives as 'pocket knives,' 'folding knives,' 'spring knives,' 'clasp knives,' or 'jackknives.' See Neumann, *supra* at 231. Most were single-bladed, with or without a holding spring, and had simple metal handles. See *id.* The term jackknife appears frequently in American colonial documents. See H.L. Peterson, *American Knives: The First History and Collector's Guide* 129 (1958). Early jackknives were large, single-bladed knives, ranging from four to six and one-half inches in length when closed. See *id.* at 130. A particular type of jackknife known as a Barlow knife 'is mentioned in American records at least as early as 1779 and seems to have been in general usage at that time.' *Id.*

*In short, folding pocketknives not only fit within contemporaneous dictionary definitions of arms—which would encompass a broader category of knives that today includes switchblades—but they also were commonly possessed by law-abiding citizens for lawful purposes around the time of the founding.* **We conclude switchblades are "arms" for Second Amendment purposes. Therefore, the carrying of switchblades is presumptively protected by the plain text of the Second Amendment.**"

*Id.* 494 Mass. 508, 512–513 (emphasis added).

Indeed, pocket knives are indisputably "bearable arms" commonly possessed for "lawful purposes." *Heller*, 554 U.S. at 625. Defense experts Rivas and Escobar confirm this undisputed fact. See 12-ER-3152-3154; 12-ER-3007-3009. As such, automatically opening knives (switchblades)—knives with "the appearance of a pocketknife" (Cal. Penal Code § 21510)—are necessarily "bearable arms." In fact,

24

according to defense expert Escobar, automatically opening knives fall under two of the three categories of knives.  12-ER-2966.

The *Bruen* court also acknowledges that knives are protected arms noting that "[i]n the medieval period, '[a]lmost everyone carried a knife or a dagger in his belt.'" *Id*. 597 U.S. at 41, quoting H. Peterson, *Daggers and Fighting Knives of the Western World* 12 (2001).  "While these knives were used by knights in warfare, '[c]ivilians wore them for self-protection,' among other things." *Bruen*, 597 at 41 (noting that "smaller medieval weapons … strike us as most analogous to modern handguns"); *see also Heller*, 554 U.S. at 590.  In early colonial America, "edged weapons were also absolutely necessary." 6-ER-1291.  At the time of the Second Amendment's ratification, every state required ordinary citizens to own some type of edged weapon as part of the militia service laws. See 6-ER-1291; 6-ER-1345-1346.

Other courts have also held that knives are "arms" protected by the Second Amendment. See *State v. Deciccio*, 315 Conn. 79, 128, 122, 105 A.3d 165 (2014). (holding dirk knives were "'arms' within the meaning of the second amendment") ("[T]heir more limited lethality relative to other weapons that, under *Heller*, fall squarely within the protection of the second amendment—*e.g*., handguns—provides strong support for the conclusion that dirk knives also are entitled to protected status); *State v. Delgado*, 692 P.2d at 613-614 (Oregon Supreme Court holding that Oregon's ban on the possession of switchblades violated the Oregon Constitution's right to arms and that a switchblade is constitutionally protected based on historical predecessors); *State v. Herrmann*, 366 Wis. 2d 312, 325, 873 N.W.2d 257, 263 (2015)

(Wisconsin Court of Appeals overturning a conviction for possession of a switchblade as unconstitutional; "[w]hether knives are typically used for self-defense or home security as a general matter is beside the point. . . it is undisputed that Herrmann possessed his switchblade inside his home for his protection"); *State v. Montalvo*, 229 N.J. 300, 162 A.3d 270 (2017) (New Jersey Supreme Court holding machete-type knives are protected by the Second Amendment); *State v. Griffin*, 2011 Del Super LEXIS 193, *26 n.62, 2011 WL 2083893 (Del Super Ct., May 16, 2011) ("a knife, even if a 'steak' knife, appears to be a 'bearable arm' that could be utilized for offensive or defensive purposes.") *reversed and remanded on other grounds*, *Griffin v. State*, 47 A.3d 487 (Del. 2012); *City of Akron v. Rasdan*, 105 Ohio App.3d 164, 663 N.E.2d 947 (Ohio Ct. App., 1995) (holding the "right to keep and bear arms" under the Ohio Constitution extends to knives).

Both *Heller* and *Bruen* are explicit, "the Second Amendment guarantees an 'individual right to possess and carry weapons *in case of confrontation*," and confrontation can surely take place outside the home." *Bruen*, 597 U.S. at 33 (internal citation omitted; emphasis added). *Bruen* further acknowledges that a showing of actual instances of self-defense use is not necessary for Second Amendment protection: "Although individuals often "keep" firearms in their home, *at the ready for self-defense*, most do not "bear" (*i.e.*, carry) them in the home beyond moments of actual confrontation. *Bruen*, 597 U.S. at 32. The act of *keeping* arms for any lawful purpose, such as self-defense, is the only requirement. *Heller*, 554 U.S. at 625. And as stated, Second Amendment rights are not limited to self-defense. *See Heller,* 554 U.S.

at 625.

