Case No. 24-5536

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

Knife Rights, Inc.; Eliot Kagan; James Miller; Garrison Ham; North County Shooting Center, Inc.; and PWGG L.P.,

Appellants.

v.

Rob Bonta, in his official capacity as Attorney General of the State of California, *et al*.,

Respondents.

_____

On Appeal from the United States District Court
for the Southern District of California
(Case No.: 3:23-CV-00474-JES-DDL)

_____

## EXCERPTS OF RECORD
## Volume 1 of 15

_____

John W. Dillon (296788)
Dillon Law Group
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
jdillon@dillonlawgp.com
Telephone: (760) 642-7150
Fax: (760) 642-7151

*Attorneys for Plaintiffs Knife Rights, Incl; Eliot Kagan; James Miller; Garrison Ham; North County Shooting Center, Inc.; and PWGG L.P.*



# United States District Court

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Knife Rights, Inc.; Eliot Kaagan; Jim Miller; Garrison Ham; North County Shooting Center, Inc.; PWGG L.P.<br><br>Plaintiff,<br>V.<br><br>Rob Bonta California Attorney General<br><br>Defendant. | Civil Action No.  23-cv-00474-JES-DDL<br><br>**JUDGMENT IN A CIVIL CASE** |

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED:

The Court Grants Defendants' Motion for Summary judgment, and Denies Plaintiffs' Motion for Summary Judgment. Judgment is entered for Defendant.

Date:    8/23/24

CLERK OF COURT
JOHN MORRILL, Clerk of Court
By:  s/ S. Tweedle

S. Tweedle, Deputy

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P., <br><br> Plaintiffs, <br><br> v. <br><br> CALIFORNIA ATTORNEY GENERAL ROB BONTA, SAN DIEGO COUNTY SHERIFF KELLY MARTINEZ, AND SAN DIEGO COUNTY DISTRICT ATTORNEY SUMMER STEPHAN, <br><br> Defendants. | Case No.: 3:23-cv-00474-JES-DDL <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> **[ECF Nos. 33-1, 34-1]** |

Before the Court are competing Motions for Summary Judgment. Plaintiffs challenge the constitutionality of California Penal Code §§ 17235, 21510, and 21590. ECF No. 34-1. Defendants argue that Plaintiffs' second amendment challenge fails under the current landscape of the second amendment jurisprudence. ECF No. 33-1. Having considered the parties' submissions, oral argument, and the governing law, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** the Defendants' Motion for Summary Judgment for the reasons stated below.

## I. BACKGROUND

On March 15, 2023, Plaintiffs commenced this action against Defendants, in their official capacities as State and City officials, challenging the constitutionality of certain switchblades under Cal. Penal Code §§ 17235, 21510, and 21590. ECF No. 1. The challenged laws make it "a misdemeanor to publicly possess, carry, sell, loan, or transfer a switchblade knife (1) with a blade of two or more inches in length, which (2) does not have a detent or similar safety mechanism." ECF No. 33-1 at 1 (citing Cal. Penal Code §§ 17235, 21510). They also define "the unlawful possession or carrying of any switchblade knife" as a nuisance. Cal. Penal Code § 21590. Plaintiffs are individuals, James Miller, Garrison Ham, Eliot Kaagan ("Individual Plaintiffs") who desire to keep and bear the regulated switchblades; weapon retailers, North County Shooting Center, Inc. and PWGG, L.P. ("Retailer Plaintiffs"); and Knife Rights, Inc. ("Knife Rights" or "Institutional Plaintiff") an organization advocating for knife rights under the Second Amendment. The Complaint facially challenges the laws at issue as infringing on the Plaintiffs' rights to "keep and bear arms" in violation of the Second Amendment. ECF No. 1 at 9-14. Plaintiffs seek declaratory and injunctive relief to restrain the enforcement of the challenged laws and any applicable attorney's fees and costs. *Id.* at 14-15.

