Case No. 24-5536

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Knife Rights, Inc.; Eliot Kagan; James Miller; Garrison Ham; North County
Shooting Center, Inc.; and PWGG L.P.,

Appellants.

v.

Rob Bonta, in his official capacity as Attorney General of the State of California,
*et al*.,

Respondents.

On Appeal from the United States District Court
for the Southern District of California
(Case No.: 3:23-CV-00474-JES-DDL)

## EXCERPTS OF RECORD
## Volume 3 of 15

John W. Dillon (296788)
Dillon Law Group
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
jdillon@dillonlawgp.com
Telephone: (760) 642-7150
Fax: (760) 642-7151

*Attorneys for Plaintiffs Knife Rights, Incl; Eliot Kagan; James Miller; Garrison
Ham; North County Shooting Center, Inc.; and PWGG L.P.*

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   KNIFE RIGHTS, INC.; ELIOT KAAGAN;  )
    JIM MILLER; GARRISON HAM; PWGG     )
4   L.P.,                             )
                                       )   No. 23-CV-0474-JES-DDL
5             Plaintiffs,              )
                                       )
6   v.                                 )   May 8, 2024
                                       )
7   ROB BONTA, California Attorney     )
    General,                          )
8                                      )   Courtroom 4B
              Defendant.               )
9   _____   )   San Diego, California

10

11              TRANSCRIPT OF PROCEEDINGS
                    (Motion Hearing)

12

13     BEFORE THE HONORABLE JAMES E. SIMMONS JR., DISTRICT JUDGE

14

15

16

17

18

19

20

21  COURT REPORTER:        AMANDA M. LeGORE
                           RDR, CRR, CRC, FCRR, CACSR
22                         U.S. District Court
                           333 West Broadway, Suite 420
23                         San Diego, CA 92101
                           amanda_legore@casd.uscourts.gov
24
    Reported by Stenotype:  Transcribed by Computer
25

(3 of 149), Page 3 of 149    Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 3 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3782   Page 2
of 51

2

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:      JOHN DILLON
                              Dillon Law Group APC
 3                            2647 Gateway Road, Suite 105, No. 255
                              Carlsbad, CA  92009
 4                            (760)642-7150
                              jdillon@dillonlawgp.com
 5

 6
     FOR THE DEFENDANT:       KATRINA UYEHARA
 7                            JANE REILLEY
                              Deputy Attorneys General
 8                            State of California
                              Office of the Attorney General
 9                            1300 I Street, Suite 125
                              P.O. Box 944255
10                            Sacramento, CA  94244
                              (916)210-7867
11

12
     ALSO PRESENT:            DOUG RITTER
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Wednesday, May 8, 2024; 1:59 p.m.)

