No. 24-5536

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

―――――――――

KNIFE RIGHTS, INC., *et al.*,

*Plaintiff-Appellant*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant-Appellee.*

―――――――――

## On Appeal from the United States District Court
## for the Southern District of California
No. 3:23-cv-00474-JES-DDL
The Honorable James E. Simmons, Jr.

―――――――――

## APPELLEE'S ANSWERING BRIEF

―――――――――

ROB BONTA
 *Attorney General of California*
THOMAS S. PATTERSON
 *Senior Assistant Attorney General*
R. MATTHEW WISE
 *Supervising Deputy Attorney General*
MEGHAN STRONG
KATRINA UYEHARA
 *Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-7867
Katrina.Uyehara@doj.ca.gov
*Attorneys for Defendant-Appellee*

April 4, 2025

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................... 1

Statement of the Issues ........................................................ 3

Statement of the Case .......................................................... 3

    I.     Historical and Legal Background ............................ 3

         A.    California's 67-Year-Old Restrictions on
              Switchblade Knives ........................................... 3

    II.    Procedural History ................................................... 6

Summary of Argument ......................................................... 7

Argument .............................................................................. 9

    I.     Plaintiffs Have Failed to Establish That California's
        Restrictions on Certain Switchblade Knives Restrict
        Presumptively Protected Conduct ........................... 9

         A.    The Particular Switchblades Regulated by the
              Challenged Statutes Are Not Presumptively
              Protected Because They Are Not in "Common Use
              for Self-Defense" .......................................... 12

         B.    Switchblades Are Not Presumptively Protected
              Because They Are "Dangerous and Unusual" ............. 21

    II.    California's Restrictions on Switchblades Are Consistent
        With the Principles Underpinning Historical Weapons
        Regulations ............................................................ 26

         A.    *Rahimi* Offers Guidance on the Historical Analysis
              in Second Amendment Cases ......................... 27

         B.    California's Restrictions on Switchblades Accord
              with the Historical Tradition of Regulating
              Particularly Dangerous Uses of Weapons ................... 31

Conclusion ........................................................................... 43

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Aymette v. State*
21 Tenn. 152 (Tenn. 1840) ......................................................... 36

*B & L Prods. Inc. v. Newsom*
104 F.4th 108 (9th Cir. 2024) ..................................................... 10

*Barrios v. Holder*
581 F.3d 849 (9th Cir. 2009) ....................................................... 23

*Bevis v. City of Naperville*
85 F.4th 1175 (7th Cir. 2023) ...................................................... 13

*Caetano v. Massachusetts*
577 U.S. 411 (2016).......................................................... 9, 15, 17

*Commonwealth v. Canjura*
494 Mass. 508 (Mass. 2024)........................................................ 17

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*
601 U.S. 416 (2024)................................................................... 31

*Corbello v. Valli*
974 F.3d 965 (9th Cir. 2020) ....................................................... 27

*Craft v. United States*
403 F.2d 360 (9th Cir. 1968) ....................................................... 23

*Crowlery Cutlery Co. v. United States*
849 F.2d 273 (7th Cir. 1988) ....................................................... 23

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA I*)
664 F. Supp. 3d 584 (D. Del. 2023)............................................. 23

# TABLE OF AUTHORITIES
## (continued)

Page

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA II*)
  108 F.4th 194 (3d Cir. 2024) ........................................................ 14

*District of Columbia v. Heller*
  554 U.S. 570 (2008) ............................................................. *passim*

*Duncan v. Bonta*
  __ F.4th __ (9th Cir. Mar. 20, 2025) ..................................... *passim*

*Ellis v. Salt River Project Agric. Improvement & Water Dist.*
  24 F.4th 1262 (9th Cir. 2022) ...................................................... 27

*Fall v. Esso Standard Oil Co.*
  297 F.2d 411 (5th Cir. 1961) ...................................................... 23

*Fyock v. Sunnyvale*
  779 F.3d 991 (9th Cir. 2015) ................................................ 21, 24

*Haynes v. Tennessee*
  24 Tenn. 120 (Tenn. 1844) ..................................................... 36, 37

*In re Gilbert R.*
  211 Cal. App. 4th 514 (Cal. Ct. App. 2012) .............................. 19

*In re S.C.*
  179 Cal. App. 4th 1436 (Cal. Ct. App. 2009) ............................ 24

*Knife Rights, Inc. v. Garland, et al.*
  (N.D. Tex. No. 4-24-cv-926) ......................................................... 4

*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017) ...................................................... 16

*McCullen v. Coakley*
  573 U.S. 464 (2014) .................................................................... 22

# TABLE OF AUTHORITIES
## (continued)

Page

*McDonald v. City of Chicago*
    561 U.S. 742 (2010)..............................................................13, 16

*Nat'l Ass'n for Gun Rights v. Lamont*
    685 F. Supp. 3d 63 (D, Conn. 2023)....................................22, 25

*New York State Rifle & Pistol Ass'n v. Bruen*
    597 U.S. 1 (2022)...............................................................*passim*

*Ocean State Tactical, LLC v. State of Rhode Island*
    95 F.4th 38 (1st Cir. 2024)...................................................15, 22

*Or. Firearms Fed'n v. Kotek*
    682 F. Supp. 3d 874 (D. Or. 2023) ......................................14, 25

*People v. Davis*
    214 Cal. App. 4th at 1322, 1333 (Cal. Ct. App. 2013)..............25

*Rupp v. Bonta*
    723 F. Supp. 3d 837 (C.D. Cal. 2024) ........................................24

*Save Bull Trout v. Williams*
    51 F.4th 1101 (9th Cir. 2022) .....................................................27

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023) ................................11, 12, 17, 24

*United States v. Olloque*
    580 Fed. Appx. 584 (9th Cir. 2014)...........................................23

*United States v. Perez-Garcia*
    96 F.4th 1166 (9th Cir. 2024) .............................................8, 11

*United States v. Rahimi*
    144 S. Ct. 1889 (2024).....................................................*passim*

*United States v. Rahimi*
    602 U.S. 680 (2024).........................................................*passim*

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Salcedo*
452 F.2d 1201 (9th Cir. 1971) ....................................................23

**STATUTES**

United States Code, Title 18
§ 922(g)(8) ............................................................27, 28, 29

1820 Alabama
10...................................................................................37

1846 Florida
Ch. 75 ...........................................................................37, 38

California Penal Code
§ 653k..............................................................................3
§ 17235............................................................................*passim*
§ 21510............................................................................*passim*
§ 21590............................................................................5, 6

Massachusetts General Laws
Chapter 269, § 10 ...........................................................17

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Second Amendment............................................................*passim*

**OTHER AUTHORITIES**

4 Blackstone, *Commentaries on the Laws of England* 148 (1769) .................21

Schwoerer, *Gun Culture in Early Modern England* 55 (2016) .......................22

Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17-18 (ed. 1782) ..........................................................................21

**INTRODUCTION**

California prohibits the possession of switchblade knives with blades two inches in length or longer inside a vehicle in public, as well as the carry, sale, loan, or transfer of such switchblade knives. *See* Cal. Penal Code §§ 17235, 21510. California does not prohibit all possession of those types of weapons, including inside the home, and permits the possession, carry, and acquisition of a range of other weapons for lawful self-defense, including shorter switchblade knives, switchblade knives that open manually and have a detent or other safety mechanism (even if the blades are two inches or longer), and other edged weapons. The district court properly rejected Plaintiffs' facial challenge to these longstanding restrictions, which fully comport with the Second Amendment at both stages of the text-and-history standard announced in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). As a threshold matter, Plaintiffs failed to demonstrate that their proposed conduct is presumptively protected by the Second Amendment. And even if the subset of switchblades knives regulated by the challenged statutes were presumptively protected, California's restrictions are consistent with historical principles that underpin our Nation's traditions of weapons regulation. Throughout American history, governments have restricted particular uses of dangerous weapons prone to criminal misuse, including edged weapons and other concealable weapons.

