No. 24-5536

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Knife Rights, Inc.; Eliot Kagan; James Miller; Garrison Ham; North County Shooting Center, Inc.; and PWGG L.P.,

Appellants,

v.

Rob Bonta, in his Official Capacity as Attorney General of the State of California, *et al.*,

Respondents.

Appeal from the U.S. District Court
for the Southern District of California
(Case No.: 3:23-CV-00474-JES-DDL), Hon. James E. Simmons, Jr., U.S.
District Judge, Presiding

## APPELLANTS' REPLY BRIEF

John W. Dillon (State Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road, Suite 105, No. 255
Carlsbad, California 92009
jdillon@dillonlawgp.com
Telephone: (760) 642-7150
Fax: (760) 642-7151

*Attorneys for Plaintiffs-Appellants Knife Rights, Inc., Eliot Kaagan, James Miller, Garrison Ham, North County Shooting Center, Inc., and PWGG L.P.*

# TABLE OF CONTENTS

**Pages**

I.    INTRODUCTION ........................................................................ 1

II.   CALIFORNIA HAS ENACTED A BAN ON "SWITCHBLADES" AND THAT BAN IS UNCONSTITUTIONAL UNDER *HELLER* ....................................................................... 6

III.  "SWITCHBLADES" ARE BEARABLE ARMS PROTECTED BY THE SECOND AMENDMENT ........................................................ 8

IV.  "SWITCHBLADES" ARE IN COMMON USE AND ARE NOT BOTH "DANGEROUS AND UNUSUAL" .................................... 15

     A.    Switchblades Are in Common Use for Lawful Purposes ..... 16
     B.    Switchblades Are Not "Dangerous and Unusual" ............... 19

V.   APPELLEE FAILS TO IDENTIFY ANY RELEVANT HISTORICAL TRADITION OF ANALOGOUS ARMS REGULATION ........................................................................ 22

     A.    Appellee's Historical Analogues Are Not Relevant ............. 22

VI.  APPELLEE'S ARGUMENTS AMOUNT TO INTEREST BALANCING, EXPRESSLY REJECTED BY THE SUPREME COURT ................................................................ 25

VII.  CONCLUSION ..................................................................... 28

CERTIFICATE OF COMPLIANCE ...................................... 29

i

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Aymette v. State*, 21 Tenn. 154 (1840) ...................................................23

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)................ 11, 17-19, 26

*Commonwealth v. Canjura*, 494 Mass. 508 (2024) ..............................14

*District of Columbia v. Heller*, 554 U.S. 570 (2008).....................*Passim*

*Duncan v. Bonta*, 133 F.4th 852,
    2025 WL 867583 (9th Cir. March 20, 2025)...................... 9-12, 20

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ...............................14

*Haynes v. Tennessee*, 17 S.W. 812 (1891) ...........................................23

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .............1, 14, 17, 26

*New York State Rifle & Pistol Association v. Bruen,*
    597 U.S. 1 (2022) .......................................................................*Passim*

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023)........................................13

*United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023) ................12, 13

*United States v. Rahimi*, 602 U.S. 680 (2024) ...........................1, 16, 26

**U.S. Constitution**

Second Amendment........................................................................*Passim*

**California Penal Code**

Section 17235................................................................2, 3, 6, 8, 9, 28
Section 21510................................................................2, 3, 6, 7, 8, 28
Section 21510(b) .......................................................................................3
Section 21590....................................................................2, 3, 6, 28
Section 18000 .......................................................................................3, 6
Section 18005 .......................................................................................3, 6

**Other Authorities**

1 Dictionary of the English Language 106 (4th ed)..............................9

## I.    INTRODUCTION

The State of California's (Appellee's) Answering Brief (AB) cannot be squared with the Supreme Court's holdings in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024). Each decision reaffirms that the Second Amendment protects the right of law-abiding citizens ('the people") to keep and bear arms, including the banned "switchblades." The Second Amendment's plain text extends to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. An automatically opening folding knife, or "switchblade," is a bearable arm protected under the Second Amendment. Full stop.

Appellee wrongly asserts that the Second Amendment does not protect the banned knives because they are (a) not in common use today strictly for self-defense, and (b) they are both "dangerous and unusual." AB at 12, 21.

As explained below, the Supreme Court held that the Second Amendment protects "arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 625. One of these lawful purposes (and the most relevant for purposes of that case) was self-defense. *Id*. at 599 (calling self-defense a "central component of the right itself").[1] In sum, *Heller* does not limit Second Amendment protections to

---

[1] Stating the obvious, "central component" does not mean the "only" component.

1

bearable arms in common use strictly for self-defense; and the *Heller* Court grounded its common use understanding in "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id*. at 627 (internal quotations omitted). It rightfully did not interpret "common use" as part of the Second Amendment's plain text analysis. *Id*. Indeed, the text of the Second Amendment does not contain the phrase "in common use," nor raise the issue of commonality at all. U.S. Const. amend II.

Further, Appellee wrongly argues that the purported "dangerous and unusual" nature of "switchblades," removes it from the protections under the Second Amendment. *Heller* itself held that the relevance of a weapon's dangerous and unusual nature lies in the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627. Because Appellee failed to provide evidence that "switchblades" were *both* uniquely dangerous *and* unusual, or that they were analogous to any other relevant historic laws, their claims should be rejected based on this Court's *de novo* review.

