No. 24-5536

# In the United States Court of Appeals for the Ninth Circuit

◆

KNIFE RIGHTS, INC., ET AL.

*Plaintiffs–Appellants,*

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF THE STATE OF CALIFORNIA,

*Defendant–Appellee.*

◆

Appeal from the United States District Court
for the Southern District of California
No. 3:23-cv-00474-JES-DDL
The Honorable James E. Simmons, Jr.

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION
OF AMERICA AND THE NATIONAL SHOOTING SPORTS
FOUNDATION, INC. AS *AMICI CURIAE* IN SUPPORT
OF PLAINTIFFS–APPELLANTS**

◆

LAWRENCE G. KEANE
SHELBY BAIRD SMITH
NATIONAL SHOOTING SPORTS
FOUNDATION, INC.
400 N. Capital St., NW
WASHINGTON, D.C. 20001
(202) 220-1340
lkeane@nssf.org

JOSEPH G.S. GREENLEE
 *Counsel of Record*
ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

## CORPORATE DISCLOSURE STATEMENT

The National Rifle Association of America has no parent corporation and no publicly held company owns 10% or more of its stock.

The National Shooting Sports Foundation, Inc., has no parent corporation and no publicly held company owns 10% or more of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS ....................................................................ii

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT OF *AMICI CURIAE* ...................................................1

CONSENT TO FILE ..........................................................................2

SUMMARY OF ARGUMENT ............................................................3

ARGUMENT ....................................................................................6

    I.   *Heller* held that common arms cannot be banned. ........................6

    II.  The state misunderstands Supreme Court precedent. ...............10

       A.  The Second Amendment's text extends to all bearable arms. .......................................................................10

       B.  The "common use" and "dangerous and unusual" considerations are part of the historical analysis—not the plain text analysis. ...........................................12

       C.  "Common use" is not limited to self-defense; it includes all lawful purposes. ........................................14

       D.  How commonly the People possess arms for lawful purposes is dispositive, not the government's assessment of their suitability for those purposes. ...................................16

       E.  The relevant inquiry is how commonly arms are possessed for lawful purposes, not how often they are actually employed in self-defense situations. ........................................19

       F.  Arms may be banned only if they are *both* dangerous *and* unusual. .................................................................20

    III. There is a robust tradition of possessing knives throughout American history, and no tradition of banning knives. ..............22

       A.  There is a strong tradition of possessing knives—including folding pocketknives—in American history. ............................23

       B.  There is no tradition of banning the possession of knives in American history. ...............................................28

CONCLUSION .................................................................................32

CERTIFICATE OF COMPLIANCE.........................................................33

CERTIFICATE OF SERVICE.................................................................34

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State,*
 50 Tenn. 165 (1871) ..............................................................15

*Aymette v. State,*
 21 Tenn. 154 (1840) .......................................................30, 31

*Caetano v. Massachusetts,*
 577 U.S. 411 (2016) ..................................................... *passim*

*District of Columbia v. Heller,*
 554 U.S. 570 (2008) ..................................................... *passim*

*Edenfield v. Fane,*
 507 U.S. 761 (1993) ..............................................................18

*Fife v. State,*
 31 Ark. 455 (1876) ...............................................................30

*Friedman v. City of Highland Park, Ill.,*
 784 F.3d 406 (7th Cir. 2015) ..............................................17

*Friedman v. City of Highland Park, Ill.,*
 577 U.S. 1039 (2015) ..............................................................9

*McDonald v. City of Chicago,*
 561 U.S. 742 (2010) ..........................................8, 15, 16, 18

*Miller v. Bonta,*
 699 F. Supp. 3d 956 (S.D. Cal. 2023) ................................21

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
 597 U.S. 1 (2022) ........................................................ *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York,*
 590 U.S. 336 (2020) ..............................................................16

*Nunn v. State,*
 1 Ga. 243 (1846) ............................................................28, 29

iv

*Snope v. Brown*,
   145 S. Ct. 1534 (2025) .......................................................... 11, 14, 17

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023) ............................................... 14

*United States v. Miller*,
   307 U.S. 174 (1939) ............................................................ 6, 7

*United States v. Rahimi*,
   602 U.S. 680 (2024) ............................................................ 11, 31

## Constitutional Provisions

U.S. CONST. amend. I ................................................................. 18, 20

U.S. CONST. amend. II.................................................................. *passim*

