No. 24-5536

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

―――――――――――――――

KNIFE RIGHTS, INC., *ET AL.*,

*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney General
of the State of California,

*Defendant-Appellee.*

―――――――――――――――

On Appeal from the United States District Court
for the Southern District of California
No. 3:23-cv-00474-JES-DDL
Hon. James E. Simmons, Jr.

―――――――――――――――

**BRIEF OF COURT-APPOINTED AMICUS CURIAE
WILLIAM TAYLOR IN SUPPORT OF APPELLEE**

―――――――――――――――

William Taylor
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163

September 26, 2025

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ......................................................... 1

QUESTIONS PRESENTED ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 2

ARGUMENT............................................................................................ 4

   I.  Circuit Precedent Resolves the Panel's "Common Use" Questions 4

     A. "Common Use" Is a Step One, Threshold Inquiry ...................... 4

     B. Plaintiffs Must Establish that a Weapon Is "In Common Use
       Today for Self-Defense" ................................................................ 9

       1. Plaintiffs Have the Burden on the "Common Use" Inquiry ... 9

       2. Plaintiffs Must Show that the Restricted Weapon Is "In
          Common Use Today for Self-Defense" ................................. 10

          a. Actual use for self-defense ................................................. 11

          b. Suitability for self-defense ................................................. 13

          c. "Most useful in military service" ....................................... 17

       3. The "Common Use" Inquiry Is Not About "Ownership
          Statistics" ............................................................................ 18

       4. Plaintiffs' Jurisdiction-Counting Approach Is Also Contrary
          to Circuit Precedent—and Illogical....................................... 20

  II. "Dangerous and Unusual" Means Unusually Dangerous and Is
     Distinct from "Common Use"........................................................ 23

     A. The Panel Does Not Need Not to Resolve Whether "Dangerous
       and Unusual" Is a Step One or Step Two Issue ........................ 24

     B. "Dangerous and Unusual" Is Distinct from "Common Use" .... 27

C. "Dangerous and Unusual" Refers to Unusually Dangerous Weapons ...................................................................... 30

CONCLUSION .......................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. James,*
120 F.4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 .................. 8

*B&L Prods., Inc. v. Newsom,*
104 F.4th 108 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025) ..... 9

*Bevis v. City of Naperville,*
85 F.4th 1175 (7th Cir. 2023),
*cert. denied*, 144 S. Ct. 2491 (2024).................................. 6, 8, 17, 20, 21

*Bianchi v. Brown,*
111 F.4th 438 (4th Cir. 2024) (en banc),
*cert. denied*, 145 S. Ct. 1534 (2025)....7, 8, 10, 12, 14-18, 20, 21, 24, 28-
30, 32, 33, 37

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ................................................................ 33

*Capen v. Campbell,*
134 F.4th 660 (1st Cir. 2025).......................................... 8, 35

*Capen v. Campbell,*
708 F. Supp. 3d 65 (D. Mass. 2023),
*aff'd,* 134 F.4th 660 (1st Cir. 2025) ...................................... 35

*Commonwealth v. Canjura,*
240 N.E.3d 213 (Mass. 2024)............................................... 22

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.,*
108 F.4th 194 (3d Cir. 2024),
*cert. denied*, 145 S. Ct. 1049 (2025).................... 8, 12, 14, 15, 19, 22, 24

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ....................................... 6, 13, 17, 24, 31

*Duncan v. Bonta*,
 133 F.4th 852 (9th Cir. 2025) (en banc),
 *petition for cert. filed*, No. 25-198 (U.S. Aug. 15, 2025)..... 2-7, 9, 10, 18, 19-21, 26, 29, 34

*Fyock v. City of Sunnyvale*,
 779 F.3d 991 (9th Cir. 2015)............................................................ 25, 33

*Hanson v. District of Columbia*,
 120 F.4th 223 (D.C. Cir. 2024),
 *cert. denied*, 145 S. Ct. 2278 (2025)............... 8, 10, 24, 28, 30, 32-35, 37

*Lane v. Cacace*,
 No. 7:22-cv-10989, 2025 WL 903766 (S.D.N.Y. Mar. 25, 2025) ........... 8

*McDonald v. City of Chicago*,
 561 U.S. 742 (2010) ............................................................................... 21

*Nat'l Ass'n for Gun Rights v. Lamont*,
 --- F.4th ---, 2025 WL 2423599
 (2d Cir. Aug. 22, 2025) .................................................. 19, 23, 26, 28-37

*Nat'l Ass'n for Gun Rights v. Lamont*,
 685 F. Supp. 3d 63 (D. Conn. 2023), *aff'd*, --- F.4th ----,
 2025 WL 2423599 (2d Cir. Aug. 22, 2025) ................................ 11-13, 20

*New York State Rifle & Pistol Ass'n v. Bruen*,
 597 U.S. 1 (2022) ................................................................ 2, 5, 6, 28, 31

*Oakland Tactical Supply, LLC v. Howell Twp.*,
 103 F.4th 1186 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 603 (2024) ..... 9

*Ocean State Tactical, LLC v. Rhode Island*,
 95 F.4th 38 (1st Cir. 2024),
 *cert. denied*, 145 S. Ct. 2771 (2025).................................... 8, 24, 34, 35

*Or. Firearms Fed'n v. Kotek*,
 682 F. Supp. 3d 874 (D. Or. 2023), *appeal docketed*, No. 23-35478
 (lead) (9th Cir. July 17, 2023) ........................................... 11, 13, 15, 25

iv

*Ramos v. Louisiana*,
  590 U.S. 83 (2020) ................................................................. 7

*Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  127 F.4th 583 (5th Cir. 2025) ................................................ 8

*Rocky Mountain Gun Owners v. Polis*,
  121 F.4th 96 (10th Cir. 2024) ..................................... 8, 9, 24

*Rupp v. Bonta*,
  723 F. Supp. 3d 837 (C.D. Cal. 2024),
  *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024) ................ 16, 25

*Teter v. Lopez*,
  125 F.4th 1301 (9th Cir. 2025) (en banc) ............................ 26

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023) ............................. 2-5, 7, 9, 10, 18, 27, 29

*United States v. Bridges*,
  150 F.4th 517 (6th Cir. 2025) ................................... 8, 24, 36

*United States v. Morgan*,
  --- F.4th ----, 2025 WL 2502968 (10th Cir. Sept. 2, 2025) ....   10, 11, 13,
  14, 16, 17, 19, 22

*United States v. Ocker-Mullen*,
  No. 4:20-cr-00313, 2024 WL 2834845 (M.D. Pa. June 4, 2024) .......... 15

