No. 24-5536

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————

KNIFE RIGHTS, INC., ET AL.,

*Plaintiffs-Appellants*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of California
No. 3:23-cv-00474-JES-DDL
Hon. James E. Simmons, Jr.

## BRIEF OF *AMICI CURIAE*
## GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AND
## BRADY CENTER TO PREVENT GUN VIOLENCE
## IN SUPPORT OF DEFENDANT-APPELLEE

Jennifer B. Loeb
    *Counsel of Record*
Austin Evers
FRESHFIELDS US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com
austin.evers@freshfields.com

Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
(212) 277-4000
brandt.henslee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com

(*Additional Counsel on Next Page*)

*Of Counsel:*

William T. Clark
Leigh Rome
GIFFORDS LAW CENTER TO PREVENT
GUN VIOLENCE
244 Madison Ave, Ste 147
New York, NY 10016
(415) 433-2062
wclark@giffords.org
lrome@giffords.org

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT AND NOTIFICATION OF PUBLICLY HELD AFFILIATES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1-1, Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence state that they are non-profit corporations organized under 26 U.S.C. § 501(c)(3), have no parent corporation, do not issue stock, and have no publicly-held affiliates.

Date: September 26, 2025

Freshfields US LLP

*/s/ Jennifer Loeb*
Jennifer Loeb

*Attorney for Amici Curiae*
Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence

## <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE*..................................................................1

INTRODUCTION...........................................................................................2

RESPONSE TO QUESTIONS POSED BY THE COURT ...............................3

I. *Bruen's* "Common Use" Standard...............................................3

    A. *United States v. Alaniz* Controls: Common Use is a Step One Inquiry. ............................................................................3

    B. Arms Must be in Common Use for Lawful Self-Defense to be Protected Under the Second Amendment......................5

    C. Common Use is Necessary, But Not Sufficient, for Second Amendment Protection; a Constitutionally Protected Arm Must Also Not be Unusually Dangerous. ...........................9

II. *Bruen's* "Dangerous and Unusual" Standard...........................11

    A. Historical Analysis Demonstrates that "Dangerous and Unusual" Means the Second Amendment Does Not Protect Arms That Are *Unusually Dangerous*. ...............................11

    B. "Dangerous and unusual" Is a Hendiadys......................14

    C. A Conjunctive Formulation of "Dangerous and Unusual" Does Not Fit Within the *Bruen* Framework. .....................15

CONCLUSION...........................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*,
    910 F.3d 106 (3d Cir. 2018) ............................................................2

*Bevis v. City of Naperville*,
    85 F.4th 1175 (7th Cir. 2023) ...................................................5, 7

*Bianchi v. Brown*,
    111 F.4th 438 (4th Cir. 2024) ............................................5, 8, 10

*Capen v. Campbell*,
    708 F. Supp. 3d 65 (D. Mass. 2023) ...........................................5, 8

*Caremark, LLC v. Choctaw Nation*,
    104 F.4th 81 (9th Cir. 2024) ........................................................4

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024) .......................................................8

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).............................................................*passim*

*Duncan v. Bonta*,
    133 F.4th 852 (9th Cir. 2025) .................................................4, 6, 7

*Hanson v. District of Columbia*,
    671 F. Supp. 3d 1 (D.D.C. 2023).................................................2

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024).................................................2, 5

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*,
    599 U.S. 382 (2023).................................................................13

*Libertarian Party of Erie Cnty. v. Cuomo*,
    970 F.3d 106 (2d Cir. 2020) .......................................................2

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)............................................................2, 5, 6

*Md. Shall Issue v. Hogan*,
    353 F. Supp. 3d 400 (D. Md. 2018) ........................................................................2

*Mills v. New York City*,
    758 F. Supp. 3d 250 (S.D.N.Y. 2024) .......................................................... 6–7

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) .......................................................................................*passim*

*Nat'l Ass'n for Gun Rts. v. Lamont*,
    685 F. Supp. 3d 63 (D. Conn. 2023) .....................................................................2

*Nat'l Ass'n for Gun Rts. v. Lamont*,
    2025 WL 2423599 (2d Cir. Aug. 22, 2025) ...............................................*passim*

