No. 24-5536

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————

KNIFE RIGHTS, INC.; ELIOT KAAGAN; JIM MILLER; GARRISON HAM;
NORTH COUNTY SHOOTING CENTER, INC.; PWGG, LP,

*Plaintiffs-Appellants*,

v.

ROB BONTA, California Attorney General,

*Defendant-Appellee.*

———————

On Appeal from the United States District Court
for the Southern District of California,
No. 3:23-cv-00474

———————

**BRIEF FOR COURT-APPOINTED *AMICUS CURIAE* ERIN E. MURPHY
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

———————

ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

September 28, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF AMICUS CURIAE ........................................................... 1

INTRODUCTION ...................................................................................... 1

BACKGROUND ........................................................................................ 2

      A.    Supreme Court Precedent ...................................................... 2

      B.    Ninth Circuit Precedent ...................................................... 12

ARGUMENT ........................................................................................... 14

I.     Whether Arms Are "In Common Use" Or "Dangerous And Unusual" Is Part Of The Historical-Tradition, Not The Plain-Text, Inquiry. .............................................................................................. 14

II.    An Arm Is In "Common Use," And Thus Not "Dangerous And Unusual," If It Is "Typically Possessed By Law-Abiding Citizens For Lawful Purposes." ................................................................... 24

III.   The Decision Below Misapplied These Principles. ...................... 29

CONCLUSION ........................................................................................ 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. James*,
  120 F.4th 941 (2d Cir. 2024) ................................................................20

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023) .......................................... 20, 22, 25, 27

*Bianchi v. Brown*,
  111 F.4th 438 (4th Cir. 2024) ...................................................... 21, 27

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ............................................... 6-8, 17, 25, 26, 28

*Commonwealth v. Caetano*,
  26 N.E.3d 688 (2015) ................................................................... 6, 7

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .............................................................. *passim*

*Duncan v. Bonta*,
  133 F.4th 852 (9th Cir. 2025) ...............................................................14

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ...............................................................................3

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ...............................................................26

*Hanson v. District of Columbia*,
  120 F.4th 223 (D.C. Cir. 2024) ...........................................................20

*Jones v. Bonta*,
  34 F.4th 704 (9th Cir. 2022) ...............................................................24

*Konigsberg v. State Bar of Cal.*,
  366 U.S. 36 (1961) ..................................................................................9

*Lara v. Comm'r Pa. State Police*,
  125 F.4th 428 (3d Cir. 2025) ...............................................................23

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)................................................................................6

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022).......................................................................... *passim*

*Nat'l Ass'n for Gun Rts. v. Lamont*,
  --- F.4th ----, 2025 WL 2423599 (2d Cir. Aug. 22, 2025).................................20

*Ocean State Tactical, LLC v. Rhode Island*,
  95 F.4th 38 (1st Cir. 2024) ..............................................................27

*Teter v. Lopez*,
  76 F.4th 938 (9th Cir. 2023)..............................................................13

*Teter v. Lopez*,
  125 F.4th 1301 (9th Cir. 2025)...........................................................13

*Teter v. Lopez*,
  93 F.4th 1150 (9th Cir. 2024)............................................................13

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023) ....................................................... 12, 13

*United States v. Bridges*,
  2025 WL 2250109 (6th Cir. Aug. 7, 2025)............................................... 20, 27

*United States v. Miller*,
  307 U.S. 174 (1939)................................................................... 4, 18

*United States v. Morgan*,
  --- F.4th ----, 2025 WL 2502968 (10th Cir. Sept. 2, 2025)................................20

*United States v. Perez-Garcia*,
  96 F.4th 1166 (9th Cir. 2024) ....................................................... 13, 14

*United States v. Price*,
  111 F.4th 392 (4th Cir. 2024) ..........................................................20

*United States v. Rahimi*,
  602 U.S. 680 (2024).........................................................11, 12, 17, 31

iii

*United States v. Stevens*,
    559 U.S. 460 (2010) .......................................................................22

**Constitutional Provisions**

U.S. Const. amend. II ........................................................... 15, 20

**Statutes**

18 U.S.C. §922(g)(8) .................................................................11, 17

Cal. Penal Code §17235 ......................................................... 29, 30

Cal. Penal Code §21510 ................................................................29

Cal. Penal Code §21510(b) ...........................................................30

Cal. Penal Code §21590 ................................................................30

**Other Authorities**

1 Timothy Cunningham,
    *A New and Complete Law Dictionary* (2nd ed. 1771) .........................3

1 Samuel Johnson,
    *Dictionary of the English Language* (4th ed. 1773) ...........................3

1 Malachy Postlethwayt,
    *The Universal Dictionary of Trade and Commerce* (4th ed. 1774) ...................30

## INTEREST OF AMICUS CURIAE

On September 5, 2025, the Court issued an order inviting amicus curiae briefs in this case to address a set of questions regarding the proper application of the Supreme Court's Second Amendment precedent, and further appointed the undersigned to file a brief as amicus curiae responding to those questions.[1]

## INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court articulated a methodology for analyzing Second Amendment challenges that focuses on text and historical tradition: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the state bears the burden to "demonstrat[e] that it[s effort to restrict that conduct] is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. 1, 24 (2022). Whether an "Arm" is in common use—i.e., is "typically possessed by law-abiding citizens for lawful purposes," *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008)—is a question that falls decidedly on the historical-tradition, not the plain-text, side of that burden-shifting regime. That is plain from how *Bruen* articulated and applied the plain-text and historical-tradition inquiries: Just as "[n]othing in the Second Amendment's text draws a home/public distinction with

---

[1] Amicus certifies that no party's counsel authored any part of this brief and that no one other than Amicus and her law firm tributed to its preparation or submission.

respect to the right to keep and bear arms," *Bruen*, 597 U.S. at 32-33, nothing in the text draws a common/uncommon distinction. It is also plain from what both *Bruen* and *Heller* said about common use, as both cases explicitly and repeatedly described the common-use rule as intertwined with "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 21 (quoting *Heller*, 554 U.S. at 627).

