No. 24-5536

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Knife Rights, Inc.; Eliot Kagan; James Miller; Garrison Ham; North County Shooting Center, Inc.; and PWGG L.P.,

Appellants,

v.

Rob Bonta, in his Official Capacity as Attorney General of the State of California, *et al.*,

Respondents.

Appeal from the U.S. District Court
for the Southern District of California
(Case No.: 3:23-CV-00474-JES-DDL), Hon. James E. Simmons, Jr., U.S. District Judge, Presiding

## PETITION FOR PANEL REHEARING,
## REHEARING EN BANC, OR BOTH

John W. Dillon (State Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road, Suite 105, No. 255
Carlsbad, California 92009
jdillon@dillonlawgp.com
Telephone: (760) 642-7150
Fax: (760) 642-7151

Attorneys for Plaintiffs-Appellants Knife Rights, Inc., Eliot Kaagan, James Miller, Garrison Ham, North County Shooting Center, Inc., and PWGG L.P.

# TABLE OF CONTENTS

**Page**

RULE 40(b)(2) STATEMENT ..................................................... 1

STATEMENT OF THE CASE ................................................. 4

REASONS FOR GRANTING REHEARING/REHEARING ................... 6

I.    The Panel's Opinion Conflicts With Supreme Court Precedent ..... 7

    A.    The Panel Rewrote the Statute and Used *Salerno* to Avoid Reviewing the Law as Enacted ............................... 7

    B.    The Panel's Historical Analysis Conflicts with *Heller, Bruen,* and *Rahimi*..................................................... 11

    C.    Even Under the Panel's Concealed-Carry Framing, the Historical Analysis Conflicts with *Bruen* ............................ 14

II.    The Panel's Opinion Is Inconsistent with Decisions of This Court and Creates Intra-Circuit Conflict ...................................... 16

    A.    The Panel's Approach Cannot Be Reconciled with *Baird* and *Perez-Garcia* ..................................................... 16

    B.    The Panel's Rewrite and Narrowing Approach Conflicts with Other Ninth Circuit Precedent ............................. 19

III.    This Case Presents Questions of Exceptional Importance ........... 19

    A.    The Proper Role of *Salerno* in Second Amendment Litigation is at Issue ..................................................... 19

    B.    The Panel Opinion Authorizes Judicial Rewriting and Fragmentation of Criminal Statutes ................................... 21

IV.    The Panel's Affirmance "For Other Reasons" Conflicts with Supreme Court and Ninth Circuit Precedent................................. 22

V.    Conclusion ....................................................... 24

# TABLE OF AUTHORITIES

**Cases** **Page**

*Airport Comm'rs v. Jews for Jesus,* 482 U.S. 569 (1987) ....................... 10

*Baird v. Bonta*, 163 F.4th 723 (9th Cir. 2026) ..................... 16, 17, 18, 21

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ................................... 7

*Columbia Pictures Industries., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ...................................................... 23

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
    657 F.3d 936 (9th Cir. 2011) .................................................. 10, 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................... *Passim*

*Hormel v. Helvering*, 312 U.S. 552 (1941) .............................................. 23

*New York State Rifle & Pistol*
*Ass'n v. Bruen,* 597 U.S. 1 (2022) ……………………………………Passim

*Proctor v. Vishay Intertechnology, Inc.*,
    584 F.3d 1208 (9th Cir. 2009) ...................................................... 23

*Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015) ................................ 23

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ............... 9

*In re S.C.*, 179 Cal.App.4th 1436 (2009) ............................................ 1, 9

*Singleton v. Wulff*, 428 U.S. 106 (1976) ................................................ 23

*United States v. Barron*, 172 F.3d 1153 (9th Cir. 1999) ........................ 24

*United States v. Gamboa-Cardenas*, 508 F.3d 491 (9th Cir. 2007) ........ 23

*United States v. Perez-Garcia,*
    96 F.4th 1166 (9th Cir. 2024) ............................................. 16, 17, 18

*United States v. Rahimi,* 602 U.S. 680 (2024) ................................ *Passim*

*United States v. Salerno*, 481 U.S. 739 (1987) ................................ *Passim*

*United States v. Stevens*, 559 U.S. 460 (2010) ......................................... 9

*Washington v. Confed. Bands & Tribes of Yakima Indian Nation,*
    439 U.S. 463 (1979) ....................................................................... 23

*Washington State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008) ......................................................................... 8

## Rules

Fed. R. App. P. Rule 35(b) .......................................................................... 4

Fed. R. App. P. Rule 40 .......................................................................... 1, 4

## Cal. Penal Code

Section 17235 .............................................................................................. 1
Section 18000 ........................................................................................ 1, 4
Section 18005 .............................................................................................. 1
Section 21510 ................................................................................... *Passim*
Section 21510(b) ............................................................................. *Passim*
Section 21590 ........................................................................................ 1, 4

Second Amendment ........................................................................ *Passim*

U.S. Constitution ................................................................................... 1, 2

## RULE 40(b)(2) STATEMENT

This case challenges *California law* that makes it a crime for "every person" who engages in any of the following conduct with a switchblade knife: (a) *possesses* the knife in the passenger's or driver's area of any motor vehicle in any public or open place[1]; (b) *carries* the knife upon the person; or (c) *sells* the knife to any other person, attempts to sell the knife, *or loans, transfers, or gives* the knife to any other person. *See* Cal. Penal Code § 21510. As the panel concedes, California's switchblade law prohibits "a wide range of conduct." Panel Opinion ("Op."), at 18.

In short, the statute imposes a categorical ban on possession, carry, sale, attempted sale, loan, transfer, or giving of switchblade knives—bearable arms under the plain text of the Second Amendment, and therefore, presumptively protected under the U.S. Constitution. *See New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008); and Cal. Penal Code §§ 21510, 17235, 21590, 18000, 18005.

---

[1] *In re S.C.*, 179 Cal.App.4th 1436 (2009), the court held that the statute governing possession of a switchblade knife is violated any time a person carries the knife on the person, regardless of where the possession occurs.

1

The panel nonetheless affirmed the district court's judgment by relying on *United States v. Salerno*, 481 U.S. 739 (1987) and *United States v. Rahimi,* 602 U.S. 680 (2024) (interpreting a federal statute). Op., at 10-11, 15, 18. In doing so, the panel: (i) treated the challenged statute as if it prohibited only the "concealed carrying of switchblade knives in public," (ii) conducted its historical analysis *solely* with respect to that narrowed concealed carry formulation, and (iii) wrongly concluded that our Nation's historical tradition supports a complete ban on the concealed carry of switchblades. *Id.*, at 5-9; 18-30. Having reached that conclusion, the panel further concluded that Appellants' facial challenge against the above Penal Code Sections in their entirety failed and expressly declined to address whether the remaining portions of the challenged statute—covering possession, sale, loan, transfer, or giving—are constitutional. Op. at 19, 19 n.4, 30. As such, the panel improperly refused to substantively analyze Appellants' facial claim before it, *nor the law actually enacted* by the California Legislature.

The panel's approach departs from the framework established in *Heller* and affirmed in *Bruen*. When "the Second Amendment's plain text covers an individual's conduct, the Constitution *presumptively protects*

that conduct" and the "government must demonstrate that *the regulation* is consistent with the Nation's historical tradition [arms] regulation." *Bruen*, 597 U.S. at 2, 17, 24 (emphasis added). In its opinion, the panel assumed "without deciding that the plain text of the Second Amendment covers Plaintiffs' proposed course of conduct." Op. at 19. But rather than evaluating the statute as enacted, the panel recharacterized a unitary criminal prohibition as solely a concealed-carry prohibition and declined to determine whether the State had demonstrated that the law *as written* is consistent with historical tradition. Op. at 2.

The result is that the panel did not analyze the statute actually enacted by the California Legislature, nor did it resolve the facial challenge presented. Instead, by redefining the statute and relying on historical regulations addressing *only* concealed carry, the panel upheld the law without determining whether the broader prohibition, as written, is constitutionally permissible under *Bruen*. That methodology conflicts with Supreme Court precedent and with decisions of the Ninth Circuit governing facial challenges.

Procedurally, the panel affirmed the district court's grant of summary judgment upholding the constitutionality of the state statutes,

but "for reasons that differ from those of the district court." Op. at 5 (with no citation to any legal authority). The panel's reasoning was based solely on its misapplication of the facial challenge precedent under *Salerno* and *Rahimi,* arguments that the AG did not raise below or brief and thereby forfeited; and the panel's reliance on undisclosed argument conflicts with Supreme Court and Ninth Circuit precedent *limiting* a reviewing court's affirmance of a district court's holding "for other reasons."

A panel rehearing is warranted, as is a rehearing *en banc*. Fed. R. App. P. 40 (formerly, Rule 35(b)).

