**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

KNIFE RIGHTS, INC.; ELIOT KAAGAN; JIM MILLER; GARRISON HAM; NORTH COUNTY SHOOTING CENTER, INC.; PWGG, LP,

*Plaintiffs – Appellants*,

v.

ROB BONTA, California Attorney General,

*Defendant – Appellee*.

No. 24-5536

D.C. No.
3:23-cv-00474-JES-DDL
Southern District of California, San Diego

ORDER

Filed July 16, 2026

Before: Kim McLane Wardlaw, Ronald M. Gould, and Lucy H. Koh, Circuit Judges.

Order;
Concurrence by Judge Wardlaw;
Dissent by Judge VanDyke;
Dissent by Judge Tung

## SUMMARY*

### Second Amendment

The panel denied a petition for panel rehearing and rehearing en banc in a case in which the panel affirmed on different grounds the district court's summary judgment in favor of the state of California in a facial Second Amendment challenge to California's switchblade regulations brought by Knife Rights, Inc., various individuals who desire to keep and bear switchblades, and two retailers of bladed weapons (collectively, "Plaintiffs").

Concurring in the denial of rehearing en banc, Judge Wardlaw, joined by Judges Gould and Koh, wrote that this case comes down to Plaintiffs' choice to pursue a facial challenge, which is the most difficult challenge to mount successfully. Plaintiffs swung for the fences by asking the district court to invalidate California's switchblade regulations in full and their challenge was unsuccessful for the reasons explained in the panel's opinion. She stated the panel ruled narrowly that California constitutionally prohibits the concealed carry of switchblade knives and did not need to say any more to resolve this case.

Dissenting from the denial of rehearing en banc, Judge VanDyke agreed with Judge Tung's dissent and wrote separately to explain that the panel's decision was possible only because the court's automatic vacatur practice enabled Hawaii to moot a panel opinion striking down a similar blanket ban on butterfly knives, thereby giving categorical

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

knife bans a second chance to obtain a more favorable ruling from a more favorable panel (from the government's perspective). Judge VanDyke further wrote that the Supreme Court should consider summarily reversing some of this court's Second Amendment decisions.

Dissenting from the denial of rehearing en banc, Judge Tung, joined by Judges Callahan, R. Nelson, Collins, Lee, Bress, Bumatay, and VanDyke, wrote that the panel's reasoning for rejecting the facial Second Amendment challenge to California's ban on the carrying of switchblade knives was wrong because a tradition prohibiting only *one* form of carry (concealed) but permitting another form of carry (open) does not justify prohibiting *all* forms of carry (concealed and open), which California's ban does. He wrote that the panel's reasoning runs directly counter to *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and would essentially shield from constitutional scrutiny any law that categorically and totally bans the carrying of arms. He wrote the court should have granted en banc review to fix the panel's error and its circumvention of the Supreme Court's instructions.

---

## ORDER

Judges Wardlaw, Gould, and Koh voted to deny the Petition for Panel Rehearing and Rehearing En Banc. The full court was advised of the Petition for Rehearing En Banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. *See* Fed. R. App. P. 40. The Petition for Panel Rehearing and Rehearing En Banc is **DENIED**.

WARDLAW, J., joined by GOULD, J., and KOH, J., concurring in the denial of rehearing en banc:

*Bruen* may be in its infancy, but *Salerno*'s facial challenge standard dates back nearly four decades. *See New York Pistol & Rifle Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Salerno*, 481 U.S. 739 (1987). This case comes down to Plaintiffs' choice to pursue the "most difficult challenge to mount successfully": a facial one. *United States v. Rahimi*, 602 U.S. 680, 693 (2024); *see also Faulk v. JELD-WEN, Inc.*, 159 F.4th 618, 623 (9th Cir. 2025) ("Because the plaintiff is the master of the complaint, she gets to determine which substantive claims to bring against which defendants." (citation modified)). There is no dispute that under this standard, Plaintiffs are "require[d] . . . to 'establish that *no set of circumstances exists* under which [California's switchblade regulations] would be valid.'" *Rahimi*, 602 U.S. at 693 (quoting *Salerno*, 481 U.S. at 745) (emphasis added). As we have recently been reminded by the Supreme Court, the parties' conscious choices concerning which claims to put before us and which to withhold from our review have consequences. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (explaining that the principle of party presentation demands that courts decide only the issues raised to them by the parties).

**I.**

Neither "dissental" seriously disputes that California's prohibition on the concealed carry of switchblade knives is consistent with our Nation's history and tradition of arms regulation. *See Knife Rights, Inc. v. Bonta*, 165 F.4th 1330, 1339–45 (9th Cir. 2026). In our dissenting colleagues' view, even if our Nation's history and tradition of arms regulation supports a regulation banning the concealed carry of

switchblade knives, the law is unconstitutional because a *different* application of the same law bans the open carry of switchblade knives. *See* Dissent of Tung, J., at 49–51. Because that view flouts the facial challenge standard established in *Salerno* and applied to a Second Amendment challenge in *Rahimi*, 602 U.S. at 693, we properly rejected Plaintiffs' facial challenge.

As stated, in a facial challenge to a regulation that burdens Second Amendment rights, the plaintiff bears the exceptional burden of "establish[ing] that *no set of circumstances exists* under which the regulation would be valid." *Rahimi*, 602 U.S. at 693 (emphasis added). As Justice Gorsuch's concurrence explained, "the question [is] whether th[e] law, in at least some of its applications, is consistent with historic firearm regulations." *Id.* at 708 (Gorsuch, J., concurring). So long as, "in at least some applications, the challenged law does not diminish any aspect of the right the Second Amendment was originally understood to protect," the facial challenge must fail. *Id.* at 711 (Gorsuch, J., concurring).

In *Rahimi*, the Supreme Court considered the constitutionality of 18 U.S.C. § 922(g)(8), a federal law criminalizing the possession of a firearm while subject to a qualifying domestic violence restraining order. 602 U.S. at 688. Critically, the Court noted that § 922(g)(8)(C) contained two separate bases for liability. *Id.* The Court ultimately concluded that our Nation's history and tradition contained sufficient historical analogues to support one basis for liability, § 922(g)(8)(C)(i), and that the Court therefore *did not need to consider* whether the other basis for liability, § 922(g)(8)(C)(ii), was constitutional at all. *See id.* In other words, "the constitutionality of just one of [§ 922(g)(8)'s] sources [of liability] was sufficient for the statute to survive

a facial challenge." *Knife Rights*, 165 F.4th at 1338. The Court declined to consider the constitutionality of § 922(g)(8)(C)(ii) and did not ask how the operation of that distinct source of liability affected the total range of prohibited conduct. *Rahimi*, 602 U.S. at 688–89, 693.

We followed *Rahimi*'s clear guidance. After recognizing Plaintiffs' heavy burden on their facial challenge, we identified one of several bases for liability under the statute: the concealed carry of switchblade knives. *See Knife Rights,* 165 F.4th at 1339. We then asked whether this application of California's switchblade regulations violates the Second Amendment. *See id.* at 1339–45. Answering that question in the negative, we concluded that Plaintiffs' facial challenge failed. *Id.* We declined to express a view "on whether the regulation of any of the other conduct prohibited by California's switchblade regulations is constitutional." *Id.* at 1339 n.4. That is exactly what the Supreme Court did in *Rahimi*.

Consistent with this understanding, Courts of Appeals across the country have upheld laws that comport with the Second Amendment in at least some respects, even if those laws might be unconstitutional in other respects.[1] *See also*

[1] *See, e.g. United States v. Diaz*, 116 F.4th 458, 471–72 (5th Cir. 2024) (The Fifth Circuit rejected a facial challenge to 18 U.S.C. § 922(g)(1) because "[t]o sustain a facial challenge, the challenger must establish that no set of circumstances exists under which the statute would be valid. This Diaz cannot do because *the statute is constitutional as applied to the facts of his own case*." (citation modified)); *Antonyuk v. James*, 120 F.4th 941, 999–1000 (2d. Cir. 2024) (The Second Circuit rejected a facial challenge to various firearm licensing requirements under New York law. It explained that "[f]ederal courts generally should be wary about granting facial challenges, which deny the opportunity for agency officials and state courts to interpret, apply, or limit state laws. . . . As-

*Rahimi*, 602 U.S. at 701 n.2 (Even where there are a myriad of potential faults present in a challenged regulation, "unless these hypothetical faults occur in every case, they do not justify invalidating [the law] on its face.").

*Bruen* does not help the Plaintiffs' or our dissenting colleagues' position. As the Second Circuit explained in *Antonyuk*, "the premise of the proper-cause rule at issue in *Bruen* (that ordinary, law abiding, adult citizens can be prohibited from carrying a gun if they lack a good reason to do so) was unsupported by history and thus violated the Second Amendment." 120 F.4th at 986 (citation modified). "How that rule was applied in particular cases was irrelevant given its facial constitutional flaw." *Id.* In other words,

---

applied challenges to particular [applications] . . . remain viable. There surely exist some possible [applications] which would unconstitutionally burden the right to bear arms: the reader can no doubt conceive of apt hypotheticals." But where a plaintiff chooses "to challenge [a] law on its face," he must establish that no set of circumstances exists under which the law would be valid.); *United States v. Ogilvie*, 153 F.4th 1098, 1103 (10th Cir. 2025) (The Tenth Circuit rejected a facial challenge to 18 U.S.C. § 922(n). It explained that a plaintiff's "facial challenge fails so long as the government shows that" the law "is constitutional in some of its applications[,] [a]nd when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict." (internal quotation marks and citations omitted)); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 226 (4th Cir. 2024) ("[I]n a facial constitutional challenge a plaintiff asks the court to declare that the statute is invalid. As the Supreme Court has explained, facial challenges are disfavored because they often rest on speculation, short circuit the democratic process, and run contrary to the fundamental principle of judicial restraint. So to succeed in a facial constitutional challenge, a plaintiff confronts a much more difficult task, namely, to establish that there is no set of circumstances under which the law would be valid. The stakes are higher in a facial challenge, so the bar goes up as well." (internal quotation marks and citations omitted)).

*every application* of the law challenged in *Bruen* was affected by an unconstitutional condition that was unsupported by our Nation's history and tradition. *Id.* It was irrelevant that some individuals would ultimately obtain a license to carry a firearm because those individuals would still need to prove a "special need" in order to obtain the license—and thus, would still be subject to the unconstitutional condition. *Bruen*, 597 U.S. at 38. The same is not true here. California's switchblade regulations comport with our Nation's history and tradition to the extent that they prohibit the concealed carry of these dangerous edged weapons. *See Knife Rights*, 165 F.4th at 1339–45. No unconstitutional condition affects that application of the law. Even if other applications might be independently unconstitutional, it is no answer to say that we should invalidate California's switchblade regulations in full.

Indeed, even if our dissenting colleagues are correct that California's switchblade regulations operate as a total ban, their analysis of Plaintiffs' Second Amendment challenge is still inconsistent with *Rahimi* and runs counter to the purpose of facial challenges. A pair of hypotheticals illustrates why this is an easy case. First, consider a man who walks into a bank in California and sets off its metal detector. A security officer frisks the man and finds a concealed switchblade knife in his pocket. The man is charged with and convicted of a misdemeanor under California Penal Code § 21510(b). The man brings an as-applied Second Amendment challenge to his conviction. That challenge must fail for all of the reasons set forth in our opinion. *See Knife Rights*, 165 F.4th at 1339–45. That is the end of this case. *See United States v. Diaz*, 116 F.4th at 471–72 (rejecting a facial challenge to 18 U.S.C. § 922(g)(1) "because the statute is constitutional as applied to the facts of [the defendant's] own case").

Next, consider a related hypothetical: A different man walks into the same bank with a switchblade knife holstered in plain view on his belt. He is charged with and convicted of a misdemeanor under California Penal Code § 21510(b). The second man may or may not be able to lodge a meritorious as-applied Second Amendment challenge to his conviction. As applied to him, a court may determine that a ban on open carry under § 21510(b) is unconstitutional. But that is precisely the point: as-applied challenges can surgically address unconstitutional applications of statutes while facial challenges cannot. *See, e.g.*, *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (An "as-applied attack . . . challenges only one of the rules in a statute . . . *or* the application of the statute to a specific factual circumstance" because we "can separate valid from invalid subrules or applications." (citation modified)). At bottom, the dissent's primary disagreement with our opinion seems to rest with *Salerno*'s facial challenge standard itself.[2]

[2] The dissent suggests that any law could be construed narrowly enough to withstand a facial challenge. For example, says the dissent, "one 'application' of a total ban could be to prohibit a violent felon from carrying a firearm." Dissent of Tung, J., at 54. Set aside for a moment that violent felons are already prohibited from carrying firearms by a federal statute. *See* 18 U.S.C. § 922(g)(1). Courts across the country have rejected facial challenges to complete possession bans, like § 922(g)(1), on the grounds that the application of the law to a single factual circumstance was constitutional. *See, e.g., United States v. Williams*, 113 F.4th 637, 643 (6th Cir. 2024) (rejecting a facial challenge to § 922(g)(1) and noting that such a challenge "fail[s] if [the law] is constitutional in even just one of its applications"); *Diaz*, 116 F.4th at 471–72. Regardless, we did not read California's switchblade regulations so narrowly. It is obvious to everyone that courts are "struggl[ing] with . . . [the] level of generality problem" at *Bruen*'s second step. *See Rahimi*, 602 U.S. at 739 (Barrett, J., concurring). The dissent's arguments do no more than repackage this debate in the facial

Plaintiffs remain free to bring an as-applied challenge to the application of California's switchblade regulations to the open carry of switchblade knives. They also remain free to challenge its other provisions. There may be a sufficient history and tradition of arms regulation to support each application of California's switchblade regulations such that even an as-applied challenge would fail under *Bruen*'s second step. Or, those challenges may fail for a different reason. For example, perhaps the unique character of switchblades distinguishes them from other knives used at the time of the Founding, such that a ban on open carry would be consistent with our "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Bruen*, 597 U.S. at 21 (internal quotation marks and citation omitted). Perhaps switchblades are not protected by the Second Amendment at all. We did not reach, and did not need to reach, these questions.

The old adage, "choices have consequences," is particularly apt under these circumstances. Plaintiffs swung for the fences by asking the district court to invalidate California's switchblade regulations in full. Their challenge was unsuccessful for the reasons explained in our opinion. Our dissenting colleagues' approach would effectively

---

challenge context. But in so doing, it attacks a straw man. We did not read California's switchblade regulations as narrowly as the dissent suggests, and we did not need to prognosticate about niche or unlikely factual applications of the challenged law to reach our conclusion. California's switchblade regulations constitutionally prohibit concealed carry. We need not say any more to reject this challenge.

require us to overrule *Salerno* and *Rahimi*. That, we cannot do.[3]

## II.

Judge VanDyke's dissent deserves but a brief response. While all agree that the Second Amendment is not "a second-class right," *Bruen*, 597 U.S. at 70 (citation omitted), "constitutional rights . . . come with exceptions," *Rahimi*, 620 U.S. at 716 (Kavanaugh, J., concurring), and, like the First Amendment, "the Second Amendment is not absolute," *id.* at 737 (Barrett, J., concurring). The procedural posture of a case matters as well. As we have explained, facial

[3] The dissent suggests that en banc review is warranted because our opinion "produces a conflict with the decision of at least one State Supreme Court." Dissent of Tung, J., at 57. At the outset, we note that a conflict with a state supreme court decision is insufficient as a matter of law to justify en banc review. *See* Fed. R. App. P. 40(b)(2). But even if that were not the case, *Commonwealth v. Canjura*, 494 Mass. 508 (2024), is deeply flawed. For example, the Supreme Judicial Court of Massachusetts rejected nearly all of the historical analogues proffered by the state, including laws regulating the carrying of dirks and bowie knives, on the ground that "none [of those laws] involved regulations of folding pocketknives, let alone switchblades." *Id.* at 514. The court explained that these laws were "inapposite because they involve historical regulations of categorically different types of bladed weapons" and Massachusetts failed to "identify any laws regulating bladed weapons akin to folding pocketknives generally, or switchblades particularly, in place at the time of the founding or ratification of the Fourteenth Amendment." *Id.* *Canjura* eschewed *Bruen*'s guidance that "the government [must] identify a well-established and representative historical *analogue*, not a *historical twin*." 597 U.S. at 30. The district court made the same error here, which we corrected on appeal. *See Knife Rights*, 165 F.4th at 1341. The remainder of *Canjura*'s analysis is unconvincing, but its wholesale rejection of representative historical analogues—an argument that the dissent does not defend—is all that matters for our purposes. Our conflict with *Canjura* exists for a reason.

challenges are disfavored for a simple reason: we don't want to throw the baby out with the bathwater. *See Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."). We took *Rahimi*'s lead and ruled narrowly: California constitutionally prohibits the concealed carry of switchblade knives. *See Knife Rights*, 165 F.4th at 1339–45. We did not need to say any more to resolve this case.