The district court's improper standard requiring that for a weapon to be even considered an "arm" under the plain text of the Second Amendment, it must be shown, with the burden on Appellants, that the specific weapon is commonly used for self-defense runs afoul of the *Heller/Bruen* framework and has no constitutional or legal support. Under the district court's flawed standard, commonly owned weapons and firearms in which no one disputes are protected "arms," would not be protected. For example, under the district court's standard, bolt action rifles, lever action rifles, fixed blade knives, assisted opening knives, manually opening folding knives, and even muskets and other black powder firearms would no longer be considered arms and thus would no longer be protected under the Second Amendment because these specific subcategories of arms are generally not "commonly used" explicitly and only for self-defense. As such, under this standard, the government could ban any of these weapons because the burden would be placed on Appellants to prove that each and every one of these weapons is *only* "commonly used for self-defense." In short, the district court's standard is clearly erroneous and if left to stand, would nullify the Second Amendment.

In any case, there is no material factual dispute that automatic opening knives (switchblades) are commonly used and can be used for any lawful purposes, including self-defense. 13-ER-3276 (Appellees conceding common ownership); *see also* 12-ER-3007-3010; 12-ER-3064-3066; and 12-ER-3076-3077. While Appellees and the district court may not have liked the evidence provided by Appellants establishing that

automatically opening knives (switchblades) are in common use numerically, categorically, and jurisdictionally, *this evidence was undisputed,* and Appellees never offered contrary evidence. 5-ER-1065-1070; *see also* 5-ER-1115-1116; 6-ER-1229, 1299; 7-ER-1432-1433, 1557, 1655, 1659-1661, 1687, 1689; 8-ER-1729, 1735-1736, 1927; 9-ER-2248; 10-ER-2474, 2519-2520, 2569-2570; and 12-ER-3008-3010, 3151-3154, 3157.

Nor did any of Appellees' experts provide evidence or opinion that contradicted Appellants' "in common use" evidence.  Both Appellants' expert and Appellees' expert agreed that such knives can be used for self-defense and many other lawful purposes—including hunting, fishing, recreation, camping, daily use, other forms of lawful activities. 7-ER-1660-1661, 1689; and 12-ER-3151-3154.

Congressional testimony and evidence established that 1.5 million automatically opening knives were being sold every year in the United States as far back as 1958. 7-ER-1432-1433, 1655, 1687, 1689; *see also* 9-ER-2248. Appellees provided no evidence that even implied such knives and the many that were sold after 1958 are no longer in circulation.  Indeed, Appellants provided undisputed evidence that such knives are manufactured and sold by at least 33 U.S. companies, which offer thousands of different models of automatically opening knives. 5-ER-1115. On one website alone, there are over 6,909 different models of switchblades offered for sale. 5-ER-1067.

**V.    There is No Historical Justification For The State of California's Ban On Automatically Opening Knives.**

*Bruen* demands that after answering the textual question of whether the conduct falls under the Second Amendment's plain text, the burden is placed on the government to justify its regulation as "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 24.  While in many cases that inquiry will involve research into potential historical analogues, both *Bruen* and *Heller* have already established the relevant contours of the tradition at issue in this case: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen,* 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627).

And a law by definition will not fit into that tradition if it bans "possession and use of weapons that are 'in common use at the time.'" *Id*. (quoting *Heller*, 554 U.S. at 627; see also *Heller*, at 625 ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes...").  This test "accords with the historical understanding of the scope of the right," but with reference to modern realities of firearm ownership.  *Heller*, 554 U.S. at 625; and *Rocky Mountain Gun Owners v. Town of Superior*, Case No. 1:22-cv-01685-RM-NRN, Doc. 18, at 9 (D. Colo. July 22, 2022) (granting, post-*Bruen*, a temporary restraining order against enforcement of a ban on certain semiautomatic rifles and finding "the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a

type of weapon that is commonly used by law abiding citizens for lawful purposes, whether in an individual's home or in public").

### A.    Automatically Opening Knives are In Common Use Today.

In *Caetano*, Justice Alito issued a concurring opinion, joined by Justice Thomas, explaining that, in determining whether "arms" are protected under the Second Amendment, "the pertinent Second Amendment inquiry is whether [the arms] (stun guns) are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411 at 420. As Justice Alito explained, "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States." *Id*. (quoting *People v. Yanna*, 297 Mich. App. 137, 144, 824 N. W. 2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional) (cleaned up).

Notably, the arm does not have to be used at all, nor used for self-defense.  When an arm is possessed by thousands for lawful purposes, it is "in common use" and it is protected —full stop.  Further, if an arm is in common use, it necessarily cannot be *both* "dangerous and unusual." It also follows that even arms not "in common use," cannot be banned so long as they are no more dangerous than other arms that are in common use.  In short, Appellees and the district court have not, and cannot, historically support the dubious proposition that the switchblade knife at issue in this case is *both* dangerous and unusual. *Heller* noted that the Second Amendment's protection of arms in common use "is fairly supported by the historical tradition of

prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. 554 U.S. at 627.  Indeed, a weapon that is "unusual" is the antithesis of a weapon that is "common" — so an arm "in common use" cannot also be "dangerous and unusual."

In *Heller*, 554 U.S. at 629, and *McDonald*, 561 U.S. 742, the Court struck bans on handguns, "the most popular weapon chosen by Americans for self-defense in the home." A detailed examination of their commonality was unnecessary. The California switchblade knife ban is unconstitutional because such knives are "in common use" under any reasonably applied metric.

In short, a "weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring) (emphasis in original). Thus, whether automatically opening knives are "dangerous and unusual" "is a contention as to which Defendants bear the burden of proof in the *second* prong of the *Bruen* analysis." *See Fouts*, 718 F.Supp.3d at 1281 (2024).  Appellees in this case did not meet their heavy burden, and the district court wrongly imposed that burden on Appellants. The district court also wrongly asserted that Appellants made up this standard, discarding reliance on *Caetano*. 1-ER-13.