On March 6, 2024, the parties cross-moved for Summary Judgment. ECF Nos. 33-1, 34-1. Both parties respectively opposed on April 8, 2024. ECF Nos. 35, 36. On April 15, 2024, the parties replied in support of their cross-motions. ECF Nos. 37, 38. The Court heard oral argument on the motions on May 8, 2024. ECF No. 40.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In reviewing a motion for summary judgment, the Court views facts in the light

1  most favorable to the nonmoving party and draws all justifiable inferences in that party's
2  favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d
3  202 (1986). Facts are "material" if it might affect the outcome of the case. *Id.* at 248. A
4  factual dispute is "genuine" if there is sufficient evidence that a reasonable jury could
5  find for the nonmoving party. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir.
6  2001) (citing *Anderson*, 477 U.S. at 248-49).
7       "[W]hen simultaneous cross-motions for summary judgment on the same claim are
8  before the court, the court must consider the appropriate evidentiary material identified
9  and submitted in support of both motions, and in opposition to both motions, before
10 ruling on each of them." *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1134 (9th
11 Cir. 2001). Each party "must carry its own burden under the applicable legal
12 standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006) (citing *Rains
13 v. Cascade Indus.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a
14 claim by each side that it alone is entitled to summary judgment, and the making of such
15 inherently contradictory claims does not constitute an agreement that if one is rejected the
16 other is necessarily justified.")). Further, the Court "must consider each party's evidence,
17 regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*,
18 632 F.3d 526, 532 (9th Cir. 2011).
19    **B.  Facial Challenges**
20       A facial challenge is "a claim that the law or policy at issue is unconstitutional in
21 all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138, 139 S. Ct. 1112, 1127
22 (2019). "Such challenges are considered the most difficult to mount successfully," *Willis
23 v. City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019), and are "disfavored," *Smith v.
24 Helzer*, 95 F.4th 1207, 1214 (9th Cir. 2024) (quoting *Wash. State Grange v. Wash. State
25 Republican Party*, 552 U.S. 442, 450 (2008)). To succeed on a facial challenge, a plaintiff
26 must establish that a law is "unconstitutional in *all* of its applications." *Willis*, 943 F.3d at
27 886 (emphasis added).
28                    **III.   DISCUSSION**

Plaintiffs challenge Cal. Penal Code §§ 17235, 21510, and 21590 as violative of the Second Amendment. Specifically, Plaintiffs contend that the regulated knives at issue are "arms" protected by the "plain text" of the Second Amendment, are commonly used today for lawful purposes, and are "not both dangerous and unusual." In Response, Defendants argue that Plaintiffs cannot meet their burden of demonstrating that the challenged statutes contravene the plain text of the Second Amendment. Defendants also argue that the regulated knives are not in common use for self-defense and are dangerous and unusual weapons. The Court first briefly outlines the reshaped landscape of the Second Amendment jurisprudence, before analyzing the constitutionality of the challenged statutes.

**A. Challenged Statutes and Second Amendment Jurisprudence**

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022), the Supreme Court of the United States transformed the second amendment jurisprudence by abrogating a two-step means-end scrutiny approach employed by the Ninth Circuit and other sister circuits, following *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008), to analyze second amendment challenges.

In its place, the Supreme Court articulated a new analytical framework in *Bruen*. Our circuit, in *United States v. Alaniz*, has construed *Bruen* as imposing a two-step framework for Second Amendment challenges. 69 F.4th 1124, 1128 (9th Cir. 2023). *Bruen* step one involves a threshold inquiry and re-affirms *Heller*'s instruction to analyze the plain text of the Second Amendment. To conduct the textual analysis, courts must first consider: (1) whether the challenger is "part of 'the people' whom the Second Amendment protects," (2) whether the weapon at issue is "'in common use' today for self-defense," and (3) whether the Second Amendment's plain text covers the challenger's "proposed course of conduct." *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 597 U.S. at 31-32); *see United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024). If so, the Second Amendment presumptively protects the conduct.