 2

 3                      P R O C E E D I N G S

 4

 5         THE CLERK:  Calling matter number 2, 23-CV-0474, Knife

 6  Rights, Inc., et al., versus Bonta, et al.

 7         THE COURT:  All right.  Good afternoon, everyone.

 8         ATTORNEY DILLON:  Good afternoon, your Honor.

 9         THE COURT:  Can I have appearances, please.

10         ATTORNEY DILLON:  John Dillon, counsel for plaintiffs,

11  Knife Rights, et al.

12         THE COURT:  All right.  Good afternoon, Mr. Dillon.

13         And?

14         CHAIRMAN RITTER:  Doug Ritter, chairman of Knife

15  Rights.

16         THE COURT:  All right.  Good afternoon, sir.

17         ATTORNEY UYEHARA:  Katrina Uyehara, attorney for

18  Defendant Ron Bonta, Attorney General.

19         THE COURT:  And Uyehara, you said?

20         ATTORNEY UYEHARA:  Uyehara.

21         THE COURT:  Uyehara.  Sorry.  Good afternoon.

22         ATTORNEY REILLEY:  Good afternoon, your Honor.  Jane

23  Reilley on behalf of Defendant Bonta.

24         THE COURT:  All right.  Good afternoon, Ms. Reilley.

25         So these obviously are cross-motions for summary
```

(5 of 149), Page 5 of 149     Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 5 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3784   Page 4
of 51

4

 1   judgment that the parties have filed.  I reviewed each of the

 2   cross-motions for summary judgment, the attached exhibits and

 3   supporting documentation.  I reviewed the opposition that each

 4   party has filed, as well as reply briefing that each party has

 5   filed.

 6           So, obviously, this is a hearing regarding the -- for

 7   lack of a better term, the California statute regulating -- or

 8   outlawing switchblade knives of two inches or longer.

 9           So the parties had different arguments in regards to

10   the burdens that were -- that the party had carried the burden

11   in this case.

12           On the onset, *Bruen* itself did not discuss which party

13   had the initial burden.  There have been two cases only in this

14   circuit that have really discussed cases post-*Bruen*.  Neither

15   one of those cases has discussed which party has the initial

16   burden.

17           I know *Bruen* and *Heller*, and predecessor cases, talks

18   about the comparison of the Second Amendment in regards to the

19   First Amendment.  And there's a -- a circuit case -- not

20   circuit.  District court in the Central District of this

21   circuit that has discussed this issue just recently, a few

22   months ago.

23           And they are of the opinion, which seems consistent,

24   that the plaintiff or the challenger to the statute carries the

25   initial burden under the two-step test under *Bruen* to prove

1    that the -- the challenged activity is within the textual

2    analysis that the *Bruen* two-step test talks about, that is

3    within the plain text of the Second Amendment.

4         And then if they do make the proper showing, then the

5    burden switches to the Government -- in this case, the

6    defendants -- to show that the restriction is within the

7    history -- this nation's history in regards to firearm

8    restrictions.

9         So the Court, in initially addressing this matter,

10   does find that the challenging party -- in this case, the

11   plaintiff -- does have the initial burden to analyze that the

12   conduct or the -- the arm that has been restricted is within

13   the plain text of the Second Amendment.

14        And in particular, *Alaniz*, which is the -- one of the

15   two Ninth Circuit cases that address this issue, lists several

16   factors for the step one of the contextual analysis.

17        The first is whether the challenger is part of the

18   people whom the Second Amendment protects.  I don't think

19   there's any dispute here, in this case, that the plaintiffs,

20   the individuals, as well as the part -- the corporation --

21   well, not corporation but the organization plaintiffs, are

22   within the part of the people whom the Second Amendment

23   protects; lawful citizens who have the right to possess arms.

24        And the second step within the first step one of the

25   *Bruen* analysis is whether the weapon at use -- at issue is in

6

1   common use today for self-defense.  That's what the *Alaniz* case

2   decided.

3          The third is whether the Second Amendment's plain text

4   covers the challenger's proposed course of conduct.

5          So the questions that I have for the parties are,

6   obviously, there's two cases only in this circuit.  *Alaniz*

7   talked about whether the weapon at issue is in common use today

8   for self-defense.  I know there's been argument, in the

9   plaintiffs' briefing as well, that the issue should be whether

10  it's in common use for the lawful -- or lawful purpose, not

11  solely self-defense.

12         And *Bruen* itself talks about both self-defense and

13  lawful purpose.  So does *Heller*.  But the Court has to decide,

14  first, whether the weapon is in common use solely for a lawful

15  purpose or whether it's in common use for -- solely for

16  self-defense.  And then the Court will get to the second step,

17  if the plaintiff had met their burden in the first step.

18         So the Court's tentative, based on that analysis, as

19  to the proper procedural framework to guide this discussion, is

20  that the plaintiff has not met their burden under step one, so

21  the Court would not get to a step-two analysis.

22         That's a tentative.  I want to hear from the parties

23  because, frankly, that tentative may change after this hearing.

24         So cross-motions.  But I'm going to allow the

25  plaintiff to go first, and I'll give each party a chance to

 1    reply to the other party's argument.

 2            But, Mr. Dillon, whenever you're ready.

 3            ATTORNEY DILLON:  All right.

 4            Good afternoon.  This is John Dillon, counsel for

 5    plaintiffs.

 6            Considering the Court's initial statements regarding

 7    the analysis that must be conducted under *Bruen*, I'm going to

 8    jump to the arms question.  As it is very clear that there's no

 9    dispute that the plaintiffs in this case are part of the

10    people.  And, in fact, the conduct in question has also not

11    been disputed as being covered under the plain text of the

12    Second Amendment.  So the only real question is whether the

13    arms that are being restricted by California's prohibition are

14    indeed arms under the plain text of the Second Amendment.

15            Now, the plain text analysis under *Bruen* and *Heller* is

16    very clear.  It does not involve any historical review.  It is

17    merely an application of what the text of the Second Amendment

18    says.

19            THE COURT:  That is absolutely correct.

20            ATTORNEY DILLON:  Yes.

21            Now, under *Heller*, the Supreme Court made clear that

22    the 18th century meaning of the term "arms" is no different

23    from its meaning today.  The term "arms" generally refer to

24    weapons of offense or armored defense.  And at the time of the

25    Second Amendment, the term "arms" was understood to extend to

1    bladed weapons.

2        And *Heller* found explicitly that this expansive scope

3    of the term "arms" extends prima facie to all instruments that

4    constitute bearable arms, even those that were not in existence

5    at the time of the founding.

6        Under that standard alone, there is no question that

7    switchblades -- being a folding pocketknife -- are arms under

8    the plain text of the Second Amendment.

9        Now, the Court mentioned the *United States verse*

10   *Alaniz* -- if I'm pronouncing that correctly -- and their

11   discussion of the *Bruen* standard.  I would say that it's very

12   important to first note that the *Alaniz* court did not conduct a

13   plain text analysis in their decision.  And so they did not

14   apply that test under *Bruen*.

15       The Court provided what plaintiffs would describe as

16   an incomplete and inaccurate summary of *Bruen*.  And it provides

17   nothing more than dicta.  If you go to *U.S. v. Perez* v. --

18   U.S. -- *United States v. Perez-Garcia*, in which the defendants

19   have relied on in arguing that the dangerous and unusual

20   argument is one that is applied under the plain text analysis,

21   you'll see that the Ninth Circuit clearly stated that the

22   dangerous and unusual weapons consideration was part of the

23   historical evidence in determining a tradition of permissible

24   regulation.

25       Now, what's significant about that is the dangerous

1    and unusual test is the same as the common use test.  They are

2    two sides of the same coin.  As the Court in *Caentano* stated

3    it's a conjunctive test.  If an arm is in common use, it cannot

4    be both dangerous and unusual.

5         And because that all was applied by both the *Heller*

6    and *Bruen* courts in the historical analysis, it has no

7    application under the plain text analysis.

8         Frankly, the -- the title of the analysis speaks for

9    itself.  We must consider the plain text of the Second

10   Amendment.  And we cannot unilaterally read into the Second

11   Amendment's plain text, extra conditions or qualifications that

12   these arms are not considered arms unless they are in common

13   use; and not just in common use but specifically in common use

14   for self-defense.  None of that is included in the plain text

15   of the Second Amendment, and we cannot just throw that in there

16   when it's not there.

17        THE COURT:  So if I take it, by the argument you're

18   making -- you're arguing to the Court that *Alaniz* is wrong, and

19   the Court should not follow the Ninth Circuit precedent?

20        ATTORNEY DILLON:  Well, again, I would argue that

21   *Alaniz* is not Ninth Circuit precedent.  It merely summarized

22   the decision in *Bruen*, and it quite explicitly states that it

23   did not conduct the plain text analysis under *Bruen*.

24        So it's difficult to see how it can guide this Court

25   when it didn't conduct the analysis itself.

1          THE COURT:  Okay.

2          ATTORNEY DILLON:  But we do have an analysis that's

3   been conducted in both *Heller* and *Bruen*.  And in both of those

4   Supreme Court cases, there is no discussion -- whatsoever -- of

5   whether or not the arms in question, in either *Heller* or *Bruen*,

6   are in common use for self-defense.

7          While it's discussed that the arms, and firearms in

8   general, are in common use for various lawful purposes, there's

9   not a single instance in either one of those decisions where

10  they put that condition or qualification as necessary in order

11  to determine whether the arms in question are arms under the

12  plain text of the Second Amendment.

13         Now, going -- moving on from that argument, unless the

14  Court has any additional questions, I would argue that

15  plaintiffs have sufficiently shown that under the plain text

16  analysis, that these arms are in fact arms under the Second

17  Amendment.  And the burden would then shift to the Government

18  to provide relevant historical justifications for their current

19  ban.

20         Now, as a part of this historical analysis, we have to

21  go back to *Heller*.  *Heller* involved a question of whether or

22  not handguns could be banned.  This was an arms ban case,

23  contrary -- distinguishable from *Bruen*, which was a case

24  dealing with the public carry of arms.

25         So *Heller* is the controlling authority in this case,

1    as this is an arms ban case.  And under *Heller* the Court

2    decided that based off the historical tradition in the

3    historical analysis, that only those arms that are both

4    dangerous and unusual can be banned.

5            Now, again, I mentioned *Caentano* earlier, when I

6    referenced in the plain text argument.  But this is really

7    where this argument is.  It's really where the *Heller* analysis

8    discusses this.  And it says that in order for a court to

9    conclude that an arm is dangerous and unusual, it has -- it

10   cannot be in common use.  Because, again, if an arm is not both

11   dangerous and unusual, it's -- sorry, if an arm is in common

12   use, it can't be both dangerous and unusual.

13           Now, plaintiffs have provided a significant amount of

14   evidence regarding the commonality of arms.  We have argued

15   that the automatic knives in question are common in many

16   different ways, including the fact that they're common

17   numerically.  We've shown that since the 1950s, millions of

18   these knives have been sold throughout the United States.  And

19   they continue to be sold today, with over 33 manufacturers

20   manufacturing and selling automatic knives in the United

21   States.

22           They're common jurisdictionally, as it is completely

23   legal to own and possess and even carry these knives.  And the

24   lion's share of the states in the United States -- 45 states

25   allowing for the purchase, possession, sale, and use of these

1  knives.

2        We've also argued that these knives are common

3  categorically.  It's undisputed that these knives are in fact

4  pocketknives.  They're a variation of a pocketknife.  The

5  defendant's experts have all acknowledged that these are

6  folding pocketknives that are carried in the pocket and meet

7  the definition of pocketknife in every conceivable way.

8        Now, because they are pocketknives, they belong to a

9  category of arms that is overwhelmingly common in the United

10  States, with estimates being that 35 million-plus of these

11  knives -- or homes in the United States have some sort of

12  pocketknife.  And, again, we have shown that there's no

13  distinction between --

14        THE COURT:  Well, I'm sorry for interrupting.  I was

15  going to ask a question about that for both parties.

16        ATTORNEY DILLON:  Um-hmm.

17        THE COURT:  The question is, at what point should the

18  Court be delineating between just a knife, generally; a

19  pocketknife generally; or a switchblade knife in particular?

20  In this case, that -- where the definition under the penal code

21  is less than two inches and opens up with a -- I forget the

22  exact language, the cadence that it had --

23        ATTORNEY DILLON:  Flick of the wrist or --

24        THE COURT:  Yes.

25        ATTORNEY DILLON:  Yes, your Honor.  And, actually,

(14 of 149), Page 14 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 14 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3793    Page 13
of 51

13

1    *Heller* gives us a great understanding of what -- how we need to

2    delineate between these different arms.

3         So, in *Heller*, the question that was answered was

4    whether handguns were allowed to be banned.  They did not break

5    down the law -- or the restriction on whether or not revolvers

6    are allowed to be banned, or whether striker-fired pistols are

7    allowed to be fired, or hammer-fired pistols are allowed to be

8    banned.  They're all arm -- they're all handguns.  And at that

9    categorical level, the Court distinguished between handguns and

10   long guns.  Said that you can't ban handguns, even if you say

11   that, well, you can still have long guns.  That's not -- that

12   was an argument specifically rejected by *Heller*.  And here,

13   same thing.

14        We have ordinary pocketknives.  These are folding

15   knives.  And that's the category that they're in.  And, in

16   fact, the defense expert, Robert Escobar, explicitly stated

17   that the switchblades belong under the two categories of

18   folding knives.  Meaning folding knives and out-the-front

19   knives, in which the knife has a handle, a blade.  And that

20   blade is either folded or collapsed into the handle.  And it

21   opens into a locked position, in various ways.  And it's

22   carried in the pocket.  So plaintiffs would make the argument

23   that this is the proper level to address this ban.

24        But we've also shown that, even if you want to be more

25   specific, their commonality -- even at the level of being a,

(15 of 149), Page 15 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 15 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3794    Page 14
of 51

14

1  quote/unquote, switchblade -- they've been in common use

2  throughout the United States for many decades.

3          THE COURT:  And I ask that question because I know

4  there's at least a district court here in the Central District,

5  in *Rupp v. Bonta*, that distinguish between automatic weapons

6  and semiautomatic weapons.

7          And they're both firearms.  They're both guns.  But

8  there's a difference between the two.  And which makes the

9  automatic weapon, the M-16 in that discussion, sufficient to

10  restrict the ability for lawful citizens to use that or possess

11  that in their self -- or any lawful purpose or self-defense.

12          So even if they're both knives, they're still -- it's

13  not just the sole discretion -- that's not the sole discussion,

14  based on the fact that there's a difference between an

15  automatic and a semiautomatic.  Correct?

16          ATTORNEY DILLON:  Well, again, you know, *Heller*

17  provides the appropriate analysis of when you're considering

18  the levels of analysis, I guess, you would apply.

19          THE COURT:  Because *Heller* even discussed that they

20  still have the ability to ban and to restrict arms to certain

21  individuals and for certain purposes.  So *Heller* didn't say you

22  can't ban firearms at all.

23          ATTORNEY DILLON:  No.  And plaintiffs have not made

24  that argument.  That's something that is very clear.  And we --

25  and in our historical analysis, in reviewing the defendants'

(16 of 149), Page 16 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 16 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3795    Page 15
of 51

15

1   justifications, you know, it seems to be that at -- in --

2   without putting words in their mouth, my interpretation of it

3   is any restriction, whatsoever, placed on any type of arm will

4   allow for broader restrictions to be placed on any arm that

5   they can think of.

6          But in fact, you know, *Heller* court, the *Bruen* Court,

7   and this Court have all now seen the same historical evidence.

8   Most of that historical evidence consists of concealed carry

9   restrictions, and most of those concealed carry restrictions

10  were implemented after 1870.

11         And the Court, in *Heller* and *Bruen*, was explicitly

12  clear that with the sheer lack of any restrictions being found

13  in the Colonial founding eras and shortly thereafter, this late

14  period -- late-1800s laws cannot contradict the plain text of

15  the Second Amendment or the lack of any restrictions during the

16  founding.

17         THE COURT:  And I agree with you.  When we get to step

18  two, the historical analysis, the key time period is around the

19  founding of the -- or the adoption of the Second Amendment.

20  The -- around 1791, I believe, to the adoption of the

21  Fourteenth Amendment; the -- the mid to late 1800s.

22         So I agree with you in that respect.  Anything in the

23  late 1800s or, frankly, the 20th Century, at all, frankly, is

24  not as instructive.  It can be, but it's not necessarily

25  binding, instructive in regards to the historical analysis.

1          So if it were to get to step two, I think there's a

2   significant problem with -- with what I have before me today.

3   But I can't get to step two until step one has been satisfied.

4   So that's the concern I have, whether step one has been

5   satisfied.

6          I've interrupted you.  So I'm sorry.  I'll let you

7   finish your argument.  I apologize.

8          ATTORNEY DILLON:  It's not a problem.  What I was

9   going into with regard to the main concealed carry restrictions

10  that the defendants have put forth in their historical

11  analysis -- I'll just make it very clear.  While these

12  restrictions regulated the active concealed carry, each and

13  every one of these restrictions permitted the purchase, sale,

14  acquisition, possession, and even open carry of every knife

15  that's been identified; whether it's Bowie knives, Arkansas

16  toothpicks, dirks, daggers, stilettos, and even, you know,

17  switchblades.  These concealed carry restrictions did not

18  impose such broad prohibitions as we're seeing today, when it

19  comes to this state's law.

20         So -- so going back -- because, you know, the Court

21  has indicated that there's still some struggle when it comes to

22  the first step in the textual analysis, you know.  We've --

23  plaintiffs have argued that the plain text is very clear.  And

24  the decisions in *Heller* and *Bruen* make it very clear that it's

25  a very simple analysis when it comes to the plain text.  We

(18 of 149), Page 18 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 18 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3797    Page 17
of 51

17

1    cannot read additional conditions or qualifications that do not

2    exist into the text.

3         You know, much of defendants' arguments, when it comes

4    to their plain text assertions and the burdens involved, amount

5    to a discussion regarding the common use in self-defense.  And,

6    again, we've already stated that there's nothing in the text

7    that says anything about being commonly used for self-defense.

8         And, in fact, if that is the test that the Court's

9    going to impose, we have to consider the implications of such a

10   thing.  Because just from a common sense level there are many

11   arms and many firearms -- indeed -- that aren't commonly used

12   for self-defensive purposes, whether they be bolt-action

13   hunting rifles or even muskets or black-powder firearms.  I

14   don't think anyone's going to argue that those are not commonly

15   used in self-defense anymore.  But there is no question that

16   they are arms under the Second Amendment.

17        The same is true for competition firearms, like

18   competition handguns or Olympic pistols, which the state of

19   California explicitly exempts from assault weapon regulations

20   because of their sporting purpose.  These are not used in

21   common use for self-defense by any means, yet they are

22   undoubtedly arms under the Second Amendment.  And, again, we

23   can't read that condition into it.

24        THE COURT:  I -- I understand the argument.  But I

25   know both *Heller* -- well, *Heller*, more particular than *Bruen*.

(19 of 149), Page 19 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 19 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3798    Page 18
of 51

18

1    But *Heller* focused on -- especially in particular, a special

2    agent in that case who was denied the -- the permit, for lack

3    of a -- no, it's a concealed weapon permit to carry the firearm

4    on its own. *Heller*'s focused a lot on self-defense and not as

5    much on lawful -- for any lawful purpose.

6            *Bruen* discussed both self-defense and lawful purpose,

7    especially in the sense of the -- the text of the Second

8    Amendment being -- at least the *Bruen* court talked about the

9    whole text of this was for individuals to have this right to

10   self-defense in their home, which is why the text was created

11   at the founding of the Second Amendment.  So I know *Heller*

12   focuses mostly on self-defense.  *Bruen* talks about both lawful

13   purpose and self-defense.  But there is that discussion.

14           And, unfortunately, we have the two-step test that was

15   created by *Bruen*.  And the Court clearly said the -- the

16   Government has the burden on the second step of that test, but

17   did not say who had the first -- the burden on the first step

18   of that test.

19           So it was -- and there hasn't been a lot of cases

20   throughout the country to talk about that.  But the courts, in

21   both *Heller* and *Bruen*, did a comparative analysis to First

22   Amendment rights.  In regards to First Amendment rights, the

23   individual challenging the statute has the -- carries the

24   initial burden.  And so that's why I'm starting off with that

25   framework here, in regards to the initial burden.  But,

1    ideally, we'll got a little bit more case law clarifying these

2    issues, so we're not making new law at the district court

3    level.

4         ATTORNEY DILLON:  Yeah.  And that's exactly

5    plaintiffs' point, your Honor.  We can't make a new standard.

6    You know, we went through around 12 years of a two-part sliding

7    scale analysis under the Ninth Circuit.  That was made up by

8    the lower courts after the *Heller* decision.  And the Supreme

9    Court explicitly repudiated that act.  So I would strongly want

10   to avoid doing that again.

11        And just -- I note one last point regarding *Heller*'s

12   analysis.  *Heller*'s analysis of the Second Amendment's plain

13   text repudiates this whole claim that it is for self-defense

14   per the -- you have to have in common use for self-defense.

15        According to *Heller*, the most natural reading of "keep

16   arms" is to have weapons.  "Keep arms" was simply a common way

17   of referring to possessing arms for militiamen and everyone

18   else.  If the Court were to -- in *Heller* were to try to make

19   the claim or put some new condition that these arms have to be

20   used in actual self-defense scenarios, they wouldn't have said

21   that.  They've made it explicitly clear.  It's just the simple

22   act of possessing.

23        And that's the decision of the people that the Second

24   Amendment grants.  It pulls away the ability for the Government

25   and even the courts to decide on a case-by-case basis whether

(21 of 149), Page 21 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 21 of 149
Case 3:23-cv-00474-JES-DDL Document 42 Filed 05/21/24 PageID.3800 Page 20
of 51

20

1   the right's really worth insisting; or whether, you know, they

2   made the right choice in what arms they're going to use.

3          In the discussion that *Heller* -- in *Heller*'s

4   discussion, when it's talking about the various reasons that

5   the people have chosen a handgun as the quintessential firearm

6   for self-defense, it lists a number of reasons why people may

7   have chosen handguns.  And defendants have relied on those

8   reasons as -- to kind of bolster their argument that this shows

9   that the suitability or common use for self-defense is an

10  actual condition.  But they omit the fact that at the end of

11  that discussion the court says, whatever the reasons, the

12  people have chosen the handgun as their weapon of self-defense.

13          And it's highlighting the fact that -- unfortunately,

14  this is not for the Government and the courts to decide.  It is

15  a decision of the people, under the Second Amendment, to decide

16  what weapons they are going to use for self-defense.  And,

17  again, the definition of "arms" extends prima facie to all

18  instruments that constitute bearable arms.  There's been no

19  discussion, whatsoever, from the defendants -- or even

20  argument -- that in fact an automatically opening knife or any

21  knife in general is somehow not a bearable arm.  There's no

22  facts or evidence that would state that you couldn't use it for

23  self-defense.  In fact, both the plaintiffs' and defendants'

24  knife experts both acknowledge that they will can be used for

25  self-defense.  And it's up to the person using it to do so.

(22 of 149), Page 22 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 22 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3801    Page 21
of 51

21

 1            So, you know, we can't overcomplicate this first

 2    textual analysis.  It's very clear.  What does the text say?

 3    Arms.  And what are arms?  Arms are all instruments that are

 4    bearable weapons of offense and defense.

 5            It's very clear that these knives are weapons of

 6    offense and defense.  The simple fact that -- that the state is

 7    trying to claim that they're too dangerous -- too dangerous of

 8    weapons that they need to be regulated concedes the point that

 9    they're a weapon of offense.

10            So it's remarkable, you know, in plaintiffs' opinion,

11    how we could try to sidestep just clear definitions.  They are

12    in fact arms.  And the burden goes and shifts immediately to

13    the defendants to prove historical justification.

14            THE COURT:  Thank you very much, Mr. Dillon.

15            Who's going to argue on behalf of the defense?

16            All right.

17            ATTORNEY UYEHARA:  Good afternoon, your Honor.

18            We agree with the tentative here in this case.  We

19    believe that the *United States verse Alaniz* was not dicta, and

20    that it is binding on this Court.

21            And in that decision, the Ninth Circuit held that the

22    *Bruen* step one involves a threshold inquiry.  In alignment with

23    *Heller*, it requires's textual analysis.  And that involves

24    whether or not the weapon at issue is in common use today for

25    self-defense.  And the Ninth Circuit is not the only court to

(23 of 149), Page 23 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 23 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3802   Page 22
of 51

22

1    hold this, so far.  The Seventh Circuit has also held this, and

2    viewed this for *City of Naperville.*  And as your Honor has

3    mentioned, in *Rupp* as well, in the Central District.

4         And so what exactly does "for self-defense" mean?

5    Well, *Heller* actually gives us some metrics.  *Heller* looks at

6    the primary use and purpose of the handgun that was at issue in

7    that case.  It also looks at the suitability of the handgun for

8    self-defense.

9         In *Heller*, the court specifically delineates there's

10   many reasons why a person would use a handgun for self-defense.

11   Mainly that they're easy to store in a location, they're

12   readily accessible in an emergency.  They're easier to lift and

13   aim than long gun, and it can be used with one hand while the

14   other hand dials the police.  All of those characteristics of

15   the handgun go to the suitability of the handgun as the

16   quintessential self-defense weapon.

17        And plaintiffs discuss the use of alternatives in

18   terms of self-defense.  But "handgun" at -- in *Heller*, what was

19   at issue was D.C.'s handgun ban.  So it wasn't -- they didn't

20   have to discuss long guns and other weapons of that nature.

21        And in this case here, we built a significant record

22   just on the issue of whether or not switchblades are suitable

23   weapons for self-defense.

24        Our expert, Robert Escobar, our self-defense expert,

25   explains in detail that switchblades require users to be

(24 of 149), Page 24 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 24 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3803   Page 23
of 51

23

1    trained in close hand-to-hand combat.  They have to overcome

2    significant psychological barriers when using those knives to

3    slash and stab in self-defense.  It requires the cutting of

4    tissue, ligaments, muscles and results in subsequent blood

5    loss.  It also requires fine motor skills to deploy the blade

6    and the potential of self-injury.

7              Plaintiffs expert, Mr. Janich, also agrees with this.

8    He doesn't recommend these knives in his classes.

9    Specifically, automatic opening knives do not have training

10   knife complements, meaning knife models that replicate the

11   actual feel of the knife but are dull.  So, in essence, you

12   can't spar or train with these knives because they're not

13   commonly used for self-defense, or at least there's no evidence

14   in this record.

15             And, specifically, plaintiffs don't provide any

16   evidence that the subset of switchblades at issue -- those with

17   blades two inches or longer and don't have a détente or safety

18   mechanism -- that they're in common use for lawful purposes at

19   all or in common use for self-defense.

20             And since -- specifically, what plaintiffs do provide

21   is they provide sales figure estimates.  So the number of

22   automatically opening knives sold by the alleged three largest

23   online knife retailers in the country.  That does not inform

24   this Court on whether or not how many of those knives are

25   actually used for ordinary self-defense.

(25 of 149), Page 25 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 25 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3804    Page 24
of 51

24

1           THE COURT:  Can I ask a question about that?  Because

2      I know in the plaintiffs -- both their original opening motion,

3      as well as their opposition to the defendants' motion, they

4      talk about the number -- I forget off the top of my head.  But

5      I know it's over one million, I believe, of these types of

6      knives that have been produced by the largest manufacturers.

7           So are you suggesting to the Court that the Court --

8      that plaintiff has to show that these knives are used for

9      self-defense, as opposed to just possessed and owned by

10     individuals?

11          ATTORNEY UYEHARA:  Yes, your Honor.  The plaintiffs

12     have to show that these knives are in common use for

13     self-defense.  And it's not as simple as just counting out how

14     many automatically open knives -- not even the ones that are

15     regulated by California -- are in common use.

16          THE COURT:  Well, let's take that to an analogy

17     with -- with a handgun.

18          Is the argument, in a similar analogy, that a

19     particular handgun that may be banned by the state of

20     California -- I don't have a particular gun in mind -- that the

21     plaintiff would be required to show that despite the fact that

22     this handgun may be legal in other parts of the country, that

23     it has -- that those who own it have to own it solely for

24     self-defense?

25          ATTORNEY UYEHARA:  This is exactly why the defendant

1    doesn't believe the numerical or numbers-only approach to the

2    common use test.

3           The Ninth Circuit -- and I believe the Seventh Circuit

4    as well -- has discussed how the common use test is kind of

5    circular.  Specifically, in *Friedman versus City of Highland*

6    *Park*, the Seventh Circuit there said it would be absurd to say

7    that the reason why a particular weapon could be banned is that

8    there is a statute banning it.  The Ninth Circuit has gone on

9    to say that a numbers-only approach would suggest that the

10   Constitution protects -- what the Constitution protects depends

11   on whether or not that's been regulated by the Government.

12          And the reason we look to whether or not a weapon is

13   in common use for self-defense is it also takes more dangerous

14   weapons that aren't in common use out of the equation.  For

15   instance, a rocket launcher is an arm.  Correct?  But that

16   doesn't mean that anyone can have one.

17          And so the common use for self-defense component of

18   the common use test helps to set limits on the term "arms" as

19   it was defined in the original public meaning of the Second

20   Amendment.

21          THE COURT:  And let me ask another question.  You were

22   talking earlier about your expert's opinion regarding the use

23   of a switchblade knife.  In this situation, how it required

24   training and the psychological component that you mentioned

25   earlier.

(27 of 149), Page 27 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 27 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3806   Page 26
of 51

26

1    Couldn't the same analogy be meant -- meant to a
2    firearm itself, a handgun?
3         ATTORNEY UYEHARA:  Most certainly, your Honor.  But
4    the point is that there's specific -- especially when it comes
5    to the psychological barriers that are involved with stabbing,
6    it's much different from shooting someone across the room to,
7    you know, physically slashing at someone and feeling that --
8         THE COURT:  I guess it depends on the individual.
9         ATTORNEY UYEHARA:  I suppose, your Honor.  But that's
10   not the only evidence that we provide, that shows that -- that
11   a switchblade is an ineffective weapon for self-defense.
12        THE COURT:  Okay.  Please continue.
13        ATTORNEY UYEHARA:  Returning to the kind of
14   numbers-only or numerical argument here.  The only case that's
15   ever really done a numbers game is *Caetano versus*
16   *Massachusetts*, which -- as we discussed in our brief -- is only
17   Justice Alito's concurrence that kind of takes a numbers-only
18   approach.
19        And courts and advocates alike are not in agreement
20   that *Caetano versus Massachusetts* even endorses a numbers-only
21   approach.  There, Justice Alito's concurrence was in direct
22   response to a statement by the Massachusetts supreme judicial
23   court that said, well, the number of stun guns is less than the
24   number of handguns, and that's the end of the analysis.  And
25   that's why Justice Alito stated that there are thousands of

(28 of 149), Page 28 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 28 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3807    Page 27
of 51

27

1    stun guns in circulation.

2          And so regardless of whether this Court takes a

3    numbers-only numerical approach, if the analysis is as we say

4    it is -- common use for self-defense -- that should be the end

5    of the inquiry there.

6          Now, if your Honor would like, we can dive into some

7    of our historical analogs, or if you have any questions at the

8    first step?

9          THE COURT:  No more questions about step one, no.

10         ATTORNEY UYEHARA:  So even if plaintiffs could

11   establish that California switchblade laws are implicated by

12   the Second Amendment's plain text, California's switchblade

13   laws are still consistent with the nation's historical

14   tradition of regulating dangerous and deadly weapons.

15         It's important to point out, at this step, that

16   plaintiffs err when they say that the Court need not engage in

17   an independent historical analysis.  That directly contravenes

18   what the Supreme Court stated in *Bruen*.  Neither *Heller* or

19   *Bruen* addressed the historical tradition of knives and other

20   impact weapons.  And *Bruen* specifically said, like *Heller*, we

21   do not undertake an exhaustive historical analysis of the full

22   history of the Second Amendment.  And they acknowledged that

23   courts would have to apply a new test here.

24         Specifically, under *Bruen*, the Government is required

25   to identify only a well-established and representative

(29 of 149), Page 29 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 29 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3808    Page 28
of 51

28

1    historical analog; not a historical twin or dead ringer.  And

2    that's all in the singular.  That analog must be relevantly

3    similar to the challenged laws, which requires to look -- which

4    requires us to look at how and why the regulations burden a

5    law-abiding citizen's right to arm itself in self-defense.

6         We argue here, today, that the switchblade

7    restrictions are consistent with the nation's historical

8    tradition of regulating similar dangerous and deadly weapons.

9         The regulation of weapons throughout U.S. history

10   follows a similar regulatory pattern.  Certain weapons become

11   associated with criminality or threats to the public safety and

12   order.  Once those weapons proliferate in society, the

13   Government subsequently enacts a variety of restrictions on

14   that particular weapon.  And they also leave a range of

15   alternatives for law-abiding citizens for self-defense.

16        At the outset, I think it's important for us to

17   explain why we use the phrase "dangerous and deadly weapons."

18   Dangerous and deadly weapons were those that are easily

19   concealable and associated with criminal use and interpersonal

20   violence.  And they're regulated throughout American history.

21        It's also a catch-all phrase that's commonly found at

22   the end of these laws, like these carry laws, that say -- for

23   instance, I have an example here.

24        (Pause, referring.)

25        ATTORNEY UYEHARA:  That -- for example, in Washington,

1   D.C., in 1868, they had a law that made it unlawful for any

2   person or persons to carry or have concealed about their

3   persons any deadly or dangerous weapons, such as dagger,

4   pistol, Bowie knife, dirk knife, or dirk, colt, slungshot, or

5   brass or other metal knuckles within the city of Washington.

6           And so dangerous and deadly weapons is a catch-all

7   phrase.  That includes Bowie knives.  It includes, also, the

8   five other impact weapons that we included in our briefing.

9           And what those weapons have in common with

10  switchblades is that they're easily concealable and that

11  they're used in interpersonal violence and they're dangerous

12  and deadly.

13          And that's particularly important in this case here

14  because concealability has a lot to do with why these

15  restrictions were enacted, or the historical analogs were

16  enacted in the first place.

17          Traditionally, the weapon of choice was a long arm; a

18  weapon that could not be easily concealed, for obvious reasons.

19  And the single-shot pistol did not come into creation until

20  much, much later.  In early American history, it was largely

21  not favored; susceptible to problems, and things like that.

22  And so these weapons -- the Bowie knife and the five impact

23  weapons that we rely on in our briefing -- were unique in that

24  they were concealable.  And then that's why they were banned

25  publicly and concealed on the person.  That was not a --

(31 of 149), Page 31 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 31 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3810   Page 30
of 51

30

1    concealed weapons were not a problem in the same way that they

2    were before.

3            THE COURT:  And one of those weapons you mentioned was

4    a club, if I recall correct -- is that correct?

5            ATTORNEY UYEHARA:  Yes, that is correct.

6            THE COURT:  You are aware that there is a court in

7    this district that has just recently struck down the California

8    statute with regard to billy clubs?

9            ATTORNEY UYEHARA:  Yes, your Honor.  And that is on

10   appeal with the Ninth Circuit.

11           THE COURT:  I understand it is.  But I do want to make

12   sure you're aware of that --

13           ATTORNEY UYEHARA:  Yes, your Honor.

14           THE COURT:  -- when you make in argument.  So --

15           ATTORNEY UYEHARA:  Yes, your Honor.  We're filing that

16   opening briefing today.

17           THE COURT:  Okay.

18           ATTORNEY UYEHARA:  And so -- yes, there are --

19           THE COURT:  It's persuasive authority, but it's not

20   binding authority, obviously.

21           ATTORNEY UYEHARA:  Exactly.

22           And so along with clubs, we list five other different

23   weapons.  We include billy clubs specifically.  And clubs is

24   like a more general version of the billy club that was less

25   concealable.  We also rely on bludgeons, slungshots and

(32 of 149), Page 32 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 32 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3811    Page 31
of 51

31

1    blackjacks and sandbags as well.

2         And some of those laws go very far back.  I believe

3    our oldest club law goes back to 1699.  But most of the laws

4    are around the 1791, when the second amendment was passed; and

5    1868, when the Fourteenth Amendment was ratified.

6         And so only four states do not specifically regulate,

7    by name, any of those five impact weapons.  And of those four

8    states, three of those states had broad restrictions on

9    dangerous and deadly weapons generally.

10        And so these dangerous and deadly restrictions are

11   relevantly similar to the switchblade laws at issue because

12   they're concealable weapons that, once they began to circulate,

13   became weapons of crime and interpersonal violence, and were

14   subsequently regulated on multitudes of fronts, in many

15   different ways.

16        And then -- (pause.)  One other thing I want to point

17   out about the relative burden of the historical analogs and the

18   switchblade laws at issue is a lot of the historical analogs

19   were actually much broader than California's law.  California's

20   law only regulates switchblades that are half blades that are

21   two inches or longer and don't have a détente or similar safety

22   mechanism; which has been praised by a California Court of

23   Appeals as being a really important exception for first

24   responders, firefighters, hunters, fisherman, and the like.

25   Because it allows them to purchase knives that open with -- can

(33 of 149), Page 33 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 33 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3812   Page 32
of 51

32

 1    be opened with one hand.

 2            And so the historical analogs, a lot of them are

 3    actually quite broader in scope.  Specifically, an example from

 4    Louisiana in 1813 restricted any concealed weapons, such as a

 5    dirk, dagger, pistol, or knife generally.  It didn't say, Bowie

 6    knife.  It could have just been any large knife; presumably,

 7    any small knife as well.

 8            And St. Louis, Missouri, there was another law,

 9    concealed any pistol, revolver, colt, Billy, sling shot, and

10    the list goes on, but it ultimately ends in the catch-all that

11    says, or any knife resembling a Bowie knife or any other

12    dangerous and deadly weapon.

13            So these were sweeping laws.

14            It's not as simple as there was one law constricting

15    carry of Bowie knives, the law likely restricted five, six, ten

16    other versions of different dangerous and deadly weapons.  And

17    part of the reason these laws were also so broad was because

18    the definition of these items would change over time.

19            In our declaration from Professor Rivas, she discusses

20    how the Bowie knife has changed over time.  And in the years

21    when regulations started to come to be, the Bowie knife itself

22    was changing and becoming standardized.  And so a lot of these

23    laws have catch-all phrases that just discuss the -- the deadly

24    and dangerous nature of these weapons in general.  So they're

25    very broad in scope.

(34 of 149), Page 34 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 34 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3813   Page 33
of 51

33

1    And so to kind of conclude our historical analogs
2  here, 49 states and the District of Columbia enacted laws
3  restricting the Bowie knife.  And 49 states regulated related
4  dangerous and deadly impact weapons generally.  So the five I