1

Plaintiffs' "straightforward" (AOB 10, 15) understanding of the Second Amendment is foreclosed by this Court's precedent. In their view, the Second Amendment broadly protects a right to keep an arm for *any* lawful purpose, *id.* at 26, and the only question a court may ask in determining whether an arm may be restricted is how many of those instruments are possessed in the United States, *id*. at 30. If the number exceeds a certain unspecified threshold, "it is in common use and it is protected—full stop." *Id*. (internal quotations omitted). But this Court, sitting en banc, recently rejected that "simplistic approach" (*Duncan v. Bonta*, __ F.4th __, 2025 WL 867583, at *22 (9th Cir. Mar. 20, 2025) (en banc)) as incompatible with the Second Amendment's text and history.

Properly understood, the "Second Amendment right . . . extends only to certain types of weapons." *District of Columbia v. Heller*, 554 U.S. 570, 623 (2008); *see Bruen*, 597 U.S. at 21. It is not "a right to keep and carry any weapon whatsoever and for whatever purpose." *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626). In assessing whether a weapon is presumptively protected, the Supreme Court has considered the character of that weapon. It has never treated the aggregate number of weapons in circulation as dispositive of the Second Amendment analysis. Under the prevailing Second Amendment framework, Plaintiffs have not carried their threshold burden to establish that switchblade knives with blades of two or more inches are presumptively protected. And

2

California's regulation of those particular edged weapons is consistent with regulatory tradition.  This Court should affirm.

## STATEMENT OF THE ISSUES

Whether California's restrictions making it a misdemeanor to possess inside a vehicle, carry, sell, loan, or transfer a switchblade knife with a blade of two or more inches in length comport with the Second Amendment to the United States Constitution.

## STATEMENT OF THE CASE

### I. HISTORICAL AND LEGAL BACKGROUND

#### A. California's 67-Year-Old Restrictions on Switchblade Knives

In 1957, California enacted its original restrictions on switchblade knives at Penal Code Section 653k.[1]  This legislation was in response to a greater anti-switchblade movement during the 1950s, due to the use of switchblade knives for criminal activity.[2]  4-ER-00818, 22.  This led to a wave of anti-switchblade legislation throughout the country:  all but ten states enacted anti-switchblade laws

---

[1] In 2012, the Penal Code Sections pertaining to switchblade knives were reorganized and renumbered.  They are now primarily found in California Penal Code Sections 17235 and 21510.

[2] Switchblade knives also experienced greater circulation among young people and returning members of the military at the end of World War II, some of whom brought switchblades home from service in Europe.  4-ER-00826; *see also* 4-ER-00835 (stating that in 1956 hundreds of switchblades had been confiscated from soldiers stationed at three American military bases).

in the 1950s, and of those states without switchblade laws, many had pre-existing legislative restrictions against concealed weapon carrying, which included knives. 4-ER-00818–19.

This anti-switchblade movement culminated in 1958 with the passage of the federal Anti-Switchblade Act of 1958.[3]  4-ER-00818.  Of particular concern was the use of such knives by juveniles in crime.  4-ER-00822–25.  Senator Estes Kefauver, the proponent of the law, testified about the investigation conducted by the Senate Subcommittee on Juvenile Delinquency drawing out this relationship. 4-ER-00825.  According to testimony from the Subcommittee, police chiefs throughout the country reported that switchblade knives were frequently used by juvenile criminals.  4-ER-00825.  By the time the federal law was passed, at least twenty states had enacted similar restrictions on switchblades.  4-ER-00824.

California's restrictions are not a "complete switchblade knife ban," and the switchblade knives in question are not merely pocketknives.  AOB 7; 15-ER-04045–60 (Dkt. 1, Compl.).  Instead, Penal Code Section 17235 restricts only a subset of switchblade knives.  Section 17235 defines a "switchblade knife" as "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type of knife, the blade or

---

[3] That law is currently being challenged by the institutional Plaintiff in *Knife Rights, Inc. v. Garland, et al.* (N.D. Tex. No. 4-24-cv-926).

4

blades of which are two or more inches in length and which can be released automatically by the flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever." Cal. Penal Code § 17235. The statute also clarifies what knives do not qualify as switchblade knives. The definition of switchblade knife "does not include a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back toward its closed position." *Id*.

Section 21510 specifies that taking any of the following actions with a "switchblade knife" (as defined in Section 17235) is a misdemeanor:

> (a) possessing the knife "in the passenger's or driver's area of any motor vehicle in any public place or in any place open to the public";
> (b) carrying the knife upon one's person; and
> (c) selling, offering or exposing for sale, loaning, transferring, or gifting the knife to any person.

Cal. Penal Code § 21510.

In 1963, the California Legislature added an amendment to California's nuisance statute defining the unlawful possession or carrying of any "switchblade knife" in violation of Section 21510 as a "nuisance," allowing law enforcement officers to confiscate such weapons. Cal. Penal Code § 21590.

## II. PROCEDURAL HISTORY

In March 2023, Plaintiffs filed their complaint, challenging the constitutionality of California Penal Code Sections 17235, 21510, and 21590's restrictions on certain switchblade knives under the Second Amendment on their face.  15-ER-04045 (Dkt. 1, Compl.).  Plaintiffs are three individuals, two federally licensed firearm retailers, and Knife Rights, Inc, an institutional plaintiff, seeking declaratory and injunctive relief allowing them to possess and sell switchblade knives.  15-ER-04060 (Prayer for Relief).

The parties filed cross-motions for summary judgment.  Dkt. 33, 34.  Last August, the district court granted the Attorney General's motion and denied Plaintiffs' motion, holding that California Penal Code Sections 17235, 21510, and 21590 do not violate the Second Amendment.  1-ER-00003 (Dkt. 50, Order).  The district court applied *Bruen*'s text-and-history framework and held that California's restrictions on switchblade knives are constitutional at step one because Plaintiffs failed to satisfy their burden at *Bruen*'s threshold stage.  1-ER-00012–15.  Because Plaintiffs failed to show that the switchblade knives at issue are commonly used for self-defense and are not dangerous and unusual weapons, the district court held the

knives were not "Arms" presumptively protected by the Second Amendment, 1-ER-00016–18, and entered judgment for Defendant, 1-ER-00002 (Dkt. 51).[4]

## SUMMARY OF ARGUMENT

Plaintiffs' challenge to California's restrictions on automatic switchblade knives with blades two inches or longer fails as a matter of law. Under *New York State Rifle & Pistol Ass'n v. Bruen*, Plaintiffs have not shown that switchblade knives generally, let alone the particular switchblade knives regulated under the challenged statutes, are presumptively protected weapons in common use by civilians for ordinary self-defense. 597 U.S. 1, 32 (2022). Plaintiffs have failed to present evidence that the subset of switchblade knives regulated by the State are typically possessed by law-abiding citizens for self-defense, let alone that the subset of those knives bear the objective characteristics of a self-defense weapon. Plaintiffs' claim therefore fails at the threshold stage, as the district court correctly determined.

Even if the subset of switchblade knives regulated by the challenged statutes were entitled to presumptive protection under the Second Amendment, California's restrictions are consistent with "the historical tradition that delimits the outer

---

[4] Even though the district court was not required to do so, it proceeded to evaluate the restrictions at *Bruen*'s historical stage and concluded that the State had not shown that they were relevantly similar to the Nation's historical regulations in *how* they burdened the right to self-defense. 1-ER-00016.

bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. The State has demonstrated a robust tradition of restricting particularly dangerous and deadly edged and impact weapons throughout American history. California's restrictions on switchblade knives are consistent with the historical principle reflected in that tradition, restricting the manufacture, sale, carry, and even possession of particularly dangerous weapons prone to criminal misuse. Plaintiffs' "divide-and-conquer approach" to the historical record (*United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024)) is irreconcilable with *United States v. Rahimi*, 144 S. Ct. 1889 (2024), and the methodology recently applied by this Court in *Duncan v. Bonta*, __ F.4th __, 2025 WL 867583 (9th Cir. Mar. 20, 2025) (en banc). In *Rahimi*, the Supreme Court reiterated that the government does not need to identify a "'dead ringer' or a 'historical twin'" to justify a modern law, but rather need only show that the law "comport[s] with the *principles* underlying the Second Amendment." 144 S. Ct. at 1898 (emphasis added) (quoting *Bruen*, 597 U.S. at 30).