Additionally, Appellee's defense of California Penal Code sections 17235, 21510, and 21590 is based on mischaracterizations of both the scope of the switchblade ban and the applicable legal standards. For example, Appellee's repeated suggestion that the laws are not a complete ban is legally and factually false. The challenged statutes prohibit "every person" who publicly possesses, carries, sells, offers for sale, exposes for sale, loans, transfers, or gives a switchblade knife, as defined, to any other person is "guilty of misdemeanor" punishable by fines, jail time, probation, and other stigmas and consequences; and

such persons also "commit" a nuisance subject to surrender, confiscation, and destruction. See Cal. Penal Code §§ 17235, 21510, 21590, 18000, and 18005. There are no statutory exceptions or exemptions.[2]

Moreover, Appellee misunderstands and misrepresents the nature of the "switchblades" banned under California law. For example, Appellee asserts there are "manual switchblades" that are not banned, but the statement is a quintessential oxymoron because there is no such thing as a "manual" switchblade. AB at 1.

Appellee digs a deeper hole, asserting that the California law "permits the possession, carry, and acquisition of a range of *other* weapons." AB at 1, (emphasis added). Here, the Supreme Court in *Heller* has already rejected the "other weapons" defense under the Second Amendment. In *Heller*, the government argued that its handgun ban was permissible because it allowed citizens to use long guns for self-defense. 554 U.S. at 629. Thus, in the government's view, handguns were not necessary because citizens could defend themselves with *other* weapons. The *Heller* Court rejected that argument, finding that, "It is no answer to say ... that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Id*. The same applies with equal force to California's

---

[2] Even if this Court accepted Appellee's incorrect claim that possessing a switchblade at home is lawful, one must first acquire and carry the knife home—thereby violating PC 21510(b), which prohibits anyone from carrying it. Thus, the statutes amount to a complete ban like the one struck down in *Heller*. *Heller*, 554 U.S. at 628–629.

switchblade ban. That there are other weapons allowable under California law is no defense to California's complete ban.

Appellee also invents an entirely new threshold, multi-prong legal test, claiming that a weapon that merits protection under the Second Amendment: (1) must be an arm under the Second Amendment's plain text; (2) but to be a protected "arm," it must also be "in common use for self-defense," (3) it must also have the "character of a self-defense weapon," (4) must be "widely used in ordinary self-defense," (5) must be "well-suited for that constitutionally protected purpose [self-defense]," and (6) must not be uniquely "dangerous." AB at 13. Only if this 6-part, multi-prong "textual analysis" is met, does the burden shift to the government to justify its ban through relevantly similar historically analogous arms regulations. *There is no such multi-prong test* in the text of the Second Amendment, in *Heller*, in *Bruen*, or in any other Supreme Court precedent.

Moreover, Appellee fails to respond to or rebut Appellants' evidence that "switchblades" are categorically treated as pocketknives under federal, state, and industry definitions, and Appellee's own expert testimony. Appellee also ignores the undisputed evidence that millions of switchblades are lawfully owned across the United States and are lawful to purchase, own, possess, and carry in the majority of jurisdictions throughout this country. See Appellants' Opening Brief (OB) at 30-38.

Significantly, Appellee provides no historical tradition that can support its switchblade ban. As Appellants showed in their opening brief, there were no bans on knives of any kind during the Colonial era.

4

8-ER-1786. There were no possession bans of any kind of knife throughout the entire 1800s. *See* 10-ER-2564, 2571; 12-ER-3158-3189. And there were only two sales restrictions on Bowie knives throughout the entire 1800s (1838 - Tennessee and 1881 - Arkansas). None of these laws prohibited the possession, transfer, purchase, manufacture, loan, giving, and open carry of Bowie knives. See 8-ER- 928-1932; 9-ER-2249-2258; see also 10-ER-2564, 2571, 2572-2573; 12- ER-3176-3189.

Additionally, many of the concealed carry restrictions identified by defense experts had explicit exceptions permitting concealed carry for travelers or while traveling or explicitly exempted pocketknives from any kind of concealed carry restriction. 9-ER-2257;10-ER-2538-2539, 2330-2431. With the exception of the single 1838 Tennessee law, the above-referenced laws all come well after the relevant period this Court must consider. In fact, nearly all of them come after 1870. 9-ER-2249-2258. Simply, none of the laws relied on by Appellee is remotely comparable to California's total switchblade knife ban.

Further, it is undisputed that the challenged switchblade knife ban does not address any "unprecedented societal concerns" or "dramatic technological changes." *Bruen*, 597 U.S. at 27-28. Thus, it is baseless for Appellee to claim that *Bruen's* historical inquiry requires "a more nuanced historical approach." Appellee's invocation of historical regulations on Bowie knives and blunt weapons not only fails the "how" and "why" considerations under *Bruen*, 597 U.S. at 29–30, but is nearly identical to the historical record the Supreme Court rejected in *Bruen* when it invalidated New York's "proper cause" regime for public carry. *Id*., at 52-53. If those laws were insufficient to support a carry

regulation in *Bruen*, they are insufficient to justify a statewide switchblade knife ban.

Appellants respectfully request that this Court *reverse* the district court's initial ruling, and find that: (1) "switchblades" are "Arms" within the meaning of the Second Amendment, (2) "switchblades" need not be "commonly used for self-defense" to receive Second Amendment protections, and (3) "switchblades" are not both "dangerous and unusual under the *Heller/Bruen* "historical tradition" analysis. Additionally, Appellants request that the Court *affirm* or otherwise uphold the district court's ruling that Appellee failed to meet its burden under the *Bruen* "historic tradition" analysis. Accordingly, the challenged statutes should be declared unconstitutional and permanently enjoined.