## Statutes and Regulations

1837 Ga. Laws 90 ........................................................................ 28

1838 Tenn. Pub. Acts 200............................................................ 29

1852 Ga. Laws 269 ...................................................................... 29

1881 Ark. Acts 192 ..................................................................... 30

## Other Authorities

BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE
   AMERICAN TRADITION, vol. 2 (Arthur Vollmer ed., 1947) .................. 27

Cooley, Thomas M., THE GENERAL PRINCIPLES OF CONSTITUTIONAL
   LAW IN THE UNITED STATES OF AMERICA (1880) ................................. 15

Kopel, David B. & Greenlee, Joseph G.S., *The History of Bans on
   Types of Arms Before 1900*, 50 J. LEGIS. 223 (2024)...................... 26, 31

Neumann, George G., SWORDS & BLADES OF THE AMERICAN
   REVOLUTION (1973) ................................................................... *passim*

v

## STATEMENT OF *AMICI CURIAE*[1]

The National Rifle Association of America (NRA) is America's oldest civil rights organization and foremost defender of Second Amendment rights. It was founded in 1871 by Union veterans—a general and a colonel—who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has approximately four million members, and its programs reach millions more.

The National Shooting Sports Foundation, Inc. ("NSSF"), is the national trade association for the firearm, ammunition, hunting, and shooting sports industry. Formed in 1961, NSSF is a 501(c)(6) tax-exempt Connecticut nonprofit trade association. NSSF's membership includes approximately 10,000 federally licensed firearms manufacturers, distributors and retailers; companies manufacturing, distributing, and

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. Only *amici* and its members contributed money intended to fund its preparation or submission.

1

selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; and endemic media. NSSF's mission is to promote, protect, and preserve hunting and the shooting sports.

*Amici* are interested in this case because California's ban on arms typically possessed by law-abiding citizens for lawful purposes violates the Second Amendment.

## CONSENT TO FILE

All parties consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The Supreme Court held that bans on common arms violate the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570 (2008). The *Heller* Court applied the text-and-history test later expounded in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Analyzing the Second Amendment's plain text, *Heller* determined that the Second Amendment extends to all bearable arms. Proceeding to our nation's historical tradition of firearm regulation, *Heller* held that only "dangerous and unusual" arms may be banned, and because common arms are necessarily not unusual, a ban on common arms violates the Second Amendment.

Under the Supreme Court's precedents, this case is simple. Switchblades are covered by the Second Amendment's text because they are bearable arms. And because they are in common use, they cannot be prohibited under our historical tradition.

The state of California resists the Supreme Court's precedents at every turn. It urges this Court to limit the Second Amendment's text to only common arms, even though *Heller* held that it covers all bearable arms and made clear that commonness is part of the historical—not

3

textual—analysis. California contends that the Second Amendment excludes arms the government deems ill-suited for self-defense, despite *Heller*'s holding that it is the People—not the government—who decide which arms are protected. It argues that arms are protected only if they are commonly used for self-defense, even though *Heller* additionally recognized hunting, training, and community defense as protected purposes. It asserts that an arm is common only if it is frequently used in self-defense incidents, despite *Heller* holding that possession alone is dispositive. And it claims that common arms may nevertheless be banned if they are dangerous, directly contradicting *Heller*'s holding that common arms cannot be banned, regardless of dangerousness. This Court should reject the state's attempt to evade Supreme Court precedent and hold California's ban on common switchblades unconstitutional.

The unconstitutionality of California's ban is further demonstrated by the tradition of knife possession and regulation throughout American history. Starting in the earliest colonial days, Americans regularly kept and carried knives, especially belt knives, daggers, dirks, and jack-knives—the last of which are folding pocketknives analogous to switchblades. These knives were all commonly possessed throughout the

colonial and Founding eras by both civilians and militiamen, and they were all used in the Revolutionary War. This tradition is especially significant when considered in light of the absence of historical prohibitions on knife possession.

No prohibition on the possession of any type of knife existed in the colonial or Founding eras. Only one state in the nineteenth century banned the possession of any particular knife, and the law imposing that ban was held to violate the Second Amendment. Two states outlawed the transfer—but not the possession—of certain knives. Neither of these laws applied to pocketknives. And two regulations cannot establish a tradition, especially when one of them was enacted in the late nineteenth century. *See Bruen*, 597 U.S. at 46, 66 (rejecting the proposition that "*three* colonial regulations could suffice to show a tradition" and noting the limited utility of late nineteenth-century evidence). Moreover, the supreme courts of both states had interpreted their state constitutional arms right as protecting only militia-suitable arms. Therefore, California's ban on switchblade knives contradicts our nation's tradition of regulation and violates the Second Amendment.