*United States v. Price*,
  111 F.4th 392 (4th Cir. 2024) (en banc),
  *cert. denied*, 145 S. Ct. 1891 (2025) ....................... 6, 8, 16, 27

*United States v. Rahimi*,
  602 U.S. 680 (2024) ................................................. 2, 21, 31

*United States v. Rahimi*,
  61 F.4th 443 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 680
  (2024) .................................................................. 8

*United States v. Veasley,*
    98 F.4th 906 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 304 (2024) ......... 8

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham,*
    741 F. Supp. 3d 172 (D. Vt. 2024), *appeal docketed*, No. 24-2026 (2d
    Cir. July 29, 2024)........................................................................... 12, 13

## Other Authorities

4 Blackstone (1769) .................................................................... 31

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual":*
    *Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016)............... 33

## INTEREST OF AMICUS CURIAE

On September 5, 2025, the panel issued an order inviting amicus curiae briefs in this case, to address a set of questions regarding issues relating to "common use" and "dangerous and unusual" and their implications for this appeal. Dkt. 25 ("Order"). The panel further appointed the undersigned as "amic[us] to provide the court with [his] independent legal expertise on these questions." *Id.* at 1 n.1.

## QUESTIONS PRESENTED

The questions presented in the panel's Order are as follows:

1. With respect to the Supreme Court's use of "in common use" in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022):

   a. Does a Court assess whether a weapon is "in common use" under *Bruen*'s "step one … threshold inquiry" or "step two" historical inquiry? See *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).

   b. What is the proper understanding and application of the "in common use" language?

2. With respect to the Supreme Court's use of "dangerous and unusual" in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008):

   a. Does a Court assess whether a weapon is "dangerous and unusual" under *Bruen*'s "step one … threshold inquiry" or "step two" historical inquiry?

   b. Whether and to what extent this language is related to the "in common use" language?

    c.  What is the proper understanding and application of the "dangerous and unusual" language?

The Argument section of this brief is organized into sections to correspond to the Court's questions.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The undersigned submits this amicus brief to respond to the panel's questions regarding the proper understanding and application of the "common use" and "dangerous and unusual" issues. On that understanding and application, and for the reasons set out in the State's brief, Dkt. 17 ("State Br."), it is the undersigned's view that California's law prohibiting the public possession, carry, and sale of certain switchblade knives is constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024).

*First*, as to "common use," this Court's recent decisions in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023), and *Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) (en banc), *petition for cert. filed*, No. 25-

---

[1] Section I.A, for example, corresponds to the Court's question 1.a, and so on.

198 (U.S. Aug. 15, 2025), control here. Under that binding Circuit precedent, the "common use" analysis occurs at the first, threshold step of the *Bruen-Rahimi* framework. And in undertaking this analysis, the Court does not focus on "ownership statistics," *id.* at 866 n.2, 882-83, but asks whether the weapon at issue is "in common use today for self-defense," *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 597 U.S. at 32). Plaintiffs have not made that showing in this case.

*Second*, as to "dangerous and unusual," the panel does not need to decide at which step of the Second Amendment analysis to address this issue. At either step, the "dangerous and unusual" inquiry does not focus on the statistical commonality of a weapon or whether it is in common use for self-defense. Rather, as other federal courts of appeals have held, "dangerous and unusual" refers to weapons that are unprotected by the Second Amendment because they are unusually or uncommonly dangerous. As California demonstrates, the switchblade knives at issue in this case fall into that category.

# ARGUMENT

## I. Circuit Precedent Resolves the Panel's "Common Use" Questions

This Court, in its recent decisions in *Alaniz* and *Duncan*, has already answered the panel's first set of questions regarding "common use." *See* Order at 1. The inquiry as to whether a weapon is "in common use" takes place at "the initial, textual determination" of the *Bruen-Rahimi* analysis. *Duncan*, 133 F.4th at 866 n.2 (citing *Alaniz*, 69 F.4th at 1128). And it asks if "the weapon at issue is 'in common use today for self-defense,'" *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 597 U.S. at 32), not how many people own one, *see Duncan*, 133 F.4th at 866 n.2, 882-83. This law of the Circuit aligns with Supreme Court precedent, first principles, and the decisions of other courts—and controls here.

### A. "Common Use" Is a Step One, Threshold Inquiry

The "common use" analysis is a part of the "threshold inquiry" into the scope of the Second Amendment textual right at "*Bruen* step one." *Alaniz*, 69 F.4th at 1128. That was this Court's holding in *Alaniz*. *Id.* The en banc Court then underscored that holding in *Duncan*, expressly reaffirming that "*Alaniz* remains good law." *Duncan*, 133 F.4th at 866 n.2. Thus, while there may be "no consensus" among other courts of

4

appeals on this question, in this Circuit it is settled that the "common use issue" is a part of the "initial, textual determination" in Second Amendment cases.[2] *Id.*; *Alaniz*, 69 F.4th at 1128.

Placing "common use" at step one follows directly from *Bruen*. There, the Supreme Court explained the two steps to Second Amendment analysis: first, evaluating whether the conduct at issue falls within the scope of the right, and second, if it does, determining whether the challenged restrictions comport with historical tradition. *See Bruen*, 597 U.S. at 24. In addressing the first step, *Bruen* made three points: (1) petitioners were "part of 'the people' whom the Second Amendment protects"; (2) the act of "public carry" fell within the "natural[]" definition of "bear arms"; and (3) the handguns they sought to bear were "weapons 'in common use' today for self-defense." *Id.* at 31-32. Only after that did *Bruen* confirm that the "Second Amendment's plain text thus presumptively guarantees" petitioners' "proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 32-33. And only then did *Bruen* place the "burden … on [the State]" to show

---

[2] Indeed, only out of an "abundance of caution" did the en banc Court in *Duncan* consider arguments about "ownership statistics" at step two. *Id.*

that its law was "consistent with this Nation's historical tradition." *Id.* at 33-34. By considering "these inquiries at step one," as *Alaniz* and *Duncan* correctly recognized, *Bruen* made clear that these "limitations on the scope of the Second Amendment right"—including "common use"—"are inherent in the text of the amendment." *United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1891 (2025) (citing *Bruen*, 597 U.S. at 31-32); *see also District of Columbia v. Heller*, 554 U.S. 570, 623 (2008) ("[T]he Second Amendment right, whatever its nature, extends only to certain types of weapons.").