*Oregon Firearms Fed'n v. Kotek*,
    682 F. Supp. 3d 874 (D. Or. 2023) ........................................................................6

*Peruta v. Cnty. of San Diego*,
    824 F.3d 919 (9th Cir. 2016) .................................................................................2

*Rupp v. Becerra*,
    401 F. Supp. 3d 978 (C.D. Cal. 2019) ...................................................................2

*Rupp v. Bonta*,
    723 F. Supp. 3d 837 (C.D. Cal. 2024) ............................................................ 5, 6

*State v. Gator's Custom Guns, Inc.*,
    4 Wash. 3d 732 (2025) ...........................................................................................5

*Stimmel v. Sessions*,
    879 F.3d 198 (6th Cir. 2018) .................................................................................2

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ...............................................................................3

*United States v. Bridges*,
    150 F.4th 517 (6th Cir. 2025) ..................................................................... 14–15

*United States v. Duarte*,
    137 F.4th 743 (9th Cir. 2025) ...............................................................................4

*United States v. Hayes*,
    555 U.S. 415 (2009) ...............................................................................................2

*United States v. Mendez*,
  35 F.4th 1219 (9th Cir. 2021) ........................................................4

*United States v. Oxley*,
  2025 WL 2306238 (D. Md. Aug. 8, 2025) .......................................5

*United States v. Price*,
  111 F.4th 392 (4th Cir. 2024) ........................................................5

*United States v. Rahimi*,
  602 U.S. 680 (2024).................................................................12, 13


**Other Authorities**

3 Bird Wilson,
  Works of the Honourable James Wilson 79 (1804) ........................12

4 William Blackstone,
  Commentaries on the Laws of England 148 (1769)..................12, 13

Decl. of Saul Cornell, *Grant v. Lamont*, No. 23-1344, Joint App'x
  1220 (2d Cir. 2025) ......................................................................13

George T. Wright, Hendiadys and Hamlet,
  96 PMLA 2 (1981)..........................................................................14

Hendiadys, Merriam-Webster Dictionary (2025),
  https://www.merriam-webster.com/dictionary/hendiadys ...............15

Henry John Stephen, Summary of the Criminal Law 48 (1840) ...........12

Samuel L. Bray, "Necessary and Proper" and "Cruel and Unusual":
  Hendiadys in the Constitution, 102 Va. L. Rev. 687 (2016)......14–15

William Shakespeare, Macbeth ............................................................13

## INTEREST OF *AMICI CURIAE*

*Amici Curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") and Brady Center to Prevent Gun Violence ("Brady") (together, "*Amici*") respectfully submit this brief[1] in response to the Court's order dated September 5, 2025, ECF 25 ("September 5 Order").

Giffords Law Center is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. Brady is the nation's longest-standing non-partisan, nonprofit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action.

Through partnerships with researchers, public health experts, and community organizations, *Amici* conduct research for, draft, and defend laws, policies, and programs proven to reduce gun violence. Giffords Law Center and Brady have filed numerous *amicus* briefs in cases involving the constitutionality of firearms

---

[1] *Amici* submit this brief in response to the Court's September 5, 2025 Order (ECF 25) "invit[ing] amici to submit briefs" on the questions presented. *Amici* state that no party's counsel authored any part of this brief, and no one other than *Amici*, their members, and their counsel contributed to its preparation or submission.

regulations,[2] and judges have regularly cited the organizations' research and expertise.[3]

## INTRODUCTION

*Amici* write with four points to aid the Court in answering the questions posed in the September 5 Order.

*First*, in response to the Court's Question 1(a) of whether "a Court assesses whether a weapon is 'in common use' under" step one or two of *Bruen*, *Amici* submit that *United States v. Alaniz* controls and "in common use" is a step one threshold inquiry.

*Second,* in response to the Court's Question 1(b) regarding "the proper understanding and application of the 'in common use' language," *Amici* submit that

---

[2] *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020).