Common use thus certainly matters, as it conclusively proves that an arm is not "dangerous and unusual," which is the only historical tradition the Supreme Court has recognized that could support the conclusion that an arm is not entitled to Second Amendment protection. But common use matters at the historical-tradition stage, where the state must prove that its law is *consistent* with the dangerous-and-unusual tradition, not when asking the threshold question whether a law restricts the keeping or bearing of "Arms" at all. That threshold question simply turns on whether something is a bearable arm; if it is, then it is the state's burden to prove that it *can* be restricted, not the challenger's burden to prove that it *cannot*.

## BACKGROUND

### A. Supreme Court Precedent

1. The Supreme Court's first major Second Amendment case did not arrive until fairly late in our history. In *Heller*, the Court confronted a challenge to D.C.'s prohibition on possessing handguns in the home. Because the Court previously had

said little about the right of the people to keep and bear arms, *Heller* began with first principles—and the first among those is to "begin as always with the precise text of the Constitution." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).

Starting with the words "right of the people," the Court determined that the Second Amendment secures an individual right for "all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 579-81. Turning to the right's operative contours, the Court explained that the phrase to "keep arms" means to "have" or "possess" arms, while to "bear arms" means to "carry" them. *Id.* at 582-92. With respect to the object of the Second Amendment—"Arms"—the Court was even more explicit. The "meaning" of that term, it explained, "is no different" today than it was at the Founding: "[T]hen as now," the term includes "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581 (first quoting 1 Samuel Johnson, *Dictionary of the English Language* 106 (4th ed. 1773), then quoting 1 Timothy Cunningham, *A New and Complete Law Dictionary* (2nd ed. 1771)). The Court thus held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. In other words, "any thing that a man" can "take[] into his hands" and use as a "[w]eapon" to "defen[d]" himself is an "Arm" that is "prima facie" protected by the Second Amendment. *Id.* at 581-82.

3

After surveying an array of historical sources that confirmed its reading of the Second Amendment's plain text, *see id.* at 592-619, the Court addressed its only previous Second Amendment decision, *United States v. Miller*, 307 U.S. 174 (1939). "[T]he appellees in *Miller* did not file a brief or make an appearance," *Heller*, 554 U.S. at 677 (Stevens, J., dissenting), so the opinion is necessarily limited. That said, *Miller* explained that, at the Founding, "men were expected to appear" on the proving ground "bearing arms supplied by themselves and of the kind *in common use at the time*." *Miller*, 307 U.S. at 179 (emphasis added); *see Heller*, 554 U.S. at 627 (majority op.) ("[T]he conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty."). *Heller* accordingly "read *Miller*" to hold that, as a matter of "historical understanding," "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625.

*Heller* then concluded its methodological discussion by clarifying the historical basis of the "common use" limitation recognized in *Miller*. The "common use" limitation, the Court explained, "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (citing sources). The Court then underscored that because of this historical tradition, "arms that are highly unusual in society at large" may not be protected by the Second

Amendment even if they are the kinds of arms that might be "most useful for militia service" today. *Id.* In other words, even though all bearable weapons are "Arms" covered by the plain text and thus "prima facie" protected, *id.* at 581, our Nation's "historical tradition" does not necessarily protect arms that are "not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, 627.

Applying that framework, the Court held D.C.'s law unconstitutional. "The handgun ban," the Court explained, amounted "to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose" "of self-defense" and extended even into the home, "where the need for defense of self, family, and property is most acute." *Id.* at 628. The Court found no historical support for "banning" a class of arms commonly owned for lawful purposes. *Id.* at 628-29. It made no difference that the District "allowed" residents to possess "other firearms," like "long guns." *Id.* at 629. "It [wa]s enough to note ... that the American people have considered the handgun to be the quintessential self-defense weapon." *Id.* Nor did it matter that "handguns ... are the overwhelmingly favorite weapon of armed criminals." *Id.* at 682 (Breyer, J., dissenting). All that mattered was that *law-abiding* citizens typically possess them for lawful purposes. *Id.* at 627-29 (majority op.)

2. After holding in 2010 that "the Second Amendment right recognized in *Heller*" as against the federal government (via D.C.) is incorporated against the

5

states, *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (plurality op.), the Supreme Court reiterated and applied *Heller*'s holding and approach a few years later in a short, unsigned opinion, *see Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam).