## STATEMENT OF THE CASE

Plaintiffs-Appellants brought this Second Amendment challenge to California's switchblade law, which broadly criminalizes the possession, carry, sale, attempted sale, loan, transfer, or giving of a switchblade knife. Cal. Penal Code § 21510. The panel itself described the statute as "comprehensive" and acknowledged that it "prohibit[s] a wide range of conduct." Op. at 6, 18. Violations are punishable as a misdemeanor and the knives are subject to seizure and destruction. Cal. Penal Code §§ 21510, 21590, 18000.

The parties filed cross-motions for summary judgment. The Attorney General did not argue that the case turned on the distinction between facial and as-applied challenges. The district court denied Plaintiffs' motion and granted the State's motion. Applying *Bruen*, the district court concluded that Plaintiffs had not established that switchblades are protected "arms" because they had not shown the knives were "in common use today for self-defense or that [they] are not dangerous and unusual." ER-00015. The district court nevertheless evaluated the State's historical analogues and concluded that the Attorney General had failed to demonstrate that California's categorical prohibition was consistent with the Nation's historical tradition of arms regulation. ER-00016-00019. Judgment was entered for the State, and Plaintiffs timely appealed.

On appeal, the Attorney General conceded that switchblade knives are bearable "arms" and that the statute regulates conduct covered by the Second Amendment's plain text. The State instead relied on *Bruen*'s historical analysis, arguing that nineteenth-century concealed-carry restrictions justified California's prohibition.

The panel affirmed, but "for reasons that differ from those of the district court." Op. at 5. Although the panel assumed that the Second Amendment's plain text covers Plaintiffs' conduct, it did not evaluate the challenged statute as enacted. Instead, it isolated one provision of Section 21510—prohibiting carrying a switchblade "upon the person"—and recharacterized that provision as a prohibition on "the concealed carrying of switchblade knives in public." Op. at 19.

After recasting the statute in that manner, the panel relied on historical concealed-carry regulations involving Bowie knives, "Arkansas toothpicks," and similar weapons to conclude that the panel-defined concealed-carry restriction was historically justified. Op. at 19–29. Because the panel concluded that this recharacterized concealed-carry prohibition could be constitutional, it held that Plaintiffs' facial challenge failed under *Salerno*. *Id*. at 19. The panel then expressly declined to "express any view" on whether the remainder of California's switchblade prohibitions are constitutional. *Id*. at 19 n.4.

## REASONS FOR GRANTING REHEARING

Rather than evaluate the statute enacted by the Legislature, the panel reformulated the law as a narrower concealed-carry restriction and

upheld that judicially-created regulation. By doing so, the panel avoided reviewing the constitutionality of the statute actually challenged in this case.

## I. The Panel's Opinion Conflicts with Supreme Court Precedent

### A. The Panel Rewrote the Statute and Used *Salerno* to Avoid Reviewing the Law as Enacted.

The panel's opinion invoked *Salerno* and *Rahimi* for the proposition that a facial challenge fails if the statute has any constitutional applications. But neither decision authorizes the methodology the panel employed here.

A facial challenge is "an attack on *a statute itself* as opposed to a particular application." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415 (2015) (emphasis added). The inquiry, therefore, concerns the statute *as enacted*. Under *Salerno*, a challenger must establish that "no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. That standard presupposes evaluation of the law's *actual prohibition*s, not a judicially drafted recharacterization of the statute.

The Supreme Court has made clear that only conduct the statute "actually authorizes or prohibits" may be considered in facial review.

*Patel*, 576 U.S. at 418. Courts may not uphold a statute by hypothesizing constitutional applications divorced from the text. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-450 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."). There is no "plainly legitimate sweep" under Section 21510. *Id*. Section 21510 does not prohibit *only* concealed carry. It criminalizes possessing the knife, carrying it upon the person, and selling, attempting to sell, loaning, transferring, or giving it to another. The statute does not distinguish between open and concealed carry—*concealment is not an element of the offense*. Nor does the statute create separate and independent regulatory schemes. It enacts a categorical prohibition expressed through enumerated conduct triggers.

The panel nevertheless evaluated a different law. Op., at 18-29. It isolated one enumerated act—carrying a switchblade "upon the person" (in any manner)—then recharacterized that provision in isolation as prohibiting the concealed carrying of switchblade knives in public, and conducted its historical analysis on that narrowed formulation alone. Op. at 19. It then concluded that because concealed-carry regulations have

historical support, the facial challenge fails, while declining to "express any view" on whether the statute's remaining prohibitions are constitutional. *Id.* at 19 n.4. The panel thus upheld a fundamentally different law than the California Legislature enacted.

The error is particularly stark here. As originally enacted in 1957, the challenged statute did prohibit carrying a switchblade "concealed upon the person." But the Legislature *removed the concealment requirement* in 1959. *In re S.C.*, 179 Cal. App. 4th 1436, 1441 n.3 (2009). The current statute contains no concealment element. By treating Section 21510(b) as a concealed-carry restriction, the panel reinserted language the Legislature deliberately *removed*.

Supreme Court precedent does not permit courts to rewrite statutes in order to uphold them. "In considering a facial challenge, this Court may impose a limiting construction on a statute only if it is 'readily susceptible to such a construction." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884 (1997). However, a court may not "'rewrite a … law to conform it to constitutional requirements.'" *Id.*, at 885; *see also United States v. Stevens*, 559 U.S. 460, 481 (2010).

The Supreme Court's decision in *Airport Comm'rs v. Jews for Jesus* underscores this principle. 482 U.S. 569 (1987). There, the Court refused to adopt a narrowing construction where "the words of the resolution simply leave no room for a narrowing construction." *Id.* at 575. The same is true here. By redefining Section 21510(b) to include a concealment element not found in the statutory text, the panel inserted a limitation the Legislature deliberately did not enact.

This Court has also applied the same rule *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*. 657 F.3d 936, (9th Cir. 2011) (*en banc*). The Ninth Circuit declined to adopt an interpretation that would have required adding language not present in the ordinance, explaining that courts may not "rewrite the statute's plain language." *Id.*, at 945–947.

By redefining Section 21510(b) as a concealed-carry restriction and evaluating only that judicially narrowed formulation, the panel improperly avoided reviewing the statute as enacted and foreclosed consideration of the law's full sweep. That methodology conflicts with *controlling Supreme Court precedent*, as well as this Court's own precedent. Rehearing is warranted.

**B.    The Panel's Historical Analysis Conflicts with *Heller*, *Bruen,* and *Rahimi*.**

*Bruen* requires courts to determine whether "the regulation" at issue is consistent with this Nation's historical tradition of arms regulation. *Bruen*, 597 U.S. at 17, 19–20, 24. The government must demonstrate a historical tradition that is "well-established and representative," not comprised of "outliers." *Id*., at 30. That inquiry must correspond to the regulation *actually enacted,* not a judicially reformulated version of the statute.

Here, the Legislature enacted Penal Code § 21510 as a categorical prohibition on switchblade knives. The statute does not distinguish between open and concealed carry, does not create separate regulatory schemes, and does not include "concealed" as an element. It reflects a single legislative judgment: switchblades may not be possessed, carried, sold, loaned, transferred, or gifted in California. Cal. Penal Code § 21510.

Where the government bans an entire category of arms, however, *Heller* has already articulated the governing historical rule. In evaluating the handgun ban, the *Heller* Supreme Court explained that the historical tradition permits prohibition only of weapons that are both

11

"dangerous and unusual." *Heller*, 554 U.S. at 627. Arms "in common use" for lawful purposes fall within the Second Amendment's protection. *Id.*, at 624-625. If an arm is not unusual, it is necessarily common—and thus protected. *Bruen* did not alter this rule; it reaffirmed *Heller*'s framework. *Bruen*, 597 U.S. at 3.

The panel did not apply that framework. Instead of determining whether switchblades are protected arms under *Heller*'s "dangerous and unusual" principle, the panel conducted its own historical inquiry into nineteenth-century concealed-carry regulations to evaluate a judicially reformulated "concealed carry" prohibition. By doing this, the panel applied the wrong constitutional framework.

Moreover, the panel's historical analysis is flawed even on its own terms. Rather than analyzing the challenged statute, the panel confined its inquiry to historical regulations addressing *concealed carry in isolation*. After reformulating Section 21510(b) as a concealed-carry restriction—an element not found in the statutory text—the panel treated nineteenth-century concealed-carry laws as dispositive.

But a tradition regulating concealed carry does not establish a tradition permitting a categorical prohibition on possessing, carrying, selling, loaning, transferring, or otherwise distributing an entire class of arms. The historical analogues on which the panel relied regulated the manner of carrying arms, not their possession or transfer. That mismatch is dispositive under *Bruen*. The historical inquiry must correspond to the burden imposed by the modern regulation. *Bruen*, 597 U.S. at 26-27. A tradition regulating the manner of carry cannot justify a categorical ban on possession and transfer. Nor can a handful of mid-to-late nineteenth-century concealed-carry enactments—far removed from the Founding era—constitute the "well-established and representative" historical tradition required to uphold a modern prohibition. *Id*. at 30.