The dissents both insist that California could not have banned open carry. We are not so sure. If the Appendices attached to Judge Tung's dissent reveal anything, it is that the historical record contains analogues for banning the open carry of some types of knives. *See* Dissent of Tung, J., Appendix D. Are those "outliers" as Judge Tung suggests? Perhaps. But perhaps not.[4] Are there other independent bases on which to uphold California's switchblade regulations as a whole? Perhaps. Or perhaps not. We resolved this case narrowly and responsibly.

[4] There is no guidance as to how we should assess whether a set of historical regulations constitutes "outliers" as opposed to a sufficient historical tradition. *See Bruen*, 597 U.S. at 65. *Bruen* rejected one of New York's proffered historical analogues for its proper cause requirement on the grounds that the analogues, one Texas and one West Virginia statute, were "outliers." *Id.* at 65–66. By contrast, the dissent's Appendix D alone catalogues eight laws from seven different states: Arkansas, Georgia, Nebraska, Pennsylvania, Tennessee, Texas, and West Virginia. *See* Dissent of Tung, J., Appendix D. Are eight laws across seven different states (one of which, concededly, was struck down), a sufficient analogue or an outlier? We should be hesitant to answer this question without clearer guidance from the Supreme Court or a good reason to do so. We have neither here.

## III.

Judge Tung's dissent is centered on disagreements with our interpretation of the law. Discussing differing interpretations of the law is our Court's duty, but the other dissent's attacks on colleagues' credibility, including those who are deceased, simply because of differing views, is not.[5]

---

[5] Our General Orders provide that "[i]f a majority of the judges eligible to vote on the en banc call votes in favor of en banc consideration, the Chief Judge *shall* enter an order taking the case en banc pursuant to Circuit Rule 40-3 and vacating the three-judge panel opinion." 9th Cir. Gen. Ord. 5.5(d) (Dec. 2024) (emphasis added). This General Order thus imposes a mandatory duty on the Chief to vacate the three-judge panel opinion. Contrary to Judge VanDyke's assertion, *see* Dissent of VanDyke, J., at 18 (VanDyke, J., dissenting), the Chief Judge was not somehow skirting our internal procedures in *Teter v. Lopez*, but simply following them. As Judge Miller noted in his concurrence in *Teter v. Lopez*, 135 F.4th 1176, 1178 (9th Cir. 2025): "Judge VanDyke believes that this court should not vacate panel opinions when we grant rehearing en banc. Whether or not that *should* be our practice, there is no denying what our practice *is*[.]" While Judge VanDyke is correct that the language in our General Orders has varied over the years, *see* Dissent of VanDyke, J., at 20 n.6, the import has always been the same: once en banc rehearing is granted, a panel decision has no precedential weight and binds no one in our Circuit. *See* 9th Cir. Gen. Ord. 5.5(d) (Jan. 1999) ("If a majority of the non-recused active judges votes in favor of en banc consideration, the Chief Judge shall enter an order withdrawing the case from the panel, taking the case en banc, and vacating the panel decision."); *id.* (July 2000) ("If a majority of the non-recused active judges votes in favor of en banc consideration, the Chief Judge shall enter an order taking the case en banc pursuant to Circuit Rule 35-3. The three-judge panel opinion shall not be cited as precedent by or to this court or any district court of the Ninth Circuit, except to the extent adopted by the en banc court."); *id.* (Dec. 2024) (requiring vacatur).

VANDYKE, Circuit Judge, dissenting from the denial of rehearing en banc:

I agree entirely with Judge Tung's excellent dissental. I write separately to explain why the panel's flawed decision never should have happened. It was possible only because our court's improper automatic vacatur practice enabled Hawaii to strategically moot a panel opinion striking down a similar blanket ban on butterfly knives. This gave categorical knife bans a second chance to obtain a more favorable ruling from a more favorable panel (from the government's perspective). And that's exactly what happened in this case.

I also write with a modest proposal. This case is just the latest chapter in our court's long and concerning history of refusing to vindicate the Second Amendment. Come hell or high water, *Heller* or *Bruen*, our court will find a way to uphold any weapons restriction that a liberal State can dream up. And the Supreme Court's occasional grant of certiorari and reversal has done *nothing*—and I mean that literally—to change our court's behavior. By now it's clear enough that, especially with regard to the Second Amendment, our court has fully adopted the operating principle of our former colleague Judge Reinhardt: the Supreme Court "can't catch 'em all."[1] In the real world, no boss would tolerate nearly two decades of repeated defiance from a subordinate. If the Supreme Court wants to do anything to ensure that the

---

[1] That's how "the famously liberal judge," Stephen Reinhardt, justified his "open resistance, defiance even" to the Supreme Court. Linda Greenhouse, *Dissenting Against the Supreme Court's Rightward Shift*, N.Y. TIMES (Apr. 12, 2018), https://www.nytimes.com/2018/04/12/opinion/supreme-court-right-shift.html [https://perma.cc/H473-3MRD].

Second Amendment doesn't remain a second-class right in this country's most populous federal circuit, then something has to change.

So, what to do? I have a suggestion. The Supreme Court should consider summarily reversing some of our wayward Second Amendment decisions. To put it more colloquially, it's time for some benchslaps. Nothing less will give this court any pause before ultimately blessing every arms restriction it reviews.[2]

## I.

California law makes it a crime to carry, publicly possess, transfer, or sell switchblade knives—no exceptions. Cal. Pen. Code §§ 17235, 21510, 21590.[3] As Judge Tung persuasively explains, the panel opinion dodges the obvious constitutional problems with California's categorical switchblade ban by misapplying the facial challenge rule in

---

[2] There is, of course, one notable post-*Bruen* exception to the otherwise hard-and-fast rule that the Second Amendment always loses in the Ninth Circuit. *See Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025). It is literally the one exception that proves the rule. My colleagues are well aware of our court's reputation, and the majority of our court is thus understandably on the lookout for some inconsequential Second Amendment case where they can chalk up the extraordinary win—similar to how most law schools try to have at least one "conservative" faculty member so they can tout their intellectual diversity. Anybody who falls for such a weak charade is, to quote our Chief Justice, a chump. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 825 (2015) (Roberts, C.J., dissenting).

[3] One California state court has construed these statutes to criminalize all possession of switchblades—even inside *private* spaces. *In re S.C. v. S.C.*, 179 Cal. App. 4th 1436, 1438, 1441 (2009) (holding that the identical, prior version of Cal. Pen. Code § 21510 "is violated any time a person carries a switchblade knife on his or her person, regardless of where the possession occurs," including in a nonpublic area).

a way that *Bruen*—a facial challenge case—doesn't support. That's bad enough. But worse, we shouldn't even be here.

**A.**

Our court addressed a similar issue a few years ago in *Teter v. Lopez*, where our good colleague Judge Bea—a fantastic judge, even if he occasionally misses the target on the Second Amendment[4]—wrote an outstanding decision explaining why Hawaii's similar complete ban on butterfly knives violated the right to keep and bear arms. *See Teter v. Lopez* (*Teter I*), 76 F.4th 938, 942 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024), *and vacated on reh'g en banc*, 125 F.4th 1301 (9th Cir. 2025). The original *Teter* panel's decision was right—it dealt with a similar categorical ban on similar knives, and it squarely rejected the flawed reasoning the panel employed here.

Butterfly knives are comparable to switchblades for all relevant purposes—they are a species of pocketknife with a handle split into two components and a folding blade that can be opened by "a few short, quick movements" with one hand. *Teter I*, 76 F.4th at 942; *see* Cal. Pen. Code § 17235 (defining a switchblade knife as a "knife having the appearance of a pocketknife [including] a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade

[4] *See, e.g.*, *Yukutake v. Lopez*, 130 F.4th 1077, 1108–24 (9th Cir. 2025) (Bea, J., dissenting), *reh'g en banc granted, opinion vacated*, 144 F.4th 1119 (9th Cir. 2025).

or by any type of mechanism whatsoever”). And just like the California switchblade ban in this case, the Hawaii law challenged in *Teter* completely banned butterfly knives. *See Teter I*, 76 F.4th at 942. Hawaii even relied on the same justification for its outright ban as California does here: it felt that butterfly knives were “associated with criminals.” *Teter I*, 76 F.4th at 949; *cf. Knife Rights, Inc. v. Bonta*, 165 F.4th 1330, 1345 (9th Cir. 2026) (“California targeted switchblades specifically because of the particular danger these weapons present, and their common association with criminality.”).

The *Teter* plaintiffs claimed these statutes violated the Second Amendment, and a panel of our court agreed. First, the three-judge *Teter* panel recognized there was no serious debate that butterfly knives qualify as “arms” under the Second Amendment. *See Teter I*, 76 F.4th at 948–50. *Heller* made clear that the Second Amendment extends to all bearable arms: “[w]eapons of offence, or armour of defence” and “any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.” *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (alteration in original) (citations omitted). Obviously, any knife would meet that definition. *But see Knife Rights*, 165 F.4th at 1339 (merely assuming, and refusing to decide, that the plain text of the Second Amendment applies to the possession and carry of switchblades).

Hawaii therefore had to prove that its categorical ban on those knives was “consistent with this Nation’s historical tradition of regulating weapons.” *Teter I*, 76 F.4th at 950 (citing *N.Y. State Rifle & Pistol Ass’n v. Bruen*, 597 U.S. 1, 17–20, 32–33 (2022)). And like California here, Hawaii tried to meet that burden by arguing that antebellum or later laws banning “Bowie knives,” “metal knuckles,” “sword-

canes," "Arkansas Toothpicks," and "slung-shots" established "an historical tradition of banning weapons associated with criminality." *Id.* at 951; *cf. Knife Rights*, 165 F.4th at 1341–45.

Judge Bea's opinion correctly explained why these statutes could not justify Hawaii's absolute ban on butterfly knives. "As *Bruen* put it, the 'how' … [was] different"—these statutes did "not ban the possession of knives; they regulated only their *carry*." *Teter I*, 76 F.4th at 951. And the vast majority of these antebellum or later statutes "prohibited the *concealed carry*" of these weapons, or their carry by certain persons or in certain sensitive places. *Id.* at 951–52. There was no tradition of categorically prohibiting *all* "carry of pocketknives, much less their possession outright." *Id.* at 952–53. These narrow bans on *some* forms of carry could not support Hawaii's categorical ban on *all* forms of possession and carry.

So how did we get to today's decision, which holds precisely the opposite?

If you're familiar with our court, you can easily guess the answer. Like every Ninth Circuit panel decision that vindicates the Second Amendment, *Teter* proved to be yet another Pyrrhic victory for the fundamental right to keep and bear arms. As day follows night, our court "called the case en banc. And after the en banc vote played out in all-too-predictable fashion, the Chief Judge issued an administrative order not only granting en banc review, but also vacating the panel's opinion." *Teter v. Lopez* (*Teter II*), 125 F.4th 1301, 1310 (9th Cir. 2025) (en banc) (VanDyke, J., dissenting in part). No judge voted on that vacatur order, and only the Chief Judge signed it, but it proved consequential. Automatically vacating the *Teter* panel decision

greenlighted Hawaii's decision to strategically moot the case and let categorical knife bans live to fight another day. And sure enough, soon after we took *Teter* en banc, Hawaii strategically narrowed its butterfly knife ban to cover everything but the conduct the *Teter* plaintiffs wanted to engage in, and argued its amendments mooted the *Teter* plaintiffs' claims. *Id.* at 1308–10. The en banc panel spotted Hawaii an assumption of good faith and agreed that the case was moot. *Id.*[5]

As I explained then, our court's practice of automatically vacating panel opinions creates obvious perverse incentives for government defendants. It allows States to strategically deploy mootness by amending their challenged laws only after this court grants rehearing en banc. Through one simple move, a State can lock in the effect of our auto-vacatur and eliminate any risk of losing on the merits before the en banc court. This, in turn, gives the State—or another State with a similar law—a second bite at the apple before a more favorable panel. That perverse incentive structure is "basically the mirror image" of the kind our *Munsingwear* precedents aim to counteract. *Id.* at 1310 (VanDyke, J., dissenting).

As I suggested then, the en banc panel in *Teter* should have vacated our prior vacatur order, thereby reinstating the

[5] Hawaii seems fond of amending its laws in an attempt to moot Second Amendment cases once our court takes them en banc. *See, e.g.*, Hawaii State Senate, *JDC Public Hearing 03-29-2022 9:30 a.m.*, https://www.youtube.com/live/KMpT6JngXG8?t=5301s [https://perma.cc/8URU-GCJR], at 1:28:21–1:28:43 (YouTube, Mar. 29, 2022) (testimony of Hawaii deputy attorney general, testifying "on behalf of the department of the Attorney General" "who supports this bill" to "address a recent federal court ruling … that invalidated two Hawaii statutes").

precedential value of the panel's opinion, because Hawaii, the en banc petitioner, took deliberate action to moot the case after rehearing en banc was granted. *Id.* at 1317. But of course we didn't.[6] *Teter* was a Second Amendment case, after all, and our court is nothing if not militant when trying to find a way to uphold a weapons restriction. Everyone knew then, and knows now, that the entire point of allowing Hawaii to play the panel erasure game in *Teter* was to leave the way open for a decision like *Knife Rights*. Is it rude to say "I told you so"?

Today we see the full consequences of letting Hawaii game our auto-vacatur practice. The panel in this case holds that Knife Rights' challenge to California's categorical switchblade ban can be rejected if the panel can think of a

---

[6] Judge Wardlaw claims that this vacatur was "mandatory" under our General Orders. *See* Concurrence of Wardlaw, J., at 13 n.5. But this is historical revisionism. As Judge Wardlaw acknowledges, the version of General Order 5.5(d) that Judge Wardlaw cites is not the version that existed when the Chief Judge vacated the *Teter* panel opinion. *See Teter*, 125 F.4th at 1313–14 (VanDyke, J., dissenting). When the *Teter* panel opinion was vacated, the relevant provision from our General Orders said nothing about vacatur and provided only that, after a successful en banc call, "[t]he three-judge panel opinion *shall not be cited as precedent* ...." *Id.* at 1313. Judge Wardlaw, like Judge Miller before her, suggests that the *Teter* vacatur simply followed what had always been our consistent practice. *See* Concurrence of Wardlaw, J., at 13 n.5 (citing *Teter v. Lopez*, 135 F.4th 1176, 1178 (9th Cir. 2025) (Miller, J., concurring)). But this isn't accurate. *See Teter*, 125 F.4th at 1312–14 (VanDyke, J., dissenting). The panel opinion was thus vacated ultra vires. The most that can be said to support the vacatur in *Teter* is that it was not the only panel opinion vacated this way before we amended our rules to authorize it. But as everyone knows, the mere fact that our court has maintained an unwritten practice of doing something is hardly evidence of its lawfulness. *See, e.g.*, *Rojas-Espinoza v. Bondi*, 167 F.4th 1069–79 (9th Cir. 2026) (VanDyke, J., dissenting).

single constitutional application for the law. And to give credit where it's due, this move makes some strategic (if not legal) sense—if your goal is to avoid enforcing the Second Amendment. No historical evidence supports a categorical ban on *all* forms of carrying knives. As *Bruen* explained, "history reveals a consensus that States could *not* ban public carry altogether." *Bruen*, 597 U.S. at 53. Even our court's pre-*Bruen* case law recognized the same thing, albeit reluctantly and backhandedly. *See Peruta v. Cnty. of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) ("If there is such a right [to public carry], it is … a right to carry a firearm openly."), *abrogated in part on other grounds*, 597 U.S. 1. So if a panel really wants to uphold California's complete switchblade ban, this might be the only way to do it.