According to binding Supreme Court precedent in *Heller* and *Bruen*, if an arm is not *both* dangerous *and* unusual—and thus, in common use—it cannot be banned as a matter of law.[4]  However,

---

[4]  Notably, Mr. Escobar, author of *Deadly Ingenuity: A History of Unusual Weapons From Around the World and Across Time*, acknowledges that his book does not discuss *common weapons* like the

California law prohibits the possession, carry, sale, loan, transfer, or giving of these common folding pocket knives in violation of the Second Amendment rights of Appellants and other similarly situated Americans.

### (i)    Total Number Establishes Common Use.

In establishing whether an arm is "in common use," "[s]ome courts have taken the view that the total number of a particular weapon is the relevant inquiry." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016), abrogated on other grounds by *Bruen.*  Using this metric, the legislative history of the Federal Switchblade Act has already established that automatically opening knives have been in common use since at least the 1950s. 7-ER-1432-1433, 1557, 1655, 1659-1661; see also 9-ER-2248. According to Senate Report No. 1980, "In the United States, 2 manufacturers have a combined production of *over 1 million switchblade knives a year.*" *Id.*

This same report states elsewhere that, "It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 *per year.*" 7-ER-1432 (emphasis added); 7-ER-1655. "In the area of Fort Bliss, Tex., alone, there are more than 20 establishments selling these knives." 7-ER-1433. The Senate report acknowledges at the time that just mail-order services and magazines were "sending out about "3,000 or 4,000 of these knives out each month." 7-ER-1557.

By the 1890s, automatically opening knives were in mass production and "fast becoming the most useful cutting tool one could

---

bowie knife, Arkansas toothpicks, folding knives, switchblades, or balisongs/butterfly knives. 12-ER-2942-2943.

carry and gaining in popularity and public acceptance." 8-ER-1729. Defense experts agree. 12-ER-3151-3154. "Over a 50-year period from the mid-1890s to the mid-1940s, there had been approximately 20 different companies who had manufactured switchblades knives in this country." 8-ER-1729. "There were switchblades specifically designed for hunters, fishermen, soldiers, farmers, veterinarians, mechanics, office workers, seamstresses, high school girls, Boy Scouts, and also for Girl Scouts." *Id.*; see also 12-ER-3151-3154. "After World War II, the popularity of the switchblades exploded. Department stores such as Macy's were selling them. Every kid and young man wanted one if they didn't already have one." 8-ER-1735-1736.  Since the Federal Switchblade Act in 1958, "the Italian switchblade stiletto has had a renaissance and is nearly as popular today [in the U.S.] as it first was in the 1950s." *Id.*  By comparison, the commonality of automatically opening knives in 1958 dwarfs the number used to establish the commonality of tasers and stun guns in *Caetano*.[5]  See *Caetano*, 577 U.S. at 420.

"By the nineteenth century, the design of the knife changed, offering a more pocket-friendly style that gained widespread popularity in Europe. Over time, several variations of the switchblade were created by French, Spanish, Italian, and American Knifemakers, each offering their own unique variations on how the blade would be exposed." 6-ER-

---

[5] The Court in *Caetano* did not draw unnecessary distinctions between stun guns and tasers. Nor is there any constitutionally legitimate reason to separately categorize manually opened folding pocket knives and automatically opening pocket knives. Constitutionally, they are identical.

1299. According to defense experts, this "pocket-friendly style" automatically opening knife encompassed the vast majority of automatically opening knives in circulation. 8-ER-1927 ("On the size and styling of early switchblades knives produced in the United States, see Erickson, *Antique American Switchblades* pages 25-143."); 12-ER-3157.

"With the arrival of the Industrial Revolution, switchblades began to be mass produced and sold at lower costs, therefore making them more readily available. In the early 1900s, George Schrade, Founder of Geo. Schrade Knife Co., dominated the American switchblade market, with his automatic version of jackknives and pocketknives." 6-ER-1299. "When the mid-1900s rolled in, these knives were mass produced by various companies worldwide, and advertised as "compact, versatile multi-purpose tools." *Id.*

Today, automatically opening knives are just as popular, if not more popular, than in the early 1900s. They are useful tools for everyday carry, recreation, hunting, utility, and self-defense. 12-ER-3152-3154; see also 12-ER-3007-3010. This fact was also acknowledged by *both* the Department of Justice and the Secretary of Commerce in 1958. 7-ER-1659-1661.

Moreover, reviewing three of the largest online knife retailers in the country (BladeHQ.com, KnifeWorks.com, and KnifeCenter.com), there are thousands of different models of automatically opening knives for sale for lawful use. Specifically, BladeHQ.com lists approximately 6,909 models of automatically opening knives; knifeworks.com lists approximately 786 models; and KnifeCenter.com lists approximately

989 models. 5-ER-1067. Because automatically opening knives are in common use, they cannot be *both* "dangerous and unusual."[6] Today, automatically opening knives—including those prohibited under the California switchblade knife ban—are widely possessed and used for lawful purposes across much of the country. 6-ER-1229 (Push button knives are "some of the more popular types of pocketknife made today"); see also 12-ER-3152-3154; 12-ER-3007-3010. In fact, today, there are at least 33 U.S. manufacturers/retailers that produce automatically opening knives, or knives that fall within California's definition of "switchblade," on a commercial scale today. 5-ER-1115; 5-ER-1067.