| | |
|---|---|
| 1 | Only if step one is satisfied does a court proceed to *Bruen* step two, where the |
| 2 | Government bears the burden of justifying its regulation is consistent with the nation's |
| 3 | historical tradition. *See Bruen*, 597 U.S. at 24; *Alaniz*, 69 F.4th at 1128; *Perez-Garcia*, 96 |
| 4 | F.4th at 1178. To carry this burden, the Government must identify representative |
| 5 | historical analogues to "demonstrate that the challenged law is consistent with a historical |
| 6 | tradition of regulation." *Alaniz*, 69 F.4th at 1128 (citing *Bruen*, 597 U.S. at 19, 26-29). |
| 7 | The analogue "need not be a 'historical *twin*' or a 'dead ringer.'" *Bruen*, 597 U.S. at 30 |
| 8 | (emphasis in original); *see Alaniz*, 69 F.4th at 1128. Rather, it need only be "relevantly |
| 9 | similar" to the challenged regulation based on "at least two metrics: how and why the |
| 10 | regulations burden a law-abiding citizen's right to armed self-defense." *See Alaniz*, 69 |
| 11 | F.4th at 1128 (quoting *Bruen*, 597 U.S. at 27-29). Thus, a historical regulation is |
| 12 | "relevantly similar" to a modern one when it "impose[s] a 'comparable burden' on the |
| 13 | right of armed self-defense and was 'comparably justified.'" *United States v. Van Dyke*, |
| 14 | No. 4:23-cr-00193-BLW, 2024 U.S. Dist. LEXIS 65037, at *9-10 (D. Idaho Apr. 8, |
| 15 | 2024) (quoting *Perez-Garcia*, 96 F.4th at 1170). |
| 16 | *Bruen*'s analytical framework does not require judges "to resolve historical |
| 17 | questions in the abstract; [instead, judges are] to resolve *legal* questions presented in |
| 18 | particular cases or controversies." 597 U.S. at 25 n.6 (emphasis in original). Therefore, |
| 19 | courts are "entitled to decide a case based on the historical record compiled by the |
| 20 | parties," and "are not obliged to sift the historical materials for evidence to sustain" a |
| 21 | challenged regulation. *Id.* at 25 n.6, 60. |
| 22 | **B. *Bruen* Step One** |
| 23 | Although *Bruen* nor *Alaniz* specify which party bears the burden of demonstrating |
| 24 | that *Bruen* step one is satisfied, courts in this Circuit have routinely placed the burden on |
| 25 | the plaintiff.  *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE, 2024 U.S. Dist. LEXIS 46430, |
| 26 | at *20-21 (C.D. Cal. Mar. 15, 2024) (recognizing that *Alaniz* "expressly asks at step one |
| 27 | whether a weapon is in common use today for self-defense" and placing the step one |
| 28 | burden on plaintiffs); *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 904 (W.D. Wash. |

2023) (assuming "that Plaintiffs can produce evidence in support of Bruen's first requirement" and then shifting the burden to the government at step two); *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 888 (D. Or. 2023) ("First, a plaintiff challenging a firearm regulation must show the plain text of the Second Amendment covers the conduct regulated by the challenged law.").

Indeed, in a Second Amendment action, when a plaintiff alleges a violation of his rights, the burden of proof falls on him. *See Bruen*, 597 U.S. at 31-32 (conducting step-one analysis with challenger-specific inquiries such as whether the challenger is part of "the people," whether the weapon is commonly used today for self-defense, whether the Second Amendment covers the challenger's proposed course of conduct); *Rupp*, 2024 U.S. Dist. LEXIS 46430, at *20 ("As *Alaniz* acknowledges, *Bruen* expressly placed the burden at the second step on the government to identify historical analogues; but neither *Bruen* nor *Alaniz* specified who bears the burden of proving that a weapon is protected by the Second Amendment at the step-one, plain-text stage. But analogizing the Second Amendment to the First Amendment (as *Heller* and *Bruen* often did) suggests that the plaintiff bears the burden at step one.").

### 1) "*The People*"

First, the Court should consider if Plaintiffs are a part of "the people" protected by the Second Amendment. The Supreme Court made clear that "the people" described in the Second Amendment are "ordinary, law-abiding, adult citizens." *United States v. Ramos*, No. 21-cr-00395-RGK-1, 2022 U.S. Dist. LEXIS 222784, at *7 (C.D. Cal. Aug. 5, 2022) (quoting *Bruen*, 597 U.S. at 31).

Here, the Complaint reads that the Individual Plaintiffs are adult natural persons who are U.S. citizens and seemingly law-abiding. ECF No. 1 at 2-3. Knife Rights is an advocacy organization suing on behalf of its members "to defend and advance the right to keep and bear bladed arms." *Id.* at 2. Retailer Plaintiffs are weapon retailers who "bring[] this action on behalf of its customers and would-be customers" who wish to acquire the