5  listed earlier.

6    Here, for similar reasons -- those being concerns
7  about their concealability and criminal use -- 40 states in the
8  federal government enacted laws restricting switchblades.

9    And so California switchblade laws are consistent with
10  our history and tradition of regulating dangerous and deadly
11  weapons.  And, for that reason, this Court should grant the
12  defendants' motion for summary judgment.

13    If the Court has any further questions --

14    THE COURT:  I do not.  Thank you.

15    ATTORNEY UYEHARA:  Thank you.

16    THE COURT:  All right.  Mr. Dillon.

17    ATTORNEY DILLON:  Yeah.  I'll limit my response to
18  just the -- the issues that were specifically brought up by the
19  defense.

20    But, first, going to the question of whether the
21  switchblades at issue are in fact arms under the Second
22  Amendment.

23    I would like to point out, the courts have already
24  held, multiple times, that knives are protected by the Second
25  Amendment and are in fact arms under the Second Amendment.

(35 of 149), Page 35 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 35 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3814   Page 34
of 51

34

1          We have *State v. DiCiccio*.  That stated that dirk
2   knives were arms within the meaning of the Second Amendment.
3   *State v. Delgado*, which it was actually over -- overruled ban
4   on possession of switchblades as violating Oregon's
5   constitutional right to arms.  And stated that switchblades
6   were in fact arms protected by the Second Amendment.
7          In *State v. Herman*, again, it overturned the
8   conviction for possession of a switchblade as unconstitutional.
9   And specifically stated:
10          "Whether knives are typically used for self-defense
11          or home security as a general matter is beside the
12          point.  It is undisputed that Herman possessed his
13          switchblade inside his home for his protection."
14          In *State v. Montalvo*, here the New Jersey Supreme
15   Court held that machete-type knives are protected by the Second
16   Amendment.
17          And in *State v. Griffin*, the court said that:
18          "A steak knife -- a knife, even a steak knife,
19          appears to be a bearable arm that could be utilized
20          for offense or defensive purposes."
21          So this is a question that has been answered many
22   times by courts already; in the broader category of knives in
23   general.
24          Also, addressing the defendant's claim that plaintiffs
25   have used a numbers-only approach to justify in common use, we

1    in fact provided three different metrics in which you can use

2    and determine common use.  And we have shown that these knives

3    are in common use numerically.  They've been produced and sold

4    in the United States for decades and sold in the millions.

5    We've shown that they're common, categorically, as folding

6    pocketknives.  And we have also shown that they're in common

7    use jurisdictionally.  Meaning that they are able to be

8    purchased and possessed and used in approximately 45 different

9    states in the United States.

10        So we haven't used the metrics-only approach.  We've

11   given the Court many different metrics that they can go off of.

12   And, also, this is why the common use or dangerous and unusual

13   analysis falls under the historical analysis under *Bruen*, not

14   the textual analysis.  Because we can't start determining

15   whether something is or is not -- falls under the definition of

16   an arm because it may or may not be common.  What constitutes

17   an arm is very clear.  It's a definitional analysis.

18        What the Court did in *Heller* -- and you'll see this

19   throughout the discussion -- the historical discussion in

20   *Heller*.  Is they said it is clear, based off of the historical

21   review, that the only weapons that were restricted were the

22   dangerous and unusual weapons.  And again, like I said, the

23   flip side to that is common use.  It's the same test.  These

24   are not different tests by any means.

25        Now, moving on to the defendants' argument that these

(37 of 149), Page 37 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 37 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3816   Page 36
of 51

36

1    arms are not arms because they're not suitable for

2    self-defense.

3          Again, this is not an argument that *Heller* or *Bruen*

4    addressed under the plain text analysis, and it should be

5    completely ignored.

6          It is also a means-end policy argument that's been

7    explicitly rejected by *Bruen*.  And it's not up to the courts

8    to -- or the state to determine whether something is suitable

9    enough to be used as an arm in self-defense.  This analysis

10   doesn't exist in either the Supreme Court's controlling

11   authority.  And absent entirely is any consideration on the

12   suitability of certain arms for self-defense in the plain text

13   analysis.

14         And *Heller* and *Bruen* specifically reject any such

15   claim, stating that a constitutional guarantee subject to

16   future judge's assessments of its usefulness is no guarantee at

17   all.

18         In any case, automatic knives are just as suitable as

19   any other knife for self-defense.  Plaintiffs' expert, Michael

20   Janich, repeatedly testified that automatic opening knives are

21   legitimate tools for self-defense.

22         In fact, defendants' expert, Robert Escobar, also

23   admitted that switchblades can be used for personal defense.

24   And that his personal preference to fixed-blade knives is in

25   fact his preference.  He -- he explicitly stated that his

(38 of 149), Page 38 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 38 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3817   Page 37
of 51

37

1    opinion is not in the concensus by any means.  So -- in fact,

2    there are many experts out there that would testify that they

3    are in fact suitable for self-defense.

4         Addressing the claims that Mr. Escobar made, our

5    expert, Michael Janich, went through each and every claim that

6    Mr. Escobar made and repudiated each one of them.  And, in

7    fact, in Mr. Escobar's deposition he admits that his criticisms

8    regarding switchblades apply to all folding knives, and they

9    apply to many firearms in many cases.

10        Defendant's counsel brought up the fact that these

11   switchblade knives are concealable, that there are

12   psychological barriers when it comes to using a knife in

13   self-defense and -- you know, with regard to blood loss; you

14   know, cutting someone; the requirement of fine motor skills to

15   deploy the knife; and the possibility of self-injury if you're

16   ever using one in self-defense.  In Mr. Escobar's deposition,

17   he explicitly stated that each and every one of these claims

18   applies to all knives, all folding knives.  And they in fact

19   apply to firearms.

20        You know, there's no question that there's a

21   psychological barrier that must be overcome if you're going to

22   shoot someone in self-defense.  I think that's fairly clear.

23   There's definitely going to be wounds and blood loss when it

24   comes to using a firearm in self-defense.  You're going to have

25   to use fine motor skills when using a firearm in self-defense,

(39 of 149), Page 39 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 39 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3818   Page 38
of 51

38

1    and that's something that defendant's expert freely admitted.

2    And, in fact, there's many more steps to implement a firearm in

3    self-defense than there would be to pull out any type of knife.

4        So the -- the suitability argument in general -- even

5    if this Court were to take that as a -- anything to rely on --

6    the defense's own expert, he -- he freely admits that it is not

7    unique to switchblades by any means.  And that in fact it

8    applies to almost every self-defense tool known to man.

9        Oh, and before I forget, you know, Mr. Escobar also

10   conceded the fact that his critiques regarding switchblades

11   don't amount to any kind of danger to the general public.  You

12   know, his critiques on the suitability of switchblades, they

13   don't in fact go to the dangerousness of the weapon to the

14   general public by any means.  In fact, at best, you could argue

15   that his statements would address the -- you know, the use of

16   the user themselves.  They don't address any dangerousness to

17   the public.

18       And, in fact, the defense expert's testimony says

19   nothing about how switchblades are uniquely more concealable

20   than any other folding knife as they -- the blade folds into

21   the handle just like any other pocketknife that's freely legal

22   in the United States and in California.

23       Defendant devotes a good amount of their argument to

24   state that the surveyed restrictions -- you know, concealed

25   carry Bowie knife and impact weapon regulations -- are

1    relevantly similar in light of their comparable burdens and

2    justifications and how the Court doesn't need to have -- find a

3    historical twin.

4         But defendants don't contest that these laws address

5    some unprecedented societal concern or dramatic technological

6    changes that would permit a more nuanced analogous -- analysis

7    under *Bruen*.

8         To the contrary, this case deals with a

9    technologically simple weapon, a folding pocketknife, and an

10   age-old social ill:  The criminal assault with knives.

11        Thus, under the *Bruen* inquiry, it's very

12   straightforward.  When a challenged regulation addresses a

13   general societal problem that has persisted since the 18th

14   century, the lack of a distinctly similar historical regulation

15   addressing the problem is relevant evidence that the challenged

16   regulation is inconsistent with the Second Amendment.

17        Now, plaintiffs have addressed all of the defendant's

18   historical evidence.  And taken as a whole, this doesn't come

19   close to any type of justification for the current ban.

20        Defense experts have identified a total of two state

21   laws that regulated the sale of any knife in the entire 19th

22   Century.  One in 1837, in Tennessee.  The other in 1881, in

23   Arkansas.  Both came after the founding era, and one was a

24   decade after the Civil War.

25        The defense experts were also not able to identify a

1    single law in the entire history of this nation that prohibited

2    the possession of any knife up until the 19 -- or -- the 20th

3    Century.

4         All of the concealed carry restrictions relied on by

5    the defense explicitly allow purchase, sale, transfer,

6    possession, and at least one form of carry in public.  This is

7    not a divide-and-conquer approach but, rather, a summary of

8    historical record.  Each and every one of the concealed carry

9    restrictions only restricted the active concealed carry.  In

10   contrast, we have a law that prohibits every aspect of owning

11   and possessing these arms.

12        And while *Heller* and *Bruen* did consider analogous --

13   analogs outside the founding, they limit -- the explicitly

14   limited these analogs -- what analogs could be considered.  And

15   no analog may be used to contradict the Second Amendment's

16   plain text, or the more relevant found here.  And it is

17   undisputed that there are no restrictions on the possession,

18   sale, transfer, acquisition, or even carry of any knife during

19   the founding era.

20        Addressing defendant's claim that these historical

21   analogs were far broader in scope than the current ban, the

22   defendant omits that every concealed carry restriction

23   permitted all of these other acts that are prohibited by

24   California's law.

25        And, moreover, in defense expert Robert Spitzer's own

ER-00311

(42 of 149), Page 42 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 42 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3821   Page 41
of 51

41

 1   words, restricting certain arms in so many different ways

 2   amounts to a de facto approach.

 3        So we have the historical analogs that purely and only

 4   restricted concealed carry, versus the current ban which is --

 5   according to the defense expert -- a de facto prohibition.

 6        The Court also mentioned a recent case that actually

 7   came out of this district, which was *Russell Fouts v. Bonta*.

 8   In that case, the court -- or the defense, the State of

 9   California, made the same argument.  That in common use for

10   self-defense is part of the plain text analysis.  The court

11   explicitly rejected that argument.

12        THE COURT:  Actually, the court said that the

13   Government didn't submit enough evidence to support that

14   argument.  I have the -- that's --

15        ATTORNEY DILLON:  And there is little to no evidence

16   that's been submitted --

17        THE COURT:  They didn't reject the argument.

18        ATTORNEY DILLON:  Well, they rejected the argument

19   that it is in the plain text.

20        THE COURT:  Not in the order I have right before me,

21   right now.  I don't see where they rejected the argument.  The

22   order before me says that the Government failed to submit

23   sufficient information to support the argument.

24        ATTORNEY DILLON:  Yeah.  And, again, in this case,

25   there is insufficient evidence to support the claim.

(43 of 149), Page 43 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 43 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3822   Page 42
of 51

42

1          THE COURT:  That's different from saying this is not

2    part of the first step --

3          ATTORNEY DILLON:  Forgive me, your Honor.  I

4    apologize.

5          THE COURT:  Yeah.

6          ATTORNEY DILLON:  Lastly, just to address the impact

7    weapons restrictions that are relied on by defendant, these are

8    all mid-to-late 19th Century restrictions on various impact or

9    blunt-force weapons.  And that showing is also just

10   insufficient to justify the state's ban, because they come far

11   too late and well beyond the relevant founding era.

12         They also discuss a completely different category of

13   arms.  And, in fact, Mr. Escobar admits that these impact

14   weapons have been in common use for -- in -- sorry.  In common

15   use for much of this country's history; in his deposition in

16   this case.

17         Finally, noteworthy is that these impact weapons

18   restrictions, you know, while they did restrict various impact

19   weapons like billy clubs, sandbags, slingshots -- impact

20   weapons such as sandbags, billy clubs, slingshots, none of

21   these restrictions prohibit knives, you know.

22         And according to the defense expert's own testimony in

23   their deposition, you know, knife violence was a significant

24   problem in the mid-19th Century.  Yet no state enacted any type

25   of prohibition on the sale or prohibition on the possession of

1    knives.

2         They did restrict concealed carry in response to knife

3    violence, but they did not enact any outright prohibitions, and

4    with the exception of the 1838 Tennessee law that restricted

5    sale.

6         With that, I have nothing further, unless the Court

7    has any questions.

8         THE COURT:  No.  I don't have any other questions.

9    And then I -- I did want to offer what I said at the onset of

10   this hearing.  That I agree with your analysis in regards to

11   step two.  That, frankly, if we were -- well, I have not

12   decided to give a tentative.  A tentative is not a final

13   ruling.

14        But if the Court moves to step two, I think there's

15   something significantly lacking on the Government's behalf to

16   historical analysis that has been done.  And I don't think the

17   proper -- I don't think the burden is on the Court to conduct

18   its own historical analysis.  I think there is an issue, here,

19   with step two.  But that's -- the Court doesn't get to step two

20   until step one has been met.

21        And, obviously, the Court, listening to the arguments

22   of the parties, will have to make that decision.

23        And anything else, Mr. Dillon?

24        (Mr. Ritter and Mr. Dillon conferring.)

25        ATTORNEY DILLON:  Bear with me one moment, your Honor.

(45 of 149), Page 45 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 45 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3824   Page 44
of 51

44

 1          THE COURT:  Of course.  Take your time.

 2          (Mr. Ritter and Mr. Dillon conferring.)

 3          ATTORNEY DILLON:  Just a quick clarification, your

 4  Honor.

 5          Earlier, the Court referenced the *Rupp* decision, and

 6  the Court -- stating that the semiautomatic rifles are similar,

 7  like fully automatic rifles, in justifying the ban?

 8          THE COURT:  No.  It wasn't in that context.  It was in

 9  the context of, you know, just because something's a knife

10  doesn't mean you can -- you cannot ban another knife.  Just

11  like you cannot -- you can still ban an automatic knife --

12  weapon, as opposed to a semiautomatic weapon.  So in that

13  context.

14          ATTORNEY DILLON:  Okay.  So just to address that one

15  point.  You know, it's been argued many times over in this

16  district court and also in the *Rupp* court, with regard to the

17  difference and distinctions between semiautomatic rifles and

18  automatic rifles.

19          But here, although automatic is used for, you know,

20  switchblades in the sense that you press a button and they

21  open, there's no similarity there.  You know, it's a one-handed

22  opening knife.  And the only real distinction is whether you

23  are putting your finger on the blade of the weapon versus

24  putting your finger on a button.  This is very distinguishable

25  from the difference between a semiautomatic firearm and an

1    automatic firearm.

2         THE COURT:  And I agree with you.  I did not bring it

3    up for that -- for that issue.  But I agree with you, what

4    you're saying.

5         ATTORNEY DILLON:  Thank you, your Honor.

6         THE COURT:  Thank you.

7         Ms. Uyehara.

8         ATTORNEY UYEHARA:  It's important to recognize, here,

9    that the different metrics that plaintiffs offer -- whether it

10   be sales estimates or just a generalized submit of how many of

11   these knives are in circulation -- plaintiffs specifically do

12   not give numbers on the subset of switchblade knives at issue

13   here; which is knives that are two inches or longer and don't

14   have a détente or safety mechanism.

15        And, specifically, they don't give evidence of whether

16   or not that subset of knives is in common use for self-defense

17   or for lawful purposes.

18        We also argue that the suitability argument about

19   whether or not a particular weapon is suitable for self-defense

20   is in *Heller*.  *Heller* discusses, in great detail -- like I

21   mentioned earlier -- about what makes handguns the

22   quintessential self-defense weapon.  And that's not interest

23   balancing.  The Second Amendment right is about common use for

24   self-defense.  And that's part of the analysis *Heller* did, and

25   that's part of the analysis that this Court must also

(47 of 149), Page 47 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 47 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3826   Page 46
of 51

46

1    undertake.

2         And it's also important to recognize that if

3    switchblades -- it's the subset of switchblade knives at issue

4    here -- are suitable for self-defense, there's no evidence in

5    the record.  There's not one single instance of a person using

6    one of these switchblade knives.  Not even the subset of

7    switchblade knives restricted by California but any switchblade

8    knife used for self-defense.

9         And both self-defense experts -- Robert Escobar and

10   Mr. Janich -- could name no instance when such a switchblade

11   was used for self-defense.  And all of the evidence points to

12   that they're ill-suited for self-defense.

13        THE COURT:  I need to ask a question here because this

14   is an issue that I've been contemplating.

15        I know you've been arguing a lot about the use for

16   self-defense.  And every time I hear the argument, I go back to

17   *Heller*, when they talk about the distinction between keep and

18   bear -- bearing arms.  And especially *Caetano* -- *Caetano*,

19   excuse me, regarding the stun guns.  And just the

20   requirement -- and I am struggling with the argument that a

21   weapon has to be used for self-defense, as opposed to the

22   second element, the second part of the Second Amendment that

23   you can keep them and you cannot just necessarily use them but

24   you have the right to retain possession, for lack of a better

25   term.

1          So I'm struggling with that argument, and I just want

2     to let you know that so you can address that further, if you --

3     if you would like.

4          ATTORNEY REILLEY:  May we have a moment, your Honor?

5          THE COURT:  Sure.

6          (Pause, Attorney Reilley and Attorney Uyehara

7          Conferring.)

8          ATTORNEY UYEHARA:  Your Honor, it depends on whether

9     or not there is a good faith belief that the person will use

10    this weapon for self-defense.  Not every person that has a

11    handgun necessarily needs to use it for self-defense.  But

12    that -- the weapon is of the character and nature that it would

13    be commonly used for self-defense.

14         Returning to our historical analogs here, the

15    historical analogs have to be taken as a whole.  It's not as

16    simple as one single-carry restriction on Bowie knives in a

17    particular state.

18         These laws were passed consecutively in different

19    years and they restricted the knives or other impact weapons in

20    a variety of different ways.

21         Notably, they also enhance the criminal penalties.  We

22    have some laws that show that when you're arrested with a Bowie

23    knife for manslaughter, it's automatically raised to murder

24    just because the nature of the knife suggested something much

25    more deadly and, you know, murderous.

(49 of 149), Page 49 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 49 of 149
Case 3:23-cv-00474-JES-DDL   Document 42   Filed 05/21/24   PageID.3828   Page 48
of 51

48

1          We also have laws --

2          THE COURT:  I'm sorry for interrupting again, but I do

3     have another question.

4          The historical analysis in the -- in the -- in the

5     analogy you're using for the -- for the weapons that you've

6     discussed, I have to point out the -- the distinction here.

7     Because, on the one hand, you have argued to the Court the

8     Court should look at not knives generally in this case but

9     specifically -- in regards to step one, specifically have you

10    look at the switchblade knives.  Because it shouldn't look at

11    knives generally in regards to how the Court -- whether they're

12    in common use or not.  But then, on the second hand, you're

13    arguing that I should not look at not even knives, generally,

14    but a different category of weapon altogether.

15         So I'm struggling with that because it seems to be a

16    direct conflict with your earlier argument.

17         ATTORNEY UYEHARA:  Well, your Honor, I think it's

18    because it depends about which step of the analysis we're

19    talking about.  At the first step, we look at -- as *Alaniz*

20    said -- whether or not a weapon is in common use for

21    self-defense today.

22         So we're looking at the particular weapon that's being

23    restricted.  But at the second step of the analysis, the

24    Supreme Court has explicitly told us we need a reason by

25    analogy.  And, you know, in the case of something like an

(50 of 149), Page 50 of 149 Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 50 of 149
Case 3:23-cv-00474-JES-DDL    Document 42    Filed 05/21/24    PageID.3829    Page 49
of 51

49

1     assault rifle, for instance, there is no, like, perfect similar

2     analogy.  And, here, our closest analogy is Bowie knives and

3     related historical impact weapons.

4          THE COURT:  Yes.  I understand that argument.  But

5     especially with assault rifles -- and even *Bruen* talked about

6     this.  Modern weapons, obviously, that did not exist during

7     Colonial period, you -- there's a more analogous historical

8     text and tradition that you look at.  But knives existed during

9     the historical period.  So I understand maybe switchblade

10    knives did not exist.  So then -- so the question is, is --

11    which I started at the onset of this hearing.  How specific or

12    how narrow should the Court be looking at this?

13         Should I be looking at it strictly as a switchblade as

14    a type of pocketknife, as the plaintiff has suggested?  Or

15    should I look at it as -- a switchblade as a separate weapon as

16    distinct from a pocketknife and distinct from a knife

17    generally?  Because if I look at it as a knife generally, then

18    that's a different analysis the Court conducts under both

19    steps, frankly.  Especially when you're talking about the

20    historical analysis.

21         ATTORNEY UYEHARA:  I think at the second step of the

22    analysis *Bruen* makes pretty clear that we look at the how and

23    the why; why these weapons were restricted.  And the why is

24    exactly the same.  That these weapons were easily concealable,

25    they were brought into public, and they pose significant

50

1     danger.  And that's why they were regulated.

2          And that's not true of just Bowie knives.  That's true

3     of, also, the other five other historical impact weapons that

4     are part of our record here.

5          I also want to point out, quickly, that plaintiffs

6     misrepresent the testimony of our expert, Dr. Spitzer.  In that

7     quote he used, Spitzer was specifically talking about inner

8     Kansas law and not our regulations here at issue today.  And so

9     Spitzer talked about how, you know, you could regulate a weapon

10    many different ways.  And it was essentially de facto

11    prohibition.  And that's the case with the historical analogs.

12         As I mentioned earlier, they -- there are prohibitive

13    taxes, both on dealers and owners of the knives themselves, so

14    that they wouldn't purchase and own them.  They enhance

15    criminal penalties and general sale of prohibitions.  And you

16    take that with carry and concealed carry laws, and you have a

17    much broader prohibition on these historical impact weapons

18    generally.

19         All right.  Thank you.

20         THE COURT:  All right.  Thank you very much.

21         I want to thank all parties for your time and your

22    effort.  And, obviously, this is an issue that is very

23    important to the parties.  And, obviously, the law has changed

24    over the last several years.  So the Court will take this

25    matter under submission.  I will issue a written order.

51

1          This will be a dispositive order for that, that I will

2     issue.  And I appreciate the efforts you went through to brief

3     this issue before the Court.  So thank you both.

4          ATTORNEY DILLON:  Thank you, your Honor.

5          ATTORNEY UYEHARA:  Thank you.

6          THE CLERK:  This court is now in recess.

7          (Conclusion of proceedings at 3:09 p.m.)

8                            --oOo--

9

10    I certify, by signing below, that the foregoing is a correct
      stenographic transcript of the oral proceedings had in the
11    above-entitled matter this 20th day of May, 2024.  A transcript
      without an original signature or conformed signature is not
12    certified.  I further certify that the transcript fees and
      format comply with those prescribed by the Court and the
13    Judicial Conference of the United States.

14              /S/ Amanda M. LeGore

15       AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

16

17

18

19

20

21

22

23

24

25

ER-00322

1   John W. Dillon (SBN 296788)
2   **DILLON LAW GROUP APC**
    2647 Gateway Road
3   Suite 105, No. 255
4   Carlsbad, California 92009
    Phone: (760) 642-7150
5   Fax: (760) 642-7151
6   E-mail: jdillon@dillonlawgp.com

7
8   *Attorneys for Plaintiffs*

9               **UNITED STATES DISTRICT COURT**
10
              **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
11

12  KNIFE RIGHTS, INC., et al.,           | Case No. 23-cv-0474-JES-DDL

13              Plaintiffs,                | Hon. James E. Simmons, Jr.
14                                          | Magistrate Judge Hon. David D.
    vs.                                     | Leshner
15
16  ROB BONTA, in his official capacity as | **PLAINTIFFS' NOTICE OF**
    Attorney General of California, et al., | **SUPPLEMENTAL AUTHORITY**
17
18              Defendants.

19
20
21
22
23
24
25
26
27
28

1

2      Plaintiffs Knife Right, Inc., *et al*. ("Plaintiffs") hereby submit the following

3 additional legal authority in support of (1) their claims for relief, (2) their pending

4 motion for summary judgment, and (3) their opposition to Defendants' summary

5 judgment motion: *United States v. Duarte*, 2024 WL 2068016 (9th Cir. May 9, 2024),

6 attached hereto as **Exhibit A**.

7      In this decision, the Ninth Circuit vacated Steven Duarte's conviction for

8 violating 18 U.S.C. § 922(g)(1), which makes it a crime for any person to possess a

9 firearm if he has been convicted of an offense punishable by imprisonment for a term

10 exceeding one year. The panel held that section 922(g)(1) violates the Second

11 Amendment under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

12      Applying *Bruen's* text-and-history framework, the panel concluded (1) Duarte's

13 weapon, a handgun, is an "arm" within the meaning of the Second Amendment's text,

14 that Duarte's "proposed course of conduct—carrying [a] handgun[] publicly for self-

15 defense"—fell within the Second Amendment's plain language, and that Duarte is part

16 of "the people" whom the Second Amendment protects because he is an American

17 citizen; and (2) the government failed to prove that section 922(g)(1)'s categorical

18 prohibition, as applied to Duarte, "is consistent with this Nation's historical tradition of

19 firearm regulation." *Id*. 2024 WL 2068016 at *4.

20      According to the Ninth Circuit, *Bruen* replaced the tiers-of-scrutiny framework

21 with one grounded exclusively in text and history. *Id*. at *4, quoting *Maryland Shall

22 Issue, Inc. v. Moore*, 86 F.4th 1038, 1041 (4th Cir. 2023), rehearing *en banc* granted,

23 86 F.4th 1038 (4th Cir.2024).

24      The Ninth Circuit also made clear that the "threshold inquiry" is "whether 'the

25 Second Amendment's plain text covers' the person challenging the law, the 'arm'

26 involved, and the person's 'proposed course of conduct.'" *Id*. 2024 WL 2068016 at *4,

27 citing *Bruen*, 597 U.S. at 17. "If the Second Amendment's 'bare text' covers the person,

28 his arm, and his conduct, 'the government must [then] demonstrate that the [challenged]

1  regulation is consistent with this Nation's historical tradition of firearm regulation.'" *Id*.
2  at *4.

3  The Ninth Circuit applied the textual analysis required by *Bruen* and held "we
4  easily conclude that Duarte's weapon, a handgun, is an 'arm' within the meaning of the
5  Second Amendment's text and that Duarte's 'proposed course of conduct—carrying [a]
6  handgun[] publicly for self-defense'— falls within the Second Amendment's plain
7  language, two points the Government never disputes." *Id*. at *2, citing *Bruen*, 597 U.S.
8  at 32. The Ninth Circuit also stated it was "mindful" that "'[t]he Constitution was
9  written to be understood by the voters,' [so] *we begin with the '"normal and ordinary'*
10 *meaning of the Second Amendment's language.*" *Id*. at *10, quoting *Heller*, 554 U.S. at
11 557 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). The Ninth Circuit
12 further considered "the same pre- and post-ratification sources" that *Heller* looked to
13 "because when it comes 'to determin[ing] the *public understanding* of a legal text in the
14 period after its enactment or ratification,' the historical record serves as 'a critical tool
15 of constitutional interpretation.'" *Id*. quoting *Bruen*, 597 U.S. at 20 (emphasis in
16 original).

17 Analyzing the plain text's meaning of "the people," the Ninth Circuit stated that
18 "*Bruen* and *Heller*… both recognized the 'strong presumption' that the text of the
19 Second Amendment confers an individual right to keep and bear arms that belongs to
20 'all Americans,' not an 'unspecified subset.' *Id*. at *2, quoting *Bruen*, 597 U.S. at 70
21 (which, in turn, quoted *Heller*, 554 U.S. at 581. The Ninth Circuit further clarified, "Our
22 own analysis of the Second Amendment's publicly understood meaning also confirms
23 that the right to keep and bear arms was every citizen's fundamental right. Because
24 Duarte is an American citizen, he is "part of 'the people' whom the Second Amendment
25 protects." *Id*. at *2, quoting *Bruen*, 597 U.S. at 32.

26 The Ninth Circuit further found that "*Heller* defined 'the people' in the ***broadest***
27 ***of terms***: the phrase 'unambiguously refer[red]' to 'all Americans,' not 'an unspecified
28 subset.' *Id*. at *5 quoting *Heller*, 554 U.S. at 581 (emphasis added).  *Bruen* also

1  "expressly reaffirmed that broad definition, quoting *Heller's* language directly and
2  holding that "'[t]he Second Amendment guaranteed to 'all Americans' the right to bear
3  commonly used arms in public[].'" *Id*. at * 9, quoting *Bruen*, 597 U.S. at 70 (which, in
4  turn, quoted *Heller*, 554 U.S. at 581.

5  According to the Ninth Circuit, "[o]ur own analysis of the Second Amendment's
6  text and history, also confirms that 'the people' in the Second Amendment included, at
7  a minimum, all American citizens"—without qualification. *Id*. at * 9.

8  Indeed, the Ninth Circuit provides an in-depth discussion of the meaning of the
9  term, "the people" in the Second Amendment (*Id*. at * 9-13), and concludes, "We are
10 confident that, 'by founding-era consensus,' the 'right of the people' to keep and bear
11 arms was publicly understood as the fundamental right of every citizen." *Id*. at * 12,
12 quoting *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012).

13 This application of the plain text with regard to the meaning of "the people" in
14 the Second Amendment's plain text is the same bare text analysis applied in *Fouts v.*
15 *Bonta*, when it rejected the "in common use for self-defense" argument offered by the
16 government, stating: "Even if such evidence did exist, it would only be an argument if
17 the Second Amendment said, 'the right of the people to keep and bear only those Arms
18 that are commonly used for self-defense, shall not be infringed.' Of course, that is not
19 the case. *Use is not required* for Second Amendment protection." *Fouts v. Bonta*, 2024
20 WL 751001, at *3 (S.D. Cal. 2024) (emphasis added).

21 Additionally, the Ninth Circuit provided guidance on what historical laws are
22 properly analogous under the *Bruen* standard. The Court made clear that "[w]hile the
23 Government does not have to find a historical 'dead ringer' to § 922(g)(1), a law that
24 'remotely resembles' a felon firearm ban is not enough." *Id*. 2024 WL 2068016 at * 13.
25 Instead, the Ninth Circuit clarified that it was "looking for something in between these
26 two endpoints. On that score, *Bruen* offers some additional guidance. If the law at issue
27 is a "distinctly modern firearm regulation[]" because it addresses a societal problem
28 "unimaginable at the founding," the Government's historical analogues need only be
"relevantly similar" to the challenged law. *Id*. at * 13; *see also Perez-Garcia*, 96 F.4th

at 1182; *Alaniz*, 69 F.4th at 1129–30. However, the Ninth Circuit found that the statute at issue took aim at "gun violence" and that "problem … has persisted [in this country] since the 18th century.' *Id*. 2024 WL 2068016 at *14, quoting *Bruen*, 597 U.S. at 26, 27. And that section 922(g)(1) "'confront[s] that problem' with 'a flat ban on the possession of []guns' by the formerly incarcerated, which no one here disputes is something 'that the Founders themselves could have adopted.' *Id*. 2024 WL 2068016 at *14.

Thus, the Ninth Circuit stated that while "'[t]he Founding generation had no laws limiting gun possession by . . . people convicted of crimes' [citation omitted]—while not fatal to the Government's case—means that 'the lack of a . . . historical regulation' that is 'distinctly similar' to § 922(g)(1) is strong if not conclusive 'evidence' that the law 'is inconsistent with the Second Amendment'" [Citations omitted]. *Id*. at *14.

Each of the above points in *Duarte* address issues squarely presented in the pending cross-motions for summary judgment, including, among other issues: (i) how Bruen's textual analysis is centered on the plain text of the Second Amendment; (ii) whether Plaintiffs' arms in question are "arms" under the plain text; (iii) whether Plaintiffs' proposed course of conduct falls within the plain text; and (iv) whether or not a nuanced approach is warranted in the historical analysis under the *Bruen* standard.

May 17, 2024                 **DILLON LAW GROUP APC**

*/s/ John W. Dillon*
John W. Dillon

Attorney for Plaintiffs

# EXHIBIT A

ER-00328

United States v. Duarte, --- F.4th ---- (2024)

---

2024 WL 2068016
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Steven DUARTE, aka Shorty, Defendant-Appellant.

No.22-50048
|
Argued and Submitted December 4, 2023 Pasadena,
California
|
Filed May 9, 2024

**Synopsis**

**Background:** Defendant was convicted in the United States District Court for the Central District of California, André Birotte, Jr., J., of possession of firearm by person who had been convicted of offense punishable by imprisonment for term exceeding one year. Defendant appealed.

**Holdings:** The Court of Appeals, Bea, Senior Circuit Judge, held that:

defendant had good cause for not raising issue of whether categorical statutory prohibition against possession of firearm by person who had been convicted of offense punishable by imprisonment for term exceeding one year, as applied to nonviolent felon, violated Second Amendment right to keep and bear arms, and therefore he could raise issue for first time on appeal and de novo review applied, and

categorical statutory prohibition against possession of firearm by person who had been convicted of offense punishable by imprisonment for term exceeding one year, as applied to nonviolent felon, was not part of historical tradition that delimited outer bounds of Second Amendment right to keep and bear arms.

Reversed, and conviction vacated.

Smith, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** Appellate Review.

Appeal from the United States District Court for the Central District of California, Andre Birotte, Jr., District Judge, Presiding, D.C. No. 2:20-cr-00387-AB-1

**Attorneys and Law Firms**

Suria M. Bahadue (argued) and Juan M. Rodriguez, Assistant United States Attorneys; Kyle Kahan, Special Assistant United States Attorney; Bram M. Alden, Assistant United States Attorney, Criminal Appeals Section Chief; E. Martin Estrada, United States Attorney; United States Department of Justice, Office of the United States Attorney, Criminal Appeals Section, Los Angeles, California; for Plaintiff-Appellee.

Sonam A. H. Henderson, Assistant Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California, for Defendant-Appellant.

Before: Carlos T. Bea, Milan D. Smith, Jr., and Lawrence VanDyke, Circuit Judges.

Opinion by Judge Bea;

Dissent by Judge M. Smith, Jr.

## OPINION

BEA, Circuit Judge:

18 U.S.C. § 922(g)(1) makes it a crime for any person to possess a firearm if he has been convicted of an offense "punishable by imprisonment for a term exceeding one year." Steven Duarte, who has five prior non-violent state criminal convictions—all punishable for more than a year— was charged and convicted under § 922(g)(1) after police saw him toss a handgun out of the window of a moving car. Duarte now challenges the constitutionality of his conviction. He argues that, under the Supreme Court's recent

United States v. Duarte, --- F.4th ---- (2024)

decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), § 922(g)(1) violates the Second Amendment as applied to him, a non-violent offender who has served his time in prison and reentered society. We agree.

**\*2** We reject the Government's position that our pre-*Bruen* decision in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), forecloses Duarte's Second Amendment challenge. *Vongxay* is clearly irreconcilable with *Bruen* and therefore no longer controls because *Vongxay* held that § 922(g)(1) comported with the Second Amendment without applying the mode of analysis that *Bruen* later established and now requires courts to perform. *Bruen* instructs us to assess all Second Amendment challenges through the dual lenses of text and history. If the Second Amendment's plain text protects the person, his arm, and his proposed course of conduct, it then becomes the Government's burden to prove that the challenged law is consistent with this Nation's historical tradition of firearm regulation. *Vongxay* did not apply these two analytical steps because *Bruen* had not yet established them. We must therefore reconsider § 922(g)(1)'s constitutionality, this time applying *Bruen*'s two-step, text-and-history framework.

At step one of *Bruen*, we easily conclude that Duarte's weapon, a handgun, is an "arm" within the meaning of the Second Amendment's text and that Duarte's "proposed course of conduct—carrying [a] handgun[ ] publicly for self-defense"—falls within the Second Amendment's plain language, two points the Government never disputes. *Bruen*, 597 U.S. at 32, 142 S.Ct. 2111. The Government argues only that "the people" in the Second Amendment excludes felons like Duarte because they are not members of the "virtuous" citizenry. We do not share that view. *Bruen* and *Heller* foreclose that argument because both recognized the "strong presumption" that the text of the Second Amendment confers an individual right to keep and bear arms that belongs to "all Americans," not an "unspecified subset." *Bruen*, 597 U.S. at 70, 142 S.Ct. 2111 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)). Our own analysis of the Second Amendment's publicly understood meaning also confirms that the right to keep and bear arms was every citizen's fundamental right. Because Duarte is an American citizen, he is "part of 'the people'

whom the Second Amendment protects." *Bruen*, 597 U.S. at 32, 142 S.Ct. 2111.

At *Bruen*'s second step, we conclude that the Government has failed to prove that § 922(g)(1)'s categorical prohibition, as applied to Duarte, "is part of the historical tradition that delimits the outer bounds of the" Second Amendment right. *Bruen*, 597 U.S. at 19, 142 S.Ct. 2111. The Government put forward no "well-established and representative historical analogue" that "impose[d] a comparable burden on the right of armed self-defense" that was "comparably justified" as compared to § 922(g)(1)'s sweeping, no-exception, lifelong ban. *Id.* at 29, 30, 142 S.Ct. 2111. We therefore vacate Duarte's conviction and reverse the district court's judgment entering the same.

## I.

On the night of March 20, 2020, two Inglewood police officers noticed a red Infiniti auto drive past them with tinted front windows. The officers turned around and trailed the car for a time before seeing it run a stop sign. When they activated their patrol lights, one of the officers saw the rear passenger (later identified as Duarte) roll the window down and toss out a handgun. The Infiniti drove about a block farther before stopping.

The officers approached the vehicle, removed Duarte and the driver from the car, and handcuffed them. A search of the car's interior recovered a loaded magazine wedged between the center console and front passenger seat. A third officer arrived at the scene and searched the immediate area, where he found the discarded handgun—a .380 caliber Smith & Wesson—with its magazine missing. One of the officers loaded the magazine into the recovered pistol, and it fit "perfectly."

A federal grand jury indicted Duarte for possessing a firearm while knowing he had been previously convicted of "a crime punishable by imprisonment for a term exceeding one year," in violation of 18 U.S.C. § 922(g)(1). The indictment referenced Duarte's five prior, non-violent criminal convictions in California: vandalism, Cal. Penal Code § 594(a); felon in possession of a firearm, *id.* § 29800(a)(1); possession of a controlled substance, Cal. Health & Safety

United States v. Duarte, --- F.4th ---- (2024)

---

Code § 11351.5; and two convictions for evading a peace officer, Cal. Veh. Code § 2800.2.¹ Each of these convictions carried a possible sentence of one year or more in prison.

*3 Duarte pleaded not guilty to the charge in the indictment. His case proceeded to trial, a jury found him guilty, and he received a below-guidelines sentence of 51 months in prison. He timely appealed and now challenges his conviction under the Second Amendment. We have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## II.

We normally review claims of constitutional violations *de novo*. *United States v. Oliver*, 41 F.4th 1093, 1097 (9th Cir. 2022). But because Duarte did not challenge § 922(g)(1) on Second Amendment grounds in the district court below, the Government argues that Federal Rule of Criminal Procedure 52(b)'s more demanding plain error standard of review controls. *Id.* ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). We disagree.

It is true that Rule 52(b)'s plain error standard "is the default standard governing ... consideration of issues not properly raised in the district court" and thus "ordinarily applies when a party presents an issue for the first time on appeal." *United States v. Guerrero*, 921 F.3d 895, 897 (9th Cir. 2019). But when the untimely issue is a Rule 12(b)(3) "defense[ ]" or "objection[ ]" to a criminal indictment, "Rule 12's good-cause standard ... displac[es] the plain-error standard" under Rule 52(b). *Id.*; *see* Fed. R. Crim. P. 12(b)(4)(B)(c)(1) ("[A] court may consider the [untimely] defense, objection, or request if the party shows good cause."). If the defendant demonstrates good cause for failing to raise the Rule 12(b)(3) issue below, we may consider it for the first time and will apply whatever default standard of review would normally govern the merits, which in this case is de novo review. *See United States v. Aguilera-Rios*, 769 F.3d 626, 629 (9th Cir. 2014).

No one disputes here that Duarte's Second Amendment challenge is untimely because he could have raised it as a Rule 12(b)(3) defense or objection to his indictment. Duarte, however, demonstrated good cause for asserting his

constitutional claim now instead of then. When Duarte was indicted, he "had no reason to challenge" whether § 922(g)(1) violated the Second Amendment as applied to him. *Aguilera-Rios*, 769 F.3d at 630. We had already held in *Vongxay* "that § 922(g)(1) does not violate the Second Amendment as it applies to ... convicted felon[s]." 594 F.3d at 1118. Only later did the Supreme Court decide *Bruen*, which (for reasons we explain just below) is irreconcilable with *Vongxay*'s reasoning and renders it no longer controlling in this Circuit. Because *Vongxay* "foreclosed the argument [Duarte] now makes," Duarte had good cause for not raising it in a Rule 12(b)(3) pretrial motion. *Aguilera-Rios*, 769 F.3d at 630. We may consider his challenge for the first time and will review it de novo.