Plaintiffs endorse a wholly unprecedented approach for evaluating Second Amendment claims that is not supported by the Supreme Court or this Court's precedents. Relying on non-binding case law, Plaintiffs conflate both stages of the *Bruen* analysis, offering historical evidence that pocketknives and similar knives were purportedly commonly possessed in the past to argue that they are "in

8

common use" today. Plaintiffs also contend that this Court need not engage in an independent historical analysis because both *Bruen* and *Heller* have already established the relevant contours of the historical tradition. Finally, at *Bruen*'s historical stage, Plaintiffs provide evidence of switchblade sales and ownership figures today and apply the *Caetano v. Massachusetts* concurrence's numbers-based approach to common use, even though that approach has never been adopted by this Court. This distortion of *Bruen*'s text-and-history analysis results in Plaintiffs failing to provide relevant evidence to carry their burden at *Bruen* step one. And Plaintiffs have failed to rebut the robust historical evidence presented by the State at *Bruen* step two. Accordingly, California's targeted restrictions on certain automatic switchblade knives satisfy both steps of the *Bruen* standard.

## ARGUMENT

I. **PLAINTIFFS HAVE FAILED TO ESTABLISH THAT CALIFORNIA'S RESTRICTIONS ON CERTAIN SWITCHBLADE KNIVES RESTRICT PRESUMPTIVELY PROTECTED CONDUCT**

The district court correctly held that Plaintiffs failed to meet their burden at *Bruen*'s threshold stage. 1-ER-00016. Plaintiffs did not show that the subset of switchblade knives restricted by the State are in common use today for self-defense. 1-ER-00016. As the district court observed, Plaintiffs elected to use their "own" "created test" and failed to identify any "relevant authority establishing the 'numerical, jurisdiction, and categorical' commonality test they apply." 1-ER-

00011, 00013. As a result, Plaintiffs did "little to illustrate common use for self-defense." 1-ER-00013.

The correct threshold question under the *Bruen* framework is whether Plaintiffs have carried their burden to establish that "the Constitution presumptively protects" their proposed course of conduct. *Bruen*, 597 U.S. at 24; *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024), *pet. for cert. filed*, No. 24-598 (U.S. Dec. 3, 2024). To answer that question, the Court addresses whether "the Second Amendment's plain text covers" Plaintiffs' proposed course of conduct. *Bruen*, 597 U.S. at 24. That inquiry considers "the normal and ordinary meaning of the Second Amendment" informed by its "historical background." *Id*. at 20 (internal quotation marks omitted).

The Second Amendment's text protects "the right of the people to keep and bear Arms."[5] The meaning of the term "Arms" is broad. *See Heller*, 554 U.S. at 581. The term is "fixed according to its historical understanding," *Bruen*, 597 U.S. at 28, and includes "'[w]eapons of offence, or armour of defence,'" *Heller*, 554 U.S. at 581; *see id*. ("'any thing that a man wears for his defence, or takes into his hands or useth in wrath to cast at or strike another'" (quoting 1 Dictionary of the English Language 106 (4th ed)). The Supreme Court has emphasized that not

---

[5] The State does not contest the district court's finding that Plaintiffs are part of the people for purposes of the Second Amendment's threshold analysis.

every "*type of weapon*" is "eligible for Second Amendment protection." *Id*. at 622. In determining what types of weapons fall within the scope of the Second Amendment right, as originally understood, the Supreme Court has clarified that only "weapons 'in common use' today for self-defense" are eligible for protection. *Bruen*, 597 U.S. at 32; *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (situating the "common use for self-defense" inquiry at the first step of the *Bruen* analysis).[6] Relatedly, the Second Amendment does not protect "dangerous and unusual weapons,'" which governments "may ban" "because the Second Amendment does not guarantee an unlimited right to possess every kind of weapon." *Perez-Garcia*, 96 F.4th at 1177 (citing *Heller*, 554 U.S. at 627).

Plaintiffs contend that this standard is flawed because switchblades, like manually opening knives and bolt action rifles, "are commonly used and can be used for any lawful purposes, including self-defense." AOB 27. However, Plaintiffs' test would sweep in any and all weapons that could possibly be used for any lawful purpose, including weapons that the Supreme Court has made clear are not constitutionally protected, like rocket launchers and weapons most useful for military service. *Heller*, 554 U.S. at 627.

---

[6] This Court recently affirmed that *Alaniz* remains good law. *See Duncan*, 2025 WL 867583, at *7 n.2.

11

**A.   The Particular Switchblades Regulated by the Challenged Statutes Are Not Presumptively Protected Because They Are Not in "Common Use for Self-Defense"**

To be a presumptively protected "Arm," it is not sufficient for the regulated instrument to be "anything that a man wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another."  AOB 22 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008)).  The regulated weapon must also be "'in common use' today for self-defense."  *Bruen*, 597 U.S. at 32; *see United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).  Plaintiffs incorrectly contend that the common use analysis focuses on whether "automatically opening knives (switchblades) are commonly used for any lawful purposes, including self-defense."  AOB 27.  This interpretation directly conflicts with *Alaniz* and is far too broad because it addresses all switchblade knives, not the more specific subset of switchblade knives at issue in this case.

This Court recently recognized that "'there is no consensus'" on whether the common use analysis is a threshold, textual, or historical inquiry.  *Duncan v. Bonta*, 2025 WL 867583, at *7 n.2 (9th Cir. March 20, 2025) (en banc) (quoting *Hanson v. District of Columbia*, 120 F.4th 223, 232 n.3 (D.C. Cir. 2024)).  While the Court declined to resolve the issue, it observed that *Alaniz* addressed common use in "the initial, textual determination" and "remains good law."  *Id*.

12

*Bruen* also compels this sequence of analysis. In *Bruen*, the Court first asked whether the plaintiffs were "part of 'the people' whom the Second Amendment protects," *Bruen*, 597 U.S. at 31-32; whether handguns "are weapons 'in common use' today for self-defense," *id*. at 32; and "whether the plain text of the Second Amendment protects [plaintiffs'] proposed course of conduct," *id*. Only *after* answering those questions in the affirmative did the Court treat that conduct as "presumptively" protected (*id*. at 33) and place "the burden . . . on [the State]" to show that its law was "consistent with this Nation's historical tradition." *Id*. at 33-34.

In *Heller*, *McDonald*, and *Bruen*, the Supreme Court held out "individual self-defense" as the "'*central component*' of the Second Amendment right." *Bruen*, 597 U.S. at 29 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), in turn quoting *Heller*, 554 U.S. at 599). The Court has reiterated that "the right secured by the Second Amendment is not unlimited" and is not "a right to keep and carry any weapon whatsoever and for whatever purpose," *id*. at 21 (quoting *Heller*, 554 U.S. at 626).