## II. CALIFORNIA HAS ENACTED A BAN ON "SWITCHBLADES" AND THAT BAN IS UNCONSTITUTIONAL UNDER *HELLER*

Before addressing Appellee's misapplication of the *Heller/Bruen* standard, Appellants first address Appellee's repeated assertions that California's switchblade laws are not functionally a complete ban on automatically opening folding knives. Appellee is incorrect.

**First**, Appellee asserts that California's switchblade laws are not a categorical ban because it permits possession in the home. AB at 1, 16; *see also* OB at 8. This assertion is inaccurate and untenable. Under Penal Code § 21510, it is unlawful to carry a switchblade on one's person, possess it in a vehicle, transfer, sell, gift, or otherwise convey it. See Cal. Penal Code §§ 17235, 21510, 21590, 18000, and 18005. Thus, unless a person forges the knife themselves inside their residence—an

unrealistic setting—it is *impossible* to lawfully acquire and possess a switchblade in the home without violating one or more provisions of California's switchblade law. *Id.* This is precisely the setting *Heller* deemed unconstitutional. 554 U.S. at 574, 628. The District's handgun ban in *Heller* was nominally limited to unregistered handguns, but the registration of handguns was prohibited, making it impossible to own/carry one. *Id.* The Supreme Court in *Heller* found that a law that effectively prohibits possession in the home—even if not by its literal terms—violates the Second Amendment. *Id.* at 628.

California's law is no different. Appellee's claim that citizens may legally possess a switchblade at home is illusory. If all acquisition, transport, or transfer is illegal, lawful possession is impossible. As Appellee's own expert conceded, prohibiting all possession, carry, sale, offers for sale, loan, transfer, and gifting amounts to a "de facto prohibition." 10-ER-02549. California Penal Code section 21510 makes clear that "[e]very person who does any of the following with a switchblade knife" commits a crime, including anyone who "[c]arries the knife upon the person." A person who brings a switchblade into their own or another's home faces conviction, fines, jail, and other severe consequences.

**Second**, Appellee attempts to conceal that it has imposed a ban on "switchblades", claiming the law permits "switchblades with blades under two inches" and "manual switchblades" See AB at 1, 17, 41-42. These claims are contradicted by California's own statutory language and reality.

California Penal Code section 17235 defines a switchblade as any knife "with a blade two inches or more in length that can be released automatically by a flick of a button, pressure on the handle, flip of the wrist, or gravity." *Id*. Thus, under the law, any knife that opens automatically and has a blade over two inches is a banned "switchblade." Cal. Penal Code § 17235. Any blade shorter than two inches is statutorily *not* a "switchblade," as defined. *Id*.

And knives that open manually, by statutory and industry definitions, are **not** "switchblades." Appellee's reference to "manual switchblades" (*e.g.*, AB at 1) is a contradiction in terms that cannot be reconciled. There are no "switchblade knives that open manually." *Id*. Indeed, Appellee's assertion that California allows the possession of "manual switchblades" illustrates that Appellee is woefully ignorant of its own ban, the arms regulated, and the operation of those arms.

In sum, Appellee prohibits all aspects of possession, carry, transfer, loan, sale, or gift "switchblade" under California law. Cal. Penal Code §§ 17235, 21510. Appellee's attempt to classify its ban as anything other than an outright switchblade ban lacks any evidentiary support and explicitly contradicts Appellee's own expert. 10-ER-02549.

## III. "SWITCHBLADES" ARE BEARABLE ARMS PROTECTED BY THE SECOND AMENDMENT

The threshold question under *Bruen* is whether the Second Amendment's "plain text covers an individual's conduct." *Bruen*, 597 U.S. at 19-20, 24, 31-32. This is a straightforward question the Supreme Court has answered without engrafting any additional standards, conditions, or tests that Appellees want this Court to read into the

Second Amendment. *See, e.g.*, AB at 17-20. In fact, even applying the most recent *en banc* decision in *Duncan v. Bonta*, 133 F.4th 852, 2025 WL 867583, at *8 (9th Cir. March 20, 2025), a straightforward analysis remains warranted.

In this case, the basic elements are undisputed: Appellants are law-abiding citizens, they seek to possess a "switchblade," that is, "a knife having the appearance of a pocketknife" (Cal. Penal Code § 17235), and they are a part of "the people." See AB at 10, n.5 (Appellee does not contest that Appellants are part of "the people."). In its own words, Appellees also concede, as it must:

> "The Second Amendment's text protects 'the right of the people to keep and bear Arms" (footnote omitted). *The meaning of the term "Arms" is broad. See Heller*, 554 U.S. at 581. The term is 'fixed according to its historical understanding,' *Bruen*, 597 U.S. at 28, and includes '[w]eapons of offence, or armour of defence,' *Heller*, 554 U.S. at 581; *see id.* ('anything that a man wears for his defense, or takes into his hands or uses in wrath to cast at or strike another' (quoting 1 Dictionary of the English Language 106 (4th ed))." (cleaned up).[3]

*See* AB at 10 (emphasis added).

And "switchblades" are "Arms" under the Second Amendment's plain text. Therefore, the conduct—namely, possession, carry, sale, loan, transfer, or giving of such knives—is presumptively protected by the

---

[3] Appellee distorts the broad definition of "Arms" by rejecting *Heller*'s own language—"anything that a man wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another," 554 U.S. at 581—and then imposes limiting qualifiers to narrow the Second Amendment's scope. See U.S. Const. amend II; AB at 12–14.