## ARGUMENT

### I. *Heller* held that common arms cannot be banned.

The Supreme Court held that bans on common arms violate the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Heller*, invalidating the District of Columbia's handgun ban, applied the test later reinforced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, which controls here:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation…. the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

597 U.S. 1, 17 (2022).

Conducting the plain text analysis of the Second Amendment, *Heller* determined that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582.

Proceeding to the historical tradition of firearm regulation, *Heller* held that common arms cannot be banned. Historically, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Therefore, "the sorts of

6

weapons protected were those 'in common use at the time.'" *Id.* at 627 (quoting *Miller*, 307 U.S. at 179).

As for prohibitions on particular arms, the Court's extensive historical analysis identified only "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* This traditional regulation "fairly supported" *Heller*'s holding that the Second Amendment protects common arms because common arms are necessarily not dangerous *and unusual. Id.*; *see also Bruen*, 597 U.S. at 47 ("Drawing from this historical tradition [of restrictions on 'dangerous and unusual weapons'], we explained [in *Heller*] that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" (quoting *Heller*, 554 U.S. at 627)).

The *Heller* Court then determined that its "historical understanding of the scope of the right"—*i.e.*, that common arms cannot be banned—was consistent with *Miller*, which established that "the

Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625.[2]

Concluding that the nation's tradition of firearm regulation allows only dangerous and unusual weapons to be banned, and that handguns—as "the most popular weapon chosen by Americans"—are common, *Heller* held that "a complete prohibition of their use is invalid." *Id.* at 629.

After *Heller*, the Supreme Court invalidated Chicago's handgun ban in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *McDonald* reaffirmed that the Second Amendment "applies to handguns because they are 'the most preferred firearm in the nation'" for self-defense. 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 628–29).

---

[2] *Bruen* likewise made clear that "dangerous and unusual" arms can become common—and thus protected—arms:

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." [*Heller*, 554 U.S. at 629.] Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

597 U.S. at 47.

In *Caetano v. Massachusetts*, the Supreme Court summarily reversed a ruling that upheld a stun gun prohibition. 577 U.S. 411 (2016). Concurring, Justice Alito, joined by Justice Thomas, explained that because "stun guns are widely owned and accepted as a legitimate means of self-defense across the country[,] Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." *Id.* at 420 (Alito, J., joined by Thomas, J., concurring).

Justice Thomas, who authored the *Bruen* opinion, joined by Justice Scalia, who authored the *Heller* opinion, provided additional confirmation of this application of the Court's test in a dissent from a denial of certiorari:

> *Heller* asks whether the law bans types of firearms commonly used for a lawful purpose…. Roughly five million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons.

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 1042 (2015) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) (citations omitted) (emphasis added).

9

Thus, for arms prohibitions, "the pertinent Second Amendment inquiry is whether [the arms] are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano*, 577 U.S. at 420 (Alito, J., joined by Thomas, J., concurring) (emphasis omitted).

Under the Supreme Court's precedents, this case is simple: switchblades are covered by the Second Amendment's plain text because they are bearable arms, and because they are common, *see* Op. Br. 30–39, they cannot be banned.

## II.    The state misunderstands Supreme Court precedent.

### A.    The Second Amendment's text extends to all bearable arms.

The state argues that to be covered by the Second Amendment's text, "[t]he regulated weapon must … be '"in common use" today for self-defense.'" Ans. Br. 12 (quoting *Bruen*, 597 U.S. at 32). But the Supreme Court has repeatedly established that the text covers all bearable arms.

The Supreme Court conducted the plain text analysis of the Second Amendment in *Heller*, 554 U.S. at 576–600. Interpreting "Arms," *Heller* held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. The Court

10

has thrice reaffirmed *Heller*'s holding. *Caetano*, 577 U.S. at 411 (quoting *Heller*, 554 U.S. at 582, and describing *Heller*'s definition of "Arms" as a holding); *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582); *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *Heller*, 554 U.S. at 582).