Assessing "common use" at the "threshold, textual inquiry," *Duncan*, 133 F.4th at 866 n.2, even though those precise words do not appear in the Second Amendment's text, also accords with how courts treat other constitutional rights. The Fifth Amendment right against compulsory self-incrimination, for example, "attaches only if the person is in custody, despite no mention of the word custody in the 'plain text' of the Amendment." *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023) (citing *New York v. Quarles*, 467 U.S. 649, 654 (1984)), *cert. denied*, 144 S. Ct. 2491 (2024). The Sixth Amendment provides for "the

right to a speedy and public trial, by an impartial jury" without any reference to juror unanimity, yet the right's "original public meaning"—defined by "common law, state practices in the founding era, [and] opinions and treatises written soon afterward"—demands unanimity. *Ramos v. Louisiana*, 590 U.S. 83, 89-93 (2020). And the First Amendment's protection of free speech was "enacted against a backdrop of laws and societal understandings" that allowed "governmental restrictions on libel, incitement, true threats, [and] fighting words," even though each would "fall within a literal reading of the word 'speech.'" *Bianchi v. Brown*, 111 F.4th 438, 447-48 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1534 (2025). So too, as this Court has held, the pre-existing Second Amendment right, "as informed by history," includes the limitations of "common use" (and "self-defense," *see infra* Section I.B) within its textual scope. *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 597 U.S. at 19, 32); *accord Duncan*, 133 F.4th at 866 n.2.

This Circuit is in good company in locating "common use" at step one of the *Bruen-Rahimi* framework. "The overwhelming majority of courts considering Second Amendment challenges address common use

7

at step one." *Lane v. Cacace*, No. 7:22-cv-10989, 2025 WL 903766, at *7

(S.D.N.Y. Mar. 25, 2025) (citing *Alaniz* and other cases). That includes

five of the six other circuits to have answered this question: the Second,

Fourth, Fifth, Eighth, and Tenth Circuits.[3] The Seventh and D.C.

Circuits have addressed but declined to decide it,[4] and only the Sixth

Circuit has squarely placed the "common use" analysis at the step-two,

historical inquiry,[5] *see United States v. Bridges*, 150 F.4th 517, 524-26

---

[3] *See, e.g.*, *Antonyuk v. James*, 120 F.4th 941, 981 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900; *Bianchi*, 111 F.4th at 453; *Price*, 111 F.4th at 402; *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 127 F.4th 583, 588 (5th Cir. 2025); *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 680 (2024); *United States v. Veasley*, 98 F.4th 906, 910 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 304 (2024); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024) ("*RMGO*") (citing *Alaniz*).

[4] *See Hanson v. District of Columbia*, 120 F.4th 223, 232 & n.3 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2278 (2025); *Bevis*, 85 F.4th at 1198. The Third Circuit also has not answered this question, but one judge has and, like this Court, located the "common use" inquiry at step one. *See Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 212 (3d Cir. 2024) ("*DSSA*") (Roth, J., concurring), *cert. denied*, 145 S. Ct. 1049 (2025).

[5] The First Circuit has responded to plaintiffs' arguments regarding the scope of "common use" in the context of its historical inquiry, but it has not addressed at which step the "common use" analysis properly belongs. *See Capen v. Campbell*, 134 F.4th 660, 670 (1st Cir. 2025) ("*Capen II*") (citing *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 50-51 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2771 (2025)); *see also id.* at 668 (declining to address any aspects of step one); *Ocean State Tactical*, 95 F.4th at 43 (same).

(6th Cir. 2025).[6] But, as explained, that is contrary to *Bruen* and is not the law of this Circuit.

## B. Plaintiffs Must Establish that a Weapon Is "In Common Use Today for Self-Defense"

Because "common use" is a step-one inquiry, Plaintiffs have the burden of establishing it. To do so, they must show that "the weapon at issue is 'in common use today for self-defense,'" *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 597 U.S. at 32)—a standard that turns on whether arms are commonly used in and suitable for self-defense, not on "ownership statistics," *Duncan*, 133 F.4th at 866 n.2, 882-83.

### 1. Plaintiffs Have the Burden on the "Common Use" Inquiry

The burden to satisfy the step-one, textual inquiry is on the party challenging a law. This Court has made that clear. *See id.* at 866 n.2; *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025). So too have other circuits. *See, e.g.*, *RMGO*, 121 F.4th at 113 ("At step one, the plaintiff has the

---

[6] Another Sixth Circuit judge had previously concluded that the "common use" analysis was part of the step-one, textual inquiry. *See Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1201-02 (6th Cir. 2024) (Kethledge, J., dissenting), *cert. denied*, 145 S. Ct. 603 (2024).

burden …."); *Hanson*, 120 F.4th at 232 ("The plaintiff bears the burden of proof at the first step …."). Plaintiffs thus have the burden of demonstrating "common use."

> **2. Plaintiffs Must Show that the Restricted Weapon Is "In Common Use Today for Self-Defense"**

This Circuit has held that the "common use" question in Second Amendment analysis is "whether the weapon at issue is 'in common use today for self-defense.'" *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 597 U.S. at 32). That does not entail the "simplistic approach," *Duncan*, 133 F.4th at 882, of trying to count up how many of an item individuals own. *See infra* Section I.B.3. Instead, as courts applying this standard have explained, it involves consideration of items' actual use and objective design and features, which demonstrate the uses for which they are suited. *See, e.g.*, *United States v. Morgan*, --- F.4th ----, 2025 WL 2502968, at *2, *6 (10th Cir. Sept. 2, 2025); *Bianchi*, 111 F.4th at 450-52, 460-61. That is because the Second Amendment protects only weapons commonly used in and suitable for self-defense, not those that are "most useful in military service," *Morgan*, 2025 WL 2502968, at *6, or "ill-suited and disproportionate to the need for self-defense," *Bianchi*, 111 F.4th at 441.

10

### a.   Actual use for self-defense

Empirical evidence regarding whether "private individuals commonly use [the type of weapon at issue] for self-defense" can be an important part of this inquiry. *Morgan*, 2025 WL 2502968, at \*6. Applying the "in common use today for self-defense" standard set forth in *Alaniz*, the Tenth Circuit, for example, recently relied on a challenger's failure to provide such evidence in determining that machineguns do not fall within the Second Amendment's textual scope. *Id.* at \*2, \*6. That the challenger "posit[ed] he uses his machineguns for self-defense" was of no moment, the Tenth Circuit explained, as this is an objective analysis that turns on evidence and data, not subjective individual preferences. *Id.* at \*6; *see, e.g.*, *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 87 (D. Conn. 2023) ("*NAGR I*") (rejecting an approach that "would mean allowing the [common-use] analysis to be driven by nebulous subjective intentions … regardless of how the weapons were actually used, a result that the Supreme Court does not indicate in the slightest that it intended"), *aff'd*, --- F.4th ----, 2025 WL 2423599 (2d Cir. Aug. 22, 2025); *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 918 (D. Or. 2023) ("If the subjective intent of an

11

individual were enough to show that a firearm or firearm accessory is used for … self-defense[,] then nearly every firearm or firearm accessory purchased in this country would satisfy that test."), *appeal docketed*, No. 23-35478 (lead) (9th Cir. July 17, 2023).