[3] *See, e.g.*, *United States v. Hayes*, 555 U.S. 415, 427 (2009); *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 23-1162, 2025 WL 2423599, at *15 (2d Cir. Aug. 22, 2025); *Hanson v. District of Columbia*, 120 F.4th 223, 248–49 (D.C. Cir. 2024); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 121–22 (3d Cir. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 208 (6th Cir. 2018); *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Nat'l Ass'n for Gun Rts v. Lamont*, 685 F. Supp. 3d 63, 85, 96, 97 n.30, 104, 110 & n.52 (D. Conn. 2023), *aff'd*, No. 23-1162, 2025 WL 2423599 (2d Cir. Aug. 22, 2025); *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 14, 19 n.10, 20, 23 (D.D.C. 2023), *aff'd*, 120 F.4th 223 (D.C. Cir. 2024); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 990 (C.D. Cal. 2019); *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403–05 (D. Md. 2018).

the phrase "in common use" encompasses a requirement that an arm be "in common use" for lawful self-defense and both *used* for and *useful* for lawful self-defense.

*Third*, also in response to the Court's Question 1(b), *Amici* submit that "in common use" is a necessary, but not sufficient, condition for Second Amendment protection as formulated in the Supreme Court's decisions in *Heller* and *Bruen*.

*Fourth*, in response to the Court's Question 2 regarding the "dangerous and unusual" standard, *Amici* submit that the phrase "dangerous and unusual" as used in *Bruen* signifies that the Second Amendment does not protect arms that are unusually dangerous.

## RESPONSE TO QUESTIONS POSED BY THE COURT

### I.  *Bruen's* "Common Use" Standard

#### A.  *United States v. Alaniz* Controls: Common Use is a Step One Inquiry.

In the Ninth Circuit, "common use" is a step one inquiry. In *United States v. Alaniz*, this court articulated how to apply step one of *Bruen*'s two-part test:

> *Bruen* step one involves a threshold inquiry. In alignment with *Heller*, it requires a textual analysis, determining whether the challenger is "part of 'the people' whom the Second Amendment protects," whether the weapon at issue is "in common use today for self-defense," and whether the "proposed course of conduct" falls within the Second Amendment.

69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 31-32 (2022)).

In *Duncan v. Bonta*, this court, sitting en banc, recognized that *Alaniz* placed the "in common use" inquiry in *Bruen*'s step one "initial, textual determination." 133 F.4th 852, 866 n.2 (9th Cir. 2025). Although it noted that other circuits had placed "in common use" at step two, the en banc court ultimately reaffirmed that "*Alaniz* remains good law." *Id.*

Under the prior panel precedent rule, "a three-judge panel may not overrule a prior decision of the court." *Caremark, LLC v. Choctaw Nation*, 104 F.4th 81, 86 (9th Cir. 2024) (quoting *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc)). The prior panel precedent rule directs panels "to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law." *United States v. Mendez*, 35 F.4th 1219, 1223 (9th Cir. 2021). Therefore, unless a prior panel decision "has been effectively overruled by a higher authority" the prior panel's holding and reasoning is binding. *Caremark*, 104 F.4th at 86; *see also United States v. Duarte*, 137 F.4th 743, 752 (9th Cir. 2025) (en banc) (finding *Bruen* did not overrule prior Second Amendment decisions upholding federal felon prohibitor).

*Alaniz* has not been overruled—it explicitly "remains good law." *Duncan*, 133 F.4th at 866. Therefore, this court should apply the "common use" inquiry at *Bruen* step one.

**B.** **Arms Must be in Common Use for Lawful Self-Defense to be Protected Under the Second Amendment.**

Any interpretation of the Supreme Court's reference to "in common use" must be grounded in the core of the Second Amendment right as explained in the Court's contemporary jurisprudence: lawful self-defense.[4] Accordingly, "in common use" cannot be separated from lawful self-defense, and the inquiry must consider a weapon's actual use *and* its utility for that purpose.[5]

Indeed, the Supreme Court has ruled that weapons "in common use" include only those arms in common use for lawful self-defense. The Court made this abundantly clear in *District of Columbia v. Heller* when it explained that "the Second

---

[4] *Heller*, *McDonald*, *Bruen*, and much of their progeny consider the constitutionality of firearms specifically. *Amici* assume, *arguendo*, that the constitutional analysis from those cases should be transferred to all weapons, including the weapons at issue in this matter, in view of the Court's September 5 Order. *Amici* therefore address the Court's questions within the scope of the existing regime.