In *Caetano*, "the Supreme Judicial Court of Massachusetts upheld a Massachusetts law prohibiting the possession of stun guns." *Id.* at 411. The SJC "offered three explanations to support its holding." *Id.* All three were inconsistent with *Heller*. "First, the court explained that stun guns are not protected because they 'were not in common use at the time of the Second Amendment's enactment.'" *Id.* (quoting *Commonwealth v. Caetano*, 26 N.E.3d 688, 693 (2015)). But *Heller* was "clear" that "the Second Amendment 'extends … to … arms … that were not in existence at the time of the founding.'" *Id.* at 412 (ellipses in original) (quoting *Heller*, 554 U.S. at 582). Second, in an apparent effort to "refer[] to 'the historical tradition of prohibiting the carrying of dangerous and unusual weapons'" that *Heller* recognized as limiting the scope of the right to keep and bear arms, *id.* (quoting *Heller*. 554 U.S. at 627), the SJC "concluded that stun guns are 'unusual' because they are 'a thoroughly modern invention,'" *id.* (quoting 26 N.E.3d at 693-94). But the conclusion that an arm is "unusual" because it is "modern" "is inconsistent with *Heller* for the same reason." *Id.* "Finally," the SJC posited that stun guns could be banned consistent with the Second Amendment because they are not "'readily

adaptable to use in the military.'" *Id.* (quoting 26 N.E.3d at 694). "But *Heller* rejected the proposition 'that only those weapons useful in warfare are protected.'" *Id.* (quoting *Heller*, 554 U.S. at 624-25). The Court therefore vacated the SJC's decision. *Id.* at 412.

Justice Alito, joined by Justice Thomas, concurred in the judgment. Justice Alito began by reiterating that *Heller* "held that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms.'" *Id.* at 416 (Alito, J., concurring in the judgment) (quoting *Heller*, 554 U.S. at 582). He next explained that stun guns "are plainly 'bearable arms'" covered by the Second Amendment's plain text: "As *Heller* explained, the term includes any '[w]eapo[n] of offence' or 'thing that a man wears for his defence, or takes into his hands,' that is 'carr[ied] … for the purpose of offensive or defensive action.'" *Id.* at 413 n.3 (alterations in original) (quoting *Heller*, 554 U.S. at 581, 584); *see also id.* at 418 ("*Heller* defined the 'Arms' *covered by* the Second Amendment to include 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" (quoting *Heller*, 554 U.S. at 581)).

Finally, Justice Alito turned to the SJC's "holding that stun guns may be banned as 'dangerous and unusual weapons.'" *Id.* at 417. In explaining why the SJC had "gravely erred," *id.*, he reiterated *Heller*'s teachings. "As the *per curiam* opinion recognize[d]," the historical tradition distinguishing arms in common use

from dangerous and unusual weapons sets forth "a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.* And "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.* at 418. That much was clear not only from *Heller*'s discussion "contrasting 'dangerous and unusual weapons' that may be banned with protected 'weapons … in common use at the time,'" but also from *Heller*'s holding "that the Second Amendment … protects" "'the sorts of lawful weapons that [men at the Founding] possessed at home'" and would be expected to bring to militia service. *Id.* at 418, 419 (both quoting *Heller*, 554 U.S. at 627). Justice Alito ended by summing up how *Heller*'s test should work in practice: Because stun guns are bearable arms and thus prima facie protected, *id.* at 416 & n.3, "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*," *id.* at 420.

3. Despite *Heller*'s (and *Caetano*'s) clarity, lower courts did not get the message about how to do Second Amendment analysis. For a decade after *Heller*, courts consistently upheld broad bans on arms, usually by applying a watered-down form of intermediate scrutiny. The Supreme Court sought to wipe away this widespread but wrongheaded rights-diluting approach once and for all in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022).

8

*Bruen* involved a challenge to New York's "may issue" licensing regime, which prohibited law-abiding citizens from carrying a handgun in public without a permit but conditioned their ability to acquire such a permit on convincing a state official that they faced a unique need for self-defense different from ordinary members of the polity. *Id.* at 10-18. In the course of resolving that challenge, *Bruen* clarified that "*Heller* does not support applying means-end scrutiny"; the Second Amendment instead demands a "methodological approach" that begins with the plain text and ends with historical tradition. *Id.* at 19-24. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and the state bears the burden to "demonstrat[e] that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. "Only" if a state carries that burden "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

In the course of articulating and applying that methodological framework, the Court had multiple occasions to discuss the concept of common use. The Court first explained that *Heller* "relied on the historical understanding of the Amendment to demark the limits on the exercise of th[e] right.… For example, we found it 'fairly supported by the historical tradition of prohibiting the carrying of dangerous and

9

unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id.* at 21 (quotation marks omitted) (quoting *Heller*, 554 U.S. at 627). The Court next invoked common use in noting two issues that were not in dispute: No "party dispute[d]" either that petitioners "are part of 'the people' whom the Second Amendment protects" or that "handguns are weapons 'in common use' today for self-defense." *Id.* at 31-32 (quoting *Heller*, 554 U.S. 580, 627).

Finally, the Court returned to common use in its application of the historical-tradition test. The state argued in *Bruen* that some American colonies "bann[ed] the public carry of" certain concealable weapons, including early handguns. *Id.* at 46-47. But the "most" that "show[ed]," the Court explained, was "that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'—a fact we already acknowledged in *Heller*." *Id.* (quoting *Heller*, 554 U.S. at 627). "Drawing from this historical tradition, [*Heller*] explained … that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* (quoting *Heller*, 554 U.S. at 627). And "[w]hatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today." *Id.* "Thus," the Court concluded, "even if these colonial laws prohibited the carrying of handguns because

they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id.*

4. The Supreme Court's last word to date on the Second Amendment came in *United States v. Rahimi*, 602 U.S. 680 (2024). *Rahimi* involved a challenge to 18 U.S.C. §922(g)(8), which prohibits an individual subject to a domestic violence restraining order from possessing a firearm. Rahimi was indicted under §922(g)(8) after a search of his residence uncovered that he was in possession of "a pistol, a rifle, [and] ammunition" while subject to such a restraining order. *Id.* at 688. Rahimi then moved to dismiss the indictment on Second Amendment grounds. *Id.* at 689.