*Rahimi* confirms the same principle. There, the Court upheld a federal statute only after identifying Founding-era surety and affray laws reflecting a broader historical principle permitting the temporary disarmament of individuals judicially determined to pose a danger. *Rahimi*, 602 U.S. at 693-702. The Court did not rely on scattered historical enactments addressing a narrower form of conduct, nor did it

uphold a modern law by extracting from a limited subset of historical regulations while leaving the statute's broader sweep unaddressed. *Id.*

By relying on historical regulations governing only the manner of carry to uphold a judicially redefined concealed-carry restriction, the panel avoided addressing whether the statute actually enacted by the Legislature can be justified under *Bruen*—a comprehensive prohibition on possessing, carrying, and transferring switchblades. The panel's analysis departs from the Supreme Court's framework in *Heller*, *Bruen*, and *Rahimi*.

### C. Even Under the Panel's Concealed-Carry Framing, the Historical Analysis Conflicts with Bruen.

Even assuming the panel could draft a prohibition on concealed carry and analyze that restriction in isolation, its historical analysis still conflicts with the framework articulated in *Bruen*. The Supreme Court did not merely catalogue historical arms regulations; it identified the constitutional principles reflected in them. *Heller* recognized a historical tradition permitting the prohibition of arms that are both "dangerous and unusual," while protecting arms "in common use" for lawful purposes. *Heller*, 554 U.S. at 626-628; see also *Bruen*, 597 U.S. at 47 (reaffirming *Heller*'s analysis). And although *Bruen* acknowledged that some

nineteenth-century jurisdictions prohibited concealed carry, it emphasized the constitutional limit of that tradition: those laws were upheld only because they regulated the *manner* of carry and did not "altogether prohibit the public carry of arms." *Bruen*, 597 U.S. at 53, 55. The antebellum authorities reflected a "consensus view that States could not altogether prohibit the public carry of arms protected by the Second Amendment or state analogues." *Id.* (emphasis added).

The Court held that, although "the manner of public carry was subject to reasonable regulation," none of the historical limitations "operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 5, 59. That distinction—between regulating how arms may be carried and eliminating public carry altogether—was central to *Bruen*'s holding.

The panel's reasoning departs from that principle. Relying on the same nineteenth-century concealed-carry statutes discussed in *Bruen*, the panel upheld what it characterized as a prohibition on the concealed carrying of switchblades in public. Op. at 19. But *Bruen* already examined those historical laws and concluded they could not justify modern restrictions that eliminate the right to carry arms for self-

15

defense. The panel relied on historical statutes that regulated the *manner* of carry within legal regimes that preserved the broader right to public carry. They did not authorize governments to prohibit public carry altogether. By treating those laws as sufficient to uphold a categorical prohibition on concealed carry—within a judicially reconstructed version of Section 21510(b)—the panel adopted a historical rule that the Supreme Court expressly rejected. At the same time, the panel declined to address whether the statute's remaining prohibitions on carrying switchblades are constitutional. Op. at 19 n.4. The result is a decision that sustains a judicially narrowed subset of the statute while leaving unresolved whether the broader prohibition enacted by the Legislature is consistent with the Second Amendment.

## II. The Panel's Opinion Is Inconsistent with Decisions of This Court and Creates Intra-Circuit Conflict

### A. The Panel's Approach Cannot Be Reconciled with *Baird* and *Perez-Garcia*.

The panel's methodology using *Salerno* as a threshold bar before the *Heller/Bruen* analysis is conducted cannot be reconciled with the Ninth Circuit's precedent governing the implementation of *Bruen* and the relationship between *Bruen* and *Salerno*.

16

In *Baird v. Bonta*, 163 F.4th 723 (9th Cir. 2026), this Court applied *Bruen* and examined the challenged California prohibition on open carry of firearms in highly populated counties, as enacted, and further required the government to justify "its firearms regulation" under *Bruen's* historical-tradition test, and not *Salerno's* "no set of circumstances" test. The Ninth Circuit in *Baird* did not redefine the statute before conducting the *Bruen* historical-tradition analysis. *Id.*, at 745-748.

And as pointed out by this Court in *Baird*, "*Heller* did not assess whether the law might conceivably have some theoretical constitutional application," and instead, treated the [handgun ban] as facially unconstitutional, regardless of whether . . . [the city] permitted individuals to keep other firearms in the home or whether some 'set of circumstances exist[ed]' where [the city] might be justified in prohibiting some handguns for some people." *Baird*, 163 F.4th at 745 (quoting *Heller*, at 629). The panel's application of *Salerno* is in direct conflict with *Baird*.

Moreover, in *United States v. Perez-Garcia*, this Court squarely rejected the argument that *Salerno* displaces *Bruen* in Second Amendment cases. 96 F.4th 1166, 1175-1177 (9th Cir. 2024). This Court held that *Bruen*, and not *Salerno*, governed defendants' Second

17

Amendment claim. *Id*. The Court explained that the government's reliance on *Salerno* "cannot be squared with *Bruen*." *Id*. at 1175. As such, the panel's methodology materially conflicts with *Perez-Garcia*.

Section 21510 imposes a unitary prohibition on switchblades through enumerated conduct triggers. The panel, however, isolated one enumerated act, carrying "upon the person," further recharacterized it as a "concealed-carrying in public" restriction, confined its historical analysis to that redefined, narrower concealed carry set of restrictions, and invoked *Salerno* to foreclose review of the statute's remaining prohibitions.

Under *Baird* and *Perez-Garcia*, *Bruen* governs and not *Salerno*, and the *Heller*/B*ruen* historical-tradition inquiry must correspond to the regulation *as enacted*. The panel applied a different methodological rule—one that permits the rewriting and narrowing of the statute before conducting the *Heller/Bruen* historical-tradition inquiry and then invoked *Salerno* to terminate review. That divergence creates intra-circuit conflicts as to how *Bruen* is to be implemented.

### B. The Panel's Rewrite and Narrowing Approach Conflicts with Other Ninth Circuit Precedent.

The panel's recharacterization of Section 21510 as a "concealed carrying in public" restriction conflicts with other Ninth Circuit precedent governing facial challenges. In *Comite de Jornaleros de Redondo Beach*, sitting *en banc*, the Ninth Circuit held that, in addressing a facial challenge, courts "are not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language[.]" *Id.*, 657 F.3d at 946.

Here, Section 21510(b) does not distinguish between open and concealed carry. *Concealment is not an element of the offense; it was expressly deleted in 1959 by the California Legislature*. The statute prohibits carrying a switchblade "upon the person," without qualification. The text is not susceptible to a "concealed-carry in public" only interpretation.

## III. The Case Presents Questions of Exceptional Importance

### A. The Proper Role of *Salerno* in Second Amendment Litigation is at Issue.

This case presents exceptionally important and recurring questions concerning the interaction between *Salerno* and the Second Amendment framework articulated in *Heller*, *Bruen*, and *Rahimi*.

Since *Bruen*, courts have grappled with whether and how *Salerno*'s facial-challenge formulation operates within the Second Amendment's historical-tradition analysis. The panel's opinion treats *Salerno* as a threshold bar that permits upholding a statute by redefining the statute, or a portion of it, to identify a single constitutional application. Op. at 5-9, 18-30. As shown, the panel rewrote Section 21510(b) as a "concealed carrying in public" restriction, identified belated historical concealed carry regulations, and invoked *Salerno* to foreclose examination of the statute as a whole. The panel's methodology elevates *Salerno* as a mechanism to redefine and narrow the scope of the challenged statute and then terminate further inquiry once a subset application can be "justified."

*Heller* established, and *Bruen* affirmed, a text-and-history standard that places the burden on the government to justify "the regulation" by reference to historical traditions of arms regulation. *Bruen*, 597 U.S. at 19–20. *Rahimi* reaffirmed that courts must assess whether the

challenged restriction is consistent with that tradition. *Rahimi*, 602 U.S. at 681. Other Ninth Circuit decisions have applied this methodology. *E.g.*, *Baird*, 163 F.4th at 745-748. Neither Supreme Court decision suggests that the panel can redefine and narrow the statute and uphold it based on outlier historical arms regulations that only address the judicially reformulated statute.

### B.    The Panel Opinion Authorizes Judicial Rewriting and Fragmentation of Criminal Statutes.

The panel's decision raises concerns that extend well beyond the Second Amendment. It authorizes courts to rewrite and fragment unified criminal statutes and uphold them based on judicially narrowed formulations untethered to the statutory text.

The consequences of the panel's approach are profound. If courts can fragment a unitary criminal statute into conceptual sub-laws and uphold the statute based on one redefined fragment, the constitutional validity of a statute will depend not on what the Legislature enacted, but on how narrowly a reviewing court chooses to characterize it.