But we are a court after all—not a collection of policy strategists or cabal of regulators—so legal sense should matter. And that is lacking here. On the panel's view, historical statutes banning one type of carry can justify modern statutes banning *all* carry. Under this reasoning—like God's bargain with Abraham, in which just a few righteous men in Sodom would have been enough to forestall the city's destruction—a blatantly unconstitutional ban on all weapons can be upheld if it has even a single conceivable constitutional application. This reasoning doesn't jibe with *Bruen*. We are supposed to ask if the laws have the same "how"—in other words, whether the modern regulation "operate[s] in different ways" than the historical analogues the State points to. *United States v. Hemani*, 608 U.S. ___, ___, 2026 WL 1751710, at *6 (2026); *accord United States v. Rahimi*, 602 U.S. 680, 711 (2024) (Gorsuch, J., concurring). And complete bans on *all* forms of carry, transfer, and public possession don't work in remotely the same way as bans on *some* forms of carry.

At any rate, the *Knife Rights* panel could employ this gambit *only* because of Hawaii's adept maneuvering, enabled by our improper auto-vacatur practice, to moot *Teter*. The *Teter* panel unanimously held that a historical tradition of banning *some* forms of carry doesn't justify a blanket ban on *all* forms of carry. That analysis was right and consistent with *Bruen*. And had we refused to let Hawaii game our auto-vacatur practice in *Teter*, it would have controlled here and prevented this panel's errant decision to uphold California's complete switchblade ban.

**B.**

This case, like *Teter* before it, is just one more predictable chapter in our court's long campaign against the Second Amendment. While the particulars vary from case to case, that story has the simplest basic plot: the government always wins; the Second Amendment plaintiff always loses. Our court will use any judicial tool—no matter how illegitimate—to avoid enforcing the right to keep and bear arms. Second Amendment plaintiffs in the Ninth Circuit are permanently stuck in the unfortunate position of having brought a knife to a gunfight. And that has remained true despite several landmark Supreme Court decisions that *should have* corrected our case law.

Before *Heller*, the law in our circuit was that the Second Amendment "right of the *people* to keep and bear arms," U.S. Const. amend. II (emphasis added), wasn't an individual right at all, but a right that belonged to the States, *see Hickman v. Block*, 81 F.3d 98, 100–01 (9th Cir. 1996), *cert. denied*, 519 U.S. 912 (1996), *overruled by District of Columbia v. Heller*, 554 U.S. 570 (2008).

After *Heller* corrected us and made clear that the Second Amendment recognizes "an individual right to keep and bear

arms," 554 U.S. at 595, we created a "means-ends" interest balancing test where we would (1) determine whether the challenged law affected conduct historically protected by the Second Amendment; and (2) apply varying levels of scrutiny to review the constitutionality of the regulation. *See, e.g.*, *Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc), *vacated*, 142 S. Ct. 2895 (2022). We selected the level of scrutiny based on (1) how close the law came to the "core" of the Second Amendment right and (2) the severity of the law's burden on that right. *E.g.*, *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013), *abrogated by Bruen*, 597 U.S. at 17. Essentially always, these steps led us to apply a form of so-called "intermediate scrutiny," under which we required "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Id.* at 1139.

That framework was so malleable that it effectively amounted to rational basis review. Guns are dangerous, after all, and we always found the government's interest in mitigating such danger to be important. *See McDougall v. Cnty. of Ventura*, 23 F.4th 1095, 1122 n.9 (9th Cir.) (VanDyke, J., concurring), *reh'g en banc granted, opinion vacated*, 26 F.4th 1016 (9th Cir. 2022), and *on reh'g en banc*, 38 F.4th 1162 (9th Cir. 2022). And we watered down the "reasonable fit" prong to such an extent that the government merely had to show that its regulation "promote[d] a substantial government interest that would be achieved *less effectively* absent the regulation." *Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016) (emphasis added) (citation omitted). As I've explained, it's hard to imagine how a law could survive even rational basis review if the State's interest would be achieved more effectively without a

challenged law. *McDougall*, 23 F.4th at 1123 n.11 (VanDyke, J., concurring). So this test, labeled "intermediate scrutiny," imposed effectively *no* scrutiny. Under it, a State's regulatory concerns *always* trumped the individual plaintiff's right to keep and bear arms. I'm not exaggerating: between *Heller* in 2008, and *Bruen* in 2022, we considered at least 50 Second Amendment challenges—significantly more than any other circuit—and ultimately denied *all of them*. *Duncan v. Bonta*, 19 F.4th 1087, 1165–66 (9th Cir. 2021) (en banc) (VanDyke, J., dissenting), *vacated*, 142 S. Ct. 2895 (2022). If you were a sports fan, and one team was literally undefeated for more than a decade, you might suspect that something was up.

Then came *Bruen*, where the Supreme Court expressly rejected the use of such interest balancing "means-end scrutiny in the Second Amendment context" and described the two-step approach as "one step too many." 597 U.S. at 19. Instead, we are to apply the Second Amendment's text and historical understanding. *Id.* at 26. If the "Second Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects that conduct." *Id.* at 17. The government may rebut that presumption only if it "affirmatively prove[s] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. This requires the government to "identify a well-established and representative historical analogue," and we must decide whether the challenged regulation and historical analogues are "relevantly similar." *Id.* at 29, 30 (citation omitted). Our "central" consideration should be whether the modern regulation "impose[s] a comparable burden on the right of armed self-defense" and whether "that burden is comparably justified." *Id.* at 29. Simply, the historical analogues and

challenged regulation must have a similar "how" and "why." *Id.*

But since *Bruen*, we've quickly come up with a number of other analytical jukes to continue our resistance to the Second Amendment. For example, we've misread *Bruen* as creating two separate tests: what we've called the "more nuanced approach" and the "straightforward" approach. *See, e.g.*, *Duncan v. Bonta*, 133 F.4th 852, 870–72 (9th Cir. 2025) (en banc). Seizing on a few lines from *Bruen*, we've decided that a more "nuanced" or "flexible analogical" approach applies when a modern regulation seeks to address new "societal concerns" or "dramatic technological changes." *Id.* at 874 (citation omitted). The more "flexible analogical approach" seemingly lets us skip over rigorous application of *Bruen*'s history and tradition test and uphold a weapons regulation if we decide—which we inevitably do—that there's a difference between the technology and societal problems that existed at the Founding and those that exist today. *See id.* at 873–74.

In other cases, we've held that restrictions on "ancillary rights"—like the right to acquire firearms in the first place—do not come within the Second Amendment's plain text *at all* unless they "meaningfully constrain" the right to keep and bear arms for self-defense. *See B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117–19 (9th Cir. 2024). This language appears nowhere in the Second Amendment, *Heller*, or *Bruen*, but that didn't stop us from asserting that it "faithfully tracks the Second Amendment's plain text." *Id.* at 119. And given our track record with the Second Amendment, you might correctly expect that we'd find all sorts of weapons-related restrictions not really all that "meaningful."

The panel's decision here is another good example of how we can avoid meaningful Second Amendment scrutiny. Under the panel's view of facial challenges, virtually any categorical weapons ban could be upheld if a historical analogue justifies banning a small subset of the outlawed activity. Just enact the same ban from *Bruen* or *Heller*, include a narrow application that is constitutional and—voila!—your firearms ban is now facial-challenge-proof. Americans who want to exercise their constitutional rights will have to chip away at the law one as-applied challenge at a time. We wouldn't treat other rights this way. If California's legislature categorically banned all speech critical of the governor, we would never uphold it just because it *could* be applied to criminalize certain unprotected categories of speech like true threats or incitement. *See Virginia v. Black*, 538 U.S. 343, 359 (2003); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam). If Oregon's legislature passed a law permitting warrantless searches in all circumstances, we would never uphold it just because it could authorize consent searches or searches pursuant to the emergency aid exception. *See Fernandez v. California*, 571 U.S. 292, 298 (2014); *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam). And if Washington's legislature provided that no indigent criminal defendant would henceforth be appointed counsel at any stage of any criminal proceeding, we wouldn't uphold that statute because it could be constitutionally applied to deny counsel in the context of post-conviction proceedings. *See Garza v. Idaho*, 586 U.S. 232, 245 (2019). And so on.

What's more, post-*Bruen*—just as before—the occasional panel decision that vindicates the Second Amendment is promptly called en banc, vacated, and ultimately replaced with more circuit precedent undermining

the right to keep and bear arms. *See, e.g.*, *Baird v. Bonta*, 163 F.4th 723 (9th Cir.), *reh'g en banc granted, opinion vacated*, 172 F.4th 1105 (9th Cir. 2026); *Rhode v. Bonta*, 145 F.4th 1090 (9th Cir.), *reh'g en banc granted, opinion vacated*, 159 F.4th 1170 (9th Cir. 2025); *Yukutake*, 130 F.4th 1077, *reh'g en banc granted, opinion vacated*, 144 F.4th 1119 (9th Cir. 2025).

The bottom line is that *Bruen*—like *Heller* before it—changed nothing here in the Ninth Circuit. We still have plenty of tricks up our sleeves to avoid vindicating the Second Amendment. And we'll come up with as many more as we need to.[7]

It's impossible to square any of this with the Supreme Court's instruction that the Second Amendment right to keep and bear arms should no longer be treated as a "second-class" right. *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)). We would never bend over backwards to find some bespoke rationalization to avoid vindicating the constitutional rights that most of my colleagues favor. To the contrary, our court often goes out of its way to *extend* those rights far beyond their original public understanding to achieve desired policy outcomes. *See, e.g.*, *United States v. Hansen*, 25 F.4th 1103, 1105 (9th Cir. 2022) (misconstruing a federal law prohibiting "encourag[ing] or induc[ing]" illegal immigration in order to find it unconstitutionally

[7] That's not to say that Second Amendment litigation in the Ninth Circuit is necessarily boring. It's a lot like watching a Harlem Globetrotters game: you know the Globetrotters are going to win, but the acrobatics involved in getting to that foregone conclusion can still make for a fascinating spectacle—as long as you don't mind that the Washington Generals never win.

overbroad under the First Amendment), *rev'd*, 599 U.S. 762 (2023); *United States v. Sineneng-Smith*, 910 F.3d 461 (9th Cir. 2018) (injecting sua sponte into an appeal an overbreadth challenge to this same statute), *vacated and remanded* 590 U.S. 371, 375 (2020) (holding that the *Sineneng-Smith* panel had "departed so drastically from the principle of party presentation as to constitute an abuse of discretion" and remanding "for an adjudication of the appeal attuned to the case shaped by the parties rather than the case designed by the appeals panel"); *Martin v. City of Boise*, 920 F.3d 584, 603 (9th Cir. 2019) (holding that the Eighth Amendment's Cruel and Unusual Punishments Clause barred a city "from prosecuting people … for sleeping outside on public property when those people have no home or other shelter to go to"), *abrogated by City of Grants Pass v. Johnson*, 603 U.S. 520 (2024); *Martinez v. City of Oxnard*, 270 F.3d 852, 857–58 (9th Cir. 2001) (holding that mere "coercive questioning" violated the Fifth and Fourteenth Amendments even when the defendant's statements were not used against him in a criminal proceeding), *rev'd sub nom. Chavez v. Martinez*, 538 U.S. 760 (2003); *Compassion in Dying v. Washington*, 79 F.3d 790, 816 (9th Cir. 1996) (en banc) (holding that the "Constitution encompasses a due process liberty interest in controlling the time and manner of one's death—that there is, in short, a constitutionally recognized 'right to die'"), *rev'd sub nom. Washington v. Glucksberg*, 512 U.S. 702 (1997).

But in the courts of this country's most populous federal circuit, the right to keep and bear arms—the palladium of liberty—is effectively a dead letter. It is important that the Supreme Court Justices understand this reality: in the Ninth Circuit, things are no different after *Heller* and *Bruen* than they were before. No different.

## II.

That we work so hard to avoid following the Supreme Court's instructions—and have so often gotten away with it—might seem counterintuitive to the average person. When *your* boss tells you that you did something wrong, you might be frustrated. You might disagree. You might even vent about it off the clock with some "vulgar barroom talk." *Olympus Spa v. Armstrong*, 169 F.4th 817, 845 (9th Cir. 2026) (statement of McKeown, J.). But when you're done kvetching, you'll probably try to fix the problem, because you know that if you don't, you'll soon be looking for a new job.

Yet strange as it may seem to the outside observer, that's not how it works on our court—at least when it comes to rights that a majority of my colleagues dislike (religious liberty and the Second Amendment, for example). When our boss, the Supreme Court, tells us we erred, we don't apologize, and we don't rush to fix the problem. We don't even feel the need to come up with some half-baked excuse for why the dog ate our homework. We persist in open defiance. Indeed, a majority of my colleagues, who see the law very differently than the Supreme Court on certain key issues, may even welcome the rare reversal from the Supreme Court in a case involving a hot-button social issue and view it as a badge of honor. *See, e.g.*, Andrew Manuel Crespo, *In Memoriam: Judge Stephen Reinhardt*, 131 Harv. L. Rev. 2101, 2102 (2018). What better way to demonstrate your bona fides to the liberal legal establishment?

What judges on our court *don't like*, however, is when they're perceived as so bad at their job that they get summarily reversed. A short summary reversal sends a

message so clear and stern it could embarrass even a judge on the Ninth Circuit.

So here's my modest proposal: if the Supreme Court really wants to be serious about genuinely doing something to address the Second Amendment's uniquely disfavored status in America's most populous federal circuit, it's going to need to prescribe stronger medicine than what it's given us so far.

**A. The benchslap**

I've been accused of using "vulgar barroom talk" to get my point across, *Olympus Spa*, 169 F.4th at 845 (9th Cir. 2026) (statement of McKeown, J.), so let me assuage my colleagues' selective Victorian predilections up front. Calm down. In making my recommendation today, I've chosen a word that, while evocative, would never be the punchline to a coarse joke at your local bar, and even has an official entry in the lawyer's dictionary of choice.

Black's Law defines "benchslap" as "[a] judge's sharp rebuke of counsel, a litigant, or perhaps another judge[.]" *Benchslap*, *Black's Law Dictionary* (12th ed. 2024). Basically, a benchslap is a form of stern judicial correction designed to impose public shame for improper litigation or judicial conduct. *See* Joseph P. Mastrosimone, *Benchslaps*, 2017 Utah L. Rev. 331, 334 (2017). Wayward attorneys have been benchslapped for everything from engaging in the "ostrich-like tactic" of pretending that adverse precedent

does not exist,[8] to citing A.I.-hallucinated cases,[9] to asking to suspend a murder trial to attend the annual Ernest Hemingway look-alike contest.[10] The deterrent effect is real. Nobody wants to become insta-famous for receiving the viral benchslap of the day.

The benchslap isn't just a tool for overworked judges to deal with the latest antic of unprofessional counsel. It's also a tool our nation's highest Court has sometimes deployed to correct *lower courts'* repeated refusal to follow precedent. The Supreme Court's benchslaps are more formally known as summary reversals. A summary reversal occurs when the Supreme Court grants certiorari and immediately reverses the lower-court decision, without merits briefing or argument, "rather than the more usual grant of certiorari, followed by three sets of briefs on the merits, oral argument, and a decision several months after certiorari was granted." Edward A. Hartnett, *Summary Reversals in the Roberts Court*, 38 Cardozo L. Rev. 591, 591–92 (2016).