Appellees provided no evidence that contradicts the above facts. Instead, Appellees made the *unsupported argument* that such evidence does not prove that such knives are "commonly used in self-defense." 1-ER-12. However, this is not the standard in *Heller* and *Bruen*. The district court improperly discarded Appellants' undisputed evidence. With this standard in mind, the switchblade ban cannot be justified. Automatically opening knives have been in common use since the early 1900s and continue to be in common use today. Indeed, these banned "switchblades" are in common use in all respects — they are in common use by sheer number; they are in common use categorically and functionally; and they are in common use jurisdictionally.

---

[6] https://www.bladehq.com/cat--Automatic-Knives--40;
https://www.bladehq.com/cat--Out-The-Front-Automatics--41;
https://knifeworks.com/automatic-knives/;
https://www.knifecenter.com/shop/automatic-knives.

### (ii)    Categorical Commonality Is Also Satisfied.

An arm "in common use" can also be proven by categorical commonality. *Heller*, 554 U.S. at 624, 627 (emphasis added). Under *Heller*, the arm must be among "the *sorts* of weapons" or "of the *kind*" that are "in common use at the time." *Id*.  Automatically opening folding knives have no practical or constitutional distinction from other folding pocket knives in that they have a blade, a handle or grip, and the blade rests within the handle or grip when closed or collapsed, and when open or extended is "fixed" into a usable position (*e.g.*, assisted opening knives, manually opening knives).  These knives are indistinguishable in their function and use. 5-ER-1116-1117; 12-ER-3064-3066; 13-ER-3238-3243; and 7-ER-1677-1678. They all operate as *pocket knives* that can be opened with one hand. *Id*. available at: https://kniferights.org/Folding_Knife_Comparison.  Defense experts agree.  Of the three categories of knives—fixed blade, folding, and out-the-front—automatic opening knives fall under two of these three categories, folding and out-the-front. 12-ER-2965-2966.

In fact, many models of folding knives are available in various versions so the user can choose their preferred method of opening.  13-ER-3238-3243; *see also State v. Delgado*, 298 Or. 395, 403 (1984) ("The only difference is the presence of the spring-operated mechanism that opens the knife. We are unconvinced by the state's argument that the switchblade is so 'substantially different from its historical antecedent' (the jackknife) that it could not have been within the contemplation of the constitutional drafters.")

Today, automatically opening knives fall under the category of

folding pocket knives—an arm possessed in millions of households in the United States. 13-ER-3245; *see also* 12-ER-3154; and 13-ER-3219-3236. According to estimates from American Knife & Tool Institute, as many as 35,695,000 U.S. households own a pocket knife. 13-ER-3245. Moreover, assisted opening and one-hand opening knives—which are functionally identical to automatically opening knives—are approximately 80% of all knives sold in the United States. *Id*. Because automatically folding knives are categorically folding pocket knives*;* and folding knives are legal in all 50 states, they are necessarily in common use.

Despite the district court's incorrect claim that Appellants have created such a "test," these metrics are applied by controlling Supreme Court precedent. *Heller*, 554 U.S. at 624-625, 627 (2008); *Bruen*, 597 U.S. at 47 (2022); *see also*, *Canjura*, 494 Mass. at 515 (2024) ("[M]ost courts have chosen among thee statistical approaches: (1) raw numerical commonality, examining 'the total number of a particular weapon'; (2) proportionate commonality, examining the proportion of a broader class of weapons that are the specific weapon in question…; and (3) jurisdictional commonality, examining the number of states that allow the possession or carrying of the subject weapon.") As such, the district court had no authority to discard the facts and evidence. Simply, there is no constitutionally relevant difference between a manually opening or an assisted opening pocket knife and a automatically opening pocket knife (switchblade)—regardless of the addition of a spring. These knives are, in all relevant respects, the same. Indeed, they are all common pocket knives in which a blade folds

37

or collapses into the handle of the knife, and it is opened by exerting pressure directly on the blade or button on the handle, and they are only useful (and potentially dangerous) when fully opened into the locked position. That the California knife ban may act to ban thousands of various configurations of common automatically opening knives, held in respectively smaller numbers than the over-arching category of "folding pocket knife" as a whole, is irrelevant to the constitutional inquiry under *Heller*. Folding pocket knives themselves have existed before the founding era and to the present, and the State of California has pointed to no evidence indicating that the Founders would have understood banning automatically opening knives (which is essentially a folding pocket knife with an extra spring) to be consistent with the right to keep and bear arms under the Second Amendment.

### (iii) Automatically Opening Knives Are Common Jurisdictionally.

An arm—specifically, automatically opening knives—cannot be both "dangerous and unusual," if they are both lawful to possess and used in a *vast majority* of the United States.  Automatically opening knives are *entirely legal* to manufacture, sell, purchase, transfer, possess, and carry in a majority of states in this country.  6-ER-1215-1218.  Thus, automatically opening knives are also in common use *jurisdictionally*.

As of February 2024, at least 45 states allow the sale, purchase, transfer, acquisition, and possession of automatically opening knives that are prohibited by the California switchblade knife ban; and at least 36 states permit the public carry of such knives in some manner. 6-ER-

1215-1218. Moreover, since 2010, nineteen states have repealed bans/restrictions on automatically opening knives. 5-ER-1069-1070. Thus, as these knives are in common use jurisdictionally, they cannot be considered "dangerous and usual" justifying the California's switchblade knife ban.