1 switchblade knives regulated in the challenged statutes. *Id.* at 3-4. Together, all Plaintiffs
2 are members of Knife Rights. *Id.* at 2-4.
3       Neither party disputes that Individual Plaintiffs, Institutional Plaintiff, or Retailer
4 Plaintiffs are "the people" who the Second Amendment safeguards. Applying *Bruen*,
5 Individual Plaintiffs fit comfortably within the ambit of "the people" covered in the
6 Second Amendment. Generally, retailers, like individuals, "have standing to challenge
7 regulations that burden their or their customers' 'right to acquire arms.'" *Altman v. Cty.*
8 *of Santa Clara*, 464 F. Supp. 3d 1106, 1125 (N.D. Cal. 2020) (quoting *Teixeira v. Cty. of*
9 *Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017)). Thus, Retailer Plaintiffs have standing
10 to institute this action on behalf of their customers and prospective customers who are a
11 part of "the people" protected by the Second Amendment.
12       Organizations have associational standing to sue on behalf of their members "only
13 if (a) their members would otherwise have standing to sue in their own right; (b) the
14 interests that the organization[] seek to protect are germane to their purpose; and (c)
15 neither the claim asserted nor the relief requested requires the participation of individual
16 members in the lawsuit." *Haynie v. Harris*, No. C 10-01255 SI, 2014 U.S. Dist. LEXIS
17 28293, at *23 (N.D. Cal. Mar. 4, 2014) (quoting *San Diego Cty. Gun Rights Comm. v.*
18 *Reno*, 98 F.3d 1121, 1130-31 (9th Cir. 1996)). In their Complaint, Plaintiffs allege that
19 Knife Rights' "members include peaceable, law-abiding individuals in California that
20 wish to exercise their right to bear arms . . . ." ECF No. 1 at 2. Plaintiffs' Complaint
21 asserts that "[t]he interests that Knife Rights seeks to protect in this lawsuit are germane
22 to the organization's purposes." *Id.* Plaintiffs' singular claim is that the challenged laws
23 infringe on their constitutional rights to keep and bear arms and they seek declaratory and
24 injunctive relief, nominal damages, and attorney's fees and costs. *Id.* at 9-15. Neither
25 Plaintiffs' claims nor requested forms of relief require the participation of individual
26 members of Knife Rights. Because Knife Rights' members consist of "the people"
27 described in the Second Amendment, its interests in this litigation are germane to their
28 organizational purposes, their claims and requested remedies do not require participation

1  of their members, and Defendants do not contest any of these assertions, Knife Rights
2  have standing. Therefore, there is no genuine material dispute as to whether Plaintiffs are
3  "the people" within the meaning of the Second Amendment.
4             2) *"Common Use for Self-Defense"*
5         Second, the Court must determine whether the regulated switchblade at issue is
6  commonly used today for self-defense. Though *Heller* announced and *Bruen* reiterated
7  that the Second Amendment extends only to bearable arms presently in common use,
8  neither case clarified a metric by which courts should determine whether a weapon is "in
9  common use." Instead, the latter case, *Bruen*, simply repeated *Heller*'s observation that
10 the Second Amendment "protects the possession and use of weapons that are 'in common
11 use at the time.'" *See Bruen*, 142 S. Ct. at 2134. In contrast, "dangerous and unusual"
12 weapons are "outside the scope of the Second Amendment." *Rupp*, 2024 U.S. Dist.
13 LEXIS 46430, at *19 (quoting *Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir.
14 2015), abrogated on other grounds by *Bruen*, 597 U.S. 1; *see Heller*, 554 U.S. at 627.
15         Here, Plaintiffs argue broadly that Defendants cannot prove the switchblades at
16 issue are "dangerous and unusual" or uncommon simply because they are regulated, and
17 defense experts fail to show a genuine factual dispute over whether the regulated knives
18 are "dangerous and unusual." ECF No. 34-1 at 14. In arguing its second point about
19 whether the regulated switchblade is "dangerous and unusual," Plaintiffs cite defense
20 experts' reports and deposition in stating that said knives are "simply a variation of the
21 folding pocket knife" and possess no "uniquely dangerous propensities." *Id.* at 14-16.
22 Plaintiffs claim that although Defense expert, Mr. Escobar, names several characteristics
23 that increase the danger of using a switchblade for self-defense, his statements are
24 contradicted by his deposition where he says that each characteristic identified in his
25 report are not unique to switchblades and apply to all folding knives or knives in general.
26 *Id.* at 14-15. Plaintiffs further argue that defense expert reports by Mr. Spitzer, Mr. Rivas,
27 and Mr. Escobar do not identify crime data from 1958 to 2024 relating to switchblades
28 other than a 1950 magazine article. *Id.* at 15. In Plaintiffs' view, because guns are more