## III.

### A.

We must first decide whether *Bruen* abrogated our decision in *United States v. Vongxay*. We follow our decision in *Miller v. Gammie* to answer that question. 335 F.3d 889 (9th Cir. 2003). Under *Miller*, "where the *reasoning or theory* of [a] prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening authority," we are "bound by the later and controlling authority" and "reject the prior circuit opinion as ... effectively overruled." *Id.* at 893 (emphasis added). This is a more "flexible approach" than what other circuits use. *Id.* at 899. To abrogate a prior decision of ours under *Miller*, the intervening authority need only be "closely related" to the prior circuit precedent and need not "expressly overrule" its holding. *Compare id.*, *with United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (intervening authority must be "clearly on point" and must "demolish and eviscerate each of [the prior decision's] fundamental props") (citations omitted). So long as the "the Supreme Court ha[s] taken an 'approach [in an area of law] that [is] fundamentally inconsistent with the reasoning of our earlier circuit authority,[']" *Rodriguez v. AT&T Mobility Services LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (quoting *Miller*, 335 F.3d at 889, 990), that "[i]s enough to render them" irreconcilable with one another, *Langere v. Verizon Wireless Services, LLC*, 983 F.3d 1115, 1121 (9th Cir. 2020) (citations omitted).

---

United States v. Duarte, --- F.4th ---- (2024)

---

**\*4** As a result, "[e]ver since ... *Miller v. Gammie*[,] ... we have not hesitated to overrule our own precedents when their underlying reasoning could not be squared with the Supreme Court's more recent pronouncements." *In re Nichols*, 10 F.4th 956, 962 (9th Cir. 2021). We have found the standard met in the obvious cases, such as when a later Supreme Court decision implicitly (but not expressly) overrules an earlier precedent of ours because the supervening authority fundamentally reshapes an area of law by announcing a new or clarified analytical framework that the earlier decision never applied. *See United States v. Slade*, 873 F.3d 712, 715 (9th Cir. 2017); *see also, e.g., United States v. Baldon*, 956 F.3d 1115, 1121 (9th Cir. 2020) ("[The Supreme Court's] clarification [in *Stokeling*] of 'violent force' ... is 'clearly irreconcilable' with ... [*Solorio-Ruiz v. Sessions*, 881 F.3d 733 (9th Cir. 2018)'s] ... analytical distinction between substantial and minimal force. This distinction no longer exists."); *Phelps v. Alameida*, 569 F.3d 1120, 1133 (9th Cir. 2009) (holding previous *per se* rule for rejecting Rule 60(b)(6) motions based on intervening change in law was irreconcilable with Supreme Court's "case-by-case approach"); *Swift v. California*, 384 F.3d 1184, 1190 (9th Cir. 2004). So too have we invoked *Miller* when the *affirmative* reasons for a previous panel decision "necessarily rested on *at least one* assumption that is clearly irreconcilable with intervening higher authority." *Ortega-Mendez v. Gonzales*, 450 F.3d 1010, 1020 (9th. Cir. 2006) (emphasis added); *see Lair v. Bullock*, 798 F.3d 736, 746 (9th Cir. 2015) ("Because [*Montana Right to Life Ass'n v.* ]*Eddleman*[, 343 F.3d 1085 (9th Cir. 2003)] relied *at least in part* on a state's interest in combating 'influence,' whereas *Citizens United*[ *v. Federal Election Com'n*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) narrowed the analysis ... to exclude th[at] state[ ] interest ... *Citizens United* abrogated *Eddleman*'s ... analysis.") (citing *Miller*, 335 F.3d at 893) (emphasis added). Thus, while *Miller*'s "clearly irreconcilable" test may be a "high" standard, by no means is it an "insurmountable" one. *Langere*, 983 F.3d at 1121.

With these principles in mind, we conclude that *Vongxay*'s reasoning is "clearly irreconcilable" with *Bruen* and its holding therefore no longer controls. *Miller*, 335 F.3d at 893. *Vongxay* did not follow the textually and historically focused "mode of analysis" that *Bruen* established and required courts now to apply to all Second Amendment challenges. *Id.*

at 900 ("[L]ower courts a[re] bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis.'" (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)); *see, e.g., Slade*, 873 F.3d at 715 ("Since *Jennen* failed to consider whether section 9A.36.021 is divisible ... the decision's reasoning is 'clearly irreconcilable' with the analytical process [later] prescribed by [the Supreme Court in] *Descamps*[ *v. United States*, 570 U.S. 254, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013)] and *Mathis*[ *v. United States*, 579 U.S. 500, 136 S.Ct. 2243, 195 L.Ed.2d 604 (2016)].") (citing *Miller*, 335 F.3d at 893). Nor do *Vongxay*'s affirmative bases for upholding § 922(g)(1) salvage *Vongxay*'s holding. We must therefore conduct our Second Amendment analysis of § 922(g)(1) anew, this time following *Bruen*'s analytical framework.

### 1.

Before *Bruen*, virtually every circuit (ours included) "coalesced around a 'two-step' framework for analyzing Second Amendment challenges." *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111; *see, e.g., United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013). At the first step, we asked whether the challenged law affected conduct historically protected by the Second Amendment. *E.g., Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc), *vacated*, ––– U.S. –––, 142 S.Ct. 2895, 213 L. Ed. 2d 1108 (2022). If it did, we moved to the second step, where we applied varying levels of scrutiny to the challenged law, depending on how close the regulated conduct lay to the "core" of the Second Amendment right to "keep and bear arms." *Id.*

"*Bruen* effected a sea change in Second Amendment law" by replacing this tiers-of-scrutiny framework with one grounded exclusively in text and history. *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1041 (4th Cir. 2023), *rehearing en banc granted*, 86 F.4th 1038 (4th Cir. 2024). Courts must now consider, as a "threshold inquiry," *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023), whether the "Second Amendment's plain text covers" the person challenging the law, the "arm" involved, and the person's "proposed course of conduct," *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111. If the Second Amendment's "bare text" covers the person, his arm, and his conduct, "the government must

---

ER-00332

United States v. Duarte, --- F.4th ---- (2024)

[then] demonstrate that the [challenged] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 18, 44 n.11, 142 S.Ct. 2111. To meet its burden, the Government must "identify a well-established and representative historical *analogue*" to the challenged law. *Id.* at 30, 142 S.Ct. 2111 (emphasis in original). As to courts, "th[e] historical inquiry that [we] must [now] conduct" requires "reasoning by analogy," in which the two "central considerations" will be whether "how" the proffered historical analogue burdened the Second Amendment right, and "why" it did so, are both sufficiently comparable to the challenged regulation. *Id.* at 28, 29, 142 S.Ct. 2111. "Only if" the Government proves that its "firearm regulation is consistent [in this sense] with th[e] Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at 17, 142 S.Ct. 2111 (citations omitted).

**\*5** Because *Bruen* "had not yet clarified the[se] particular analytical step[s]" until after *Vongxay* was decided, *Vongxay*, predictably, failed to apply them. *See Slade*, 873 F.3d at 715. Unlike post-*Bruen* circuit cases to consider § 922(g)(1)'s constitutionality, *Vongxay* did not grapple with the "threshold [textual] inquiry ... whether [Vongxay] [wa]s part of 'the people' whom the Second Amendment protects," whether "the weapon at issue" was an "arm" within the meaning of the Second Amendment, or "whether the 'proposed course of conduct' f[ell] within the Second Amendment['s]" plain language. *See Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 597 U.S. at 31–32, 142 S.Ct. 2111); *see also, e.g.*, *Range v. Attorney General*, 69 F.4th 96, 101 (3d Cir. 2023) ("We begin with the threshold question: whether Range is one of 'the people' who have Second Amendment rights."). As a result, *Vongxay* never decided whether to proceed to *Bruen*'s second step, which would have required the Government to prove that § 922(g)(1)'s lifetime ban on felons possessing firearms imposed a "comparable burden" on the Second Amendment right that was "comparably justified" compared to historical examples of firearm regulations—the "how and why" of *Bruen*'s "analogical inquiry." 597 U.S. at 29, 142 S.Ct. 2111; *compare United States v. Jackson*, 69 F.4th 495, 501–06 (8th Cir. 2023) (surveying historical examples and concluding § 922(g)(1) comported with this Nation's history of firearm regulation), *with Range*, 69 F.3d at 103–06 (surveying the same history but concluding the opposite).

The dissent does not dispute that *Vongxay* never performed the textual "person," "arms," and "conduct" analysis at *Bruen*'s first step, nor the historically focused "reasoning by analogy" approach required at *Bruen*'s step two. But none of these omissions should matter, the dissent argues, because *Heller* read the Second Amendment's "the people" as "exclu[ding] ... felons" and *Bruen* "implicitly endorsed" that reading when it made the (unremarkable) observation that the petitioners in that case—two "ordinary, law-abiding, adult citizens"—were indisputably "part of 'the people.' " 597 U.S. at 31, 142 S.Ct. 2111; Dissent at ——, ——. So there is "harmon[y]" between *Bruen* and *Vongxay* after all. Dissent at —— – ——.

The dissent's post-hoc reading of *Bruen* and *Heller* finds no support in either case. The Supreme Court "has *never* suggested that felons are *not* among 'the people' within the plain meaning of the Second Amendment." *United States v. Perez-Garcia*, 96 F.4th 1166, 1175 (9th Cir. 2024) (emphasis added). Quite the opposite, *Heller* defined "the people" in the broadest of terms: the phrase "unambiguously refer[red]" to "all Americans," not "an unspecified subset." 554 U.S. at 581, 128 S.Ct. 2783. More importantly, *Bruen* ratified that broad definition, quoting *Heller*'s language directly to hold that "[t]he Second Amendment guarantee[s] to '*all Americans*' the right to bear commonly used arms in public." 597 U.S. at 70, 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 581, 128 S.Ct. 2783) (emphasis added).

In sum, *Vongxay*'s wholesale omission of *Bruen*'s two-step methodology is "clearly irreconcilable" with *Bruen*'s "mode of analysis" for analyzing Second Amendment challenges. *Miller*, 335 F.3d at 900. We would be remiss, however, to ignore *Vongxay*'s affirmative reasons for upholding § 922(g)(1). We do that below. Because *Vongxay*'s rationale "rested on ... at least one assumption" about the propriety of felon firearm bans, none of which continue to have any purchase in a post-*Bruen* world, this is a separate basis for parting ways with *Vongxay* under *Miller v. Gammie*. *See Ortega-Mendez*, 450 F.3d at 1020.

**2.**

*Vongxay* concluded that § 922(g)(1) comported with the Second Amendment because that was what we held in

United States v. Duarte, --- F.4th ---- (2024)

*United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005). *Vongxay*, 594 F.3d at 1116. But "[t]he reasoning upon which *Younger* was based—that the Second Amendment does not give individuals a right to bear arms—was *invalidated* by *Heller*," *id.* (emphasis added), and again by *Bruen*, which expressly reaffirmed *Heller*'s holding that "the Second Amendment[ ] ... 'guarantees the *individual* right to possess and carry weapons in case of confrontation,' " 597 U.S. at 33, 142 S.Ct. 2111 (emphasis added) (quoting *Heller*, 554 U.S. at 592, 128 S.Ct. 2783). *Vongxay*'s reliance on *Younger* is therefore "clearly irreconcilable" with *Bruen*— separate and apart from *Vongxay*'s failure to apply *Bruen*'s methodology. *See Murray v. Mayo Clinic*, 934 F.3d 1101, 1105–06 (9th Cir. 2019).

*6 While concluding that "*Younger* control[led]" and the "legal inquiry end[ed]" with that case, *Vongxay* also turned to two Fifth Circuit, pre-*Heller* decisions—*United States v. Everist*, 368 F.3d 517 (5th Cir. 2004) and *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001)—which purportedly "len[t] credence to the ... viability of *Younger*'s holding" in a post-*Heller* (but pre-*Bruen*) world. *Vongxay*, 594 F.3d at 1116, 1117. *Vongxay* endorsed, specifically, *Everist*'s holding that § 922(g)(1) was constitutional "as a 'limited and narrowly tailored exception to the freedom to possess firearms, reasonable in its purposes and consistent with the right to bear arms.' " *Id.* at 1116–17 (quoting *Everist*, 368 F.3d at 519 (quoting *Emerson*, 270 F.3d at 261)). This was "particularly instructive for [a] post-*Heller* analys[is]" of § 922(g)(1), *Vongxay* reasoned, because the Fifth Circuit had recognized, "even before *Heller*," that the right to keep and bear arms was an individual right, and yet still determined that "felon [firearm] restrictions" were "permissible ... under heightened scrutiny." 594 F.3d at 1117 (citing *Everist*, 368 F.3d at 519).

*Vongxay*'s dependence on *Emerson* and *Everist* is untenable post-*Bruen*. "*Emerson* applied heightened—i.e., intermediate—scrutiny" to uphold a different law—18 U.S.C. § 922(g)(8)—against a Second Amendment challenge.[2] *United States v. McGinnis*, 956 F.3d 747, 759–60 (5th Cir. 2020). Relying exclusively on *Emerson*, *Everist* applied the same "means-end" scrutiny approach to § 922(g)(1) and similarly held that law was a "narrowly tailored" and "reasonable" regulation on the Second Amendment right. *Everist*, 368 F.3d at 519 (quoting

*Emerson*, 270 F.3d at 261). *Bruen*, as we know, "expressly repudiated the ... means-end scrutiny ... embodied in *Emerson*" and *Everist*. *See United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023), *cert. granted*, ⸺ U.S. ⸺, 143 S. Ct. 2688, 216 L.Ed.2d 1255 (2023). Thus, as with *Younger*, *Everist*'s reasoning—and the reasoning of the precedent on which it stood (*Emerson*)—were abrogated by *Bruen*. *Vongxay*'s reliance on these cases is clearly irreconcilable with *Bruen*. *See Murray*, 934 F.3d at 1105–06.

The Government and the dissent remind us repeatedly that, while *Vongxay* relied on *Everist* and *Emerson*, *Vongxay* never itself applied the now defunct means-end scrutiny approach to uphold § 922(g)(1). Dissent at ⸺ – ⸺. That counts for little under *Miller* and its progeny because when, as here, the prior circuit decision in question imports the reasoning of a previous case by citing it with approval, we ask simply whether *that* earlier case's reasoning is "clearly irreconcilable" with subsequent higher authority. *See id.* ("In *Head*[ *v. Glacier Northwest Inc.*, 413 F.3d 1053 (9th Cir. 2005)], we relied on the reasoning of our sister circuits ... [but] *Gross*[ *v. FBL Financial Services, Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)] and *[University of Texas Southwestern Medical Center v. ]Nassar*[, 570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)] undercut the reasoning set forth by our sister circuits [in those cases].").  What matters is that *Vongxay* still *endorsed* the Fifth Circuit's application of means-end scrutiny to § 922(g)(1) because it cited *Everist* for the proposition "that, although there is an individual right to bear arms, felon restrictions are permissible even under *heightened scrutiny*." *Vongxay*, 594 F.3d at 1117 (emphasis added) (citing *Everist*, 368 F.3d at 519).

*Vongxay* lastly took comfort in the *Heller* Court's remark that "nothing in [its] opinion should be taken to cast doubt" on certain "longstanding" laws restricting the Second Amendment right, such as laws "prohibit[ing] ... the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783. In a footnote, *Heller* labeled these and other examples as "presumptively lawful." *Id.* n.26. *Vongxay* took this to mean that felon firearm bans were "categorically different" from other restrictions on the Second Amendment right, which "buttressed" the conclusion that § 922(g)(1) was constitutional. 594 F.3d at 1115, 1116.

United States v. Duarte, --- F.4th ---- (2024)

**\*7** "Simply repeat[ing] *Heller*'s language" about the "presumptive[ ] lawful[ness]" of felon firearm bans will no longer do after *Bruen*. *See Pena v. Lindley*, 898 F.3d 969, 1007 n.18 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) (citing *Vongxay*, 594 F.3d at 1115). *Bruen* expressly "require[s] courts to assess whether" § 922(g)(1), *id.* at 26, 142 S.Ct. 2111, like "*any* regulation infringing on Second Amendment rights[,] is consistent with this nation's historical tradition of firearm regulation," *Perez-Garcia*, 96 F.4th at 1175 (citations omitted). It would pay lip service to this mandate if we continued to defer (as *Vongxay* did) to *Heller*'s footnote, not least because the historical pedigree of felon firearm bans was never an issue the *Heller* Court purported to resolve. While referring to such laws and others as "longstanding," the Court "fail[ed] to cite any colonial analogues," *Heller*, 554 U.S. at 721, 128 S.Ct. 2783 (Breyer, J., dissenting), and clarified that it was "not providing [an] extensive historical justification" for felon firearm bans because *Heller* was its "first in-depth examination of the Second Amendment," not an attempt "to clarify the entire field," *id.* at 635, 128 S.Ct. 2783. "[T]here w[ould] be time enough to expound upon the historical justifications for [these and other] exceptions," *Heller* promised, "if and when th[ey] ... come before us." *Id.*; *see also Vongxay*, 594 F.3d at 1117 n.4 (acknowledging *Heller* "anticipated the need for such historical analy[is]"). The Court has yet to explore this country's history of banning felons from possessing firearms.[3] Until then, we can no longer "assum[e]," by way of *Heller*'s footnoted caveat, the "propriety of [every] felon firearm ban" that comes before us. *See United States v. Phillips*, 827 F.3d 1171, 1175 (9th Cir. 2016). "Nothing allows us to sidestep *Bruen* in th[is] way."[4] *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023); *see also Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) ("*Bruen* clarified the appropriate legal framework to apply when a ... statute [is challenged] under the Second Amendment.").

Had the Court in *Bruen* endorsed simply deferring to *Heller*'s "presumptively lawful" footnote, the outcome of that case would have been much different. "[L]aws forbidding the carrying of firearms in sensitive places" were another one of the categories of " 'longstanding' ... and 'presumptively lawful' regulatory measures" that *Heller*'s footnote mentioned. *Jackson v. City & County of San Francisco*, 746 F.3d 953, 959 (9th Cir. 2014) (quoting *Heller*, 554 U.S. at 626–27, 627 n.26, 128 S.Ct. 2783); *see Bruen*, 597 U.S. at 30, 142 S.Ct. 2111. But rather than go along with New York's "attempt[ ] to characterize [its] proper-cause requirement as a [longstanding] 'sensitive-place' " regulation under *Heller*, the *Bruen* Court rejected, as having "no historical basis," the argument that "New York [could] effectively declare the island of Manhattan a 'sensitive place' " where public carry could be categorically banned. *Id.* at 30–31, 142 S.Ct. 2111. As with any other firearm regulation challenged under the Second Amendment, *Bruen* clarified, courts must now analyze "sensitive place" laws by analogizing them to a sufficiently comparable historical counterpart. *See id.* at 30, 142 S.Ct. 2111.

**\*8** It would be "fundamentally inconsistent" with *Bruen*'s analytical framework to treat felon firearm bans any differently, as nothing in the majority opinion implies that we can jettison *Bruen*'s test for one "presumptively lawful" category of firearm regulations but not others (e.g., sensitive place regulations). *See Rodriguez*, 728 F.3d at 979. And far from what the dissent suggests, applying *Bruen* to laws like § 922(g)(1) will not "uproot" any "longstanding prohibitions" on felons possessing firearms. Dissent at ——. To the extent any such "longstanding" tradition exists, *Bruen* would require us to *uphold* § 922(g)(1). But to do that, we must first flesh out what the relevant tradition is and how it compares to the law before us. That is the whole point of the "analogical inquiry" at *Bruen*'s second step, which played no role in *Vongxay*'s reasoning.

### 3.

The Government understandably downplays *Vongxay*'s heavy reliance on prior cases that are clearly inconsistent with *Bruen*. *See also* Dissent at —— – ——, ——. It also concedes by omission that *Vongxay* did not apply the two-step textual and historical methodology that *Bruen* requires. The Government argues instead that (if you squint hard enough) it is clear *Bruen* endorsed *Vongxay*'s "conclusion" that Congress may categorically disarm all felons for life because the Court referred to the petitioners in *Bruen* as "law abiding" and "responsible" citizens not once, not twice, but 14 times.

First, whether *Vongxay* reached the right "conclusion" is irrelevant under *Miller* if "th[at] conclusion [can] no longer

United States v. Duarte, --- F.4th ---- (2024)

[be] 'supported for the reasons stated' in th[e] decision." *Rodriguez*, 728 F.3d at 979 (quoting *United States v. Lindsey*, 634 F.3d 541, 551 (9th Cir. 2011)); *see also Langere*, 983 F.3d at 1121 ("[D]eference [to intervening Supreme Court decisions] *extends to the reasoning* of ... the decisions ... not just their holdings.") (emphasis added). Because *Vongxay*'s *rationale* for holding § 922(g)(1) constitutional is incompatible with *Bruen, Vongxay*'s holding cannot control.

Second, we do not think that the Supreme Court, without any textual or historical analysis of the Second Amendment, intended to decide the constitutional fate of so large a population in so few words and with such little guidance. *See Range*, 69 F.4th at 102 ("[T]he phrase 'law-abiding, responsible citizens' is as expansive as it is vague."); Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1595 (2022) ("[R]ecent scholarly estimates of the number of former felons range from 19 million to 24 million.") (internal citations omitted). "[T]he criminal histories of the plaintiffs ... in *Bruen*," after all, "were not at issue in th[at] case," *Range*, 69 F.4th at 101, and "[i]t is inconceivable that [the Supreme Court] would rest [its] interpretation of the basic meaning of any guarantee of the Bill of Rights upon such ... dictum in a case where the point was not at issue and was not argued," *Heller*, 554 U.S. at 625 n.25, 128 S.Ct. 2783. So we agree with the Third Circuit that *Bruen*'s scattered references to "law-abiding" and "responsible" citizens did not implicitly decide the issue in *this* case. *Range*, 69 F.4th at 101; *see United States v. Johnson*, 256 F.3d 895, 916 (9th Cir. 2001) (separate opinion of Kozinski, J., Trott, T.G. Nelson, Silverman, JJ.) (statements "uttered in passing" and "made ... without analysis" do not bind future panels).

\* \* \*

*Vongxay* did not apply anything that resembles the analytical steps of *Bruen*'s "mode of analysis" to determine whether § 922(g)(1) was constitutional under the Second Amendment. *Miller*, 335 F.3d at 900 (internal citations omitted). *Vongxay* instead relied first on prior decisions from this circuit and others, the reasoning of which does not square with *Bruen*, and then turned to *Heller*'s passing footnote referring to "longstanding" felon firearm bans as "presumptively lawful," which the *Heller* Court made without "providing [any] extensive historical justification," *Heller*, 554 U.S. at

635, 128 S.Ct. 2783. We must therefore apply *Bruen*'s two-step framework to reconsider § 922(g)(1)'s constitutionality.

**B.**

**\*9** Step one of *Bruen* asks the "threshold question," *Range*, 69 F.4th at 101, whether "the Second Amendment's plain text covers" (1) the individual, (2) the type of arm, and (3) the "proposed course of conduct" that are at issue, *Bruen*, 597 U.S. at 19, 31–32, 142 S.Ct. 2111. Here, as in *Bruen*, it is undisputed that the Second Amendment protects the arm in this case (a handgun) and the conduct involved (simple possession). *See id.* at 31–32, 142 S.Ct. 2111. All that is left for us to decide is the first textual element: whether Duarte is among "the people" to whom the Second Amendment right belongs.

On that issue, Duarte argues that "the people" in the Second Amendment means all American citizens, which includes him. Look no further than the Court's textual analysis of "the people" in *Heller*, where the Court construed that phrase as "unambiguously refer[ring]" not to any "unspecified subset" of people but to "all members of the national community," which includes "all Americans." *Id.* at 580–81, 128 S.Ct. 2783; *see also Bruen*, 597 U.S. at 70, 142 S.Ct. 2111 (ratifying *Heller*'s "all Americans" definition of "the people"). Regardless whether Duarte is an American citizen, the Government responds, the Second Amendment excludes felons from "the people" because the right to keep and bear arms was a qualified "political" right at the Founding reserved for members of the "virtuous citizenry." The right to bear arms, in other words, was no different from the right to vote, sit on a jury, or run for office, all of which state legislatures historically denied felons because their conduct had proved they were not upright or moral citizens.

Duarte is one of "the people" because he is an American citizen. *Heller* resolved this textual question when it held that "the people" includes "all Americans" because they fall squarely within our "national community." *Id.* at 580–81, 128 S.Ct. 2783. *Bruen* expressly reaffirmed that reading. 597 U.S. at 70, 142 S.Ct. 2111 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.") (quoting *Heller*, 554 U.S. at 581, 128

United States v. Duarte, --- F.4th ---- (2024)

S.Ct. 2783). Our own analysis of the Second Amendment's text and history also confirms that the original public meaning of "the people" in the Second Amendment included, at a minimum, all American citizens. We therefore reject the Government's position that "the people," as used in the Second Amendment, refers to a narrower, "unspecified subset" of virtuous citizens. *See Heller*, 554 U.S. at 580, 128 S.Ct. 2783.

**1.**

In *Heller*, "the people"—the "holder of the [Second Amendment] right"—was the starting point of the Court's textual analysis. *Id.* at 581, 128 S.Ct. 2783. The Court began by tracking that phrase's use across various provisions in the Constitution. While the preamble, Article I, § 2, and the Tenth Amendment "refer[red] to 'the people' acting collectively," they "deal[t] with the exercise or reservation of powers, not rights." *Id.* at 579–80, 128 S.Ct. 2783. Of those provisions that, like the Second Amendment, referred to the "the people" in the context of individual rights—the First, Fourth, and Ninth Amendments—the phrase was used as a "term of art" that "unambiguously refer[red] to all members" of the "political" or "national community," not "an unspecified subset." *Id.* at 580, 128 S.Ct. 2783. The Court then closed this part of its textual analysis by concluding that there is "a strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans.*" *Id.* at 581, 128 S.Ct. 2783 (emphasis added).

The Government argues that the Court in *Heller* never meant to define the scope of "the people" when it said those words. We are urged to think about it less as a statement of law and more as a "comment" the *Heller* Court made as a warmup to its ultimate conclusion "[t]hat the [Second] Amendment confers an individual right unrelated to militia service." If the court wants guidance from *Heller* as to who "the people" are, we should focus instead on *Heller*'s concluding remarks at the tail-end of the opinion, where the Court stated that "whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635, 128 S.Ct. 2783.

**\*10** The Court's textual analysis of "the people" in *Heller* hardly reads as a "mere[ ] ... prelude to another[,] [more important] legal issue that command[ed] the [Court's] full attention." *Johnson*, 256 F.3d at 914–16; *see Range*, 69 F.4th at 101. The Second Amendment's use of "the people" to "descri[be] the holder of th[e] right" was "[t]he first salient feature of the [Amendment's] operative clause" that dominated the *Heller* Court's textual analysis—the second being the Amendment's phrase "to keep and bear arms," which described "the substance of the right." *Heller*, 554 U.S. at 580–81, 128 S.Ct. 2783. Thus, defining who "the people" were and the "substance" of the right they held were both equally necessary to *Heller*'s holding. *See id.* at 581, 128 S.Ct. 2783 ("We move now from the holder of the right—'the people'—to the substance of the right: 'to keep and bear Arms.' "). Only after "[p]utting ... these [two] textual elements together" did the Court conclude that the "[m]eaning" of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592, 128 S.Ct. 2783 (emphasis added).

So we agree with Duarte that *Heller* read "the people" in the Second Amendment as "unambiguously refer[ring] ... not to an unspecified subset" but to "all Americans," who are indisputably "part of the national community." *Id.* at 580–81, 128 S.Ct. 2783; *see also Bruen*, 597 U.S. at 70, 142 S.Ct. 2111 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.") (quoting *Heller*, 554 U.S. at 581, 128 S.Ct. 2783); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767–68, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) ("[W]e concluded[ ] [in *Heller* that] citizens must be 'permitted "to use [handguns] for the core lawful purpose of self-defense." ' ") (citing *Heller*, 554 U.S. at 630, 128 S.Ct. 2783). With that, we join the growing number of circuits to give authoritative weight to *Heller*'s "national community" definition for "the people."[8]

**2.**

Our own analysis of the Second Amendment's text, "as informed by [its] history," confirms that "the people" included, at a minimum, all American citizens—without qualification. *Bruen*, 597 U.S. at 19, 142 S.Ct. 2111. Mindful

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.    9

United States v. Duarte, --- F.4th ---- (2024)

that "the Constitution was written to be understood by the voters," we begin with the " 'normal and ordinary' meaning of the Second Amendment's language." *Heller*, 554 U.S. at 576, 128 S.Ct. 2783 (quoting *United States v. Sprague*, 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931)). We also consider the same pre-and post-ratification sources that *Heller* looked to because when it comes "to determin[ing] the *public understanding* of a legal text in the period after its enactment or ratification," the historical record serves as "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20, 142 S.Ct. 2111 (emphasis in original) (quoting *Heller*, 554 U.S. at 605, 128 S.Ct. 2783).

What we gather from history is that ordinary English speakers at the Founding understood the "people" to refer to "the whole Body of Persons who live in a Country[ ] or make up a Nation." N. Bailey, *An Universal Etymological English Dictionary* 601–02 (1770). The "most useful and authoritative [contemporaneous-usage] dictionaries" of the Founding-era uniformly defined the term this way.[6] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419 (1st ed. 2012). This broad definition—with its focus on residency—largely overlapped with the commonly understood meaning of "citizens" at that time. *Compare People*, Webster, *supra*, at 600 ("The body of persons who compose a community, town, city, or nation"), *with e.g., Citizen*, Dyche, *supra*, at 156 ("[A] freeman or inhabitant of a city or body corporate."). Other Founding-era sources likewise used the two terms synonymously. *See, e.g.*, The Federalist No. 2, at 10 (John Jay) (Jacob E. Cooke ed. 1961) ("To all general purposes we have uniformly been one people each individual citizen everywhere enjoying the same national rights, privileges, and protection."); The Federalist No. 14 (James Madison) ("Hearken not to the unnatural voice which tells you that the people of America[ ] ... can no longer be fellow citizens of one great, respectable, and flourishing empire."); *Douglass v. Stephens*, 1 Del. Ch. 465, 467 (1821) ("[T]he people of the United States ... resist[ed] the ... British King and Parliament .... [T]hey knew that they were practically, as well as legally, fellow-citizens, ... enjoying every right and privilege indiscriminately with the inhabitants.").

**\*11** This notion that one's status as a "citizen" signified his membership among "the people" traces its roots to English common law. In his Commentaries on the Laws of England,

William Blackstone explained that every "[n]atural-born subject[ ]" of England "fall[s] under the denomination of the *people*" because his birth within the realm creates an "intrinsic" duty of allegiance, a "tie ... which binds [him] to the king." 2 William Blackstone, *Commentaries* \*366 (St. George Tucker ed. 1803) (1767); *see also* William Blackstone, *An Analysis of the Laws of England* 24 (6th ed. 1771) ("Allegiance is the duty of all subjects; being the reciprocal tie of *the People* to the Prince.") (emphasis added). But this "tie" went both ways. "[B]y being born within the king's" realm, Blackstone continued, all "natural-born subjects ... acquire" a "great variety of rights," *id.* at \*371, including "the fundamental right[ ] of Englishmen," to "hav[e] arms for their defence," *see Heller*, 554 U.S. at 594, 128 S.Ct. 2783 (citing 1 Tucker's Blackstone, *supra*, at \*136, \*139–40); *Jimenez-Shilon*, 34 F.4th at 1047 (citations omitted). "[T]he colonists considered themselves to be vested with th[ese] same fundamental rights" because, as British subjects, they counted themselves among "the People of Great Britain." *McDonald*, 561 U.S. at 816, 817, 130 S.Ct. 3020 (Thomas, J., concurring in part and concurring in judgment) (quoting The Massachusetts Resolves (Oct. 29, 1765), reprinted in Prologue to Revolution: Sources and Documents on the Stamp Act Crisis, 1764–1766, p.56 (E. Morgan ed. 1959)).

That "the people" referred (at a minimum) to all citizens, and that the "right of the people" to keep and bear arms was a fundamental right of *every* citizen, is also "confirmed by [the] analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment." *Heller*, 554 U.S. at 600, 128 S.Ct. 2783. The "most relevant" of these examples are the ten "state constitutional provisions written in the [late] 18th century or the first two decades of the 19th." *Id.* at 582, 128 S.Ct. 2783. While three of those states—Indiana, Missouri, and Ohio— described the Second Amendment right as belonging to "the people," Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 209 (2006), six states—Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania—expressly conferred it to "the citizens" or "*every* citizen."[7] Tennessee, in addition, described the right as belonging to all "freemen," another term for "citizens." Tenn. Const. art. I, § 26; *see, e.g., Citizen*, Samuel Johnson, *A Dictionary of the English Language* 297 (6th ed. 1785) ("A freeman of a city; not a

United States v. Duarte, --- F.4th ---- (2024)

foreigner; not a slave."); *see also Simpson v. State*, 13 Tenn. 356, 360 (1833) ("By this clause of the constitution, an express power is ... secured to *all the free citizens* of the state to keep and bear arms for their defence.") (emphasis added).

"That of the[se] ... state constitutional protections ... enacted immediately after 1789, at least seven unequivocally protected [every] individual *citizen's* right to self-defense is strong evidence that this is how the founding generation conceived of the right." *Heller*, 554 U.S. at 603, 128 S.Ct. 2783. "These provisions," after all, offer "the most analogous linguistic context" for discerning how the public understood the Second Amendment right. *Id.* at 585–86, 128 S.Ct. 2783. And "[i]t is clear from th[eir] formulations that," when describing the holder of the right, the Founding generation used "the people" and "the citizens" interchangeably. *Id.* at 585, 128 S.Ct. 2783.

The "three important founding-era legal scholars [to] interpret[ ] the Second Amendment"—William Rawle, Joseph Story, and St. George Tucker—likewise equated "the people" with "citizens" and described the right to keep and bear arms as an all-citizens' right. *Id.* at 605, 128 S.Ct. 2783. In his "influential treatise," Rawle spoke of "[the] people [who are] permitted and accustomed to bear arms ... [as] properly consist[ing] of armed citizens." *Id.* at 607, 128 S.Ct. 2783 (quoting W. Rawle, *A View of the Constitution of the United States of America* 140 (1825)) (emphasis added). Story similarly wrote that "[t]he right of *the citizens* to keep and bear arms has justly been considered as the palladium of the liberties ... [I]t offers a strong moral check against the ... arbitrary power of rulers ... [and] enable[s] *the people* to resist and triumph over them." *Heller*, 554 U.S. at 607–08, 128 S.Ct. 2783 (quoting 2 J. Story, *Commentaries on the Constitution of the United States* § 1897, pp. 620–21 (4th ed. 1873)) (emphasis added). And Tucker, in his notes to Blackstone's Commentaries, described the holder of the arms right mostly broadly of all: "[*A*]*ll men, without distinction*, ... are absolutely entitled ... [to] th[e] right of self-preservation." 2 Tucker's Blackstone, *supra*, at 145–46 n. 42 (1803) (emphasis added); *see Heller*, 554 U.S. at 594–95, 128 S.Ct. 2783 (citing *id.*).

**\*12** Mid-19th-century cases interpreting the Second Amendment carried on this unbroken tradition of referring to the right to keep and bear arms as every citizen's right. *See,*

*e.g., Heller*, 554 U.S. at 612, 128 S.Ct. 2783 (quoting *United States v. Sheldon*, in 5 Transactions of the Supreme Court of the Territory of Michigan 337, 346 (W. Blume ed. 1940) (" 'The constitution of the United States also grants to the citizen the right to keep and bear arms.' ")); *State v. Chandler*, 5 La. Ann. 489, 490 (1850) (describing the Second Amendment as protecting every "man's right to carry arms ... 'in full open view' "). The Georgia Supreme Court's decision in *Nunn v. State*, 1 Ga. 243, 251 (1846), for instance—a case that "perfectly captur[ed]" the import of the Second Amendment's text—described the right as belonging to "the *whole people*, old and young, men, [and] women ...." *Heller*, 554 U.S. at 612, 128 S.Ct. 2783 (quoting *id.*) (emphasis added).

We will stop there, although we could go on. *See McDonald*, 561 U.S. at 773–74, 130 S.Ct. 3020 ("[T]he Civil Rights Act of 1866, ... which was considered at the same time as the Freedmen's Bureau Act, similarly sought to protect the right of *all citizens* to keep and bear arms.") (emphasis added). We are confident that, "by founding-era consensus," the "right of the people" to keep and bear arms was publicly understood as the fundamental right of every citizen. *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012).

### 3.

Against this weight of evidence, the Government tells us that "the people" protected by the Second Amendment historically included not all citizens but rather a subset of them—namely, members of the "virtuous citizenry." As its one and only example from history, the Government quotes the most favorable language from 19th-century commentator Thomas Cooley's "massively popular" Treatise on Constitutional Limitations. *Heller*, 554 U.S. at 616, 128 S.Ct. 2783. In that work, Cooley wrote that "the people, in the legal sense, must be understood to be those who ... are clothed with political rights," such as the right of "elective franchise." Thomas M. Cooley, *A Treatise on the Constitutional Limitation Which Rest upon the Legislative Power on the States of the American Union* ch. III, 39 (4th ed. 1878). When used "in this connection," he continued, "[c]ertain classes have been almost universally excluded" from "the people," such as the "slave, ... the woman, ... the infant, the idiot, the lunatic, *and the felon*." *Id.* at 36, 37

United States v. Duarte, --- F.4th ---- (2024)

---

(emphasis added). "The theory" was that these groups "lack[ed] either the intelligence, ... the liberty of action," or, in the case of felons, "the virtue" that was "essential to the proper exercise of the elective franchise." *Id.* at 37. So they "are compelled to submit to be ruled by an authority in the creation of which they ha[d] no choice." *Id.* at 36.

Cooley was referring to the "idiomatic" meaning of "the people" used in select parts of the Constitution that "deal with the exercise or reservation of [the] powers, not [the individual] rights" of "the people." *See Heller*, 554 U.S. at 579–80, 128 S.Ct. 2783. Indeed, the notion that the right to vote was among the "natural right[s]" of "the people" was, in Cooley's view, "utterly without substance" because it "d[id] not exist for the benefit of the individual, but for the benefit of the state itself." Cooley, *General Principles of Constitutional Law in the United States of America* ch. XIV, § II at 248–49 (1880); *see also Kanter v. Barr*, 919 F.3d 437, 462 (7th Cir. 2019) (Barrett, J., dissenting) ("For example, the right to vote is held by individuals, but they do not exercise it solely for their own sake; rather, they cast votes as part of the collective enterprise of self-governance."). When used to describe the fundamental rights of individuals, as opposed to their powers, Cooley clarified that "the people" took on the much broader "all-citizens" definition that we have described all along. He explained this difference in meaning when discussing the First Amendment in his 1880 work, General Principles of Constitutional Law:

> **\*13** The first amendment to the Constitution further declares that Congress shall make no law abridging the right of the people peaceably to assemble and to petition the government for a redress of grievances.... When the term *the people* is made use of in constitutional law or discussions, it is often the case that those who are intended who have a share in the government through being clothed with the elective franchise ... *But in all the enumerations and guaranties of rights the whole people are intended*[.] ... In this case, therefore, *the right to assemble is preserved to all the people, and not merely to the electors, or to any other class or classes of the people.*

*Id.* at 267 (emphasis added). So we add Cooley to the already long list of influential writers who understood "the people," in the rights' context, to mean the whole body of citizens, and

the "right of the people to keep and bear arms" as every citizen's right.

\* \* \*

"[W]ith respect to [whom] the right to keep and bear arms" belongs, "[n]othing in the Second Amendment's text draws a ... distinction" between those who are virtuous and those who are not. *See Bruen*, 597 U.S. at 32, 142 S.Ct. 2111 (emphasis added) (finding no distinction between public versus private carry in the phrase "keep and bear arms"). Because Duarte's status as an American citizen places him among "the people" protected by the Second Amendment's "bare text," "[t]he Second Amendment ... presumptively guarantees" his right to possess a firearm for self-defense. *Bruen*, 597 U.S. at 33, 44 n.11, 142 S.Ct. 2111. The Government now "shoulder[s] the burden of demonstrating" at step two of *Bruen* that § 922(g)(1) "is consistent with the Second Amendment's ... historical scope."[8] *Id.* at 44 n.11, 142 S.Ct. 2111.

## C.

At *Bruen*'s second step, the Government must prove that it "is consistent with this Nation's historical tradition of firearm regulation" for Congress to ban permanently, by making it a felony, a non-violent offender like Duarte from possessing a firearm even after he has already served his terms of incarceration. *See id.* at 34, 142 S.Ct. 2111. Because "[b]ans on convicts possessing firearms were unknown [in the United States] before World War I," *Chovan*, 735 F.3d at 1137 (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698, 708 (2009)), the Government must identify for us "a well-established and representative historical *analogue*" to § 922(g)(1) that can justify the law's application to Duarte, *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111. In assessing whether the Government has met its burden, the two "central considerations" that guide our analysis are "how and why" the Government's proposed analogues burdened the Second Amendment right. *Id.* (citations omitted). Did these historical examples, we must ask, "impose a comparable burden on the right of armed self-defense" (*Bruen*'s "how") that was "comparably justified" (*Bruen*'s "why") as compared to § 922(g)(1)? *Id.* at 29, 142 S.Ct. 2111.

United States v. Duarte, --- F.4th ---- (2024)

One final point of order. While the Government does not have to find for us a historical "dead ringer" to § 922(g)(1), a law that "remotely resembles" a felon firearm ban is not enough. *Id.* at 30, 142 S.Ct. 2111. We are looking for something in between these two endpoints. On that score, *Bruen* offers some additional guidance. If the law at issue is a "distinctly modern firearm regulation[ ]" because it addresses a societal problem "unimaginable at the founding," the Government's historical analogues need only be "relevantly similar" to the challenged law. *Id.* at 28–29, 142 S.Ct. 2111; *see Perez-Garcia*, 96 F.4th at 1182; *Alaniz*, 69 F.4th at 1129–30.

**\*14** Section 922(g)(1), however, takes aim at "[ ]gun violence" generally, which is a "problem that has persisted [in this country] since the 18th century." *Bruen*, 597 U.S. at 26, 27, 142 S.Ct. 2111. And § 922(g)(1) "confront[s] that problem" with "a flat ban on the possession of [ ]guns" by the formerly incarcerated, which no one here disputes is something "that the Founders themselves could have adopted." *Id.* at 27, 142 S.Ct. 2111. Thus, the fact that the "[t]he Founding generation *had no laws* limiting gun possession by ... people convicted of crimes," Adam Winkler, *Heller's Catch-22*, 56 UCLA Law Rev. 1551, 1563 (2009) (emphasis added)—while not fatal to the Government's case—means that "the lack of a ... historical regulation" that is "distinctly similar" to § 922(g)(1) is strong if not conclusive "evidence" that the law "is inconsistent with the Second Amendment," *Bruen*, 597 U.S. at 27, 142 S.Ct. 2111; *see also Baird*, 81 F.4th at 1047 ("Because states in 1791 and 1868 also grappled with general gun violence, California must provide analogues that are 'distinctly similar.' "); *Range*, 69 F.4th at 103 (similar). We turn now to the Government's evidence.

### 1.

The Government's first proposed category of historical analogues are not firearm regulations per se but a trio of draft proposals that certain members of New Hampshire's, Massachusetts's, and Pennsylvania's state conventions recommended adding to the Constitution prior to its ratification. New Hampshire's convention offered language providing that "Congress shall never disarm any citizen,

unless such as are or have been in actual rebellion." 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891). "Samuel Adams and other delegates unsuccessfully urged the Massachusetts convention to recommend" adding a provision to the Constitution that it "be never construed to authorize Congress to ... prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Marshall, *supra*, at 713 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 674–75 (1971) (emphasis added)). A minority of Pennsylvania's convention lastly proposed language that read: "[T]he people have a right to bear arms for the defense of themselves ... and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 Schwartz, *supra*, at 665 (emphasis added).