To qualify for presumptive protection, the regulated weapon must have the "character" of a "self-defense weapon," *Heller*, 554 U.S. at 622, 629—one that is widely used in ordinary self-defense and is well-suited for that constitutionally protected purpose. *See also Bevis v. City of Naperville*, 85 F.4th 1175, 1192 (7th

13

Cir. 2023) ("Both Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense."), *cert denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA II*) 108 F.4th 194, 211 (3d Cir. 2024) (Roth, J., concurring) ("Limiting the scope of 'bearable arms' to those that are used for self-defense comports with the 'normal and ordinary meaning' of 'bear arms.'").[7]  In assessing "common use" for self-defense, courts should consider "objective evidence" of suitability and use of a weapon in self-defense, not the purported popularity of a weapon or the subjective views of its owners.  *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 918-922 (D. Or. 2023); *see Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and aim than a long gun and can be used with a single hand while the other hand dials the police).

Plaintiffs have not shown that switchblade knives with blades of two inches or longer are commonly used today for ordinary self-defense.  Plaintiffs rely on a

---

[7] *Rahimi* further confirmed that self-defense, and not simply any lawful purpose, is the purpose protected by the Second Amendment.  *See* 144 S. Ct. at 1897 (noting that "the [Second Amendment] right secures for Americans a means of self-defense").

strained interpretation of Justice Alito's concurrence in *Caetano v. Massachusetts* for the proposition that the mere fact that thousands own switchblades demonstrates that they are in common use.[8]  AOB 30-39 (relying on 577 U.S. 411 (2006) (Alito, J., concurring).  But the concurrence is not binding on this Court and has been rejected by others.  *Ocean State Tactical, LLC v. State of Rhode Island*, 95 F.4th 38, 51 (1st Cir. 2024) (recognizing that the plaintiffs in that case erred in treating the concurrence in *Caetano* as binding authority); *see also id.* (recognizing, in addition, that *Caetano* only addressed stun guns, a non-lethal weapon); *see also Caetano*, 577 U.S. at 420 (Alito, J., concurring) (emphasizing that the case involved non-lethal weapons that were "widely . . . accepted as a legitimate means of self-defense across the country").  *Bruen* makes clear that the test for Second Amendment protection of a particular weapon is *common use*, not *common ownership*.  *Bruen*, 597 U.S. at 32, 47.  In any event, even under Plaintiffs' preferred formulation of the test, their argument would fail, because the evidence they presented of "the number of switchblades allegedly sold in the country—generally, not the kind specifically regulated here—does not prove they

---

[8] Justice Alito's concurrence does not even clearly support a numbers-only approach.  That discussion was in direct response to the Massachusetts Supreme Judicial Court's observation that the number of stun guns was dwarfed by the number of firearms in circulation.  *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (recognizing that hundreds of thousands owning stun guns was "[t]he more relevant statistic").

are commonly used today for self-defense." 1-ER-00013; *see Duncan*, 2025 WL 867583, at *23 (rejecting ownership-statistics standard that would extend Second Amendment protection to instruments "no matter how rarely that [instrument] is used in armed self-defense").

The district court likewise rejected two variations of this argument. Plaintiffs first claim that weapons that are common jurisdictionally are in common use. AOB 38-39. The district court observed that "whether other jurisdictions do not regulate switchblades is irrelevant and it does not illuminate whether the regulated switchblades are in common use today for self-defense." 1-ER-00013. The district court recognized that *McDonald v. City of Chicago* held that states have the ability to legislate solutions to suit local values and needs. *Id*. (citing *McDonald v. City of Chicago*, 561 U.S. 742, 784-785 (2010). California need only ensure that its laws pass constitutional muster, not that they align with laws of other states. Although the Supreme Court has defined the outer bounds of permissible regulations, it has not "abrogate[d] states' core responsibility of "[p]roviding for the safety of citizens within their borders." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by Bruen*, 597 U.S. 1. The district court also rejected Plaintiffs' "categorical commonality" argument (AOB 36-38) and correctly determined that Plaintiffs' emphasis on the similarities between

16

switchblades and other folding or pocketknives did "not address whether the regulated switchblades are in common use." 1-ER-00013.

Aside from *Caetano*, Plaintiffs rely heavily on *Commonwealth v. Canjura*, 494 Mass. 508 (Mass. 2024), a Massachusetts Supreme Court case that is not binding on this Court and addresses a law much broader than the restrictions at issue here. *Canjura* concerned a complete ban on all switchblade knives. *Id*. at 508*; see* Mass. Gen. Laws ch. 269. § 10 (2024). California's restrictions only address certain long-bladed switchblades, which are uniquely suitable for melee and offensive fighting: those with blades over two inches in length that are opened automatically or manually without a detent or other safety mechanism.[9]

While Plaintiffs failed to meet their burden to provide evidence of common use for self-defense, the State's experts confirmed that the subset of switchblade knives restricted by the State are not suitable for "ordinary self-defense." *Bruen*, 597 U.S. at 60. Both Plaintiffs' and the State's experts are in agreement that extensive training is required to use a switchblade knife safely and effectively for self-defense. *Compare* 4-ER-00802–00803, 00806 (Expert Report of Robert

---

[9] The Massachusetts Supreme Court also made several errors in its Second Amendment analysis. For example, the *Canjura* Court appears to have injected an analysis of historical weapons and knives into the threshold stage of the *Bruen* inquiry. *Canjura*, 494 Mass. at 511-513. The inquiry is not whether the regulated weapon was in common use in 1789 or 1868, but whether the weapon is in common use for self-defense today. *Alaniz*, 69 F.4th at 1128.

Escobar), *with* 3-ER-00432, 00435 (Deposition of Rebuttal Expert Michael Janich). Plaintiffs' expert explained that he recommends using training knives—models of knives that replicate the actual feel of a knife but are dull—when teaching classes on how to use knives for self-defense. 3-ER-00441. However, very few knife companies produce training knives for automatic switchblade knives. 3-ER-00441. As a result, it can be difficult to practice using a switchblade for self-defense.

There are also significant psychological barriers to using knives for self-defense. Unlike with a firearm, a self-defense situation involving a switchblade knife is inherently a close-combat encounter—one that will likely require the cutting of tissue, ligaments, and muscles, and result in subsequent blood loss. 4-ER-00804; *see also* 3-ER-00433–00435 (Plaintiffs' rebuttal expert identifying the quadriceps and median and ulnar nerves as prime targets for knife self-defense).[10] The nature of such an encounter raises the significant question of whether an ordinary person would be capable of effectively using a knife for self-defense. 4-ER-00804–00805.

---

[10] Plaintiffs spend considerable time attacking the State's weapons expert Robert Escobar and generally claim that their expert, Michael Janich, disputes every one of Escobar's claims. AOB 44-45. But Plaintiffs do not point this Court to those specific disputes, nor did they challenge the State's expert in the district court. Moreover, the district court found Robert Escobar did not make any conflicting statements. 1-ER-00014.

Aside from such psychological barriers, switchblades are generally ill-suited for self-defense. All switchblades store the blade within the handle of the knife. Both out-the-front and folding versions of the knife require the user to seat the knife in their hand in a certain way to avoid injury upon deployment of the blade. 4-ER-00800. In addition, many users may struggle to disengage the safety on the switchblade or may accidentally deploy the knife, causing injury to the user. 4-ER-00803–00804; *see also In re Gilbert R.*, 211 Cal. App. 4th at 612 (recognizing that the detent exception to Penal Code Section 21510 is "prudent and a matter of public safety as [a detent] will ensure the blade will not inadvertently come open"). As a result, users risk injury and delay in attempting to deploy a switchblade for self-defense.

Switchblade knives must also lock in place in order to be used for self-defense. This is supposed to happen automatically, but on occasion, these knives can fail to lock and are rendered effectively unusable. 4-ER-00802–00803. In contrast, fixed blade knives need only be unsheathed to be ready to use, and folding knives without automatic features give their users tactile feedback that the knife has opened and locked into place. 4-ER-00802–00803. By their very nature, an automatic switchblade knife incorporates more complicated mechanical parts that can fail. 4-ER-00800; 3-ER-00484.