9

Second Amendment. And because California's switchblade laws fit within the ambit of that Amendment's plain text, the California switchblade laws are "presumptively" unconstitutional under *Bruen*, 597 U.S. at 24, and Appellees had the burden to overcome that presumption of unconstitutionality under the Nation's "historical tradition of firearms regulation." *Id*. Appellee failed to overcome that heavy burden, as the district court determined in this case (1-ER-16-19), so such laws are unconstitutional.

Yet the district court found that "switchblades" are not "Arms." See 1-ER-7-16, 19. However, even Appellee won't go so far to claim that "switchblades" do not fall under the plain text definition of "arms." Appellee limits its support of the district court to two very narrow propositions, namely, that "switchblades" are not arms "presumptively protected" by the Second Amendment purportedly because: (1) "they are not in 'common use for self-defense,'" and (2) "they are 'dangerous and unusual.'" AB at 12, 21. Appellee is wrong on both counts.

As *Heller* made clear, the term "Arms" does "not apply 'only to those arms in existence in the 18th century.'" *Bruen*, 597 U.S. at 28, (quoting *Heller*, 554 U.S. at 582).[4] "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. (internal quotation marks omitted); *see also Duncan v. Bonta*, at *8.[5]

---

[4] Note that "switchblades" did exist during the 18th Century in the U.S. OB at 32-33.

[5] While *Duncan* held that so-called "high-capacity magazines" are not "Arms" but "accessories," Appellants disagree with that classification.

10

*Heller* did not limit protection to weapons "widely used in self-defense" or "most suitable for self-defense." 554 U.S. at 582. The Supreme Court's later decision in *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam) also did not limit protection to weapons "widely used in self-defense" or "most suitable for self-defense." In *Caetano*, the Court reversed a conviction under a stun gun ban, emphasizing that the Second Amendment protects arms even if they are "a thoroughly modern invention" and "not in common use at the time of the founding." *Id.* at 411–12. Justice Alito, concurring, explained that the relevant question is whether a weapon is "commonly possessed by law-abiding citizens for lawful purposes." *Id.* at 420 (Alito, J., concurring). It is undisputed that "switchblades," as defined, are "an item that a person 'takes into his hands, or uses in wrath to cast at or strike another" and "reasonably described, by itself, as a "weapon[] of offence, or armor of defense." *Duncan v. Bonta*, at *9 (*citing Heller*, 554 U.S. at 581) (cleaned up). Thus, "switchblades" are "Arms" protected by the Second Amendment and the burden immediately shifts to Appellee to justify the switchblade knife ban through historically relevant analogous arms regulations. *Bruen*, 597 U.S. at 24.

Though the switchblade ban: (i) prohibits arms-bearing conduct; and (ii) prohibits bladed weapons that are in every conceivable way "Arms" under the plain text of the Second Amendment, Appellee asserts that an array of additional, multi-prong tests must be applied to

---

Regardless, there is no dispute here that "switchblades" are bearable arms under any definition and thus are presumptively protected—even under *Duncan's* analysis. See OB at 20-28; Duncan, at *8.

11

determine if these automatically opening knives are "Arms" under the *Bruen* standard. *See* AB at 12-14 (adding "in common use for self-defense" requirements, as well as "character," "ordinary self-defense," and "suitability" usage conditions); *see also* AB at 17-18 (engrafting suitability, training, psychological-preparedness, and motor skill prerequisites). These contrived, multi-prong requirements go well beyond the established *Heller* and *Bruen standard.*

Further, Appellee relies, in part, on *Duncan* for the notion that Appellants supposedly failed to satisfy their burden to prove that "switchblades" are "in common use for self-defense," which it argues is part of *Bruen*'s so-called step-one textual analysis. AB at 12. This is wrong on several levels.

**First**, in *Duncan,* the government asserted that so-called "large-capacity magazines" are not "in common use for self-defense" and are both "dangerous and unusual," but the *Duncan* court made clear that it need not, and did not, "reach" these government assertions. See *Duncan v. Bonta*, at *7.

**Second**, *Duncan* acknowledged that there "is no consensus" on whether the "common-use issue" is a "threshold, textual inquiry or a historical inquiry." *Id*. at *7, n.2. The *Duncan* court explicitly stated it need not, and did not, address the issue in that case. *Id*. That same court added that *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) placed the question in the threshold, textual inquiry determination, stating it "remains good law." *Id*. *Duncan* **did not** approve of the statement in *Alaniz* to the effect that regulated "Arms" must also be "in common use for self-defense." *Id*. at *7, n.2. And the

12

*Alaniz* court was merely describing its interpretation of *Bruen*. 69 F.4th at 1128; it quotes, verbatim, the *Bruen* standard at that same page without reference to arms "in common use for self-defense." *Id*. Again, the Second Amendment contains no — strictly-necessary-and-most-suitable-for-self-defense — precondition.

**Third**, Appellants contend that the so-called "in common use for self-defense" inquiry is a fiction. Instead, the "in common use" understanding is part of *Bruen*'s historical analysis — and not a threshold, textual determination.

**Fourth**, this "in common use" inquiry has divided panels within the Ninth Circuit. Compare *Alaniz*, 69 F.4th at 1128 (*Bruen's* threshold, textual inquiry) and *Teter v. Lopez*, 76 F.4th 938, 949-950 (9th Cir. 2023), *vacated and reh'g en banc granted*, 93 F.4th 1150 (9th Cir. 2024) (*Bruen's* historical inquiry).