*Heller*'s "general definition" of "Arms," *Bruen*, 597 U.S. at 28, "includes any 'weapon of offence' or 'thing that a man wears for his defence, or takes into his hands,' that is 'carried … for the purpose of offensive or defensive action,'" *Caetano*, 577 U.S. at 416 n.3 (Alito, J., joined by Thomas, J., concurring) (quoting *Heller*, 554 U.S. at 581, 584) (brackets and citations omitted). It also "covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28; *cf. Caetano*, 577 U.S. at 416 n.3 (Alito, J., joined by Thomas, J., concurring).

Thus, "[u]nder the plain text of the Second Amendment, the challengers' only burden is to show that [switchblades] are bearable 'Arms'—*i.e.*, 'weapons of offence.'" *Snope v. Brown*, 145 S. Ct. 1534, 1537 (2025) (Thomas, J., dissenting from the denial of certiorari) (quoting *Heller*, 554 U.S. at 581) (brackets omitted).

11

Here, because the banned knives are bearable arms and thus covered by the plain text, the state may justify its ban only by proving that it is consistent with historical tradition.

### B. The "common use" and "dangerous and unusual" considerations are part of the historical analysis—not the plain text analysis.

The state contends that the Second Amendment's text does not cover the banned knives because the "Plaintiffs have not shown that" they are "commonly used today for ordinary self-defense." Ans. Br. 14. But both *Heller* and *Bruen* demonstrate that the consideration of whether an arm is "in common use," and the corresponding consideration of whether an arm is "dangerous and unusual," must be considered in the historical analysis—where the government bears the burden—rather than in the plain text analysis.

*Heller* referred to "the *historical tradition*" of regulating "dangerous and unusual weapons." 554 U.S. at 627 (emphasis added). And *Bruen* explained that the *Heller* Court was "[d]rawing from this *historical tradition*" of restricting "dangerous and unusual weapons" in holding that the Second Amendment protects arms "'in common use at the time,'

as opposed to those that 'are highly unusual in society at large.'" 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627) (emphasis added).

Moreover, *Heller* considered that "historical tradition" in its own historical analysis. After completing the plain text analysis of the Second Amendment, 554 U.S. at 576–600, the Court began focusing on historical tradition, including "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," *id.* at 605, 605–19, as well as Supreme Court precedents, *id.* at 619–26. Only after that did the Court identify the "historical tradition" of regulating "dangerous and unusual weapons" and determine that arms "in common use at the time" are protected. *Id.* at 627 (quotations omitted).

What is more, the Court identified the traditional "dangerous and unusual" regulation in the same paragraph as other "longstanding" regulations, *id.* at 626–27, while promising to "expound upon the *historical justifications* for" those regulations another time, *id.* at 635 (emphasis added). Indeed, *Heller* "did not say that dangerous and unusual weapons are not *arms*," but rather, "that the relevance of a weapon's dangerous and unusual character lies in the '*historical*

13

tradition[.]'" *Teter v. Lopez*, 76 F.4th 938, 949 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024) (quoting *Heller*, 554 U.S. at 627) (emphasis in *Teter*).

Justice Kavanaugh recently reinforced the Court's precedents by referring to "the *historically based* 'common use' test with respect to the possession of particular weapons." *Snope*, 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting the denial of certiorari) (emphasis added).

### C. "Common use" is not limited to self-defense; it includes all lawful purposes.

The state contends that the Second Amendment does not cover the banned knives because "Plaintiffs did not show" that they are "in common use today *for self-defense*." Ans. Br. 9 (emphasis added). In addition to impermissibly shifting its burden to plaintiffs, the state's argument is contrary to the holdings in *Heller* and its progeny because self-defense is not the only purpose the Second Amendment protects.

*Heller* explained that the right protects weapons "typically possessed by law-abiding citizens for *lawful purposes*," 554 U.S. at 625 (emphasis added), which makes sense because "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' *for lawful purposes* like self-defense," *id.* at 624 (emphasis added).

14

*Heller* approvingly quoted the Supreme Court of Tennessee stating that "the right to keep arms involves, necessarily, the right to use such arms *for all the ordinary purposes*." *Id.* at 614 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)) (emphasis added). *Heller* also acknowledged that "most [founding-era Americans] undoubtedly thought [the right] even more important for self-defense *and hunting*" than militia service, *id.* at 599 (emphasis added), and that the right includes "learning to handle and use [arms] in a way that makes those who keep them ready for their efficient use," *id.* at 618 (quoting Thomas M. Cooley, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 271 (1880)). Indeed, Justice Stevens's dissent recognized that "[w]hether [the Second Amendment] also protects the right to possess and use guns for nonmilitary purposes like hunting and personal self-defense is the question presented by this case." *Id.* at 636–37 (Stevens, J., dissenting).