Other courts and judges have similarly pointed to evidence regarding the actual use of a type of weapon for self-defense in finding that plaintiffs had failed to meet their step-one burden. *See, e.g.*, *Bianchi*, 111 F.4th at 450, 460 (assessing "instances of 'active employment' of the weapon" to determine whether weapon is "typically used by average citizens for self-defense"); *DSSA*, 108 F.4th at 212 (Roth, J., concurring) (asking if a weapon is widely "employed for self-defense"). Several courts rejecting challenges to laws restricting large-capacity magazines ("LCMs"), for instance, have relied in part on empirical data and expert analysis showing that "it is exceedingly rare for individuals to fire more than ten shots in self-defense, and that when guns *are* fired in self-defense, an average of between two and three shots are discharged." *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 192 (D. Vt. 2024), *appeal docketed*, No. 24-2026 (2d Cir. July 29, 2024); *see NAGR I*, 685 F. Supp. 3d at 96-

12

97; *Kotek*, 682 F. Supp. 3d at 896-97. That evidence, these courts find, "leads to the conclusion that LCMs—which allow users to fire upwards of 10 rounds per magazine—are not 'in common use for self-defense.'" *Birmingham*, 741 F. Supp. 3d at 192; *see NAGR I*, 685 F. Supp. 3d at 96-98; *Kotek*, 682 F. Supp. 3d at 896-97, 920-22.

### b. Suitability for self-defense

In assessing whether a weapon is "in common use today for self-defense," courts also are to consider a weapon's objective characteristics and whether they make it suitable for self-defense. That approach follows directly from *Heller*. In determining that handguns were the "quintessential self-defense weapon," the Court examined the handgun's distinguishing functionality—the practical "*reasons* that a citizen may prefer [one] for home defense," including that handguns are easier to access in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand "while the other hand dials the police." *Heller*, 554 U.S. at 629 (emphasis added); *see Morgan*, 2025 WL 2502968, at *3 n.2. Following this direction, the question courts have properly asked is whether a weapon "makes sense" for self-defense, *Morgan*, 2025 WL 2502968, at *6, and is "well-adapted for self-defense,"

*DSSA*, 108 F.4th at 212 (Roth, J., concurring), or whether its design and features make it "ill-suited and disproportionate" to self-defense, *Bianchi*, 111 F.4th at 461.

The Tenth Circuit's recent decision in *Morgan* is again instructive on this point. There, the court found that the challenger had not shown that machineguns "make[] sense" as a self-defense weapon, noting that "self-defense does not commonly require 'fir[ing] more than 1,000 rounds per minute.'" *Morgan*, 2025 WL 2502968, at *6 (quoting *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012)). "Although 'one could imagine Hollywood-inspired scenarios in which a homeowner would need to fend off a platoon of well-armed assailants' with a machinegun," the Tenth Circuit explained that this was not the relevant inquiry. *Id.* (quoting *Ocean State Tactical*, 95 F.4th at 45). The test instead focuses on objective suitability for self-defense under common circumstances, and the challenger had "provide[d] no reason why it would be common to need 'the rapid and uninterrupted discharge of many shots' for self-defense." *Id.* (quoting *Ocean State Tactical*, 95 F.4th at 45).

Courts have applied this same sort of "common use" analysis in other cases, involving challenges to prohibitions on other types of

14

weapons and accessories. *See, e.g.*, *Bianchi*, 111 F.4th at 460-61 (assault weapons); *Kotek*, 682 F. Supp. 3d at 919-20 (LCMs); *United States v. Ocker-Mullen*, No. 4:20-cr-00313, 2024 WL 2834845, at *4 (M.D. Pa. June 4, 2024) (grenades). The question these courts rightly ask is "whether a weapon is objectively suitable for self-defense." *DSSA*, 108 F.4th at 212-13 (Roth, J., concurring). Notably, given the recognized "limitations on the right to self-defense," *Bianchi*, 111 F.4th at 449, the weaponry suitable for lawful self-defense is also necessarily limited. As the en banc Fourth Circuit recently illustrated, "[a]n umbrella gun that fires a ricin-laced pellet," for example, "is utterly ineffective at countering imminent threats for which the right to self-defense exists because it takes hours for ricin to have a debilitating effect," and so it falls outside the scope of Second Amendment protection. *Id.* at 451, 460. Similarly, "AR-15 rounds," the Fourth Circuit concluded, are unsuitable for self-defense because they "'can pass through most construction materials, even at ranges of 350 yards,' thereby threatening the lives of 'bystanders, family members, or other innocent persons well outside the intended target area.'" *Id.* at 458 (quoting *Capen v. Campbell*, 708 F. Supp. 3d 65, 86 (D. Mass. 2023) ("*Capen I*"), *aff'd*, 134 F.4th 660 (1st

15

Cir. 2025)). And, in addition, "some bearable arms deliver force so excessive for self-defense that no reasonable person could posit that the Constitution guarantees civilian access to them." *Id.* at 451, 460 (referencing "the W54 nuclear warhead"); *see, e.g.*, *Rupp v. Bonta*, 723 F. Supp. 3d 837, 855 (C.D. Cal. 2024) (explaining, in line with "the doctrine of lawful self-defense," that "if [guns] shoot too quickly, too powerfully, and while the alleged instigator is too far away, then they are not well-suited to self-defense"), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024).

Further, as these examples show, evidence that a weapon is "excessively dangerous"—whether to intended targets, bystanders, law enforcement, or others—is often highly relevant to whether it is appropriate for self-defense or instead "ill-suited and disproportionate to such a purpose." *Bianchi*, 111 F.4th at 450, 452-53, 457; *see, e.g.*, *Morgan*, 2025 WL 2502968, at *6 & n.10; *Rupp*, 723 F. Supp. 3d at 855; *see also Price*, 111 F.4th at 406 ("Of course, a weapon's dangerousness is not unrelated to whether it is in common use for a lawful purpose. The powerful and unpredictable nature of a sawed-off shotgun contributes to why it would be an unlikely choice for a law-abiding citizen to use for

16

self-defense …."). This, too, is part of why plaintiffs in these cases have failed to meet their step-one burden.[7]

### c.    "Most useful in military service"

Relatedly, weapons that are "most useful in military service" fall outside the category of weapons in common use for self-defense. *Bianchi*, 111 F.4th at 453, 459 (quoting *Heller*, 554 U.S. at 627); *accord Bevis*, 85 F.4th at 1193-94, 1197; *Morgan*, 2025 WL 2502968, at *2, *6. This follows directly from the Supreme Court's recognition in *Heller* that "weapons that are most useful in military service—M-16s and the like—may be banned." *Heller*, 554 U.S. at 627. Courts have applied that teaching to uphold laws restricting items including assault weapons and LCMs, *e.g.*, *Bianchi*, 111 F.4th at 453, 459; *Bevis*, 85 F.4th at 1193-94, 1197, and machineguns, *e.g.*, *Morgan*, 2025 WL 2502968, at *2, *6. As the en banc Fourth Circuit concluded with respect to the AR-15, for example, its "military origination, combat-functional features, and extraordinary lethality" make it "most useful in military service" rather

---

[7] There will, of course, inevitably be some overlap between this analysis and the "dangerous and unusual" inquiry, as the same evidence of a weapon's dangerousness will be relevant to both. But the inquiries remain distinct. *See infra* Section II.B.