[5] Nearly every post-*Bruen* court to decide the issue has determined that "in common use" requires a direct link to lawful self-defense. *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, 2025 WL 2423599, at *11 (2d Cir. Aug. 22, 2025); *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025); *Bevis v. City of Naperville*, 85 F.4th 1175, 1193 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024); *United States v. Price*, 111 F.4th 392, 408 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1891 (2025); *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2778 (2025); *State v. Gator's Custom Guns, Inc.*, 4 Wash. 3d 732, 742 (2025); *Capen v. Campbell*, 708 F. Supp. 3d 65, 79 (D. Mass. 2023), *aff'd*, 134 F.4th 660 (1st Cir. 2025); *United States v. Oxley*, 2025 WL 2306238, at *3 (D. Md. Aug. 8, 2025); *Rupp v. Bonta*, 723 F. Supp. 3d 837, 851-52 (C.D. Cal. 2024).

5

Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," and that "the core lawful purpose [is] self-defense." 554 U.S. 570, 625, 630 (2008). The Court reiterated this position in *McDonald v. City of Chicago*, when it ruled that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780 (2010). And most recently, in *New York State Rifle & Pistol Ass'n v. Bruen*, the Court ruled that "individual self-defense is 'the central component' of the Second Amendment right." 597 U.S. at 29.

This Court has recently and properly interpreted this guidance from the Supreme Court to mean that, for purposes of Second Amendment analysis, arms "in common use" are those that are chosen for and "facilitate armed self-defense" *Duncan*, 133 F.4th at 866, 883 n.12 (quoting *Heller*, 554 U.S. at 628) (cleaned up). In line with this language, district courts in this Circuit have required that a weapon be "commonly used . . . for the *central purpose* of self-defense," not any other potentially lawful purpose such as hunting. *Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 917 (D. Or. 2023) (emphasis added); *Rupp v. Bonta*, 723 F. Supp. 3d 837, 851–52 (C.D. Cal. 2024) ("[T]he Court concludes that the inquiry as to whether a weapon is dangerous and unusual must be tethered to self-defense, not lawful purposes generically."); *see also Mills v. New York City*, 758 F. Supp. 3d 250, 266

(S.D.N.Y. 2024) ("[T]he relevant Supreme Court caselaw is clear that the central purpose of the Amendment is individual self-defense.").

Further, courts recognize post-*Bruen* that the "in common use" language requires an arm be both *used for* and *useful for* lawful self-defense. In demonstrating that an arm is indeed *used for* lawful self-defense, mere ownership statistics are insufficient. Unless tethered to lawful self-defense, ubiquity cannot satisfy the requirement that the arm be used for the core purpose of the Second Amendment right. An *en banc* panel of this Court highlighted the absurdities that would flow from adopting such a logically fallacious framework. In *Duncan*, this Court wrote, "We reject Plaintiffs' facile invitation to jettison [*Bruen's*] approach and hold that, any time an undefined number of people own an undefined number of any optional accessory to any weapon, no legislature may ban that accessory, no matter how rarely that accessory is used in armed self-defense." 133 F.4th at 883 (rejecting plaintiffs' "ownership-statistics theory," noting that "a device may become popular because of marketing decisions made by manufacturers" (quoting 19 F.4th 1087, 1126–27 (9th Cir. 2021))).

Other courts agree. The Seventh Circuit declined "to base our assessment of the constitutionality of these laws on numbers alone. Such an analysis would have anomalous consequences." *Bevis v. City of Naperville*, 85 F.4th 1175, 1198–99 (7th Cir. 2023). "Such a rule would lead to a host of absurd results. . . . [T]he

7

constitutionality of the regulation of different firearms would ebb and flow with their sales receipts. . . . [A]n entirely novel weapon that achieved rapid popularity could be rendered beyond the reach of regulation if innovation and sales outstripped legislation." *Capen v. Campbell*, 708 F. Supp. 3d 65, 78 (D. Mass. 2023), *aff'd*, 134 F.4th 660 (1st Cir. 2025); *see also Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 213 (3d Cir. 2024) (Roth, J., concurring) ("A law's constitutionality cannot be contingent on the results of a popularity contest."), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025).