In rejecting Rahimi's position that §922(g)(8) is facially unconstitutional, the Court began by reaffirming that, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation'" by reference to historical tradition. *Id.* at 691 (quoting *Bruen*, 597 U.S. at 24). The Court then breezed past the threshold textual question of whether the government *had* "regulate[d] arms-bearing conduct." *See id.* Whether the "pistol, rifle, [or] ammunition" Rahimi wanted to keep and bear were common, or instead were dangerous and unusual, made no difference; it was enough for the Court that they are "Arms" under *Heller*'s definition, and that §922(g)(8) prevented Rahimi from keeping and bearing them. Finally, in discussing

11

our Nation's historical tradition of firearm regulation, the Court noted that, "[a]t the founding," "[s]ome jurisdictions banned the carrying of 'dangerous and unusual weapons.'" *Id.* at 690-91 (quoting *Heller*, 554 U.S. at 626-27). Once again, then, the Court treated "dangerous and unusual" as a historical consideration, not a textual one.

### B.    Ninth Circuit Precedent

While this Court has had multiple occasions to address where common use fits into the Second Amendment analysis, there is presently no clear holding of the Court on that question, and the panels that have addressed the question—whether in dictum or in vacated decisions—have reached conflicting conclusions.

First, in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023), a panel situated common use as part of the threshold-textual inquiry. *Id.* at 1128 ("*Bruen* step one involves a threshold inquiry. In alignment with *Heller*, it requires a textual analysis, determining whether the challenger is 'part of "the people" whom the Second Amendment protects,' whether the weapon at issue is '"in common use" today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment."). That statement, however, was obiter dictum. *Alaniz* stated explicitly that it was not "deciding" anything about *Bruen*'s threshold textual inquiry, and the court made clear that it was "assum[ing], without deciding, that step one of the *Bruen*

test [was] met." *Id.* at 1129. Consistent with that approach, *Alaniz* contains a grand total of one sentence describing *Bruen*'s "threshold inquiry." *See id.* at 1128.

Then, in *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), a different panel "rejected [the] argument that the purported 'dangerous and unusual' nature of [certain bearable instruments] means that they are not 'arms' as that term is used in the Second Amendment." *Id.* at 949. Focusing on *Heller*'s "state[ment] that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons,'" *Teter* held that whether something is "'dangerous and unusual' is a contention as to which [the state] bears the burden of proof in the second prong of the *Bruen* analysis." *Id.* at 949-50 (quoting *Heller*, 554 U.S. at 627). But that opinion is no longer on the books; the Court granted en banc rehearing and vacated it, 93 F.4th 1150 (9th Cir. 2024), and an en banc panel subsequently held that the challenge there was "moot" because the state "amended the challenged statute" during the pendency of appeal, 125 F.4th 1301, 1304 (9th Cir. 2025) (en banc).

Next, in *United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024), another panel of this Court observed that "[t]he Second Amendment may not protect [a] right to bear or keep 'dangerous and unusual weapons'" because "the presumptive protections of the Second Amendment may be rebutted as to arms not 'in common use today for self-defense.'" *Id.* at 1180-81 (quoting *Bruen*, 597 U.S. at 32). But

the Court found no need to opine further on the subject because the restriction at issue there banned keeping or carrying "*any* firearm," "and therefore unquestionably implicate[d] [the defendant's] Second Amendment rights." *Id.* at 1181

The Ninth Circuit's most recent word on this issue came in *Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) (en banc)—but the Court there expressly declined to "address the issue" of where in the analytical framework "common use" belongs. *Id.* at 866 n.2. *Duncan* did note that *Alaniz* had "placed [common use] in the initial, textual determination," and further noted that "*Alaniz* remains good law." *Id.* But the Court then went on to address whether the magazines California banned are commonly possessed "in the historical analysis, where [the state] bears the burden of proof." *Id.* at 866 n.2. In the course of doing so, *Duncan* rejected the notion that "any time an undefined number of people own an undefined number of any optional accessory to any weapon, no legislature may ban that accessory, no matter how rarely that accessory is used in armed self-defense." *Id.* at 883.

## ARGUMENT

### I. Whether Arms Are "In Common Use" Or "Dangerous And Unusual" Is Part Of The Historical-Tradition, Not The Plain-Text, Inquiry.

Whether an "arm" is "in common use"—or is instead "dangerous or unusual"—is not part of the threshold-textual inquiry on which the citizen bears the burden of proof. Those considerations certainly matter, but they come into play only at the historical-tradition stage, where the government bears the burden of proving

14

that an effort to restrict the keeping or bearing of arms is consistent with our Nation's historical tradition. They do not come into play when determining at the threshold whether a law implicates the Second Amendment *at all*.