The panel's approach is not confined to switchblades. It applies to any categorical prohibition structured through enumerated conduct

triggers. Under the panel's reasoning, a court can isolate one component of a comprehensive regulatory scheme, uphold it, and invoke *Salerno* to then avoid addressing the constitutionality of the remaining prohibitions. Such an improper analysis can then be repeated with any subsequent challenge of the same law by further judicially narrowing/redrafting of the challenged conduct. Such an approach blurs the line between judicial interpretation and legislation triggering separation of powers issues.

If the panel's approach is permitted to stand, any comprehensive arms ban structured through enumerated conduct triggers can avoid any serious review under the *Bruen* framework. A reviewing court need only redefine the "regulation," identify a historically supported statutory fragment, and foreclose further review based on the existence of that single "constitutional" application. Under such a rule, the historical inquiry mandated by *Heller* and *Bruen* is side-stepped.

## IV. The Panel's Affirmance "For Other Reasons" Conflicts With Supreme Court and Ninth Circuit Precedent

The panel states obliquely, and without citation to any legal authority, "we affirm, for reasons that differ from those of the district court." Op. at 5.

The controlling rule of law is that a reviewing court "may affirm … 'on any ground raised below *and* fairly supported by the record.'" *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1076 (9th Cir. 2015) (emphasis added), citing *Columbia Pictures Industries., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013) (quoting *Proctor v. Vishay Intertechnology, Inc.*, 584 F.3d 1208, 1226 (9th Cir. 2009).

The Supreme Court held long ago, "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below. . . .") *Singleton v. Wulff*, 428 U.S. 106, 120 (1976), citing *Hormel v. Helvering*, 312 U.S. 552, 556 (1941); see also *Washington v. Confed. Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 477 n. 20 (1979) n.20.

The panel's opinion conflicts with this precedent because the panel's "other reasons" for affirming the district court's decision were *not* raised below, nor fairly supported by the record; and the AG never argued or briefed the facial versus as-applied challenge reasoning resulting in its waiver. See *United States v. Gamboa-Cardenas*, 508 F.3d 491, 502 (9th Cir. 2007) (where appellees fail to raise an argument in their answering

brief, "they have waived it") (citation omitted); see also *United States v. Barron*, 172 F.3d 1153, 1156 (9th Cir. 1999).

## V.  Conclusion

Panel rehearing is warranted, as is a rehearing *en banc*.

March 16, 2026

Respectfully submitted,

DILLON LAW GROUP, APC

 */s/ John W. Dillon*
John W. Dillon
California State Bar No. 296788
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

Attorneys for Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

Prepared in a format, typeface, and type style that complies with Fed. R. App. P.

32(a)(4)-(6) and **contains the following number of words:**                    **.**

*(Petitions and responses must not exceed 4,200 words)*

**OR**

In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature**                                        **Date**

*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11**                                                                 *Rev. 12/01/24*

# OPINION

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KNIFE RIGHTS, INC.; ELIOT KAAGAN; JIM MILLER; GARRISON HAM; NORTH COUNTY SHOOTING CENTER, INC.; PWGG, LP, | No. 24-5536<br><br>D.C. No. 3:23-cv-00474-JES-DDL |
| *Plaintiffs - Appellants*, | |
| v. | OPINION |
| ROB BONTA, California Attorney General, | |
| *Defendant - Appellee.* | |

Appeal from the United States District Court
for the Southern District of California
James E. Simmons, Jr., District Judge, Presiding

Argued and Submitted October 8, 2025
Pasadena, California

Filed January 30, 2026

Before: Kim McLane Wardlaw, Ronald M. Gould, and
Lucy H. Koh, Circuit Judges.

Opinion by Judge Wardlaw

# SUMMARY[*]

## Second Amendment

The panel affirmed on different grounds the district court's summary judgment in favor of the state of California in a facial Second Amendment challenge to California's switchblade regulations brought by Knife Rights, Inc., various individuals who desire to keep and bear switchblades, and two retailers of bladed weapons (collectively, "Plaintiffs").

While California's switchblade regulations prohibit a wide range of conduct, the panel focused on Cal. Pen. Code § 21510(b), which prohibits the concealed carrying of switchblade knives in public. The panel did not express any view on whether the regulation of any of the other conduct prohibited by California's switchblade regulations is constitutional.

Applying the two-step framework set forth in *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), the panel assumed without deciding that the plain text of the Second Amendment covered Plaintiffs' proposed course of conduct. Proceeding to the second step, the panel determined that switchblades are relevantly similar to Bowie knives and other weapons in terms of the concerns they pose to legislatures (the "why"), and California's concealed carry prohibition is relevantly similar to the manner in which historical legislatures responded to these concerns (the "how"). California's switchblade regulations therefore

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

comport with the principles underpinning the Second Amendment, to the extent that they prohibit the concealed carry of switchblade knives in public places.

Acknowledging uncertainties in *Bruen*'s methodological framework, the panel stated that their holding is narrow: Plaintiffs' facial challenge fails because they cannot establish that California's switchblade regulations are unconstitutional in every one of their applications.

---

## COUNSEL

John W. Dillon (argued), Dillon Law Group APC, Carlsbad, California, for Plaintiffs-Appellants.

Katrina K. Uyehara (argued), Anthony P. O'Brien, and Meghan Strong, Deputy Attorneys General; R. Matthew Wise, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, Sacramento, California; Jane Reilley, Deputy Attorney General, Office of the California Attorney General, San Francisco, California; for Defendant-Appellee.

William J. Taylor Jr., Everytown Law, New York, New York, for Amicus Curiae William Taylor.

Erin E. Murphy and Matthew D. Rowen, Clement & Murphy PLLC, Alexandria, Virginia, for Amicus Curiae Erin E. Murphy.

Joseph G.S. Greenlee and Erin M. Erhardt, National Rifle Association of America, Fairfax, Virginia; Lawrence G.

Keane and Shelby B. Smith, National Shooting Sports Foundation Inc..

David H. Thompson, Peter A. Patterson, and John D. Ohlendorf, Cooper & Kirk PLLC, Washington, D.C., for Amicus Curiae Firearm Policy Coalition Inc..

Anna M. Barvir and C.D. Michel, Michel & Associates PC, Long Beach, California; Konstadinos T. Moros, Second Amendment Foundation, Bellevue, Washington; for Amici Curiae Second Amendment Foundation, California Rifle & Pistol Association Incorporated, and Second Amendment Law Center Inc..

Jennifer B. Loeb and Austin Evers, Freshfields US LLP, Washington, D.C.; Brandt Henslee, Daniel Hodgkinson, and Taylor Jachman, Freshfields US LLP, New York, New York; William T. Clark and Leigh Rome, Giffords Law Center to Prevent Gun Violence, New York, New York; Douglas N. Letter, Shira L. Feldman, and Tess M. Fardon, Brady Center to Prevent Gun Violence, Washington, D.C.; for Amici Curiae Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence.

# OPINION

WARDLAW, Circuit Judge:

Knife Rights, Inc., various individuals who "desire to keep and bear" switchblades, and two retailers of bladed weapons (collectively, "Plaintiffs"), bring a facial Second Amendment challenge to various sections of the California Penal Code, which restrict the possession, sale, transfer, and carry of switchblade knives. *See* Cal. Pen. Code §§ 21510, 17235, 21590, 18000, 18005. The district court held that the right to bear switchblades is not protected by the plain text of the Second Amendment, reasoning that switchblades are not commonly used for self-defense and are dangerous and unusual, and granted summary judgment in favor of the state of California. Plaintiffs timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm, for reasons that differ from those of the district court.

## I. STATUTORY BACKGROUND

Switchblades are knives that have the appearance of a pocket knife, and open using an automatic mechanism. Primitive switchblades date back to at least the eighteenth century, but modern switchblades did not become popularized in the United States until after World War II. In the 1950s, after switchblades became associated with criminal activity, the federal government and dozens of states responded by adopting legislation regulating the possession, carry, sale, and transfer of these weapons.

California adopted its first switchblade regulation in 1957. Cal. Stats. 1957, c. 355, p. 999, § 1. In its initial form, Cal. Pen. Code § 653k provided that: "Every person who carries concealed upon his person, and every person who

sells, offers for sale, exposes for sale, loans, transfers, or gives to any other person a switch-blade knife having a blade over two inches in length is guilty of a misdemeanor." In 1986, the California Legislature amended the statute to provide that: "Every person who possesses in the passenger's or driver's area of any motor vehicle in any public place or place open to the public, carries upon his or her person, and every person who sells, offers for sale, exposes for sale, loans, transfers, or gives to any other person a switchblade knife having a blade over two inches in length is guilty of a misdemeanor." Cal. Stats. 1986, c. 1422, p. 5116, § 1. Minor changes were made to the wording and the definition of a switchblade in 1996, *see* Cal. Stats. 1996, c. 1054, pp. 6640–41, § 1, and 2001, *see* Cal. Stats. 2001, c. 128, pp. 1349–50 § 1. In 2009, the Legislature reorganized the statute and repealed section 653k, moving its provisions to Sections 21510, 17235, and 16965. *See* 38 Cal. L. Revision Comm'n Reports 217, 323 (2009), doi: https://clrc.ca.gov/pub/Printed-Reports/Pub233.pdf. No substantive changes were made to the statute at that time.