---

[8] *Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011) (Posner, J.) (noting that the "ostrich is a noble animal, but not a proper model for an appellate advocate" and then helpfully including a picture of an ostrich burying its head in the sand).

[9] *See, e.g.*, *Payne v. State*, —S.E.2d—, 2026 WL 1215905 (Ga. Sup. Ct. May 5, 2026). Here's a related practice tip: if you're a lawyer and you find yourself citing a Ninth Circuit decision that seems to vindicate the Second Amendment right, you should definitely double- (and triple-) check that it's not an A.I.-hallucinated case.

[10] This actually happened. *See United States v. Bottorff*, No. 8:11-cr-269-T-23AEP, 2012 WL 2449858, at *1 (M.D. Fla. June 22, 2012) ("Between a murder-for-hire trial and an annual look-alike contest, surely Hemingway, a perfervid admirer of 'grace under pressure,' would choose the trial…. Best of luck to counsel in next year's contest. The motion … is DENIED.").

Summary reversals serve several purposes. Commentators note that they "enforce the Court's supremacy over recalcitrant lower courts," William Baude, *Foreword: The Supreme Court's Shadow Docket*, 9 N.Y.U. J.L. & Liberty 1, 2 (2015), and "rebuke lower courts for resisting the Supreme Court's commands," Richard C. Chen, *Summary Dispositions as Precedent*, 61 Wm. & Mary L. Rev. 691, 710 (2020). Justices on the Supreme Court have likewise described summary reversal as "bitter medicine," *Spears v. United States*, 555 U.S. 261, 268 (2009) (Roberts, C.J., dissenting), prescribed when lower courts "seek to defy" Supreme Court precedent, *Pavan v. Smith*, 582 U.S. 563, 568 (2017) (Gorsuch, J., dissenting).

These sterile descriptions, while accurate, don't fully capture the stinging impact of a summary reversal. When the Supreme Court summarily reverses, it's essentially sending a clear (if harsh) message to a lower court:

> Dear lower court:
>
> Your decision sucks.... And it sucks so badly, it isn't even worth a closer look.
>
> Kindly re-do it.
>
> Regards,
>
> The Supreme Court.

I have to respectfully disagree with commentators who have criticized the benchslap as a form of inappropriate judicial bullying. *See* Mastrosimone, *Benchslaps*, 2017 Utah L. Rev. at 353, 375–76. While it's no doubt strong medicine, a benchslap can be a form of much-needed judicial correction in response to demonstrated lower court recalcitrance.

To see just how effective a series of summary reversals from the Supreme Court can be, consider an example from recent Ninth Circuit history. In the mid-2000s, the Antiterrorism and Effective Death Penalty Act (AEDPA) had been the law for nearly a decade, instructing federal courts not to grant habeas relief unless the state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Yet some federal courts of appeals (any guesses as to which?) persisted in open defiance of Congress's command. Because the Supreme Court could not realistically grant certiorari to correct every single misapplication of AEDPA, it began issuing summary reversals.

From 2005 to June 2019, the Supreme Court summarily reversed eighty-eight cases. Chen, *Summary Dispositions as Precedent*, 61 Wm. & Mary L. Rev. at 706 & n.74. *Forty-one* of those summary reversals came in federal habeas cases. *Id.* at 707 & n.81. Our court was a particularly bad offender and therefore a frequent recipient of the Supreme Court's summary reversals during this period: by my count, fifteen (more than a third) of the Supreme Court's habeas summary reversals corrected Ninth Circuit decisions.[11] To

[11] *Schriro v. Smith*, 546 U.S. 6 (2005) (per curiam); *Kane v. Garcia Espitia*, 546 U.S. 9 (2005) (per curiam); *Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam); *Swarthout v. Cooke*, 562 U.S. 216 (2011) (per curiam); *Felkner v. Jackson*, 562 U.S. 594 (2011) (per curiam); *Cavazos v. Smith*, 565 U.S. 1 (2011) (per curiam); *Ryan v. Schad*, 570 U.S. 521 (2013) (per curiam); *Marshall v. Rodgers*, 569 U.S. 58 (2013) (per curiam); *Nevada v. Jackson*, 569 U.S. 505 (2013) (per curiam); *Lopez v. Smith*, 574 U.S. 1 (2014) (per curiam); *Glebe v. Frost*, 574 U.S. 21 (2014) (per curiam); *Johnson v. Lee*, 578 U.S. 605 (2016) (per curiam);

give a flavor of these summary reversals, consider *Glebe*, where the Supreme Court summarized the improper reasoning employed by a panel of this court and then responded with one word: "No." *Glebe*, 574 U.S. at 25. When the Nation's highest Court issues the same monosyllabic correction that a frazzled parent gives her whining toddler, it's kind of embarrassing (to the toddler).

It worked. While the process wasn't pleasant, our AEDPA decisions improved. Judges on our court now more often—although sadly not always—afford the appropriate level of deference to state-court decisions that AEDPA requires.[12] And when they're tempted to reverse simply because they would have analyzed the case differently had they been in the shoes of the relevant state court, my more "experienced" colleagues at least have the threat of a possible summary reversal in the back of their mind. That fear of a summary reversal provides a greater incentive to behave than any concern about the occasional reversal in a full Supreme Court opinion.

**B. Benchslaps for the Second Amendment**

Our historical (and, sometimes, ongoing) resistance to the Supreme Court's AEDPA jurisprudence pales in comparison to our unwavering defiance of the Court's

---

*Kernan v. Hinojosa*, 578 U.S. 412 (2016) (per curiam); *Kernan v. Cuero*, 583 U.S. 1 (2017) (per curiam); *Sexton v. Beaudreaux*, 585 U.S. 961 (2018) (per curiam).

[12] When the Supreme Court cited a list of recent AEDPA summary reversals, there was no decision from our court on the list. *See Klein v. Martin*, 607 U.S. 213, 214 (2026) (citing cases). Of course, that doesn't mean we're guaranteed to avoid future AEDPA summary reversals—especially if we regress. *See, e.g.*, *Doyle v. Royal*, 161 F.4th 570 (9th Cir. 2025).

Second Amendment jurisprudence. Even before the decade of Supreme Court AEDPA summary reversals, we would at least occasionally apply the proper level of deference to state-court decisions. In contrast, we effectively *never* vindicate the right to keep and bear arms. And when a panel does, our court takes the decision en banc, vacates the panel's decision, and ultimately upholds the arms regulation. By this point, it is clear enough that a Second Amendment reversal every few years sadly does nothing to protect the particularly disfavored constitutional right to keep and bear arms. It's equivalent to the parent of a chronically delinquent child taking away TV privileges for fifteen minutes for one day every few years and hoping that will somehow put the child back on the straight and narrow. Not going to work. But a series of good summary reversals—and given our Court's intransigence, it will take more than one—could.

As I see it, the summary reversal approach has several key advantages. First, Justices on the Supreme Court are so busy. Issuing summary reversals will save them time and allow them to address other important issues rather than correcting our blatantly errant work. Our circuit decides more Second Amendment cases than any other, and it's simply not possible for the Supreme Court to grant certiorari in every one of our wayward decisions. But summarily reversing and remanding for a second try will enable the Supreme Court to expedite the process and put an end to the "can't catch 'em all" game our court loves to play. *See* Linda Greenhouse, *Dissenting Against the Supreme Court's Rightward Shift*, N.Y. TIMES (Apr. 12, 2018).

Second, by summarily reversing, the Supreme Court won't have to develop new doctrine or waste time repeating holdings it has already made. It can just cite *Bruen* and force

Case: 24-5536, 07/16/2026, DktEntry: 58.1, Page 36 of 138



our court to gain some much-needed practice faithfully applying the proper Second Amendment framework. Most of my colleagues can't fathom writing a pro-Second Amendment opinion. They need to get some reps in. Forcing them to bite the bullet and make a ruling they disagree with will operate as a form of exposure therapy. The first time writing an opinion that enforces the Second Amendment will no doubt feel scary. But after doing it a few times, they'll realize it's not so bad as they thought.

Third, the threat of embarrassment on summary reversal will allow the core message of *Bruen* finally to sink in: laws that restrict the right to keep and bear arms—just like laws that restrict any other fundamental right—are presumptively *unconstitutional*. 597 U.S. at 24. This means that, while applying the *Bruen* framework is "not *always* easy," many Second Amendment cases are simply "not hard." *Wolford v. Lopez*, 609 U.S. ___, ___, 2026 WL 1825723, at *20 (June 25, 2026) (Barrett, J., concurring) (emphasis added).

But you'd never know that if you follow this court's Second Amendment jurisprudence. The truth is that a majority of my colleagues treat every arms restriction as presumptively *constitutional* and then have to work really hard to confirm that presumption. Consequently, in our circuit, the line between hard and easy cases doesn't exist. Every Second Amendment case turns into a hard one. Take the very recent case of *Wolford*, for example, where the Supreme Court easily backhanded Hawaii's attempt to justify its law prohibiting firearms on private property without the express and affirmative consent of the property owner by pointing to colonial anti-poaching laws. 609 U.S. at ___, 2026 WL 1825723, at *12–13. Could laws prohibiting unauthorized hunting on private land justify banning lawful public carry in every "gas station, coffee

shop, grocery store, or other private property open to the public without express and unambiguous consent?" *Id.* at *13. Obviously not, the Supreme Court said: "The question answers itself." *Id.* But not for us! We treated *Wolford* like an unsolvable Gordian knot that could be untied only by … you guessed it … deferring to the State's regulatory concerns and upholding the ban. *See Wolford v. Lopez*, 116 F.4th 959, 976–1003 (9th Cir. 2024), *cert. granted in part*, 146 S. Ct. 79 (2025), *rev'd and remanded*, 609 U.S. ___, 2026 WL 1825723. And we do the same thing in every Second Amendment case. It's always complicated. There's always so much arduous analysis. And the final result is always the same: the arms restriction must win.

Our court's efforts are a crucial part of a broad and energetic campaign to deliberately overcomplicate *Bruen*. Legal academics, the mainstream media, and complicit judges are working overtime to push hard the narrative that *Bruen* is unworkable, unclear, and just too difficult to apply. Some say "[h]istory is messy," "not straightforward or fair," and that it "makes no sense for contemporary society to pledge allegiance to the founding era's … understanding of the Constitution." *See State v. Wilson*, 543 P.3d 440, 453–54 (Haw. 2024), *abrogated in part by Wolford*, 609 U.S. at ___, 2026 WL 1825723, at *11. Some say *Bruen* is "insane" to require judges "to hunt down obscure, colonial-era statutes" "from the age of muskets" to justify "perfectly sensible gun laws." Ruth Marcus, *Ye olde Supreme Court? Your originalism is making America unsafe.*, Washington Post, (Feb. 4, 2023). Some, like former district court judge Kimberly J. Mueller, strangely spend 15 pages of an order trashing *Bruen* itself—cribbing from the "greatest hits" list of *Heller* and *Bruen* critics—before purporting to apply *Bruen* faithfully to the case at hand (and, shocker, finding no

Second Amendment violation). *See Baird v. Bonta*, 709 F. Supp. 3d 1091, 1093, 1103–1118 (E.D. Cal. 2023), *aff'd in part, rev'd in part*, 163 F.4th 723 (9th Cir.), *vacated*, 172 F.4th 1105 (9th Cir. 2026).[13] These, and many other, voices cry out in unison: "*Bruen* is just too hard to apply. Please! Return to interest balancing!"

As with any constitutional right, no doubt there are going to be some hard Second Amendment questions. But there is an obvious disconnect when Justices of the Supreme Court emphasize that Second Amendment questions it just reviewed "are not hard," *Wolford*, 609 U.S. at ___, 2026 WL 1825723, at *20 (Barrett, J., concurring)—indeed, are so easy that the government's arguments "cannot be taken seriously," *id.* at ___, 2026 WL 1825723, at *14—while our court, considering the same issues, murdered a small forest of trees with myriad pages of dense and opaque analysis before "taking a step back" from its final "analysis" and acknowledging its conclusion about "the lists of places where a State likely may ban … the carry of firearms appear[s] arbitrary" and "the lack of an apparent logical connection … is hard to explain in ordinary terms." *Wolford*, 116 F.4th at 976–1003. As *Wolford* shows, applying *Bruen* in this circuit is only hard because my

[13] These are just a few examples to illustrate the common refrains in this "*Bruen*-is-too-hard" pressure campaign. *See also* Tonja Jacobi & Cory Conley, *Is* Bruen *The New* Usery*?*, 67 Wm. & Mary L. Rev. Online 1529 (2026); Brandon P. Denning & Glenn H. Reynolds, *Essay: Trouble's* Bruen*: The Lower Courts Respond*, 108 Minn. L. Rev. 3187 (2024); Jacob D. Charles, *The Dead Hand of a Silent Past:* Bruen*, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67 (2023); Clara Fong, et al., *Judges Find Supreme Court's* Bruen *Test Unworkable*, Brennan Ctr. for Justice (June 26, 2023), https://www.brennancenter.org/our-work/research-reports/judges-find-supreme-courts-bruen-test-unworkable [https://perma.cc/CW35-AC3M].

colleagues are stretching their considerable analytical and imaginative powers to the limit in search of any possible way to uphold an arms restriction—effectively applying a presumption of *constitutionality*. Tell any first-year law student about a city code "that target[s] speech based on its communicative content," and they'll quickly and intuitively recognize that the law is probably unconstitutional and unlikely to survive judicial review. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Easy" Second Amendment cases should be similar. The fact that my court has never encountered an "easy" Second Amendment case is a huge tell of how vigorously we are collectively kicking against the goads.

Summarily reversing—telling lower courts in unignorable and unmistakable terms: (1) you got it badly wrong; (2) this is an easy question; (3) try again—will reinforce that laws burdening the Second Amendment right are presumptively unconstitutional—not just in theory, but in reality. That presumption should make many cases an easy call. This, in turn, will allow the Supreme Court to focus its energies on the *actually* hard cases.

Finally, a word in response to Judge Wardlaw. I agree that if we were only dealing with "differing interpretations of the law," then the stern criticism that I've employed here wouldn't be necessary. Concurrence of Wardlaw, J., at 13. But let's stop pretending: our Second Amendment jurisprudence is rooted not in "differing interpretations of the law," but in this court's consistent, long-term, demonstrated refusal to follow the law. If the results in our Second Amendment cases really reflected a diversity of views among the majority of my colleagues, you'd expect a diversity of outcomes. Instead, we have a shockingly

monolithic jurisprudence: the government wins, the Second Amendment loses.

Despite this glaring track record, our court loves to give lip-service to the fiction that "all agree" the Second Amendment is not a "second-class right," and that our court's Second Amendment jurisprudence is simply the byproduct of reasonable disagreement from case-to-case. *Id.* at 11. That is precisely what I am disputing. My point—one Judge Wardlaw never addresses, instead attempting to just shoot the messenger—is that when it comes to the Second Amendment, the "exceptions" *always* win, which can only be explained by an underlying bias against the Second Amendment. *Cf. id.* And because of that, we'll continue discovering and creating as many new "exceptions" as we need to ensure that doesn't change. The content and tone of this dissent is necessary precisely because of our court's consistent attempts, like Judge Wardlaw's here, to simply wave our hands in an attempt to distract from the severity of our Second Amendment recalcitrance by strategically deployed complexity and manipulative calls for faux collegiality. At some point our court's cover-up will stop working. I'm asking the Supreme Court to help in that regard.

If we are truly concerned about the "credibility" of our court, and our reputation as judges, we should follow the law rather than contort it to reach our preferred outcomes. It should go without saying: we should care more about *being* credible than about *looking* credible.

* * *

We should have taken this case en banc. But our refusal to do so surprises no one. Even after *Bruen*, we still have an arsenal of ways to avoid doing the unthinkable: applying the

Second Amendment of the United States Constitution. Like a clever, spoiled child, we've successfully defied the Supreme Court's Second Amendment precedent for nearly two decades. The Supreme Court has let us get away with it. And without some stern correction, we'll continue to do so.