## B.    Automatically Opening Knives Are Not Both Dangerous and Unusual Arms.

To be clear, the "common use" analysis and the "dangerous and unusual" analysis are two sides of the same coin. That is to say, they do not fall under or require a separate analysis. If an arm is in common use, it cannot be both dangerous and unusual. Despite this fact, the district court improperly broke down this analysis into two distinct burdens.

Both the district court and Appellees mistakenly assert that the "dangerous and usual" analysis is conducted under the plain text analysis, and therefore, come to the unsupported conclusion that for a weapon to be considered an "arm" under the plain text of the Second Amendment, it must be proven that the weapon is "commonly used for self-defense." 1-ER-12-15. Not so.

**First**, Appellees cannot credibly assert that automatically opening knives are "dangerous and unusual" or uncommon simply because California has prohibited the possession, carry, sale, loan, transfer, or giving of automatically opening knives in California since 1958. "The more relevant statistic" is that millions of these knives "have been sold to private citizens" who "may lawfully possess them in 45 States." *See Caetano*, 136 S.Ct. at 1032.

**Second**, Appellees' experts have failed to present evidence sufficient to create a genuine factual dispute over whether automatically opening knives are "dangerous and unusual." The court in *Fyock v. Sunnyvale*, 779 F.3d at 997, noted that in determining whether a weapon is both dangerous and unusual, "we consider whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes." Automatically opening knives are not uniquely dangerous compared to other folding and fixed blade knives.

**Third**, as stated above, the banned switchblade knife is simply a variation of the folding pocket knife. Defense experts do not dispute this fact. See 10-ER-2474, 2569-2570 ("both can be carried in the pocket…" "they both fold"); see also 12-ER-3154. It is *entirely undisputed* in this case that an automatically opening knife is the exact same as any other folding knife —including manually opening, assisted opening and fixed blade knives—when it is opened. *In other words, it is undisputed that, when opened, an automatically opening knife poses no greater danger to the public than any other opened or exposed knife*. 5-ER-1116-1117.

**Fourth,** like any folding knife, an automatically opening knife does not possess any "uniquely dangerous propensities." *Fyock*, 779 F.3d at 997. Nonetheless, the district court concluded wrongly that automatically opening knives are dangerous because they operate automatically ("ease of automation"). 1-ER-14. However, a knife that opens or operates using a spring is hardly dangerous, let alone unusual. The district court went further, stating that their "ease of automation" results in "a higher propensity for failure" and with "more moving

parts" the knife has "a higher risk of failure." *Id*. Yet, even if this Court were to assume these unsupported opinions, the fact that a knife may fail to open automatically due to moving parts, or otherwise, does not constitute a "dangerous propensity" under *Fyock*.

Specifically, defense experts failed to identify any uniquely dangerous propensities of switchblades or any verifiable link to their use in any crime. In his report, Mr. Escobar discusses several characteristics he claims increase the danger of using a switchblade for self-defense. 10-ER-2440-2444. To be clear, this is not a danger to the public or even a direct threat of the knife to the user. *Id*. Escobar's claims state there is an increased danger to the user in a self-defense scenario because they may fail to be able to use the knife against an attacker as the knife may fail to open. *Id*. However, in his deposition, Mr. Escobar admits that each characteristic identified in his report are *not exclusive* to switchblades and apply to *either all* folding knives or *all* knives in general. See 12-ER-2968-2972, 2978-2979, 2981-2982, 2988-2989, 2990-2991, 2993, 2995-2997, 2999, 3002-3003, 3004-3005, 3015, 3019-3020, and 3022-3025. Moreover, Mr. Escobar makes clear that the alleged problematic characteristics he identifies for "switchblades" are not a threat to the general public, but only *possibly* to the user. 12-ER-3005.

In fact, Appellees have never made the claim that automatically opening knives are dangerous to the public. They have never claimed that automatically opening knives cause more damage/trauma than any other kind of knife. They have never claimed that such knives are more concealable or have any characteristic that would make them more of a

threat to others than any other kind of knife. Nor do Appellees dispute that all knives—including automatically opening knives—are unquestionably less dangerous than any firearm. 12-ER-3021-3022. The entirety of Appellees' expert testimony—and thus the entirety of Appellees' evidence—centers on a single individual's *personal opinion* that fixed blade knives are "better suited for self-defense" because they don't have to be opened and there is less chance of some kind of mechanical failure that either opens the knife before it is needed or does not sufficiently open the knife when needed in self-defense. 10-ER-2440-2444. To be clear, Appellees' expert is simply stating his personal preference to use fixed blade knives for self-defense *over any folding knife*. 12-ER-2991.

**Sixth**, in other defense expert reports—from Messrs. Spitzer, Rivas, and Escobar—none of them refer to or cite any crime data relating to switchblades spanning from 1958 to 2024. See 8-ER-1915-1933; 9-ER-2235-2265; 10-ER-2433-2447; and 12-ER-2965. In fact, the only "crime data" from any period relied on by Mr. Spitzer is derived from a *single* 1950's *magazine article*—in which every claim is unverifiable hearsay with no evidentiary support—and a Senate report from 1958. *See* 9-ER-2245-2247. To the contrary, Appellants have provided evidence that explicitly says otherwise. See 7-ER-1689. ("Given that 99% of switchblades were never used for any illegal purpose, the assertion that they are only used for or suited for murder, assault, and robbery is demonstrably false.").