1  lethal and dangerous than the regulated knives at issue, then such knives cannot be
2  "dangerous and unusual." *Id.* at 15-16.
3        Plaintiffs' third point creates its own test for ascertaining commonality. In doing
4  so, Plaintiffs argue that the regulated switchblade is in common use today because they
5  "are common numerically, jurisdictionally, and categorically." *Id.* at 6, 16-21. Plaintiffs
6  rely on a pre-*Bruen* 5th Circuit case, *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016),
7  to assert that the total number of a particular weapon shows that it is in common use. *Id.*
8  at 16. Using this metric, Plaintiffs contend that two U.S. manufacturers produce over 1
9  million switchblades a year, the "total traffic in this country in switchblade knives
10 exceeds 1,200,000 per year," and that since the 1890s switchblades have been mass
11 produced. *Id.* at 16-17. Based on sheer numbers, Plaintiffs reason that switchblades
12 generally (not exclusive to the switchblades regulated here) are in common use
13 contemporarily. *Id.* at 19. Plaintiffs also argue that the regulated switchblades are
14 categorically in common use because they claim the knives at issue "have no practical or
15 constitutional distinction from other folding pocket knives in that they have a blade, a
16 handle or grip, and the blade rests within the handle or grip when closed or collapsed, and
17 when open or extended is 'fixed' into a usable position." *Id.* Plaintiffs aver that the
18 regulated switchblades fall under the category of folding pocketknives and claims that
19 folding pocketknives are possessed in millions of homes in the U.S. *Id.* at 20. Thus,
20 Plaintiffs contend that "[b]ecause automatically folding knives are categorically folding
21 pocket knives; and folding knives are legal in all 50 states, they are in common use." *Id.*
22 Across jurisdictions, Plaintiffs argue that the regulated switchblades are in common use,
23 not regulated in 45 states, and 36 states permit public carry. *Id.* at 20.
24       Defendants counterargue, stating that "Plaintiffs make at least two analytical errors
25 at *Bruen*'s first stage. First, they claim that the arm does not have to be used for self-
26 defense. When an arm is possessed by thousands for lawful purposes, it is in common use
27 and it is protected—full stop . . . And second, they assert that even arms not in common
28 use cannot be banned so long as they are no more dangerous than other arms that are in

1  common use." ECF No. 36 at 5. Defendants contend that the correct inquiry is simply
2  whether the weapons are in common use today for self-defense. *Id.* (quoting *Alaniz*, 69
3  F.4th at 1129). Defendants argue that Plaintiffs' preferred rule of determining
4  commonality based on sheer numbers comes from Justice Alito's concurrence in *Caetano*
5  *v. Massachusetts*, 577 U.S. 411, 136 S. Ct. 1027 (2016), which is not binding authority.
6  *Id.* at 6. Defendants also argue that Plaintiffs never address whether the weapons at issue
7  are in common use specifically for self-defense and instead focus erroneously on
8  common ownership and general sales which have "no bearing on the types of knives
9  actually regulated by the challenged statutes" and is insufficient to pass *Bruen* step one.
10 *Id.* at 7-8. Defendants further argue that the subset of regulated switchblades at issue are
11 ill-suited for self-defense because it requires training in close hand-to-hand combat and
12 such "inherently [] close-combat" results in "significant psychological barriers." *Id.* at 8-
13 10. Defendants assert that *Bruen* step one cannot be satisfied because the general sales
14 provided by Plaintiffs do not demonstrate that the subset of switchblades regulated are in
15 common use for self-defense.  *Id.* at 11. Defendants counter Plaintiffs' "jurisdictional"
16 argument by contending that "California need only ensure that its laws pass constitutional
17 muster, not that they align with the laws of other states." *Id.* at 12. To support this
18 argument, Defendants invoke *McDonald v. City of Chicago*, 561 U.S. 742 (2010) stating
19 that the Second Amendment does not eliminate a state's "ability to devise solutions to
20 social problems that suit local needs and values." *Id.* at 12.
21         Defendants also argue that not only are the regulated switchblades not in common
22 use for self-defense, but they are "dangerous and unusual weapons." *Id.* Defendants point
23 to two out-of-Circuit pre-*Bruen* cases in arguing that federal courts "have long
24 recognized that switchblades are uniquely dangerous weapons." *Id.* at 14. Defendants
25 also string cite a collection of Ninth Circuit cases, asserting that they show a relationship
26 between switchblades and criminal activity. *Id.*
27         The Court finds that there are no triable issues as to whether the regulated
28 switchblades are in common use today for self-defense. To start, Plaintiffs identify no