"It is dubious" at best whether several, rejected "proposals [made] in the state conventions," *Heller*, 554 U.S. at 603, 128 S.Ct. 2783, can—consistent with *Bruen*'s second step— amount to a "well-established and representative" national tradition of regulating firearms, *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111; *see also Heller*, 554 U.S. at 590, 128 S.Ct. 2783 ("It is always perilous to derive the meaning of an adopted provision from [ ]other provision[s] deleted in the drafting process."). None of the proposals, obviously, found its way into the Second Amendment. The two most restrictive ones (Pennsylvania's and Massachusetts's) failed to carry a majority vote within their own states. *See* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 222 (1983). And neither of those two states, we add, incorporated the language of its proposal into the Second Amendment provision of *its own* constitution.[9] *See, e.g.*, Pa. Const. art. 1, § 21 (1790); Mass. Const. pt. 1, art. 17 (1780); *see* Volokh, *supra*, at 208. All told, a handful of failed proposals "deleted in the drafting process," *Heller*, 554 U.S. at 590, 128 S.Ct. 2783, without more, offers "too dim a candle," to illuminate "how and why" the Founding generation restricted the Second Amendment right, *see Folajtar v. Attorney General*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting). "But even assuming that this legislative history is relevant," *Heller*, 554 U.S. at 603, 128 S.Ct. 2783; *see Perez-Garcia*, 96 F.4th at 1188, we agree with now-Justice Barrett that "[t]he common concern [among] all three" of the proposals

United States v. Duarte, --- F.4th ---- (2024)

was "not about felons in particular or even criminals in general" but those whose conduct "threatened violence and the risk of public injury," *Kanter*, 919 F.3d at 456 (Barrett J., dissenting).

**\*15** Start with New Hampshire's proposal. It empowered Congress to disarm only those who "are or have been in actual rebellion," which was a crime against the state that denoted violence. *Id.* at 456 (citing *Rebellion*, 2 New Universal Etymological English Dictionary (4th ed. 1756) (defining "rebellion" as "traitorous taking up [of] arms, or a tumultuous opposing [of] ... the nation")). Adams's proposal in the Massachusetts convention permitted disarming only citizens who were not "peaceable," a term that at the time meant "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent." Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773), *quoted in Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). "Far from banning the [possession] of ... firearms" by any class of criminal, Adams's proposal "merely [sought to] codif[y] the existing common-law" tradition of disarming those who "b[ore] arms to terrorize the people, as had [been done since] the Statute of Northampton" in 1328. *See Bruen*, 597 U.S. at 46–47, 142 S.Ct. 2111; *compare id.* (citing Massachusetts's colonial law "authoriz[ing] justices of the peace to arrest 'all Affrayers, Rioters, Disturbers, or Breakers of the Peace' ") (1692 Mass. Acts and Laws no. 6, pp 11–12), *with Kanter*, 919 F.3d at 455 (Barrett J. dissenting) ("Those who 'breach[ed] the peace' caused '[a] violation of the public peace, as by a riot, affray, or any tumult which [wa]s contrary to law, and destructive to the public tranquility.' ") (quoting Noah Webster, *An American Dictionary of the English Language* (1828)). Only the Pennsylvania minority's proposal—which would have allowed disarming those for *crimes committed*, or [for] real danger of public injury"—comes close to "suggest[ing]" the categorical disarmament of all lawbreakers. *Perez-Garcia*, 96 F.4th at 1188. *But see Bruen*, 597 U.S. at 66, 142 S.Ct. 2111 ("[W]e will not give disproportionate weight to a single state statute and a pair of state-court decisions."). But when read together with the remaining clause "or [for] real danger of public injury," the more plausible interpretation is that "crimes committed" referred to a narrower "subset of crimes [that] suggest[ed] a proclivity for violence." *Kanter*, 919 F.3d at 456 (Barrett J.,

dissenting); Scalia, *supra*, at 112 (explaining that "or," when "set off by commas," "introduces a definitional equivalent").

On balance, then, the draft proposals allude to a possible tradition of disarming a narrow segment of the populace who posed a risk of harm because their conduct was either violent or threatened future violence. That does not offer a "distinctly similar" justification for an across-the-board disarming of non-violent offenders like Duarte. *Bruen*, 597 U.S. at 26, 142 S.Ct. 2111. We move on to the Government's second category of historical analogues.

### 2.

The Government next refers us to 17th-to early 19th-century colonial and American laws that disarmed groups whom the Founding generation, according to the Government, "deemed untrustworthy based on [their] lack of adherence to the rule of law." At the height of the Revolutionary War, British Loyalists who refused to swear allegiance to the new republic were dispossessed of their firearms. *Infra* Part a. Catholics were disarmed in England once the Protestants seized power after the Glorious Revolution; several colonies passed similar Catholic-disarmament laws during the French and Indian War. *Infra* Part b. Bans on selling arms to Indians were a matter of course in the early American colonies. *Infra* Part c. And Blacks, free and enslaved alike, were routinely deprived of their arms. *Infra* Part d. Repugnant as these laws are by modern standards, the Government maintains that they represent a longstanding tradition in this country of disarming groups whom legislatures thought were "unwilling" to comply with the law.

Laws that disarmed British Loyalists, Catholics, Indians, and Blacks fail both the "why" and "how" of *Bruen*'s analogical test. First, the "why." There is a solid basis in history to infer that states could lawfully disarm these groups because they "were written out of 'the people' " altogether. *Rahimi*, 61 F.4th at 457. But Duarte is an American citizen and counts among "the people" by both modern and Founding-era standards. And insofar as legislatures passed these laws to prevent armed insurrections by dangerous groups united along political, ideological, or social lines, the Government offers no historical evidence that the Founding generation

United States v. Duarte, --- F.4th ---- (2024)

perceived formerly incarcerated, non-violent criminals as posing a similar threat of collective, armed resistance.

As to the nature of the burden on the Second Amendment right (the "how" under *Bruen*) most of the historical examples we have seen were far less reaching than § 922(g)(1). During the American Revolution, states generally allowed British Loyalists to regain their arms once they swore loyalty to the new republic. *Infra* Part C.2.a. Catholics still retained "such necessary weapons" for their own self-defense. *Bruen*, 597 U.S. at 45 n.12, 142 S.Ct. 2111 (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). Many colonial-era firearm regulations targeting Indians did not even disarm this group but instead banned the *sale* of arms *to them*.*Infra* Part C.2.c. Even laws prohibiting Blacks from possessing arms still allowed for (albeit narrow) exceptions. *Infra* Part C.2.d. What this all tells us is that the burden on the Second Amendment right under these laws did not persist for life for these groups. It was subject to certain need-based or case-specific exemptions or could end altogether when evidence undermined the justification for the disability. That stands in stark contrast to § 922(g)(1)'s lifelong, no-exception, categorical ban. The Government's proffered analogues are thus not "distinctly similar" to § 922(g)(1) in both "how and why" these laws burdened the Second Amendment right.

### a. Laws disarming British Loyalists or "disaffected" persons.

**\*16** When the Revolutionary War was in full swing, early state legislatures routinely condemned "disaffected" persons as "enem[ies] to the American cause," who "spread [their] disaffection" from within to the detriment of the war effort. Act of 1779, 9 *The Statutes at Large of Pennsylvania from 1682 to 1801* 441 (1903). "[T]here [wa]s great reason to believe" that "dangerous and disaffected" persons "communicate[d] intelligence to the [British] enemy," and were inclined to either join or support an insurrection should one arise. Act of 1778, 1 *Laws of the State of New York Passed at the Sessions of the Legislature* 50 (1777-1784); Act of 1780, 10 *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619* 310–11 (Hening ed. 1822) ("[C]omit[ting] to close confinement[ ] any person ...

suspect[ed] of disaffection" in the event of invasion or insurrection). So much so did this class of people concern the new nation that the Continental Congress "recommended ... disarm[ing] persons 'who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies.' " Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 264 (2020) (quoting 1 *Journals of the Continental Congress, 1774-1789*, at 285 (1906)). Six of the states heeded this advice by enacting oath-or-disarmament laws, which stripped individuals of their arms if they refused to "renounc[e] all allegiance to the now-foreign sovereign George III in addition to swearing allegiance to one's State."[10] Marshall, *supra*, at 724–25.

The Government would have us conclude that the reason the states disarmed "disaffected" persons was "because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact." That is far too generalized an abstraction to draw and ignores the historical context in which these laws were passed. *See Bruen*, 597 U.S. at 42, 142 S.Ct. 2111 (noting 16th century "royal efforts at suppress[ing] ... handguns" arose not because of "concerns about their safety but rather their inefficacy").

The states passed these laws during "the darkest days of an existential domestic war" between the newly formed republic and Great Britain. Marshall, *supra*, at 725. "[N]on-associat[ors]," the thinking went, not only "refuse[d] ... to defend, by arms, th[e] United Colonies," 1 *Journals of the Continental Congress, 1774-1789*, at 285 (1906), but might also "take up arms *against* America" in "th[is] present unhappy dispute," *see* Resolution of the Council of Safety, Jan. 18, 1776, 1 *The Revolutionary Records of the State of Georgia* 101 (Candler ed. 1908) (emphasis added). Confiscating their weapons—for the time being—was thought both reasonable and necessary to preserve the new nation. *See* Greenlee, *supra*, at 265 ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them."); *Perez-Garcia*, 96 F.4th at 1187 ("The justification was always that those being disarmed were dangerous.") (quoting Greenlee, *supra*, at 265).

ER-00343

United States v. Duarte, --- F.4th ---- (2024)

---

**\*17** The laws targeting disaffected persons, for example, certainly read like emergency wartime measures. *See, e.g.,* 1778 Act of Va., 10 *Statutes at Large, supra,* at 310–11 (calling for the confinement of disaffected persons "in this time of public[ ] danger, when a powerful and vindictive enemy are ravaging our southern sister states"); 1779 Act of Pa., 9 *Statutes at Large, supra,* at 441 (calling for the "temporary suspension of law" in this "time[ ] of public danger" and confining suspected Loyalists). And there is good reason to think they were, in famed commentator St. George Tucker's words, "merely temporary." 2 Tucker's Blackstone, *supra,* at \*368 n.2 (discussing Virginia's 1777 oath-or-disarmament law); *see also* Marshall, *supra,* at 726 ("[T]here is good reason to consider the[se] [laws] not to have survived through the Founding in anything like their original form."). It lastly bears emphasis that only male inhabitants who qualified for militia service—i.e., men of fighting age—had to swear an oath. Most states, in other words, disarmed those who were not just sympathetic to the prospect of a domestic, armed uprising, but physically capable of joining one. *E.g.,* 1776 Act of Mass., 5 *Acts and Resolves, supra,* at 479 (1886) (requiring "every male person above sixteen" to swear the oath and disarming those who "neglect[ed] or refuse[d]"); 1777 Act of Va., 9 *Statutes at Large, supra,* at 282 (same); Act of 1777, 24 *The State Records of North Carolina, supra,* at 88 (similar); Act of 1776, 7 *Records of the Colony of Rhode Island, supra,* at 566 (1862) (same); 1777 Act of Penn., 9 *Statutes at Large, supra,* at 111.

There is just as good reason to conclude that "disaffected" persons could be disarmed *in toto* because they fell outside "the people" and were therefore deemed to have no fundamental rights. *See Jimenez-Shilon,* 34 F.4th at 1048. Since "an individual's undivided allegiance to the sovereign" was a "precondition" to his "membership in the political community," British Loyalists "renounced" their place among "the [American] people" by refusing to swear a loyalty oath. *Jimenez-Shilon,* 34 F.4th at 1048 (quoting *United States v. Perez,* 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring) (internal quotations omitted)).

At least several states explicitly justified disarming Loyalists along these lines. North Carolina, for example, explained that it is "the Duty of every Member of Society to give proper Assurance of fidelity to the Government from which

he enjoys protection." Act of 1777, 24 *The State Records of North Carolina, supra,* at 88. Those who abstain from swearing allegiance, "by their refusal ... to do [so]," "proclaim that they should no longer enjoy the *Privileges of Freemen* [i.e., citizens] of the ... State." *Id.* (emphasis added). Pennsylvania, Virginia, and Maryland similarly invoked this idea of a "reciprocal" relationship of "allegiance and protection" between the citizen and state. 1777 Act of Va., 9 *Statutes at Large, supra,* at 281; 1778 Act of Pa., 9 *Statutes at Large, supra,* at 111; Act of 1777, 203 *Hanson's Laws of Maryland, supra,* at 187; Churchill, *supra,* at 160 ("Noting that 'in every free state, allegiance and protection are reciprocal,' Maryland['s] ... test oath barred those refusing from ... keeping arms."). By refusing to promise the former, the "disaffected" person swore off "the benefits of the latter." *E.g.,* 1777 Act of Va., 9 *Statutes at Large, supra,* at 281.

It is no small coincidence either that these "loyalty" oaths were precursors to the 1795 naturalization oath that the First Congress later required resident aliens to swear as a condition for American citizenship. *Compare* 2 Tucker's Blackstone, *supra,* at \*368 n.2 (quoting Virginia's oath-or-disarmament law), *with id.* at \*374 n.12 (quoting 1795 federal naturalization law). Thus, "[t]o refuse [that oath in 1777] was to declare oneself [not only] a resident alien of the new nation," but, "given the war," a "resident *enemy* alien" who sympathized with a foreign belligerent power. Marshall, *supra,* at 725 (emphasis added); *see also* Thomas Jefferson, Notes on the State of Virginia 163 (Lilly & Wait eds., 1832) ("By our separation from Great Britain, British subjects became aliens, and being at war, they were alien enemies."). Consistent with that status change, disarmament was just one "part of a wholesale stripping of rights and privileges" that followed from refusing to swear allegiance. Marshall, *supra,* at 725. Many states, for example, sent suspected Loyalists to the "gaol," where they were held without bail until they recited the oath. *See, e.g.,* 1779 Act of Pa., 9 *Statutes at Large, supra,* at 442; 1777 Act of Va., 9 *Statutes at Large, supra,* at 282–83. Virginia went one step further, barring oath-recusants from "suing for any debts ... [and] buying lands, tenements, or hereditaments." 1777 Act of Va., 9 *Statutes at Large, supra,* at 282; *see also* Notes on the State of Virginia, *supra,* at 162 ("By our laws, ... no alien can hold lands, nor alien enemy maintain an action for money, or other moveable thing."). North Carolina outright banished those who refused their oath and declared anyone so

---

United States v. Duarte, --- F.4th ---- (2024)

banished who returned to the state "guilty of Treason." Act of 1777, 24 *The State Records of North Carolina*, *supra*, at 89. The few "permitted ... to remain in the State" were not allowed to *leave* without express "[p]ermission ... obtained from the Governor and Council." *Id.* Thus, "[b]y refusing to take an oath of allegiance," disaffected persons "forfeited [not just] the state's protection of their right to arms," *Jimenez-Shilon*, 34 F.4th at 1048, but other fundamental rights considered intrinsic to one's membership among "the people," *see Corfield v. Coryell*, 6 F. Cas. 546 (C.C.E.D. Pa. 1823) (enumerating certain "fundamental" rights of citizens as including "[t]he right ... to pass through ... in any other state, ... to institute and maintain actions of any kind[,] ... [and] to take, hold and dispose of property").

**\*18** When viewed through this lens, the Government's analogy to laws disarming Loyalists fails the "why" of *Bruen*'s second step. Insofar as these laws were meant to be "merely temporary" measures, 2 Tucker's Blackstone, *supra*, at \*368 n.2, that "disarm[ed] [a] narrow segment[ ] of the population" because they "threaten[ed] ... the public safety," that does not justify *permanently* disarming *all non-violent* felons today, *see Perez-Garcia*, 96 F.4th at 1189 (citing *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting)). And if disarming the British Loyalist naturally followed because he swore himself out of "the people" by refusing his oath of allegiance, that reasoning does not carry over to the non-violent offender who served his prison term. The Government offered no evidence demonstrating that a former non-violent convict forever forfeited his legal status as one of "the people" merely because he sustained a criminal conviction.[11]

Nor did "how" these laws burden the Second Amendment right come close to approximating § 922(g)(1)'s lifetime, no-exception ban. *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111. The laws themselves were short-lived, as we mentioned earlier, but so was their burden on the Second Amendment right. Of the "disaffected" who were disarmed, they could normally regain their arms upon demonstrating they were not, in fact, "disaffected" to the American cause. Massachusetts, for instance, provided that disaffected persons could "receive their arms again ... by the order of" the "committees of correspondence, inspection or safety." Act of Mass. (1775–76), 5 *Acts and Resolves, supra*, at 484. Rhode Island similarly contemplated that those who refused their loyalty

oath could still keep their weapons by providing "satisfactory reasons" for their recusal. 1776 Act, 7 *Records of the Colony of Rhode Island* 567 (Bartlett ed. 1862). Connecticut's law spoke most directly to the principle that disaffected persons were not disarmed for life, qualifying that he who was found "inimical" to the States would be disarmed only "until such time as he could prove his friendliness to the liberal cause." G.A. Gilbert, *The Connecticut Loyalists*, 4 Am. Historical Rev. 273, 282 (1899); *see* Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut, supra*, at 193; *see also* Journal of the Council of Safety, 1 *The Public Records of the State of Connecticut* 329 (Hoadly ed. 1894) (releasing "George Folliot of Ridgfield" from custody after he swore to take an oath of loyalty).

### b. Laws disarming Catholics or "Papists."

Laws disarming Catholics fare arguably worse as historical analogues to § 922(g)(1) because the Government "point[s] to only three [such] restrictions." *See Bruen*, 597 U.S. at 46, 142 S.Ct. 2111. In 1756, Pennsylvania's and Maryland's colonies each enacted militia laws that seized arms belonging to any "Papist or reputed Papist" and barred them from enlisting in the local militia. 3 *Pennsylvania Archives* 131–32 (Samuel Hazard ed. 1853); 52 *Proceedings and Acts of the General Assembly, 1755-1756* 454 (Raphael Semmes ed. 1946). The Virginia colony, that same year, required "any Person ... suspected to be[ ] a Papist" "to swear allegiance to Hanoverian dynasty and to the Protestant succession." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007). No Catholic "so refusing ... [could] have any Arms, Weapons, Gunpowder, or Ammunition." Act of 1756, 7 *Statutes at Large* 35–36 (Hening ed. 1820).

**\*19** It is "doubt[ful] that *three* colonial regulations" prove that disarming Catholics as a class ever became a "well-established" tradition in this country. *See Bruen*, 597 U.S. at 46, 142 S.Ct. 2111 (emphasis in original). The practice appears instead to have been more of an English novelty that began when "the deposed King James II ... disarm[ed] Protestants while arming ... Roman Catholics." Marshall, *supra*, at 722–21. Indeed, the inhabitants of Virginia,

United States v. Duarte, --- F.4th ---- (2024)

Pennsylvania, and Maryland were still British subjects when they passed their Catholic-disarmament laws, and they did so at the height of the French and Indian War, "which was perceived by many ... as a war between Protestantism and Catholicism." Greenlee, *supra*, at 263. Following independence, the custom did not seem to secure a strong enough foothold on this side of the Atlantic to mature into a longstanding tradition of firearm regulation. We are unaware of any post-ratification laws disarming Catholics as a class. *See id.* at 721 ("Like the game laws, the English exclusion of subjects based on religion ha[d] no place within the Second Amendment, as early commentators also celebrated."); *see also Bruen*, 597 U.S. at 35, 142 S.Ct. 2111 ("[C]ourts must be careful when assessing evidence concerning English common-law ... English common-law practices ... cannot be indiscriminately attributed to the Framers of our own Constitution.").

We are not even sure that disarming Catholics was that prevalent in England. "[T]hese laws are seldom exerted to their utmost rigour," Blackstone wrote, and "if they were, it would be very difficult to excuse them." *See* 5 Tucker's Blackstone, *supra*, at 57; *see id.* at 55–56 (summarizing arms restrictions and other anti-Catholic English laws); *see also Bruen*, 597 U.S. at 58, 142 S.Ct. 2111 ("[R]espondents offer little evidence that authorities ever enforced surety laws."). Episodes like the foiled Gunpowder Plot of 1605, where Guy Fawkes led fervent Catholics in a conspiracy to kill King James I and blow up both Houses of Parliament, Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1210–11 (2016), "obliged parliament to counteract so dangerous a spirit by laws of a great, and then perhaps necessary, severity," 5 Tucker's Blackstone, *supra*, at 57. Thus, Blackstone explained, these laws "are rather ... accounted for ... from their history, and the urgency of the times which produced them, than to be approved ... as a standing system of law." *Id.*

In any event, the "why" behind these laws does not justify disarming non-violent felons as a class. In theory, Catholics "acknowledge[ed] a foreign power, superior to the sovereignty of the kingdom." *Id.* at 55. Catholics "c[ould not] complain if the laws of th[e] kingdom will not treat them upon the footing of good subjects," Blackstone wrote, when their "separation" from the Church of England was "founded [not] only upon [a] difference of [religious]

opinion" but a "subversion of the civil government." *Id.* at 54–55. Taking away their guns thus followed "the same rationale" for stripping suspected loyalists of their arms during the American Revolution. Marshall, *supra*, at 724. The only difference was the "religious overlay." *Id.* While one's "disaffection" to American independence went together with supporting the British, "being Roman Catholic was equated with supporting [the deposed Catholic king] James II," was "presumptive [with] treason," and made one "effectively a resident enemy alien liable to violence against the [protestant] king" George II. *Id.*

Nor can we say that the burdens these laws imposed on the Second Amendment right were as heavy as § 922(g)(1)'s no-exception, lifetime ban. In England, "[e]ven Catholics, who [technically] fell beyond protection of the right to have arms, ... were at least allowed to keep 'such necessary Weapons as shall be allowed ... by Order of the Justices of the Peace ... for the Defence of his House or Person.' " *Bruen*, 597 U.S. at 45 n.12, 142 S.Ct. 2111 (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). Maryland's and Virginia's laws included the same self-defense exception. 1756 Act of Va., 7 *Statutes at Large*, at 35 (Hening ed. 1820); 1756 Act of Md., 52 *Proceedings and Acts of the General Assembly, 1755-1756* 448 (Raphael Semmes ed. 1946) (similar). That Virginia, for example, thought it was "dangerous at th[e] time to permit Papists to be armed," yet still allowed for a professed Catholic to possess arms for self-defense, suggests that even a suspected traitor to the English crown still retained his fundamental right to protect himself with a firearm. 1756 Act of Va., 7 *Statutes at Large, supra*, at 35.

### c. Laws disarming Indians.

**\*20** Like Catholics and Loyalists, Indians, while not traitors, "had always been considered [members of a] distinct, independent political communit[y]," with whom the colonies were frequently at war. *Worcester v. State of Ga.*, 31 U.S. 515, 519, 6 Pet. 515, 8 L.Ed. 483 (1832). Indians, simply put, "w[ere] [not] ... citizen[s] of the British colonies" and were not "entitled to the [same] rights of English subjects," so they could be disarmed as a matter of course. *Jimenez-Shilon*, 34 F.4th at 1047 (quoting Joyce Lee Malcom, *To Keep and Bear Arms: The Origins of an Anglo-American*

United States v. Duarte, --- F.4th ---- (2024)

*Right* 140 (1994)). And to the extent they were, it was generally during times of conflict.[12] In a similar vein, to *sell* Indians arms during wartime was to provide material aid to the enemy, a capital crime in many cases. *See, e.g.*, 1675 Act of Va., 2 *Statutes at Large* 326–27, 336 (Hening ed. 1823). Thus, colonial assemblies justified barring the sale of arms to Indians not because they were "deemed untrustworthy based on lack of adherence to the rule of law," but because they were foreign combatants with whom the colonists were engaged in an ongoing and violent military conflict.

For example, one 1675 Virginia law, after condemning "the sundry mur[d]ers, rapines and many depredations lately committed and done by Indians on the inhabitants of this country," resolved that "a war[ ] be declared ... against all such Indians," and warned that "any person ... within this colony ... presum[ing] to trade ... with any Indian any powder, shot[ ] or arm[s] ... shall suffer death without benefit[ ] of clergy." 2 *Statutes at Large, supra*, at 326–27, 336. New York and Massachusetts similarly denounced "the dangerous practice of selling [g]uns ... [to] the Indians" as causing "the destruction of the Christians" and as "very poisonous and destructive to the English." Ordinance of 1645, *Laws and Ordinances of New Netherland, 1638–1674* 47 (O'Callaghan ed. 1868); Act of 1676, 11 *Records Of The Colony Of New Plymouth In New England* 242–43 (Pulsifer ed. 1861). Anyone "daring to trade" any arms or "munitions of War" with them was to be executed. *Id.* "[T]he eastern Indians have broke[n] and violated all treaties and friendship made with them," one 1721 New Hampshire law remarked. 1721 Act, *Acts and Laws of His Majesty's Province of New Hampshire* 164 (1771). "[T]herefore [be] it enacted ... [t]hat whoever shall ... supply them with any ... guns, powder shot[ ], [or] bullets ... [shall] pay the sum of five hundred pounds, and suffer twelve months imprisonment." *Id.* Thus, even those colonies punishing the sale of arms to Indians less harshly still justified these measures as designed to prevent the arming of a foreign enemy.

The nature of the burden imposed by these laws was also different in kind from how § 922(g)(1) operates. Most colonial enactments targeting Indians regulated a different type of conduct. *See Bruen*, 597 U.S. at 47, 142 S.Ct. 2111. Rather than ban Indians from *possessing* firearms, the laws prohibited the *sale* of arms to them by colonial residents. *E.g.*, 1675 Act of Va., 2 *Statutes at Large, supra*, at 326–27,

336. They also referred to licensing requirements and implied that those with proper credentials could still trade arms with Indians. Pennsylvania's 1676 sale-of-arms ban, for instance, prohibited persons from "sell[ing] giv[ing] or barter[ing] ... any gun ... to any Indian" "without *license first* ... [being] obtained under the Governor's hand and Seal." Act of 1676, *Charter to William Penn, and Laws of the Province of Pennsylvania* 32 (Staughton et al., 1879) (emphasis added); *see also* Act of 1763, Pa. Laws 319, § 1 (prohibiting sale of "guns ... or other warlike stores *without license*") (emphasis added). Georgia similarly outlawed selling arms to Indians in 1784 but only at any "place ... [other] than at stores or houses *licensed for that purpose*." Act of Feb. 1784, *Digest of Laws of the State of Georgia* 288–89 (Watkins ed. 1800) (emphasis added); *see also* Act of 1645, *Laws and Ordinances of New Netherland, 1638–1674* 47 (O'Callaghan ed. 1868) (prohibiting the sale of "munitions of War" to Indians "without express permission").

### d. Laws disarming Slaves and free Blacks.

**\*21** The by-now-familiar reasons for disarming Loyalists, Catholics, and Indians also motivated laws disarming Slaves and free Blacks as a class. Slaves, by definition, fell outside "the people" entitled to Second Amendment protection. *E.g.*, *Citizen*, Samuel Johnson, *A Dictionary of the English Language* 297 (6th ed. 1785) ("A freeman of a city; not a foreigner; not a slave"). And "free blacks, like that of Tories and Roman Catholics, ... were considered ... non-citizens or, at best, second class citizens." Marshall, *supra*, at 726. At the time, they enjoyed any right to arms solely as a matter of legislative grace. *See e.g.*, *State v. Newsom*, 27 N.C. 250, 254 (1844) (concluding that "free people of color cannot be considered as citizens in the largest sense of the term" and the state therefore has "the power to say ... who, of this class of persons, shall have a right to a licence [to keep arms], or whether they shall"). "[T]he external danger of Indian attack[s]," moreover, "was consistently matched" by the "equivalent fear" (especially in the South) of "indentured servants and slaves as a class," Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607–1794*, 16 Law & Hist. Rev. 567, 581 (1998)—hence why states like Virginia, Georgia, South Carolina, and North Carolina commonly justified disarming Blacks based on the threat of violence they posed as a

United States v. Duarte, --- F.4th ---- (2024)

collective group.[13] *See also Heller*, 554 U.S. at 611–12, 128 S.Ct. 2783 (citing *Waters v. State*, 1 Gill 302, 309 (Md. 1843) for the proposition that "free blacks were treated as a 'dangerous population,' " prompting " 'laws ... to prevent their migration into th[e] State; to make it unlawful for them to bear arms; [and] to guard even their religious assemblages with peculiar watchfulness' ").

And as with every other historical analogue the Government relies on, laws disarming Blacks still allowed for certain case-specific exceptions. Virtually every law that we found contained exemptions for slaves who were armed but had in their possession a "ticket or license ... from his or her master." 1768 Act of Ga., *A Compilation of the General and Public Statutes of the State of Georgia* 594 (Cobb ed. 1859). This was basically a certificate authorizing them to possess firearms for some limited purpose—usually to hunt and kill game.[14] To be clear, the notion that Blacks as a class were equally entitled to the right to possess arms for self-defense arguably did not enter the public conscience until Reconstruction. *See Bruen*, 597 U.S. at 60, 142 S.Ct. 2111 (surveying the "outpouring of discussion ... [during Reconstruction regarding] whether and how to secure constitutional rights for newly free slaves"). But what these and other exemptions demonstrate is that categorical bans on certain groups possessing arms gave way when the justifications for disarming them no longer existed. The slave "carrying his master's arms to or from his ... plantation" did not pose the same threat under the law as the slave who carried a gun after sundown. *See, e.g.*, 1768 Act of Ga., *A Compilation of the General and Public Statutes of the State of Georgia* 594 (Cobb ed. 1859). The Massachusetts merchant in 1668 presumably could not sell arms to *every* Indian but he could sell to "Indians *not in hostility* with ... any of the English." 1668 Act, *Colonial Laws of Massachusetts* 240–41 (1672) (emphasis added). The "Papist" in 1756 Virginia kept his arms if he swore allegiance to the protestant King George III, 1756 Act, 7 *Statutes at Large, supra*, at 35–36, because this proved his Catholic faith "was founded only upon [the] difference of [religious] opinion," not "the subversion of civil government," 5 Tucker's Blackstone, *supra*, at 54–55. And the British Loyalist in 1777 Connecticut was disarmed only "until such time as he could prove his friendliness to the liberal cause." Act of Dec. 1775, *The Public Records of the Colony of Connecticut* 193 (Hoadly ed. 1890).

*22 § 922(g)(1) has no analogous exceptions for the class it targets and thus "bears little resemblance" to the class-based firearm prohibitions "in effect at [or near] the time the Second Amendment was ratified." *Cf. United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). "[O]riginally intended to keep firearms out of the hands of *violent* offenders, Greenlee, *supra*, at 274 (emphasis added), § 922(g)(1) is now far broader and far less case-specific than "its earlie[r] incarnation [codified] as the Federal Firearms Act of 1938," *Booker*, 644 F.3d at 24. Its predecessor "initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary." *Id.* In its present form, the law now "encompasses those who have committed *any* nonviolent felony or qualifying state-law misdemeanor"—an "immense and diverse category." *Kanter*, 919 F.3d at 466 (Barrett, J., dissenting); *id.* ("[Section 922(g)(1)] includes everything from ... mail fraud, to selling pigs without a license in Massachusetts, redeeming large quantities of out-of-state bottle deposits in Michigan, and countless other state and federal offenses.")

In sum, the burdens and justifications (*Bruen*'s "how" and "why") for laws disarming disfavored groups at the Founding are not "distinctly similar" to § 922(g)(1) to justify its blanket ban on non-violent felons possessing firearms. *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111 ("[C]ourts should not uphold every modern law that remotely resembles a historical analogue because doing so risk[s] endorsing outliers that our ancestors would never have accepted."). We turn now to the Government's final body of historical evidence.

### 3.

According to the Government, the Founding generation "would have understood" that the 18th-century felon had no right to possess a firearm because, historically, he faced death and total estate forfeiture for his crimes. Citing colonial and Founding era laws declaring miscellaneous offenses as either capital crimes or ones that resulted in civil forfeiture, the Government argues that these were the default penalties for committing a felony at that time. Since felons at the Founding were punished this harshly, the Government contends, it is consistent with our nation's history to disarm

United States v. Duarte, --- F.4th ---- (2024)

*permanently* the *modern-day* felon because that is far less severe a penalty. We reject this line of reasoning.

First, the history of punishing felonies at the Founding is far more nuanced than the Government lets on; the notion that *all* felons (violent and non-violent alike) were historically put to death or stripped of their estates is "shaky" to begin with. *Kanter*, 919 F.3d at 459 (Barrett J., dissenting). Founder James Wilson, for example, explained that while, in theory, "the idea of [a] felony [wa]s very generally ... connected with capital punishment," in practice, this "inference[ ] ... [wa]s by no means entitled the merit of critical accuracy." *James Wilson's Lectures on Law* Part 3, Chap. I (1791). In England, "few felonies, indeed, were punished with death." *Id.* And on this side of the Atlantic, a "felony" in late 18th-century America was likewise "a term of loose signification." The Federalist No. 42 (James Madison). What counted as one, and how it was punished, was "not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws." *Id.* As a result, there were "many felonies" on the books in the late 18th-and early 19th-century, "not one punished with forfeiture of estate, and but a very few with death."[15] 6 Nathan Dane, *Digest of American Law* 715 (1823).

**\*23** Second, today's felon, in many respects, resembles nothing of his Founding-era counterpart, despite bearing the same label. Even as the newly formed states filled the pages of their penal codes with new felonies each passing year, "[t]he felony category" at the Founding still remained "a good deal narrower [then] than now." *Lange v. California*, — — U.S. ——, 141 S. Ct. 2011, 2023, 210 L.Ed.2d 486 (2021). The upshot is that "[m]any crimes classified as misdemeanors, or nonexistent, at common law are ... felonies" today. *Tennessee v. Garner*, 471 U.S. 1, 14, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Indeed, at least one of Duarte's prior felonies—vandalism—almost certainly would have been a misdemeanor. *United States v. Collins*, 854 F.3d 1324, 1333 (11th Cir. 2017) (explaining "the closest common-law offense for damaging another's property" was "malicious mischief," which was punishable by a fine); *see, e.g.*, Act of 1772, *An Abridgment of the Laws of Pennsylvania* 357 (Purdon ed. 1811) ("[A]ny person or persons [who] shall maliciously and voluntarily break ... any brass or other knocker affixed to such door ... [shall] pay the sum of twenty-five pounds.").

So not all felonies now were felonies then, and many felonies then were punishable by a term of years—not execution, civil forfeiture, or life in prison. Nevertheless, it may well be that "the 18th-and 19th-century" laws traditionally punishing *certain* felonies with death, estate forfeiture, or a life sentence are the closest things to "longstanding" felon firearm bans that *Heller* had in mind. *See Bruen*, 597 U.S. at 1, 142 S.Ct. 2111; *see also Phillips*, 827 F.3d at 1174 n.1 (citing *Chovan*, 735 F.3d at 1144 (Bea, J., concurring)). We might then venture to "assume it settled that *these*" offenses were of a kind the Founding generation thought serious enough to warrant the permanent loss of the offender's Second Amendment right. *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111 (emphasis added); *see also id.* ("[A]ssum[ing] it settled" that the "relatively few 18th-and 19th-century 'sensitive places' " (schools, polling places, courthouses, etc.) were "the[ ] locations ... where arms carrying could be prohibited consistent with the Second Amendment."). And it would lastly stand to reason that we "c[ould] use ... th[ese] historical regulations" as "analogies," *id.* at 31, 142 S.Ct. 2111, to "largely *modern*" crimes" that may not "closely" resemble their historical counterparts but still share with them enough "relevant[ ] similar[ities]" to justify permanent disarmament for committing such new-age offenses, *see Alaniz*, 69 F.4th at 1129–30 (emphasis added) ("Like burglary or robbery, [modern-day] drug trafficking plainly poses substantial risks of confrontation that can lead to immediate violence.").

That would all seem to be in step with *Bruen.* Yet the Government would have us go much further. We are asked to hold that "Congress[ ] ... [can] define any ... crime as a felony and thereby use it as the basis for a § 922(g)(1) conviction." *Phillips*, 827 F.3d at 1176 n.5 (emphasis added).

This, in our view, "expand[s]" the historical felony category "far too broadly." *Bruen*, 597 U.S. at 31, 142 S.Ct. 2111. "Put simply, there is no historical basis" for Congress "to effectively declare" that committing "a[ny] crime punishable by imprisonment for a term exceeding one year," § 922(g)(1), will result in permanent loss of one's Second Amendment right "simply because" that is how we define a felony today, *Bruen*, 597 U.S. at 31, 142 S.Ct. 2111 ("New York [cannot] ... declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally

**United States v. Duarte, --- F.4th ---- (2024)**

---

by the New York City Police Department."); *see also Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting) ("The majority's extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label."). To accept the Government's position would "in effect exempt" from Second Amendment protection entire categories of people whose crimes were misdemeanors or did not exist at the Founding. *See Bruen*, 597 U.S. at 30, 142 S.Ct. 2111. As one commentator put it, "someone who shoplifts three times in seven years [in West Virginia] ... twice operates a recording device in a movie theater [in Utah] ... [or] release[s] a dozen heart-shaped balloons [as] a romantic gesture [in Florida]" will earn a lifetime ban on possessing a firearm under § 922(g)(1) because it is apparently a felony to do any of those things in those respective states. Greenlee, *supra*, at 269 (citations omitted). That, in our view, is a bridge too far.

**\*24** A more faithful application of *Bruen* requires the Government to proffer Founding-era felony analogues that are "distinctly similar" to Duarte's underlying offenses and would have been punishable either with execution, with life in prison, or permanent forfeiture of the offender's estate. *See Bruen*, 597 U.S. at 27, 142 S.Ct. 2111. Our pre-*Bruen* decision in *Phillips* largely endorsed this approach. After "assuming the propriety of felon firearm bans," as *Vongxay* required, we still canvassed the history to determine whether "Phillips's predicate conviction for misprision of felony c[ould] constitutionally serve as the basis for a felon ban" under § 922(g)(1). *Phillips*, 827 F.3d at 1175. "[T]here [w]as little question" that it could, we explained, because the Founding generation had labelled Phillips's crime a "felony" ever since the First Congress passed the Crime Act of 1790. *See id.* at 1175–76 (citing 1 Stat. 113, Sec. 6). True, we did not ask whether misprison of felony was a capital or life-sentence offense back then. But this was only because *Bruen* had not yet clarified that "how" a historical analogue burdens a Second Amendment right is a "central consideration[ ]" that courts must weigh when reviewing the history. *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111 (citations omitted). With that minor tweak, our approach today conforms with both *Phillips* and *Bruen*.

Here, Duarte's underlying vandalism conviction, we have explained, likely would have made him a misdemeanant at the Founding. *See infra* at ——. Duarte's second predicate

offense—felon in possession of a firearm, Cal. Pen. Code § 29800(a)(1)—was a nonexistent crime in this country until the passage of the Federal Firearms Act of 1938. *See Range*, 69 F.4th at 104. As for Duarte's remaining convictions—drug possession and evading a peace officer—we do not know whether either crime traces back to an analogous, Founding-era predecessor because the Government failed to proffer that evidence.[16] Based on this record, we cannot say that Duarte's predicate offenses were, by Founding era standards, of a nature serious enough to justify permanently depriving him of his fundamental Second Amendment rights. The Government therefore failed to demonstrate that applying § 922(g)(1)'s lifetime firearm ban to Duarte fits within any "longstanding" tradition of "prohibit[ing] ... the possession of firearms by felons." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783.

## IV.

We do not base our decision on the notion that felons should not be prohibited from possessing firearms. As a matter of policy, § 922(g)(1) may make a great deal of sense. But "[t]he very enumeration of the [Second Amendment] right" in our Constitution "takes out of [our] hands ... the power to decide" for which Americans "th[at] right is *really worth* insisting upon." *Heller*, 554 U.S. at 634, 128 S.Ct. 2783 (emphasis added).

Duarte is an American citizen, and thus one of "the people" whom the Second Amendment protects. The Second Amendment's plain text and historically understood meaning therefore presumptively guarantee his individual right to possess a firearm for self-defense. The Government failed to rebut that presumption by demonstrating that permanently depriving Duarte of this fundamental right is otherwise consistent with our Nation's history. We therefore hold that § 922(g)(1) violates Duarte's Second Amendment rights and is unconstitutional as applied to him.

**REVERSED; CONVICTION VACATED.**

**M. SMITH**, Circuit Judge, dissenting:
Whether felons have a Second Amendment right to bear arms is settled in our circuit. They do not. *United States v.*

---

United States v. Duarte, --- F.4th ---- (2024)

---

*Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). Until an intervening higher authority that is clearly irreconcilable with *Vongxay* is handed down, we, as a three-judge panel, are bound by that decision. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003).

**\*25** The Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), did not overrule *Vongxay*. Instead, *Bruen* reiterates that the Second Amendment right belongs only to law-abiding citizens. Duarte's Second Amendment challenge to 18 U.S.C. § 922(g)(1), as applied to nonviolent offenders, is therefore foreclosed. Accordingly, I respectfully dissent.

\* \* \*

In *Vongxay*, we held that § 922(g)(1) does not violate the Second Amendment as applied to persons with nonviolent felony convictions. *See* 594 F.3d at 1118. There, the defendant (Vongxay) had three previous, nonviolent felony convictions: two for car burglary and one for drug possession. *Id.* at 1114. He was charged and convicted under § 922(g)(1) after a police officer found a firearm on his person outside a nightclub. *Id.* at 1113–14. Vongxay challenged his conviction on Second Amendment grounds, arguing that § 922(g)(1) "unconstitutionally limits firearm possession by categories of people who have not been deemed dangerous." *Id.* at 1116 (internal quotation marks omitted). We affirmed his conviction, holding that nothing in *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), "can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)" and that felons are "categorically different from the individuals who have a fundamental right to bear arms." *Vongxay*, 594 F.3d at 1114–15. Duarte does not dispute that *Vongxay* is on point.

In our circuit, a decision of a prior three-judge panel is controlling until a superseding ruling comes from the Supreme Court or a panel of our court sitting en banc. *See Miller*, 335 F.3d at 893, 899–900. "[T]he issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.* at 900. When the two authorities are

"clearly irreconcilable," we consider ourselves "bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Id.* The "clearly irreconcilable" requirement is "a high standard." *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (internal quotation marks omitted). "It is not enough for there to be 'some tension' between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to 'cast doubt' on the prior circuit precedent." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (quoting *United States v. Orm Hieng*, 679 F.3d 1131, 1140–41 (9th Cir. 2012), and *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011) (per curiam)). "In order for us to ignore existing Ninth Circuit precedent ... the reasoning and principles of [the later authority] would need to be so fundamentally inconsistent with our prior cases that our prior cases cannot stand." *In re Gilman*, 887 F.3d 956, 962 (9th Cir. 2018). But if we "can apply our prior circuit precedent without running afoul of the intervening authority, we must do so." *Lair*, 697 F.3d at 1207 (internal quotations marks omitted).