19

And folding switchblades can be even more difficult to use because they require an even more complicated multi-step, fine-motor-skill operation to open the blade of the knife. 4-ER-00801–00802. This fine motor skill requires training and practice to be used in an actual, adrenalized self-defense scenario. 4-ER-00802. Bringing a folding switchblade to bear in a high-stress self-defense situation is difficult. *See* 4-ER-00802; 3-ER-00432.[11]

In short, a switchblade is a far cry from the "quintessential self-defense weapon" discussed in *Heller* and *Bruen*. It requires its users to be trained in close hand-to-hand combat, to be psychologically prepared to slash or stab in self-defense, and to use fine motor skills to deploy the blade to effectively deploy a switchblade in self-defense, assuming that the knife is not wrested away during self-defense encounter and used by the attacker against the user.[12] Because

---

[11] Plaintiffs note that none of the State's experts cite crime data relating to switchblades from 1958 to 2024. AOB 41. While *Bruen* does not require the government to produce evidence of crime data to justify its regulations, the State's expert conducted an analysis of the term "switchblade" in historical newspapers, which showed a significant increase in their criminal use in the 1950s. 4-ER-00819–22. That same expert also explained that record-keeping of crime data and sales data at the time the restrictions were enacted was far more primitive, limited, decentralized, and incomplete. 4-ER-00826.

[12] For these reasons, militaries all over the world prefer fixed blade knives. 4-ER-00804; *see also* 4-ER-00825 n.27 (stating that in 1957 switchblades knives were not standard military issue).

Plaintiffs cannot establish that switchblades are commonly used for self-defense, their claims fail at the threshold stage.

### B. Switchblades Are Not Presumptively Protected Because They Are "Dangerous and Unusual"

Switchblades are also not presumptively protected "Arms" for the separate reason that they are "dangerous and unusual" weapons. In *Heller*, the Supreme Court made clear that it did not intend to cast doubt on the constitutionality of longstanding prohibitions traditionally understood to be outside the scope of the Second Amendment. *Heller*, 554 U.S. at 626; *see also Fyock v. Sunnyvale*, 779 F.3d 991, 996-997 (9th Cir. 2015). One such "historical tradition" is the prohibition on "dangerous and unusual weapons." *Heller*, 554 U.S. at 627.

The district court held that Plaintiffs failed to show that the switchblade knives at issue were not dangerous and unusual weapons. 1-ER-00015. While the State agrees with this outcome, the district court erred in its analysis of the issue. The view that the phrase "dangerous and unusual" imposes a two-part test, where each word has independent meaning, has never been adopted by a majority of the Supreme Court, and it is inconsistent with the leading treatise cited in *Heller* and *Rahimi* and other historical sources. *See* 4 Blackstone, *Commentaries on the Laws of England* 148 (1769) (referring to "dangerous *or* unusual weapons" (emphasis added)); Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17-18 (ed. 1782) (identifying certain

21

dangerous weapons that may be "restrain[ed]" without reference to numerical prevalence).

"Dangerous and unusual" refers to especially dangerous weapons. A weapon qualifies as dangerous and unusual if it has some heightened "level of lethality or capacity for injury" that makes the weapon "especially dangerous." *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 90 (D. Conn. 2023). To fall within that category, the weapon need not be numerically rare, or to put it another way "unusual." *See Ocean State Tactical*, 95 F.4th at 50 (noting that the Supreme Court "has not held that states may permissibly regulate only unusual weapons"). Governments often regulate weapons only after they become sufficiently prevalent in society that they pose a significant and widely known danger to the public. *See McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (noting that governments do not "regulate for problems that do not exist"); *cf. Rahimi*, 144 S. Ct. at 1295 (Barrett, J., concurring) (noting that the "assum[ption] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority," is "flawed").

Indeed, history shows that particularly dangerous weapons have often been regulated only after their ownership and use had already become widespread. Henry VIII, for example, prohibited crossbows precisely because of concerns arising from their increased popularity and use. *See* Schwoerer, *Gun Culture in*

*Early Modern England* 55 (2016) (noting the "wanton pleasure that men now have in using crossbows"). The same goes for Bowie knives and the other impact weapons in the State's historical analysis, which were regulated after they "proliferated in civil society." *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA I*), 664 F. Supp. 3d 584, 602 (D. Del. 2023).

Federal courts across the country have long recognized that switchblades are uniquely dangerous weapons that are not typically possessed for law-abiding purposes. *See Crowlery Cutlery Co. v. United States*, 849 F.2d 273, 278 (7th Cir. 1988) ("Switchblade knives are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use."); *Fall v. Esso Standard Oil Co.*, 297 F.2d 411, 416-417 (5th Cir. 1961) ("It is now well settled beyond a doubt that a switchblade knife is a dangerous weapon."). Numerous Ninth Circuit cases confirm the relationship between switchblade knives and criminal activity. *See, e.g.*, *Barrios v. Holder*, 581 F.3d 849, 853 (9th Cir. 2009) (noting that in Guatemala a gang cut a person seeking immigration relief with a switchblade); *United States v. Salcedo*, 452 F.2d 1201 (9th Cir. 1971) (finding that a switchblade knife and a container of heroin found by a Border Control Agent supported a drug smuggling conviction); *Craft v. United States*, 403 F.2d 360, 362 (9th Cir. 1968) (affirming conviction for the illegal importation of marijuana and switchblades); *United States v. Olloque*, 580 Fed. Appx. 584, 584

23

(9th Cir. 2014) (affirming conviction of possession and intent to distribute drugs, noting that officers found a switchblade along with drug paraphernalia). California courts have similarly recognized that switchblades are not typically possessed by law-abiding citizens for lawful purposes. *See, e.g.*, *In re S.C.*, 179 Cal. App. 4th 1436, 1441 (Cal. Ct. App. 2009) ("A switchblade carried on the person represents a constant threat to others, whether carried in public or in private. A switchblade carried at home, for example, is dangerous to family members and house guests during an argument."). These cases demonstrate that the switchblade is uniquely dangerous, thus placing the proposed conduct outside the scope of the Second Amendment.

On appeal, Plaintiffs continue to insist that a weapon that is commonly owned cannot also be dangerous and unusual. AOB 31. Plaintiffs also contend that "*Heller* already conducted the historical analysis" concerning dangerous and unusual weapons and "[t]his Court need only apply that historical principle to the facts in this case." AOB 46. But this argument incorrectly places the dangerous and unusual analysis in the wrong part of the *Bruen* framework. *Alaniz*, 69 F.4th at 1129; *see also Rupp v. Bonta*, 723 F. Supp. 3d 837, 849-850 (C.D. Cal. 2024) (recognizing that placing the dangerous and unusual analysis in the historical analysis "was in direct tension with *Fyock*," "directly contradicted *Alaniz*," and "was out of step with most courts that have considered the issue").

24

Whether a weapon is dangerous and unusual is properly considered at *Bruen*'s threshold inquiry into whether a weapon is presumptively protected.  *See, e.g.*, *NAGR*, 685 F. Supp. 3d 63, 88 (D. Conn. 2023) ("*Heller* may have discussed the common use test as part of the 'historical tradition' of prohibiting dangerous and unusual arms, rather than the 'plain text' . . . but *Heller* stressed that text and history are inextricably intertwined . . . and that the text itself is defined by its original meaning, including the history and tradition behind it."); *Or. Firearms Fed'n*, 682 F. Supp. 3d at 922.  In *Heller*, the Court explained that an "important limitation on the right to keep and carry arms" is "that the sorts of weapons protected were those 'in common use at the time.'  We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  554 U.S. at 627.  Thus, it is Plaintiffs—not the State— who bear the burden of showing that switchblades are not dangerous and unusual.