**Fifth**, the "in common use for self-defense" inquiry does not rightly fall within the *Bruen* threshold, textual inquiry for good reason. The Second Amendment does not state that it protects against the infringement of "the right of the people to keep and bear Arms, so long as they *are in common use for self-defense*." Nonetheless, both the district court and Appellee wrongly attempt to engraft this inquiry into the text of the Second Amendment. Nowhere in the Second Amendment's text does "in common use for self-defense" appear.

**Lastly**, under *Bruen's* historical inquiry, the Second Amendment permits only firearm regulation "consistent with this Nation's historical tradition." 597 U.S. at 17. And the questions of whether "Arms" are "in common use" or "dangerous *and* unusual" are based on the "historical

understanding of the Amendment." *Id*. at 21. These are not textual inquiries.

Appellants have offered undisputed evidence that switchblades are pocketknives—a category of everyday tools and offensive and defensive arms that are unquestionably "bearable arms." OB at 24; 12-ER-3007-3009; 12-ER-3114; and 12-ER-3152-3154. Appellees' own experts agreed. *Id*. Plaintiffs have submitted sworn declarations stating that they wish to acquire, own, possess, and carry these knives for lawful purposes including self-defense. 5-ER-1092-1117. Undisputed evidence shows that these knives are legal and sold in over 45 states, are available in thousands of models, and are used by millions of Americans. *See* OB at 29-39. Appellee cites no case post-*Bruen*, holding that "switchblades" fall outside the Second Amendment's plain text. Nor could it. In fact, the only post-*Bruen* case that involved a ban on "switchblades" ruled that the state's ban was unconstitutional. *Id*. at 22-24, *citing Commonwealth v. Canjura*, 494 Mass. 508, 512-513 (2024).

There is no question that "switchblades" are "Arms" under the Second Amendment's plain text. California's switchblade knife ban unconstitutionally prohibits law-abiding citizens, including Appellants, from possessing, carrying, selling, loaning, transferring, and giving such knives for lawful purposes, including self-defense. *See Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (all arms "commonly possessed by law-abiding citizens for lawful purposes"); see also *Heller*, 554 U.S. at 625 (stating that the Second Amendment protects weapons that are "'in common use at the time' for lawful purposes, like self-defense"); and *McDonald*, 561 U.S. at 780 ("our central holding in

14

Heller: that the Second Amendment protects a person right to keep and bear arms for lawful purposes, most notably for self-defense'). No case limits the Second Amendment's text to a right to keep and bear arms, but only if the arms are in common use for self-defense purposes. And if there are any cases that make this inference, or include this dicta, they should be rejected.

Under *Bruen*, the initial question has been answered. The burden now falls to Appellee to demonstrate that its laws are consistent with this Nation's historical tradition of arms regulation. *Bruen*, 597 U.S. at 17, 24.

## IV.  "SWITCHBLADES" ARE IN COMMON USE AND ARE NOT "DANGEROUS AND UNUSUAL"

As presented, *Bruen* demands that after answering the textual question of whether the conduct falls under the Second Amendment's plain text, the burden is placed on the government to justify its regulation as "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 24.  While in many cases that inquiry will involve research into potential historical analogues, both *Bruen* and *Heller* have already established the relevant contours of the tradition at issue in this case: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 21 (quoting Heller, 554 U.S. at 627).

And any law by definition will not fit into that tradition if it bans "possession and use of weapons that are 'in common use at the time.'" *Id.* (*quoting Heller*, 554 U.S. at 627; *see also Heller*, at 625 ("We

15

therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes...”). This test “accords with the historical understanding of the scope of the right,” but with reference to modern realities of firearm ownership. *Heller*, 554 U.S. at 625.

The questions of whether certain arms are in common use or are both “dangerous and unusual” come from *Heller’s* and *Bruen’s* historical inquiry, and therefore, the burden is on Appellee to prove that “switchblades” are “not in common use,” or are *both* “dangerous and unusual.”

Appellants reiterate that the “common use/dangerous and unusual” analysis was *applied* in both *Heller* and *Bruen* in the Court’s historical analysis.[6] As such, the burden is on Appellee, and it has failed to prove that “switchblades” are not “in common use” or are *both* “dangerous and unusual.”

A. **Switchblades Are in Common Use for Lawful Purposes**

Appellee asserts that Appellants have failed to show that “the subset of switchblade knives regulated by the State… bear the objective characteristics of a self-defense weapon.” AB at 7. This formulation invents a standard that does not exist under any constitutional doctrine. *Heller*, *Bruen*, nor *Rahimi* require a weapon to possess objective “characteristics” of a self-defense weapon, nor do they

---

[6] Though *Heller* and *Bruen* mention “in common use” in their textual discussions, the Supreme Court applied this inquiry only as part of the historical analysis.

empower courts to make policy judgments about what is "well-suited" for such purposes. Indeed, the *Heller* Court explicitly rejected the government's argument that handguns could be banned because other weapons (like long guns) were more effective.

The *Heller* Court rejected that reasoning, stating: "It is no answer to say... that it is permissible to ban the possession of handguns so long as the possession of other firearms is allowed." 554 U.S. at 629. And such arms are selected "by the people" and not the government. In *McDonald*, 561 U.S. at 923, Justice Breyer, dissenting, expressed concern over judges enforcing the Second Amendment rights because it could require them to decide questions about what kind of weapons, are needed for self-defense, but the majority opinion rightly responded, stating it is not up to judges "to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *Id*. 561 U.S. at 790-791.