In *McDonald*, the Court summarized the "central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms *for lawful purposes*, most notably for self-defense within the home." 561 U.S. at 780 (emphasis added); *see also Friedman*, 577 U.S. at 1042

15

(Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) ("The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, that is all that is needed[.]") (citation omitted).

In *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*—a case that was dismissed as moot—four Justices of the Supreme Court recognized that other rights protected by the Second Amendment include "transfer[ring] ownership" of an arm, "tak[ing] a gun for maintenance or repair," and "tak[ing] a gun to a range in order to gain and maintain the skill necessary to use it responsibly." 590 U.S. 336, 364–65 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting); *id.* at 340 (Kavanaugh, J., concurring) ("agree[ing] with Justice ALITO's general analysis of *Heller* and *McDonald*").

**D. How commonly the People possess arms for lawful purposes is dispositive, not the government's assessment of their suitability for those purposes.**

The state argues that "switchblades are generally ill-suited for self-defense," because "extensive training is required to use a switchblade knife safely and effectively," "it can be difficult to practice using a switchblade," there can be "psychological barriers" to using one, and

"these knives can fail to lock and are rendered effectively unusable." Ans. Br. 17, 19.

But it is not for the government to decide whether an arm is "ill-suited for self-defense." *Id.* at 19. "Our Constitution allows the American people—not the government—to decide which weapons are useful for self-defense." *Snope*, 145 S. Ct. at 1537 (Thomas, J., dissenting from the denial of certiorari). "To limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government—a result directly contrary to our constitution and to our political tradition." *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 413 (7th Cir. 2015) (Manion, J., dissenting); *see also Caetano*, 577 U.S. at 422 (Alito, J., joined by Thomas, J., concurring) (Disapproving "the safety of all Americans [being] left to the mercy of state authorities who may be more concerned about disarming the people than about keeping them safe.").

Rather, *Heller* affirmed that the People have the right to choose their preferred arms: "*Whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629 (emphasis

17

added). As Justice Stevens explained, "[t]he [*Heller*] Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose." *McDonald*, 561 U.S. at 890 n.33 (Stevens J., dissenting).

In *McDonald*, the Court explained why it struck the handgun ban in *Heller*: "we found that this right applies to handguns because they are the most preferred firearm in the nation to 'keep' and use for protection of one's home and family. Thus, we concluded, citizens must be permitted to use handguns for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 767–68 (cleaned up). Because handguns are "preferred," they "must be permitted." The same goes for switchblades.

In the First Amendment context, "the general rule is that the speaker and the audience, not the government, assess the value of the information presented." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). Just as the People have the right to determine the value of the information they exchange, they have the right to determine the value—including the defensive value—of the arms they keep and bear. California's contrary argument that it is the arbiter of what arms are *truly* necessary for self-

18

defense is redolent of the "interest-balancing" explicitly rejected in *Heller*, 554 U.S. at 634. The strict-necessity test California advocates for is premised on the discredited theory that the Second Amendment is a "second-class right." *Bruen*, 597 U.S. at 70. But the Supreme Court has made abundantly clear that "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government— the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634.

### E. The relevant inquiry is how commonly arms are possessed for lawful purposes, not how often they are actually employed in self-defense situations.

The state claims that "common ownership" is insufficient to establish common use, and that an arm must be commonly employed in actual self-defense situations to be protected. Ans. Br. 15.

But *Heller* held that weapons "typically *possessed*" for "lawful purposes" are protected. 554 U.S. at 625 (emphasis added). And the *Caetano* concurrence explained that "the pertinent Second Amendment inquiry is whether [the arms] are commonly *possessed* by law-abiding citizens for lawful purposes today." 577 U.S. at 420 (Alito, J., joined by Thomas, J., concurring) (emphasis altered).

19

It does not matter how often an arm is actually employed in self-defense. A firearm that is possessed for self-defense is *used* for self-defense, even when it is not being fired. *Heller* did not attempt to quantify defensive handgun incidents—it focused only on how commonly handguns were kept for that purpose. Moreover, if Second Amendment protection depended on the frequency of defensive uses, the People's rights would diminish as the nation became safer, because their arms would be employed less frequently in self-defense. Rather, unfired firearms are protected by the Second Amendment just as unread books are protected by the First Amendment.