17

than a weapon of self-defense—and thus outside the Second
Amendment's textual protection. *Bianchi*, 111 F.4th at 459.

### 3. The "Common Use" Inquiry Is Not About "Ownership Statistics"

Plaintiffs contend that the focus of the "common use" inquiry
should be the "total number" of a type of weapon that are owned, sold,
or produced. *See* Dkt. 10 ("Pls.' Br.") at 32-35. But, as this Court has
unequivocally held, this "facile" and "simplistic approach" is not the
law. *Duncan*, 133 F.4th at 882-83. The "common use" analysis does not
depend on "ownership statistics." *Id.* at 866 n.2, 882-83. Rather, the
proper approach to follow in Second Amendment cases is the one
described in *Bruen* and *Rahimi*, *see id.* at 883—which, at the threshold,
text step, asks whether Plaintiffs have established not that a weapon is
commonly owned but that it is "in common *use* today for self-defense,"
*Alaniz*, 69 F.4th at 1128 (emphasis added); *see supra* Section I.B.

Plaintiffs' "rigid" numbers-based approach would mean that no
government could prohibit a weapon "any time an undefined number of
people own an undefined number" of that weapon, regardless of how
rarely it used in self-defense or its suitability for self-defense. *Duncan*,
133 F.4th at 882-83. Such a standard "would strain both logic and

18

administrability, as it would hinge the right on … a 'trivial counting exercise' that would 'lead[] to absurd consequences' where unusually dangerous arms like the M-16 or 'the W54 nuclear warhead' can 'gain constitutional protection merely because [they] become[] popular before the government can sufficiently regulate [them].'" *Nat'l Ass'n for Gun Rights v. Lamont*, --- F.4th ---, 2025 WL 2423599, at *11 (2d Cir. Aug. 22, 2025) ("*NAGR II*") (quoting *Bianchi*, 111 F.4th at 460); *see Duncan*, 133 F.4th at 882-83.[8] That "startling" approach is one this Circuit—and others—have thus rightly rejected. *Duncan*, 133 F.4th at 882-83 (citing cases from First, Fourth, Seventh, and D.C. Circuits); *accord*, *e.g.*, *Morgan*, 2025 WL 2502968, at *6; *NAGR II*, 2025 WL 2423599, at *11; *DSSA*, 108 F.4th at 212-13 (Roth, J., concurring).

What is more, Plaintiffs' "ownership-statistics theory," *Duncan*, 133 F.4th at 883, is inconsistent with constitutional principles more generally. As other courts have found, no other right is "read to expand or contract based on nothing more than contemporary market trends."

---

[8] As *Duncan* recognized, there is also "uncertainty about the total number of [a restricted item at issue] owned by civilians," as well as "how many were truly 'chosen by American society for th[e] lawful purpose [of self-defense].'" 133 F.4th at 883 n.12 (quoting *Heller*, 554 U.S. at 628).

*Bianchi*, 111 F.4th at 461; *see NAGR I*, 685 F. Supp. 3d at 102

(observing that "no other constitutional right waxes and wanes based

solely on what manufacturers choose to sell"). That makes perfect sense,

as the reasoning of such an approach is inescapably "circular." *Bevis*, 85

F.4th at 1190; *see Bianchi*, 111 F.4th at 461 (rejecting position that

"arms manufacturers can secure constitutional immunity for their

products so long as they distribute a sufficient quantity before

legislatures can react"). "[I]t would be absurd to say that the reason

why a particular weapon can be banned is that there is a statute

banning it, so that it isn't commonly owned." *Bevis*, 85 F.4th at 1190

(quoting *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir.

2015)); *see Duncan*, 133 F.4th at 882-83. This further explains why this

Court, sitting en banc, has squarely foreclosed this popularity-based

approach to "common use." *See Duncan*, 133 F.4th at 882-83.

### 4. Plaintiffs' Jurisdiction-Counting Approach Is Also Contrary to Circuit Precedent—and Illogical

Plaintiffs also assert that the "common use" inquiry should ask

how many other jurisdictions do or do not restrict the item at issue

today. *See* Pls.' Br. 38-39. But that illogical approach would hinge the

meaning of a constitutional right on contemporary legislative choices.

20

*Cf. Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (criticizing as "flawed" a "'use it or lose it' view of legislative authority"). The en banc Court properly rejected that same mode of analysis in *Duncan*. *See* 133 F.4th at 882-83 (declining to find constitutional relevance in modern-day legislative decisions regarding whether or not to prohibit a type of weapon); *see also Bevis*, 85 F.4th at 1190 ("A law's existence can't be the source of its own constitutional validity." (quoting *Friedman*, 784 F.3d at 409)). It simply has no role here. *See Duncan*, 133 F.4th at 882-83.

Moreover, as California explains, *see* State Br. 16, this sort of jurisdiction-counting approach would be contrary to the Supreme Court's assurance that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010); *see, e.g.*, *Bianchi*, 111 F.4th at 446 ("This conclusion that the Maryland regulation is consistent with the Constitution is not some sort of edict to the rest of the states, obligating them to follow suit."); *Bevis*, 85 F.4th at 1203 ("The people of some states may find the arguments in favor of a lack of restrictions to be persuasive; the people of other states may prefer tighter restrictions. As long as those restrictions do not infringe

21

on the constitutionally protected right to keep and bear Arms covered by the Second Amendment, either choice is permissible."). In short, "whether other jurisdictions do not regulate [the weapon at issue] is irrelevant and it does not illuminate whether the regulated [weapons] are in common use today for self-defense." 1-ER-00013.[9]

*　　*　　*

Here, Plaintiffs have presented no evidence that the restricted switchblade knives at issue are ever used in self-defense, and certainly no evidence that they are commonly used for such purposes. *See, e.g.*, *DSSA*, 108 F.4th at 212 (Roth, J., concurring) (noting "evidence that … a widely possessed weapon is occasionally used in self-defense is not, alone, enough" for common use). Nor have Plaintiffs presented evidence showing that these switchblades are well-suited to defense, *see* 1-ER-

---

[9] The Tenth Circuit recently considered the laws of other jurisdictions in conducting the "common use" inquiry in a machinegun case. *See Morgan*, 2025 WL 2502968, at *7. But the court did not establish a jurisdiction-counting approach to "common use." Rather, the court engaged in that analysis as part of showing that the challenger had failed to show "common use" by any conceivable metric—without holding that "common use" turns on jurisdiction counting. In any event, for the reasons discussed, such an approach is illogical—and contrary to the law of this Circuit. Plaintiffs' attempted reliance on *Commonwealth v. Canjura*, 240 N.E.3d 213 (Mass. 2024), should be rejected for these same reasons, as well as those noted by California, *see* State Br. 17.