To demonstrate that a commonly used arm is *useful for* lawful self-defense requires a finding that the weapon is "most appropriate" for self-defense. *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024) (the Second Amendment "emphatically does not stretch to encompass weapons that are ill-suited and disproportionate to" use in self-defense) *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025). A weapon that releases slow-acting poison, for example, is not encompassed by the Second Amendment because it "is utterly ineffective at countering imminent threats for which the right to self-defense exists," while nuclear weapons are likewise not covered by the Second Amendment because they "deliver [a] force so excessive for self-defense that no reasonable person could posit that the Constitution guarantees civilian access to them." *Id.* at 451.

All told, courts post-*Bruen* have clearly delineated the "in common use" standard to require a showing that an arm is both *used for* lawful self-defense and *useful for* lawful self-defense.

### C. Common Use is Necessary, But Not Sufficient, for Second Amendment Protection; a Constitutionally Protected Arm Must Also Not be Unusually Dangerous.

A finding that an arm is "in common use" is necessary to achieve protection under the Second Amendment, but it is not sufficient. The law, as articulated by the Supreme Court and multiple circuit courts, is clear on this point.

When first referencing "common use," the *Heller* Court stated: "*Miller* said . . . that the sorts of weapons protected were those 'in common use at the time.' We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627. Thus, *Heller* applies "in common use" as a "limitation" on the scope of arms protected by the Second Amendment. *See id.* at 625 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.").

Similarly, the Supreme Court in *Bruen* again characterized the common use requirement as a limitation, ruling that "the Second Amendment protects *only* the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" 597 U.S. at 47 (emphasis added).

It would be error to interpret the Court's language excluding certain arms from the Amendment's reach as a statement that any arm in common use is necessarily protected. The Second Circuit properly interpreted the "common use" discussion in *Heller* and *Bruen* as setting out a necessary requirement for constitutional protection, not a condition sufficient for protection. In *Nat'l Ass'n for Gun Rights v. Lamont*, the plaintiffs argued that weapons being "widely popular" was "'sufficient' for finding that possessing the regulated weapons is protected by the Second Amendment." No. 23-1162, 2025 WL 2423599, at *11 (2d Cir. Aug. 22, 2025). The Second Circuit rejected that argument, instead holding that

> *Heller* and *Bruen* provide that the Second Amendment "protects *only* the carrying of weapons that are those 'in common use' at the time, as opposed to those that 'are highly unusual in society at large.'" The cases do not hold that the Second Amendment *necessarily* protects all weapons in common use. They do not shield popular weapons from review of their potentially unusually dangerous character.

*Id*. (quoting *Bruen*, 597 U.S. at 47 and *Heller*, 554 U.S. at 627); *see also Bianchi*, 111 F.4th at 460 (observing that, according to *Heller* and *Bruen*, "weapons that are *not* in common use can safely be said to be *outside* the ambit of the Second Amendment. But the logic does not work in reverse. Just because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms.").

The language referring to "common use" in *Heller* and *Bruen* is thus properly applied as one of the characteristics *required* for Second Amendment protection, not one *sufficient* for protection.

## II.     *Bruen's* "Dangerous and Unusual" Standard

The Supreme Court has "also recognize[d] another important limitation" on the Second Amendment right: "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. *Amici* make three related points to assist this Court's analysis of this limitation: *First*, historical sources confirm that the Second Amendment was traditionally understood to limit "unusually dangerous" weapons. That is, the analysis does not consist of individual, disjoined assessments of dangerousness and unusualness. Indeed, *second*, grammatically, the phrase "dangerous and unusual" should be read as a "hendiadys" that means "unusually dangerous." *And third*, to read the phrase otherwise would lead to illogical results. Second Amendment allows for prohibitions on unusually dangerous weapons.

### A.     Historical Analysis Demonstrates that "Dangerous and Unusual" Means the Second Amendment Does Not Protect Arms That Are *Unusually Dangerous*.