1. Under *Bruen*, the threshold question for purposes of determining whether a law implicates the Second Amendment is whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. All a citizen must do to make that threshold showing is demonstrate that "the Second Amendment's plain text covers" the "conduct" in which she would engage but for the challenged law. *Id.* So if the challenger is among "the people," and the challenged law restricts her ability to "keep" or "bear" an "Arm," U.S. Const. amend. II—i.e., if the law "regulates arms-bearing conduct," *Rahimi*, 602 U.S. at 691—then "the Constitution presumptively protects" what the government restricts, and the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition," *Bruen*, 597 U.S. 17.

To answer the threshold question of whether "the Second Amendment's plain text covers" the conduct at issue, courts simply look to the ordinary understanding of the words the Second Amendment uses. That much is clear from *Heller*. "In *Heller*, [the Court] began with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 576-77). Consistent with that focus, *Heller* examined

15

historical dictionaries, thesauruses, and other sources to determine how the specific words the Second Amendment uses were defined and understood at the time. 554 U.S. at 581. The Court did not incorporate into its textual analysis evidence about what kinds of regulations of keeping and bearing arms did or did not exist around the Founding; it instead focused only on how the words the Second Amendment uses were commonly understood and used at that time.

To the extent there were any doubt that the plain-text analysis is focused on the text, *Bruen* eliminated it. *Bruen* used the phrase "plain text" three times to describe the threshold inquiry into whether conduct is presumptively protected, 597 U.S. at 17, 32, 33, and it dispensed with that inquiry in just a few short paragraphs. The Court invoked the definition of "bear" that *Heller* set forth—i.e., "to 'wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person'"—observed that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," and noted that "confrontation can surely take place outside the home." *Id.* at 32-33 (quoting *Heller*, 554 U.S. at 584). In analyzing the text, the Court did not ask whether the historical understanding of the right to bear arms might nonetheless tolerate restrictions on carrying arms outside the home; that was a question to be answered at the historical-tradition stage. *Rahimi* dispensed with the threshold-textual inquiry

16

even more expeditiously: All that mattered was that Rahimi wanted to keep some sort of firearm, and that 18 U.S.C. §922(g)(8) prohibited him from doing so. *Rahimi*, 602 U.S. at 690-91. Again, whether the historical understanding of the right to keep arms might permit that restriction was a question for the historical-tradition stage.

2. *Heller* and *Bruen* do not just make clear how the plain-text inquiry should be conducted; they *already conducted it* as to the term "Arms." After examining contemporaneous evidence of how the term was understood and used at the Founding, the Court defined "Arms" to cover all "[w]eapons of offence" and "any thing that a man wears for his defence." *Heller*, 554 U.S. at 581 (citations omitted). The Court thus concluded that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *id.* at 582—a conclusion that it has reiterated thrice since, *see Caetano*, 577 U.S. at 411; *Bruen*, 597 U.S. at 28; *Rahimi*, 602 U.S. at 691. The Court has likewise repeatedly reiterated that the term encompasses "bearable arms[] … that were not in existence at the time of the founding," *Heller*, 554 U.S. at 582; because "the Second Amendment's definition of 'arms' is fixed," it "covers modern instruments" that satisfy it too, *Bruen*, 597 U.S. at 28; *accord Rahimi*, 602 U.S. at 691. Taken together, *Heller*, *Bruen*, *Caetano*, and *Rahimi* thus confirm that any bearable instrument that an individual can use to defend himself—i.e., "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," *Heller*, 554 U.S. at 581—is an

17

"Arm" covered by the plain text, regardless of whether it is common, unusual, or otherwise.

Indeed, *Heller* never even mentioned "common use" or the "dangerous and unusual" tradition in the lengthy section of the opinion explicating the Amendment's plain text; it was not until an entirely separate section 40 pages later that the Court discussed those concepts. *See id.* at 621-26. The Court did so, moreover, not to explain the meaning of the plain text, but to address its decision in *Miller*. As the Court explained, when *Miller* said that the Second Amendment protects arms that are "part of ordinary military equipment," it invoked the historical tradition that "when called for [militia] service," able-bodied men "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.'" *Id.* at 624 (quoting *Miller*, 307 U.S. at 179). The Court thus read *Miller* to hold only that "the Second Amendment does not protect those weapons *not* typically possessed by law-abiding citizens for lawful purposes"—a holding that it noted "accords with the historical understanding of the scope of the right" that it would go on to address in the next section of the opinion. *Id.* at 625 (emphasis added). The Court then returned to the common-use principle in the following section, where it found the rule that the Second Amendment protects weapons that are "in common use at the time" to be "fairly supported by the *historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (emphasis added). *Heller* thus

makes abundantly clear that the common-use/dangerous-and-unusual dichotomy is derived from "historical tradition," not from the Second Amendment's plain text. *Id.*

To the extent there were any doubt about that, once again, *Bruen* eliminated it. *Bruen* focused on that dichotomy twice, and it expressly described it as derived from "historical tradition" both times. First, in illustrating how *Heller* "relied on the historical understanding of the Amendment to demark the limits on the exercise of that right," the Court provided the "example" that "we found it 'fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons" that the Second Amendment protects the possession and use of weapons that are "in common use at the time.""" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). The Court then returned to common use when conducting its historical-tradition analysis of the law at hand, where it again noted how, "[d]rawing from th[e] historical tradition" of laws that "prohibited the carrying of "dangerous and unusual weapons," *Heller* "explained … that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47 (quoting *Heller*, 554 U.S. at 627). The Court did not—and could not—purport to derive that distinction from anything about how the word "Arms" was understood by the founding generation. Just as "[n]othing in the Second Amendment's text draws a home/public distinction," *id.* at 32, nor does anything in its text draw a distinction between common and

19

uncommon arms; it secures "the right of the people to keep and bear arms," full stop, U.S. Const. amend. II.  So for purposes of *presumptive* protection, an arm is an arm, no matter whether it is in common use or dangerous and unusual.