Today, California's switchblade regulations are comprised of five comprehensive statutes (collectively, "California's switchblade regulations").

Cal. Pen. Code § 21510 provides that:

> Every person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor:
> (a) Possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public.
> (b) Carries the knife upon the person.

> (c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person.

Cal. Pen. Code § 17235 defines "switchblade knife":

> As used in this part, "switchblade knife" means a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever. "Switchblade knife" does not include a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back toward its closed position.

Cal. Pen. Code § 21590 makes "[t]he unlawful possession or carrying of a switchblade knife a nuisance

"subject to Sections 18000 and 18005," while Cal. Pen. Code § 18000 requires the surrender of switchblade knives:

> (a) Any weapon described in Section… 21590… shall be surrendered to one of the following:
> > (1) The sheriff of a county.
> > (2) The chief of police or other head of a municipal police department of any city or city and county.
> > (3) The chief of police of any campus of the University of California or the California State University.
> > (4) The Commissioner of the California Highway Patrol.
>
> (b) For purposes of this section, the Commissioner of the California Highway Patrol shall receive only weapons that were confiscated by a member of the California Highway Patrol.
>
> (c) A finding that the defendant was guilty of the offense but was insane at the time the offense was committed is a conviction for the purposes of this section.

Finally, Cal. Pen. Code § 18005(a)–(b) provides for destruction of the surrendered weapon, unless it has been stolen, in which case it may be returned to the lawful owner:

> (a) An officer to whom a weapon is surrendered under Section 18000, except upon the certificate of a judge of a court of record, or of the district attorney of the county, that the retention thereof is necessary

or proper to the ends of justice, shall destroy
that weapon and, if applicable, submit proof
of its destruction to the court.
(b) If any weapon has been stolen and is
thereafter recovered from the thief or the
thief's transferee… without the prior
knowledge of its lawful owner that it would
be so used, it shall not be destroyed pursuant
to subdivision (a) but shall be restored to the
lawful owner…

A person therefore violates California's switchblade
regulations by engaging in any of the following conduct:
(i) possessing a covered switchblade in the passenger's or
driver's area of a motor vehicle when in public, (ii) carrying
a covered switchblade on their person,[1] or (iii) selling,
offering for sale, exposing for sale, loaning, transferring, or
giving a covered switchblade to another person. Violating
these regulations is punishable as a misdemeanor and
nuisance. As the switchblade regulations do not specify the
punishment, California's default punishment for
misdemeanors applies: "imprisonment in the county jail not
exceeding six months, or . . . fine not exceeding one
thousand dollars ($1,000), or . . . both." Cal. Pen. Code § 19.

## II.  PROCEDURAL HISTORY

Plaintiffs brought a facial Second Amendment challenge
to California's switchblade regulations. After discovery, the
parties filed cross-motions for summary judgment. The

---

[1] The parties fiercely debate whether Cal. Pen. Code § 21510(b) extends
to the carrying of a switchblade knife in the home. We need not decide
that issue today.

district court granted summary judgment in favor of the State, and denied summary judgment to Plaintiffs.

The district court applied the analytical framework set forth in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and concluded that California's switchblade regulations are constitutional. The district court explained that the plain text of "the Second Amendment extends only to bearable arms presently in common use," and rejected Plaintiffs' constitutional challenge because Plaintiffs "fail[ed] to prove that the regulated switchblades are in common use today for self-defense or that the weapons are not dangerous and unusual." Despite acknowledging that this conclusion was dispositive, the district court analyzed the historical analogues proffered by the State in support of its switchblade regulations, and concluded that California failed to meet its burden to show that its regulations are consistent with the history and tradition of arms regulation in this Nation.

## III.  STANDARD OF REVIEW

"We review the district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party." *Cohen v. City of Culver City*, 754 F.3d 690, 694 (9th Cir. 2014). Here, Plaintiffs pursue the "most difficult challenge to mount successfully": a facial challenge. *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

To succeed on their facial challenge, Plaintiffs must prove that the statute violates the Second Amendment in all of its applications. *Id.* Thus, Plaintiffs must show that there exists "no set of circumstances" in which California's

switchblade regulations can be applied without violating the Second Amendment. *Id.* (quoting *Salerno*, 481 U.S. at 745). As such, the mere fact that California's switchblade regulations "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [the statutes] wholly invalid." *Salerno*, 481 U.S. at 745. If "some of" the applications of California's switchblade regulations are constitutional, Plaintiffs' facial challenge must fail. 602 U.S. at 693.

## IV.   SECOND AMENDMENT JURISPRUDENCE

The Second Amendment provides:

> "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

### A.   Applicable Principles

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). This right was born out of the English right to "self-preservation." *Id.* at 595 (quoting 1 Blackstone's Commentaries ("Blackstone"), at 145–46, n.42 (1803)).

The colonists fought fiercely to maintain the right to keep and bear arms for self-preservation in the years leading up to the Revolutionary War. As the *Heller* Court explained, King George III's efforts "to disarm the inhabitants of the most rebellious areas" of the colonies in the 1760s and 1770s "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Id.* at 594. The

colonists understood the right to self-preservation to be "a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence." *Id.* (quoting A Journal of the Times: Mar. 17, New York Journal, Supp. 1, Apr. 13, 1769, in Boston Under Military Rule 79 (O. Dickerson ed. 1936) (reprinted 1970)). "Blackstone's Commentaries made clear" that "Americans understood the 'right of self-preservation' as permitting a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Id.* at 594–95 (quoting Blackstone, at 145–46, n.42). Since before our founding, therefore, we have understood self-defense to be the "*central component*" of the Second Amendment. *Id.* at 599.

The Court cautioned, however, that this "individual right to keep and bear arms… [is] not unlimited" and does not "protect the right of citizens to carry arms for *any sort* of confrontation." *Id.* at 595. Given the "historical tradition of prohibiting the carrying of dangerous and unusual weapons," the Court noted that the Second Amendment extends only to those weapons "in common use at the time." *Id.* at 627 (internal quotations and citations omitted). The Court was careful, however, to explain that the Second Amendment applies to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582.

Applying these principles to the District of Columbia's ban on possessing handguns in the home, the Court held that the law violated the Second Amendment because the law prohibited possession of "the quintessential self-defense weapon" in "the home, where the need for defense of self, family, and property is most acute." *Id.* at 628–29. Soon afterwards, the Court extended *Heller*'s holding to state and

local laws, and struck down a Chicago law which prohibited possession of handguns in the home.  *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 750 (2010).

In the wake of *Heller* and *McDonald*, the Courts of Appeals applied means-end scrutiny to determine the constitutionality of firearms regulations.  *See Bruen*, 597 U.S. at 17.  The Court rejected that approach in *Bruen*.  *Id.*

Instead, *Bruen* adopted the following two-step test:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).  Therefore, courts first assess whether the challenged regulation burdens conduct covered by the "Second Amendment's plain text," and if it does, then the government bears the burden of "identify[ing] a well-established and representative analogue" that demonstrates that the regulation is consistent with our Nation's history and tradition of firearm regulation.  *Id.* at 30.

In assessing whether a law is "relevantly similar under the Second Amendment," courts are instructed to compare modern and historical regulations in terms of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Court cautioned that "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 34. Because "[t]he Second Amendment was adopted in 1791," and the Fourteenth Amendment in 1868, "[h]istorical evidence that long predates either date may not illuminate the scope of the right." *Id.* And, "post-Civil War discussions of the right to keep and bear arms . . . 'do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 36 (quoting *Heller*, 554 U.S. at 614).

Despite *Bruen*'s heavy focus on historical evidence, the Court recognized, as it did in *Heller*, that the Second Amendment must apply to modern circumstances. *Id.* at 28 ("Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."). As such, the Second Amendment applies to "modern instruments that facilitate armed self-defense," even if such instruments are far more advanced than the muskets the colonists used in the 1700s. *Id.* In the same way, because modern circumstances present different "regulatory challenges" than those the Founders contemplated, we must "reason[] by analogy" to determine whether "modern regulations that were unimaginable at the founding" might nonetheless be constitutional today. *Id.* at 27–28. The Court also made clear that the Second Amendment is grounded in the English right to individual self-defense, and was never intended to be an absolute right. *See id.* at 30 (explaining that the Second Amendment leaves

room for regulation, and is "neither a regulatory straightjacket nor a regulatory blank check").