Until the Supreme Court takes more serious and sustained action to correct us, our court's Second Amendment case law will never improve. *Wolford*'s nice, but it literally affects nothing on my court. To paraphrase 17th-century satirist Samuel Butler, "What med'cine else can cure the fits/ Of [judges] when they lose their wits?"[14] Some benchslaps, that's what.

---

TUNG, Circuit Judge, joined by CALLAHAN, R. NELSON, COLLINS, LEE, BRESS, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

This case asks whether California's ban on the carrying of switchblade knives violates the Second Amendment. The panel rejected a facial challenge to this ban, and it did so on the basis of a tradition banning the concealed carrying of knives.

That reasoning is wrong. A tradition prohibiting only *one* form of carry (concealed) but permitting another form of carry (open) does not justify prohibiting *all* forms of carry (concealed and open), which California's ban does. In holding otherwise, the panel retreads a path that the U.S.

[14] Samuel Butler, *Hudibras*, Part II, Canto I, line 841 (Hartford, S. Andrus & Son 1845) (1664).

Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), expressly foreclosed. The panel's decision also conflicts with a State Supreme Court decision concluding that the Second Amendment protects the carrying of switchblade knives.

The panel's reasoning is not just wrong. It should set off alarm bells. If accepted, it would upend *Bruen* and essentially shield from constitutional scrutiny any law that categorically and totally bans the carrying of arms. Never would our court have tolerated, with respect to any other constitutional right, the sort of analytical move that the panel made here. The Supreme Court even reminded us just last month that "[t]he right protected by the Second Amendment is entitled to no less protection than other constitutional rights." *Wolford v. Lopez*, 609 U.S. ---, --- n.13 (2026). We should have granted en banc review to fix the panel's obvious error and its open circumvention of the Supreme Court's instructions. I dissent.

**I.**

**A.**

Perhaps no tool has been more important to man's survival than the knife. Since the Stone Age, knives have been used for all sorts of purposes, including as weapons and cutting tools. Harold L. Peterson, *Daggers and Fighting Knives of the Western World, from the Stone Age till 1900* 1–2 (1968) ("Daggers and Fighting Knives"). When Viking explorers reached American shores a millennium ago, they carried scramasaxes on their persons—bladed "weapons so highly prized, it is said, that they never left their owner's side day or night." Harold L. Peterson, *American Knives: The First History and Collectors' Guide* 6 (1958) ("American Knives"). In the 1600s, English settlers in the colonies

carried knives too—most popularly, the "kidney" knife, with lobes that formed its hilt. *Id.* at 14. In the 1700s, frontiersmen (including those who later fought in the American Revolution) could not do without knives, which were used for scavenging, hunting, and defense. *Id.* at 21; *see also* George C. Neumann, *Swords and Blades of the American Revolution* 14 (1973) ("Swords and Blades") ("Belt and pocket knives, too, accompanied him in the developing eastern settlements and on the western frontier.").

Simply put, "[k]nives and daggers were personal necessities to the early American." Swords and Blades at 227. "Everyone had a knife" during the colonial period, and "[a]s long as a man was required to defend his life," a "knife was a constant necessity." American Knives at 6. Well into the 1800s, too, "men of all walks of life" were "accustomed to wear a knife as a necessary part of their garb." Daggers and Fighting Knives at 68. By the Civil War, "knife manufacture" in the United States "was in full swing"—as "an age of specialization in pocketknives" (of which the switchblade knife was a species) "set in." American Knives at 133, 137.

The switchblade knife, in particular, has had a storied history. Generally defined, a switchblade is a type of pocketknife that releases a folding or sliding blade upon the pressing of a button or lever. "Springblade knives" (a precursor to the modern switchblade) "have been made for hundreds of years because there has always been a need for a pocketknife that can be opened easily when the hands are wet, cold, or covered with gloves." Ben Myers & Lowell Myers, *An Introduction to Switchblade Knives* 6 (1982) ("An Introduction to Switchblade Knives"). In the 1700s, for example, certain types of flint-lock pistols incorporated such

knives; "[i]f the pistol mis-fired (which frequently happened) the person would touch the release button and the blade would open up, and be available for use." *Id.*; *see also* H. Gordon Frost, *Blades and Barrels* 230–32 (1972); *Knife Rights, Inc. v. Bonta*, 165 F.4th 1330, 1333 (9th Cir. 2026) ("Primitive switchblades date back to at least the eighteenth century[.]").

Patents for switchblade knives proliferated immediately after the Civil War. The "gravity knife" (the blade of which is released by gravity as opposed to a spring or other mechanism) was patented in 1862. *See* An Introduction to Switchblade Knives at 94; U.S. Patent No. 35,964 ("This device is particularly intended for carpenters' use, and its principal advantage is that it can be opened and closed with one hand. . . . It is a very simple instrument, which can be used in place of the ordinary pocket-knife, and which can be made at a trifling cost."). Patents for other variants quickly followed—the "compressed spring straight-line knife" (1866); the "coiled-spring side-opening knife" (1878); the "curved-spring side-opening knife" (1883); the "pull-spring knife" (1895); the "compressed spring side-opening knife" (1922); the "pin-pull" knife (1944); and many more. *See* An Introduction to Switchblade Knives at 23–25, 28–29; U.S. Patent No. 57,902; U.S. Patent No. 199,766; U.S. Patent No. 273,858; U.S. Patent No. 551,052; U.S. Patent No. 1,412,373; U.S. Patent No. 2,360,165.

The large-scale production of "switchblades in the United States began in the 1880s, shortly after the first switchblade patents were granted in this country." Mark Erickson, *Antique American Switchblades: Identification & Value Guide* 6 (2004) ("Antique American Switchblades"). "Over a 50 year period from the mid 1890s to the mid 1940s there had been approximately 20 different companies who

had manufactured switchblade knives in this country." *Id.*; *cf. Knife Rights*, 165 F.4th at 1333 ("[M]odern switchblades did not become popularized in the United States until after World War II.").

Switchblade knives served many useful purposes other than as a weapon. For instance, such knives "were extremely handy for the fisherman and there was a time when most tackle boxes were not complete without a switch blade knife inside." Antique American Switchblades at 6. "There were switchblades specifically designed for hunters, fishermen, soldiers, farmers, veterinarians, mechanics, office workers, seamstresses, high school girls, Boy Scouts and also for Girl Scouts." *Id.* The automatic-release feature of the switchblade "save[d] many broken fingernails." *Id.*; *see also* 13-ER-3219 ("Automatic Push Button Knife by Edgemaster").

The switchblade, the Department of Justice had opined, "is not inherently dangerous but requires the introduction of a wrongful human element to make it so." Letter from Deputy Attorney General William P. Rogers to Representative Oren Harris (Apr. 12, 1957), *in* Senate Report No. 1980 (July 28, 1958) (responding to a congressional request for the Department's view concerning a bill that would "prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives"). "Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons." *Id.* But "they serve useful and even essential, purposes in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits[.]" *Id.*; *see also* Paul Clark, *Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?*, 13 Conn. Pub. Int. L.J. 219, 233 (Spring-Summer 2014) (detailing

"numerous" examples of "useful" purposes that switchblades serve including a "medical provider" "need[ing] to use one hand to push pressure on a wound" and "us[ing] the other hand to cut away clothing or restraints").

It was not until the 1950s that legislatures sought to ban a person from carrying a switchblade knife. Motion-picture films made during this period portrayed the phenomenon of teenage gang violence, linked such violence with the switchblade knife, and galvanized support for switchblade bans. *See* An Introduction to Switchblade Knives at 9; Clark, *Criminal Use of Switchblades*, 13 Conn. Pub. Int. L.J. at 236 ("Some of the most famous movies of the 1950s prominently featured switchblades . . . . Switchblades came to be associated with crime, and especially juvenile delinquency in New York."); *see also* Jack H. Pollack, *The Toy that Kills*, Woman's Home Companion, Nov. 1950, at 38.

In 1957, the State of California banned a person from carrying "concealed upon his person" a "switch-blade knife having a blade over two inches in length." Cal. Stats. 1957, c. 355, p. 999, § 1. That statute did not ban, however, the open carrying of a switchblade knife. Thirty years later, the California legislature amended the law to prohibit not only the concealed carry of the switchblade knife, but also the open carrying of that knife. Cal. Stats. 1986, c. 1422, p. 5116, § 1. The current version of the prohibition remains materially unchanged. As relevant here, the statute makes it a crime for a person to carry a switchblade knife (whether

openly or in a concealed manner in public). *See* Cal. Pen. Code §§ 21510, 17235.[1]

**B.**

Plaintiffs brought a challenge, under the Second and Fourteenth Amendments, to the California statute banning the carrying of switchblade knives. The Second Amendment (incorporated by the Fourteenth Amendment to the States) provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has instructed us to follow a two-step test in assessing whether a challenge under the Second Amendment is valid—first, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; and second, "[t]o justify its regulation, the government may not

[1] California's Penal Code § 21510 states: "Every person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor: (a) Possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public; (b) Carries the knife upon the person; (c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person." Cal. Pen. Code § 17235 defines a switchblade knife as "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever." This definition "does not include a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back toward its closed position." *Id.*

simply posit that the regulation promotes an important interest." *Bruen*, 597 U.S. at 17. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only if an arms "regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Before the district court, Plaintiffs argued that, under *Bruen*, California's ban on the carrying of switchblade knives is unconstitutional. Plaintiffs claimed that the conduct of carrying such knives fell within the scope of the Second Amendment's plain text (step one of *Bruen*) and that the State of California failed to shoulder its burden of demonstrating (at step two) that its ban was consistent with this Nation's historical tradition of arms regulation. 5-ER-1055–74.

The district court granted summary judgment against Plaintiffs. It reasoned that Plaintiffs failed to satisfy step one of the *Bruen* test because Plaintiffs failed to show that switchblade knives were "arms" in common use today. *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL, 2024 WL 4224809, at *7 (S.D. Cal. Aug. 23, 2024). The district court also concluded that the State had not met its burden at step two, but because in the court's view Plaintiffs failed at step one, the district court upheld the ban. *Id.* at *8–9.

The panel sustained the ban on different grounds. It assumed (without deciding) that, at step one of *Bruen*, switchblades were "arms" presumptively protected under the Second Amendment. *Knife Rights*, 165 F.4th at 1339.

But the panel held that the State satisfied step two (thus rebutting the presumption) by demonstrating a national tradition analogous to California's ban. *Id*. at 1345.

The panel conducted the step-two analysis in the following way. First, the panel construed Plaintiffs' challenge as a facial challenge and required Plaintiffs to show that the ban was unconstitutional "in all of its applications." *Id*. at 1335. Next, the panel asserted that one of those applications is a prohibition on the *concealed* carrying of switchblade knives—even though the statute does not distinguish between concealed carry and open carry, but criminalizes, on its face, any carrying of switchblade knives. *Id*. at 1341–45. The panel then found that there was a historical tradition banning the concealed carrying of weapons, including knives, and therefore there was an application of the ban that was lawful. *Id.* at 1341. Critical to its analysis, the panel relied on the Supreme Court's statement in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that "prohibitions on carrying concealed weapons were lawful under the Second Amendment[.]" *Knife Rights*, 165 F.4th at 1341 (quoting *Heller*, 554 U.S. at 626). Accordingly, the panel concluded, Plaintiffs' facial challenge could not succeed.

## II.

The panel's opinion is flawed. In sustaining California's total ban on public carry, the panel invoked a historical tradition of laws banning the carrying of *concealed* weapons (including firearms and knives) while ignoring that those same laws also allowed for the *open* carrying of those weapons. The panel's reasoning runs directly counter to *Bruen*. As the Supreme Court made clear in that case, a tradition of concealed-carry bans is not enough to justify a

*total* ban like the one that California imposes on its citizens. *Bruen*, 597 U.S. at 53.

To justify California's total ban, the panel cites *Heller*'s statement that "prohibitions on carrying concealed weapons were lawful under the Second Amendment." *Knife Rights*, 165 F.4th at 1341 (quoting *Heller*, 554 U.S. at 626). But that statement cannot bear the weight that the panel places on it. Addressing the very same quotation that the panel cites, *Bruen* concluded that "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry." 597 U.S. at 53 (emphasis in original). In other words, concealed-carry prohibitions would *not* be constitutional if they *also* banned open carry. *Id*. at 54 ("[I]t was considered beyond the constitutional pale in antebellum America to altogether prohibit public carry."). Here, California bans both concealed and open carry of switchblades, and hence it is not proper for the panel to invoke laws that ban only concealed carry as historical support for a ban on public carry altogether.

The relevant passage from *Bruen* is worth quoting in full, not only because the panel disregarded it entirely, but also because it shows that the Supreme Court expressly rejected the exact reasoning that the panel employs here:

> In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. As we recognized in *Heller*, "the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."

> Respondents unsurprisingly cite these statutes—and decisions upholding them—as evidence that States were historically free to ban public carry.
>
> In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents' cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. . . . All told, these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of "arms" protected by the Second Amendment or state analogues.

*Id*. at 52–55 (emphasis in original) (citations omitted).

The import of all this is plain. Just like the government parties in *Bruen*, the panel here mistakenly relies on laws that contain a concealed-carry prohibition but *not* a similar prohibition on open carry. As far as I can gather, there is no historical tradition of totally banning the public carrying of knives (including switchblades).

Indeed, the opposite appears to be true. The vast majority of laws the panel itself cites *allowed* some sort of public carry (usually open carry). *See* Appendix A. Even today, it appears that only seven States (including California) and the District of Columbia expressly ban the possession or carrying of switchblade knives.[2] Doubtless, a

[2] *See* Cal. Pen. Code § 21510; Conn. Gen. Stat § 53-206; D.C. Code § 22–4514(a); Minn. Stat. § 609.66 subd. 1(a)(4); N.J. Stat. § 2C:39-3(e); N.M. Stat. § 30-7-8; N.Y. Penal L. § 265.01(1); Wash. Rev. Code

small handful of territorial laws cited by the panel banned the carrying of knives (*see* Appendix B), but *Bruen* already explained that the government's reliance on such territorial laws was misplaced (*e.g.*, they were "rarely subject to judicial scrutiny," the populations living under them were "miniscule," and they were "short-lived"), and those scattered laws could not, in any event, displace the overwhelming historical evidence permitting some form of public carry. *See* 597 U.S. at 67–69. A few other laws cited by the panel are irrelevant—either because those laws did not prohibit knives at all or because they prohibited the carrying of knives *with intent to harm* or *in sensitive places* (qualifications that California's total ban lacks). *See* Appendix C. The few remaining laws that the panel cites did ban public carry of knives altogether (*see* Appendix D (fewer than ten)), but those are limited "outliers" in relation to the far more widespread tradition permitting some form of public carry. *Bruen*, 597 U.S. at 70.[3] Contrary to the panel's conclusion, then, there is no national tradition that is analogous to California's total ban on the public carrying of switchblades.[4] That alone provides grounds to vacate the panel's opinion.

§ 9.41.250(1)(a). Delaware had a switchblade prohibition that was repealed in 2025. *See* 2025 Del. L. Ch. 119 (S.B. 108) (repealing 11 Del. C. § 1446). Another provision does state that "[n]o person licensed or unlicensed shall possess, sell, or offer for sale any switchblade knife," but that provision appears to apply only to dealers. 24 Del. C. § 901.

[3] Indeed, as *Bruen* discusses, one of the statutes the panel cites—1837 Ga. Acts. 90, § 1—was held to be unconstitutional to the extent the statute banned "bearing arms openly." *Bruen*, 597 U.S. at 54 (citing *Nunn v. State*, 1 Ga. 243, 251 (1846)).