**Seventh**, in his report, Mr. Escobar asserts there is ample evidence that switchblades are used for criminal activity. However, to

support this claim, Mr. Escobar does not cite to crime data of any kind in the United States. To the contrary, he references criminal use of *razor blades in Australia* and *Navaja knives in Spain*—neither of which support that the banned switchblades are used for criminal purposes. See 10-ER-2437-2439; 12-ER-2960-2962, 2964-2965. Appellants' expert identified this lack of evidence in his report. 12-ER-3061. In any case, the argument fails because California's switchblade knife ban is not limited to criminals. *See* Cal. Penal Code §§ 17235, 21510, 21590, 18000 and 18005. Indeed, the uncontroverted evidence in the record shows that these Plaintiffs-Appellants are not criminals, so Appellees' argument does not resolve their claims and should be rejected.

Finally, no one disputes that handguns (and any commonly used firearm) are more dangerous than any knife. Appellees' expert explicitly stated that firearms are unequivocally more deadly than any knife. 10-ER-2537 ("Obviously, a knife is dangerous but less dangerous than a pistol"), 10-ER-2538-2539 ("in present day, handgun far more dangerous than a knife"); *see also* 12-ER-3020-3022. The simple fact that a firearm can project lethal force over distance makes them more dangerous than any knife. Nonetheless, the relative dangerousness of handguns (including significant use by criminals) is *insufficient* to justify any prohibition on these arms. Moreover, the fact that a handgun has a safety, or that it requires "extra steps" to bring to a ready position does not make it "dangerous" or negate the fact that it can and is used for self-defense—the same is true for a switchblade. 12-ER-3000-3002. Folding pocket knives are a less lethal/dangerous arm and defense experts agree. See 10-ER-2537, 2538-2539; and 12-ER-

43

3020-3022. Thus, automatically opening knives cannot be held to be *both* "dangerous *and* unusual" to justify any kind of ban.

Appellees also fail to establish that automatically opening knives were not commonly used in self-defense, nor did they provide any evidence that contradicted or disputed Appellants' evidence showing that automatically opening knives were commonly used and possessed for various lawful purposes, including self-defense. 5-ER-1115; 5-ER-1067; 6-ER-1229; 7-ER-1432-1433, 1557, 1655, 1659-1661, 1687, 1689; and 12-ER-3152-3154. Instead, the only evidence offered by Appellees was expert testimony from Mr. Escobar that automatically opening knives were not as "suitable" as fixed blade knives for self-defense. 10-ER-2444-2446. Mr. Escobar never states that automatically opening knives cannot be used for self-defense, or are not used for self-defense. He admits the opposite. 12-ER-3007-3010. He personally would just select a different kind of knife. But the Second Amendment right is not limited to a single individual's personal preference.

And this Court should also consider that all the evidence Appellees rely on to assert that automatically opening knives are "not suitable for self-defense" is derived entirely from the *single opinion* of an individual who objectively—*and through the expert's own testimony*—has no professional experience, training, or writing, in the design, manufacture, or use of automatically opening knives or knives in general. 12-ER-2949-2950. Nor does he have any professional experience in using knives in self-defense. 12-ER_2931-2932. While Appellees' expert has written two books on the history and use of blunt force weapons like saps, blackjacks, and slungshots; and a history of

"unusual weapons" and "forgotten" weapons; he has never written any published material on common folding knives, including automatically opening knives. 12-ER-2937. In fact, Mr. Escobar's book titled, *Saps, Blackjacks, and Slungshots: A History of Forgotten Weapons*, does not discuss knives of any kind. 12-ER-2940. The only mention of knives in Mr. Escobar's other publication titled, *Deadly Ingenuity: A History of Unusual Weapons From Around the World and Across Time*, is a short description of fixed blade Gaucho Knives from South America. 12-ER-2941-2945.

In contrast, Appellants' expert Michael Janich, who contradicts every one of Mr. Escobar's unsupported claims, and has decades of professional experience in designing and using knives in self-defense, shows that automatically opening knives are suitable for self-defense. 12-ER-3058-3060, 3075-3078, 3080-3081.

*Bruen* did not create a "new" test, but merely applied the test that the *Heller* Court established in 2008. *Bruen* expressly states, "*The test that we set forth in Heller and apply today* requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text *and* historical understanding." 597 U.S. at 26 (emphasis added). The dangerous and unusual/not in common use standard was based on history, not the text of the Second Amendment, and considerations of historical tradition arise under *Bruen*'s second prong analysis, *not* the first prong. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 38-39; *U.S. v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024); *Fouts*, 718 F.Supp.3d at 1281 (2024).

The "central" holding in *Heller* was "that the Second Amendment

protects a personal right to keep and bear arms *for lawful purposes, most notably for self-defense within the home.*" *McDonald*, 561 U.S. at 780 (emphasis added). The *Heller* decision controls, and absent from *Heller*'s plain text analysis (and the *Bruen* analysis) is any discussion of whether or not the arms are "commonly used for self-defense" or "suitable for self-defense." 3-ER-405; *and see*, *Heller*, 554 U.S. at 581-595; *Bruen*, 597 U.S. at 32-33. Neither Appellees, nor the district court can *unilaterally engraft* such conditions onto the Second Amendment's plain text or repudiate the Supreme Court's binding authority.

### C. Appellees' Historical Arms Regulations Fail to Justify The State's Ban On Automatically Opening Knives

While the district court improperly concluded that automatically opening knives were not "arms" under the plain text of the Second Amendment, it correctly concluded that Appellees failed to justify California's switchblade knife ban through the identification of historically relevant analogous arms regulations. 1-ER-16-19. As such, Appellants do not appeal this portion of the district court's ruling. Nonetheless, it is undisputed that Appellees have failed to justify its switchblade ban "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 24.