1  relevant authority establishing the "numerical, jurisdictional, and categorical"
2  commonality test they apply. Beyond that, Plaintiffs' created test does little to illustrate
3  common use for self-defense. *Rupp*, 2024 U.S. Dist. LEXIS 46430, at *23-24 ("[W]hen
4  briefly conducting a common-use analysis, *Bruen* stated that no "party dispute[s] that
5  handguns are weapons 'in common use' today for *self-defense*." . . . In line
6  with *Heller* and *Bruen*, the Court concludes that the inquiry as to whether a weapon is
7  dangerous and unusual must be tethered to self-defense, not lawful
8  purposes generically.") (emphasis in original). Indeed, the number of switchblades
9  allegedly sold in the country – generally, not only the kind specifically regulated here –
10 does not prove that they are commonly used today for self-defense. *Id.* at *37 ("*Fyock*
11 noted that 'sales statistics indicating that millions of [the regulated component]' were
12 sold 'does not necessarily show' that they 'are commonly possessed by law-abiding
13 citizens'") (quoting *Fyock*, 779 F.3d at 997-98). Likewise, whether a switchblade is
14 categorized as a folding pocketknife does not show common use of the regulated
15 switchblades. At issue, in this action, is the regulation of a subset of switchblades that
16 have a two-inch or longer blade and no safety mechanism. As such, Plaintiffs
17 emphasizing that switchblades generally fall under the umbrella of folding knives does
18 not address whether the regulated switchblades are in common use.
19         In further applying its own created test, Plaintiffs allege that forty-five states do not
20 regulate switchblades and thirty-six states permit public carry, thus switchblades are
21 common across jurisdictions. *Bruen* transformed the Second Amendment jurisprudence
22 and abrogated cases that conflicted with its holding. *McDonald* is not one of those cases.
23 561 U.S. 742. Thus, *McDonald* is left undisturbed, and *McDonald* makes clear that while
24 the Bill of Rights is fully binding on States, it limits – but does not eliminate – their
25 ability to legislate solutions to social problems. *Id.* at 784-85. Consequently, whether
26 other jurisdictions do not regulate switchblades is irrelevant and it does not illuminate
27 whether the regulated switchblades are in common use today for self-defense. Therefore,
28

1  there is no triable issue of genuine material fact as to whether the regulated weapon is
2  commonly used for self-defense.
3         With this conclusion, the Court turns to whether the regulated switchblades are
4  dangerous and unusual weapons. "Whether a weapon is dangerous and unusual is a two-
5  part test—with dangerous and unusual each bearing independent meaning." *Rupp*, 2024
6  U.S. Dist. LEXIS 46430, at *23 (citing *Fyock*, 779 F.3d at 997). Here, the Court finds
7  that there is no genuine material dispute over whether the regulated switchblades – let
8  alone switchblades in general – are dangerous weapons. In fact, Plaintiffs never argue to
9  the contrary. Instead, Plaintiffs argue that the defense expert Mr. Escobar made
10 statements in his report that switchblades have uniquely dangerous properties, which
11 conflict with his deposed statements. However, Mr. Escobar made no such conflicting
12 statements. Rather, he says that the regulated switchblades have uniquely dangerous
13 properties. Namely, they have an ease of automation. Though he acknowledges other
14 knives may have similar design features – e.g., folding – he distinguishes them from the
15 regulated switchblades because their ease of automation results in a higher propensity for
16 failure when the user tries to deploy the weapon and the more moving parts a weapon has
17 the higher the risk of failure. ECF No. 34-5 at 67, 92-93.
18        While there is no genuine material dispute over whether the regulated switchblades
19 are dangerous for self-defense, the "dangerous and unusual" inquiry tethered to the
20 "common use" factor in *Bruen* step one requires the Court to also determine whether the
21 weapon is unusual for self-defense. "The 'unusual' prong asks whether a weapon is
22 'commonly possessed.'" *Rupp*, 2024 U.S. Dist. LEXIS 46430, at *37. If the weapon is
23 dangerous and unusual, then it falls outside of the Second Amendment's purview.
24 Notably, neither party directly addresses whether the regulated switchblades are unusual
25 for self-defense. Plaintiffs seemingly touch on whether the weapons are unusual, by
26 arguing that the weapons are widely used for lawful purposes. But Plaintiffs never come
27 close to arguing whether the weapons are specifically unusual for self-defense. *Alaniz*, 69
28 F.4th at 1128 (interpreting *Bruen* step one, in alignment with *Heller*, to require the