Nothing in the Supreme Court's decision in *Bruen* reflects a retreat from the Court's earlier statement in *Heller* that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful." *Heller*, 554 U.S. at 626, 627 n.26, 128 S.Ct. 2783; *see also McDonald v. Chicago*, 561 U.S. 742, 786, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality) (noting that the Court "made it clear in *Heller* that [its] holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' " and that the Court "repeat[s] those assurances here" (citation omitted)). To the contrary, *Bruen*'s analysis implicitly acknowledged *Heller*'s exclusion of felons from "the people" protected by the Second Amendment. *See* 597 U.S. at 31–32, 142 S.Ct. 2111 ("It is undisputed that petitioners Koch and Nash—two ordinary, *law-abiding*, adult citizens—are part of 'the people' whom the Second Amendment protects." (emphasis added) (citing *Heller*, 554 U.S. at 580, 128 S.Ct. 2783)); *see also, e.g., Heller*, 554 U.S. at 635, 128 S.Ct. 2783 ("law-abiding, responsible citizens"). *Indeed*, *Bruen repeatedly limited its definition of the scope of the right to "law-abiding" citizens, using that phrase no fewer than fourteen times throughout the opinion. See* 597 U.S. at 9, 15, 26, 29–31, 33 n.8, 38 & n.9, 60, 70–71, 142 S.Ct. 2111.[1]

United States v. Duarte, --- F.4th ---- (2024)

---

**\*26** Two of the Justices whose concurrences were essential to the judgment cabined the scope of *Bruen* on this very point. Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to "underscore two important points about the limits of the Court's decision." *Id.* at 79, 142 S.Ct. 2111 (Kavanaugh, J., joined by Roberts, C.J., concurring). His second point is germane here: "[A]s *Heller* and *McDonald* established and the Court today again explains, the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. Properly interpreted, the Second Amendment allows a variety of gun regulations." *Id.* (Kavanaugh, J., joined by Roberts, C.J., concurring) (cleaned up). Justice Kavanaugh then reiterated *Heller*'s and *McDonald*'s statements that a "prohibition[ ] on the possession of firearms by felons" is "presumptively lawful." *See id.* at 81, 142 S.Ct. 2111 (Kavanaugh, J., joined by Roberts, C.J., concurring) (citations omitted).

Justice Alito added in a separate concurrence that *Bruen* did not "disturb[ ] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 72, 142 S.Ct. 2111 (Alito, J., concurring) (cleaned up). He made clear: "All that we decide in this case is that the Second Amendment protects the right of *law-abiding* people to carry a gun outside the home for self-defense." *Id.* at 76, 142 S.Ct. 2111 (Alito, J., concurring) (emphasis added).

Thus, *Bruen* did nothing to upend our decision in *Vongxay*. *Bruen* was a Second Amendment challenge to New York's gun licensing regime, not the felon-in-possession statute at issue in *Vongxay*; *Bruen* repeatedly emphasized that it only extended the Second Amendment right to "law-abiding citizens," a phrase it used, as noted, no fewer than fourteen times; and three Justices in the *Bruen* majority reiterated, unequivocally, that a prohibition on the possession of firearms by felons is presumptively lawful.[2] The two decisions are harmonious.

Moreover, *Vongxay*'s mode of analysis is not clearly inconsistent with that in *Heller*. *Vongxay* is a post-*Heller* decision that considered, *inter alia*, the historical scope of the Second Amendment.[3] *See Bruen*, 597 U.S. at 22, 142 S.Ct. 2111 ("*Heller* relied on text and history."); *Vongxay*, 594 F.3d at 1118. We did not reference, let alone employ, the

"means-end" scrutiny that *Bruen* rejected. *See Bruen*, 597 U.S. at 19, 142 S.Ct. 2111; *Vongxay*, 594 F.3d at 1114–18. That we cited *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004), and *United States v. Emerson*, 270 F.3d 203, 260 (5th Cir. 2001), does not suggest otherwise. *See Vongxay*, 594 F.3d at 1116–17. Rather, we cited these Fifth Circuit cases merely as examples from our "examination of cases from other circuits and of historical gun restrictions [that] lends credence to the post-*Heller* viability of" *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005), in which we held that § 922(g)(1) is constitutional. *Vongxay*, 594 F.3d at 1116. We did not adopt their mode of analysis.

**\*27** For the reasons noted, Duarte fails to meet the "high standard" of *Miller*. *See Rodriguez*, 728 F.3d at 979. *Vongxay* is neither "clearly irreconcilable" nor "so fundamentally inconsistent" with *Bruen* that we must reject our precedent. *See Miller*, 335 F.3d at 900; *In re Gilman*, 887 F.3d at 962. To conclude otherwise is to read *Bruen* more broadly than, at a minimum, Chief Justice Roberts, Justice Alito, and Justice Kavanaugh intended. The *Bruen* majority did not fashion an entirely new Second Amendment test, instead stressing that it was applying the same "test that [the Court] set forth in *Heller*." 597 U.S. at 26, 142 S.Ct. 2111. *Bruen* rejected only "means-end scrutiny," which, again, is a mode of analysis *Vongxay* did not employ. *See id.* at 24, 26, 142 S.Ct. 2111. We are thus bound by our holding in *Vongxay*: § 922(g)(1) does not violate the Second Amendment as it applies to nonviolent felons. *See* 594 F.3d at 1118. Duarte's challenge is foreclosed, and no further inquiry is necessary.

The majority errs by discarding *Vongxay* and conducting the Second Amendment analysis of § 922(g)(1) anew. First, the majority contends that *Vongxay* is "clearly irreconcilable" with *Bruen* because of "*Vongxay*'s wholesale omission of *Bruen*'s two-step methodology." That is, we are no longer bound by *Vongxay* because *Vongxay* did not follow the textually and historically focused 'mode of analysis' that *Bruen* established and required courts now to apply to all Second Amendment challenges."

The majority appears to suggest that *Vongxay*'s failure to apply the two-step framework set forth in *Bruen* is alone sufficient to render the decision null. But that view is not supported by *Miller* or its progeny. The *Miller* analysis focuses on the "theory" and "reasoning" underlying the

United States v. Duarte, --- F.4th ---- (2024)

decisions; the analysis turns on function, not form. *See Miller*, 335 F.3d at 900. Yet, the majority states: "Because *Bruen* had not yet clarified these particular analytical steps until after *Vongxay* was decided, *Vongxay*, predictably, failed to apply them" (cleaned up), citing our decision in *United States v. Slade*, 873 F.3d 712, 715 (9th Cir. 2017). *Slade* does not stand for such formalism. In *Slade*, we held that our decision in *United States v. Jennen*, 596 F.3d 594 (9th Cir. 2010), was clearly irreconcilable with later Supreme Court precedent because *Jennen* based its analysis on an implicit assumption that the Supreme Court thereafter expressly denounced. *See Slade*, 873 F.3d at 715. It was not the mere failure to consider "the analytical process [later] prescribed by [the Supreme Court]" that made the two decisions clearly irreconcilable but rather *Jennen*'s incorrect legal assumption. *See id.* The circumstances here are different. We did not merely assume in *Vongxay* that a felon was excluded from "the people" whom the Second Amendment protects, nor did the Supreme Court expressly reject that view in *Bruen* (in fact, again, it implicitly endorsed the view). *Slade* is therefore inapposite, as are the other authorities cited by the majority on this issue. *See, e.g., United States v. Baldon*, 956 F.3d 1115, 1121 (9th Cir. 2020) (prior precedent rested on analytical distinction between "substantial" and "minimal" force rebuffed by intervening authority); *Swift v. California*, 384 F.3d 1184, 1190 (9th Cir. 2004) (prior precedent applied "relates to" test that Supreme Court later expressly overruled). Under *Miller*, the creation of a new test does not per se invalidate prior precedent.

Second, the majority contends that "*Vongxay*'s reliance on *Younger* is ... 'clearly irreconcilable' with *Bruen*—separate and apart from *Vongxay*'s failure to apply *Bruen*'s methodology." But *Vongxay* did not improperly rely on cases holding that the Second Amendment protected a collective rather than individual right. *Vongxay* was decided after *Heller* and recognized that *Heller* "invalidated" this court's pre-*Heller* caselaw holding that the Second Amendment did not protect an individual right. 594 F.3d at 1116. We cited *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), only to explain its pre-*Heller* precedent and cited *Younger*, 398 F.3d at 1192, for its holding: "that § 922(g)(1) does not violate the Second Amendment rights of a convicted felon." *Vongxay*, 594 F.3d at 1116. That holding was correct—even if, as *Vongxay* acknowledged, the reasoning was wrong. We then

explained why *Heller* did not disturb that holding. *Id.* at 1116–18.

**\*28** Indeed, in a case decided six years after *Vongxay*, we expressly rejected the argument that *Vongxay* somehow invalidated itself by citing pre-*Heller* precedent:

Phillips argues that *Vongxay* is not good law. He contends that it conflicted with circuit precedent when it relied, in part, on *United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005), a pre-*Heller* case that held that there is no individual right to bear arms under the Second Amendment. *See Vongxay*, 594 F.3d at 1116. But *Vongxay* acknowledged *Heller*'s holding—that there is an individual right under the Second Amendment— notwithstanding the panel's assertion that it was "still bound by *Younger*." *Id.* ...

If the panel had truly considered itself bound by *Younger* in all respects, it would not have analyzed the Second Amendment question at all, since there would have been no claim to an individual right. If Phillips believes that *Vongxay* is inconsistent with *Heller*, his remedy in this court is to seek rehearing en banc.

*United States v. Phillips*, 827 F.3d 1171, 1174 n.1 (9th Cir. 2016). Since the majority's theory here is identical to the argument rejected in *Phillips* (except referencing *Bruen*, rather than *Heller*), it is foreclosed.

The "clearly irreconcilable" requirement of *Miller* is a "high standard." *Rodriguez*, 728 F.3d at 979. As long as we "can apply our prior circuit precedent without running afoul of the intervening authority, we must do so." *Lair*, 697 F.3d at 1207. For the reasons noted, we can easily do so here. Nevertheless, the majority engages in a de novo Second Amendment analysis of § 922(g)(1). Had *Bruen*, for example, redefined the meaning of "the people" under the Second Amendment, such a review may indeed be necessary. But *Bruen* did not do so. The scope of "the people" is the same now under *Bruen*, as it was under *Vongxay*, as it was under *Heller*. Felons are excluded from the right to keep and bear arms.

\* \* \*

United States v. Duarte, --- F.4th ---- (2024)

The majority reads *Bruen*, a Supreme Court decision
reviewing New York's gun licensing regime, as an invitation
to uproot a longstanding prohibition on the possession of
firearms by felons. *Bruen* extends no such invitation. As
Justice Alito cautioned, *Bruen* decides "nothing about *who*
may lawfully possess a firearm." *Bruen*, 597 U.S. at 72, 142
S.Ct. 2111 (emphasis added).

One day—likely sooner, rather than later—the Supreme
Court will address the constitutionality of § 922(g)(1) or
otherwise provide clearer guidance on whether felons are
protected by the Second Amendment. But it is not our role as
circuit judges to anticipate how the Supreme Court will
decide future cases. *See* *United States v. Osife*, 398 F.3d
1143, 1148 (9th Cir. 2005) ("As the Supreme Court has
explained, when there is clearly controlling precedent, circuit
courts are not to anticipate the direction in which the Court's
jurisprudence is moving."), *abrogated on other grounds by*
*Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d
485 (2009); *Tekoh v. Cnty. of Los Angeles*, 997 F.3d 1260,
1263 (9th Cir. 2021) (Miller, J., concurring in the denial of
rehearing en banc) ("[M]aking such predictions is the role of
academics and journalists, not circuit judges. Our duty is to
follow what the Supreme Court has done, not forecast what it
might do."). Until we receive contrary definitive guidance
from the Supreme Court, or from a panel of our court sitting
en banc, we are bound by our decision in *Vongxay.*

**\*29** I respectfully dissent and express the hope that our court
will rehear this case en banc to correct the majority's
misapplication of *Bruen.*

**All Citations**

--- F.4th ----, 2024 WL 2068016

United States v. Duarte, --- F.4th ---- (2024)

## Footnotes

[1]    In the proceedings below, the Government conceded in pre-trial briefing that "none of [Duarte's] prior convictions [we]re violent." And neither Duarte's indictment, nor the pre-sentencing report prepared after his conviction, alleged that Duarte's predicate offenses involved violence.

[2]    18 U.S.C. § 922(g)(8) ("It shall be unlawful for any person [to possess a firearm] ... who is subject to a court order that ... restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child.").

[3]    When that day comes, perhaps the Court will also clarify how far back felon firearm prohibitions must stretch to qualify as "longstanding." We are confident, however, that anything postdating the 19th century is not what the Court has in mind. *See, e.g.*, *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111 (discussing *Heller*'s reference to "longstanding" laws "forbidding the carrying of firearms in sensitive places" and concluding that such laws consisted of a limited set of "18th-and 19th-century" regulations prohibiting firearms in "schools and government buildings"); Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 73 (2024) (determining that "Founding era history is paramount" because, as the Court recognized in *Bruen*, "not all history is created equal" and "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them").

[4]    Even before *Bruen*, we were uncomfortable with *Vongxay*'s reliance on *Heller*'s "presumptively lawful" footnote. In *United States v. Phillips*, we upheld a defendant's § 922(g)(1) conviction against a Second Amendment challenge because *Vongxay*'s reading of *Heller*'s footnote "foreclose[d]" the defendant's constitutional claim. 827 F.3d at 1174. "Nevertheless, there [we]re good reasons to be skeptical of the constitutional correctness" of *Vongxay*'s deference to *Heller*'s footnote. *Id.* "*Heller*'s caveat endorsed only 'longstanding' regulations on firearms, naming felon bans in the process," and "[y]et courts and scholars are divided over how 'longstanding' tho[se] bans really are." *Id.*; *see also id.* at n.2 (collecting sources). Even *Vongxay* conceded that this "historical question ha[d] not been definitively resolved." 594 F.3d at 1118 (citing some of the same sources).

[5]    *See, e.g.*, *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023) ("The right to bear arms is held by 'the people.' That phrase 'unambiguously refers to all members of the political community['] ... not a special group of upright citizens.... Even as a marihuana user, Daniels is a member of our political community.") (citations omitted); *Range*, 69 F.4th at 101, 103 ("[T]he Second Amendment right, *Heller* said, presumptively 'belongs to all Americans.' ... We reject the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people[,]' ... [and] conclude that Bryan Range remains among 'the people' despite his [felony] conviction."); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (observing "even ... dangerous felons and those suffering from mental illness" are "indisputably part of 'the people' "); *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) ("[A]t least members of the 'national community' or those with a 'sufficient connection' with that community are part of the 'people' covered by the Second Amendment.").

[6]    *See, e.g.*, Noah Webster, *American Dictionary of the English Language* 600 (1st ed. 1828) ("The body of persons who compose a community, town, city, or nation."); Thomas Dyche, *A New General English Dictionary* 626 (14th ed. 1776) ("[E]very person, or the whole collection of inhabitants in a nation or kingdom."); Samuel Johnson, *A Dictionary of the English Language* 297 (6th ed. 1785) ("A nation; those who compose a community.").

United States v. Duarte, --- F.4th ---- (2024)

[7]    Ala. Const. art. I, § 27; Conn. Const. art. I, § 15; Ky. Const. of 1792, art. XII, cl. 23; Me. Const. of 1819, art. I, § 16; Miss. Const. of 1817, art. I, § 23; Pa. Const. art. 1, § 21; *see* Volokh, *supra*, at 208–09.

[8]    While *Bruen* offered no explicit guidance on who bears the burden at step one, "[w]e need not decide that issue here because our conclusion that the Second Amendment presumptively protects" Duarte "would stand regardless." *Perez-Garcia*, 96 F.4th at 1178 n.8.

[9]    Nor did New Hampshire, which did not ratify an arms right provision in their constitution until 1982. *See* Volokh, *supra*, at 199.

[10]    Act of 1779, 9 *Statutes at Large of Pennsylvania, supra*, at 347–48; Act of 1776, 5 *The Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 479 (1886); 1777 Act of Va., 9 *Statutes at Large, supra*, at 282; Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (Bartlett ed. 1862); Act of 1777, 24 *The State Records of North Carolina* 89 (Clark ed. 1905); Act of 1778, 203 *Hanson's Laws of Maryland 1763-1784* 193, 278 (1801).

Several other states passed similar laws. Connecticut disarmed those who "libel[ed] or defame[d] any of the resolves of the ... Congress of the United Colonies" or, upon "complaint being made to the civil authority," were found to be "inimical to the liberties of th[e] Colon[ies]." Act of 1775, 15 *The Public Records of the Colony of Connecticut, From May, 1775, to June 1776* 193 (Hoadly ed. 1890). New York ordered the supplying of its militias with "such good Arms ... as they may have collected by disarming disaffected persons," Order of 1776, 15 *Documents Relating to the Colonial History of the State of New York* 103 (Fernow ed. 1887). New Jersey, lastly, empowered its Council of Safety "to deprive ... [all] Arms, Accoutrements, and Ammunition" from "such Person as they shall judge disaffected." Act of 1777, *Acts of the General Assembly of the State of New Jersey* 90 (1777).

[11]    In any case, we doubt that the garden variety horse thief or counterfeiter, for example, stood on remotely similar legal footing as British Loyalists at the Founding. Depending on the jurisdiction, the former served several years of "hard Labor" for his nonviolent offense. *See, e.g.*, *An Act for the Punishment of certain atrocious Crimes and Felonies*, Acts and Laws of the State of Connecticut, in America, 183–84 (1796). While incarcerated, his fundamental rights as one of "the people" were "merely suspended." *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting) (citing, e.g., *In re Estate of Nerac*, 35 Cal. 392, 396 (1868)). The latter was a "traitor in thought, ... [if] not in deed," Notes on the State of Virginia, *supra*, at 165, who had no rights to speak of, Marshall, *supra*, at 725 ("The harsh yet simple principle of the Revolution was that Tories 'had no civil liberties.' ") (quoting Leonard W. Levy, *Emergence of a Free Press* 173 (1985)).

[12]    *See, e.g.*, An Order for All Indyans on Long Island to Bee Disarmed, in This Juncture of Ware, & That None Ramble from Place to Place, 14 *Documents Relating to the Colonial History of the State of New York* 712 (1883); Ordinance of the Director and Council of New Netherland, *Laws and Ordinances of New Netherland (1638–1674)* 234 (O'Callaghan ed. 1868) (ordering "a[ll] Indians" to forfeit their arms after "hav[ing] been inform[ed] that ... Indians of the *Tappaen* ... intended to kill one or more Christians" and "to prevent such dangers of isolated murders and assassinations").

[13]    *See, e.g.*, 1752 Act of Va., 2 *Statutes at Large, supra*, at 481–82 ("Whereas the frequent meeting of considerable numbers of ... slaves ... is judged of dangerous consequence ... it shall not be lawful[ ] for any ... slave to carry or arm[ ] himself[ ] with any club, staff[ ], gun[ ] ... or any other weapon."); 1770 Act of Ga., *A Codification of the Statute Law of Georgia* 813 (Hotchkiss ed. 1848) ("[A]s it is absolutely necessary to the safety of this province[ ] ... to restrain the wandering and meeting of ... slaves ... it shall be lawful for any person ... to apprehend any ... slave ... found out of the plantation ... [and] if he ... be armed ... to disarm [him]."); 1740 Act of S.C., *Statutes at Large of South Carolina* 410 (McCord ed. 1840) (same); *see also* 1790 Act of N.C., *A Manual of the Laws of North-Carolina* 172 (Haywood ed. 1814) ("When any number of ... slaves ... shall collect together in arms ... committing thefts and

United States v. Duarte, --- F.4th ---- (2024)

alarming the inhabitants of any county ... it shall be the duty of commanding [militia] officer ... to suppress[ ] such depredations or insurrections."); 12 *Colonial Records of the State of Georgia* 451–52 (Candler ed. 1907) (complaining of "a Number of Slaves appear[ing] in Arms ... [and] commit[ting] great Outrages and plunder in and about the Town" and petitioning that "all Slaves ... be immediately disarmed").

[14] 1768 Act, *A Compilation of the General and Public Statutes of the State of Georgia* 594 (Cobb ed. 1859); 1741 Act, *A Manual of the Laws of North-Carolina* 157 (Haywood ed. 1814); 1748 Act of Va., 6 *Statutes at Large* 169 (Hening ed. 1819); 1722 Act, 7 *Statutes at Large of South Carolina* 373 (McCord ed. 1840).

[15] *See, e.g.*, Act of Conn., *Acts and Laws of the State of Connecticut* 182–83 (1796) (listing various "felonies" but punishing only some capitally (e.g., bestiality, arson, bearing false witness) and others with a term of imprisonment (e.g., forgery, horse stealing, robbery)); *General Laws of Pennsylvania, from the Year 1700 to April 22, 1846* 155 (1847) (abolishing capital punishment for *all* crimes except first-degree murder); An Act to Prevent the Stealing and Taking away of Boats and Canoes, 1 *The Laws of the Province of South Carolina* 49 (1776) (punishing boat theft with "corporal punishment" and a fine "if the Matter of Fact be a Felony"); 1793 Act Respecting the Punishment of Criminals, 2 *The Laws of Maryland* chap. LVII, § XIII (1800) (empowering justices of the court to, "in their discretion," sentence males convicted of "[a]ny felony" "to serve and labour for any time[ ] ... not exceeding seven years"); 1801 Act Declaring the Crimes Punishable with Death or Imprisonment in the State Prison, 1 *The Laws of the State of New York* 254 (1802) (committing any person "duly convicted ... of any felony," with certain enumerated exceptions, to a "term [of imprisonment] not more than fourteen years."); *See also* 2 Timothy Cunningham, *A New and Complete Law Dictionary* (3d ed. 1783) (describing punishments for various felonies as ranging from death and estate forfeiture to imprisonment and hard labor).

[16] Criminalizing drug possession, in particular, did not appear to gain significant momentum until the early 20th century, with the passage of such laws as the Food and Drug Act of 1906 and the Harrison Narcotics Tax Act of 1914. *See* Margarita Mercado Echegaray, Note, *Drug Prohibition in America: Federal Drug Policy and its Consequences* 75 Rev. Jur. U.P.R. 1215, 1219 (2006); *cf. Alaniz*, 69 F.4th at 1129–30 (citing *id.*). Before then, what we now think of as "illicit drugs," such as opium and cocaine, "were ... legal in the United States" for a long stretch of this country's history. Echegaray, *supra, at 1218*.

[1] The majority does "not think that the Supreme Court, without any textual or historical analysis of the Second Amendment, intended to decide the constitutional fate of so large a population in so few words and with such little guidance." But any doubt or ambiguity on this issue cuts in favor of following circuit precedent. It is Duarte's burden to show that *Vongxay* is "clearly irreconcilable" with *Bruen.*

[2] The majority claims that the Supreme Court did not even *suggest* in *Heller* or *Bruen* that felons are not among "the people" within the meaning of the Second Amendment, quoting our recent decision in *United States v. Perez-Garcia,* 96 F.4th 1166, 1175 (9th Cir. 2024). But *Perez-Garcia* itself notes that "when the Supreme Court specifically analyzed limitations on the scope of the Second Amendment's protections, *Heller* described the Second Amendment right as belonging to 'law-abiding, responsible citizens,' " that "*Bruen*, in turn, used the term 'law-abiding, responsible citizens' and its variants more than a dozen times when describing the Second Amendment's scope," and that the *Bruen* "concurrences reiterated the same point." *Perez-Garcia*, 96 F.4th at 1179 (cleaned up).

[3] We noted the following:

Finally, we observe that most scholars of the Second Amendment agree that the right to bear arms was "inextricably ... tied to" the concept of a "virtuous citizen[ry]" that would protect society through "defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) ...." Don B. Kates, Jr., *The Second Amendment: A*

United States v. Duarte, --- F.4th ---- (2024)

*Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986); *see also* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) (noting that felons "were excluded from the right to arms" because they were "deemed incapable of virtue"). We recognize, however, that the historical question has not been definitively resolved. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 714–28 (2009) (maintaining that bans on felon gun possession are neither long-standing nor supported by common law in the founding era).

*Vongxay*, 594 F.3d at 1118.

---

**End of Document**  <span style="float:right">© 2024 Thomson Reuters. No claim to original U.S. Government Works.</span>

1  John W. Dillon (SBN 296788)
2  jdillon@dillonlawgp.com
   **DILLON LAW GROUP APC**
3  2647 Gateway Road
4  Suite 105, No. 255
   Carlsbad, California 92009
5  Phone: (760) 642-7150
6  Fax: (760) 642-7151

7  *Attorney for Plaintiffs*

8
            **UNITED STATES DISTRICT COURT**
9
         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
10

11

12  KNIFE RIGHTS, INC., ELIOT              Case No. 23-CV-0474-JES-DDL
13  KAAGAN, JIM MILLER, GARRISON
    HAM, NORTH COUNTY SHOOTING
14  CENTER, INC., and PWGG L.P.,           **PLAINTIFFS' REPLY TO DEFENDANT'S**
15                                         **OPPOSITION TO PLAINTIFFS MOTION**
                   Plaintiffs,             **FOR SUMMARY JUDGMENT**
16
17         vs.                             Date:        April 22, 2024
                                           Time:        10:00 a.m.
18  CALIFORNIA ATTORNEY                    Dept:        4B
19  GENERAL ROB BONTA, ET AL.,             Judge:       The Honorable James E.
                                                        Simmons, Jr.
20                 Defendants.             Trial Date:  None set
21                                         Action filed: March 15, 2023
22

23

24

25

26

27

28

---

Plaintiffs' Reply to Defendant's Opposition to Plaintiffs Motion for Summary Judgment
ER-00359

# TABLE OF CONTENTS

Page

I.    INTROCUTION ........................................................................... 1

II.   CALIFORNIA'S CRIMINALIZATION OF "SWITCHBLADES" .............
      IS A *DE FACTO* BAN/PROHIBITION ON SUCH KNIVES .................... 1

III.  AUTOMATICALLY OPENING KNIVES ARE "ARMS"
      UNDER THE SECOND AMENDMENT'S PLAIN TEXT—
      AND THE TEXT DOES NOT INCLUDE DEFENDANT'S
      "IN COMMON USE FOR SELF-DEFENSE" AND
      "SUITABILITY" LIMITATIONS ............................................................. 2

      A.    Defendant's "Suitability"/"Primary Use" Encraft On
            The Second Amendment Represents Another Back-Door
            Attempt To Apply Interest-Balancing Tests Rejected By
            *Heller* and *Bruen*. .................................................................. 4

      B.    Defendant—Not Plaintiffs—Bear The Burden of Proving
            That Automatically Opening Knives Are Not Both Dangerous
            And Unusual (*i.e.*, Not in Common Use) As Part of the *Heller*
            and *Bruen's Second*-Prong Historical Inquiry ................................. 5

IV.   THE PENAL CODE SCHEME BANNING SUCH KNIVES IS NOT
      SUPPORTED BY ANY HISTORICALLY RELEVANT
      LAWS PROHIBITING THE POSSESSION AND SALE
      OF ANY KNIFE OR WEAPON ........................................................... 8

      A.    Such Knives Are Not Both Dangerous
            And Unusual. ........................................................................... 9

      B.    Plaintiffs Do not Apply A "Divide-and-Conquer" Approach
            To the Historical Record............................................................ 10

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ........................................... 8, 9

*District of Columbia v. Heller,* 554 U.S. 570 (2008) ................................... *Passim*

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...................................... 2, 3, 9

*New York State Rifle & Pistol Association v. Bruen,* 597 U.S. 1 (2022) ...... *Passim*

*Ocean State Tactical, LLC v. Rhode Island,* 95 F.4th 38 (1st Cir. 2024) …. .......... 9

*Russell Fouts v. Bonta*, 2024 WL 751001 (S.D. Cal. 2024) ............................... 5, 7

*U.S. v. Perez-Garcia,* 96 F.4th 1166 (9th Cir. 2024) .................................. 7, 8, 10

*United States v. Alaniz,* 69 F.4th 1124 (9th Cir. 2023) ......................................... 6

**Cal. Penal Code**

Section 19 ............................................................................................................ 2

Section 17235 ....................................................................................................... 1

Section 21510 ....................................................................................................... 1

Section 21590 ....................................................................................................... 1

**U.S. Constitution**

Second Amendment ...................................................................................... *Passim*

**Other Authorities**

Alexandra Natapoff, *Misdemeanors* 85 S. Cal. L. Rev. 1313 (2012) ..................... 2

## I.   INTRODUCTION

In Plaintiff's summary judgment motion and in their opposition to Defendant's motion Plaintiffs already address Defendant's continued misapplication of the constitutional standard required under *District of Columbia v. Heller,* 554 U.S. 570, 581-595, 627 (2008) and *New York State Rifle & Pistol Association v. Bruen,* 597 U.S. 1, 32-33 (2022).[1] Plaintiffs have shown through undisputed evidence that automatically opening knives are "arms" under the plain text of the Second Amendment and that Defendant has failed to justify its knife ban through a well-established historical tradition of prohibiting the possession and sale of any kind of knife. Plaintiffs' ask that this Court grant Plaintiffs' motion and deny Defendant's motion for all the reasons given in Plaintiffs' briefs.

## II.   CALIFORNIA'S ENFORCES A DE FACTO BAN/PROHIBITION ON "SWITCHBLADE" KNIVES

Defendant's claim that California's statutory scheme is anything other than a ban of common bladed arms borders on the frivolous, as the challenged statutes prohibit the possession, carry, sale, offers of sale, loan, transfer, and gifting of automatically opening folding knives. Cal. Penal Code sections 17235, 21510, and 21590. In defense expert Robert Spitzer's own words, restricting certain arms in so many different ways amount to a "*de facto* prohibition" (ECF No. 34-5, KR1461):

> **Q:**    So, with regard to this 1881 Arkansas law… restricting…these Bowie knives and other weapons in so many different ways … amounted to an outright prohibition, is that correct?
>
> **A:**    I would call it a *de facto* prohibition, yeah. *Id.*

Defendant also trivializes the serious implications of violating the Knife Ban. Violating Penal Code section 21510 results in six months imprisonment in county

---

[1] Plaintiffs incorporate by reference all arguments and evidence submitted in support of Plaintiffs' summary judgment motion (ECF No. 34) and their opposition to Defendant's Motion (*Id.* at 33).

---

jail, or a substantial fine, or both; and for an individual, a stigma that carries post-conviction implications such as a criminal record, the loss of employment, housing, and educational opportunities. See also Cal. Penal Code § 19; and Alexandra Natapoff, *Misdemeanors*, 85 S. Cal. L. Rev. 1313, 1316-1317, 1323-1327 (2012).

## III. AUTOMATICALLY OPENING KNIVES ARE "ARMS" UNDER THE SECOND AMENDMENT'S PLAIN TEXT—AND THE TEXT DOES NOT INCLUDE DEFENDANT'S "IN COMMON USE FOR SELF-DEFENSE" OR "SUITABILITY" LIMITATIONS

Defendant makes the unsupported claim that automatically opening knives are not "arms" under the plain text of the Second Amendment because they are "not in common use today for self-defense" and "the weapon's objective characteristics render it [un]suitable for self-defense." ECF No. 36 at 7-8.

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Second Amendment's plain text is clear—it protects against infringing on the people's right to "keep and bear arms." *Id*. What are arms? According to the binding authority in *Heller*, arms consist of "weapons of offence, or armour of defence"; in other words, "anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581. The expansive scope of this plain text "extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding" (*Id.* 554 U.S. at 582), and "is fully applicable to the States." *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

In fact, *Heller's* analysis of the Second Amendment's plain text specifically repudiates Defendant's baseless claims. "No party has apprised us of an idiomatic meaning of "keep Arms." Thus, the most natural reading of "keep Arms" is to "*have* weapons." *Heller*, 554 U.S. at 582 (emphasis added). "'Keep Arms' was simply a common way of referring to *possessing arms*, for militiamen *and everyone else*."

*Id.*, at 583. In other words, the simple act of possessing or carrying arms for action is all that is needed under the plain text of the Second Amendment. "Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons *in case of confrontation. Id.*, at 592 (emphasis added). *Bruen* did not alter or contradict *Heller's* conclusions.

It is undisputed that the Second Amendment's plain text covers Plaintiffs' proposed action in seeking to acquire, possess, carry, keep, bear, and offer bearable arms. Plaintiffs have shown they seek to engage in normal, peaceable, commonplace, and constitutionally protected conduct with normal, commonplace, constitutionally protected arms in California and retailer Plaintiffs seek to offer these knives currently prohibited by California law to the public. KR13-17, KR18-2,4 KR21-30, KR2160-65, and KR2154-59. The individual Plaintiffs have sworn they wish and intend to carry automatically opening knives for self-defense and other lawful purposes. *Id.* Retailer Plaintiffs have sworn they wish and intend to sell these knives to their customers for self-defense and other lawful purposes. *Id.* Plaintiff Knife Rights has confirmed that its California members wish and intend to keep and bear these knives for these same purposes. KR32; KR34. Plaintiffs' Complaint and evidence shows that the knives at issue are intended for any lawful purpose, including self-defense.

The "central" holding in *Heller* was "that the Second Amendment protects a personal right to keep and bear arms *for lawful purposes, most notably for self-defense within the home*." *McDonald*, 561 U.S. at 780 (emphasis added). The *Heller* decision controls, and absent from *Heller*'s plain text analysis (and the *Bruen* analysis) is any discussion of whether or not the arms are "commonly used for self-defense" or "suitable for self-defense." ECF No. 36 at 7; *and see*, *Heller*, 554 U.S. at 581-595; *Bruen*, 597 U.S. at 32-33. Neither Defendant, nor any lower court can unilaterally engraft such conditions onto the Second Amendment's plain text or repudiate the Supreme Court's binding authority.

Plaintiffs have provided overwhelming evidence that automatically opening knives are "arms" under the Second Amendment's plain text. See ECF No. 34-1 at 6-10; ECF No. 35 at 5-10. Defendant has not contradicted this evidence. Instead, Defendant argues the plain text requires more than it says. Not so. Accordingly, since Plaintiffs' action is covered by the Second Amendment's plain text, Defendant must justify its regulations as consistent with the Nation's tradition of firearm regulation. *Bruen*, 597 U.S. at 17-18, 24. As explained further below, the Court's common use/dangerous and unusual considerations came from the Court's historical review under the second prong of the *Heller*/*Bruen* analysis, where the burden is on Defendant to justify their regulation.

### A. Defendant's "Suitability" / "Primary Use" Represents Another Back-Door Interest-Balancing Test Rejected By *Heller*/*Bruen*.

In its argument that automatically opening knives are not 'arms' under the plain text, Defendant delves into a full-blown interest-balancing argument explicitly rejected by *Bruen,* asserting the lack of "suitability" of such knives for self-defense. ECF No. 36 at 7-9. *Bruen* already repudiated the lower courts' "two-part test" as "one step too many" and explicitly rejected these policy arguments justifying unconstitutional arms regulations. *Bruen*, 597 U.S. at 2, 19. Defendant again improperly attempts to take the straightforward constitutional analysis from *Heller* and *Bruen*, and split it into a multi-step interest-balancing test. Defendant's argument must be rejected under the binding authority of *Heller* and *Bruen*.

Even if the Court were to ignore the Supreme Court's mandates, Defendant falsely claims that "the record in this case clearly establishes, the [regulated] switchblade knives … are not even suitable for 'ordinary self-defense'" ECF No. 36 at 8. Plaintiffs' knife expert Michael Janich repeatedly testified that automatically opening knives are legitimate tools for self-defense. KR1981, KR1984, KR 1987, and KR1988. Moreover, Janich repudiated each claim advanced by defense expert

Escobar in his report and deposition. See KR1967-1988, and ECF No. 35 at 11-14. Moreover, in his deposition, defense expert Escobar admitted that his opinions are a personal preference and that his criticisms of automatically opening knives applied to *all* folding knives in general. *Id*. Finally, Defendant misrepresents Plaintiffs' expert Janich's testimony claiming, "he would not recommend switchblades for self-defense given that there are few training knives for switchblades." Not true. See ECF No. 35 at 11-12; see also KR1705, 1758. No such discussion is required under the plain text analysis in either *Heller* or *Bruen*. And, contrary to Defendant's claim, no showing is required that such knives "are actually used for self-defense." ECF No. 36 at 10; *see Russell v. Bonta*, 2024 WL 751001 (S.D. Cal. 2024) at *3 (rejecting Defendant's very same claim that a "billy is not commonly used for self-defense," and holding that, "Use is not required for Second Amendment protection").

**B.      Defendant Bear The Burden Of Proving That Automatically Opening Knives Are Not Both Dangerous And Unusual (*i.e.*, Not in Common Use) As Part of the Historical Inquiry.**

Defendant asserts the Plaintiffs' bear the burden of proving that automatically opening knives are "in common use for self-defense" and not "dangerous and unusual" arms under the first prong of the *Heller* and *Bruen* plain text analysis. ECF No. 36, p. 5-15. Defendant is wrong. Defendant's argument is based on a single sentence from *Bruen* in which the Court briefly mentions that no party "dispute[s] that handguns are weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 23. The out-of-context sentence cannot be read to the exclusion of the entirety of the *Heller* and *Bruen* decisions.

Importantly, Defendant's argument ignores the plain text analysis regarding arms conducted by *Heller* described above. Moreover, in *Bruen*, after this statement, the Court applied the plain text of the Second Amendment, "The Court has little difficulty concluding also that the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for

self-defense…" and concludes "the Second Amendment guarantees an "individual right to possess and carry weapons *in case of confrontation*." *Id*. There is no discussion regarding "common use for self-defense" or "dangerous and unusual arms." The Court then moved to the next prong shifting the burden to the government to justify the State's "proper cause" requirement through a historical tradition of firearms regulation. In this stage, both *Heller* and *Bruen* addressed arms in the context of dangerous and unusual arms (*e.g.*, not in common use) as a limitation on the Second Amendment's protections based on the historical record. *Heller*, 554 U.S. at 581-595; *Bruen*, 597 U.S. at 32-33.

Defendant also relies on *United States v. Alaniz* to support its baseless argument that Plaintiffs bear the burden of proving the knives in question are "in common use for self-defense" and that they are not both "dangerous and unusual." *Alaniz* does not support Defendant's claim. After providing an extremely brief (and inaccurate) summary of the *Bruen* standard, *Alaniz* did not conduct the plain text analysis under *Bruen*: "We assume, without deciding, that step one of the *Bruen* test is met." *Id*. 69 F.4th at 1128-29. As such, its dicta provides no support.  Regardless, the U.S. Supreme Court is the binding precedent this Court must apply. And while *Alaniz* considered more nuanced analogues due to the finding that the case "implicat[ed] unprecedented societal concerns" (*e.g.,* drug trafficking), this is not the case here. Defendant has not alleged, let alone shown, any "unprecedented societal concern" or "technological advancement" warranting  a nuanced approach. This Court must to apply a straightforward historical analysis. ECF No. 35, p. 16-20 (*i.e.*, Plaintiffs' argument that no nuance is required).

In fact, *U.S. v. Perez-Garcia*—for which Defendant relies (ECF No. 36, p. 16)—contradicts Defendant's claims that the dangerous and unusual/common use analysis belongs under the first prong of the *Bruen* analysis. Relying on the *second* prong of the Bruen analysis, the Ninth Circuit  states:

"We instead examine the *historical evidence* as a whole, determining whether it establishes a *tradition of permissible regulation (such as "dangerous and unusual weapons"* or "sensitive places"), and whether the historical precedent and the modern regulation are 'relevantly similar,' so as to 'evince[ ] a comparable tradition of regulation." U.S. *v. Perez-Garcia,* 96 F.4th 1166 (9th Cir. 2024) at 18 (citing *Bruen*, 597 U.S. at 27, 29, and emphasis added).

*Bruen* did not create a "new" test, but merely applied the test that the *Heller* Court established in 2008. *Bruen* expressly states, "*The test that we set forth in Heller and apply today* requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text *and* historical understanding." 597 U.S. at 26 (emphasis added). The dangerous and unusual/not in common use standard was based on history, not the text of the Second Amendment, and considerations of historical tradition arise under *Bruen*'s second prong analysis, *not* the first prong. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 38-39; *U.S. v. Perez-Garcia*, 96 F.4th at 18; *Fouts*, 2024 WL 751001 at *3.

Here, the State cannot meet its burden that the current knife ban is part of an "historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. The plain text of the knife ban prohibits conduct infringing on the right to keep bearable arms. And moreover, there is no appropriate analogue in history that supports California's ban on keeping and bearing such knives.

## IV. THE KNIFE BAN IS NOT SUPPORTED BY ANY HISTORICALLY RELEVANT LAWS PROHIBITING THE POSSESSION AND SALE OF ANY KNIFE OR WEAPON

As Plaintiffs have shown, *Heller* has established the relevant contours of the historical tradition analysis affirmed in *Bruen*: Bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are *both* dangerous *and* unusual. *Bruen*, 597 U.S. at 21. *Bruen* spelled out that this was a historical analysis. *Id*. ("we found it 'fairly supported by the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons that the Second

---

7

Amendment protects the possession and use of weapons that are in common use at the time") (emphasis added, internal quotation marks omitted). See also *U.S. v. Perez-Garcia*, 96 F.4th at 18.

*Bruen* examined common use while analyzing the relevant historical analogues, finding that historical laws regulating "dangerous and unusual" weapons could not be analogous to the licensing regime's restriction on carrying handguns, because handguns were "indisputably in common use." *Bruen*, 597 U.S. at 39. Under *Heller*, history is used to establish the scope of the right. But here, *Heller* has done the historical analysis, and determined the scope of the right when it comes to protected arms—those that include arms in common use for lawful purposes *such as* self-defense—because the only bearable arms that are not protected are those that are both dangerous *and* unusual at the time the analysis is done. *Heller*'s categorical analysis asks simply whether the arms regulated or banned are in common use for lawful purposes. *Heller,* 554 U.S. at 570.

"A weapon may not be banned unless it is *both* dangerous *and* unusual;" it "is a conjunctive test." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., concurring). Because the banned knives are not unusual, the Court need not consider if they are "dangerous" in a manner different from the inherent "danger" of firearms or weapons in general—such "danger" to those who pose a threat, of course, being the very reason arms are protected and useful in the first place. *Id.* Accordingly, like D.C.'s ban on handguns in *Heller* and Chicago's ban on handguns in *McDonald*, California's knife ban is categorically unconstitutional—full stop.

**A. Such Knives Are Not Both Dangerous and Unusual.**

The "dangerous and unusual" test is simply the corollary of the common use test, directly derived from *Heller*. See ECF No. 34-1 at 10-21 and ECF No. 35 at 10-16. And if a class of arm is established to be in common use—and overwhelmingly so—it cannot, by definition, be "unusual."

1    Defendant discounts Plaintiffs' reliance on Justice Alito's concurrence in
2  *Caetano v. Massachusetts* "for the proposition that the mere fact that thousands own
3  switchblades demonstrates they are in 'common use.'" ECF No. 36 at 6. Defendant
4  cites *Ocean State Tactical*. However, it is not Plaintiffs' view that the common use
5  analysis detailed in *Caetano* is the proper application, but rather the Supreme Court's
6  holding. In referencing whether handguns are weapons "in common use today" the
7  *Bruen* Court explicitly cited *Caetano*. *See Bruen*, 597 U.S. at 31-32.

8    Though not Plaintiffs' burden, they have nonetheless offered overwhelming
9  and undisputed evidence that automatically opening knives have been and continue
10  to be owned in the millions throughout the United States. ECF No. 34-1, at 16-19.
11  Plaintiffs have also provided undisputed evidence that the knives in question are
12  common jurisdictionally (*Id.*, at 20-21) and categorically (*Id.*, at 19-20). They are
13  merely a kind of pocketknife. This fact is not only undisputed, but supported by all
14  defense experts. KR1153; KR1155; KR1875; KR1977; KR1986; KR2044; KR2064;