In response to the State's evidence, Plaintiffs claim that switchblade knives are generally less dangerous than firearms and that the State has not shown they are more dangerous than other kinds of knives.  AOB 41-42.  However, *Heller* did not hold that any less-than-lethal weapon is off-limits from regulation simply because more-lethal handguns may be protected.  Even though a gun is the weapon of choice in most violent crimes, that does not mean other weapons are not ordinarily used for criminal and unlawful purposes.  *See Davis*, 214 Cal. App. 4th

at 1333 (quoting *Grubb*, 63 Cal. 2d at 620). Indeed, throughout American history, governments regulated concealable impact and edged weapons even as they regulated certain firearms as they became more lethal and widespread. Moreover, Plaintiffs bear the burden for this issue and have failed to establish that the subset of switchblade knives at issue are not unusually dangerous. Because the limited range of switchblade knives regulated under the challenged statutes are not commonly used for self-defense and are dangerous and unusual, California's switchblade laws are constitutional at step one of the *Bruen* inquiry.

## II. CALIFORNIA'S RESTRICTIONS ON SWITCHBLADES ARE CONSISTENT WITH THE PRINCIPLES UNDERPINNING HISTORICAL WEAPONS REGULATIONS

Even if the Court holds (or assumes) that the kinds of switchblades restricted by the State are presumptively protected by the Second Amendment, California's restrictions on them are constitutional because they are consistent with the Nation's regulatory tradition. The district court's determination to the contrary failed to give sufficient weight to the State's robust record of historical analogues, which establish that governments have long targeted for heightened regulation weapons— including concealable edged and impact weapons—that are especially dangerous

or particularly susceptible to criminal misuse, while leaving other instruments and weapons available for lawful self-defense.[13]

## A. *Rahimi* Offers Guidance on the Historical Analysis in Second Amendment Cases

While the parties were awaiting a decision in this case, the Supreme Court issued its opinion in *United States v. Rahimi*, 144 S. Ct. 1889 (2024). Both parties submitted notices of supplemental authority for the case, Dkt. 45, 46, and the district court concluded that "*Rahimi* provides no additional support to the Court's *Bruen* analysis." 1-ER-00019. To the contrary, *Rahimi* "is instructive." *Duncan*, 2025 WL 867583, at *20.

*Rahimi* provides helpful guidance on the Second Amendment framework first announced in *Bruen* and further confirms that California's switchblade restrictions are consistent with regulatory tradition. *Rahimi*, 602 U.S. 680. In an 8-1 decision, the Court rejected a facial challenge under the Second Amendment to 18 U.S.C. § 922(g)(8), which prohibits individuals subject to certain domestic violence

---

[13] Plaintiffs contend that the district court's analysis of *Bruen*'s historical stage is final because the State did not cross-appeal. AOB 15. Plaintiffs are wrong. A party who wishes simply to defend a favorable judgment, even on different grounds from those relied upon by the district court, need not file a cross-appeal. A cross-appeal is required only when an appellee requests a substantive change in the district court judgment. *Ellis v. Salt River Project Agric. Improvement & Water Dist.*, 24 F.4th 1262, 1268 (9th Cir. 2022); *see also Corbello v. Valli*, 974 F.3d 965 (9th Cir. 2020); *Save Bull Trout v. Williams*, 51 F.4th 1101, 1107 (9th Cir. 2022).

restraining orders from possessing a firearm. 602 U.S. at 693. The Court explained that "some courts have misunderstood the methodology of our recent Second Amendment cases," noting that those "precedents were not meant to suggest a law trapped in amber." *Id*. at 691. The Court explained that the history-and-tradition approach first articulated in *Bruen* "involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id*. at 692 (emphasis added). To show that a modern law is consistent with those principles, the government need not identify "a 'dead ringer' or a 'historical twin.'" *Id*. Instead, the government need only show that "the new law is 'relevantly similar' to laws that our Nation's historical tradition is understood to permit." *Id*.

Applying that analytical framework to Section 922(g)(8), the Court identified "two distinct legal regimes" relevant to its analysis: surety laws and prohibitions on "going armed" in public. *Id*. at 694-695. The Court acknowledged that Section 922(g)(8) is "by no means identical" to the surety and going armed laws, but recognized that "it does not need to be" because the statute "fits neatly within the tradition the surety and going armed laws represent." *Id*. at 698. Ultimately, the Court had "no trouble" concluding that section 922(g)(8) falls within this regulatory tradition, which allows the government to "disarm individuals who present a credible threat to the physical safety of others." *Id*. at 700. It did so even

28

though Section 922(g)(8) imposed a greater burden on the right to armed self-defense than the historical analogues. *See Duncan*, 2025 WL 867583, at *20 (referencing Justice Thomas's dissent in *Rahimi*, which pointed out that the historical surety laws "imposed no burden whatsoever on armed self-defense").

Here, the district court made several errors in its historical analysis. First, the district court heightened the government's burden by requiring the State to "identify what qualities about bowie knives make [Bowie knife restrictions] a 'representative' analogue," and similarly to "describe what properties clubs have that are similar to the regulated switchblades." 1-ER-00017. In other words, the district court required the State to produce the sort of "dead ringer" or "historical twin" that *Bruen* expressly prohibited. *Bruen*, 597 U.S. at 30. *Rahimi*'s analysis of surety laws and prohibitions on "going armed" in support of 18 U.S.C. § 922(g)(8) makes clear that the State was not required to identify particular qualities of antique weapons to rely on historical regulations of those weapons. *Rahimi*, 602 U.S. at 697-698.

Second, the district court disregarded *Rahimi*'s emphasis on the importance of the *principles* that underpin our regulatory tradition. *Id*. at 692. While the State's historical analogues include weapons other than switchblade knives, the principles underpinning those laws are the same. California's switchblade restrictions fit

29

comfortably within the robust American tradition of restricting particularly dangerous and deadly edged and impact weapons throughout American history.

Plaintiffs also misunderstand the historical stage of the *Bruen* framework. On appeal, Plaintiffs continue to insist that the Court need not engage independent historical analysis at all because, in their view, "both *Bruen* and *Heller* have already established the relevant contours of the tradition" in this case: the historical tradition of prohibiting the carrying of dangerous and unusual weapons. AOB 29; *see also* Dkt. 34-1 (Pls.' Mot. for Summ. J.). But if this Court holds (or assumes) that the subset of switchblade knives at issue are presumptively protected, *Bruen* directs that the State must have an opportunity to justify the challenged law by pointing to evidence that it is consistent with our Nation's historical tradition.

Plaintiffs attempt to sidestep that inquiry, urging the Court to rely on *modern* ownership numbers and *contemporary* laws of other jurisdictions as the sole and dispositive evidence of *historical* tradition. And when they turn to the actual evidence of tradition, they effectively demand a historical twin. *Bruen* does not support these arguments. *Rahimi* similarly forecloses Plaintiffs' argument (*see* AOB 52, fn. 8) that local and territorial laws should be disregarded. *Rahimi* relied on surety laws from two territories and the District of Columbia. *See* 144 S. Ct. at 1900 (citing *Bruen*, 597 U.S. at 56 & n.23, which included an 1838 Wisconsin

territorial law, 1851 Minnesota territorial law, and 1857 District of Columbia law).

Finally, contrary to Plaintiffs' contention that "1791 must be the controlling time"

for *Bruen*'s historical analysis, the Supreme Court expressly declined to resolve

that issue, 597 U.S. at 38, as did *Rahimi*, 144 S. Ct. at 1898 n.1. But *Rahimi* did

rely on surety laws enacted in the mid-nineteenth century, long after the ratification

of the Second Amendment, to define the relevant principle. *See id*. at 1900 (citing

*Bruen*, 597 U.S. at 56 & n.23, which gathered laws enacted between 1838 and

1868); *id*. at 1910 (Kavanaugh, J., concurring) (explaining that Second

Amendment analysis properly encompasses "pre-ratification and post-ratification

history"); *cf. Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601

U.S. 416, 445 (2024) (Kagan, J., concurring) (considering "a continuing tradition"

"[t]hroughout history" in addition to "founding-era history).