Similarly, Appellee's wrongly claim that a weapon must be "widely used in ordinary self-defense." AB at 13. This claim is based on a clear misreading of *Heller*, *McDonald*, *Bruen*, and *Caetano*. The standard is whether arms are "commonly possessed by law-abiding citizens for lawful purposes," which includes self-defense, but is not limited to it. *Caetano*, 577 U.S. at 420 (Alito, J., concurring). The Court in *Heller* declared D.C.'s handgun ban unconstitutional without considering specific statistics of handgun use in self-defense. *Heller*, 554 U.S. at 634-636. *Caetano* also invalidated Massachusetts's stun gun ban without any data showing stun guns were commonly *used* in self-defense—only that they were commonly possessed. *Id*.

Nonetheless, Appellee demands that Appellants prove "switchblades" are actually "widely" used in self-defense settings to be considered "Arms" under the Second Amendment's plain text. This standard does not exist in either *Heller* or *Bruen*. In any case, Appellants presented robust and undisputed evidence that switchblades are lawfully owned and used by millions of Americans, legal in over 45 states, and sold in thousands of varieties across major retailers. *See* OB at 30-39. Appellants demonstrated this common use using three lenses: numerical (volume of ownership), jurisdictional (legal status across the U.S.), and categorical (placement within the widely used class of pocketknives). These metrics are not separate "tests," as Appellee suggests (AB at 14-17), but interlocking evidentiary paths pointing to the same conclusion: "switchblades" are commonly possessed by law-abiding citizens across the country for lawful purposes. Appellee has no *evidentiary answer* for these facts.

If Appellee asserts that this "common use" analysis should not consider the majority of jurisdictions that do not prohibit "switchblades" it again contradicts *Bruen*, which examined "shall issue" and may issue" licensing laws in various jurisdictions nationally. *Bruen*, 597 U.S. at 13-15, 78. National prevalence, not localized legality, determines whether an arm is "in common use." *Caetano*, 577 U.S. at 420 (Alito, J., concurring). Moreover, Appellee asserts that a weapon be "well-suited" for "ordinary self-defense" (AB at 13), but there are no such legal requirements in Supreme Court precedent.

Finally, Appellee's own expert described switchblades as "pocketknives," undercutting any attempt to isolate them as a unique

18

threat. 12-ER-3152-3154; 12-ER-3007-3009. This acknowledgment alone defeats any claim of "unusualness," given the ubiquity of pocket knives in this country.

In simple terms, commonly possessed arms by definition cannot be "unusual." *Heller*, 554 U.S. at 627; *Caetano*, 577 U.S. at 417. Appellee has not offered any evidence that "switchblades" are uncommon. Appellee also presents no credible evidence that switchblades are rare, disfavored, or disproportionately used in crime. In fact, Appellee's expert, Robert Escobar, who wrote the book on the history of "unusual weapons," admits that switchblades and Bowie knives were not included in his book because they were far too common. 12-ER-2941-2944.

## B.    Switchblades Are Not Both "Dangerous and Unusual"

Appellee asserts that the Second Amendment does not protect switchblades because they are "dangerous and unusual." AB at 21. Make no mistake, the standard, first discussed in *Heller*, is conjunctive. A weapon must be both "dangerous *and* unusual" to fall outside the scope of the Second Amendment's protection. *Heller*, 554 U.S. at 627.

All evidence in the record shows that "switchblades knives" are in common use throughout this country. This fact alone is sufficient to satisfy the "dangerous and unusual" consideration under *Heller* and *Bruen*.

Nevertheless, as to whether "switchblades" could be considered dangerous, Appellees has not provided any evidence that an such knives are any more dangerous than any other knife in existence. See OB at

43; Nor has Appellee provided evidence that switchblades are disproportionately used in crimes. The only data-based evidence in the record—submitted by Appellants—shows that switchblades are rarely used in crime. 7-ER-1670 through 8-ER-1725. "Despite switchblades' ominous reputation, there is no credible data suggesting they are disproportionately used in crime." 7-ER-1689.

Appellee relies instead on anecdotes and older, pre-*Heller* case law. See AB at 23-24. For example, it cites cases where a switchblade was present during a crime. *Id.* However, Appellee provides no empirical data supporting the assertion that switchblades are used *in* violent crime more than any other knife. In fact, Appellee has not offered any evidence that a "switchblade" has ever been used in a crime in California. Even if this Court were to ignore these undisputed facts, *Heller* has already made clear that the presence of arms in criminal activity cannot justify banning them from law-abiding citizens. *Heller*, 554 U.S. at 636.

In contrast to Appellee's arguments in *Duncan*, here, there is no claim that "switchblades" cause "devastating harm" or are "particularly capable of unprecedented lethality" or "pose exceptional dangers to innocent civilians." *Duncan*, at *17. In *Duncan*, the majority found justification for upholding California's so-called "high-capacity magazine" ban based on the contested theory that high-capacity magazines are used in mass shootings and contribute directly to greater casualties. *Id.*, at *7–9. That was central to the majority's reasoning.

But here, Appellee's expert admits that the critiques he offers do not amount to any public threat. *See* OB at 41. Appellee also makes no

20

claim that switchblades are associated with mass casualty events, nor any claim that they facilitate criminal violence at higher rates than other knives, nor any data suggesting that they are disproportionately used in crime. In short, even if this Court were to conclude that some arms may receive less protection based on "public risk" (a point not conceded), Appellee's evidence still fails to show that switchblades are both dangerous and unusual in any constitutional sense.