## F. Arms may be banned only if they are *both* dangerous *and* unusual.

As noted in Part I, for regulations on particular arms, *Heller*'s historical analysis identified only "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. "To fall within that category," according to the state, "the weapon need not be … 'unusual,'" but only "especially dangerous." Ans. Br. 22. But the Supreme Court has demonstrated that a "dangerous and unusual" weapon must be *both* dangerous *and* unusual.

The Court "carefully uses the phrase 'dangerous *and* unusual arms.'" *Miller v. Bonta*, 699 F. Supp. 3d 956, 969 (S.D. Cal. 2023), *appeal held in abeyance*, No. 23-2979, 2024 WL 1929016 (9th Cir. Jan. 26, 2024) (emphasis added). Plus, in *Caetano*, after determining that the Massachusetts Supreme Judicial Court's analysis of whether stun guns were "unusual" was flawed, the Court declined to consider whether stun guns qualified as "dangerous." 577 U.S. at 412. If dangerousness alone sufficed to justify a prohibition, the Court would have proceeded to consider the dangerousness of stun guns. Justice Alito made this point explicitly in the concurrence:

> As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous."

*Id.* at 417 (Alito, J., joined by Thomas, J., concurring) (citing *Heller*, 554 U.S. at 636). The state dismisses the *Caetano* concurrence as "not binding on this Court," Ans. Br. 15, but as the concurrence itself points out, the *Caetano* opinion—which is binding—makes plain that an arm must be *both* dangerous *and* unusual.

21

Because "dangerous and unusual" is a conjunctive test, and a weapon that is common is the antithesis of a weapon that is unusual, common arms cannot be banned even if they are dangerous. Indeed, contrary to the state's claim that an arm need only be "especially dangerous" to be "dangerous and unusual," Ans. Br. 22, "[i]f *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Caetano*, 577 U.S. at 418 (Alito, J., joined by Thomas, J., concurring).

### III. There is a robust tradition of possessing knives throughout American history, and no tradition of banning knives.

The state failed to prove that switchblade knives are either dangerous or unusual, and "[a] weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.* at 417 (Alito, J., joined by Thomas, J., concurring). Therefore, California's switchblade ban violates the Second Amendment. This is further supported by the specific tradition of knife possession and regulation throughout American history.

### A. There is a strong tradition of possessing knives—including folding pocketknives—in American history.

Starting in the earliest colonial days, Americans regularly kept and carried knives for lawful purposes including self defense. They maintained this practice throughout and beyond the Founding Era.

"Knives and daggers were personal necessities to the early American. They served him in a wide variety of uses, including cleaning game, home chores, fighting, trading with the Indians, and as cooking-eating utensils." George G. Neumann, SWORDS & BLADES OF THE AMERICAN REVOLUTION 227 (1973).

Most knives in the colonial and Founding eras could be classified as a belt knife, dagger, dirk, or jack-knife. The belt knife, "a single-edged blade (with or without a false edge), designed primarily for cutting," was used "as both a tool and a weapon" and "could whittle, carve, skin, chop stab, and scalp." *Id.* at 227, 228. "The longer sizes are generally thought of as 'riflemen's knives'—since with the rifle and tomahawk they constituted the frontiersman's basic equipment." *Id.* at 228. The blades "often reached 12 or more inches," but smaller variations "with blades of 5 to 6 inches were also popular." *Id.* A third variation, "with a 3 to 4-inch blade," was known as a "patch cutter." *Id.* The dagger, with its

23

"symmetrical tapering blade having at least two edges," was "[d]eveloped for fighting" and "most effective as a thrusting and stabbing weapon." *Id.* at 227. The dirk initially "denoted an even-tapering blade similar to the dagger, with only one edge sharpened," but near "the end of the American Revolution the term began to describe short naval side arms mounting either dagger or knife blades." *Id.* The jack-knife was a folding pocketknife, with blades ranging from three to twelve inches. *Id.* at 231. These were sometimes referred to as "pocket knives," "clasp knives," "spring knives," or "folding knives." *Id.*

In seventeenth-century America, "these short-edged weapons had very real importance." *Id.* at 227. "The prevailing practice stressed daggers for the skilled fighting man and knives for everyday use." *Id.* Thus, while "military men emphasized the dagger, most colonists carried knives for their daily needs—utilizing both fixed and folding blades." *Id.* "Contemporary records list ship cargoes with thousands of 'long knives' and jackknives," with most imports apparently arriving "from England, France, Germany, and Low Countries." *Id.* at 228. Because knives served as essential weapons for defense, tools for everyday tasks, and "an important commodity in trading with the Indians," historical sources

24

frequently "mention their employment" in America "through the 1600s." *Id.* at 227–28.