00015 (district court opinion), and, as California explains, the record, in fact, shows that they are not, *see* State Br. 17-20. Thus, Plaintiffs have not carried their step-one burden.

## II. "Dangerous and Unusual" Means Unusually Dangerous and Is Distinct from "Common Use"

Circuit precedent has spoken less directly on the panel's second set of questions regarding "dangerous and unusual," *see* Order at 2, but the proper course to take here is nevertheless clear. First, the panel need not resolve at which step courts should address the "dangerous and unusual" issue, because Plaintiffs' claims fail either way. Second, contrary to Plaintiffs' contention, the "dangerous and unusual" formulation is not limited to "only weapons that are numerically uncommon," *NAGR II*, 2025 WL 2423599, at \*25 (Nathan, J., concurring); *see id.* at \*12 (majority opinion) ("We fully join in Judge Nathan's concurrence.")—and it is distinct from common use for self-defense. As the Second Circuit recently explained, the category of "dangerous and unusual" weapons "encompasses those arms that legislators determined were *unusually dangerous* because of their characteristics." *Id.* at \*11.

## A. The Panel Does Not Need Not to Resolve Whether "Dangerous and Unusual" Is a Step One or Step Two Issue

Courts have not reached a consensus as to whether the "dangerous and unusual" question in Second Amendment cases is part of the step-one, textual inquiry or the step-two, historical inquiry. The Fourth and Tenth Circuits have placed it at step one.[10] The Sixth Circuit, conversely, has placed it at step two, and the First and D.C. Circuits appear to have done so as well.[11] This Circuit has not definitively resolved at which step of the *Bruen* analysis the "dangerous and unusual" issue belongs—and it is not necessary to do so in this case either.

The district court concluded, and California argues, that assessing whether a weapon is "dangerous and unusual" is a step-one question. 1-ER-00010; *see* State Br. 24-25. That aligns with *Heller*'s statement that "the Second Amendment right, whatever its nature, extends only to certain types of weapons." 554 U.S. at 623. As this Court recognized

---

[10] *See Bianchi*, 111 F.4th at 452-53; *RMGO*, 121 F.4th at 117; *see also DSSA*, 108 F.4th at 211, 213-14 (Roth, J., concurring).

[11] *See Bridges*, 150 F.4th at 524-28; *Ocean State Tactical*, 95 F.4th at 47; *Hanson*, 120 F.4th at 235.

before *Bruen*, this implies that unprotected items like "dangerous and unusual" weapons "fall[] outside the scope of the Second Amendment." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015). Several district courts in this Circuit have continued to rely on this reasoning since *Bruen* in addressing the "dangerous and unusual" issue at the initial, threshold determination of the Second Amendment analysis. *See, e.g.*, *Rupp*, 723 F. Supp. 3d at 848-50; *Kotek*, 682 F. Supp. 3d at 922. Thus, if the Court chooses to address in this case whether "dangerous and unusual" is a step-one or step-two question, the better approach, and the one most consistent with past authority in this Circuit, would be to place it at step one.[12]

But Plaintiffs' claims fail no matter at which step the Court considers "dangerous and unusual." As just discussed, Plaintiffs have not shown the switchblades at issue are "in common use today for self-defense." California has also demonstrated that its law is consistent

---

[12] If the Court were to agree with Plaintiffs that the "dangerous and unusual" analysis "do[es] not fall under or require a separate analysis" from "common use," Pls.' Br. 39, then the binding precedent of *Alaniz* and *Duncan* would control here to place it at step one. *See supra* Section I.A. But, as discussed next, Plaintiffs are not correct, and the two analyses, while related, are distinct. *See infra* Section II.B.

with the nation's historical tradition of regulation. *See* State Br. 26-43. And, as to the "dangerous and unusual" question itself, the record shows that the restricted switchblades are unusually dangerous regardless of which party has the burden. *See id.* at 23-24. Any one of those conclusions is enough for affirmance here.

Under these circumstances—and given the lack of consensus among other courts—it would be appropriate for the panel to simply decline to decide in this case whether to address "dangerous and unusual" at step one or step two. *See, e.g.*, *NAGR II*, 2025 WL 2423599, at *12-13 (following a similar approach); *cf. Duncan*, 133 F.4th at 866 n.2 (resolving "ownership statistics" issue at step two rather than step one only "out of an abundance of caution" and to "give [p]laintiffs the benefit of the doubt," because step two is "where [d]efendant bears the burden of proof"). Instead, the Court can properly leave resolution of that question to a future case, where determining whether "dangerous and unusual" is part of step one or step two is necessary to the result. *See Teter v. Lopez*, 125 F.4th 1301, 1309 (9th Cir. 2025) (en banc) (noting the "cardinal principle of judicial restraint—if it not necessary to decide more, it is necessary not to decide more" (quoting *PDK Labs.*

26

*Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))).

### B.   "Dangerous and Unusual" Is Distinct from "Common Use"

Plaintiffs argue that "the 'common use' analysis and the 'dangerous and unusual' analysis are two sides of the same coin." Pls.' Br. 39. That means, according to Plaintiffs, that "an arm 'in common use' cannot also be 'dangerous and unusual'"—and so "cannot be banned." *Id.* at 31. But this is not the law.

As discussed above, the correct "common use" inquiry focuses on whether a weapon "is in common use today for self-defense," not on statistical commonality or popularity. That inquiry is certainly related to the "dangerous and unusual" inquiry, as the same evidence of a weapon's dangerousness is relevant to both. But the questions each inquiry asks, and thus the analyses they undertake, are not the same. *See Price*, 111 F.4th at 405 (noting that "while historical tradition regarding the regulation of dangerous weapons *supports* a limitation on the scope of the Second Amendment right, a weapon must be in common use for a lawful purpose to be protected by that right"). "Common use"— properly understood as "in common use today for self-defense," *Alaniz*,

27

69 F.4th at 1128—asks whether a weapon is commonly used in and suitable for self-defense. *See supra* Section I.B. "Dangerous and unusual" examines the different, but related, question whether a weapon is "unusually dangerous." *NAGR II*, 2025 WL 2423599, at *11-12. That distinct "dangerous and unusual" inquiry is discussed in more detail below. *See infra* Section II.C.