*Bruen* requires that the contours of the Second Amendment right are informed by history. 597 U.S. at 17. In *Heller*, the Supreme Court invoked a variety of historical sources to describe the tradition of regulating unusually dangerous

11

weapons. These sources appear to use the phrases "dangerous *and* unusual" and "dangerous *or* unusual" interchangeably. *Heller* invokes Blackstone to describe "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627 (citing 4 William Blackstone, Commentaries on the Laws of England 148–49 (1769)). And yet, Blackstone characterizes this tradition as prohibiting the carrying of "dangerous *or* unusual weapons." 4 Blackstone 148–49 (emphasis added); *see also United States v. Rahimi*, 602 U.S. 680, 698 (2024) (stating that historical going armed laws prohibited "dangerous or unusual weapons," citing Blackstone).

After the reference to Blackstone, *Heller* cites a string of other historical sources, some of which describe prohibitions on weapons that are "dangerous *and* unusual" and some on weapons that are "dangerous *or* unusual." *See, e.g.*, Henry John Stephen, Summary of the Criminal Law 48 (1840) ("dangerous or unusual"); 3 Bird Wilson, Works of the Honourable James Wilson 79 (1804) ("dangerous and unusual").

In a recent concurrence joined by the entire panel, Second Circuit Judge Nathan explained that "the interchangeable use of 'dangerous and unusual' and 'dangerous or unusual' supports the proposition that neither 'and' nor 'or' should be read so literally." *Lamont*, 2025 WL 2423599, at *26 (Nathan, J., concurring). Instead, as the panel explained, the interchangeable use of these phrases indicates

that "both the conjunctive and disjunctive formulations were traditionally understood as meaning 'unusually dangerous.'" *Id.* at *11. "Educated readers in the Founding era would have interpreted both phrases to mean the same thing, a ban on weapons that were 'unusually dangerous.'" *Id.* (quoting Decl. of Saul Cornell ¶ 20, *Grant v. Lamont*, No. 23-1344, Joint App'x 1220-21 (2d Cir. 2025)). And "[t]his framework persisted throughout the nineteenth century." Decl. of Saul Cornell ¶ 20.

Moreover, "closer scrutiny of [these] historical regulations on 'dangerous and unusual weapons' reveals a tradition of restrictions on public affray—that is, terrifying the public." *Lamont*, 2025 WL 2423599, at *26 (Nathan, J., concurring). For example, Blackstone describes going armed "with dangerous or unusual weapons" as a crime that "terrif[ies] the good people of the land." *Rahimi*, 602 U.S. at 697 (quoting 4 Blackstone 149). Judge Nathan explains:

> This broad restriction, at the heart of the "dangerous and unusual" standard, makes clear that the tradition emerges from concern about danger to the public, not statistical commonality of the threatening weapon. Indeed, glaringly absent from these historical laws is any particular focus on the commonality of the weapons used to cause that terror. Rather, when these historical sources mention weapons, they name ones that were certainly in common use.

*Lamont*, 2025 WL 2423599, at *26 (Nathan, J., concurring). Thus, *Heller*'s reference to "dangerous and unusual" is properly understood in the context of history as a tradition of regulating *unusually dangerous* weapons. In this way, the phrase "dangerous and unusual" is a hendiadys.

13

### B. "Dangerous and unusual" Is a Hendiadys.

A hendiadys is "two terms separated by a conjunction [that] work together as a single complex expression." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 413 (2023) (Gorsuch, J., dissenting) (quoting Samuel L. Bray, "Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution, 102 Va. L. Rev. 687, 688 (2016)). William Shakespeare used hendiadys a great deal in his writing and is credited with popularizing the construction in the English language.[6] Today, an English speaker who has never heard the term hendiadys is still quite familiar with the construction. Bray at 689; ("[Hendiadys] is widespread, for example, in colloquial English. If a farmer says his cow is '*nice and fat*,' he is not praising two qualities of the cow—niceness and, separately, fatness—but rather expressing that the cow is nicely fat, quite fat.").[7]

Samuel Bray analyzed hendiadys in the context of constitutional interpretation

---

[6] *See* Macbeth, act 5, sc.5 l.29-31 ("It is a tale / Told by an idiot, full of *sound and fury*, / Signifying nothing.") (emphasis added); *see generally* George T. Wright, Hendiadys and Hamlet, 96 PMLA 2, 168, 171 (1981) ("[S]ome Shakespearean expressions that are hendiadys . . . have become familiar and even idiomatic staples of our speech . . . . How many of us, for example, understand the signification of both terms in *spick and span*, *part and parcel*, *null and void*, *hard and fast*, and *by hook or by crook*?").