3. While the Sixth Circuit has correctly held that whether an arm is "in common use" or is "dangerous and unusual" must be evaluated as part of the historical-tradition inquiry at "*Bruen*'s second step," *United States v. Bridges*, --- F.4th ----, 2025 WL 2250109, at *5-6 (6th Cir. Aug. 7, 2025), at least two other circuits have held that "common use" is part of the plain-text inquiry, *see United States v. Morgan*, --- F.4th ----, 2025 WL 2502968, at *4 (10th Cir. Sept. 2, 2025); *United States v. Price*, 111 F.4th 392, 400-02 (4th Cir. 2024) (en banc).[2]  Those circuits are mistaken.

Courts have reached that conclusion principally by relying on the fact that, before it engaged in the plain-text analysis in *Bruen*, the Supreme Court noted that

---

[2] The D.C., Second, and Seventh Circuits fall somewhere in between.  The Second Circuit initially held that common use is part of the threshold analysis, *Antonyuk v. James*, 120 F.4th 941, 981 (2d Cir. 2024), but recently "assume[d] without deciding that" if a "bearable" instrument satisfies the definition of "arms," then its "acquisition and possession is presumptively entitled to constitutional protection."  *Nat'l Ass'n for Gun Rts. v. Lamont*, --- F.4th ----, 2025 WL 2423599, at *13 (2d Cir. Aug. 22, 2025).  The D.C. Circuit has "assume[d], without deciding," that common use "falls under *Bruen* step one."  *Hanson v. District of Columbia*, 120 F.4th 223, 232 n.3 (D.C. Cir. 2024).  And the Seventh Circuit held that the textual "definition of 'bearable Arms' extends only to weapons in common use," but then somewhat confusingly "assume[d] (without deciding …) that [common use] is a step two inquiry."  *Bevis v. City of Naperville*, 85 F.4th 1175, 1193, 1198 (7th Cir. 2023).

it was undisputed that petitioners were "part of 'the people' whom the Second Amendment protects" and that "handguns are weapons 'in common use' today for self-defense." 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). From that, some courts have inferred "that the 'common use' inquiry defines what counts as an 'Arm' within the plain meaning of the text." *Bianchi v. Brown*, 111 F.4th 438, 501 (4th Cir. 2024) (en banc) (Richardson, J., dissenting) (rejecting this view). But the Court was not conducting plain-text analysis in those two sentences of its opinion; it was simply clearing the underbrush of what was and was not disputed in that case. *See Bruen*, 597 U.S. at 31-32. Indeed, if the Court were conducting plain-text analysis, then it would have spoken in terms of presumptions, which it did not.

More fundamentally, to draw that inference is to miss the forest for the trees. In both its explication and its application of the threshold inquiry into what is presumptively protected, *Bruen* focused only on the historical understanding of *the text*. *See id.* at 17, 32-33. It was not until the Court turned to historical tradition that it examined principles that might "restrict[]" the scope of the right recognized in the text. *Id.* at 38; *see also id.* at 30 (discussing sensitive places doctrine to illustrate how historical-tradition analysis should work). To be sure, historical tradition played a critical role in the Court's ultimate inquiry into the "historical understanding of the *scope* of the right" to bear arms, *Heller*, 554 U.S. at 625 (emphasis added), including whether it encompassed public carry. *Bruen*, 597 U.S. at 34-70. But the Court

21

examined that evidence at the historical-tradition stage, not the plain-text stage. To read *Bruen* as baking one lone historical tradition into the threshold-textual analysis simply because it observed at the outset that it was "undisputed" that "handguns are weapons 'in common use' today for self-defense," *id.* at 32, thus would be to elevate one (at most) slightly ambiguous sentence above pages upon pages of unambiguous instruction that historical traditions come into play only at the historical-tradition stage.

To the extent some courts have read *Bruen* to demand a full explication of the "historical understanding of the scope of the right" at the threshold, *see, e.g.*, *Bevis v. City of Naperville*, 85 F.4th 1175, 1193 (7th Cir. 2023), that (il)logic fares even worse. It is at fundamental odds with the analogy the Court drew to the First Amendment, where challengers need not scour the historical record to eliminate any potential basis for the restriction they challenge just to secure some measure of First Amendment scrutiny. So long as something fits within the ordinary understanding of the word "speech," it is for the government to prove that it is nonetheless unprotected as a historical matter. *See Bruen*, 597 U.S. at 24-25 (citing *United States v. Stevens*, 559 U.S. 460, 468-71 (2010)). The threshold inquiry does not change just because the Second Amendment is stake.

To conclude otherwise not only would defy the Court's repeated admonishment that the Second Amendment "is not 'a second-class right,'" *id.* at 70

22

(quoting *McDonald*, 561 U.S. at 780 (plurality op.)), but would collapse *Bruen*'s burden-shifting regime into itself. After all, if nothing not *ultimately* protected by the Second Amendment was not *presumptively* protected either, then the distinct inquiries *Bruen* laid out in painstaking detail would merge. And if challengers could not make it past the threshold inquiry without proving that historical tradition does *not* support restricting the conduct they wish to undertake, then the government would be relieved of its historical-tradition burden in virtually every case. "[T]hat is obviously not the state of the law." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 437 (3d Cir. 2025).