In *United States v. Rahimi*, the Court considered a facial challenge to 18 U.S.C. § 922(g)(8), a federal statute that "prohibits an individual subject to a domestic violence restraining order from possessing a firearm" in certain circumstances. 602 U.S. 680, 684 (2024). The Court held that the Fifth Circuit erred in striking down the challenged law at *Bruen*'s second step, and explained that "some courts have misunderstood the methodology of our recent Second Amendment cases," which "were not meant to suggest a law trapped in amber." *Id.* at 691.

*Rahimi* emphasized a number of *Bruen*'s holdings in reaching this conclusion. First, the objective of *Bruen*'s historical inquiry is to determine whether the "challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. "A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.* (internal quotations and citation omitted). Second, the "central" focus of this inquiry is "why and how" the challenged regulation "burdens the Second Amendment right." *Id.* at 692, 698. Third, the *Rahimi* Court emphasized that *Bruen* does not require the Government to provide a historical analogue that is a "dead ringer" or "historical twin" to the challenged regulation. *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). Even if "a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). A court need only find that the challenged law "comport[s] with the principles underlying the Second Amendment." *Id.*

Applying these principles to Section 922(g)(8), the Court held that Rahimi's facial challenge failed. Though § 922(g)(8) provided "two independent bases for liability," *see* § 922(g)(8)(C)(i), (C)(ii), the Court held that the constitutionality of just one of those sources was sufficient for the statute to survive a facial challenge. *Rahimi*, 602 U.S. at 693. The Court explained that its "reasoning start[ed] and stop[ped] with Section 922(g)(8)(C)(i) because the Government offer[ed] ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Id.* As to § 922(g)(8)(C)(ii), which "bars an individual from possessing a firearm if his restraining order 'prohibits the use, attempted use, or threatened use of force,'" the Court held that given the facial nature of the plaintiff's challenge, it "need[ed] not decide whether regulation under Section 922(g)(8)(C)(ii) is also permissible." *Id.*

In so holding, the Court relied on two historical analogues—surety laws and going armed laws—to support liability under § 922(g)(8)(C)(i). *Id.* at 693–97. Surety laws empowered a magistrate "to require individuals suspected of future misbehavior to post a bond," and "[i]f the individual did post a bond and then broke the peace, the bond would be forfeit." *Id.* at 695. Going armed laws "prohibited riding or going armed with dangerous or unusual weapons to terrify the good people of the land." *Id.* at 697 (quoting 4 Blackstone 149) (citation modified). The Court held that "surety and going armed laws confirm [that] . . . [w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698. Importantly, neither surety laws nor going armed laws exactly mirrored Section 922(g)(8). *Id.* at 699; *infra* Sec. V(A). But the Court nonetheless held that Section

922(g)(8)(C)(i)'s "prohibition on the possession of firearms by those found by a court to present a threat to others" was relevantly similar to these two categories of laws. *Id.* at 698. Although the challenged statute was "by no means identical to these founding era regimes, . . . it does not need to be." *Id.* at 698. Therefore, Rahimi's facial challenge to Section 922(g)(8) failed.

B. "In Common Use" and "Dangerous and Unusual"

The Supreme Court held in *Heller* and again in *Bruen* that "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time[.]'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627)). The *Heller* Court explained that this limitation on the Second Amendment is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627 (citing 4 Blackstone 148–49).

Much has been made in the lower courts of this "in common use" and "dangerous and unusual" language, notwithstanding that the Supreme Court has yet to apply it.[2] The Court has not explained, for example, whether the Second Amendment protects weapons in common use for all "lawful purposes," *Heller*, 554 U.S. at 624, or only those "weapons 'in common use' today for self-defense," *Bruen*, 597 U.S. at 32. Nor has it explained whether the "in common use" analysis should be conducted as part of *Bruen*'s

---

[2] *See, e.g., Rocky Mount. Gun Owners v. Polis,* 121 F.4th 96, 113–14 (10th Cir. 2024); *Bianchi v. Brown*, 111 F.4th 438, 450 (4th Cir. 2024); *United States v. Bridges*, 150 F.4th 517, 525–26 (6th Cir. 2025); *Ocean State Tactical, LLC v. R.I.*, 95 F.4th 38, 48–51 (1st Cir. 2024); *Nat. Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 233 (2d Cir. 2025); *United States v. Rush*, 130 F.4th 633, 638–41 (7th Cir. 2025).

threshold, step one inquiry, or at *Bruen*'s second step.[3] *See Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (Mem.) (Statement of Thomas, J.) (July 2, 2024) (acknowledging that the Court has provided only "minimal guidance" on "what types of weapons are 'Arms' protected by the Second Amendment" and has therefore "[left] open essential questions such as what makes a weapon 'bearable,' 'dangerous,' or 'unusual'").

We need not resolve these complicated questions today, and we explicitly decline to express a view on the proper interpretation of this language. We simply join the growing chorus of courts acknowledging uncertainties in *Bruen*'s methodological framework. Our holding today is narrow: Plaintiffs' facial challenge fails because they cannot establish that California's switchblade regulations are unconstitutional in every one of their applications. *See Salerno*, 481 U.S. at 745.

## V. CALIFORNIA'S SWITCHBLADE REGULATIONS

California's switchblade regulations prohibit a wide range of conduct. The parties agree that Cal. Pen. Code

---

[3] Many circuits, including ours, have interpreted *Bruen* as setting forth a two-step framework for analyzing Second Amendment challenges. *See United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023). We have suggested that "*Bruen* step one involves a threshold inquiry" whereby a court must determine using a "textual analysis . . . whether the challenger is part of the people whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the Second Amendment." *Id.* (internal quotations and citations omitted). "If the first step is satisfied, we proceed to *Bruen* step two, at which the "government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* (quoting *Bruen*, 597 U.S. at 24).

§ 21510(b) prohibits the concealed carrying of switchblade knives in public.  Because such a restriction is supported by our Nation's history and tradition of arms regulations, Plaintiffs' facial challenge fails.[4]

We assume without deciding that the plain text of the Second Amendment covers Plaintiffs' proposed course of conduct.  *See Rahimi*, 602 U.S. at 693 (beginning the analysis at *Bruen*'s second step).  We proceed, therefore, to *Bruen*'s second step.  "[T]he government must demonstrate that the [challenged] regulation is consistent with this Nation's historical tradition of [arms] regulation."  *Bruen*, 597 U.S. at 17.

A.  Historical Analogues Test Under *Rahimi*

It bears repeating that the challenged regulation and historical analogues offered by the state need only be "relevantly similar" in terms of "why and how [they] burden[] the Second Amendment right."  *Rahimi*, 602 U.S. at 698.  The key inquiry in this analysis is whether the challenged regulations "comport with the principles underlying the Second Amendment."  *Id.* at 692.  In *Rahimi*, the surety and going armed laws proffered by the government differed from Section 922(g)(8) in several respects.  *See id.* at 693–98.  Under surety laws, individuals were required to post a bond—not forfeit their weapons— and "could obtain an exception if [they] needed [their] arms for self-defense or some other legitimate reason."  *Id.* at 697. Going armed laws punished only conduct that "disrupted the public order and led almost necessarily to violence."  *Id.*

---

[4] We need not and do not express any view on whether the regulation of any of the other conduct prohibited by California's switchblade regulations is constitutional.

(quoting *State v. Huntly*, 25 N.C. 418, 421–22 (1843) (per curium)) (citation modified). Both provided for the arrest of a person who violated the laws, but "offered the accused significant procedural protections." *Id.* at 696.

Section 922(g)(8) makes it a felony, punishable by then 10, now 15, years in prison for any person to possess a firearm or ammunition if that person is subject to a civil protective order which contains a "finding that [the person subject to a civil protective order] represents a credible threat to the safety of [an] intimate partner or child." 18 U.S.C. § 922(g)(8)(C)(i). Unlike surety and going armed laws, which directly addressed and provided the remedy for certain dangerous behaviors which required disarmament, Section 922(g)(8) provides a federal remedy for the violation of *state* civil protective orders. Several *amici* in *Rahimi* argued that Section 922(g)(8) was not analogous to founding-era regulations because, when layered on top of state domestic violence restraining order regimes, the statute operated to punish more conduct, in a harsher manner. *See, e.g.*, Brief of the Bronx Defenders Union and National Association of Criminal Defense Lawyers as *Amici Curiae* in Support of Respondent, at 4, *Rahimi*, 602 U.S. 680 (2024) (No. 22-915); Brief of Alameda County Public Defenders and California Public Defenders Association as *Amici Curiae* in Support of Respondent, at 23, *Rahimi*, 602 U.S. 680 (2024) (No. 22-915). For example, because "[s]tate protective order regimes vary widely," the Alameda County Public Defenders' brief argued that Section 922(g)(8) could result in "indefinite, or lifetime possession bans, even for nonviolent conduct," *see* Brief of Alameda County Public Defenders, *et al.*, at 23, which was a far more severe punishment than that imposed under surety laws, under which "[b]onds could not be required for more than six

months at a time," *Rahimi*, 602 U.S. at 697.**5**  Nevertheless, the Court held that surety and going armed laws were relevantly similar to Section 922(g)(8), and thus the challenged statute was constitutional.  *Id*. at 698–700.