[4] The panel notes that "Dr. Spitzer" (the State's expert) "found that at least '15 states banned all carrying of Bowie knives[.]'" *Knife Rights*,

The panel cannot point to its "facial" analysis to salvage its opinion. It is true (as the panel says) that a facial challenge can succeed only if the plaintiff shows that there exists "no set of circumstances" under which the law would be valid. *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). But beyond that, the panel's analysis veers off track: one "application" of the *total* ban, the panel says, is a ban on the *concealed* carrying of the knife; the panel then narrows its historical inquiry to ask if there was a tradition banning such concealed carrying. *Knife Rights*, 165 F.4th at 1341. But that "facial" analysis is improper. The challenged statute is a *total* ban—*not* a concealed-carry ban. And so, any historical analysis (under the second step of *Bruen*) must be conducted with respect to *that* ban—not some other, narrower ban that the legislature did not enact. The proper historical comparator, therefore, would be a tradition banning public carrying altogether (like California's law). If (as here) no such tradition exists, the total ban cannot be constitutional under any circumstance.

---

165 F.4th at 1344. But Dr. Spitzer himself conceded in deposition that this tally was inaccurate—two of the cited laws, he admitted, did not ban "all carrying" but banned concealed carrying. 10-ER-2551–53; *see also* 10-ER-2556 (Q: "[W]ould you state that 15 states banned all carrying of Bowie knives?" A: "No. . . . I may have simply been mistaken."); *see also* Appendix E. Moreover, a few of the other "states" he cited were, in fact, *territories*, which *Bruen* already instructed us to discount. *See* Appendix E. Still other laws he cited prohibited only carry with intent to harm or in sensitive places—they did not ban public carry altogether. *See id.*; *see also* 10-ER-2555. Despite the expert's confessed errors, the State continued to represent (wrongly) that "15 states" "banned both open and concealed carry[.]" Ans. Br. at 35. The State's (and the panel's) reliance on a report admitted by its own author as inaccurate is, to put it mildly, misguided.

It is hard to see how the analysis could proceed otherwise. If a total ban could always be reconceived as a narrower ban (as the panel would allow), then a total ban would survive any Second Amendment facial challenge. On the panel's logic, one "application" of a total ban could be to prohibit a violent felon from carrying a firearm. Another "application" could be prohibiting a person from carrying that firearm with the intent to terrify surrounding passers-by. Because such "applications" would likely be permissible, a facial challenge to a total ban would always fail, if we followed the panel's logic. That is not the law. *Bruen* and *Heller* invalidated certain gun bans on their face.[5] The Court did not reconceptualize the bans in a narrow way to see if those narrower, imagined versions of the law could withstand constitutional scrutiny. If the panel were right, courts could maneuver with ease around *Bruen* and *Heller* merely by reconceiving the bans as something narrower. But a court must take the ban as it comes. And it must assess the government's proffered historical analogues against *that* ban, not some other ban. A court is not allowed, by clever craft, to immunize total bans from facial constitutional

---

[5] *Compare* Amended Complaint ¶ 46, *New York State Rifle & Pistol Ass'n v. Beach* (*Bruen* Complaint), No. 18-cv-134-BKS-ATB (N.D.N.Y. filed May 16, 2018) ("facially" attacking New York's law requiring "proper cause" to conceal-carry firearms while also banning open carry), *with Bruen*, 597 U.S. at 71 (holding that New York's law "violates the . . . right to keep and bear arms"); *see Antonyuk v. James*, 120 F.4th 941, 986 (2d Cir. 2024) ("*Bruen* was a facial challenge"). *Compare also* Complaint ¶¶ 15, 22, *Parker v. District of Columbia*, No. 1:03-cv-02131 (D.D.C. filed Nov. 6, 2003) (*Heller* Complaint) (attacking D.C.'s law banning "the home ownership and possession of handguns by private citizens"), *with Heller*, 554 U.S. at 635 (holding that "the District's ban on handgun possession in the home violates the Second Amendment"); *see also City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (describing *Heller* as addressing a "[f]acial challenge[]").

scrutiny and reduce our "palladium of liberty" to a near nullity. *Heller*, 554 U.S. at 606 (quoting 1 Tucker's Blackstone at App. 300).

Invoking *Rahimi* does not help the panel. There, the Court rejected the plaintiff's facial challenge to 18 U.S.C. § 922(g)(8). That statute prohibits the carrying of a firearm by any person who is subject to a "court order" (issued after notice and opportunity for a hearing) that restrains the person from threatening an intimate partner or child, and that either (1) "includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child" or (2) "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury[.]" 18 U.S.C. § 922(g)(8)(C)(i), (C)(ii). The two ways described above in which the "court order" could subject a person to criminal liability under section 922(g)(8) are contained, respectively, in sub-provisions (C)(i) and (C)(ii). The Court in *Rahimi* held that, in order for the plaintiff to prevail in his facial challenge to section 922(g)(8), he needed to show that *both* sub-provisions were unconstitutional and, because he could not do that with respect to sub-provision (C)(i), his challenge to section 922(g)(8) necessarily failed. 602 U.S. at 693.

That analysis has no bearing here on California's total carry ban. To start, California prohibits any law-abiding citizen from carrying a tool that has been used and carried for hundreds of years. It does not just impose a ban on persons, deemed dangerous by a court, from possessing arms. California's law is thus completely different from section 922(g)(8). Key to the Court's facial analysis in *Rahimi*, too, section 922(g)(8) "provides two independent bases for liability." 602 U.S. at 693. Thus, if one basis was

constitutionally permissible (as the Court found), then the plaintiff's facial challenge to section 922(g)(8) would not succeed.

But that is just *not* the sort of challenge that Plaintiffs mount here. Plaintiffs challenge a *total* ban on public carry; it is the *combined effect* of banning both concealed carry and open carry that works the constitutional violation. For the panel to disaggregate one effect (a ban on concealed carry) from the other effect (a ban on open carry), and then to find that the former is permitted and conclude that Plaintiffs' challenge fails, is to misconstrue the nature of Plaintiffs' claim altogether.

Perhaps it is easier to see the fallacy in the panel's logic if we removed ourselves from the often-fraught Second Amendment context. A facial challenge to a *complete* prohibition on a litigant's access to the courts is not defeated simply because it would be permissible to deny access *some of the time* (e.g., non-business hours and federal holidays). Nor would a facial challenge to a complete ban on protesting be defeated merely because protesting could lawfully be restricted by time, place, and manner. So too here: a facial challenge to a *complete* prohibition on carrying cannot be nixed just because the State could permissibly prohibit *some form* of carrying. The State cannot ban *all* forms of carrying (as *Bruen* teaches). That is what Plaintiffs are challenging.

Even if the ban here could be conceived more narrowly, the panel's conclusion would still be wrong. *Bruen* again tells us why. The case addressed a facial challenge to a concealed-carry restriction, and even in the context of that narrow challenge (not a challenge to a total ban), the Court held that the government could not justify the concealed-carry restriction by pointing to a history of concealed-carry

prohibitions, which (again) "were constitutional" only because "they did not similarly prohibit *open* carry." 597 U.S. at 53 (emphasis in original).[6] The upshot is this: if reliance on historical concealed-carry bans could not defeat a challenge to a modern concealed-carry restriction in *Bruen*, then surely it cannot defeat a challenge to a narrowed conception of California's ban as "applied" to concealed carry here.

En banc review was warranted not only because the panel's analysis is wrong. It was warranted also because the panel's decision produces a conflict with the decision of at least one State Supreme Court.[7] In *Commonwealth v. Canjura*, the Supreme Judicial Court of Massachusetts held that a state law prohibiting people from carrying switchblade knives violated the Second Amendment. 494 Mass. 508, 509 (2024). The court concluded that a switchblade is an "arm" under "the plain text of the Amendment" and that the government failed to demonstrate that the state "prohibition is consistent with this nation's historical tradition of arms

[6] That is why Judge Wardlaw is wrong when she states that "California's switchblade regulations *constitutionally* prohibit concealed carry." Conc. at 10 n.2 (emphasis added). *Bruen* makes clear that a prohibition on concealed carry is *not* constitutional when open carry is *also* prohibited.

[7] Judge Wardlaw acknowledges a conflict with a decision of the Supreme Judicial Court of Massachusetts but contends that this does not support en banc review. Conc. at 11 n.3. To be sure, Federal Rule of Appellate Procedure 40(b)(2) does not require specification of a state-supreme-court conflict in a petitioner's statement. But such a conflict supports the notion that "the proceeding involves one or more questions of exceptional importance." Fed. R. App. P. 40(b)(2)(D). In any event, the panel's decision "conflicts with a decision of the United States Supreme Court" (Fed. R. App. P. 40(b)(2)(B))—*Bruen*—which is sufficient to justify en banc review.

regulation." *Id.* at 511. The court also ruled that switchblades are in "common use" today for self-defense and are not "dangerous and unusual" weapons. *Id.* at 515–16; *see also State v. Delgado*, 298 Or. 395, 403–04 (1984) (holding that the prohibition on the carrying of a switchblade knife violated the defendant's right to bear arms under the Oregon Constitution). The Supreme Judicial Court of Massachusetts has the better view, and we should have taken this case en banc to correct the panel's plain error.

* * *

I do not deny that the switchblade has been "associated" in the public imagination "with criminal activity." *Knife Rights*, 165 F.4th at 1333. The spate of laws passed to prohibit the carrying of such a device may have had its impetus in films released in the 1950s, after which the switchblade became the symbol of teenage crime and gang violence. But the constitutional validity of such laws depends not on modern fads or Hollywood vibes, but on what the Second Amendment protects as a matter of original meaning. Sound constitutional adjudication requires, then, a fair assessment of what our Nation's history and traditions proscribed. The panel failed in that task when it rejected Plaintiffs' constitutional challenge. Even on the panel's own evidence, no historical tradition exists in our country of completely banning the public carry of knives. Just the reverse—"the history reveals a consensus that States could *not* ban public carry altogether." *Bruen*, 597 U.S. at 53 (emphasis in original). Yet that is just what California has done. I respectfully dissent.

## Appendix A

Laws that are cited by the panel and that prohibit concealed carry but allow open carry. These laws appear in alphabetical order by jurisdiction.

| Number | Law | Text |
|---|---|---|
| 1 | Act of Feb. 1, 1839, No. 77, § 1, 1839 Ala. Acts 67, 67 | That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending, shall on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court. |
| 2 | Act of Apr. 8, 1873, No. 87, § 1, 1872–1873 Ala. Laws 130, 130–31 | That any person who carries concealed about his person brass knuckles, slung shot, or either weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for |

| | | |
|---|---|---|
| | | the county for a term not exceeding six months. |
| 3 | ARIZ. REV. STAT. § 662 (1887) | Any person in this territory having or carrying concealed any dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol, or other weapon within any city, village or town in this territory, shall be fined in any sum not more than three hundred dollars, or be imprisoned in the county jail not more than six months, or be punished by both such fine and imprisonment. |
| 4 | Act of Mar. 6, 1891, No. 2, § 1, 1893 Ariz. Sess. Laws 3, 3 (brackets in original) | It shall be unlawful for any person [except a peace officer in actual service and discharge of his duty] to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense. |
| 5 | Act of Apr. 27, 1863, ch. 485, § 1, 1863 Cal. Stat. 748, 748 | Every person, not being a peace officer or traveler, who shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed, shall, |

| | | |
|---|---|---|
| | | upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the County Jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. |
| 6 | Act of Mar. 1, 1864, ch. 128 § 1, 1863–1864 Cal. Stat. 115, 115–16 | Every person not being peace officer, Provost Marshal, enrolling officer, or officer acting under the laws of the United States in the Department of the Provost Marshal of this State, State and Federal Assessors, Collectors of Taxes and Licenses while in the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the County Jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. |
| 7 | Oakland, Cal., Ordinance No. | It shall be unlawful for any person in the City of Oakland, not being a |

| | | |
|---|---|---|
| | 1141, § 1 (May 15, 1890), *reprinted in* City Charter of the City of Oakland, Cal., also General Municipal Ordinances of Said City in Effect October 1, 1898, at 332–33 (Oakland, Enquirer Publ'g Co. 1898) | public officer or a traveler actually engaged in making a journey, to wear or carry concealed about his person without a permit, as hereinafter provided, any pistol, slung-shot, brass or iron knuckles, sand club, dirk or bowie knife, or iron bar or other dangerous or deadly weapon, or any sling or other contrivance by which shot or other missiles are or may be hurled or projected. A written permit may be granted by the Mayor for a period of not to exceed one year to any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person. |
| 8 | Stockton, Cal., Ordinance No. 53, § 1 (Being originally No. 324, approved Mar. 31, 1891, as amended), *reprinted in* Charter and Ordinances of the City of Stockton 240 (Stockton, | It shall be unlawful and a misdemeanor . . . [f]or any person not being a peace officer or actually prosecuting a journey to or from the town, city or county of his residence, to wear or carry concealed about his person any pistol, dirk, bowie-knife, slungshot, sand-club, metallic knuckles or any other deadly or dangerous weapon, except he first have a written permit to so do from the Mayor of the City of Stockton. |

Case: 24-5536, 07/16/2026, DktEntry: 58.1, Page 63 of 138



| | | |
|---|---|---|
| | Stockton Mail, Printers & Bookbinders 1908) | |
| 9 | Act of Apr. 10, 1891, § 1, 1891 Colo. Sess. Laws 129, 129 | If any person, or persons shall within any city, town or village in this State, whether the same is incorporated or not carry concealed upon his, her or their person any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon, such person, or persons shall upon conviction thereof before any police magistrate or justice of the peace, be punished by imprisonment in the county jail for a term not exceeding thirty days, or by a fine of not more than fifty dollars with costs or by both such fine and imprisonment, in the discretion of the court; and in case any such fine is not paid, the offender may be committed to, and confined in the county, or city jail one day for each two dollars of such fine, or until such fine is paid in money or by such confinement. |
| 10 | Washington, D.C., Act Against the Carrying of | It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such |

| | | |
|---|---|---|
| | Concealed Weapons (Nov. 18, 1858), *reprinted in* William B. Webb, The Laws of the Corporation of the City of Washington 418 (1868) | as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: *Provided*, That the Police officers when on duty shall be exempt from such penalties and forfeitures. |
| 11 | Georgetown, D.C., An Ordinance Prohibiting the Carrying of Firearms, &c. (Apr. 2, 1859), *reprinted in* Ordinances of the Corporation of Georgetown 22–23 (1860) | That from and after the 1st of April, 1859, it shall not be lawful for any person or persons to have about their persons any concealed deadly or dangerous weapons, such as daggers, pistols, bowie-knives, dirk-knives, colt, slung-shots, or brass or other metallic knuckles, within the limits of this Corporation; and any person or persons who shall be duly convicted of so carrying or having on their persons any such weapons, shall forfeit and pay upon such conviction not less than five dollars |

| | | |
|---|---|---|
| | | nor more than twenty dollars, which fine shall be prosecuted and recovered in the same manner as other fines and forfeitures according to this Corporation are sued for and recovered: *Provided*, That the police officers and military, when on duty, shall be exempt from such fines and forfeitures.<br><br>*And be it further enacted*, That all such weapons named above shall be taken away from the persons on whom they may be found, and deposited with the Mayor. |
| 12 | Act of Aug. 10, 1871, ch. 25, § 1, 1871–1872 D.C. Laws 33, 33 (1872) | That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the |

| | | |
|---|---|---|
| | | same manner as other penalties and forfeitures are sued for and recovered: *Provided*, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures. |
| 13 | Act of Jan. 30, 1835, ch. 860 § 1, 1835 Fla. Acts 318, 318 | That from and after the passage of this Act, it shall not be lawful for any person in this Territory, to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending, shall on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the |

| | | |
|---|---|---|
| | | superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several Counties in this Territory, at every session of the Courts. |
| 14 | BOISE CITY, IDAHO, CHARTER AND REV. ORDINANCES ch. 1, § 36, approved May 1, 1879 (1894) | Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or othe[r] dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment. |
| 15 | HYDE PARK, ILL., LAWS AND ORDINANCES ch. 27, § 39 (1876) | No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except |

| | | |
|---|---|---|
| | | by written permission of the Captain of Police. |
| 16 | Sioux City, Iowa, Ordinance on Public Safety, § 4 (June 16, 1882) | No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife, or dagger, or any knife resembling a dirk-knife or bowie knife, or other dangerous weapon. *Provided*, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties. |
| 17 | LEAVENWORTH, KAN., CHARTER AND ORDINANCES No. 32, § 23, approved Mar. 28, 1862 (1863) | For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars. |
| 18 | Act of Mar. 10, 1854, ch. 1020 | § 1. . . . That if any person shall hereafter carry concealed any deadly |