The Supreme Court in *Heller* already conducted the historical analysis. *Heller* held that only arms that are *both* dangerous *and* unusual arms can be categorically banned. This Court need only apply that historical principle to the facts in this case, just as done in *Heller* and *Bruen*. There is no need for any further historical analysis. Any

attempt by Appellees to engage in such analysis would be asking "to repudiate the [Supreme] Court's historical analysis," which this Court "can't do." *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012).

Nevertheless, in *Bruen*, the Court considered historical evidence supplied by respondents in their attempt to justify their prohibitions on the public carry of firearms. Although the Supreme Court reviewed evidence from a wide range of historical periods: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries," 597 U.S. at 34, it noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' […] The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Id.* at 34 (citing *Heller*, 554 U.S. at 634–35 (emphasis original). The Court in *Bruen* cautioned against "giving post enactment history more weight than it can rightly bear." 597 U.S. at 35. *"To the extent later history contradicts what the text says, the text controls."* *Id.* at 36 (citation omitted).

Further, in examining the relevant history offered, the *Bruen* court stated, "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" 597 U.S. at 36 (citing *Heller*, 554 U.S. at 614). "[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of

47

Rights was adopted in 1791." *Bruen*, 597 U.S. at 37; *see also Marsh v. Chambers*, 463 U.S. 783, 787-88 (1983); *Furman v. Georgia*, 408 U.S. 238, 319–20 (1972); and *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (discussing that the Court looks "to the statutes and common law of the founding era to determine the norms that the Fourth Amendment" protects).

And while the Court in *Bruen* reviewed materials published *after* adoption of the Bill of Rights, it did so to shed light on the public understanding in 1791 of the right codified by the Second Amendment, and only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions. "The 19th-century treatises were treated as *mere confirmation* of what the Court had already been established." 597 U.S. at 37 (citing *Gamble v. United States*, 139 S.Ct. 1960, 1976 (2019) (emphasis added).

Therefore, under binding Supreme Court precedent, 1791 must be the controlling time for the constitutional meaning of Bill of Rights provisions incorporated against the States by the Fourteenth Amendment because, as in *Heller*, the Court has looked to 1791 when construing the Bill of Rights. While *Bruen* acknowledged a *scholarly debate* on this subject, *Bruen* did not disturb these precedents, and they are therefore binding on lower courts. *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). "[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th Century to establish the original meaning of the Bill of Rights." *Bruen*, 597 U.S. at 83 (Barrett, J., concurring).

In sum, under *Bruen,* some evidence *cannot* be appropriate historical analogues, such as (i) 20th-century restrictions, (ii) laws that are rooted in racism, (ii) laws that have been overturned (such as total handgun bans), and (iii) laws *inconsistent* with the original meaning of the constitutional text. *Bruen,* 597 U.S. at 34-38. These sources of evidence must be disregarded.

The challenged ban has *no historical pedigree*, nor justification in this Nation's history and tradition of arms regulation.  Nor does the ban address any kind of "unprecedented societal concerns" and "dramatic technological changes" that would require a more nuanced historical approach.  *Bruen*, 597 U.S. at 27-28.  This case concerns a type of folding pocket knife and an age-old social ill: criminal use of knives. 12-ER-3114.  "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

While Appellees claimed to have "identified 136 historical laws from 49 states and the District of Columbia regulation of Bowie knives," this 30,000-foot generalization is not supported by the historical record or Appellees' experts. 12-ER-3186-3189. For example, defense expert Rivas admits to finding only one state statute throughout the entire 19th Century that prohibited *the sale* of any kind of knife. *Id*. Additionally, Dr. Rivas admits she was unable to identify a single law that prohibited the *possession* of any kind of knife throughout the entire 19th Century. *Id*. The same is true for the preceding—and more

relevant—Founding era. Both Prof. Spitzer[7] and Dr. Rivas admit that the vast majority of the laws they referenced only restrict the act of *concealed carry* of certain weapons and nothing more.10-ER-2571; 12-ER-3186-3189. In other words, every concealed carry restriction on knives cited by Appellees' experts explicitly permitted the purchase, sale, transfer, possession, and open carry of these knives. This historical analysis should end here based on Appellees' own experts' admissions.

Indeed, California's switchblade knife ban dates only to the 1950's. *People v. Bass*, 225 Cal.App.2d 777, 780 (1963). Not only was this significantly past the relevant Founding era in which Appellees must provide analogous laws to justify the ban; it is also several decades after automatically opening knives were introduced into the United States and chosen by the people as a commonly used arm.

Simply put, bans on possession or sale to legal adults of particular arms from 1607 through 1899 are *exceedingly rare*. *See* 8-ER-1742. For example:

> "There were no prohibitions on any particular type of arm, ammunition, or accessory in any English colony that later became an American State. The only restriction in the English colonies involving specific arms was a handgun and knife carry restriction enacted in Quaker-owned East New Jersey in 1686…. The 1684 East Jersey restriction on carry was in force at most eight years, and was not carried forward

---

[7] In his report, Professor Spitzer references one 1881 Arkansas law banning the carry and sale of certain weapons. His remaining laws largely address concealed carry or are regulations on impact weapons in the late 1800s—far removed from the relevant Founding era. 11-ER-2892-2896.

> when East Jersey merged with West Jersey in 1702. That
> law imposed no restriction on the possession or sale of any
> arms."