1  challenged weapon to be "'in common use' today for self-defense"). Defendants, in a
2  roundabout way, appear to address whether the regulated switchblades are unusual by
3  contending that they necessitate close hand-to-hand combat training to be used for self-
4  defense and such encounters create psychological barriers.
5       Because Plaintiffs bear the burden of satisfying *Bruen* step one and fail to prove
6  that the regulated switchblades are in common use today for self-defense or that the
7  weapons are not dangerous and unusual, it follows that there is no genuine dispute of
8  material fact as to this issue.
9             **3)  "*Proposed Course of Conduct*"**
10       Third, the Court must consider whether the Second Amendment's plain text covers
11  the proposed course of conduct. The Second Amendment reads: "A well regulated
12  Militia, being necessary to the security of a free State, the right of the people to keep and
13  bear Arms, shall not be infringed." To determine whether the plain text "covers an
14  individual's conduct, courts must first identify and delineate the specific course of
15  conduct at issue." *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-00501-
16  BLF, 2023 U.S. Dist. LEXIS 120797, at *12 (N.D. Cal. July 13, 2023) (citing *Bruen*, 597
17  U.S. 1, 31). While conducting the *Bruen* step one analysis, if the plaintiff is not "part of
18  the people" or if the weapon at issue is not "in common use for self-defense," then the
19  proposed conduct cannot be covered by the Second Amendment. 597 U.S. 1, 31-32
20  (analyzing "the people" and "common use" then "turn[ing] to whether the plain text of
21  the Second Amendment protects Koch's and Nash's proposed course of conduct—
22  carrying handguns publicly for self-defense"); *see also Ramos*, 2022 U.S. Dist. LEXIS
23  222784, at *6-7 ("[T]he [*Bruen*] Court has indicated that there is a threshold
24  determination to be made before comparing the conduct at issue to the Amendment's
25  language . . . Therefore, before analyzing whether an individual's *conduct* is protected, a
26  court must first determine whether the *individual himself* is protected—whether he is
27  part of the people.") (emphasis in original) (internal citations omitted).
28

1       Here, in their Complaint, Plaintiffs state that their proposed course of conduct is
2 "to keep and bear [the regulated switchblades] for self-defense and other lawful purposes
3 . . . ." ECF No. 1 at 7. The only other time Plaintiffs directly name their proposed course
4 of conduct is in their reply brief, which states: "Plaintiffs' proposed action . . . [is] to
5 engage in normal, peaceable, commonplace, and constitutionally protected conduct with
6 normal, commonplace, constitutionally protected arms in California and retailer Plaintiffs
7 seek to offer these knives currently prohibited by California law to the public." ECF No.
8 38 at 3. Further, nowhere in the briefings do Defendants address Plaintiffs' proposed
9 conduct.
10      Although, neither party asserts fully fleshed out arguments under the "proposed
11 course of conduct" factor of *Bruen* step one, the Plaintiffs' proposed conduct cannot be
12 covered by the Second Amendment because the weapons at issue are not commonly used
13 for self-defense and are dangerous and unusual. The weapons thus fall outside of the
14 scope of the Second Amendment. Therefore, this factor yields no genuine material
15 dispute.
16      Given that Plaintiffs fail to meet the burden of satisfying *Bruen* step one, the Court
17 need not proceed to step two. Even so, the Court evaluates *Bruen* Step two below.
18      **C. *Bruen* Step Two**
19      When *Bruen* step one is not satisfied, the Court need not assess *Bruen* step two.
20 *See Bruen*, 597 U.S. at 24; *Alaniz*, 69 F.4th at 1128; *Perez-Garcia*, 96 F.4th at 1178.
21 Nevertheless, *Bruen* step two demands the Government to justify its regulation is
22 consistent with the nation's historical tradition. To do this, the Government must produce
23 representative historical analogues that are "relevantly similar" to the challenged
24 regulation in two important ways: "how and why the regulations burden a law-abiding
25 citizen's right to armed self-defense." *Alaniz*, 69 F.4th at 1128 (citing *Bruen*, 597 U.S. at
26 19, 26-29). *Bruen* suggests that 1791 to 1800 is the most relevant time period for
27 identifying representative historical analogues, while classifying historical sources 75
28 years or later after the Second Amendment adoption as an outer limit. 597 U.S. at 35-36.

Defendants claim that "the regulation of weapons throughout U.S. history tends to follow a similar regulatory sequence: certain weapons become associated with criminality or threats to public order and safety after proliferating in society; and subsequently the government enacts a variety of restrictions on that particular weapon, while leaving a range of alternatives available to law-abiding citizens for self-defense." ECF No. 33-1 at 12. Specifically, Defendants name bowie knives and clubs as a historically analogous weapon to the regulated switchblades at issue. *Id.* Defendants state that bowie knives "featur[e] a long, thin blade." *Id.* at 13. Defendants also describe bowie knives as changing "over time . . . [to] be recognized as a large, eight to twelve-inch knife with a clipped blade—one with a sharpened swedge making it more lethal, with the point generally aligned with the handle." *Id.* Defendants reference various State statutes, and specifically cite a Tennessee 1838 law, that prohibit the sale of bowie knives and argue that if ever these laws were challenged, they survived judicial scrutiny because bowie knives were linked to crime and were dangerous weapons. *See id.* at 14. Defendants state that at least three states, Alabama, North Carolina, and Mississippi, imposed high taxes on the personal possession of bowie knives as to be prohibitive. *Id.* However, Defendants do not identify what qualities about bowie knives make them a "representative" analogue to the regulated switchblades at issue.