15  KR2067. Instead of offering evidence to the contrary, Defendant boldly asserts
16  Plaintiffs' evidence doesn't mean anything. ECF No. 36 at 11. Defendant relies on
17  inapposite cases mentioning "switchblades, nothing more. See Plaintiffs' opposition.
18  ECF No. 34-1 at 14-16.

19    **B. No "Divide-and-Conquer" Approach Has Been Applied.**
20    Defendant relies on *U.S. v. Perez-Garcia* to claim Plaintiffs have taken a
21  "divide-and-conquer" approach to *Bruen's* historical analysis and have not
22  "examine[d] the historical evidence as a whole" "focusing on immaterial distinctions
23  between each of Defendant's historical analogues and the challenged statutes. ECF
24  No. 36 at 16. Defendant is wrong. Plaintiffs have thoroughly reviewed all
25  Defendant's purported historical justifications for the knife ban. Taken as a whole,
26  they do not come close to the justification required under either *Heller* or *Bruen*.
27
28

1
2
3
4
5
6
7
8

Defendant's experts identified a total of two state laws that regulated the sale of any kind of knife (1837 Tennessee and 1881 Arkansas). Both came *after* the Founding and one was *a decade after* the Civil War. Defense experts were also *not* able to identify a single law in the entire history of this Nation that prohibited the possession of any knife. All the concealed carry restrictions relied on by defense experts explicitly allowed the purchase, sale, transfer, possession and at least one form of carrying in public. This is not a "divide-and-conquer approach,", but rather a summary of the historical record as a whole—this record is lacking to say the least.

9
10
11
12
13
14

Defendant argues *Bruen* "endorsed the use of analogues outside of the Founding Era." ECF No. 36 at 16. While *Heller* and *Bruen* considered analogues outside the Founding, the Court placed *limitations* on what analogues could be considered and the ability to *contradict* the Second Amendment plain text and the more relevant Founding era. ECF Nos. 35 at 16-20. These limitations cannot be ignored.

15
16
17
18
19
20
21
22
23
24
25
26

In *Heller*, the government sought to ban handguns in the home. *Heller* reviewed the same historical laws offered then as Defendant's offer now. After reviewing these same *concealed carry* restrictions, the Supreme Court held that such restrictions did not justify the ban. Like here, the government in *Heller* argued the ban was not a ban as they allowed for the possession of a handgun as long as it was stored inoperable and because other firearms were lawful to purchase and possess. *Heller rejected* these arguments. *Heller*, 554 U.S. at 629; and see *Bruen*, 597 U.S. at 34-70 (the very same concealed carry restrictions were not sufficient to justify the good cause concealed carry restrictions as not analogous). The very same arguments can't be resurrected here. For the foregoing reasons, Plaintiffs' request that this Court *deny* Defendant's summary judgment motion and grant Plaintiffs cross-motion.

27
28

1  April 15, 2024                    Respectfully submitted,

2                                    DILLON LAW GROUP, APC

3

4                                    */s/ John W. Dillon*_____
                                     John W. Dillon

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  John W. Dillon (SBN 296788)
2  jdillon@dillonlawgp.com
   **DILLON LAW GROUP APC**
3  2647 Gateway Road
4  Suite 105, No. 255
   Carlsbad, California 92009
5  Phone: (760) 642-7150
6  Fax: (760) 642-7151

7  *Attorney for Plaintiffs*

8
               **UNITED STATES DISTRICT COURT**
9
          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
10

11

12 | KNIFE RIGHTS, INC., ELIOT          Case No. 23-CV-0474-JES-DDL
13 | KAAGAN, JIM MILLER, GARRISON
   | HAM, NORTH COUNTY SHOOTING
14 | CENTER, INC., and PWGG L.P.,       **PLAINTIFFS' OPPOSITION TO**
                                        **DEFENDANT'S OBJECTIONS TO**
15 |                Plaintiffs,          **REBUTTAL REPORT AND**
                                        **DECLARATION OF DAVID T. HARDY**
16 |
17 |        vs.                          Date:        April 22, 2024
18 | CALIFORNIA ATTORNEY                 Time:        10:00 a.m.
19 | GENERAL ROB BONTA, ET AL.,          Dept:        4B
                                        Judge:       The Honorable James E.
20 |                Defendants.                        Simmons, Jr.
21 |                                     Trial Date:  None set
                                        Action filed: March 15, 2023
22 |
23 |
24 |
25
26
27
28

Plaintiffs' Opposition to Defendant's Objections to
Rebuttal Report and Declaration of David T. Hardy
ER-00373

## I.  INTRODUCTION

Plaintiffs submit this opposition to Defendant's objections to the rebuttal report and declaration of David T. Hardy, filed March 6, 2024. Defendant objections are improper, as Mr. Hardy's report and the opinions contained in the report are based on his experience and expertise as both an attorney and a Second Amendment historian. Notably, Defendant does not object to Mr. Hardy's expertise in either respect. Instead, Defendant claims that certain of Mr. Hardy's expert opinions consist of inadmissible legal conclusions. Not so.

## II.  ARGUMENT

Plaintiffs provide the following responses to specific portions of Defendant's objections to the rebuttal declaration of David T. Hardy.

**Opposition to objections to Paragraphs 5, 6, 7, and 8 "in [their] entirety:"** The objections are without merit. Mr. Hardy's statements are foundational and provide the basis for his expert opinion based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702.

**Opposition to objection to "Paragraph 9 in its entirety:"** The objection is without merit. Mr. Hardy's statements are foundational and provide the basis for his expert opinion, based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702. Mr. Hardy's statements provide historical facts regarding whether the Supreme Court originally treated the Bill of Rights as binding to the states. His statements also a provide factual summary of whether state courts ever applied the Bill of Rights to state law in the context of the Second Amendment. Mr. Hardy's statements discuss historical facts, not legal conclusions.

**Opposition to objection to "Paragraph 10 in its entirety:"** The objection

Plaintiffs' Opposition to Defendant's Objections to
Rebuttal Report and Declaration of David T. Hardy

is without merit. Mr. Hardy's statements are foundational and provide the basis for his expert opinion, based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702. Moreover, the statements made in paragraph 10 provide an historical summary of the whether certain states had constitutional rights guarantees in their state constitutions or whether certain states placed limitations on their arms guarantees within their state constitutions. Mr. Hardy's statements discuss historical facts, not legal conclusions.

**Opposition to objection to "Paragraph 11, with the exception of the second, third, and fourth sentences:"** The objection is without merit. Mr. Hardy's statements are foundational and provide the basis for his expert opinion, based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702. Mr. Hardy's statements provide his expert opinion on whether restrictions for pistols or blunt weapons are factually analogous to regulations on knives.

**Opposition to objection to "The second sentence of Paragraph 15:"** The objection is without merit. Mr. Hardy's statements are foundational and provide the basis for his expert opinion, based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702.

**Opposition to objection to the "last sentence of Paragraph 15:"** The objection is without merit. Mr. Hardy's statements focus on his expert opinion in responding to Professor Spitzer's highly generalized interpretation that any historical arms restriction on one specific issue justifies outright prohibitions on arms. After reviewing the historical record provided by Mr. Spitzer, Mr. Hardy's disagrees with Spitzer's unsupported conclusion.

**Opposition to objection to the "portion of Paragraph 17 that reads:** "and

2

Plaintiffs' Opposition to Defendant's Objections to
Rebuttal Report and Declaration of David T. Hardy
ER-00375

not to be considered under *Bruen*. *Bruen*, 142 S. Ct. 2111, 2136-37, 2153-54 (2022):" The objection is without merit. Mr. Hardy's statements are foundational and provide the basis for his expert opinion, based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702.

**Opposition to objection to portions of Paragraphs 19, 23, and 28:** The objections are without merit. Mr. Hardy's statements are foundational and provide the basis for his expert opinion, based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702.

**Opposition to objection to "The second sentence of Paragraph 31:"** The objection is without merit. Mr. Hardy's statements are foundational and provides the basis for his expert opinion, based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702. Moreover, Mr. Hardy's statement, "the time period is also inconsistent with *Bruen*," is not a legal conclusion, but a factual statement comparing the time periods reviewed by the Supreme Court in *Bruen* with the time period presented by Defendant's expert.

**Opposition to objections to portions of paragraphs 37 and 38:** The objection is without merit. Mr. Hardy's statements are foundational and provide the basis for his expert opinion based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702.

**Opposition to objection to "Mr. Hardy's characterization of 1776-1870 as the 'relevant time period:'"** The objection is without merit. Mr. Hardy's statements are foundational and provides the basis for his expert opinion based on his knowledge, skill, experience, training, and education, all of which is permissible under Federal Rule of Evidence 702.

**Opposition to objection to "The portion of Mr. Hardy's third conclusion**

Plaintiffs' Opposition to Defendant's Objections to
Rebuttal Report and Declaration of David T. Hardy

1  **that begins with 'and we know' and ends with 'switchblades:'"** The objection is

2  without merit. Mr. Hardy's statements are foundational and provide the basis for his

3  expert opinion, based on his knowledge, skill, experience, training, and education,

4  all of which is permissible under Federal Rule of Evidence 702.

5        **Opposition to objection to "The portion of Mr. Hardy's fourth conclusion**

6  **that begins with 'rendering' and ends with 'ratification.'"** The objection is

7  without merit. Mr. Hardy's statements are foundational and provide the basis for his

8  expert opinion, based on his knowledge, skill, experience, training, and education,

9  all of which is permissible under Federal Rule of Evidence 702.

10

11  April 15, 2024                  Respectfully submitted,

12                                     DILLON LAW GROUP, APC

13

14                                     */s/ John W. Dillon*_____

15                                     John W. Dillon

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Opposition to Defendant's Objections to
Rebuttal Report and Declaration of David T. Hardy

1   ROB BONTA
    Attorney General of California
2   R. MATTHEW WISE
    Supervising Deputy Attorney General
3   KATRINA UYEHARA
    Deputy Attorney General
4   State Bar No. 349378
      1300 I Street, Suite 125
5     P.O. Box 944255
      Sacramento, CA 94244-2550
6     Telephone: (916) 210-7867
      Fax: (916) 324-8835
7     E-mail: Katrina.Uyehara@doj.ca.gov
    *Attorneys for Defendant Rob Bonta, in his*
8   *official capacity as Attorney General of the*
    *State of California*
9
                  IN THE UNITED STATES DISTRICT COURT
10
              FOR THE SOUTHERN DISTRICT OF CALIFORNIA
11

12

13

| | |
|---|---|
| 14 **KNIFE RIGHTS, INC., ELIOT** | 3:23-cv-00474-JES-DDL |
| 15 **KAAGAN, JIM MILLER,** | |
| **GARRISON HAM, NORTH** | |
| 16 **COUNTY SHOOTING CENTER,** | |
| **INC., and PWGG L.P.,** | **DEFENDANT ATTORNEY** |
| 17 | **GENERAL ROB BONTA'S REPLY** |
| Plaintiffs, | **IN SUPPORT OF MOTION FOR** |
| 18 | **SUMMARY JUDGMENT** |
| **v.** | Date:        April 22, 2024 |
| 19 | Time:        10:00 a.m. |
| **CALIFORNIA ATTORNEY** | Dept:        4B |
| 20 **GENERAL ROB BONTA,** | Judge:       The Honorable James E. |
| | Simmons, Jr. |
| 21 Defendant. | Trial Date:  None set |
| | Action Filed:  3/15/2023 |

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

Introduction..................................................................................................1

Argument .....................................................................................................2

    I.      Plaintiffs Have Failed to Establish That the Subset of
            Switchblades at Issue Are in Common Use for Self-Defense .............2

          A.     Plaintiffs Fail to Produce Sufficient Evidence to Satisfy
                 Their Burden at *Bruen's* Textual Step........................................3

          B.     The Switchblade Knives Regulated by the Challenged
                 Statutes Are Dangerous and Unusual ........................................7

    II.     *Bruen* Requires This Court to Engage in an Independent
            Historical Analysis and Does Not Require a Historical Twin or
            Dead Ringer .......................................................................................8

          A.     *Bruen* Requires Analogical Reasoning, Not a Historical
                 Twin or Dead Ringer ..................................................................8

          B.     *Bruen* Endorsed the Use of Analogues Beyond the
                 Founding Era ..............................................................................9

          C.     The Challenged Statues Fit Comfortably Within a Long
                 Tradition of Regulating Dangerous and Deadly Weapons.......10

Conclusion ...............................................................................................10

Defendant's Reply ISO Motion for Summary Judgment (3:23-cv-00474-JES-DDL)

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Baird v. Bonta*
    81 F.4th 1036 (9th Cir. 2023)................................................................9

*Bevis v. City of Naperville*
    85 F.4th 1175 (7th Cir. 2023)................................................................3

*Caetano v. Massachusetts*
    577 U.S. 411 (2006).........................................................................5, 6

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland
    Sec.*
    664 F. Supp. 3d 584 (D. Del. 2023)......................................................2

*District of Columbia v. Heller*
    554 U.S. 570 (2008).................................................................*passim*

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015)................................................................7

*Hartford v. Ferguson*
    2023 WL 3836230 (W.D. Wa. 2023)....................................................2

*Nat'l Ass'n for Gun Rights v. Lamont*
    ___ F.Supp.3d ___ (D. Conn., Aug. 3, 2023) ...................................3, 5

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
    597 U.S. 1 (2022) .....................................................................*passim*

*Ocean State Tactical, LLC v. Rhode Island*
    95 F.4th 38 (1st Cir. March 7, 2024).................................................3, 5

*Or. Firearms Fed'n v. Kotek*
    2023 WL 4541027 (D. Or. July 14, 2023) ............................................2

*Oregon Firearms Fed'n Inc. v. Brown*
    644 F. Supp. 3d 782 (D. Or. Dec. 6, 2022) ..........................................3

*Rupp v. Bonta*
    2024 WL 1142061 (C.D. Cal. March 15, 2024) .............................2, 5, 7

ii

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

*United States v. Alaniz*

4

    69 F.4th 1124 (9th Cir. 2023)....................................................................2, 3, 7, 9

5

*United States v. Perez-Garcia*

6

    __ F.4th ___ (9th Cir. March 18, 2024) ............................................................ 8

7

**STATUTES**

8

California Penal Code § 17235................................................................................... 6

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Reply ISO Motion for Summary Judgment (3:23-cv-00474-JES-DDL)

**INTRODUCTION**

California's switchblade laws prohibit the public possession, carry, sale, loan, or transfer of switchblade knives with blades two inches in length or longer, allowing a range of other weapons for lawful self-defense while protecting public safety. Plaintiffs mount a facial challenge to these laws. But their Second Amendment claim fails at both steps of the text-and-history analysis set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

At the threshold stage, Plaintiff fail to acknowledge that they bear the burden of showing that the specific subset of switchblade knives at issue are implicated by the plain text of the Second Amendment. As a result, Plaintiffs do not present any evidence addressing whether those specific knives are in common use. Instead, they merely provide a list of automatically opening knife models and data on pocketknife ownership in the United States generally—neither of which are relevant to the knives actually regulated by the challenged laws. Nor do Plaintiffs present any evidence on the primary use or purpose of the regulated knives, such as whether the knives are suitable for ordinary self-defense. Because Plaintiffs fail to show that the challenged laws proscribe a type of weapon that is in common use for self-defense, they have not met their burden at *Bruen*'s textual step.

And Plaintiffs attempt to avoid *Bruen*'s second step altogether by erroneously contending that this Court need not engage in any historical analysis because, in their view, "only dangerous and unusual arms can be categorically banned." ECF 35 at 16. On the contrary, *Bruen* explicitly directs courts to conduct the historical analysis specific to the challenged regulation before it; indeed, the Supreme Court acknowledged that it did not conduct an exhaustive historical analysis of the full scope of the Second Amendment in *Heller* or *Bruen*. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 31 (2022). Here, California's switchblade laws fit comfortably within a tradition of regulating the possession and carry of bladed and dangerous weapons dating back to the Founding and antebellum eras.

1

1    For these reasons, and those set forth below, this Court should grant

2    Defendants' motion for summary judgment.

3                              ARGUMENT

4    **I.    PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THE SUBSET OF**
5    **SWITCHBLADES AT ISSUE ARE IN COMMON USE FOR SELF-DEFENSE**

6    Plaintiffs make two errors in characterizing *Bruen*'s textual step. First, they

7    mistakenly place the burden on the government. ECF 35 at 5. But under *Bruen*, it is

8    Plaintiffs' burden at the first stage of the analysis. *Bruen*, 597 U.S. at 24 ("When

9    the Second Amendment's plain text covers an individual's conduct, the

10   Constitution presumptively protects that conduct. The *government must then* justify

11   its regulation" by historical analogy. (emphasis added)); *see also Hartford v.*

12   *Ferguson,* 2023 WL 3836230, *3 (W.D. Wa. 2023) (assuming "that Plaintiffs can

13   produce evidence in support of *Bruen*'s first requirement" and then shifting the

14   burden to government at step two); *Or. Firearms Fed'n v. Kotek*, 2023 WL

15   4541027, at *5 (D. Or. July 14, 2023) ("First, a plaintiff challenging a firearm

16   regulation must show the plain text of the Second Amendment covers the conduct

17   regulated by the challenged law."); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't*

18   *of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 593 (D. Del. 2023) (finding that

19   "Plaintiffs have shown" that some of the challenged weapons were in common use,

20   and then shifting the burden to the government at step two).

21   Second, Plaintiffs argue that the weapon may be in common use for any

22   unspecified "lawful purpose" and claim that *Bruen* "acknowledged that a showing

23   of actual instances of self-defense use is not necessary for Second Amendment

24   protection." ECF 35 at 8. The Ninth Circuit has settled this question: when

25   analyzing common use, the correct inquiry is "whether the weapon at issue is 'in

26   common use' today *for self-defense.*" *United States v. Alaniz*, 69 F.4th 1124, 1129

27   (9th Cir. 2023) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008)

28   (emphasis added)); *see also Rupp v. Bonta*, 2024 WL 1142061, at *8 (C.D. Cal.

2

1  March 15, 2024) (following *Alaniz* in placing the common use for self-defense

2  analysis at step one of the *Bruen* framework).[1]

3      To determine whether a weapon is in common use for self-defense, courts

4  must consider the suitability of, and actual use of, the weapon for lawful self-

5  defense. *See Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen may

6  prefer a handgun for home defense," including that handguns are easier to store in a

7  location that is readily accessible in an emergency, are easier to lift and aim than a

8  long gun, and can be used with a single hand while the other hand dials the police).

9  **A. Plaintiffs Fail to Produce Sufficient Evidence to Satisfy Their
    Burden at *Bruen*'s Textual Step**

10

11      The specific subset of switchblades that are regulated by the challenged

12  statutes do not constitute "Arms" protected by the Second Amendment because

13  they are not commonly used for self-defense. *Bruen* makes clear that the test for

14  Second Amendment protection of a particular weapon is common use, not common

15  ownership. *See* 597 U.S. at 38 (referring to "commonly used firearms for self-

16  defense"); *see also Ocean State Tactical*, 95 F.4th at 50 ("Depriving citizens of a

17  device that is virtually never used in self-defense imposes less of a burden on that

18  right than does banning a weapon that is, in fact, traditionally used in self-

19  defense").

20      Plaintiffs do not provide any evidence that any switchblades—much less the

21  particular switchblades California regulates—are in common use for self-defense

22  _____

23      [1] Other out-of-circuit courts have also held that the correct inquiry is whether
    a weapon is in common use for self-defense. *See Bevis v. City of Naperville*, 85

24  F.4th 1175, 1193 (7th Cir. 2023) (recognizing that the singular lawful purpose
    protected under the Second Amendment is the right to individual self-defense);

25  *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 50 (1st Cir. March 7,
    2024) ("*Bruen*…directs us in no uncertain terms to assess the burden imposed by

26  modern gun regulations on the right of armed self-defense"); *see also Nat'l Ass'n
    for Gun Rights v. Lamont*, ___ F.Supp.3d ___, 2023 WL 4975979, at *13 (D.

27  Conn., Aug. 3, 2023); *see also Oregon Firearms Fed'n Inc. v. Brown*, 644 F. Supp.
    3d 782 (D. Or. Dec. 6, 2022).

28

3

1   today. To the contrary, the record in this case clearly establishes that switchblades

2   are not even suitable for "ordinary self-defense." *Bruen*, 597 U.S. at 60. Both

3   Plaintiffs' and Defendant's experts agree that extensive training is required to use a

4   switchblade knife safely and effectively for self-defense. *See* Escobar Decl., ¶ 27,

5   31, 40; Janich Transcript at pp. 33, 36.[2] A self-defense situation involving a

6   switchblade is inherently a close-combat encounter—one that will likely require the

7   cutting of tissue, ligaments, and muscles, and result in subsequent blood loss.

8   Escobar Decl., ¶ 34–35; *see also* Ex. Janich Transcript at pp. 34–36 (identifying the

9   quadriceps and median and ulnar nerves as prime targets for knife self-defense).

10   The nature of such an encounter raises the significant question of whether an

11   ordinary person would be physically and psychologically capable of effectively

12   using a knife for self-defense. Escobar Decl., ¶ 35–36.[3] In short, a switchblade is a

13   far cry from the "quintessential self-defense weapon" discussed in *Heller* and

14   *Bruen*.[4]

15        Because Plaintiffs cannot establish that the regulated switchblades are

16   commonly used for self-defense, their claims fail at *Bruen*'s threshold inquiry.

17        Plaintiffs' declarations stating their preference for using a knife prohibited

18   under the challenged statutes is insufficient to establish common use. ECF 35 at 3.

19   But Plaintiffs cannot rely upon such subjective declarations alone to meet their

---

[2] Plaintiffs argue that this is a misrepresentation of their expert's testimony. ECF 35 at 11. It is not. *See* Ex. Janich Transcript at pp. 31–33 ("Q. In your expert opinion, do you believe it's important for a person to be trained in how to use a knife for self-defense before attempting to use a knife in a real-life self-defense situation? A. Yes. . . . Q. And what kind of training do you believe is necessary? . . . A. It needs to be hands-on training").

[3] Defendant incorporates by reference his arguments on the suitability of switchblades for self-defense, including arguments on the difficulty in deploying the blade and the potential for mechanical malfunction. *See* ECF 36 at 8–10.

[4] Plaintiffs contend that *Heller* rejected the argument that the "use of smaller or different type of knives" is a defense. ECF 35 at 2–3. However, *Heller* was specifically addressing a ban on an entire category of firearms (namely, handguns), and the statues at issue in this case only address a subset of switchblade knives (namely, those with blades two inches or longer and without a detent mechanism). Because California does not impose a wholesale prohibition on all switchblade knives, Plaintiffs' appeal to *Heller* is unpersuasive.

4

burden. *Rupp*, 2024 WL 1142061, at 16 n. 17 (recognizing that "something more than the number of weapons owned and the subjective intentions of owners is required . . . The Court knows of no other area of constitutional law where an inquiry as to subjective intent, dependent on malleable survey results, is the only touchstone for deciding where the outer bounds of constitutional protections lie"); *see also Lamont*, ___ F.Supp.3d ___, 2023 WL 4975979 at *14 (recognizing the plaintiffs' similar arguments "would mean allowing the analysis to be driven by nebulous subjective intentions). Moreover, Plaintiffs' testimony that they may possibly choose to utilize one of the regulated switchblades for self-defense does not prove that the subset of switchblade knives is actually in common use for self-defense. *See, e.g. Ocean State Tactical*, 95 F.4th 38, 45 (1st Cir. Mar. 7, 2024) (imagining "Hollywood-inspired scenarios" in which a regulated weapon could theoretically be used in self-defense is not relevant to "how a regulation actually burdens the right of armed self-defense").

Plaintiffs' remaining arguments incorrectly substitute a common ownership standard for the common use test. Plaintiffs rely, in particular, on Justice Alito's concurrence in *Caetano v. Massachusetts* for the proposition that the mere fact that thousands of people own switchblades demonstrates they are in "common use."[5] ECF 35 at 9 (citing *Caetano*, 577 U.S. 411 (2006) (Alito, J., concurring) (per curiam). The First Circuit recently rejected a similar argument in *Ocean State Tactical*, correctly observing that the plaintiffs there erroneously "treat[ed] the concurring opinion as if it were binding authority." 95 F.4th at 51 (recognizing, in

---

[5] And even if Plaintiffs could show that "thousands" of people possess one of the particular switchblades regulated by the challenged statutes "for lawful purposes," that showing would be patently insufficient to establish that the regulated switchblades are in common use. Given that the adult population of the United States was approximately 258.3 million as of 2020,2 "thousands" of individuals owning a particular weapon would not come anywhere close to the number necessary to establish common use. *See, e.g. Rupp, supra*, at 30–31 (holding that ownership by 24.6 million Americans—or 2.59% of the adult population—is not sufficient to establish common use as a matter of law).

addition, that *Caetano* only addressed stun guns, a non-lethal weapon); *see also*
*Caetano*, 577 U.S. at 420 (Alito, J., concurring) (emphasizing that the case involved
non-lethal weapons that were "widely . . . accepted as a legitimate means of self-
defense across the country").[6] Plaintiffs make this same error here.

Having misstated the common use standard, Plaintiffs mistakenly rely on
national switchblade sale estimates in an attempt to meet their burden. ECF 35 at
14; *see also* ECF 34-1 at 18. But these statistics do not inform the court of how
many of those switchblades are being used for self-defense, as Plaintiffs admitted in
their motion for summary judgment. ECF 34-1 at 22. Moreover, the sales statistics
provided by Plaintiffs are not specific to the particular subset of knives that are
regulated by the challenged statutes, and thus have little probative value to the
Court's analysis. Plaintiffs' statistics about pocketknives are equally irrelevant and
unpersuasive. Not all pocketknives are switchblades, and even fewer are the
specific type of switchblades proscribed by the challenged statutes. Pen. Code, §
17235.[7]

Finally, Plaintiffs suggest that automatically opening knives are prevalent in
other jurisdictions. ECF 35 at 14; ECF 34-1 at 20–21. This argument again
addresses automatically opening knives generally, rather than the specific
switchblades that California regulates, and thus is far too overbroad to assist this
Court's analysis. Moreover, California need only ensure that its laws pass
constitutional muster, not that they mirror the laws of other states.[8] *See* ECF 36-1 at
12.

---

[6] It is not evident that Justice Alito's concurrence even supports a numbers-only approach. The number of stun guns in circulation was in direct response to analysis by the Massachusetts Supreme Judicial Court that observed the number of stun guns was dwarfed by the number of firearms in circulation. *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (recognizing that hundreds of thousands owning stun guns was "[t]he more relevant statistic").

[7] A pocketknife, a folding knife, a one-handed knife, an automatically opening knife, or a knife that shares a combination of these features is legal under section 17235's definition of "switchblade knife."

[8] Plaintiffs argue that there is no material factual dispute that automatically opening knives are commonly owned. This is incorrect. *See infra* pp. 3–6.

1    In sum, Plaintiffs have failed to meet their threshold burden of establishing

2  that the specific type of switchblades regulated by the challenged statutes are in

3  common use for self-defense.

4    **B.    The Switchblade Knives Regulated by the Challenged Statutes
5         Are Dangerous and Unusual**

6    In addition to being ill-suited for self-defense, the subset of switchblade knives

7  that are regulated by the challenged statutes fall outside the scope of the Second

8  Amendment for the separate reason that they are dangerous and unusual weapons.

9  Plaintiffs mistakenly conflate the "common use" analysis with the "dangerous and

10  unusual" analysis. ECF 35 at 14. But *Heller* made clear that proscribing dangerous

11  and unusual arms was just one of several longstanding weapons traditions that is

12  consistent with the Second Amendment. *Heller*, 554 U.S. at 626; *see also Fyock v.*

13  *Sunnyvale*, 779 F.3d 991, 996–97 (9th Cir. 2015).

14    Plaintiffs continue to incorrectly place the dangerous and unusual analysis at

15  the second step of the *Bruen* framework, in defiance of Ninth Circuit precedent. *See*

16  *Alaniz*, 69 F.4th at 1129; *see also Rupp*, 2024 WL 1142061, at *8 n. 5 (recognizing

17  that placing the dangerous and unusual at the second step of the analysis "was in

18  direct tension with *Fyock*," "directly contradicted *Alaniz*," and "was out of step

19  with most courts that have considered the issue"). Thus, it is Plaintiffs—not

20  Defendant—who bear the burden of showing that switchblades are not dangerous or

21  unusual. In any event, Defendant has presented substantial evidence showing that

22  switchblades are dangerous and unusual, *see* ECF 36 at 12–15,[9] and Plaintiffs have

23  failed to rebut this showing.

24

25    ───────────────
         [9] Plaintiffs argue that "Defendant's weapons expert also concedes that
26  switchblades are not unusual, but common." ECF 35 at 13 (citing KR1851–53).
    This is a mischaracterization of Robert Escobar's testimony. At his deposition
27  Robert Escobar was asked questions about his book, which addressed *obscure*
    *historical weapons* like saps, blackjacks, and slungshots. He was then was asked
28  whether certain knives appeared in that book. KR 1852–1853. Plaintiffs
    erroneously conclude that weapons not in the book must be common.

(119 of 149) Page 119 of 149
Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 119 of 149
Case 3:23-cv-00474-JES-DDL    Document 37    Filed 04/15/24    PageID.3722    Page 12 of 15

**II.   BRUEN REQUIRES THIS COURT TO ENGAGE IN AN INDEPENDENT HISTORICAL ANALYSIS AND DOES NOT REQUIRE A HISTORICAL TWIN OR DEAD RINGER**

Plaintiffs attempt to dissuade this Court from engaging in any historical analysis, arguing that the Court is limited to the historical analysis set forth in *Heller* and *Bruen*, ECF 35 at 16—notwithstanding the fact that neither case addressed the historical tradition of regulating knives. Indeed, *Bruen* explicitly calls for courts to engage in their own historical analysis particular to the facts of the case before it. *Bruen*, 597 U.S. at 31 ("Like *Heller*, we 'do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment.'"). It follows that this Court must engage in an independent historical analysis here.

As the Ninth Circuit recently observed in *United States v. Perez-Garcia*, "[i]n applying the Second Amendment, we do not isolate each historical precursor and ask if it differs from the challenged regulation in some way. We emphasize again: *Bruen* does not require the Government to identify a 'historical twin' or an 18th century 'dead ringer' . . . We instead examine the historical evidence as a whole." *United States v. Perez-Garcia*, __ F.4th ___ (9th Cir. March 18, 2024) (quoting *Bruen*, 597 U.S. at 30).

**A.   *Bruen* Requires Analogical Reasoning, Not a Historical Twin or Dead Ringer**

Plaintiffs plainly err in asserting that "analogical reasoning is not necessary in this case" and that "only straightforward historical prohibitions on the purchase, sale, possession, and carry of knives are relevant." ECF 35 at 19. *Bruen* explicitly directs courts to engage in analogical reasoning: the "historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Bruen*, 597 U.S. at 29. *Bruen* goes on to clarify that that "analogical reasoning under the

8

1    Second Amendment is neither a regulatory straightjacket nor a regulatory blank

2    check" and "requires only that the government identify a well-established and

3    representative historical *analogue*, not a historical *twin*." *Bruen*, 587 U.S. at 30.

4    Thus, Plaintiffs' insistence that Defendant produce, in essence, a "dead ringer" *id*.,

5    directly contradicts *Bruen* and should hold no weight with this Court.

6        **B.    *Bruen* Endorsed the Use of Analogues Beyond the Founding Era**

7        Plaintiffs' contention (ECF 35 at 10, 17) that this Court may only consider

8    Founding-era analogues also contravenes *Bruen*, which recognized that periods

9    outside the Founding era are relevant to the Court's historical analysis. *Bruen*, 142

10   S. Ct. at 2132 ("The regulatory challenges posed by firearms today are not always

11   the same as those that preoccupied the Founders in 1791 or the Reconstruction

12   generation in 1868."); *id*. at 2133 (describing a review of the "historical record . . .

13   [of] 18th- and 19th-century 'sensitive places'"). It further ignores the Ninth

14   Circuit's recent decisions treating post-1791 evidence as relevant under *Bruen*. *See

15   Alaniz*, 69 F.4th at 1129 (finding that a "historical tradition is well-established"

16   based on the fact that "several States enacted [analogous] laws throughout the

17   1800s"); *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (noting the relevance

18   of Reconstruction-era regulations under *Bruen*). Accordingly, this Court should

19   reject Plaintiffs' arbitrary limits on the relevant time period and consider the

20   entirety of the extensive eighteen- and nineteenth-century historical record

21   submitted in support of Defendants' motion.

22       **C.    The Challenged Statues Fit Comfortably Within a Long
             Tradition of Regulating Dangerous and Deadly Weapons**
23

24       Defendant incorporate by reference the arguments in their motion providing

25   historical analogues that are representative of our Nation's robust history of

26   regulating dangerous weapons in both the Founding era and throughout American

27   history. ECF 33-1 at 11–19.

28

9

Defendant's Reply ISO Motion for Summary Judgment (3:23-cv-00474-JES-DDL)

# CONCLUSION

As set forth above, Plaintiffs have failed to meet their evidentiary burden at the first stage of the *Bruen* analysis and have further failed to refute Defendant's historical evidence at *Bruen*'s second stage. Accordingly, Defendant is entitled to summary judgment.

Dated:  April 15, 2024                              Respectfully submitted,

                                                    ROB BONTA
                                                    Attorney General of California
                                                    R. MATTHEW WISE
                                                    Supervising Deputy Attorney General


                                                    */s/ Katrina Uyehara*
                                                    KATRINA UYEHARA
                                                    Deputy Attorney General
                                                    *Attorneys for Defendant Rob Bonta, in*
                                                    *his official capacity as Attorney*
                                                    *General of the State of California*

# CERTIFICATE OF SERVICE

Case Name:   **Knife Rights, Inc., et al. v.**          No.   **3:23-cv-00474-JES-DDL**
               **California Attorney General**
               **Rob Bonta, et al.**

I hereby certify that on <u>April 15, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### DEFENDANT ATTORNEY GENERAL ROB BONTA'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 15, 2024</u>, at Sacramento, California.

|  |  |
|---|---|
| Eileen A. Ennis | */s/ Eileen A. Ennis* |
| Declarant | Signature |

SA2023301419
38014059.docx

1   ROB BONTA
    Attorney General of California
2   R. MATTHEW WISE
    Supervising Deputy Attorney General
3   JANE REILLEY
    Deputy Attorney General
4   KATRINA UYEHARA
    Deputy Attorney General
5   State Bar No. 349378
      1300 I Street, Suite 125
6     P.O. Box 944255
      Sacramento, CA 94244-2550
7     Telephone: (916) 210-7867
      Fax: (916) 324-8835
8     E-mail: Katrina.Uyehara@doj.ca.gov
    *Attorneys for Defendant Rob Bonta, in his*
9   *official capacity as Attorney General of the*
    *State of California*

10

                 IN THE UNITED STATES DISTRICT COURT
11
                FOR THE SOUTHERN DISTRICT OF CALIFORNIA
12

13

14

| | |
|---|---|
| 15 **KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,**<br><br>18                                Plaintiffs,<br><br>19   **v.**<br><br>20 **CALIFORNIA ATTORNEY GENERAL ROB BONTA,**<br><br>22                                Defendant. | 3:23-cv-00474-JES-DDL<br><br>**DEFENDANT ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          April 22, 2024<br>Time:          10:00 a.m.<br>Dept:          4B<br>Judge:        The Honorable James E. Simmons, Jr.<br>Trial Date:   None set<br>Action Filed: March 15, 2023 |

24

25

26

27

28

1
2

# TABLE OF CONTENTS

**Page**

Introduction.................................................................................1

Background.................................................................................2

Procedural History .......................................................................4

Legal Standard ...........................................................................4

Argument ..................................................................................5

I.    Plaintiffs Fail to Establish That the Challenged Statutes Implicate the Second Amendment's Plain Text ....................5

    A.    Plaintiffs Fail To Show That the Specific Subset of Regulated Switchblade Knives Are in Common Use for Self-Defense .....................................................7

    B.    The Challenged Statutes Regulate "Dangerous and Unusual" Weapons .............................................12

II.   The Challenged Statutes Are Consistent with the Nation's Historical Tradition of Regulating Similar Weapons, Notwithstanding Plaintiffs' "Divide-and-Conquer" Approach .........15

    A.    *Bruen* Requires This Court to Engage in Historical Analysis ...........................................................15

    B.    The Ninth Circuit Has Cautioned Against a Divide-and-Conquer Approach to *Bruen's* Historical Analysis.............16

    C.    *Bruen* Endorsed the Use of Analogues Outside of the Founding Era .....................................................16

    D.    The Challenged Statutes Fit Comfortably Within a Long Tradition of Regulating Bowie Knives, Impact Weapons, and Other Dangerous and Deadly Weapons.........................17

Conclusion ...............................................................................22

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ................................................................. 4

5

6

*Baird v. Bonta*
    81 F.4th 1036 (9th Cir. 2023) ................................................. 17

7

8

*Barrios v. Holder*
    581 F.3d 849 (9th Cir. 2009) ................................................. 14

9

10

*Bevis v. City of Naperville*
    85 F.4th 1175 (7th Cir. 2023) ................................................. 6

11

12

*Caetano v. Massachusetts*
    577 U.S. 411 (2006) ................................................................. 6

13

14

*Cockrum v. State*
    25 Tex. 394 (1859) ................................................................. 21

15

16

*Craft v. U.S.*
    403 F.2d 360 (9th Cir. 1968) ................................................. 14

17

18

*Crowlery Cutlery Co. v. U.S.*
    849 F.2d 273 (7th Cir. 1988) ................................................. 14

19

20

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*
    664 F. Supp. 3d 584 (D. Del. 2023) ..................................... 5

21

22

*District of Columbia v. Heller*
    554 U.S. 570 (2008) .......................................................*passim*

23

24

*Fall v. Esso Standard Oil Co.*
    297 F.2d 411 (5th Cir. 1961) ................................................. 14

25

26

*Frlekin v. Apple, Inc.*
    979 F.3d 639 (9th Cir. 2020) ................................................. 4

27

28

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015) ................................................. 13

ii

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

*Hartford v. Ferguson*
  2023 WL 3836230 (W.D. Wa. 2023)................................................................. 5

*In re Gilbert R*
  211 Cal.App.4th 514 (Cal. Ct. App. 2012)................................................... 3, 9

*In re S.C.*
  179 Cal. App. 4th 1436 (Cal. Ct. App. 2009) ............................................... 14

*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017) ......................................................................... 12

*Las Vegas Sands, LL v. Nehme*
  632 F.3d 526 (9th Cir. 2011)............................................................................ 4

*McDonald v. City of Chicago*
  561 U.S. 742 (2010) ....................................................................................... 12

*Nat'l Ass'n for Gun Rights v. Lamont*
  ___ F. Supp. 3d. ___ (D. Conn., Aug. 3, 2023) ........................................... 13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
  597 U.S. 1 (2022) ......................................................................................*passim*

*New York State Rifle & Pistol Association, Inc., et al. v. Bruen*
  142 S. Ct. 2111 (2022) ............................................................................. 16, 17

*Ocean State Tactical, LLC, et al. v. State of Rhode Island, et al.*
  95 F.4th 38 (1st Cir. March 7, 2024)................................................6, 11, 18, 21

*Or. Firearms Fed'n v. Kotek*
  2023 WL 4541027 (D. Or. July 14, 2023) ...................................................... 5

*People ex rel. Mautner v. Quattrone*
  211 Cal. App. 3d. 1389 (Cal. Ct. App. 1989).............................................. 19

*Rupp v. Bonta*
  No. 8:17-cv-00745 (C.D. Cal. March 15, 2024) ........................................... 13

*Rupp v. Bonta*
  No. 8:17-cv-00746 (C.D. Cal. March 15, 2024) ............................................. 6

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*S.D. Myers, Inc. v. City & County of San Francisco*
    253 F.3d 461 (9th Cir. 2001) ................................................................... 4

*Teter v. Connors*
    459 F. Supp. 3d 989 (D. Haw. 2020) ...................................................... 14

*Teter v. Lopez*
    2024 WL 719051 (9th Cir. Feb. 2, 2024) ............................................... 14

*Teter v. Lopez*
    76 F.4th 938 (9th Cir. 2023) .................................................................. 14

*U.S. v. Olloque*
    580 Fed. Appx. 584 (9th Cir. 2014) ...................................................... 14

*U.S. v. Salcedo*
    452 F.2d 1201 (9th Cir. 1971) ............................................................... 14

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023) .........................................................*passim*

*United States v. Perez-Garcia*
    __ F.4th ___ (9th Cir. March 18, 2024) 2024 WL 1151665 .......................... 2, 16

*United States v. Salerno*
    481 U.S. 739 (1987) ................................................................................. 4

*Wa. State Grange v. Wa. State Republican Party*
    552 U.S. 442 (2008) ................................................................................. 4

*Willis v. City of Seattle*
    943 F.3d 882 (9th Cir. 2019) .................................................................... 4

**STATUTES**

California Penal Code
    § 17235 ..............................................................................................*passim*
    § 21510 ............................................................................................2, 4, 9, 19
    § 21590 ...................................................................................................2, 4

Defendant's Opp. to Plaintiffs' MSJ (3:23-cv-00474-JES-DDL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

COURT RULES

Federal Rules of Civil Procedure
    Rule 56 ................................................................................................... 4
    Rule 56(a) .............................................................................................. 4

OTHER AUTHORITIES

Assem. Com. on Public Safety, Analysis of Sen. Bill No. 274 (2001-
    2002 Reg. Sess.) ................................................................................... 3