## B. California's Restrictions on Switchblades Accord with the Historical Tradition of Regulating Particularly Dangerous Uses of Weapons

The historical record assembled by the State confirms the principle that

governments can regulate (and outright prohibit) particularly weapons that are

particularly dangerous or susceptible to criminal misuse, so long as alternative

weapons remain available for self-defense. This is especially true of certain

weapons that become associated with criminality or threats to public order and

safety after proliferating in society. In such circumstances, it is common for

government to enact a variety of restrictions on that particular weapon, while leaving a range of alternatives available to law-abiding citizens for self-defense. 4-ER-00817; *see also* 4-ER00839–00840. In *Duncan*, this Court recently relied on some of the same historical laws and recognized that "beginning before the Founding and continuing throughout the Nation's history, legislatures have enacted laws to protect innocent persons from especially dangerous uses of weapons once those perils have become clear." 2025 WL 867583, at *24.

The State's restrictions on a subset of switchblade knives are "consistent with the principles that underpin our regulatory tradition" because they are "relevantly similar" to historical weapons restrictions, *Rahimi*, 602 U.S. at 692—they "impose a comparable burden on the right of armed self-defense" that "is comparably justified," *Bruen*, 597 U.S. at 29.

Plaintiffs take a "divide and conquer approach to the historical evidence" presented by the State, arguing that these carry restrictions and other related laws are not analogous. AOB 49-50. Yet all of the cited laws fit within a broad tradition of regulating deadly impact weapons. For example, state and municipal taxes imposed on certain enumerated weapons, including Bowie knives, AOB 53, are among the ways deadly weapons have been regulated as part of a multifaceted regulatory scheme.

Here, the State relies on the same category of significant weapons restrictions relied on in *Duncan*, which is "restrictions on weapons after their use by criminals exposed an especially dangerous use of the weapon" which "date from long before the Founding and continue to today." *Duncan*, 2025 WL 867583, at *43.

Each of the dangerous weapons regulated by the State's analogues—Bowie knives, clubs, bludgeons, billy clubs, slungshots, and sandbags—share at least two important similarities that make them relevant to the *Bruen* analysis: they were edged and impact weapons capable of fatally striking a person quickly, and they became a weapon associated with criminality or threats to public order and were regulated as a result. As the State's historical expert explained, a fundamental feature of early legislatures' regulatory approach was the distinction these legislatures drew between two types of weapons: (1) "arms suitable for militia service or hunting" and (2) "concealable weapons associated with interpersonal violence" which were known as "deadly weapons." 3-ER-00478; *see also* 3-ER-00480. Arms suitable for militia service or hunting—rifles, muskets, and shotguns—could not be readily concealed and were carried openly by a shoulder strap or attached to a saddle. 3-ER-00479. These arms were not likely to be used in the commission of crimes, particularly for crimes of passion that resulted in murder and manslaughter. 3-ER-00479. Those crimes were much more likely to

33

be committed with the easily concealable, blunt impact weapons known as "deadly weapons" that were restricted by state legislatures. 3-ER-00479.

In the nineteenth century, it became more common for Americans to publicly carry and use these deadly weapons. 3-ER-00479. Rates of homicide and the lethality of weapons rose together, and as deadly weapons became more prevalent in public spaces, lawmakers responded by regulating these weapons. *Id*; 4-ER-00828. Such laws were enacted based on the prevailing view of the time that a person who carried a deadly weapon was likely to be a ruffian, burglar, or assassin—a person predisposed to settle personal agreements by blood rather than law. 3-ER-00479–00480; 4-ER-00829.

Of those weapons, no other weapon serves as a better analogy to the types of switchblade knives that California currently regulates than the Bowie knife. In the antebellum era, the Bowie knife became of one of the most widely regulated weapons. The Bowie knife was a large, single-edged knife infamously used by Jim Bowie to kill a man in a duel in 1827. *Duncan*, 2025 WL 867583, at \*43; 3-ER-00482; *see also* 4-ER-00826. The story of Jim Bowie and the mythology related to his story led to the proliferation of the knife.[14] 3-ER-00483; *see also* 4-ER-99826.

---

[14] This is not unlike the switchblade itself, which experienced heightened popularity following its prevalence in pop culture and the media in the 1950s and 1960s. 4-ER-00819, 00822.

The exact details of the original Bowie knife are unknown, but versions of the knife became more standardized over time. 3-ER-00482; 4-ER-00827. For example, some folding Bowie knives existed. 3-ER-00484. However, over time, the Bowie knife came to generally be recognized as a large, eight to twelve-inch knife with a clipped blade—one with a sharpened swedge making it more lethal, with the point generally aligned with the handle. 3-ER-00482–00483. The knife was widely used in fights and duels, even though this practice was widely disfavored. *Duncan*, 2025 WL 867583, at \*43-\*44; *see also* 3-ER-00483; 4-ER-00827.

The public safety concerns surrounding Bowie knives and other thin long-bladed knives were ubiquitous. 4-ER-00832–00833. Accordingly, states enacted a variety of restrictions on the Bowie knife throughout the nineteenth century, including open and concealed carry prohibitions and criminal penalty enhancements, and imposed taxes on individuals and dealers. *Duncan*, 2025 WL 867583, at \*44; 4-ER-00833–00834.

Most states regulated Bowie knives by enacting carry restrictions. Fifteen states banned both open and concealed carry of Bowie knives. 4-ER-00833–34. Twenty-nine states enacted laws barring concealed carry of Bowie knives. 4-ER-

35

00834.  In addition, seven states enhanced the criminal penalties for those who used Bowie knives to commit a crime.  4-ER-00834.[15]

Some states prohibited the sale of certain kinds of knives altogether.  3-ER-00492.  Tennessee enacted a law in 1838 criminalizing "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever" who "shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving, or disposing of in any manner whatsoever any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick."  *Id* (quoting 1838 Tenn. Ch. 137 at 3-ER-00512–00513.

Such regulations—if they were ever challenged—withstood judicial scrutiny. In *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840), for example, the Supreme Court of Tennessee upheld a conviction for the concealed carry of a Bowie knife. The Court recognized that the prohibition against wearing the Bowie knife was justified because such knives were "usually employed in private broils, and [] are efficient only in the hands of the robber and the assassin."  *Id*; *see also* 4-ER-00829.  Similarly, in *Haynes v. Tennessee*, the Tennessee Supreme Court upheld a

---

[15] Since the beginning of the twentieth century, forty-nine states plus the District of Columbia have barred or restricted Bowie knives.  4-ER-00832–00833. The other eight states enacted laws restricting the category or type of knife that was embodied by the Bowie knife, but did not mention it by name. *Id*.

conviction for the concealed carry of a Bowie knife. The Court recognized that the statute was designed "to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life." 24 Tenn. 120 (Tenn. 1844); *see also* 4-ER-00830.

Some states also enacted laws taxing the possession and sale of dangerous weapons to discourage their use. 3-ER-00489–00490. At least three states—Alabama, North Carolina, and Mississippi—taxed the personal possession of certain weapons, including large fighting knives like dirks and Bowie knives. *Id*; 1820 Ala. 10, § 3 (3-ER-00522); 1846 Fla. Ch. 75 (3-ER-00524–00525). The rates of these taxes were often so high as to be prohibitive. 3-ER-00489–00490. In the late-nineteenth century, some municipalities also imposed personal taxes on the value of residents' dirks and Bowie knives. 3-ER-00490–00491.

In addition, some states imposed prohibitive occupation taxes upon dealers to discourage the sale and use of deadly weapons. Through revenue bills that were reenacted year after year, Alabama, Georgia, and Mississippi taxed dealers of deadly weapons. 3-ER-00491. In Georgia, for example, dealers of pistols, toy

pistols, shooting cartridges, dirks, and Bowie knives were taxed $100 a year in 1884, 1886, 1888, 1890, 1892, and 1894.[16]  3-ER-00491.