Instead, because "switchblades" are functionally identical to any other folding pocket knife, and pose no greater danger to the public than any other knife, Appellee's expert, Mr. Escobar, offered subjective opinions and his personal preference that he would rather use a fixed-blade knife, specifically in a self-defense setting. *See* OB at 41. However, Mr. Escobar provided no evidence that switchblades are uniquely dangerous to the public at large. *Id.* He offered no methodology, no crime data, and no justification for treating switchblades as distinct from the broader class of pocketknives, which are legal nationwide.

In fact, the risks or "dangers" Mr. Escobar attributes to switchblades—*e.g.*, the potential for mechanical failure, and stress under pressure—apply equally to all folding knives and to all firearms. *See* 12-ER-2968-2972, 2978-2979, 2981-2982, 2988-2989, 2990-2991, 2993, 2995-2997, 2999, 3002-3003, 3004-3005, 3015, 3019-3020, and 3022-3025. However, just as Appellee has no ability to prohibit handguns because of their (i) use in crime, (ii) their concealability, (iii) their ability to be wrestled away, (iv) the possibility of mechanical failure, or (v) the required mental state to initiate lethal force against

another, Appellee cannot lawfully ban switchblades for the exact same reasons.

## V.   APPELLEE FAILS TO IDENTIFY ANY RELEVANT HISTORICAL TRADITION OF ANALOGOUS ARMS REGULATION

Once it is shown that the conduct in question falls under the Second Amendment's plain text, *Bruen* places the burden on the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24–25. Appellee has not met, and cannot meet, this heavy burden.

### A.   Appellee's Historical Analogues Are Not Relevant

Appellee relies heavily on antebellum and postbellum regulations of Bowie knives and blunt weapons. AB at 31–42. But as Appellants explained, these laws almost universally regulated **how** certain weapons could be carried—typically restricting concealed carry—*but did not prohibit possession, sale, transport, or use.* OB at 49-53.

Appellee admits, as it must, that there were no 18th or 19th century bans that prohibited the acquisition, purchase, sale, transfer, possession, and carry of pocketknives, switchblades, or knives of any kind (including Bowie knives).  OB at 52. Of the only two restrictions on the sale of Bowie knives throughout the entire 1800s, they were both rare and short-lived. OB at 51-52. To be clear, there was no law that prohibited the *possession* of *any knife* during the Founding era, throughout the *entire* 1800s, and into the early 1900s. *Id*. And there were only two laws that restricted sales. *Id*., at 51. All other restrictions

22

cited by Appellee (i) were enacted in the late 1800s; (ii) only restricted the method of carrying such weapons *concealed*; (iii) permitted the purchase, sale, transfer, possession, and open carry of all knives; and (iv) many had explicit exceptions for pocketknives. *See* OB at 51-53.

In *Bruen*, the Supreme Court examined the very same historical record—Bowie knife laws and restrictions on clubs, daggers, and slung shots—and found it insufficient to justify New York's "proper cause" requirement for public carry. *Bruen*, 597 U.S. at 124-126 (J. Breyer, dissent). New York's regime prohibited public carry. Here, however, California is enforcing an outright ban on the possession, carry, sale, transfer, loan, or gifting of "switchblade" knives. Yet the Supreme Court held the analogues were too few and too dissimilar to justify the New York law. *Id.* at 52-53. If the exact same historical evidence cannot support New York's prohibition on carrying, it necessarily cannot support California's complete ban on a category of commonly used pocket knives.

Appellee also relies on laws that regulated "dangerous weapons" generally, but it offers no evidence these statutes ever prohibited ownership or sale—let alone all of the following simultaneously: sale, transfer, transport, and carry. AB at 33–34.

Appellee cites *Aymette v. State*, 21 Tenn. 154 (1840), and *Haynes v. Tennessee*, 17 S.W. 812 (1891), to suggest a narrower understanding of the right to bear arms. AB at 36-37. But *Heller* explicitly rejected *Aymette's* interpretation. *Heller*, 554 U.S. at 613. These decisions are thus not merely outdated—they are abrogated.

Appellee's reliance on 19th-century tax laws fails. Taxing weapons like Bowie knives or pistols may reflect regulation, but it is not a blanket ban. Appellee offers no evidence that these taxes deterred purchases or were enforced. Their experts simply assert the taxes acted as restrictions. As *Bruen* makes clear, historical laws must be similar in both "how" and "why." 597 U.S. at 30. A tax on knife sales is not comparable to a broad ban on possession, carry, sale, or transfer.

That is the "how" of California's law. And the "why" differs too. Early regulations aimed to prevent public affrays and dueling—localized and behavioral risks—not to disarm law-abiding citizens categorically.

Even Appellee's own analogy undermines its position. It asserts that in the Antebellum period, "the Bowie knife became one of the most widely regulated weapons." AB at 34. Even if this Court accepted this claim wholesale, it is undisputed that during the 1800s, "the most widely regulated weapon"—the Bowie knife—was still legal to purchase, sell, possess, use, and be carried in public openly in nearly every state and territory in the country. OB at 51-52. The Bowie knife was never banned. This is a stark contrast to California's switchblade knife ban challenged here, especially considering that there is no evidence that "switchblades" are used in crime. While Bowie knives were occasionally taxed, restricted from concealed carry, and subject to dueling laws, they were never prohibited to the extent of California's ban on switchblades.