At the turn of the eighteenth century, "farmers and tradesmen continued to carry the belt knife and dagger," but as the century progressed, "more and more adopted the pocket knife for personal use" to "the point where they became almost universal accessories." *Id.* at 228, 231. The "majority of gentlemen" along the Atlantic Coast "adopted the new fashion of wearing a small sword," while "along the frontier … the belt knife and dagger remained common accessories." *Id.* at 228. In the southern colonies, dirks were especially popular, in large part due to the significant number of Scottish settlers. "The dirk was a personal weapon to them. It was usually carried in civilian life and commonly supplied by the soldier himself[.]" *Id.* at 230. "It was also the practice by many Scots to carry a small companion knife to the dirk." *Id.* at 231. This companion knife, called a "sgian dubh" (meaning, "black knife"), was commonly carried in a shirt sleeve in the early eighteenth century but became more commonly carried in the "top of the stocking" by the late eighteenth century. *Id.*

25

Militiamen in colonial America always depended on knives and other edged weapons. Even as firearms became increasingly reliable, "for close combat the soldier's ultimate reliance remained with his bladed secondary arm—the bayonet, sword, belt axe, or knife." *Id.* at 14. Throughout both the colonial and Founding eras, militiamen were required to keep and bear a variety of edged weapons, including backswords, bayonets, broad swords, cimeters, cutlasses, cutting-swords, hangers, hatchets, rapiers, swords, tomahawks, halberds, lances, partisans, pikes, and spontoons. David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. 223, 244–47 (2024)[3] (defining each weapon and providing the many militia laws that required them).

Additionally, jack-knives, daggers, and dirks were all widely used during the Revolutionary War. Jack-knives "were apparently used by a great majority of soldiers to serve their numerous personal needs." Neumann, SWORDS & BLADES, at 231. Massachusetts, New Hampshire, and New York required militiamen to keep and bear jack-knives during

---

[3] https://scholarship.law.nd.edu/cgi/viewcontent.cgi?article=1774&context=jleg.

the war. *Id.* at 20, 231; 2 BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Part 6 (Massachusetts), at 223 (Arthur Vollmer ed., 1947); *id.* Part 7 (New Hampshire), at 82. "Daggers were apparently 'unofficial' weapons of the American Revolution. The pocket knife and rifleman's knife are mentioned in surviving regulations, but the dagger seems to have found most of its use as an individual's personal weapon." Neumann, SWORDS & BLADES, at 229. "Many Americans, especially the militia, fought without bayonets in the Revolution, and a number of them apparently substituted the belt dagger as their 'close up' weapon.'" *Id.* As for dirks, "[m]any appear to have been used during the War for Independence by colonists of Scotch background, as well as by Scottish units in the British Army." *Id.* at 230.

Additionally, "[m]any innovations were attempted prior to 1783," including "spring-folding blades, knife and sword bayonets, locking spring clips, [and] spear points," although they were not commonly used during the war. *Id.* at 31. Nevertheless, the "belt knife and dagger continued to be popular in America for at least 80 years after the Revolution." *Id.* at 230.

27

In sum, knives were commonly possessed throughout the colonial and Founding eras by both civilians and militiamen. This tradition is especially significant when considered in light of the absence of historical knife prohibitions, discussed next.

## B. There is no tradition of banning the possession of knives in American history.

No prohibition on the possession of any type of knife existed in the colonial or Founding eras.