Plaintiffs' position here is premised on a misreading of *Heller* and *Bruen*. Contrary to what Plaintiffs contend, "the Supreme Court did not posit that a weapon's common use is conclusive evidence that it cannot be banned." *Bianchi*, 111 F.4th at 460. Instead, the Court stated that "the Second Amendment protects *only* the carrying of weapons that are those 'in common use at the time.'" *Bruen*, 597 U.S. at 47 (emphasis added). That is, being "in common use" is a necessary, but not a sufficient, condition for Second Amendment protection. *See, e.g.*, *Bianchi*, 111 F.5th at 460 ("Just because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms."); *NAGR II*, 2025 WL 2423599, at *11 (rejecting argument that "the Second Amendment *necessarily* protects *all* weapons in common use"); *Hanson*, 120 F.4th at 233-34 & n.4

28

(rejecting argument that "to find an arm is in common use renders any restriction of that arm unconstitutional").[13]

Plaintiffs' error is even clearer given that they conflate "common use" with mere common ownership: on their theory, once a weapon is owned in sufficient numbers, it cannot be prohibited as "dangerous and unusual." As explained above, that "simplistic" ownership-statistics approach to "common use" is misguided and was rejected by this Court's en banc decision in *Duncan*. *See supra* Section I.B.3. Similarly, this "ill-conceived popularity test," *Bianchi*, 111 F.4th at 460, makes little sense as a way of evaluating whether weapons are "dangerous and unusual." As discussed more fully below, assessing whether a weapon is "dangerous and unusual"—and so may be prohibited for that reason—is *not* about "statistical commonality." *NAGR II*, 2025 WL 2423599, at *26 (Nathan, J., concurring); *see infra* Section II.C. The Second Amendment "do[es] not shield popular weapons from review of their potentially

---

[13] That conclusion also directly follows from this Court's holdings in *Alaniz*, 69 F.4th at 1128, and *Duncan*, 133 F.4th at 866 n.2, that the "common use" inquiry is part of the step-one, threshold inquiry—and so an assessment of a challenged law under the remainder of step one and step two would be necessary before any finding of unconstitutionality.

unusually dangerous character." *NAGR II*, 2025 WL 2423599, at *11 (majority opinion).

### C. "Dangerous and Unusual" Refers to Unusually Dangerous Weapons

Plaintiffs contend that "dangerous and unusual" represent two separate criteria: a weapon cannot be prohibited unless it is "*both* dangerous *and* unusual." *See* Pls.' Br. 46. That is wrong. As several circuits have explained, and as the historical record makes clear, the category of "dangerous and unusual" weapons unprotected by the Second Amendment "encompasses those arms that legislators determined were *unusually dangerous* because of their characteristics." *NAGR II*, 2025 WL 2423599, at *11; *accord Hanson*, 120 F.4th at 238 n.7 ("uncommonly dangerous"); *Bianchi*, 111 F.4th at 450 ("excessively dangerous"). This is the understanding the Court should follow here.

An examination of the historical sources the Supreme Court has relied on to explain the "dangerous and unusual" formulation makes clear that the "unusually dangerous" meaning is the correct one. In *Heller*, which is "the first time the Supreme Court seems to have referenced the 'dangerous and unusual' tradition," *NAGR II*, 2025 WL 2423599, at *25 (Nathan, J., concurring), the Court cited Blackstone

30

and other common-law authorities in support. 554 U.S. at 627 (first citing 4 Blackstone 148-49 (1769)). The Court then reiterated this limit on the Second Amendment right in *Bruen*, again tracing it primarily to Blackstone. 597 U.S. at 21 (citing, via *Heller*, 4 Blackstone 148-49 (1769)). And mostly recently, in *Rahimi*, the Court confirmed that *Heller* derived the 'dangerous and unusual' language from Blackstone. 602 U.S. at 691 (quoting *Heller* for the 'dangerous and unusual' formulation and noting that *Heller* cited Blackstone).

Blackstone, however, "did not use the phrase 'dangerous and unusual.'" *NAGR II*, 2025 WL 2423599, at *26 (Nathan, J., concurring). Blackstone instead speaks in the disjunctive of prohibitions on "dangerous *or* unusual weapons." 4 Blackstone 149 (1769) (emphasis added); *see NAGR II*, 2025 WL 2423599, at *11 & n.18 (noting that both *Bruen* and *Rahimi*, as well as 19th-century decisions from state supreme courts, quote this disjunctive formulation from Blackstone); *id.* at *26 (Nathan, J., concurring) (providing the full passage from Blackstone). And the other authorities cited by *Heller* refer variously to "dangerous and unusual" and "dangerous or unusual" weapons. *See NAGR II*, 2025 WL 2423599, at *11; *id.* at *26 (Nathan, J., concurring);

31

*Bianchi*, 111 F.4th at 450. As this variation suggests, the traditional category *Heller* summarized as "dangerous and unusual weapons" does not reflect a rigid, two-part test.

Rather, both of these formulations "were traditionally understood as meaning 'unusually dangerous.'" *NAGR II*, 2025 WL 2423599, at *11; *accord id.* at *26 (Nathan, J., concurring). As the Second and D.C. Circuits have indicated, the phrase "dangerous and unusual" is best understood as "a hendiadys, which individuals in the founding era would have interpreted as 'unusually dangerous.'" *Id.* at *12 n.19 (majority opinion) (citing expert declaration of Professor Saul Cornell); *see Hanson*, 120 F.4th at 238 n.7 (citing Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016)). A hendiadys is a traditional rhetorical device by which two terms, "separated by a conjunction," nonetheless "work together as a single complex expression." *NAGR II*, 2025 WL 2423599, at *12 n.19 (quoting *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 413 (2023) (Gorsuch, J., dissenting)). While the technical term may be unfamiliar to many today, it was well known in the founding era: it is found, for example, in

32

18th- and early 19th-century English dictionaries, Latin grammars, and commentaries on Shakespeare and the Bible. *See* Bray, 102 Va. L. Rev. at 698-99. This helps explain why *Heller* used this phrase both disjunctively and conjunctively—and why "the interchangeable use of 'dangerous and unusual' and 'dangerous or unusual' supports the proposition that neither 'and' nor 'or' should be read so literally." *NAGR II*, 2025 WL 2423599, at *26 (Nathan, J, concurring). Instead, "unusually dangerous" (or "uncommonly dangerous" or "especially dangerous") is "the most faithful formulation." *Id.*; *see Hanson*, 120 F.4th at 238 n.7; *Bianchi*, 111 F.4th at 450.