[7] *See also* "Hendiadys," Merriam-Webster Dictionary (2025) https://www.merriam-webster.com/dictionary/hendiadys (last visited: Sept. 26, 2025) (defining hendiadys as "the expression of an idea by the use of usually two independent words connected by *and* (such as *nice and warm*) instead of the usual combination of independent word and its modifier (such as *nicely warm*)").

through his study of the Eighth Amendment's prohibition on "cruel and unusual punishment." *See id.* Rather than reading the phrase conjunctively, Bray argued that the phrase should be read as a hendiadys, with "unusual" modifying "cruel" to mean punishment that is "unusually cruel." *Id.* at 690. According to Bray, reading "cruel and unusual" to mean "unusually cruel" "has an elegant simplicity" that "solves textual puzzles about how 'cruel' and unusual' work together" and "lead[s] to an inquiry that is more amenable to judicial resolution." *Id.*

So too here: "dangerous" and "unusual" work together "[a]s one, blended idea" that signifies weapons that are "unusual in their dangerousness," or more simply, unusually dangerous. *United States v. Bridges*, 150 F.4th 517, 546 (6th Cir. 2025) (Nalbandian, J., concurring).

### C.   A Conjunctive Formulation of "Dangerous and Unusual" Does Not Fit Within the *Bruen* Framework.

Indeed, as the Second Circuit stated, any argument that "dangerous and unusual" is a conjunctive standard "strips coherence from the historical limitation to the Second Amendment right applicable to dangerous and unusual weapons."

> "It is axiomatic that to some degree all firearms are 'dangerous," so that word does no work by itself. And the phrase "and unusual" or the phrase "or unusual" standing alone raises more questions than it answers. What is meant by "unusual" standing alone? "Dangerous" needs a modifier, and its companion "unusual" needs something to modify. *Unusually dangerous* is the obvious fit to describe weapons that are so lethal that legislators have presumed that they are not used or intended to be used for lawful purposes, principally individual self-defense.

*Lamont*, 2025 WL 2423599, at *12. Analytically, requiring that a weapon be both "dangerous" *and* "unusual" would mean that if a weapon is common (i.e., not unusual), it cannot be regulated. Such a conjunctive test would erroneously nullify step two of *Bruen*'s two-step framework. Indeed, it would moot the dangerousness assessment entirely, defying the "historical tradition of prohibiting the carrying of dangerous and unusual weapons" emphasized in *Heller*. 554 U.S. at 627.

## CONCLUSION

*Amici* submit the foregoing points to aid the Court in its analysis in *Knife Rights, Inc. v. Bonta*, No. 24-5536.

Dated: September 26, 2025          Respectfully submitted,

/s/ *Jennifer B. Loeb*
Jennifer B. Loeb
  *Counsel of Record*
Austin Evers
FRESHFIELDS US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com
austin.evers@freshfields.com

Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007

16

(212) 277-4000
brandt.henselee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com

*Counsel for Amici Curiae*
Giffords Law Center to Prevent Gun Violence
and Brady Center to Prevent Gun Violence

William T. Clark
Leigh Rome
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
244 Madison Ave, Ste 147
New York, NY 10016
(415) 433-2062
wclark@giffords.org
lrome@giffords.org

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** <u>No. 24-5536</u>

I am the attorney or self-represented party.

**This brief contains 3,777 words,** including _____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[X] complies with the length limit designated by court order dated <u>September 5, 2025.</u>

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** <u>*/s/ Jennifer B. Loeb*</u>

**Date:** <u>September 26, 2025</u>

18

## CERTIFICATE OF SERVICE

I certify that on September 26, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the court's Appellate Case Management System (ACMS). I certify that all other participants in this case are registered ACMS users and that service will be accomplished by the Appellate Case Management System.

Dated: September 26, 2025                    /s/ *Jennifer B. Loeb*_____