\*   \*   \*

In sum, the question of whether an arm is "in common use," or is "dangerous and unusual," certainly has a role to play in Second Amendment analysis—but it is at the historical-tradition stage, where the state bears the burden of proof. Considerations that find no purchase in the plain text have no role in the plain-text analysis. And just as the Second Amendment's plain text says nothing about arms in the home versus arms in public, it says nothing about arms that are in common use versus arms that are dangerous and unusual. The Second Amendment thus *presumptively* protects anything that constitutes a bearable arm.

## II. An Arm Is In "Common Use," And Thus Not "Dangerous And Unusual," If It Is "Typically Possessed By Law-Abiding Citizens For Lawful Purposes."

Because common-use/dangerous-and-unusual are questions of historical tradition, the state bears the burden of proving that an arm is *not* in common use for lawful purposes, and is instead dangerous and unusual. Of course, a state need not prove up the historical distinction between the two again and again, as the Supreme Court has already recognized that it exists. But the government does bear the burden to "demonstrate that the regulation is consistent with this Nation's historical tradition," *Bruen*, 597 U.S. at 17, so if a state wants to rely on the dangerous-and-unusual tradition to try to justify a law, then it must prove that the arms in question are not in common use for lawful purposes, and are in fact dangerous and unusual. While those concepts are very similar, they are not entirely one and the same—a point that courts tend to overlook when critiquing the common-use test.

1. As the earlier discussion of *Heller* and *Bruen* makes clear, the "common use" and "dangerous and unusual" inquiries are in a sense two sides of the same coin. Indeed, *Heller* tied them together explicitly, finding the principle that the Second Amendment protects those arms "in common use at the time" to be "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627; *see, e.g.*, *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir.) ("'Dangerous and unusual weapons' is a kind of historical term of art: *Heller*

24

contrasted those arms with weapons 'in common use at the time.'"), *vacated on reh'g*, 47 F.4th 1124 (2022) (mem.). And *Bruen* reiterated that connection, noting that *Heller* "found it 'fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons" that the Second Amendment protects the possession and use of weapons that are "in common use at the time."'" 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627).

That said, the concepts are not completely overlapping—a point that some courts have overlooked in accusing the common-use test of being "circular." *E.g.*, *Bevis*, 85 F.4th at 1190. According to those courts, focusing on commonality would enable states to narrow Second Amendment protection by banning any new arm as soon as it comes on the market, thus depriving it of a chance to become common. Not so. To be sure, an arm cannot be *unusual* if it is in common use. But that does not necessarily mean that every arm that is *not* in common use satisfies the dangerous-and-unusual test, as the historical tradition asks whether an arm "is *both* dangerous *and* unusual," *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment); *see Heller*, 554 U.S. at 627 ("common use" limitation "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'").

Of course, all arms are dangerous in some sense: A "[w]eapon" that one "takes into his hands, or useth in wrath to cast at or strike another," *Heller*, 554 U.S.

at 581 (defining "Arm"), is by definition capable of causing harm. So, to be considered "dangerous and unusual," an arm must be dangerous in a way that differentiates it from the arms people commonly use for lawful purposes. States thus cannot freeze technology in time by banning new models before they can enter the market, as they would still have the burden of showing that a new model is "dangerous" in some way that meaningfully differentiates it from arms that are in common use. Take, for instance, the stun guns at issue in *Caetano*. Setting aside whether Justice Alito was correct in his assessment that they are in common use, it would be awfully difficult for a state to prove that a stun gun is more "dangerous" than common firearms when people who prefer stun guns prefer them precisely because they pose substantially less risk of causing permanent harm. *See* 577 U.S. at 417-18 (Alito, J., concurring in the judgment). The circularity critique thus ignores the critical work that the conjunctive "dangerous" component of the dangerous-and-unusual test does.

That likely explains why the critique has yet to sway the Supreme Court. The circularity critique is no recent innovation; it first featured in Justice Breyer's dissent in *Heller*, *see* 554 U.S. at 720-21 (Breyer, J., dissenting), and it was voiced again in pre-*Bruen* circuit law, *see, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). Yet a majority of the Supreme Court not only embraced the common-use test in *Heller*, but then reiterated it—repeatedly—in *Bruen*. *See Heller*,

26

554 U.S. at 627; *Bruen*, 597 U.S. at 21, 47. Indeed, the Court in *Bruen* even went out of its way to make clear that the Second Amendment protects arms that are common today that were *not* common at the Founding, and instead would have been considered "dangerous and unusual" in times gone by. 597 U.S. at 47. As that discussion reflects, the whole point of the common use test is to defer to the views of the people, not the government, on what arms are best suited for the people's self-defense. *See id.* at 26. The government cannot pretermit that inquiry by trying to prevent the people from weighing in on the matter.

2. Of course, not just any use counts for purpose of the common-use inquiry; arms must be in common use for lawful purposes, such as self-defense. But that does not mean, as some courts have suggested, that "only instances of 'active employment' of the weapon" in self-defense situations "should count" when determining whether an arm is in common use. *Bianchi*, 111 F.4th at 460; *see also, e.g.*, *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 45-51 (1st Cir. 2024); *Bevis*, 85 F.4th at 1198-99. As the Sixth Circuit correctly recognized, the "common use" inquiry focuses on the conduct the Second Amendment protects—what the people typically *keep and bear* to be *ready* should the need for self-defense arise, or for other lawful purposes. *Bridges*, 2025 WL 2250109, at *6.