As *Bruen* recognized, we must read the Second Amendment in light of its context: a right arising out of and inextricably tied to the English right to self-preservation, the meaning of which, although fixed at the founding, must nonetheless apply to modern circumstances.  *Bruen*, 597 U.S. at 28.  *Rahimi* confirms that here, California must produce "relevantly similar" historical analogues to justify the challenged statutes, but those analogues need only establish that California's switchblade regulations "comport with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692.  Modern legislatures will necessarily regulate arms in a different manner than did historic legislatures, as new challenges and social interests arise.  The Second Amendment was never intended to bind the hands of today's legislatures to do so, so long as modern regulations do not disturb core Second Amendment principles. *Id.*

---

[5] Indeed, the historical record reveals that, at the time of the Founding, the civil protective orders at issue in *Rahimi* did not exist, and domestic violence regulations were rarely enacted and sparsely enforced. *See* Jordan Al-Rawi, *The Case for Relaxing Bruen's Historical Analogues Test: Rahimi, Domestic Violence Regulation, and Gun Ownership*, 39 BERKELEY J. GENDER, L. & JUST. 93, 112 (2024) ("The few laws that criminalized domestic violence in early and post-Civil War America were rarely and selectively enforced."); 105 ("The revolutionary values of individual liberty and privacy resulted in a general reluctance among the judiciary to punish" the exact conduct that Section 922(g)(8) was designed to address.).  But "analogical reasoning under the Second Amendment is [not] a regulatory straightjacket[.]"  *Bruen*, 597 U.S. at 30.

**B.  Historical Analogues for Switchblade Regulation**

The Supreme Court has long understood that "prohibitions on carrying concealed weapons were lawful under the Second Amendment[.]" *Heller*, 554 U.S. at 626; *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring) (acknowledging that "*Heller*… recognized a few categories of traditional exceptions to the right" to bear arms, including that "prohibitions on carrying concealed weapons were lawful" (quoting *id.*)).   California's prohibition on the concealed carry of switchblades is relevantly similar to historical concealed carry regulations of Bowie knives, dirks, daggers, slungshots, and other weapons.

The district court rejected California's citation to historical regulations on Bowie knives, holding that "Bowie knives are bladed instruments like the regulated switchblades," but "[o]utside of this similarity, it is not clear what makes Bowie knives 'representative.'"   As to California's citation to regulations on clubs, the district court explained only that "[i]t is less clear how clubs are 'representative.'"   It seems that the district court rejected these analogues on the ground that Bowie knives and clubs are too dissimilar from switchblades to provide representative historical analogues.   In other words, the district court appeared to require a "dead ringer" or "historical twin" that *Rahimi* expressly said States need not provide.  602 U.S. at 692. We caution, as the Court did in *Rahimi*, against reading the Second Amendment or *Bruen* so narrowly.  The State need only proffer "relevantly similar" historical analogues, and the Supreme Court has explicitly recognized that "the Constitution can, and must, apply to circumstances beyond those the founders specifically anticipated," including "modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28–30.  Just as a

law that applied to muskets in 1789 provides a relevantly similar historical analogue to a modern regulation that applies to pistols, so too regulations of Bowie knives are a relevantly similar analogue to California's switchblade regulations.

Laws banning the concealed carry of Bowie knives—knives with a double-edged, clipped blade of eight to twelve inches—and other dirks and daggers were common in the antebellum period.[6]  *See* Greenlee, Joseph, et al., The History of Bans on Types of Arms Before 1900, 50 J. Legis. 223, 293 (2024).  Several states punished the concealed carry of Bowie knives, or other dirks and daggers, with imprisonment.  For example, in 1839, Alabama banned the concealed carry of "any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon," punishable by "a fine not less than fifty nor more

_____

[6] Many state laws regulating the concealed carry of knives swept broadly, applying to all "deadly" or "dangerous weapons."  *See* Act of Feb. 1, 1839, No. 77, § 1, 1839 Ala. Acts. 67, 67 (prohibiting the concealed carry of "any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon"); Act of Apr. 19, 1686, ch. 9, *reprinted in* The Grants, Concessions, and Original Constitutions of the Province of New Jersey 289 (1758) (citing a 1686 New Jersey law prohibiting the concealed carry of "bowie kni[ves], dirk[s], or other dangerous weapon[s]"); Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 130, 148 (similar); 1859 Ohio Laws 56, § 1 (similar).  A few state laws carved out exceptions for pocket knives.  *See* Act of Jan. 30, 1835, ch. 860, 1835 Fla. Acts 318 (prohibiting the carrying of "any dirk, pistol, or other arm or weapon," punishable by a fine "not exceeding five hundred dollars, and not less than fifty dollars, or imprison[ment] not more than six months, and not less than one month," but excepting the concealed carrying of "common pocket kni[ves]"); 1853 Ky. Acts 186 (prohibiting the concealed carry of "any deadly weapons, other than an ordinary pocket knife," punishable by a fine).

than five hundred dollars" and "imprison[ment] for a term not exceeding three months."  Act of Feb. 1, 1839, No. 77, § 1, 1839 Ala. Acts. 67, 67.  In 1838, Tennessee made it a misdemeanor to "wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape, or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person," punishable by a fine "not less than two hundred dollars, nor more than five hundred dollars," and imprisonment "not less than three months and not more than six months."  Act of Jan. 27, 1838, ch. 137, § 2, 1838 Tenn. Acts 200, 200–01.  Louisiana punished the concealed carry of "bowie kni[ves], dirk[s], or any other dangerous weapon" as a misdemeanor punishable by a fine "not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for one month" for the first offense.  Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 130, 148.  A second offense was punishable by a fine "not less than five hundred dollars nor more than one thousand dollars, or imprisonment . . . not to exceed three months." [7]  *Id.*  Ohio adopted a nearly identical law to Louisiana's in 1859, though with slightly lower fines.  1859 Ohio Laws 56, § 1.  New Mexico followed suit in 1860.  *See* Act of Feb. 2, 1860, §§ 1–2, N.M. Laws 94, 94–99 (Prohibiting the Carrying of Weapons, Concealed or Otherwise).  In fact, the record reflects one particularly early example: New Jersey prohibited the concealed carry of

---

[7] An earlier version of the law, adopted in 1813, had punished the second offense with "a fine not less than one hundred dollars . . . and [imprisonment] for a time not exceeding six months."  Act of Mar. 25, 1813, §§ 1–3, 1812 La. Acts 172, 172–75.  The Louisiana Supreme Court upheld the law's concealed carry provisions in 1850.  *State v. Chandler*, 5 La. Ann. 489, 490 (1850).

"daggers or dirks" as early as 1686, punishing a second offense with six months in prison. *Supra* n.6.

Other states and territories during the antebellum period similarly banned the concealed carry of Bowie knives, dirks, daggers, and other knives, but punished the violation of these laws by only a fine. For example, the Georgia legislature made the concealed carry of Bowie and similar knives, dirks, and other dangerous weapons a "high misdemeanor" punishable by a fine in 1837. *See* 1837 Ga. Acts 90, § 1.[8] As did Kentucky in 1853, *see* Ky. Acts 1853, c. 1020, p. 186, Indiana in 1859, *see* 1859 Ind. Acts 129, and the cities of Washington and Georgetown in 1858 and 1859 respectively.[9]

Other states and territories continued to adopt concealed carry restrictions on Bowie knives and other dangerous knives and weapons during and after the Civil War. These states punished unlawful concealed carry with

---

[8] The Georgia Supreme Court held that other provisions of this law violated the Second Amendment, but upheld concealed carry prohibitions. *Nunn v. State*, 1 Ga. 243, 245 (1846); *Bruen*, 597 U.S. at 54 (citing *Nunn* in support of the proposition that concealed carry prohibitions are typically lawful).

[9] Washington, D.C., Act Against the Carrying of Concealed Weapons (Nov. 18, 1858), *reprinted in* William B. Webb, The Laws of the Corporation of the City of Washington 418 (1868); Georgetown, D.C., Ordinance Prohibiting the Carrying of Firearms (Apr. 2, 1859), *reprinted in* Ordinances of the Corporation of Georgetown 22 (1860). The cities of Georgetown and Washington were governed separately until 1871, when Congress passed the District of Columbia Organic Act of 1871. *See* 16 Stat. 419, 41st Cong., ch. 62 (1871). The District of Columbia banned the concealed carry of "any deadly or dangerous weapons," including "bowie-knives, dirk-knives, or dirks, razors, razorblades, [and] sword-canes" the same year. *See* Act of Aug. 10, 1871, ch. 25, 1872 D.C. Laws, pt. 2, at 33.

imprisonment, fines, or both.[10]  In addition, the record includes prohibitions on the concealed carry of knives from several cities in the post-Civil War period.[11]

---

[10] *See, e.g* Act of Apr. 27, 1863, ch. 485, § 1, 1863 Cal. Stat. 748 (making the concealed carry of "any dirk . . . sword in a cane, slung-shot, or other dangerous or deadly weapon," a "misdemeanor" punishable by "imprison[ment] . . . for . . . not less than thirty nor more than ninety days" or a fine); Act of Mar. 5, 1879, ch. 127, 1879 N.C. Sess. Laws 231 (making the concealed carry of "any . . . dirk, dagger, slungshot . . . or razor or other deadly weapon of like kind" a "misdemeanor" punishable by a fine or "imprison[ment] at the discretion of the court"); 1890 Okla. Sess. Laws 476, § 20 (making the concealed carry of "any sharp or dangerous weapon, such as is usually employed in attack or defense of the person" a misdemeanor); *id.* at 413, § 14 (misdemeanors were punishable by "imprisonment in the county jail not exceeding one year or by a fine not exceeding five hundred dollars, or both"); Terr. Dak. Rev. Penal Code § 457 (1877) (making the concealed carry of "any sharp or dangerous weapon such as is usually employed in attack or defense of the person" a misdemeanor); Greenlee, *supra*, at 339 (collecting over a dozen 19th Century restrictions on the concealed carry of razors, many of which "could fold into the handle, like a pocket knife").

[11] *See* Expert Report & Decl. of Dr. Robert Spitzer, Ex. D, *Knife Rights Inc. v. Bonta*, No. 3:23-cv-00474 (S.D. Cal. Apr. 8, 2024) (Dkt. 36-4) (citing, e.g., C. B. Pierce, Charter and Ordinances of the City of Leavenworth, 45, Image 45 (1863), 1862 An Ordinance Relating to Misdemeanors, § 23; Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska, 36, Image 36 (1872), 1872 Ordinance No. 7, § 1; Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois], 64, Image 64 (1876), Misdemeanors, § 39; Charter and Revised Ordinances of Boise City, Idaho, 118–119, Image 119–120 (1894), 1879 Carrying Concealed Weapons, § 36; S. J. Quincy, Revised Ordinances of the City of Sioux City, 62, Image 62 (1882), 1882 Ordinances of the City of Sioux City, Iowa, § 4; 1883 Wis. Sess. Laws 713, chap. 6, § 3, pt. 56 (City of Oshkosh); W. P. Murray, The Municipal Code of Saint Paul, 289, Image 295 (1884), Concealed Weapons – License, § 1; Charter and Ordinances of the City of Syracuse, 215, Image 216 (1885), available at The Making

The record also includes evidence as to *why* jurisdictions prohibited the concealed carry of Bowie knives and other knives. One of California's experts, Dr. Robert Spitzer, explained that "Bowie knives were widely used in fights and duels," and were known to be "fighting knives" intended for "[interpersonal] combat." Another expert, Dr. Brennan Rivas, explained that "[a]s rates of violence rose during the nineteenth century, people were more likely to carry and use large knives; the increased presence of knives . . . had the regrettable consequence of exacerbating the problem." This problem was "especially notable in southern areas, where Bowie knives were quite common and known to be associated with needless bloodshed." "The response on the part of Americans confronting knife-violence was the regulation of such weapons."[12] *See also Aymette v. State*, 21 Tenn. 154 (1840) (explaining that antebellum legislatures prohibited concealed carry "to preserve the public peace, and protect our citizens['s] . . . lives from being endangered by desperadoes with concealed arms"). Dr. Spitzer found that at least "15 states banned all carrying of Bowie knives," in an effort to "push[] dangerous weapons out of public spaces and places, improv[e] public safety through the deterrence and punishment effects of such laws, and also discourag[e] the settlement of private grievances and disputes in public through . . . violence."

Many states also banned the concealed carry of flexible impact weapons, such as the slungshot. *See, e.g.*, 1890 Okla.

---

of Modern Law: Primary Sources. [Offenses Against the Public Peace and Quiet,] § 7).

[12] Plaintiffs' rebuttal expert did not challenge these opinions. Indeed, his rebuttal report suggests that he agrees that concealed carry bans are constitutional.

Sess. Laws 476, § 19 (making the concealed and open carry of a slungshot a felony); *id.* at 413, § 13 (felonies were punishable by "a fine not exceeding one thousand dollars, or by imprisonment in the Territorial prison not exceeding two years, or by both"); Greenlee, *supra* at 347–48 (collecting dozens of statutes prohibiting the concealed carry of slungshots in the period immediately following the Civil War). Dr. Spitzer explained that slungshots were "viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention and their spreading use by criminals and as fighting implements." *See also* Greenlee, *supra*, at 345 (explaining that slungshots were of particular concern given their popularity with "street criminals" and that they were "suited for a sneak attack." (quoting Escobar, Robert, Saps, Blackjacks, and Slungshots: A History of Forgotten Weapons (2018), at 44, 233)). Other laws banned the concealed carry of impact weapons commonly carried by law enforcement, such as the sandbag, blackjack, and billy club. *See* Greenlee, *supra*, at 355–59. As the record and other historical analogues reveal, state legislatures banned the concealed carry of Bowie knives, dirks, daggers, and other weapons because of their common association with and use in criminal activity.

Taken together, these historical analogues "confirm what common sense suggests": states may ban the concealed carry of dangerous edged or impact weapons, such as switchblade knives, which can be used to cause devasting injury or death to a victim. *Rahimi*, 602 U.S. at 698. California's switchblade regulations are relevantly similar to these historical laws with respect to how and why switchblades are regulated. First, the "how": Like the dozens of historical regulations described, California bans the concealed carry of

switchblade knives, and violation of its regulations is a misdemeanor. *Compare* Cal. Pen. Code § 21510(b) *with, e.g.*, Act of Jan. 27, 1838, ch. 137, § 2, 1838 Tenn. Acts 200, 200–01; Act of Feb. 1, 1839, No. 77, § 1, 1839 Ala. Acts. 67, 67. Violations are "punishable by imprisonment in the county jail not exceeding six months, or by fine not exceeding one thousand dollars ($1,000), or by both." Cal. Pen. Code § 19. California's switchblade regulations do not apply uniformly to all knives or even to all switchblades— instead, California limits its regulations to switchblades with a blade "two or more inches in length[,] and which can be released automatically[.]" [13] Cal. Pen. Code § 17235; *compare id. with* Act of Jan. 27, 1838, ch. 137, § 2, 1838 Tenn. Acts 200, 200–01 (banning only Bowie knives, Arkansas tooth picks, and similar knives). The challenged statutes are therefore relevantly similar to the State's proffered historical analogues in terms of "how" the statutes regulate switchblades. *Bruen*, 597 U.S. at 29.

The challenged statutes are also relevantly similar to the State's proffered historical analogues in terms of "why" the statutes regulate switchblades. *Id.* California targeted switchblades specifically because of the particular danger these weapons present, and their common association with criminality. California adopted its ban on switchblade knives nearly 70 years ago in response to "a significant increase in [the] criminal use" of switchblades "in the 1950s." Plaintiffs' own expert conceded that most court cases involving knives "ha[ve] to do with the felonious use of knives." And, as Dr. Rivas, explained, antebellum legislatures largely restricted the carrying of Bowie knives

---

[13] California's switchblade regulations apply to a much narrower class of knives than many of the historical analogues in the record. *Supra* n.6.

"even if ostensibly carried for personal defense" because the increased carrying of Bowie knives "had the regrettable consequence of exacerbating the [violence] problem." The record therefore reveals that the purpose for which California's switchblade regulations were adopted—to address concerns about threats to public safety caused by the use of switchblades in criminal activity—closely mirrors the purposes for which antebellum and post-Civil War legislatures adopted similar regulations of Bowie knives, dirks, daggers, clubs, slungshots, and other weapons.

To be sure, switchblades are not identical in form or character to Bowie knives, Arkansas tooth picks, slungshots, blackjacks, or clubs. But the Supreme Court has already confirmed that historical regulations can map onto modern instruments. *Id.* at 28, 30. States need not produce a "dead ringer" or "historical twin" for modern regulations to pass muster under the Second Amendment. *Rahimi*, 602 U.S. at 692. Switchblades are relevantly similar to Bowie knives and other weapons in terms of the concerns they pose to legislatures (the "why"), and California's concealed carry prohibition is relevantly similar to the manner in which historical legislatures responded to these concerns (the "how"). California's switchblade regulations therefore comport with the principles underpinning the Second Amendment, to the extent that they prohibit the concealed carry of switchblade knives in public places.

## VI.  CONCLUSION

Today, we decide only that Plaintiffs' facial challenge to California's switchblade regulations fails. Our Nation's historical tradition supports California's prohibition against the concealed carry of switchblades, punishable by up to six months of imprisonment or a fine, or both.

**AFFIRMED.**