Case: 24-5536, 07/16/2026, DktEntry: 58.1, Page 69 of 138



| | | |
|---|---|---|
| | §§ 1–2, 1853 Ky. Acts 186, 186 | weapons, other than an ordinary pocket knife, except as provided in the next section, he shall be fined on the first conviction not less than fifty nor more than one hundred dollars, and on any subsequent conviction not less than one hundred nor more than five hundred dollars.<br><br>§ 2. That the carrying of concealed deadly weapons shall be legal in the following cases: 1. Where the person has reasonable grounds to believe his person, or the person of some of his family, or his property, is in danger from violence or crime. 2. Where sheriffs, constables, marshals, and policeman carry such weapons as are necessary to their protection in the efficient discharge of their duty. 3. Where persons are required by their business or occupation to travel during the night, the carrying concealed deadly weapons during such travel. |
| 19 | Act of Mar. 25, 1813, § 1, 1812 La. Acts 172, 172–75 | That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view, any |

| | | |
|---|---|---|
| | | person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . . |
| 20 | Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 130, 148 | That whoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution by indictment or presentment, and on conviction for the first offence shall be fined not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for one month; and for the second offence not less than five hundred dollars nor more than one thousand dollars, or imprisonment in the parish prison at the discretion of the court, not to exceed three months, and that it shall be the duty of the Judges of the District Courts in this State to charge the Grand Jury specially as to this section. |
| 21 | Act of Feb. 26, 1872, ch. 42 § 1, 1872 Md. Laws 56, 57 | It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other |

| | | |
|---|---|---|
| | | deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected . . . . |
| 22 | Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144, 144 | That it shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air-gun, stiletto, metallic knuckles, pocket-billie, sand-bag, skull-cracker, slung-shot, razor, or other offensive and dangerous weapon or instrument concealed upon his person. |
| 23 | Act of Mar. 28, 1891, No. 257, § 15, 1891 Mich. Pub. Acts 388, 409 | And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned. . . . |

| | | |
|---|---|---|
| 24 | Act of June 2, 1897, No. 465, § 15, 1897 Mich. Pub. Acts 962, 1030 | And all persons who shall carry, concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles or other dangerous weapon; . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution; and in the imposition of any such fine and costs, the court may make a further sentence that in default of the payment thereof, such offender be imprisoned . . . . |
| 25 | SAINT PAUL, MINN., MUNICIPAL CODE art. 18, § 308, passed Jan. 17, 1882(1884) | It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. |
| 26 | Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175, 175 | That any person not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a journey, or peace officers, or deputies in discharge of |

| | | |
|---|---|---|
| | | their duties, who carries concealed, in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description, shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . . . |
| 27 | Act of Mar. 11, 1896, ch. 104, § 1, 1896 Miss. Laws 109, 109–10 | Any person who carries concealed, in whole or in part, any bowie knife, dirk knife, butcher knife, pistol, brass or metallic knuckles, sling shot, sword or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and on conviction, shall be punished by a fine of not less than ten dollars nor more than one hundred dollars, and be imprisoned in the county jail not less than one month nor more than three months. |
| 28 | Act of Feb. 11, 1898, ch. 68, § 1, 1898 Miss. Laws 88, 88 | Any person who carries concealed, in whole or in part, any bowie knife, dirk knife, butcher knife, pistol, brass or metallic knuckles, slingshot, sword or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and on conviction shall be punished, unless |

| | | |
|---|---|---|
| | | the jury shall say in its verdict there shall be no imprisonment, by a fine of not less than twenty-five dollars ($25) nor more than one hundred dollars ($100), or by imprisonment in the county jail not more than three months, or both, in the discretion of the court; but the jury may return a verdict that there shall be no imprisonment, and in such case the court shall impose a fine only. |
| 29 | LINCOLN, NEB., ORDINANCES AND RULES, ch. 14, art. 16, § 782 (1895) | It shall be unlawful for any person within [Lincoln] to carry about the person any concealed pistol, revolver, dirk, bowie knife, billy, sling-shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge of their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be subject to the penalty hereinafter provided. |
| 30 | Act of Feb. 27, 1867, ch. 30 § 1, 1867 Nev. Stat. 66, 66 | Every person, not being a peace officer or traveler, who shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any Court of competent jurisdiction, be |

| | | |
|---|---|---|
| | | deemed guilty of misdemeanor, and shall be imprisoned in the County Jail for not less than thirty, nor more than ninety days, or fined in any sum not less than twenty, nor more than two hundred dollars. |
| 31 | Act of Apr. 19, 1686, ch. 9, *reprinted in* The Grants, Concessions, and Original Constitutions of the Province of New Jersey 289 (1758) | Whereas there hath been great complaint by the Inhabitants of this Province, that several Persons wearing Swords, Daggers, Pistols, Dirks, Stilladoes, Skeines, or any other unusual or unlawful Weapons, by reason of which several Persons in this Province, receive great abuses, and put in great Fear and Quarrels, and Challenges made, to the great abuse of the Inhabitants of this Province . . . . AND BE IT FURTHER ENACTED by the Authority aforesaid, that no Person or Persons after Publication hereof, shall presume privately to wear any Pocket Pistol, Skeines, Stilladers, Daggers or Dirks, or other unusual or unlawful Weapons within this Province, upon Penalty for the first Offence *Five Pounds*, and to be committed by any Justice of the Peace, his Warrant before whom Proof thereof shall be made, who is here by authorized to enquire of and proceed in the same, and keep in |

| | | |
|---|---|---|
| | | Custody till he hath paid the said *Five Pounds*, one half to the publick Treasury for the use of this Province, and the other half to the Informer: And if such Person shall again Offend against this Law, he shall be in like manner committed (upon proof thereof before any Justice of the Peace) to the common Gaol, there to remain till the next Sessions, and upon conviction thereof by Verdict of twelve Men, shall receive Judgment to be in Prison six Month, and pay *Ten Pounds* for the use aforesaid. AND BE IT FURTHER ENACTED by the Authority aforesaid, that no Planter shall Ride or go Armed with Sword, Pistol or Dagger, upon the penalty of *five Pounds*, to be levied as aforesaid, excepting all Officers, Civil and Military, and Soldiers while in actual Service, as also all Strangers, Travelling upon their lawful Occasions thro' this Province, behaving themselves peaceably. |
| 32 | Jersey City, N.J., Ordinance to Prevent the Carry of Loaded or Concealed | That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her |

Case: 24-5536, 07/16/2026, DktEntry: 58.1, Page 77 of 138



| | | |
|---|---|---|
| | Weapons § 1, (June 20, 1873) *reprinted in* Ordinances of Jersey City 41 (1874) | person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. |
| 33 | Jersey City, N.J., Ordinance in Relation to the Carrying of Dangerous Weapons § 1, (June 20, 1873) *reprinted in* Ordinances of Jersey City 41 (1874) | That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. |
| 34 | Hoboken, N.J., Ordinance to Prevent the Carry of Loaded or Concealed Weapons § 1 (Oct. 17, 1885) *reprinted in* Ordinances of | That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of the city of Hoboken, to carry, have or keep concealed on his or her person any instrument or weapon commonly known as slung shot, stilletto, billy, sand-club or metal knuckles, and any dirk or dagger not contained as a blade of a |

| | | |
|---|---|---|
| | the City of Hoboken 240-41 (1892) | pocket knife, and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense, provided nevertheless that this and the following section shall not apply to any person or persons who shall have made an application to and received a written permit therefor from the board of police commissioners on recommendation of the chief of police of said city of Hoboken, or in his absence from the acting chief of police of said city. |
| 35 | Act of Jan. 14, 1853, § 1, 1852 N.M. Laws 67, 67 | That each and every person is prohibited from carrying short arms, such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act, shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days. |
| 36 | Act of Feb. 16, 1877, ch. 104, § 1, 1876–1877 N.C. Sess. | If any person shall be found off of his own premises, within the county of Alleghany, having concealed about his person a pistol, bowie-knife, dirk, dagger, slung-shot, |

| | | |
|---|---|---|
| | Laws 162, 162-63 | loaded cane, or brass or iron knuckles, or other deadly weapon of a like kind, such person shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined or imprisoned at the discretion of the court. |
| 37 | Act of Mar. 5, 1879, ch. 127, § 1, 1879 N.C. Sess. Laws 231 | That it shall be unlawful for any person in this state, except when upon his own premises, to carry concealed about his person any pistol, bowie-knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or other deadly weapon of like kind. |
| 38 | TERR. DAK. REV. PEN. CODE § 457 (1877) | Every person who carries concealed about his person any description of fire-arms, being loaded or partly loaded or any sharp or dangerous weapon such as is usually employed in attack or defense of the person, is guilty of a misdemeanor. |
| 39 | Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56, 56 | That whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or |

| | | |
|---|---|---|
| | | imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. |
| 40 | Act of Feb. 18, 1885, § 1, 1885 Or. Laws 33, 33 | It shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or any knife (other than an ordinary pocket-knife), or any dirk or dagger, slungshot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person. |
| 41 | Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231, 231-32 | No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description, concealed upon his person: *Provided*, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such |

| | | |
|---|---|---|
| | | officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. |
| 42 | Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447, 448 | That any person carrying a pistol, dirk, dagger, slung shot, metal knuckles, razors, or other similar deadly weapon usually used for the infliction of personal injury, concealed about his person, shall be guilty of a misdemeanor, and, upon conviction thereof, before a Court of competent jurisdiction, shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court. |
| 43 | Act of Feb. 17, 1897, No. 251, § 1, 1897 S.C. Acts 423, 423 | Any person carrying a pistol, dirk, dagger, slingshot, metal knuckles, razor or other deadly weapon usually used for the infliction of personal injury concealed about his person shall be guilty of a misdemeanor, and upon conviction thereof before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum of not more than one hundred |

| | | |
|---|---|---|
| | | dollars and not less than twenty dollars or be imprisoned not more than thirty nor less than ten days, in the discretion of the Court. |
| 44 | Act of Jan. 27, 1838, ch. 137, § 2, 1838 Tenn. Acts 200 | That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months. |
| 45 | Act of Mar. 6, 1882, ch. 219, 1881–1882 Va. Acts 233, 233 | If a person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, or any weapon of the like kind, he shall be fined not more than fifty dollars, nor less than fifteen dollars. |
| 46 | Act of Feb. 22, 1884, ch. 148 § 1, 1883–1884 Va. Acts 180, 180 | If a person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than |

| | | |
|---|---|---|
| | | twenty dollars nor more than one hundred dollars . . . . |
| 47 | Act of Mar. 4, 1896, ch. 745 § 1, 1895–1896 Va. Acts 826, 826 | If a person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars, *or be committed to jail not more than thirty days, or both in the discretion of the court or jury trying the case*, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind shall be forfeited to the commonwealth and may be seized by an officer as forfeited. |
| 48 | Act of Jan. 20, 1886, § 1, 1885–1886 Wash. Sess. Laws 81, 81-82 | If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other firearms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than twenty dollars, nor more than one hundred dollars, or |

| | | |
|---|---|---|
| | | imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court[.] |
| 49 | Act of Feb. 14, 1872, ch. 7, 1872 Wis. Sess. Laws 17, 17–18 | If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: *provided*, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or |

Case: 24-5536, 07/16/2026, DktEntry: 58.1, Page 85 of 138



| | | |
|---|---|---|
| | | property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent. |
| 50 | Act of Apr. 10, 1883, ch. 183(6) § 3, 1883 Wis. Sess. Laws 704, 713 (City of Oshkosh) | The common council . . . shall have authority by ordinances, resolutions or by-laws: . . . To regulate or prohibit the carrying or wearing by any person under his clothes, or concealed about his person, of any pistol or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon; and to provide for the confiscation or sale of such weapon. |
| 51 | Act of Apr. 11, 1887, ch. 409(4), § 36(53), 1887 Wis. Sess. Laws 1284, 1308 (City of Berlin) | The common council . . . shall have authority, by ordinances, resolutions, by-laws or vote: . . . To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person of any pistol, slingshot, knuckles of lead, brass or other metal, or bowie knife, dirk knife, dagger, or other dangerous or deadly weapon; and to |

| | | |
|---|---|---|
| | | provide for the confiscation and sale of such weapon. |

## Appendix B

Laws that are cited by the panel and that governed territories and prohibited public carry. These laws appear in alphabetical order by territory.
This list does not include any laws in Appendix A.

| Number | Law | Text |
|---|---|---|
| 1 | Act of Mar. 18, 1889, No. 13, § 1, 1889 Ariz. Sess. Laws 30, 30 | If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried. |
| 2 | Act of Feb. 2, 1860, §§ 1–2, N.M. Laws 94, 94–99 | SECTION 1. That, from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or |

| | | |
|---|---|---|
| | | called, under the penalties and punishment which shall hereinafter be described.<br><br>SEC. 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause. |
| 3 | Act of Jan. 29, 1869, ch. 32, §§ 1–2, 1868-1869 N.M. Laws 72, 72–73 | SECTION 1. From and after the passage of this act it shall be unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory, except it be in the lawful defence of themselves, their families or their property, and the same being then and there threatened with danger, or by order of legal authority, or on their own landed |

| | | |
|---|---|---|
| | | property, or in the execution of an order of court.<br><br>Sec. 2. Deadly weapons, in the meaning of this act, shall be construed to mean all kinds and classes of pistols whether the same be a revolver, repeater, derringer, or any other kind or class of pistol; any and all kinds of bowie knives, daggers, poniards, butcher knives, dirk knives, and all such weapons with which cuts can be given, or by which wounds can be inflicted by thrusting, including sword canes and such sharp pointed canes with which deadly thrusts can be given, and all kinds of slung shots, and any other kinds of deadly weapon, by whatever name it may be called, by which a dangerous wound can be inflicted. |
| 4 | Act of Feb. 18, 1887, ch. 30, §§ 1, 8, 1886 N.M. Laws 55, 55, 57 | SECTION 1. That any person who shall hereafter carry a deadly weapon, either concealed or otherwise, on or about the settlements of this territory, except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family or property, the same being then and there threatened with danger, or except such carrying be done by legal authority, upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than three hundred, or by imprisonment not |

| | | |
|---|---|---|
| | | less than sixty days, nor more than six months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.<br><br>SEC. 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. |
| 5 | OKLA. STAT. PEN. CODE §§ 2294–95, 2432–-33, 2438–39 (1890) | (2294) § 19. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.<br><br>(2295) § 20. Every person who carries concealed about his person and description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in |

| | | |
|---|---|---|
| | | attack or defense of the person, is guilty of a misdemeanor.<br><br>(2432) § 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.<br><br>(2433) § 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.<br><br>(2438) § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are |

| | | |
|---|---|---|
| | | sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.<br><br>(2439) § 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. |
| 6 | OKLA. STAT. PEN. CODE §§ 2404–05, 2410–11 (1893) | (2404) § 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.<br><br>(2405) § 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.<br><br>(2410) § 7. It shall be unlawful for any person, except a peace officer, to carry |

| | | |
|---|---|---|
| | | into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.<br><br>(2411) § 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. |

## Appendix C

Laws that are cited by the panel and that prohibit the carry of (1) weapons besides knives, (2) knives with an intent to harm, or (3) knives into sensitive places/on sensitive times. These laws appear in alphabetical order by jurisdiction. This list does not include any laws in Appendix A or B.

| Number | Law | Text |
|---|---|---|
| 1 | Act of July 13, 1892, ch. 159 §§ 1–2, 27 Stat. 116, 116–17 (District of Columbia) | *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.<br><br>SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid |

| | | |
|---|---|---|
| | | to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court[.] |
| 2 | Act of Apr. 16, 1881, §§ 1, 4, 1881 Ill. Laws 73, 73–74 | SECTION 1. . . . That whoever shall have in his possession . . . any slung-shot or metallic knuckles, or other deadly weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor, and upon conviction shall be fined in any sum not less than ten dollars ($10) nor more than two hundred dollars ($200).<br><br>§ 4. Whoever shall carry a concealed weapon upon or about his person of the character in this act specified, or razor as a weapon, or whoever, in a threatening or boisterous manner, shall display or flourish any deadly weapon, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25) nor more than two hundred dollars ($200). |
| 3 | Act of Feb. 23, 1859, ch. 79, § 1, 1859 Ind. | That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear |

| | | |
|---|---|---|
| | Acts 129, 129 | any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars. |
| 4 | Act of Apr. 6, 1874, ch. 250, § 1, 1874 Md. Laws 366, 366–67 | That from and after the passage of this act, it shall not be lawful for any person in Kent, Queen Anne's or Montgomery counties, to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this act shall be deemed guilty of a misdemeanor, and on conviction thereof, before any justice of the peace in either of said counties, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county, until the same is paid. |
| 5 | Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md. Laws 602, 602 | Every person not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted) concealed upon or about his person, and every person who |

| | | |
|---|---|---|
| | | shall carry or wear any such weapon openly with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars or be imprisoned not more than six months in jail or the House of Correction. |
| 6 | Act of Apr. 8, 1890, ch. 534, § 1, 1890 Md. Laws 606, 606–07 | Every person in said city of Baltimore not being a conservator of the peace entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, slung-shot, billey, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen-knives excepted,) concealed upon or about his person; and every person who shall carry or wear such weapons openly with the intent or purpose of injuring any person, shall upon a conviction thereof be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the |

| | | |
|---|---|---|
| | | general law of this State as if this act had not been passed. |
| 7 | Act of Apr. 6, 1894, ch. 547, § 30, 1894 Md. Laws 833, 834. | Every person not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, and not carrying such weapon as a reasonable precaution against apprehended danger, who shall wear or carry any pistol, dirk knife, bowie knife, slung shot, billy, sand club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever (penknives excepted,) concealed upon or about his person, and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person in any unlawful manner, and not for any proper purpose of self-protection, shall, upon conviction thereof, be fined not more than one thousand dollars, or be imprisoned not more than two years in jail or in the house of correction; and the court or jury before whom any such case may be tried shall in all cases have the right to judge of the reasonableness of the carrying of any such weapon, and of the proper occasion therefor, upon satisfactory proof; and in case, upon conviction of any offender, the court, in view of the evidence, shall be of the opinion that such weapon was carried |

| | | |
|---|---|---|
| | | with the deliberate purpose of inflicting grievous and unlawful injury to the life or person of another, it shall in that case be the duty of the court to impose the highest sentence of imprisonment hereinbefore prescribed. |
| 8 | MINN. PEN. CODE §§ 334–35 (1886) | SEC. 334. **Carrying, using, etc., certain weapons.**— A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as slung-shot, sand-club or metal knuckles, or a dagger, dirk, knife, pistol or other firearm, or any dangerous weapon, is guilty of a misdemeanor.<br>SEC. 335. **Possession, presumptive evidence.**— The possession by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section. |
| 9 | MINN. STAT. §§ 6290, 6292 (1891) | SEC. 6290. **Carrying, using, etc., certain weapons.**— A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as slung- |

| | | |
|---|---|---|
| | | shot, sand-club or metal knuckles, or a dagger, dirk, knife, pistol or other firearm, or any dangerous weapon, is guilty of a misdemeanor.<br><br>SEC. 6291. **Same—Possession, presumptive evidence.**— The possession by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section. |
| 10 | MO. REV. STAT. § 1862 (1899) | If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage or persons met for any lawful purpose other than for militia drill, or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such |

| | | |
|---|---|---|
| | | weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, . . . he shall, upon conviction, be punished by a fine of not less than fifty nor more than two hundred dollar, or by imprisonment in the county jail not less than five days nor more than six months, or by both such fine and imprisonment. |
| 11 | Act of Apr. 20, 1866, ch. 716, §§ 1–2, 1866 N.Y. Laws 1523, 1523 | SECTION 1. Every person who shall within this State use, or attempt to use or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun, shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the State prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.<br>§ 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public |

| | | |
|---|---|---|
| | | officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act. |
| 12 | SYRACUSE, N.Y., REV. CHARTER ch. 27, § 7 (1885) | Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment. |
| 13 | Act of Apr. 15, 1889, ch. 140, § 2, 1889 N.Y. Laws 167, 167 | A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slungshot, billy, sand-club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years, who shall have, carry or have in his possession in any public |

| | | |
|---|---|---|
| | | street, highway or place in any city or incorporated village in this State, without a written license from a police magistrate of such city or incorporated village, any pistol or other firearm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of firearms as merchandise, or for use without the city or village limits. |
| 14 | N.Y. REV. STAT., Weapons §§ 2–3 (1890) | **2 Carrying, using, etc., certain weapons.** A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slungshot, billy, sand-club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years, who shall have, carry or have in his possession in any public street, highway or place in any city or incorporated village in this State, without a written license from a police magistrate of such city or incorporated village, any pistol or other firearm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of firearms as |

| | | |
|---|---|---|
| | | merchandise, or for use without the city or village.<br><br>**3 Possession, presumptive evidence.** The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section. |
| 15 | Act of Nov. 12, 1849, No. 36 § 2, 1849 Vt. Acts & Resolves 26, 26 | Any person who shall, within this State, hereafter carry, or be found in the possession of, use or attempt to use, as against any other person, any instrument, or weapon, of the kind usually known as slung shot, or of any similar kinds, shall be deemed guilty of felony, and be punished therefor by imprisonment in the State prison for a term not exceeding five years. |

## Appendix D

Laws that are cited by the panel and that ban the public carry of knives.

| Number | Law | Text |
|---|---|---|
| 1 | Act of Feb. 16, 1875, § 1, 1874–1875 Ark. Acts 156, 156 | That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-five nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; *Provided*, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of |

| | | |
|---|---|---|
| | | any legal process, or any private person legally authorized to execute any legal process to him directed. |
| 2 | Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191, 191 | That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor; *Provided*, That officers, whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided*, *further*, That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises. |
| 3 | Act of Dec. 25, 1837, § 1, 1837 | [I]t shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: |

| | | |
|---|---|---|
| | Ga. Acts 90, 90[8] | Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c. |
| 4 | NEBRASKA CITY, NEB., Ordinance No. 7, § 136, (1872) | That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy, slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb.; *Provided*, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another. |
| 5 | Act of Apr. 12, 1873, No. 810, 1873 Pa. | That any person who shall carry any pistol, dirk-knife, slung-shot or deadly weapon within the city limits of Harrisburg, except police officers, shall |

[8] As *Bruen* discusses, this statute was held to be unconstitutional to the extent the statute banned "bearing arms openly." *Bruen*, 597 U.S. at 54 (citing *Nunn v. State*, 1 Ga. 243, 251 (1846)).

| | | |
|---|---|---|
| | Laws 735, 735–36 (City of Harrisburg) | be deemed guilty of misdemeanor, and being convicted thereof, shall be sentenced to undergo an imprisonment or be fined in any sum of not less than fifty dollars, or both, at the discretion of the court, and in case of non payment of the fine so imposed, shall be imprisoned for a period of not less than three months, and be required to give security for future good behavior. |
| 6 | Act of Mar. 27, 1879, ch. 186, § 1, 1879 Tenn. Pub. Acts 231, 231 | [I]t shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand, or loaded cane, slung-shot, brass knucks[.] |
| 7 | Act of Apr. 12, 1871, ch. 34, §§ 1-2, 1871 Tex. Gen. Laws 25, 25 | SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that |

| | | |
|---|---|---|
| | | such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and on conviction thereof shall, for the first offense, be punished by fine of not less then than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided*, that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further*, that members of the |

| | | |
|---|---|---|
| | | Legislature shall not be included under the term "civil officers" as used in this act.<br><br>SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense. |
| 8 | Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421, 421–22 | If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months;. . . but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling |

| | | |
|---|---|---|
| | | house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife. |

## Appendix E

Laws cited by Dr. Spitzer for the proposition that "15 states banned all carrying of Bowie knives."

| Number | Law | Text | Response |
|---|---|---|---|
| 1 | Act of Mar. 18, 1889, No. 13, § 1, 1889 Ariz. Sess. Laws 30, 30 | If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried. | This law governed a territory and is addressed in Appendix B. |

| | | | |
|---|---|---|---|
| 2 | Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191, 191 | That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor; *Provided*, That officers whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided*, *further*, That nothing in this act be so construed as to prohibit any person from carrying any weapon | This statute is addressed in Appendix D. |

| | | | |
|---|---|---|---|
| | | when upon a journey, or upon his own premises. | |
| 3 | COLO. STAT. ch. 35 § 1830 (1911)[9] | No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any fire arms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles, or other deadly weapon. | Dr. Spitzer is mistaken. As he conceded in deposition, this statute banned concealed carry but not open carry. *See* 10-ER-2552. |
| 4 | Act of May 15, 1852, § 1, 1852 Haw. Sess. Laws 19, 19 | Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less | This law governed a territory. Hawaii did not become a state until 1959. |

[9] Dr. Spitzer cites Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248 (1881). *See* 10-ER-2344. We are unable to verify the existence of this law. The text he provides for this citation matches with COLO. STAT. ch. 35 § 1830 (1911), and so we assume that he meant to cite this provision.

Case: 24-5536, 07/16/2026, DktEntry: 58.1, Page 115 of 138



| | | | |
|---|---|---|---|
| | | than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons; and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate. | |
| | Act of Mar. 19, 1913, No. 23, § 1, 1913 Haw. Sess. Laws 26, 26 | Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and | This law governed a territory. Hawaii did not become a state until 1959. This law was also enacted decades after |

| | | | |
|---|---|---|---|
| | | Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment for a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person. | the 14th Amendment's ratification. |
| 5 | BOISE CITY, IDAHO, CHARTER AND REV. ORDINANCES ch. 1, § 36, approved May 1, 1879 (1894) | Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, | Dr. Spitzer is mistaken. As he conceded in deposition, this city ordinance banned concealed carry but not open carry. *See* 10-ER-2553. This ordinance is |

Case: 24-5536, 07/16/2026, DktEntry: 58.1, Page 117 of 138



| | | | |
|---|---|---|---|
| | | unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment. | addressed in Appendix A. |
| 6 | Act of Feb. 23, 1859, ch. 79, § 1, 1859 Ind. Acts 129, 129 | That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars. | This statute banned carrying with intent to harm and is addressed in Appendix C. |

| | | | |
|---|---|---|---|
| 7 | Act of Mar. 16, 1870, No. 100, § 73, 1870 La. Acts 145, 159 | That it shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the parish jail for not less than one month; provided, that the provisions of this section shall not apply to any commissioner or officer of the election or supervisor or assistant | This statute banned the carrying of bowie knives on election days and is addressed in Appendix C. |

| | | | |
|---|---|---|---|
| | | supervisor of registration, police officer or other person authorized to preserve the peace on days of registration or election. | |
| 8 | JOPLIN, MO., JOPLIN CODE, art. 67, § 1201 (1917) | If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having | This city ordinance banned concealed carry, public carry in sensitive places, and brandishing. The ordinance was also enacted decades after the 14th Amendment's ratification. |

| | | | |
|---|---|---|---|
| | | upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, billy, sword cane, dirk, dagger, slung shot or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. | |
| | Act of Apr. 3, 1923, § 17, 1923 Mo. Laws 236, 241–42 | Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or | This statute banned public carry in sensitive places. This |

| | | | |
|---|---|---|---|
| | | about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club, or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury, or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than | statute was also enacted decades after the 14th Amendment's ratification. |

| | | | |
|---|---|---|---|
| | | two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes. | |
| 9 | NEBRASKA CITY, NEB., Ordinance No. 7, § 136, (1872) | That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy, slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb.; *Provided*, that nothing herein contained shall | This ordinance is addressed in Appendix D. This is a city ordinance, not a state statute. |

| | | | |
|---|---|---|---|
| | | prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another. | |
| 10 | SYRACUSE, N.Y., REV. CHARTER ch. 27, § 7 (1885) | Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to | This ordinance banned carry with intent to harm and is addressed in Appendix C. |

| | | | |
|---|---|---|---|
| | | both such fine and imprisonment. | |
| | N.Y. STAT. PEN. CODE §§ 410–411 (1885) | § 410. A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand–club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as | This law banned the carrying of bowie knives with an intent to harm. |

| | | | |
|---|---|---|---|
| | | merchandise, or for use without the city limits.<br><br>§ 411. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section. | |
| 11 | OKLA. STAT. PEN. CODE §§ 2294–95, 2432–33, 2438–39 (1890) | (2294) § 19: Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.<br><br>(2295) § 20: Every person who carries concealed about his person and [sic] description of firearms, | This law is addressed in Appendix B. |

| | | | |
|---|---|---|---|
| | | being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.<br><br>(2432) § 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.<br><br>(2433) § 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, | |

| | | | |
|---|---|---|---|
| | | billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.<br><br>(2438) § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article. | |

| | | | |
|---|---|---|---|
| | | (2439) § 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. | |
| 12 | Act of Dec. 1, 1869, § 2, 1869–70 Tenn. Pub. Acts 108, 108 (1869) | That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas tooth-pick, or weapon in form, shape, or size resembling a Bowie-knife or Arkansas tooth-pick, or other deadly or dangerous weapon. | This statute only banned the carry of bowie knives in sensitive places. |
| | NASHVILLE, TENN., | That every person found carrying a pistol, bowie- | This is a city ordinance, |

| | | | |
|---|---|---|---|
| | ORDINANCES, ch. 108, § 1 (1881) | knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; *Provided*, *however*, That no ordinary pocket-knife and common walking-canes shall be construed to be deadly weapons. | not a state statute. |
| | NASHVILLE, TENN., ORDINANCES, ch. 11, § 738(742) (1893) | Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every | This is a city ordinance, not a state statute. |

| | | | |
|---|---|---|---|
| | | subsequent offense, shall be fined fifty dollars; *Provided*, *however*, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. | |
| 13 | Act of Apr. 12, 1871, ch. 34, §§ 1–2, 1871 Tex. Gen. Laws 25, 25 | SECTION 1. Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or | This statute is addressed in Appendix D. |

Case: 24-5536, 07/16/2026, DktEntry: 58.1, Page 131 of 138



| | | | |
|---|---|---|---|
| | | about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fined imposed and collected shall go into the treasury of the county in which they may have been imposed; | |

| | | | |
|---|---|---|---|
| | | *provided*, that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further*, that members of the Legislature shall not be included under the term "civil officers" as used in this act.<br><br>SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or | |

| | | | |
|---|---|---|---|
| | | unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense. | |
| 14 | PROVO CITY, UTAH, ORDINANCES, ch. 6, § 182 (1877) | Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowieknife, dagger, or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; *Provided*, that | This law governed a territory. Utah did not become a state until 1896. |

| | | | |
|---|---|---|---|
| | | nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city. | |
| 15 | Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421, 421–22 | If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, | This statute is addressed in Appendix D. |

| | | | |
|---|---|---|---|
| | | from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing | |

| | | | |
|---|---|---|---|
| | | in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife. | |
| | W. VA. CODE ch. 148, § 7 (1891) | If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, | |

| | | | |
|---|---|---|---|
| | | metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided[.] | |
| | Act of June 5, 1925, ch. 3, § 7(a), 1925 W. Va. Acts 24, 25 | If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie- | |

| | | | |
|---|---|---|---|
| | | knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense[.] | |