8-ER-1756; *see also* 11-ER-2891-2896.

At the time of the Founding era, the preferred means of addressing the general threat of violence was to *require* law-abiding citizens to be armed. As *Heller* observed, "[m]any colonial statutes required individual arms-bearing for public-safety reasons. Colonies required arms carrying to attend church, public assemblies, travel, and work in the field." 8-ER-1762. The statutes that required the keeping of arms—by all militia and some non-militia—indicate some of the types of arms that were so common during the colonial period that it was practical to mandate ownership. These mandates regularly included bladed weapons/knives. 8-ER-1763.

In fact, firearms *and* cutting weapons were ubiquitous in the Colonial era, and a wide variety existed of each. Yet they were not banned. The historical record up to 1800 provides no support for general prohibitions on any type of arms. 8-ER-1786. In fact, during the Colonial era, there were *no bans on knives of any kind*. According to Appellees' expert, prohibitions on the sale or possession of any kind of knife were virtually non-existent throughout the entire 19th Century. 10-ER-2564, 2571; 12-ER-3158-3189.

With the exception of an 1838 Tennessee restriction and an 1881 Arkansas restriction on the sale of Bowie knives, each and every bowie knife restriction in the 19th Century only restricted the *mode of carrying such knives*—mostly restricting concealed carry of Bowie

knives, but allowing for the open carry of Bowie knives.[8]  8-ER-1932; *see also* 10-ER-2564, 2571; 12-ER-3158-3189. Notably, Professor Spitzer states twice that 15 states banned all carrying of Bowie knives (by banning both concealed carry and open carry).  9-ER-2256-2257. However, of these 15 state laws cited by Mr. Spitzer, four explicitly restrict concealed carry only; another four are city ordinances, and not state laws; and one is an election day restriction. 10-ER-2321-2323, 2330-2431.

None of these laws prohibited the possession, transfer, purchase, manufacture, loan, giving, *and* open carry of Bowie knives.  *See* 8-ER-1928-1932; 9-ER-2249-2258; *see also* 10-ER-2564, 2571, 2572-2573; 12-ER-3176-3189. Additionally, many of the concealed carry restrictions identified by defense experts had explicit exceptions permitting concealed carry for travelers or while traveling or explicitly exempted pocket knives from any kind of concealed carry restriction.  9-ER-2257; 10-ER-2538-2539, 2330-2431.

With the exception of the single 1838 Tennessee law, the laws referenced above all come well *after* the relevant period this Court must consider.  In fact, nearly all of them come after 1870. 9-ER-2249-2258.

Further, any reliance on mid-to-late 19th Century restrictions on various impact or blunt force weapons is also insufficient to justify the

---

[8]  According to Prof. Spitzer's expert report, six states enacted laws that restricted both open carry *and* concealed carry (Arizona (1889), Arkansas (1881), Hawaii (1852), Oklahoma (1890), Texas (1871), and West Virginia (1882). However, Hawaii was an independent kingdom in 1852, Oklahoma was a territory, and Texas and West Virginia have exceptions for good cause.

State's ban as they also come far too late and well beyond the relevant Founding era to be relied on according to *Heller* and *Bruen*, as most of these laws come after the Civil War. 9-ER-2258-2262; 10-ER-2572-2573; see also *Fouts v. Bonta*, 2024 WL 751001, at *5 (S.D. Cal. Feb. 23, 2024). They also discuss a completely different category of arms. Finally, defense experts' reliance on these late 1800s restrictions on impact weapons does not justify any knife ban as these impact weapon laws do not justify prohibitions on blunt force weapons themselves. *Fouts v. Bonta*, No. 19-CV-1662-BEN-JLB, 2024 WL 751001 (S.D. Cal. Feb. 23, 2024).

Defense experts Rivas and Spitzer also devote considerable time discussing various state and municipal *taxation regulations* to justify the ban. 13-ER-3459-3462; 15-ER-3807. These tax regulations are not sufficiently similar to the ban before this Court. Moreover, the vast majority of these taxation regulations were implemented in the late-1800s. 15-ER-3870-3872, 3879-3980. Overall, Appellees reference *four states that imposed either a personal or occupational tax* on certain weapons—Alabama, North Carolina, Mississippi and Georgia. Aside from the fact that these tax laws are entirely distinguishable from the ban currently before this Court, that four states enacted certain tax regulations on weapons in the late-1800s does not overrule the plain text of the Second Amendment or that the most relevant era to be considered—the Founding—is devoid of any regulations that justify California's switchblade ban.

## VI.   CONCLUSION

For all the reasons stated above, the challenged portions of the district court's decision granting Appellees' motion for summary judgment should be reversed. The district court's ruling denying Appellants' motion for summary judgment should also be reversed.

February 3, 2025                    Respectfully submitted,

                                   DILLON LAW GROUP, APC

                                   _/s/ John W. Dillon_
                                   John W. Dillon
                                   California State Bar No. 296788
                                   jdillon@dillonlawgp.com
                                   **DILLON LAW GROUP APC**
                                   2647 Gateway Road
                                   Suite 105, No. 255
                                   Carlsbad, California 92009
                                   Phone: (760) 642-7150
                                   Fax: (760) 642-7151

                                   Attorneys for Appellants

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure Rule 32(g)(1), this brief contains 13,629 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). The undersigned certifies that this brief complies with the word limit of Ninth Cir. R. 32-1.

By: _/s/ John W. Dillon_
John W. Dillon