      Defendants also identify clubs as a representative historical analogue. *Id.* at 15. Defendants claim that laws regulating clubs date back to the Founding era and that "our nation's history" has a "robust tradition of regulating clubs." *Id.* Defendants name seven states that regulated clubs spanning from 1664 to 1889 and two states that regulated clubs in 1905 and 1923. *Id.* Like Defendant's proposal of using bowie knives as a historical analogue, they do not describe what properties clubs have that are similar to the regulated switchblades.

      As to both proposed historical analogues, Defendants argue that their regulations are "relevantly similar" to the weapons at issue here, in terms of *how* both were regulated, because of "their comparable burdens and justifications." *Id.* at 17. But then

Defendants state that "historical laws regulating Bowie knives and other dangerous weapons were actually significantly more burdensome than California's switchblade restrictions." *Id.* Defendants juxtapose the regulated switchblades and the historical analogues by saying that the weapons at issue are only a subset of switchblade knives and in contrast the historical analogues were broader in scope and made no exception for particular types of knives. *Id.* Defendants stress that "California's law leaves a range of weapons available for lawful self-defense, including handguns." *Id.* at 18. Yet, if the regulations in these historical analogues imposed heftier burdens on how a law-abiding citizen exercises their right to armed self-defense, then they are not similar to the less restrictive burden in the present action.

To demonstrate *why* the historical and present regulations both burden law-abiding citizens' right to armed self-defense, Defendants state that "[t]he modest burdens imposed by California's switchblade laws and its analogues are comparably justified by pressing public-safety concerns." *Id.* at 18. Defendants argue that both the historical analogues and the challenged laws at issue were responses to a rise in crime with the historic and modern regulated weapons. *Id.*

Although, the historical analogues may be relevantly similar to the regulated switchblades in *why* they burdened individuals' right to armed self-defense, it is likely that the historical analogues and the regulated switchblades at issue are not relevantly similar in *how* they were regulated. By Defendants' own admission, the two identified historical analogues were more burdensome than the regulated switchblades here. Also, *Bruen* states the historical analogue needs to be "representative." 597 U.S. at 19, 26-29. Though *Bruen* articulates two metrics to determine whether the historical analogue is comparable to the regulation in the present action, it did not specify how courts are to determine whether the historical analogue is "representative." Bowie knives are bladed instruments like the regulated switchblades. Outside of this similarity, it is not clear what makes bowie knives "representative." It is less clear how clubs are "representative." Thus, Defendants fail to meet their burden at step two to show that there is no genuine

1 dispute of material fact as to whether the regulations comport with the nation's historical
2 tradition. While Defendants fail to meet their *Bruen* step two burden, because Plaintiffs
3 did not satisfy *Bruen* step one, the Court must conclude that the weapons at issue are not
4 bearable arms protected by the Second Amendment.

### D. Supplemental Authority

Plaintiffs submit *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) as supplemental authority. ECF No. 41. But the three-judge panel's opinion in *Duarte* has been vacated and the case will be reheard en banc. *United States v. Duarte*, No. 22-50048, 2024 U.S. App. LEXIS 17601, at *1 (9th Cir. July 17, 2024). Both parties submit *United States v. Rahimi*, 144 S. Ct. 1889 (2024) as supplemental authority pointing to language that reiterates *Bruen*'s articulation and application of the two-step framework and to statements in their respective concurring opinions. ECF Nos. 45, 46. As such, *Rahimi* provides no additional support to the Court's *Bruen* analysis. Finally, Plaintiffs also submit *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) as supplemental authority. ECF No. 48. *Worth* is an out-of-circuit case involving a state permit-to-carry statute that regulated public carry handgun rights of adults under 21. *See id*. *Worth*, therefore, is not persuasive authority and provides no additional support here.

### IV. CONCLUSION

For the reasons above, the Court **GRANTS** Defendants' Motion for Summary judgment, and **DENIES** Plaintiffs' Motion for Summary Judgment. The Clerk of Court shall enter judgment for the Defendants and close this case.

**IT IS SO ORDERED.**

**Dated:** August 23, 2024

Honorable James E. Simmons Jr.
United States District Judge