H.R. No. 9820, H.R. No. 10618, H.R. No. 111289, 85th Cong., 2d
    Sess., pp. 1–33 (1958) ........................................................................ 19

Sen. Rep. No. 1980, 85th Cong., 1st Sess. ............................................... 19

**INTRODUCTION**

Plaintiffs' motion for summary judgment rests on the faulty assumption that California law categorically bans all switchblade knives. In fact, California's longstanding statutory regime regulates only a narrow category of knives: automatically opening knives of two inches or longer without a detent or safety mechanism. Thus, Californians are permitted to own, carry, and sell pocketknives; one-handed knives; folding knives and out-the-front knives; and even automatically opening knives, provided that the blade is less than two inches. Plaintiffs' misunderstanding of the scope of California's switchblade regulations manifests itself in their arguments at both steps of the *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* framework and is fatal to their motion. 597 U.S. 1 (2022).

At the threshold stage, Plaintiffs fail to present evidence addressing whether the specific types of knives regulated by the challenged statutes are in common use. Instead, they merely provide a list of automatically opening knife models and data on pocketknife ownership in the United States generally—neither of which are relevant to the types of knives actually regulated by the challenged statutes. Thus, at the first step of the analysis, Plaintiffs fail to establish that the challenged laws proscribe a type of weapon that is in common use and thus would implicate the plain text of the Second Amendment.

Plaintiffs also urge this Court to apply an extreme interpretation of *Bruen*'s threshold inquiry that contradicts Ninth Circuit precedent. In *United States v. Alaniz*, the Ninth Circuit made clear that the common-use analysis focuses on whether the weapon is in common use *for self-defense*, and not whether the weapon is generally in use for some other unspecified lawful purpose. 69 F.4th 1124, 1129 (9th Cir. 2023); *see also Bruen*, 597 U.S. at 21. Here, Plaintiffs fail to provide any evidence that the specific knives regulated by California law are commonly used for self-defense, or even used for self-defense at all. Plaintiffs also attempt to move the "dangerous and unusual" analysis from the first step of the *Bruen* analysis to the

1

1    second, improperly shifting the burden on this issue from Plaintiffs to Defendant.

2    However, the Ninth Circuit in *Alaniz* also made clear that the dangerous and

3    unusual analysis belongs at the threshold stage. *Alaniz*, 69 F.4th at 1129.

4        Plaintiffs also attempt to avoid the second step of the *Bruen* analysis altogether

5    by contending that this Court need not engage in *any* historical analysis because

6    "*Heller* decided [that] only dangerous *and* unusual arms can be categorically

7    banned." ECF No. 34-1 at 21. On the contrary, *Bruen* explicitly directs courts to

8    conduct the historical analysis specific to the challenged regulation before it;

9    indeed, the Supreme Court acknowledged that it did not conduct an exhaustive

10   historical analysis of the full scope of the Second Amendment in *Heller* or *Bruen*.

11   *Bruen*, 597 U.S. at 31. And notwithstanding whether the weapon at issue is

12   "dangerous and unusual," a regulation pertaining to that weapon still passes

13   constitutional muster as long as it "is consistent with the Nation's historical

14   tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Finally, Plaintiffs' attempt

15   to take a "divide-and-conquer" approach to Defendant's historical analogues—

16   wherein Plaintiffs attempt to distinguish each individual analogue, rather than

17   addressing the historical tradition as a whole—is unpersuasive, particularly since

18   the Ninth Circuit disclaimed this approach in *United States v. Perez-Garcia*, __

19   F.4th ___ (9th Cir. March 18, 2024) 2024 WL 1151665, at 45. Nothing in

20   Plaintiffs' motion refutes the comprehensive historical record supporting

21   California's switchblade regulations set forth in Defendant's motion for summary

22   judgment.

23       This Court should deny Plaintiffs' motion for summary judgment.

24                              **BACKGROUND**

25       Defendant incorporates the background and asserted facts set forth in the

26   memorandum of points and authorities in support of his motion for summary

27   judgment. ECF No. 33-1 at 7–8. As discussed in that brief and summarized here,

28   the laws challenged by Plaintiffs—Penal Code sections 17235, 21510, and 21590—

                                          2

(131 of 149) Page 131 of 149
Case 3:24-5536, 02/03/2025, DktEntry: 11.4, Page 131 of 149
Case 3:23-cv-00474-JES-DDL    Document 36    Filed 04/08/24    PageID:3100    Page 9 of 28

1    have been operative for over half a century and place reasonable restrictions on

2    certain types of switchblade knives that (1) have blades two inches in length or

3    longer and (2) do not have a detent or similar safety mechanism.

4        Penal Code section 17235 defines the subset of regulated knives as follows:

5        [S]witchblade knife" means a knife having the appearance of a
         pocketknife and includes a spring-blade knife, snap-blade knife,
6        gravity knife, or any other similar type knife, the blade or blades of
         which are two or more inches in length and which can be released
7        automatically by the flick of a button, pressure on the handle, flip of
         the wrist or other mechanical device, or is released by the weight of
8        the blade or by any type of mechanism whatsoever. "Switchblade
         knife" does not include a knife that opens with one hand utilizing
9        thumb pressure applied solely to the blade of the knife or a thumb stud
         attached to the blade, provided that the knife has a detent or other
10       mechanism that provides resistance that must be overcome in opening
         the blade, or that biases the blade back towards its closed position.
11

12   Cal. Penal Code § 17235.

13       Thus, Plaintiffs' attempt to frame California's statutory regime as a "Knife

14   Ban" is inaccurate and misleading. Section 17235 does not ban all knives in the

15   State. Nor does it ban all pocketknives; rather, the statute merely states that the

16   regulated knives have the *appearance of a pocketknife*. The subset of switchblade

17   knives regulated here are different from pocketknives, primarily because they are

18   automatically opening and do not have a detent or other safety mechanism. This

19   definition does not even include all switchblades. Knives with blades shorter than

20   two inches, or knives that may be opened with one hand and have a detent or

21   similar mechanism "serve an important utility to many knife users, as well as

22   firefighters, EMT personnel, hunters, fishermen, and others," and thus are legal in

23   California. *In re Gilbert R*, 211 Cal.App.4th 514, 612 (Cal. Ct. App. 2012) (citing

24   Assem. Com. on Public Safety, Analysis of Sen. Bill No. 274 (2001-2002 Reg.

25   Sess.).

26

27

28

## PROCEDURAL HISTORY

Defendant incorporates the procedural history set forth in the brief in support of his motion for summary judgment. ECF No. 33-1 at 8–9.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020). When deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And where, as here, the parties file cross-motions for summary judgment, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LL v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

Here, Plaintiffs raise facial challenges against Penal Code sections 17235, 21510, and 21590. Facial challenges are "disfavored" because "a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 449 (2008). They are "the most difficult challenge[s] to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (holding the Ninth Circuit will apply the *Salerno* standard in facial challenges, except for certain First Amendment challenges, until directed otherwise by the Supreme Court). Accordingly, to prevail on their facial challenge, Plaintiffs must establish that the challenged regulations are "unconstitutional in *all* of [their] applications." *Willis v.*

1    *City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019) (emphasis added). As shown

2    below, Plaintiffs have not met this high burden.

3    **ARGUMENT**

4    **I.    PLAINTIFFS FAIL TO ESTABLISH THAT THE CHALLENGED STATUTES**

5    **IMPLICATE THE SECOND AMENDMENT'S PLAIN TEXT**

6    Plaintiffs fail to meet their burden of establishing that the specific subset of

7    switchblade knives that are regulated by the challenged statutes are protected by the

8    plain text of the Second Amendment. Under *Bruen*'s text-and-history standard for

9    adjudicating Second Amendment claims, the party challenging a restriction must

10   first demonstrate that the law regulates conduct that is presumptively protected by

11   the Second Amendment. *Bruen*, 597 U.S. at 24. Following *Bruen*, several district

12   courts across the country have held that the party challenging the regulation bears

13   this burden.[1]

14   Plaintiffs make at least two analytical errors at *Bruen*'s first stage. First, they

15   claim that "the arm does not have to be used for self-defense. When an arm is

16   possessed by thousands for lawful purposes, it is 'in common use' and it is

17   protected—full stop." ECF No. 34-1 at 17. And second, they assert that "even arms

18   'not in common use' cannot be banned so long as they are no more dangerous than

19   other arms that are in common use." *Id*. This interpretation of *Bruen*'s threshold

20   analysis is plainly incorrect.

21   To begin with, the Ninth Circuit has made clear that when analyzing common

22   use, the correct inquiry is "whether the weapon at issue is 'in common use' today

23   *for self-defense*." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023)

---

24   [1] *Hartford v. Ferguson*, 2023 WL 3836230, *3 (W.D. Wa. 2023) (assuming

25   "that Plaintiffs can produce evidence in support of *Bruen*'s first requirement" and
     then shifting the burden to government at step two); *Or. Firearms Fed'n v. Kotek*,

26   2023 WL 4541027, at *5 (D. Or. July 14, 2023) ("First, a plaintiff challenging a
     firearm regulation must show the plain text of the Second Amendment covers the

27   conduct regulated by the challenged law."); *Del. State Sportsmen's Ass'n, Inc. v.
     Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 593 (D. Del. 2023)

28   (finding that "Plaintiffs have shown" that some of the challenged weapons were in
     common use, and then shifting the burden to the government at step two).

5

1     (quoting *Heller*, 554 U.S. at 580) (emphasis added); *see also Rupp v. Bonta*, No.

2     8:17-cv-00746, at 13 (C.D. Cal. March 15, 2024) (following *Alaniz* in placing the

3     common use for self-defense analysis at step one of the *Bruen* framework); *Bevis v.*

4     *City of Naperville*, 85 F.4th 1175, 1193 (7th Cir. 2023) (recognizing that the

5     singular lawful purpose protected under the Second Amendment is the right to

6     individual self-defense).

7         Rather than follow the analysis required in this circuit, Plaintiffs cite Justice

8     Alito's concurrence in *Caetano v. Massachusetts* for the proposition that the mere

9     fact that thousands own switchblades demonstrates they are in "common use." [2]

10    ECF No. 34-1 at 17 (citing 577 U.S. 411 (2006) (Alito, J., concurring) (per curiam).

11    The First Circuit recently rejected a similar argument in *Ocean State Tactical*,

12    explaining that "the closest arguable support for plaintiffs' preferred rule—that a

13    weapon cannot be banned once a large number of people own it . . . comes from a

14    concurring opinion in *Caetano v. Massachusetts*." 95 F.4th 38, 51 (1st Cir. March

15    7, 2024). Like the plaintiffs in *Ocean State*, here, Plaintiffs treat the "concurring

16    opinion as if it were binding authority." *Id*. (recognizing, in addition, that *Caetano*

17    only addressed stun guns, a non-lethal weapon); *see also Caetano*, 577 U.S. at 420

18    (Alito, J., concurring) (emphasizing that the case involved non-lethal weapons that

19    were "widely . . . accepted as a legitimate means of self-defense across the

20    country.").[3] As detailed below, Plaintiffs have failed to establish that the particular

---

21           [2] And even if Plaintiffs could show that "thousands" of people possess one of

22 the particular switchblades regulated by the challenged statutes "for lawful purposes," that showing would be patently insufficient to establish that the regulated switchblades are in common use. Given that the adult population of the

23 United States was approximately 258.3 million as of 2020,[2] "thousands" of individuals owning a particular weapon would not come anywhere close to the

24 number necessary to establish common use. *See, e.g. Rupp, supra*, at 30–31 (holding that ownership by 24.6 million Americans—or 2.59% of the adult

25 population—is not sufficient to establish common use as a matter of law).

26           [3] It is not evident that Justice Alito's concurrence even supports a numbers-only approach. The number of stun guns in circulation was in direct response to analysis by the Massachusetts Supreme Judicial Court that observed the number of

27 stun guns was dwarfed by the number of firearms in circulation. *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (recognizing that hundreds of thousands owning stun

28 guns was "[t]he more relevant statistic".).

6

1    subset of switchblade knives that are regulated by the challenged statute are in

2    common use for self-defense purposes, and they therefore cannot show that such

3    knives fall within the Second Amendment's plain text.

4         In addition, Plaintiffs identify no legal support—pre- or post-*Bruen*—for their

5    argument that even if the covered knives are not in common use, California may not

6    regulate them if they are no more dangerous than other weapons that are in

7    common use. Instead, courts are required to consider the primary use or purpose of

8    a weapon and its suitability for self-defense. *Heller*, 554 U.S. at 629. Plaintiffs do

9    not provide evidence on the primary use or purpose of the specific subset of

10   switchblades that California regulates, or any evidence on their suitability for self-

11   defense. As detailed below, Plaintiffs' evidence—general sales and ownership

12   statistics that have little to no bearing on the types of knives actually regulated by

13   the challenged statutes—is insufficient to meet their burden at *Bruen*'s threshold

14   stage.

15       **A.    Plaintiffs Fail To Show That the Specific Subset of Regulated**
         **Switchblade Knives Are in Common Use for Self-Defense**
16

17        The Second Amendment right "is not unlimited" and does not extend to "'a

18   right to keep and carry any weapon whatsoever in any manner whatsoever and for

19   whatever purpose.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 629).

20   Rather, the Second Amendment only protects those weapons that are "'in common

21   use' today for self-defense." *Id.* (quoting *Heller*, 554 U.S. at 627); *see also Alaniz*,

22   69 F.4th at 1129 (recognizing at the threshold stage, courts must consider "whether

23   the weapon at issue is 'in common use' today for self-defense") (quoting *Heller*,

24   554 U.S. at 580.) This analysis requires courts to consider the primary use or

25   purpose of that weapon and whether the weapon's objective characteristics render it

26   suitable for self-defense. *Heller*, 554 U.S. at 629 (explaining the "reasons that a

27   citizen may prefer a handgun for home defense," including that handguns are easier

28   to store in a location that is readily accessible in an emergency, are easier to lift and

7

1    aim than a long gun, and can be used with a single hand while the other hand dials

2    the police).

3        The specific subset of switchblades that are regulated by the challenged

4    statutes do not constitute "Arms" protected by the Second Amendment because

5    they are not commonly used for self-defense. *Bruen* makes clear that the test for

6    Second Amendment protection of a particular weapon is common *use*, not common

7    *ownership*. *See* 597 U.S. at 38 (referring to "commonly *used* firearms for self-

8    defense") (emphasis added). Plaintiffs do not provide any evidence that

9    switchblades are in common use for self-defense today.[4] Indeed, they never even

10    consider the suitability of the regulated switchblades and the actual use of those

11    weapons for self-defense.

12        As the record in this case clearly establishes, the switchblade knives regulated

13    by California's statutory regime are not even suitable for "ordinary self-defense."

14    *Bruen*, 597 U.S. at 60. As both Plaintiffs' and Defendant's experts agree, extensive

15    training is required to use a switchblade knife safely and effectively for self-

16    defense. *Compare* Escobar Decl., ¶ 27, 31, 40, *with* Ex. Janich Transcript at pp. 33,

17    36. A self-defense situation involving a switchblade is inherently a close-combat

18    encounter—one that will likely require the cutting of tissue, ligaments, and

19    muscles, and result in subsequent blood loss.  Escobar Decl., ¶ 34–35; *see also* Ex.

20    Janich Transcript at pp. 34–36 (identifying the quadriceps and median and ulnar

21    nerves as prime targets for knife self-defense). The nature of such an encounter

22    raises the significant question of whether an ordinary person would be capable of

23    effectively using a knife for self-defense. Esocbar Decl., ¶ 35–36. There are

24    significant psychological barriers to using knives for self-defense.

25

26    _____

27    [4] To the extent that Plaintiffs provide data from the legislative history of the
Federal Switchblade Act from the 1950s and 1980s to prove switchblades are in
common use today, that evidence must be disregarded because the common use
28    analysis looks only at present-day statistical data.

Defendant's Opp. to Plaintiffs' MSJ (3:23-cv-00474-JES-DDL)

1    Aside from such psychological barriers, switchblades are generally ill-suited

2  for self-defense. All switchblades store the blade within the handle of the knife.

3  Both out-the-front and folding knives require the user to seat the knife in their hand

4  in a certain way to avoid injury upon deployment of the blade. Escobar Decl., ¶ 21.

5  In addition, many users may struggle to disengage the safety on the switchblade or

6  may accidentally deploy the knife, causing injury to the user. Escobar Decl., ¶ 31–

7  32; *see also In re Gilbert R.*, 211 Cal. App. 4th at 612 (recognizing that the detent

8  exception to Penal Code section 21510 is "prudent and a matter of public safety as

9  [a detent] will ensure the blade will not inadvertently come open"). As a result,

10  users risk injury and delay in attempting to deploy a switchblade for self-defense.

11    Switchblade knives must also lock in place in order to be used for self-

12  defense. This is supposed to happen automatically, but on occasion, these knives

13  can fail to lock and are rendered effectively unusable. Escobar Decl., ¶ 30. In

14  contrast, fixed blade knives must only be unsheathed to be ready to use, and folding

15  knives without automatic features give their users tactile feedback that the knife has

16  locked into place. Escobar Decl., ¶ 30. By their very nature, an automatic

17  switchblade knife consists of more complicated mechanical moving parts that can

18  fail. Escobar Decl., ¶ 21; Rivas Decl., ¶ 21

19    And folding switchblades can be even more difficult to use because they

20  require an even more complicated multi-step, fine-motor-skill operation to reveal

21  the blade of the knife. Escobar Decl., ¶ 24–28. This fine motor skill requires

22  training and practice to be used in an actual, adrenalized self-defense scenario.

23  Escobar Decl., ¶ 27. Bringing a folding switchblade to bear in a high-stress self-

24  defense situation is difficult. *Compare* Escobar Decl., ¶ 26–27, *with* Ex. Janich

25  Transcript, p. 33.[5]

26

27    _____

    [5] Plaintiffs note that none of Defendant's experts cite any crime data relating
to switchblades from 1958 to 2024. ECF No. 34-1 at 19. But *Bruen* does not require

28  the government to produce evidence of current crime data to justify its regulations.

9

In short, a switchblade is a far cry from the "quintessential self-defense weapon" discussed in *Heller* and *Bruen*. It requires its users to be trained in close hand-to-hand combat, to be psychologically prepared to slash or stab in self-defense, and to use fine motor skills to deploy the blade.[4] Because Plaintiffs cannot establish that switchblades are commonly used for self-defense, their claims fail at the threshold.

Plaintiffs also make no attempt to show that the particular subset of switchblades regulated by the challenged statutes are actually used for self-defense. This is in part due to the fact Plaintiffs misinterpret the Ninth Circuit's current precedent and incorrectly believe that the analysis is limited to whether a weapon is in common use for any unspecified "lawful purpose," and not whether the weapon is in common use for self-defense. *Compare* ECF No. 34-1 at 17, *with Alaniz*, 69 F.4th at 1129.

Despite his independent research and decades of experience in training hundreds of individuals in self-defense with bladed weapons, Plaintiffs' purported self-defense expert, Michael Janich, could not recall a single instance in which a switchblade was for self-defense. Ex. Janich Transcript, p. 32. Mr. Janich further testified that he would not recommend switchblades for self-defense given that there are few training knives for switchblades. Ex. Janich Transcript, p. 63. Training knives—knife models that replicate the actual feel of a knife but are dull—are often used to train individuals on how to use a knife for self-defense. Ex. Janich Transcript, p. 63. Mr. Janich admitted that very few knife companies produce training knives for their automatic switchblade knives. Ex. Janich Transcript, p. 63. Thus, despite the importance of training with a knife before using it for self-defense—as recognized by both parties' experts, *see* Escobar Decl., ¶ 27, 31, 40; Ex. Janich Transcript, pp. 33, 36—it is difficult to practice using a switchblade for self-defense. And the very fact that training versions of automatic switchblade knives are so rarely produced evidences the industry's general consensus that these

10

1    types of knives are not commonly used for self-defense. Given the lack of evidence

2    that the specific type of switchblades that California regulates are commonly used

3    in self-defense, it reasonably follows that regulating them imposes no meaningful

4    burden on residents' ability to defend themselves. *See, e.g., Ocean State Tactical*,

5    95 F.4th at 45 (recognizing that, since there was no known instance of someone

6    using 10-rounds for self-defense, regulating large-capacity magazines imposed no

7    meaningful burden on the right to self-defense).

8         Plaintiffs mistakenly rely on national switchblade sale estimates in an attempt

9    to meet their burden. They allege, without evidentiary support, that "millions of

10   [automatically-opening] knives have been sold to private citizens who may lawfully

11   possess them in 45 states." ECF No. 34-1 at 13. And they cite the number of

12   automatically opening knives sold by the alleged three largest online knife retailers

13   in the country. ECF No. 34-1 at 22. But these statistics do not inform the court of

14   how many of those switchblades are being used for self-defense; indeed, Plaintiffs

15   admit that they list "thousands of different models of automatically opening knives

16   *for sale for lawful use*," *id*. at 22, not those specifically used for self-defense.

17   Moreover, the sales statistics provided by Plaintiffs are not specific to the particular

18   subset of knives that are regulated by the challenged statutes.

19        Plaintiffs similarly argue that "automatically opening knives fall under the

20   category of folding pocket knives," that "[a]ccording to estimates from American

21   Knife & Tool Institute, as many as 35,695,000 U.S. households own a pocket

22   knife," and that "assisted opening and one-hand opening knives—are

23   approximately 80% of all knives sold in the United States." ECF No. 34-1 at 24.

24   But these statistics about pocketknives do not support Plaintiffs' argument that the

25   regulated switchblades are in common use for self-defense. Just as not all rectangles

26   are squares, not all pocketknives are switchblades, and even fewer are the specific

27   type of switchblades proscribed by the challenged statutes. Pen. Code, § 17235

28   (Switchblade knife "*does not include a knife that opens with one hand utilizing*

11

1    *thumb pressure applied solely to the blade of the knife or a thumb stud attached to*

2    *the blade, provided that* the knife has a detent or other mechanism that provides

3    resistance that must be overcome in opening the blade, or that biases the blade back

4    towards its closed position".)[6]

5        Plaintiffs also suggest that automatically opening knives are prevalent in other

6    jurisdictions. ECF No. 34-1 at 20–21. Yet, California need only ensure that its laws

7    pass constitutional muster, not that they align with the laws of other states.

8    Although the Supreme Court has defined the outer bounds of permissible

9    regulations, it has not "abrogate[d] states' core responsibility of "[p]roviding for the

10    safety of citizens within their borders." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir.

11    2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635),

12    *abrogated on other grounds by Bruen*, 597 U.S. 1. In *McDonald*, the Court

13    emphasized that the Second Amendment "by no means eliminates" a state's "ability

14    to devise solutions to social problems that suit local needs and values." 561 U.S. at

15    785. Thus, other states' laws are ultimately not relevant to whether California's

16    statutes are constitutional.

17        Plaintiffs are trying to place an evidentiary burden on the State that has no

18    foundation in *Bruen* or any other Supreme Court Second Amendment case. In short,

19    Plaintiffs have failed to meet their threshold burden of establishing that the specific

20    type of switchblades regulated by the challenged statutes are in common use for

21    self-defense.

22    **B.    The Challenged Statutes Regulate "Dangerous and Unusual"**
       **Weapons**

23

24        In addition to being ill-suited for self-defense, the subset of switchblade knives

25    that are regulated by the challenged statutes fall outside the scope of the Second

26    Amendment for the separate reason that they are dangerous and unusual weapons.

27    _____

       [6] A pocketknife, a folding knife, a one-handed knife, an automatically

28    opening knife, or a knife that shares a combination of these features is legal under
       section 17235's definition of "switchblade knife".

1   Plaintiffs mistakenly suggest "only dangerous and unusual arms can be

2   categorically banned." ECF No. 34-1 at 25. But *Heller* made clear that proscribing

3   dangerous and unusual arms was just one of several longstanding weapons

4   regulations traditionally understood to be consistent with the Second Amendment.

5   *Heller*, 554 U.S. at 626; *see also Fyock v. Sunnyvale*, 779 F.3d 991, 996–97 (9th

6   Cir. 2015).

7       Plaintiffs also argue that "Defendants' experts have failed to present evidence

8   sufficient to create a genuine factual dispute over whether automatically opening

9   knives are dangerous and unusual." ECF No. 34-1 at 18. But this argument

10   incorrectly places the dangerous and unusual analysis at the second step of the

11   *Bruen* framework. *Alaniz*, 69 F.4th at 1129; *see also Rupp v. Bonta*, No. 8:17-cv-

12   00745, at 14, fn. 5 (C.D. Cal. March 15, 2024) (recognizing that placing the

13   dangerous and unusual at the second step of the analysis "was in direct tension with

14   *Fyock*," "directly contradicted *Alaniz*," and "was out of step with most courts that

15   have considered the issue"). Thus, it is Plaintiffs—not Defendant—who bear the

16   burden of showing that switchblades are not dangerous or unusual.

17       Blackstone, a leading historical source cited by *Heller* and *Bruen* on this point,

18   elaborated on this tradition and explained that "[t]he offense of riding or going

19   armed, with dangerous *or* unusual weapons, is a crime against the public peace . . .

20   and is particularly prohibited." 4 Blackstone, Commentaries on the Laws of

21   England 148 (1769); *see also Bruen*, 597 U.S. at 35 (recognizing that a "long,

22   unbroken line of common-law precedent stretching from Bracton to Blackstone is

23   far more likely to be part of our law than a short-lived 14th-century English

24   practice"). A weapon qualifies as dangerous and unusual if it has some heightened

25   "level of lethality or capacity for inquiry" that makes the weapon "especially

26   dangerous." *Nat'l Ass'n for Gun Rights v. Lamont*, ___ F. Supp. 3d. ___, 2023 WL

27   4975979, at *16 (D. Conn., Aug. 3, 2023).

28

Federal courts across the country have long recognized that switchblades are uniquely dangerous weapons that are not typically possessed for law-abiding purposes. *See Crowlery Cutlery Co. v. U.S.*, 849 F.2d 273, 278 (7th Cir. 1988) ("Switchblade knives are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use."); *Fall v. Esso Standard Oil Co.*, 297 F.2d 411, 416–17 (5th Cir. 1961) ("It is now well settled beyond a doubt that a switchblade knife is a dangerous weapon.").[7] Numerous Ninth Circuit cases confirm the relationship between such knives and criminal activity. *See, e.g.*, *Barrios v. Holder*, 581 F.3d 849, 853 (9th Cir. 2009) (noting that in Guatemala a gang cut a person seeking immigration relief with a switchblade); *U.S. v. Salcedo*, 452 F.2d 1201 (9th Cir. 1971) (finding that a switchblade knife and a container of heroin found by a Border Control Agent supported a drug smuggling conviction); *Craft v. U.S.*, 403 F.2d 360, 362 (9th Cir. 1968) (affirming conviction for the illegal importation of marijuana and switchblades); *U.S. v. Olloque*, 580 Fed. Appx. 584, 584 (9th Cir. 2014) (affirming conviction of possession and intent to distribute drugs noting that officers found a switchblade amongst drug paraphernalia). California courts have similarly recognized that switchblades are not typically possessed by law-abiding citizens for lawful purposes. *See, e.g.*, *In re S.C.*, 179 Cal. App. 4th 1436, 1441 (Cal. Ct. App. 2009) ("A switchblade carried on the person represents a constant threat to others, whether carried in public or in private. A switchblade carried at home, for example, is dangerous to family members and house guests during an argument."). These cases provide additional evidence that the types of switchblades regulated by the challenged statutes are

---

[7] The district court in *Teter v. Connors* similarly held that butterfly knives—like switchblades—are often associated with gang activity and present a danger to public safety. 459 F. Supp. 3d 989, 992–93 (D. Haw. 2020). The district court's decision was reversed by a three-judge panel of the Ninth Circuit, *Teter v. Lopez*, 76 F.4th 938, 949-50 (9th Cir. 2023), but that opinion was vacated when the Ninth Circuit agreed to rehear the case en banc, *Teter v. Lopez*, 2024 WL 719051, at *1 (9th Cir. Feb. 2, 2024).

1    uniquely dangerous, thus placing these weapon outside the scope of the Second

2    Amendment.

3    **II.    THE CHALLENGED STATUTES ARE CONSISTENT WITH THE NATION'S
         HISTORICAL TRADITION OF REGULATING SIMILAR WEAPONS,
4         NOTWITHSTANDING PLAINTIFFS' "DIVIDE-AND-CONQUER" APPROACH**

5         Plaintiffs' motion for summary judgment also fails at the second stage of the

6    *Bruen* analysis because the challenged statutes fall comfortably within the Nation's

7    historical tradition of weapons regulation. The regulation of weapons throughout

8    U.S. history tends to follow a similar regulatory sequence: certain weapons become

9    associated with criminality or threats to public order and safety after proliferating in

10    society; and subsequently the government enacts a variety of restrictions on that

11    particular weapon, while leaving a range of alternatives available to law-abiding

12    citizens for self-defense. Spitzer Decl., ¶ 12, 60. This regulatory tradition includes

13    historical precursors to modern-day switchblade regulations, including regulations

14    of the Bowie knife and other dangerous weapons. Here, Defendant has identified

15    136 historical laws from 49 states and the District of Columbia regulating Bowie

16    knives, and even more laws regulating the use of dangerous weapons through carry

17    restrictions and taxes. Spitzer Decl., Ex. C; see also Spitzer Decl., ¶ 43–44, Ex. B,

18    C, D; Rivas Decl., Ex. 2–47. Plaintiffs attempt to isolate and distinguish discrete

19    aspects of Defendant's historical analogues, rather than rebut the broader historical

20    tradition. Plaintiffs' "divide and conquer" approach to Defendant's historical record

21    should be rejected.

22        **A.    *Bruen* Requires This Court to Engage in Historical Analysis**

23        Plaintiffs attempt to dissuade this Court from engaging in *any* historical

24    analysis, arguing that the Court is limited to the historical analysis set forth in

25    *Heller* and *Bruen*, ECF No. 34-1 at 21—notwithstanding the fact that neither case

26    addressed the historical tradition of regulating knives. Indeed, *Bruen* explicitly calls

27    for courts to engage in their own historical analysis particular to the facts of the

28    case before it. *Bruen*, 597 U.S. at 31 ("Like *Heller*, we 'do not undertake an

exhaustive historical analysis . . . of the full scope of the Second Amendment.' And we acknowledge that 'applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins.'"). It follows that this Court must engage in an independent historical analysis here.

**B.    The Ninth Circuit Has Cautioned Against a Divide-and-Conquer Approach to *Bruen*'s Historical Analysis**

As the Ninth Circuit recently observed in *United States v. Perez-Garcia*, "[i]n applying the Second Amendment, we do not isolate each historical precursor and ask if it differs from the challenged regulation in some way. We emphasize again: *Bruen* does not require the Government to identify a 'historical twin' or an 18th century 'dead ringer' . . . We instead examine the historical evidence as a whole." *United States v. Perez-Garcia*, ___ F.4th ___ (9th Cir. March 18, 2024) 2024 WL 1151665, at 45. Accordingly, the Ninth Circuit discounted the *Perez-Garcia* plaintiffs' "divide and conquer approach to the historical evidence," because such an approach "misses the forest for the trees." *Id.* Here, Plaintiffs make the same methodological error as the *Perez-Garcia* plaintiffs by focusing on immaterial distinctions between each of Defendant's historical analogues and the challenged statutes, rather than evaluating the overarching historical tradition set forth in Defendant's motion. In doing so, Plaintiffs improperly ask this Court to require Defendant to produce historical analogues that are "twins" or "dead ringers" for the challenged statutes—a requirement that *Bruen* expressly disclaimed. *Bruen*, 597 U.S. at 30.

**C.    *Bruen* Endorsed the Use of Analogues Outside of the Founding Era**

Plaintiffs also erroneously contend that the Court is limited to Founding-era laws in conducting its historical analysis. Yet *Bruen* suggested that periods outside the Founding era are relevant to the analysis. *Bruen*, 142 S. Ct. at 2132 ("The regulatory challenges posed by firearms today are not always the same as those that

16

1   preoccupied the Founders in 1791 or the Reconstruction generation in 1868."); *id.*

2   at 2133 (describing a review of the "historical record . . . [of] 18th- and 19th-

3   century 'sensitive places'"). Plaintiffs' view also contravenes the Ninth Circuit's

4   recent decisions treating post-1791 evidence as relevant under *Bruen*. *See Alaniz*,

5   69 F.4th at 1129 (finding that a "historical tradition is well-established" based on

6   the fact that "several States enacted [analogous] laws throughout the 1800s"); *Baird*

7   *v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (noting the relevance of

8   Reconstruction-era regulations under *Bruen*). The historical analogues discussed

9   below are representative of our Nation's robust history of regulating dangerous

10  weapons in both the Founding era and throughout American history.

**D.    The Challenged Statutes Fit Comfortably Within a Long
Tradition of Regulating Bowie Knives, Impact Weapons, and
Other Dangerous and Deadly Weapons**

13  Defendant incorporates by reference the historical arguments in the brief in

14  support of his motion for summary judgment. ECF 33-1 at 16–19 (establishing the

15  historical tradition of regulating dangerous and deadly weapons, including the

16  Bowie knife and other impact weapons). While Defendant's motion addresses

17  numerous analogues, no historical weapon serves as a better analogy to the types of

18  switchblade knives that California currently regulates than the Bowie knife. In the

19  antebellum era, the Bowie knife became one of the most widely regulated weapons.

20  The Bowie knife was a large, single-edged knife infamously used by Jim Bowie to

21  kill a man in a duel in 1827. Spitzer Decl., ¶ 34; see also Rivas Decl., ¶ 18. The

22  story of Jim Bowie and the mythology related to his story led to the proliferation of

23  the knife.[8] Spitzer Decl., ¶ 35; Rivas Decl., ¶ 19. The knife's distinctive features,

24  along with Bowie's death at the Alamo in 1836, led to widespread interest in and

25  proliferation of the knife. Spitzer Decl., ¶ 35; Rivas Decl., ¶ 15.

26

27  _____
[8] This is not unlike the switchblade itself, which experienced heightened

28  popularity following its prevalence in pop culture and the media in the 1950s and
1960s. Spitzer Decl., ¶ 15.

17

1  Featuring a long, thin blade, the Bowie knife was designed for interpersonal
2  fighting in a time when single-shot pistols were unreliable and inaccurate. Spitzer
3  Decl., ¶ 36. The exact details of the original Bowie knife are unknown, but versions
4  of the knife became more standardized over time. Rivas Decl., ¶ 18. For example,
5  some folding Bowie knives existed in the nineteenth century. Rivas Decl., ¶ 22.
6  However over time, the Bowie knife came to generally be recognized as a large,
7  eight to twelve-inch knife with a clipped blade—one with a sharpened swedge
8  making it more lethal, with the point generally aligned with the handle. Rivas Decl.,
9  ¶ 18. The knife was widely used in fights and duels, even though this practice was
10  widely disfavored. Spitzer Decl., ¶ 36–37.

11  The public safety concerns surrounding Bowie knives and other thin long-
12  bladed knives were ubiquitous. Spitzer Decl., ¶ 43. Accordingly, states enacted a
13  variety of restrictions on the Bowie knife throughout the nineteenth century,
14  including open and concealed carry prohibitions and criminal penalty
15  enhancements, and imposed taxes on individuals and dealers. Spitzer Decl., ¶ 45–
16  46. The First Circuit recently credited the well-established historical tradition of
17  regulating Bowie knives, recognizing "the severe restrictions placed on Bowie
18  knives by forty-nine states and the District of Columbia in the nineteenth century
19  once their popularity in the hands of murderers became apparent." *Ocean State*
20  *Tactical*, No. 23-1072 (upholding Rhode Island's restrictions on large capacity
21  magazines by relying in part on historical laws regulating Bowie knives).

22  The challenged statutes are also relevantly similar to laws dating back to the
23  Founding era. Plaintiffs contend that, "[a]t the time of the Founding era, the
24  preferred means of addressing the general threat of violence, was to require law-
25  abiding citizens to be armed." ECF No. 34-1 at 27. But in the Founding era, states
26  also banned a variety of impact weapons they deemed dangerous and prone to
27  criminal misuse, including bludgeons, billy clubs, slungshots, and sandbags. Impact
28  weapons were used to strike others and were associated closely with criminal use.

18

1    *Id*. As a result, they were ubiquitously regulated by early state governments, which

2    enacted laws primarily regulating their carry. *Id*. Every state in the nation had laws

3    restricting one or more types of impact weapons. *Id*.

4         In determining whether regulations are relevantly similar, *Bruen* pointed

5    courts to two different metrics: "how and why the regulations burden a law-abiding

6    citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Here, the challenged

7    statutes are analogous to the aforementioned historical analogues in "how" they

8    regulate weapons by proscribing a specific subset of particularly dangerous and

9    deadly switchblade knives. The challenged statues are also analogous as to

10   "why"—the laws reduce criminal activity and protect public safety. Defendant

11   incorporates by reference the arguments set forth in his brief in support of his

12   motion for summary judgment. ECF No. 33-1 at 17–19 (establishing that the

13   historical analogues are relevantly similar to California's switchblade restriction in

14   how and why they regulate switchblades). The historical analogues establish that

15   different forms of dangerous knives have been regulated throughout history for

16   public safety reasons.

17        The modest burdens imposed by California's switchblade restrictions are

18   comparably justified by pressing public-safety concerns. In response to a rise in

19   crime and public concern, forty states, including California, and the federal

20   government enacted laws restricting switchblades. One California court observed

21   that "the dramatic rise in switchblade crimes nationwide, as noted in the

22   Congressional reports and hearings, must also have been evident to the California

23   Legislature when it passed [Penal Code section 17235 and 21510]." *People ex rel.*

24   *Mautner v. Quattrone*, 211 Cal. App. 3d. 1389, 1396 (Cal. Ct. App. 1989) (citing

25   Sen. Rep. No. 1980, 85th Cong., 1st Sess., and H.R. No. 9820, H.R. No. 10618,

26   H.R. No. 111289, 85th Cong., 2d Sess., pp. 1–33 (1958) [bills of the Federal

27   Switchblade Act].) Indeed, historical laws regulating Bowie knives and other

28   dangerous weapons were actually significantly more burdensome than California's

19

1    switchblade restrictions. ECF No. 33-1 at 17–18 (recognizing that many historical

2    analogues were broader in scope than the challenged statutes (e.g., regulating *all*

3    concealed knives and deadly weapons broadly) and that historical analogues were

4    particularly burdensome in an era where the single-shot pistol was unreliable,

5    inaccurate and widely disfavored).

6        Plaintiffs argue that the historical dangerous weapons laws are not analogous

7    because "there are no outright prohibitions on the manufacture, sale, possession,

8    and carry of any kind of knife during the Founding era, or the 19th century."[9] ECF

9    No. 34-1 at 28. This argument is predicated on the notion that the challenged

10   statutes impose an "outright prohibition" on switchblade knives—which, as

11   explained above, is misplaced. Plaintiffs' primary argument in response to

12   Defendant's historical analogues is that the challenged statutes regulate

13   pocketknives, which have been legal throughout American history. ECF No. 34-1 at

14   14. But this assertion notwithstanding, "folding pocketknives" are not at issue in

15   this case.[10] The challenged laws do not preclude Plaintiffs from owning folding

16   pocketknives generally; the law only regulates automatic-opening switchblade

17   knives that are two inches or longer and do not have a detent or safety mechanism.

18   Indeed, the law expressly excludes folding knives that "open[] with one hand."

19   (Cal. Penal Code § 17235.) As Plaintiffs recognize, many historical laws similarly

20   had exceptions for ordinary pocketknives. ECF No. 34-1 at 29 ("many of the

21   concealed carry restrictions identified by defense experts . . . explicitly exempted

22   pocket knives").

23        This Court is not required to find a historical twin as Plaintiffs demand; rather,

24   it must look to whether modern and historical regulations impose a comparable

25   ———————————

      [9] Moreover, given the historical context, there are many reasons states did not
26   impose "outright prohibitions" that no longer ring true today. *See* Spitzer Decl.,
      ¶ 47–48 (explaining the difficulties in prohibiting knife possession in early
27   America).
          [10] Not all switchblades are pocketknives. *See* Janich Transcript, p. 56 (stating
28   tjat the longest switchblade in his collection is 13-inches long and would not fit in
      his pocket).

(149 of 149) Page 149 of 149
Case 3:23-cv-00474-JES-DDL   Document 36   Filed 04/08/24   PageID.3118   Page 27 of 28
Case: 24-5536, 02/03/2025, DktEntry: 11.4, Page 149 of 149

burden on the right of armed self-defense and whether the burden is comparably justified. *Bruen*, 597 U.S. at 29. In *Ocean State Tactical*, the First Circuit relied heavily on similar dangerous weapons laws—and, in particular, historical regulations of Bowie knives—to justify Rhode Island's law banning possession of all large-capacity magazines. If such laws can be analogized to a possession ban of a firearms magazine, then they can certainly be analogized to the subset of switchblade knives regulated by the challenged statutes, which are much more similar to Bowie knives than are large-capacity magazines.

The historical laws regulating Bowie knives and other dangerous weapons also imposed a substantial burden in a time when the precursor to the modern handgun—the single-shot pistol—was unreliable, inaccurate and widely disfavored.[11] The First Circuit recognized recently that, "[a]t the time, Bowie knives were considered more dangerous than firearms." *Ocean State Tactical*, 95 F.4th, at 48. While a "gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. . . . [t]he bowie-knife differs from these in its device and design; it is the instrument of almost certain death." *Id.* (quoting *Cockrum v. State*, 25 Tex. 394, 402 (1859).). Any argument by Plaintiff that the historical analogues compiled by Defendant did not impose a significant burden on the right to self-defense ignores this historical reality.

Plaintiffs argue that many large fighting knives, similar to the ones presented in Defendant's historical laws, are legal in California. While that may be true, large fighting knives historically posed a significant danger because of their unique concealability. Rivas Decl., ¶ 4, 12, 13. Unlike hunting rifles which had to be carried openly, large knives could be concealed and carried into public places. *Id*. The switchblade is also easily concealable and brought to bear in public and was regulated for these reasons. Moreover, states are not obligated to impose every

---

[11] In contrast, fighting knives, like the Bowie knife, worked in wet and dry conditions and did not need to be reloaded after firing a single shot. Rivas Decl., ¶ 14.

21