The challenged statutes are also relevantly similar to laws regulating clubs and other impact weapons that date back to the founding era. Throughout our nation's history, there is a robust tradition of regulating clubs and other impact weapons, such as bludgeons, billy clubs, slungshots, and sandbags.  4-ER-00836. Like knives, these other impact weapons date back to ancient times.  4-ER-00835. These weapons were used to strike others and were associated closely with criminal use.  4-ER-00836.  Consequently, they were ubiquitously regulated by state governments, which enacted laws primarily regulating their carry.  4-ER-09836.  Every state in the nation had laws restricting one or more types of club weapons.  4-ER-00836.

The earliest known law that broadly regulated "clubs" dates back to 1664.  4-ER-00837.  Seven states—New York (1664), Massachusetts (1750), Maine (1786), Virginia (1792), Delaware (1797), Kentucky (1798), Mississippi (1799)—enacted these laws in the seventeenth and eighteenth centuries.  4-ER-00837.  Six states—

---

[16] While the aforementioned laws focus on Bowie knives, these laws often also addressed other concealable weapons considered dangerous at the time, including pocket pistols, dirks, daggers, saps, slungshots, and other large knives. 4-ER-00832–00833; *see also* 3-ER00487.  The concealability of these weapons is distinct from rifles, muskets, and shotguns, which were carried openly and not likely to be used in the commission of crimes.  3-ER-00479.

Alabama (1805), Arkansas (1835), Indiana (1804, 1855, 1881), Mississippi (1804), Missouri (1818), Texas (1889)—enacted laws regulating clubs in the nineteenth century. 4-ER-00837. Two states—Indiana (1905) and Missouri (1923)—regulated clubs in the early twentieth century. 4-ER-00837.

In addition to laws regulating clubs generally, states also enacted laws specifically regulating the billy club, a heavy, hand-held rigid club made of wood, plastic or metal. 4-ER-00837. At least sixteen states had laws regulating billy clubs, the earliest of which dates back to a Kansas law enacted in 1862. 4-ER-00837. Together, these sixteen states enacted a total of forty-six separate billy club laws over the years. 4-ER-00837. Eleven states enacted similar laws in the early twentieth century. 4-ER-00837.

States also enacted laws regulating the bludgeon, a short stick with a thickened or weighted end. 4-ER-00836. The earliest known law regulating bludgeons dates back to 1799 in New Jersey. 4-ER-00836. Twelve states enacted similar laws in the eighteenth and nineteenth centuries. 4-ER-00836. Four states—Michigan (1927, 1929), New Jersey (1927), New York (1911, 1913, 1931), North Dakota (1915)—regulated bludgeons in the early twentieth century. 4-ER-00836–37.

Similarly, states regulated the slungshot, also known as a "blackjack," which is a hand-held weapon for striking that has a piece of metal or stone at one end

attached to a flexible strap or handle. *Duncan*, 2025 WL 867583, at *44-45; 4-ER-00838. The earliest known law regulating slungshots was enacted in 1850. 4-ER-00838. Forty-three states enacted a total of seventy-one laws in the nineteenth century, and a total of twelve in the twentieth century, regulating slungshots. 4-ER-00838.

States also regulated sandbags—also known as "sand clubs"—which consisted of sand poured into a bag, sack, sock, or similar tube-shaped fabric. 4-ER-00839. The earliest known law regulating sandbag use was enacted in 1866. 4-ER-00839. Ten states enacted fourteen similar laws—seven laws in the nineteenth century, and seven laws in the early twentieth century. 4-ER-00839. Only four states did not specifically regulate any of these five specific impact weapons (clubs, billy clubs, bludgeons, slungshots, and sand bags) by name. 4-ER-00839. But in three of those states, such specific laws would have been redundant because they had broad laws against the carrying of any concealed, dangerous, or deadly weapon. 4-ER-00839.

While some of these laws could be considered a "dead ringer" or "historical twin," the relevant question under *Bruen* and *Rahimi* is whether they establish a broader tradition of regulating dangerous and deadly impact weapons. *Perez-Garcia*, 96 F.4th at 1191 (stating that the historical evidence must be examined as a whole). Specifically, the State must show that the challenged laws are

40

"relevantly similar" in terms of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 30. Here, the State's restrictions on certain switchblade knives burdened the right to armed self-defense under the same "why" recognized by this Court in *Duncan*: "Both the historical laws and California's law share the same justification: to protect innocent persons from harm from especially dangerous uses of weapons." *Duncan*, 2025 WL 867583, at *50. The *Duncan* Court relied on similar historical restrictions, including the State's laws restricting slungshots and Bowie knives. *Id*. at 49. The weapons discussed above—Bowie knives, clubs, bludgeons, billy clubs, slungshots, and sandbags—were the "switchblades" of their time. They were used in intrapersonal violence, were associated with crime, and only after they began to proliferate, did the Legislature step in to regulate them. *Id*. at 52.

Turning to "how" the regulations affect the Second Amendment right to self-defense, this Court must consider whether California's restrictions and the historical regulations "impose a comparable burden on the right of armed self-defense." *Bruen*, 597 U.S. at 29; *see also Duncan*, 2025 WL 867583, at *51. With respect to armed self-defense, the State's restrictions leave a variety of bladed alternatives for self-defense: automatically opening switchblade knives with blades under two-inches, manually-opening knives with blades of any length and a detent or safety mechanism that keeps the blade in a closed position, and many other

41

fixed-blade knives.  In addition, "[a] person wishing to buy any lawful firearm (or other weapon) is free to do so."  *Id*. at 52.  Moreover, the State's restrictions only limit possession of certain automatically opening switchblade knives in specific circumstances: possession inside a vehicle in public and public carry.  Cal. Penal Code § 21510.  Plaintiffs may possess knives that fall under California's definition of switchblade knife "at home for self-defense."  *Duncan*, 2025 WL 867583, at *52.

Here, the historical analogues were significantly more burdensome than California's restrictions on switchblade knives.  In addition, restrictions on Bowie knives and similar dangerous and deadly edged and impact weapons were especially burdensome in an era where the single-shot pistol—the precursor to the quintessential self-defense weapon—was unreliable, inaccurate, and widely disfavored as a self-defense weapon.  3-ER-00480–00481.

The burden imposed by California's restrictions on switchblade knives is comparable to the burden imposed by the historical laws.  As *Duncan* makes clear in examining the same tradition, "various laws throughout the Nation's history regulated the right to armed self-defense by prohibiting specific uses of weapons that had proved particularly dangerous" and those laws restricted, and even outright prohibited "the use of weapons in ways that had proved, in their time, especially dangerous."  *Duncan*, 2025 WL 867583, at *52.  California's

restrictions on a certain subset of switchblade knives thus fit comfortably within this long and unbroken tradition of regulating Bowie knives, impact weapons, and other dangerous and deadly weapons.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  April 4, 2025                Respectfully submitted,

                                  */s/ Katrina Uyehara*

Rob Bonta
  *Attorney General of California*
R. Matthew Wise
  *Supervising Deputy Attorney General*
MEGHAN STRONG
  *Deputy Attorney General*
KATRINA UYEHARA
  *Deputy Attorney General*

## STATEMENT OF RELATED CASES

The Attorney General is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court and are not already consolidated here.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** No. 24-5536

I am the attorney or self-represented party.

**This brief contains 9,704 words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Katrina Uyehara*  **Date:** April 4, 2025

## CERTIFICATE OF SERVICE

I certify that on April 4, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the court's Appellate Case Management System (ACMS). I certify that all other participants in this case are registered ACMS users and that service will be accomplished by the Appellate Case Management System.

Dated: April 4, 2025            */s/ Katrina Uyehara*