Appellee's claim that the "switchblade" ban targets knives with long blades is contradicted by California law, which permits the

purchase, possession, and open carry of Bowie and other fixed-blade knives regardless of length. A person can legally carry a 12-inch or longer Bowie knife in public, yet possession of a 2-inch switchblade is a crime. This shows the prohibition is not about blade length, as California imposes no such limits on other knives.

Appellee also fails to confront the Supreme Court's timeline limitations. While *Bruen* permitted courts to look at post-1791 history, it emphasized that 20th-century regulations are of little probative value and cannot override founding-era understandings. 597 U.S. at 68. Appellee's heavy reliance on late-19th-century and 20th-century statutes, therefore, carries little or no weight. Even if this Court were to consider these late restrictions on certain arms, none of them amount to anything close to the ban being challenged here. As such, it provides no historical justification for California's switchblade knife ban.

Finally, Appellants presented the **only expert evidence** on criminal misuse: an empirical analysis of switchblade crime rates across jurisdictions that have repealed their bans. See 7-ER-1670 through 8-ER-1725. That study concludes, "There is no credible data suggesting that switchblades are disproportionately used in crime." 7-ER-1689. Appellee offered no contrary data—only anecdotes and generalities.

## VI. APPELLEE'S ARGUMENTS AMOUNT TO INTEREST BALANCING, EXPRESSLY REJECTED BY THE SUPREME COURT

Rather than supplying any relevant historical analogue—as *Bruen* requires—Appellee reverts to policy arguments about the relative

"dangers" and "utility" of switchblades. These arguments are not part of the *Bruen* test and were rejected in *Heller*.

Appellee claims that courts should consider "objective evidence" of a weapon's use or suitability for self-defense, and argues that to qualify for protection, an arm must possess the "character" of a self-defense weapon. AB at 13-14. But this turns *Heller* on its head. The Supreme Court emphasized that constitutional rights do not depend on whether a particular weapon is best suited, most effective, or most frequently used for self-defense. "Whatever the reason," the *Heller* Court held, individuals may choose the arms they wish to keep and bear. 554 U.S. at 629.

This principle is repeated throughout the Court's modern Second Amendment jurisprudence. In *Bruen*, the Court reaffirmed that "[t]he Second Amendment… is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" 597 U.S. at 33 (quoting *McDonald*, 561 U.S. at 780). In *Rahimi*, the Court held that even "seemingly reasonable" public safety arguments *could not override* the need for a historical analogue. 602 U.S. at 692. And in *Caetano*, the Court vacated a conviction despite Appellee's argument that stun guns were "unusual" or "less effective" than other self-defense tools. 577 U.S. at 412 (per curiam).

Appellee offers no authority—none—for its novel "character" requirement. AB at 13-14. It never defines what qualifies as a "self-defense weapon," what characteristics must be present, or what burden must be met. Nor does Appellee explain how such an inquiry is

26

consistent with *Heller* and *Bruen's* repeated admonition that courts may not engage in cost-benefit/interest balancing analysis. 554 U.S. at 634.

If adopted, Appellee's theory would effectively remove constitutional protection from any weapon not currently "popular" for self-defense—an outcome *Heller* explicitly condemned. Lever-action rifles, bolt-action hunting rifles, double-barrel shotguns, and even muskets would all fail the test if gauged by frequency of use in modern self-defense incidents. Yet no court has ever suggested that such arms fall outside the Second Amendment—because such an argument would be absurd.

Indeed, Appellee's arguments could apply equally to handguns. It asserts that switchblades are "particularly susceptible to misuse," "favored by criminals," "not ideal under stress," and "readily concealable." AB at 17–21. But every one of those conditions could be applied to handguns—a fact the *Heller* rejected when it invalidated D.C.'s handgun ban as unconstitutional. The *Heller* Court rejected arguments about the risks of handgun misuse, noting that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* 554 U.S. at 635. The same must apply here.

The possibility of misuse or "distressed use" cannot justify a categorical ban on a class of arms in common use. Nor can Appellee limit the Second Amendment to only those weapons Appellee deems are "suitable" or "appropriate" for self-defense.

## VII.  CONCLUSION

Appellee fails to justify California's switchblade knife ban under any constitutionally relevant framework. The laws ban a class of arms that are commonly possessed by law-abiding citizens for lawful purposes. It is a functional and categorical ban. Appellee's policy concerns, expert preferences, and generalized weapon fears cannot overcome the Supreme Court's clear instruction that the Second Amendment protects arms in common use and that interest-balancing is not at issue.

Accordingly, this Court is asked to: (i) reverse the district court's ruling that switchblades are not "arms" protected by the Second Amendment; (ii) affirm the district court's finding that Appellees failed to identify a historical analogue; (iii) declare California Penal Code §§ 17235, 21510, and 21590 unconstitutional and permanently enjoined; and (iv) remand with instructions to enter judgment in favor of Appellants.

April 25, 2025                          Respectfully submitted,

                                           **DILLON LAW GROUP, APC**

                                           */s/ John W. Dillon*

                                           John W. Dillon
                                           California State Bar No. 296788
                                           jdillon@dillonlawgp.com

                                         **DILLON LAW GROUP APC**
                                         2647 Gateway Road, Ste 105, #255
                                         Carlsbad, California 92009
                                         Phone: (760) 642-7150
                                         Fax: (760) 642-7151
                                         Attorneys for Appellants

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure Rule 32(g)(1), this brief contains 6,999 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). The undersigned certifies that this brief complies with the word limit of Ninth Cir. R. 32-1.

By:    */s/ John W. Dillon*
       John W. Dillon