In the nineteenth century, only one state banned the possession of any particular knife, and the law imposing that ban was held to violate the Second Amendment. In 1837, Georgia forbade the possession, carry, or sale of "Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c…. save such pistols as are known and used, as horseman's pistols, &c." 1837 Ga. Laws 90. Hawkins Nunn was convicted of violating this law by "having and keeping about his person, and elsewhere, a pistol[.]" *Nunn v. State*, 1 Ga. 243, 247 (1846). The Supreme Court of Georgia held the law unconstitutional, ruling that the Second Amendment protects the right "to keep and bear arms *of every description*" and that only the concealed carry of those arms

28

may be prohibited. *Id.* at 251 (emphasis added).[4] In response, the 1837 law was expressly repealed and replaced with a law forbidding the concealed carry of the same arms that had been prohibited by the 1837 law—but, consistent with *Nunn*, the new law did not prohibit the possession, sale, or open carry of those arms. 1852 Ga. Laws 269.[5]

Two states outlawed the transfer of certain knives, but not their possession. Tennessee in 1838 prohibited the sale of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick[.]" 1838 Tenn. Pub. Acts 200. And Arkansas in 1881 forbade the transfer of

---

[4] *Nunn* is sometimes read as striking down only the ban on carrying pistols openly. But in order to "dispose finally of this case," and order that "the judgment of the court below must be reversed, and the proceeding quashed," the court had to invalidate Nunn's conviction for "having" the pistol as well. *Nunn*, 1 Ga. at 245, 247, 251. Indeed, it would be nonsensical for the court to hold the ban on openly carrying pistols unconstitutional without holding the ban on possessing pistols unconstitutional. Rather, the *Nunn* court held "that portion of the statute which entirely forbids [the pistol's] use" unconstitutional, except for the concealed carry ban, which it deemed "valid." *Id.* at 251.

[5] This law forbade the concealed carry of "any pistol (except horseman pistols,) dirk, sword in a cane, spear, bowie knife, or any other kind of knives manufactured and sold for the purpose of offence and defence[.]" 1852 Ga. Laws 269.

"any dirk or bowie knife, or a sword or a spear in a cane[.]" 1881 Ark. Acts 192.

These laws cannot establish a tradition of regulation. First, only Georgia's law could arguably be interpreted as applying to pocketknives—*i.e*, knives analogous to switchblade knives—and that law was held unconstitutional. This provides evidence that California's ban is also unconstitutional. *Bruen* explained that if "analogous regulations … were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 597 U.S. at 27. Second, the Tennessee and Arkansas laws are too few to establish a tradition. *Bruen* rejected the proposition that "*three* colonial regulations could suffice to show a tradition." *Id.* at 46. Surely two regulations—including one late-nineteenth-century regulation—cannot either. *See id.* at 66 ("[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). Third, the supreme courts of both Tennessee and Arkansas had interpreted their state constitutional right to arms as solely applicable to militia-suitable arms. *Aymette v. State*, 21 Tenn. 154, 158 (1840); *Fife v. State*, 31 Ark. 455, 460–61 (1876); *see also Heller*, 554

U.S. at 613 (*Aymette*'s "odd reading of the right is, to be sure, not the one we adopt").

The most common approach to regulating knives throughout the nineteenth century was to restrict the manner in which they could be carried, restrict sales to minors, or impose extra punishment for criminal misuse. Kopel & Greenlee, *The History of Bans*, at 383. But *Bruen* held that lesser historical restrictions—including "restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms"—cannot justify "broadly prohibiting the public carry of commonly used firearms." 597 U.S. at 38. Similarly, *Rahimi* reaffirmed that lesser historical restrictions—including laws requiring sureties for threatening behavior or preventing carrying in a terrifying manner—cannot justify laws that "broadly restrict arms use by the public generally." 602 U.S. at 698. For the same reason, lesser, non-prohibitory restrictions—such as laws regulating the manner of carry, *see* Ans. Br. 35, or enhancing penalties for criminal misuse, *see id.* at 36—cannot justify the broad prohibition on possessing common arms at issue here.

31

Because there is no tradition of prohibiting the possession of any knives, let alone pocketknives, California's ban on switchblade knives contradicts our nation's tradition of regulation and violates the Second Amendment.

## CONCLUSION

California's ban on protected arms should be held unconstitutional, and the district court's orders should be reversed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
   *Counsel of Record*
ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

LAWRENCE G. KEANE
SHELBY BAIRD SMITH
NATIONAL SHOOTING SPORTS
FOUNDATION, INC.
400 N. Capital St., NW
WASHINGTON, D.C. 20001
(202) 220-1340
lkeane@nssf.org

32

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-5536

I am the attorney or self-represented party.

**This brief contains** | 5,973 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated | 09/05/2025 .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Joseph G.S. Greenlee | **Date** | 09/26/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on September 26, 2025, I served the foregoing with the Clerk of the Court using the ACMS System, which will send notice of such filing to all registered ACMS users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*