Plaintiffs point to Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring), in support of their argument that the "dangerous and unusual" category creates a conjunctive test, covering only weapons that are "*both* dangerous *and* unusual."[14] *See* Pls.' Br. 29-31. But "this non-binding

---

[14] Prior to *Bruen*, this Court seemed to apply such a conjunctive test. *See Fyock*, 779 F.3d at 997-98. Under this approach, a weapon was protected by the Second Amendment if it was not unusual, and *Fyock* accepted statistics about the number of items sold as satisfying that metric under an abuse-of-discretion standard. *See id.* at 998. But this Court, sitting en banc, recently clarified that widespread ownership alone cannot bestow Second Amendment protection on an item. *See*

concurrence cannot bear the weight Plaintiffs place on it." *NAGR II*, 2025 WL 2423599, at *12; *see Hanson*, 120 F.4th at 238 n.7 (noting that this concurrence "is obviously not controlling"); *Ocean State Tactical*, 95 F.4th at 51 (rejecting argument that "treat[ed] the concurring opinion [in *Caetano*] as if it were binding authority"); *see also* State Br. 15 (observing that "the [*Caetano*] concurrence is not binding on this Court and has been rejected by others").

Nor is the conjunctive test persuasive. It places dispositive weight on the single word "and" in *Heller*—a "possible misquote of Blackstone," *NAGR II*, 2025 WL 2423599, at *26 (Nathan, J., concurring)—while ignoring the actual historical sources that *Heller* relied on. *See id.* at *25 ("Our commitment to history requires us to look beyond Plaintiffs' reliance on one word in *Heller* and journey to the historical sources of their proposed standard."). As explained, those historical sources, with their mix of "dangerous and unusual" and "dangerous or unusual," are better read as referring to unusually dangerous weapons.

---

*Duncan*, 133 F.4th at 882-83; *supra* Section I.B.3. In thoroughly rejecting the ownership-statistics argument, *Duncan* necessarily abrogated any pre-*Bruen* conjunctive test endorsed by *Fyock*, under which such statistics could establish Second Amendment protection.

The conjunctive test is also unconvincing because, by treating dangerous and unusual as separate criteria, it would "strip[] coherence from [this] historical limitation to the Second Amendment right." *Id.* at *12 (majority opinion). The idea that only unusual weapons can be prohibited is illogical since, historically, jurisdictions have moved to prohibit weapons precisely *because* they were becoming all too prevalent. *See* State Br. 22-23 (describing crossbows and Bowie knives as examples).[15] And further, the term "dangerous" by itself can "do no work delineating the category" of unprotected weapons, because all weapons "are self-evidently 'dangerous.'" *Hanson*, 120 F.4th at 238 n.7; *see also NAGR II*, 2025 WL 2423599, at *12 (dangerous "does no work by itself," since "[i]t is axiomatic that to some degree all firearms are 'dangerous'").[16] In order for this category to define a meaningful subset

---

[15] Even if "unusual" had some standalone meaning in Second Amendment analysis, it would not be numerically uncommon. As the First Circuit observed, the Supreme Court has not "intimated that a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is that sole measure of whether it is 'unusual.'" *Ocean State Tactical*, 95 F.4th at 50-51; *accord Capen II*, 134 F.4th at 670. Its meaning must "derive at least in part from the essential purpose of the Second Amendment": self-defense. *Capen I*, 708 F. Supp. 3d at 79-80; *see* 1-ER-00014 (district court opinion).

[16] Indeed, this problem is apparent in the decision of the one circuit to apply a conjunctive dangerous-and-unusual test after *Bruen*.

of weapons, the word dangerous "needs a modifier." *NAGR II*, 2025 WL 2423599, at \*12. The historically grounded reading of "dangerous and unusual" as a hendiadys for "unusually dangerous" provides "the obvious fit." *Id.*

The context of the historical sources underlying the "dangerous and unusual" category also supports this interpretation. Those sources reveal "a tradition of restrictions on public affray—that is, terrifying the public." *Id.* at \*26 (Nathan, J., concurring). They show "concern about danger to the public, not statistical commonality of the threatening weapon." *Id.* And "glaringly absent from these historical laws is any particular focus on the commonality of the weapons." *Id.* (explaining that numerous historical restrictions on "dangerous and unusual" weapons included "weapons … that were certainly in common use"). Thus, focusing on the unusual or excessive dangerousness of weapons— as opposed to whether they are dangerous and, separately, unusual—is

---

*See Bridges*, 150 F.4th at 524-28 (holding that machine guns are dangerous and unusual). In *Bridges*, the Sixth Circuit defined "dangerous" as "likely to cause serious bodily harm," *id.* at 524, which could fairly describe any firearm. It unsurprisingly found this prong of the test easily met, since machine guns "are plainly dangerous." *Id.* Accordingly, the test reduced entirely to whether machine guns qualified as "unusual." *See id.* at 525-28.

consistent with the historical reasons *why* certain weapons were traditionally prohibited. The conjunctive test simply "does not survive ... historical scrutiny." *Id.* at *12.

For all these reasons, this Court should follow the Second, Fourth, and D.C. Circuits—as well as the historical sources cited by *Heller*—in recognizing that the "dangerous and unusual" weapons unprotected by the Second Amendment are weapons that are unusually or uncommonly dangerous. *See NAGR II*, 2025 WL 2423599, at *11-12; *id.* at *25-27 (Nathan, J., concurring); *Hanson*, 120 F.4th at 238 n.7; *Bianchi*, 111 F.4th at 450.

*     *     *

As California demonstrates, the switchblades at issue in this case are unusually dangerous weapons and thus may be prohibited under the Second Amendment. *See* State Br. 23-24. Thus, on this basis, too, Plaintiffs' challenge fails, and this Court should affirm. *See also supra* pp. 25-26 (noting additional reasons why Plaintiffs' challenge fails).

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

Dated: September 26, 2025      /s/ William Taylor
William Taylor
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163
wtaylor@everytown.org

*Court-Appointed Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on September 26, 2025, I filed the foregoing amicus brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Case Management System (ACMS) system.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

/s/ William Taylor
William Taylor

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-5536

I am the attorney or self-represented party.

**This brief contains** | 7,836 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated | 09/05/25 |.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ William Taylor | **Date** | September 26, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**         *Rev. 12/01/22*