That follows first and foremost from the text of the Second Amendment, which protects the right "to keep and bear Arms," U.S. Const. amend. II, not just to

27

fire at or stab someone when the need for self-defense arises.  As both *Heller* and *Bruen* recognized, "bear[ing] arms" includes not just firing them at attackers, but "carry[ing]" arms "for the purpose … of being *armed and ready* for offensive or defensive action."  *Bruen*, 597 U.S. at 32 (emphasis added; ellipsis in original) (quoting *Heller*, 554 U.S. at 584).  A law-abiding citizen thus "uses" her arm for the Second Amendment's *ne plus ultra* purpose every time she keeps it inside her home or carries it outside her home "at the ready for self-defense"—i.e., anytime she lawfully keeps or bears it—which would make it more than passing strange to ignore those protected uses when considering what arms people commonly use.

It also follows directly from *Heller* and *Bruen*.  *Heller* framed the common-use question as whether a particular bearable instrument is "typically *possessed* by law-abiding citizens for lawful purposes."  554 U.S. at 625 (emphasis added).  As Justice Alito has explained, *Heller*'s "in common use" "quotation … reflects the reality that the founding-era militia consisted of citizens 'who would bring the sorts of lawful weapons that they possessed at home to militia duty,' and that the Second Amendment accordingly guarantees the right to carry weapons 'typically possessed by law-abiding citizens for lawful purposes.'"  *Caetano*, 577 U.S. at 416 (Alito, J., concurring in the judgment) (quoting *Heller*, 554 U.S. at 625, 627).

*Bruen* confirmed the point.  The Court there reiterated *Heller*'s juxtaposition of the phrase "weapons that are … 'in common use at the time'" with the phrase

"those that '*are* highly unusual in society at large.'" 597 U.S. at 47 (emphasis added) (quoting *Heller*, 554 U.S. at 627). That juxtaposition makes sense only if the "uses" that matter for determining whether an arm is "in common use" include keeping and bearing. After all, the latter phrase ("are highly unusual") is nonsensical vis-à-vis a frequency-of-firing/stabbing inquiry. What is more, *Bruen* held that citizens have a fundamental right to carry handguns outside the home without ever asking how frequently people fire them in self-defense situations. It sufficed there, just as it had in *Heller*, that "handguns are the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629; *see also Bruen*, 597 U.S. at 47. Arms thus are in common use so long as people commonly keep and bear them for self-defense or other lawful purposes.

## III. The Decision Below Misapplied These Principles.

Applying those principles, the threshold analysis is straightforward here. California makes it a crime for "[e]very person" in the state to (a) "Possess[]" a "switchblade knife" "in the passenger's or driver's area of any motor vehicle in any public place or place open to the public," (b) "Carr[y]" a "switchblade knife" "upon [one's] person," or (c) "Sell[] … or give[]" a "switchblade knife" "to any other person." Cal. Penal Code §21510; *see id.* §17235 (defining "switchblade knife" as "a knife having the appearance of a pocketknife," "the blade or blades of which are two or more inches in length and … can be released automatically by a flick of a

button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever"). "The unlawful possession or carrying of any switchblade knife, as provided in Section 21510," is also "a nuisance." *Id.* §21590. California thus prohibits members of the general public (i.e., "the people") from carrying (i.e., "bear[ing]") a class of knives.[3]

The only question at the threshold, then, is whether "switchblade knives" as defined in §17235 are "Arms." They plainly are. A switchblade knife is unquestionably a bearable instrument, as evidenced by the fact that California criminalizes "[c]arry[ing]" one. *See id.* §21510(b). And it is just as clearly a "thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *See Heller*, 554 U.S. at 581 (defining "Arm"). While that is arguably true of *any* knife, *see Bruen*, 597 U.S. at 41; 1 Malachy Postlethwayt, *The Universal Dictionary of Trade and Commerce* (4th ed. 1774) (including among "arms" fascines, halberds, javelins, pikes, and swords), it is especially true of a switchblade. Unlike, say, a kitchen knife, a switchblade is carried on one's person to be available as a weapon if a self-defense encounter arises.

---

[3] California law arguably bans *keeping* switchblades in addition to carrying them in public. But that issue is academic for purposes of the threshold analysis, as *Bruen* makes plain that a ban on bearing arms implicates the Second Amendment just as much as a ban on keeping them. *See Bruen*, 597 U.S. at 32.

Because the challenged laws restrict "conduct" that "the Second Amendment's plain text covers," *Bruen*, 597 U.S. at 24—i.e., "arms-bearing conduct," *Rahimi*, 602 U.S. at 691—the state bears the burden to prove that they fit within the historical tradition of restrictions on "dangerous and unusual" weapons. *Bruen*, 597 U.S. at 47; *Heller*, 554 U.S. at 625-29. And for reasons explained in the Appellants' briefs, that is a burden the state has not borne.

## CONCLUSION

For the reasons set forth above, the Court should reverse.

Respectfully submitted,

/s/ ERIN E. MURPHY
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Amicus Curiae*

September 28, 2025

31

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of the Court's order dated September 5, 2025, *see* Dkt.25, because it contains 7,761 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

September 28, 2025

<u>s/Erin E. Murphy</u>
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy